1          IN THE DISTRICT COURT FOR THE STATE OF ALASKA

2              FOURTH JUDICIAL DISTRICT AT FAIRBANKS

3    STATE OF ALASKA,          )
                               )
4              Plaintiff,      )
                               )
5         vs.                  )
                               )
6    1038 LAKEVIEW TERRACE,    )
                               )
7              Defendant.      )
     _____   )
8    Case No. 4FA-SW05-335

9

     TRANSCRIPT OF APPLICATION FOR SEARCH WARRANT 4FA-SW05-335

10

              BEFORE THE HONORABLE PATRICK S. HAMMERS
11                        Magistrate

12                                Fairbanks, Alaska
                                  November 28, 2005
13                                11:22 o'clock a.m.

14   APPEARANCES:

                                  ELIZABETH F. CRAIL
15                                Assistant District Attorney
                                  455 Third Avenue, Suite 150
16                                Fairbanks, Alaska  99701

17

18

19

20

21

22

23

24

25

1                          TABLE OF CONTENTS

2    WITNESSES _____ DIRECT

3    JLC-05-09 (Confidential Informant)  . . . . . . . . . . .   3

4    Ronald Wall . . . . . . . . . . . . . . . . . . . . . 9/14

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit A
Page 2 of 21

*Gaylene's Word Services*
*(907) 338-3936*

i

1                    P R O C E E D I N G S

2   4FA1205-216

3   [11:22:40]

4        THE CLERK:  Court is reconvened.

5        THE COURT:  At this time the court is going to call a

6   case entitled *State of Alaska versus 1038 Lakeview Terrace.*

7   We have Ms. Elizabeth Crail present in court, assistant

8   district attorney.  There's some other individuals in court,

9   and, Ms. Crail, you're here seeking a search warrant today, is

10  that correct?

11       MS. CRAIL:  Yes, Your Honor.

12       THE COURT:  All right.  And which person would you like

13  to have testify in this case?

14       MS. CRAIL:  We're going to have -- we have an informant

15  with an informant number here that we would like to just use

16  the number for purposes of today.

17       THE COURT:  All right.  Why don't you refer to that

18  number, then?

19       MS. CRAIL:  And that'll be JLC-05-09.

20       THE COURT:  All right.  And --

21       MS. CRAIL:  We also are going to have Sergeant Wall

22  testify a little bit, I think.

23       THE COURT:  All right.  Well, why don't we have the

24  informant stand first, and then should this -- how should

25  this -- when the person takes the oath, they wouldn't refer to

1   their name, I imagine.

2       MS. CRAIL:  Correct.

3       THE COURT:  They would refer to their --

4       MS. CRAIL:  We just have them specify that that's

5   their -- their designation as they understand it from the drug

6   unit.

7       THE COURT:  All right.  So what we'll do is we'll have

8   you stand, sir, and raise your right hand, and Madam Clerk

9   will administer the oath.

10      (Oath administered)

11      JLC-05-09:  I do.

12                                **JLC-05-09**

13  called as a witness, testified as follows:

14      THE CLERK:  Please be seated.  And for the record,

15  your --

16      SERGEANT WALL:  (Indiscernible - away from microphone)

17  informant -- or the identification number of the informant.

18      THE COURT:  So what would --

19      THE CLERK:  JLC-05-09, is that correct?

20      SERGEANT WALL:  Yes.

21      THE CLERK:  And you live in Fairbanks?

22      THE WITNESS:  Yes.

23      THE CLERK:  Thank you.

24      THE COURT:  Ms. Crail?

25      MS. CRAIL:  All right.

Exhibit A
Page 4 of 21

1                      **DIRECT EXAMINATION**

2    BY MS. CRAIL:

3    Q    Sir, we're going to ask you about --

4         MS. CRAIL:  He's already taken me (indiscernible).

5         SERGEANT WALL:  Oh.

6    Q    Do you know a person named Jason Colette?

7    A    I do.

8    Q    Okay.  You're going to have to move the microphone up

9         close so we can hear what you're saying.  You know a

10        person named Jason Colette, is that right?

11   A    I do.

12   Q    Okay.  And do you know where he lives?

13   A    Uh-huh (affirmative).  Yes, I do.

14   Q    Where is that?

15   A    Lakeview Terrace.

16   Q    Okay.  Aid the number on the search warrant you just

17        heard, is that where he lives?

18   A    I think so.  I'm not familiar.  I just go over there.  I

19        don't know the number by heart.

20   Q    Did you have an opportunity to show Sergeant Wall earlier

21        today --

22   A    Uh-huh (affirmative).

23   Q    -- where he lives?

24   A    Yes, ma'am.

25   Q    Okay.  So Sergeant Wall can identify it --

*Gaylene's Word Services*
*(907) 338-3936*                                              4

1    A    Yes.

2    Q    -- from where you pointed it out?

3    A    Yes.

4    Q    All right.  And Mr. Colette, do you know if he has -- if

5         he generally has cocaine in his residence?

6    A    Yes.

7    Q    Okay.  How do you know that?

8    A    I got over there and I buy it from him.

9    Q    Okay.  And how often have you done that?

10   A    For the last year or two I've been doing it.

11   Q    Okay.  And how much cocaine does he keep in the

12        residence?

13   A    Man, I'm pretty sure like -- I can't count from -- I know

14        at least 40 -- 30, 40 zips at a time --

15   Q    Uh-huh (affirmative).

16   A    -- at all times, already bagged.

17   Q    And what's a zip?

18   A    In a big bag.

19   Q    What's a zip?

20   A    An ounce.

21   Q    Okay.  So 30 or 40 ounces at a time?

22   A    Maybe more.  I've seen more there plenty of times.

23   Q    And when you -- whenever you've gone over there, have you

24        seen that?

25   A    Yeah.

1  Q    Where does he keep it?

2  A    I believe in his bedroom in a safe.

3  Q    And what was the most recent time that you'd seen him

4       with a lot of cocaine like that?

5  A    Maybe a week ago.

6  Q    And had you bought cocaine from him there a week ago,

7       then?

8  A    Yes.

9  Q    Okay.  And did you also buy it in the large amounts like

10      he's selling it?

11 A    No.

12 Q    Just like an ounce at a time --

13 A    Yeah, I --

14 Q    -- or a couple ounces?

15 A    Yeah.

16 Q    All right.  Was anybody else there when you've been --

17      when you bought cocaine from Mr. Colette?

18 A    Most of the time it's just me and him in his room.  I

19      don't never see anybody there.  Sometimes his

20      girlfriend's there, but she's not in the mix, like she's

21      in the back or something.  I've never seen her around us

22      when we did that.

23 Q    Now, do you buy from him usually at a particular time of

24      day?

25 A    Usually in the evening time.

1    Q    Okay.  Do you believe that he would have cocaine there in

2         the morning or afternoon times as well?

3    A    I personally believe it would be there, because I -- I

4         believe he keeps everything in the safe.

5    Q    All right.  Based on all your prior contacts?

6    A    Yes.

7    Q    Do you know, does he have any weapons?

8    A    Yeah, I'm pretty sure he does.  I seen a couple there.  I

9         don't know if they're his, but I seen weapons there, yes.

10   Q    What kind of weapons?

11   A    Maybe a fully automatic Uzi, couple handguns.

12   Q    And do you know where he keeps those?

13   A    Probably in his room.  Every time I've been there I seen

14        it in his room --

15   Q    Okay.

16   A    -- or he had it on his person.

17   Q    All right.  Same room as the cocaine was in?

18   A    Yeah.

19   Q    Are there buildings on the property as well?

20   A    Not that I know of.

21   Q    Do you know if he ever keeps anything in his vehicles?

22   A    Not that I know of.  It's never he had to go outside and

23        go grab it.  It's always in his room in the safe.

24   Q    Now, sir, I do need to ask you, are you aware or have you

25        been investigated by the drug unit yourself?

1   A   Well, they -- they -- they raided me, I guess, today.

2   Q   Okay.

3   A   So that must means yes.

4   Q   Do they -- do you have a deal with them as far as

5       assisting and being an informant here?

6   A   Yes.

7   Q   Okay.  And is that deal that you would potentially look

8       at a lesser charge, a charge of MICS-4 --

9   A   Zero to probation time, that was the initial plan.

10  Q   And that's right, that's dropping you back from a

11      potential MICS-3 to a MICS-4, is that correct?

12  A   I don't know all that lingo.

13  Q   Okay.  But simple --

14  A   The --

15  Q   Simple possession instead of delivery?

16  A   Yeah.

17  Q   Okay.  And that -- and you don't have any prior felonies,

18      is that correct?

19  A   No, ma'am.

20  Q   Okay.  And that's why you say that the deal -- the MICS-4

21      would be a zero-to-two range, is that right, and that you

22      are expecting them to testify and say that you -- how

23      helpful you've been and try to get you on the low end?

24  A   Zero to probation time.

25  Q   Right, which is what you want, yeah, which is what you

1      want.

2  A    If you want my full help, I'm getting no time, basically.

3      That's what I'm hoping for.

4  Q    Okay.

5  A    Be straight across, I've been helpful so far, and I plan

6      to be helpful as long as I'm going home, going to lunch

7      pretty soon.

8      MS. CRAIL:  Okay.  Anything else?

9      SERGEANT WALL:  No.

10     MS. CRAIL:  All right.  I don't have any further

11  questions at this point, Judge.

12     THE COURT:  Nor do I.  Your next witness?

13     MS. CRAIL:  Sergeant Wall, Judge.

14     THE COURT:  Sergeant, please stand and raise your right

15  hand.

16     SERGEANT WALL:  Yes, sir.

17     (Oath administered)

18     SERGEANT WALL:  I do.

19                         **RONALD WALL**

20  called as a witness, testified as follows:

21     THE CLERK:  For the record, your full name, spelling your

22  last name.

23     THE WITNESS:  It's Ronald Wall, W-a-l-l.

24     THE CLERK:  City where you live and your occupation?

25     THE WITNESS:  Fairbanks.  I'm a sergeant with the Alaska

*Gaylene's Word Services*
*(907) 338-3936*

1   State Troopers.

2   BY MS. CRAIL:

3   Q    Now, Sergeant Wall, let me ask you first with respect to

4        JLC-05-09, you did a raid on him this morning?

5   A    Yes, ma'am.

6   Q    Okay.  And you made him some kind of an offer here this

7        morning if he would assist you with this other matter

8        that we're doing the search warrant on?

9   A    That is correct.

10  Q    Okay.  And what was your offer?

11  A    The offer was that in lieu of 09 directing us to a --

12       approximately a kilo of cocaine, his charge would be

13       reduced from a MICS-3 to a MICS-4.

14  Q    Okay.  And you agreed that you would testify as far as

15       how helpful he'd been?

16  A    That is correct.

17  Q    Okay.  Now, with respect to Mr. Colette's residence, can

18       you confirm the address?

19  A    I can.  It is 1038 Lakeview Terrace.

20  Q    And you checked that out this morning?

21  A    That is correct.  We confirmed that through APSIN as well

22       as visually by the informant.

23  Q    Okay.  And so that's Mr. Colette's residence that he

24       owns, then?

25  A    That is correct.  To my knowledge, at least he resides

*Gaylene's Word Services*
*(907) 338-3936*

10

1      there.

2   Q   All right.  According to APSIN?

3   A   Correct.  Now, do you have any other results of

4       investigations that would suggest that he would have

5       cocaine at the residence?

6   A   Yes, ma'am.

7   Q   And what's that?

8   A   Approximately a year ago, another informant came forward,

9       advised that several weeks prior they had observed 10 to

10      15 ounces of cocaine and a large quantity of cash in the

11      safe in his bedroom.

12  Q   Okay.  And that's similar, I take it, to what you've been

13      hearing form 05-09 here?

14  A   That is correct.

15  Q   Okay.  Now, you've requested or written in on the front

16      of the warrant that you'd like it to be a no-knock

17      warrant.  Can you explain your basis for that for the

18      court?

19  A   Yes, ma'am.  Mr. Colette has an officer safety advisement

20      in the computer, hostile towards law enforcement.  It's

21      also believed that based on the fact that he has fully

22      automatic weapons, which would be a federal violation, we

23      are concerned that he may attempt to use those weapons as

24      well as the informant 09 mentioning that Mr. Colette

25      often carries a weapon or may have the weapon on him.

1        For officer safety purposes, we request that this warrant

2        be a no-knock warrant.

3  Q   Now, you've -- in your attachment that you've referenced

4        on the search warrant, attachment A --

5  A   Uh-huh (affirmative).

6  Q   -- as far as what you want to search, you've mentioned

7        persons on the premises to be searched.  Can you clarify

8        that?

9  A   Yes, ma'am. It's very common in drug-related cases that

10       individuals either have drugs, cash, or weapons on their

11       person or concealed in their clothing, so we request

12       authorization to go ahead and search anybody that's on

13       the property as well as --

14  Q   In your experience, have you found that a person that's

15       on the property may be asked at the moment of a bust to

16       take some of the money, weapons, or drugs into their

17       possession in order to get it off the property?

18  A   That is correct.

19  Q   Okay.  Now, there was a couple of other spaces besides

20       the actual residence itself that I believe you also

21       wanted to search?

22  A   Yes, ma'am.  There's a cedar shed on the back of the

23       property as well as a separate shed that's attached to

24       the -- to the entryway or the structure, and there's a

25       couple of vehicles parked on the property.  We'd request

1       authorization to search any of the structures on the

2       cartilage of the property.

3   Q   And what's your basis for that?

4   A   It's very common for people to contain drugs, cash, and

5       other evidence in outbuildings and transport it in

6       vehicles and so forth.

7   Q   Okay.  Although you don't have a specific information as

8       to this person --

9   A   That is correct.

10  Q   -- that's just a common practice?

11  A   It is very common.

12  Q   Okay.  So what you're asking for is not just the specific

13      residence on the property but the cartilage including the

14      outbuildings and any vehicles parked on the property.

15  A   Yes, ma'am.

16      MS. CRAIL:  Okay.  So we would want to ask the court to

17  add that if the court's willing to add those conditions.  I

18  believe that's all the questions I have for Sergeant Wall at

19  this point, Your Honor.

20      THE COURT:  Were you going to call any other witnesses,

21  Ms. Crail?

22      MS. CRAIL:  No, sir.

23      (Pause - whispered conversation)

24      JLC-05-09:  I've been holding -- I need to use the

25  bathroom.  I've been holding it for a min -- at least 10

```
 1  minutes now, man.  I got to go.  I can't even hold it.
 2       MS. CRAIL:  Maybe one of the other troopers could --
 3       JLC-05-09:  You got a cup, pitcher?  I really got to go.
 4  I'm not trying to be funny.
 5       MS. CRAIL:  -- could escort him out.
 6       THE COURT:  All right.
 7       JLC-05-09:  It's not funny, man.
 8       THE COURT:  We'll have one of the officers take you out.
 9       JLC-05-09:  It's not funny, man.  I just got to use the
10  bathroom.
11       SERGEANT WALL:  Here you go.  You can use your card.
12  Your card should open that door.
13       (Pause - background information)
14       (Informant exits)
15       THE COURT:  All right.
16       MS. CRAIL:  I do have one additional question --
17       THE COURT:  Sure, go ahead.
18       MS. CRAIL:  -- that occurred to me, Judge, for Sergeant
19  Wall.
20                         RONALD WALL
21  testified as follows on:
22                  DIRECT EXAMINATION CONTINUED
23  BY MS. CRAIL:
24  Q    With respect to the other informant you mentioned a year
25       ago --
```

```
 1   A    I can tell you who it is now that he's out of the room,
 2        if that's required.
 3   Q    The main thing is, for purposes for Aguilar-Spinelli
 4        purposes, we need to have you clarify why you believe
 5        that person to have been credible as well.
 6   A    The individual resided with that -- with the suspect and
 7        indicated that the -- Mr. Colette was a very high-level
 8        drug dealer.
 9   Q    Okay.  And did you have other reasons to belief that
10        person to be credible?
11   A    I believed them at the time.  They've -- they've provided
12        other information about other individuals that associated
13        with Mr. Colette that I knew to be true from other
14        informants as well as my own investigations.
15   Q    Okay.  So you had other -- this person gave other
16        information that was corroborated, specifically
17        corroborated?
18   A    Yes.
19   Q    Okay.
20   A    His businesses and who was -- who he was hanging out with
21        and -- and so forth.
22        MS. CRAIL:  Okay.
23        THE COURT:  All right.  And that's exactly what I was
24   looking at, Ms. Crail.
25        MS. CRAIL:  That was my (indiscernible) --
```

1       THE COURT:  -- was the *Aguilar-Spinelli* test.  The first

2   thing the court has to determine is whether or not the

3   confidential informant had firsthand knowledge, and I'm

4   finding that that firsthand knowledge by the confidential

5   informant was shown here today.  I think he does have personal

6   knowledge of Mr. Colette's involvement in the sale of cocaine.

7   So I'm finding the basis-of-knowledge prong has been met.

8       The next question is the veracity prong of the *Aguilar-*

9   *Spinelli* test.  And basically I'm called upon to determine

10  whether or not the statements by the confidential informant

11  were sufficiently corroborated by independent police

12  investigation.  The mere fact that this is his address is a

13  public fact, and that's not good enough.  We have to look for

14  something else, and in this case, Sergeant Wall testified that

15  there was an informant that came forward about a year ago that

16  basically indicated that he resided with Mr. Colette.

17                          **EXAMINATION**

18  BY THE COURT:

19  Q    Is that correct, Officer Wall?

20  A    That's correct, sir.

21  Q    And that this person also witnessed, I guess, cocaine --

22  A    Cocaine --

23  Q    -- in a safe --

24  A    -- as well as money, sir.

25       THE COURT:  Right, so I am going to find also the

1  veracity prong of the *Aguilar-Spinelli* test has been met for

2  the purposes of this search warrant, and as such, I am

3  going to issue the search warrant at this time for

4  1038 Lakeview Terrace.

5  Q    And specifically you're asking to search a cedar

6        outbuilding, is that what you said, trooper?

7  A    Yes, sir.  We're asking authorization to search any of

8        the structures on that property, and we know that there's

9        a cedar outbuilding like a shed on the back of -- behind

10       the trailer as well as another shed that's attached to

11       that, and any vehicles that are parked on those premises.

12 Q    And you indicated based upon your experience, you feel

13       that these sheds should be searched because what?

14 A    Well --

15 Q    Because why?

16 A    We have found drugs to be hidden outside the -- the

17       residences before, either on the outside of the

18       structures or in outbuildings, and it's very common that

19       drugs are transported in vehicles.

20 Q    Are there some -- you see there's two outbuildings.  Now,

21       are there parked cars out there?

22 A    There are two vehicles parked on the property.  Neither

23       one of them appear to have been driven today.  One of

24       them is snow-covered, one of them is not.

25 Q    So you're asking for permission to search both vehicles,

1    the one that is not snow-covered, that's been driven?

2  A   That is correct, and it wouldn't be uncommon for someone

3      to -- to hide drugs or money or other contraband inside

4      the other vehicle.

5  Q   Do you know who the owners of these vehicles are?

6  A   Sir, I ran the -- the one license plate that we could

7      see.  It did not come back to Mr. Colette.  The informant

8      indicated that it's possibly his girlfriend's vehicle.

9  Q   And this car that's not snow-covered would leave me to

10     conclude that it's being driven.

11 A   Correct, sir.

12     THE COURT:  Well, I'm not sure that there's probable

13 cause to search those cars unless you wish to argue the

14 matter, Ms. Crail.

15     MS. CRAIL:  Just based on what Sergeant Wall's

16 experienced, Judge, is the only thing I've got.

17     THE COURT:  Okay.  Well, I'm going to allow you to search

18 this residence and the two structures, and if the one car is

19 disabled, I'm going to allow you to search that.  In other

20 words, if there's -- if there is indication to lead a

21 reasonable person to conclude that this car has not been

22 driven, that it's basically just a heap, just a junk pile

23 sitting there, I'm going to allow you to search that.

24     But with respect to the other car, if it's not owned by

25 this gentleman, I'm not sure there's probable cause to search

1   it.  So on the caption of the case I'll put down 1038 Lakeview

2   Terrace, comma.

3   Q    And there's two outbuildings?

4   A    I believe there are.  I think one of them may actually be

5        attached to the structure, sir.

6   Q    All right.

7   A    But you can only access it from the outside.

8        THE COURT:  All right.  I'll put down outbuildings.

9   Q    And he is the owner of this property?  You said you

10       checked APSIN?  Is he the owner --

11  A    APSIN.

12  Q    ASPIN (ph)?

13  A    He is the reg -- APSIN.

14  Q    APSIN.

15  A    He is registered as the occ --

16  Q    Okay.

17  A    Or that's what he shows as an address.

18       THE COURT:  And I'll put down outbuildings and disabled

19  motor vehicle.

20       (Whispered conversation)

21       THE COURT:  All right.  Anything else, Ms. Crail?

22       MS. CRAIL:  Judge, we just needed to ask whether the

23  court was agreeing with the no-knock position?

24       THE COURT:  Yes.  In view of the testimony concerning

25  weapons, one being an Uzi, I'm going to grant the no-knock.

1   Anything else?

2        SERGEANT WALL:  No, sir.

3        MS. CRAIL:  I think that's it, sir.  I just want to make

4   sure the attachment A is with it, and I believe attachment A

5   is also referenced on the form.

6        THE COURT:  Yes, attachment A --

7        MS. CRAIL:  Very well.

8        THE COURT:  -- will become part of the search warrant.

9        And persons on the premises to be searched, I imagine

10  that's for officer safety reasons or --

11       SERGEANT WALL:  That and contraband as well, sir.

12       THE COURT:  Okay.  All those items set forth in

13  attachment A shall also -- would be the things that you'd be

14  looking for here.

15       All right.  Anything else, Ms. Crail?

16       MS. CRAIL:  No, Your Honor.

17       THE COURT:  All right.  We can go off the record.

18       THE CLERK:  Off the record.

19       (Off record)

20  [11:43:03]           - END OF PROCEEDING -

21                        **CERTIFICATE**
    I certify that the foregoing is a correct transcript from the
22  electronic sound recording of the proceedings in the above-
    entitled matter.
23
         **COPY - DRAFT**                        **February 23, 2006**
24  _____
    M. Gaylene Larrecou, Transcriber          Date
25  United States Court Approved
    AAERT Certified #00285