1

<u>IN RE: THE BUSINESS MATTERS OF</u>

2

<u>JASON COLETTE'S AUTO SHOP</u>

3

4

Interview with Jason Avila

5

6

7

8

Date:  April 7, 2007

9

10

11

12

13

14

15

16

17

18

19

20

21

G & L TRANSCRIPTION OF NEW JERSEY

22

40 EVANS PLACE

23

POMPTON PLAINS, NJ  07444

24

(973) 616-1051

25

www.webtranscription.com



1    THIS TRANSCRIPT WAS A BIT DIFFICULT TO TRANSCRIBE, AS

2    MR. AVILA CONSISTENTLY BEGAN HIS ANSWERS BEFORE MS.

3    PETTY WAS FINISHED ASKING THE QUESTIONS.  IN ADDITION,

4    MR. AVILA MUMBLED MANY OF HIS WORDS.

5         Q    Could you please state your name, for the

6    record?

7    A    Jason Avila.

8         Q    Okay, how do you spell your last name?

9    A    A-V-I-L-A.

10        Q    Okay, thank you.  This is Investigator Denise

11   Petty, with DC Recovery and Investigations.  It is

12   11:19 a.m. on April 7th, 2006.  We are at DC Recovery

13   Investigation offices, discussing the Colette matter.

14   You are aware that I am recording this conversation?

15   A    Yes.

16        Q    Okay, are you comfortable with that?

17   A    Yes.

18        Q    Thank you.  First of all, I would like to ask

19   you how you know Jason Colette?

20   A    Just from him doing work on my vehicle; he

21   installed the auto start.

22        Q    Okay, all right, and -- he installed an auto

23   start -- start?  Okay, what do you have, as far as

24   knowledge about the business?  When you went there, was

25   Jason working --

1    A    Yeah.

2         Q    -- at the business?

3    A    Yeah, there was customers there.

4         Q    How many, would you say?

5    A    It was a pretty small, little office; I think

6    there was two -- an old lady, and a guy --

7         Q    Okay.

8    A    -- that -- I think they installed a stereo, and

9    she was getting something touched up, or -- I don't

10   know.

11        Q    Okay, and where was Jason working?

12   A    He was, I think, going back and forth, from the

13   car to the business.

14        Q    Okay.

15   A    And then -- so, it was briefly (indiscernible) --

16   "Yeah, I want this one installed."

17        Q    Okay.

18   A    And what -- I dropped it off in the morning, and I

19   think he gave me a ride home; and then, he picked me

20   up, and -- or he dropped my vehicle off.

21        Q    Okay, and you were happy with the work that

22   was --

23   A    Yeah.

24        Q    -- done?

25   A    Yup, still --

1        Q      Great.

2    A    -- works great.

3        Q      Awesome.  Do you know what time the business

4    open and closed?

5    A    Boy, I would say, probably around 8:00 and, you

6    know, (indiscernible) any audio -- if you got a

7    customer and you got to have it out, they have to be

8    sometime a little later.

9        Q      Okay.

10   A    (Indiscernible) drive by, you know, in my Summer

11   job; I'd drive by and see it (indiscernible) open.

12       Q      See him still working --

13   A    Yeah.

14       Q      -- until all the work was done?

15   A    Exactly, finishing the project.

16       Q      Okay, what type of work was done at -- at

17   Jason's shop?

18   A    That I had done, or --

19       Q      In general, what kind of business was it?

20   A    It was a audio and, I think, just a stereo -- and

21   car alarms (indiscernible).

22       Q      Okay, and there were employees there that

23   were working?

24   A    Yeah, I think he had two -- two, maybe -- three --

25       Q      (Indiscernible).

1    A    -- that I seen.

2         Q    That you saw, yeah?

3    A    Yeah, you know.

4         Q    And the shop area was separate --

5    A    Exactly.

6         Q    -- from the rest of it?  So, --

7    A    Yeah -- yeah.

8         Q    Okay, do you remember if he had any retail

9    for sale upfront?

10   A    Yeah, there was a display.  There was -- he had

11   boxes; and, like, (indiscernible) alarms, --

12        Q    Mmm Hmm.

13   A    -- you know; and he had the auto starts.  So, you

14   -- you figure -- what's (indiscernible)?  I don't know

15   the -- how big it is under the hood; but you know, it's

16   a little key on mine.  So, I don't think there's much

17   shelf space to hide these.

18        Q    Yeah, no kidding.  Do you know if his

19   business advertised or not?

20   A    I think I heard it on the radio once or twice; I

21   think I did hear (indiscernible) -- you know, when they

22   first moved there, because I don't think he was

23   originally always there.  Didn't they move from

24   somewhere else?

25        Q    I'm not sure, so --

1  A     Yeah, I think they went to that building; I'm

2  trying to think where they were first.  I just seen

3  them, like -- say, he lived down the road, and figured,

4  give a neighbor some business.

5          Q     And your reason for going there was because

6  he was a neighbor, and he --

7  A     Yeah.

8          Q     -- had you heard from somebody else that he

9  did good work, or --

10 A     No, but -- what was it -- what was it -- because

11 usually we go to Hoitt's, but we went there -- I don't

12 know.  I think it was because he was a neighbor --

13 figured, have him install it.

14         Q     Throw some money his way, and --

15 A     Yup, exactly.

16         Q     Okay, was the phone ringing, and was he

17 handling other business calls, and that type of thing

18 while you were there?

19 A     He -- like I said, "He had a customer that I don't

20 know if the -- something didn't get hooked up right, or

21 -- so, he was going back and forth, and working with

22 that vehicle while I was there."

23         Q     Did --

24 A     And then, like I say, "He gave me a ride to my

25 house, and went back and worked on it."

```
 1        Q    Okay, did he give -- did you call ahead for
 2   an appointment?
 3   A    I don't know --
 4        Q    Do you know (indiscernible) --
 5   A    -- if I seen him -- I might have just seen him
 6   while -- like I say, "When I was driving home."   Just
 7   out the window -- said, "Hey, need one installed."   And
 8   he was, like, "Bring it by."
 9        Q    Okay.
10   A    So, --
11        Q    Did you get a printed invoice -- like, a
12   computer invoice --
13   A    It would probably be --
14        Q    -- when you came in?
15   A    -- in -- what -- my last year's files.
16        Q    Okay, but he did give you a printed --
17   A    Yeah.
18        Q    -- (indiscernible)?
19   A    No -- no, because I -- I ran it through the
20   business.
21        Q    Okay.
22   A    So -- so, I did -- I had a paving business; so, I
23   put it right in there as -- write-off.
24        Q    Yeah, exactly.
25   A    It's a write-off.
```

1        Q      You're writing it off on a --

2    A    No kidding.

3        Q      -- vehicle expense, definitely.  How did you

4    pay for your service?  Do you remember?

5    A    Probably a check, I would say; --

6        Q      Okay.

7    A    -- I'd say it was probably a check.

8        Q      And did you refer other people there for work

9    to be done?

10   A    Yeah.  Well, I think it was just a couple of weeks

11   later that the doors were shut.

12       Q      Oh, they (indiscernible).

13   A    Yeah, it was a real -- after that -- the doors

14   were shut after that.

15       Q      Wow.

16   A    I was, like, holy smokes.  A couple of days later,

17   I wonder (indiscernible) my truck would have been.

18       Q      Yeah.

19   A    I was, like, jeez (indiscernible).

20       Q      What kind of warranty did he offer on his --

21   on his service?  Do you remember, or --

22   A    I think it was, pretty much, the life of the

23   vehicle; it was -- you know, neighbors.

24       Q      That's a good warranty.

25   A    Yeah.  No, actually, I'd say, I've had no problems

1    with it; I've had nothing, you know, go wrong with it -

2    - works.  But then again, all I do is hit the button,

3    and it starts; that's all I --

4        Q    Yeah.

5    A    -- I don't -- I don't go for the fancy program.

6        Q    Yeah, why make things any harder than they

7    have to be?

8    A    Exactly.  My -- my luck -- it breaks.

9        Q    Yeah, the more bells and whistles, the more

10   likely something's --

11   A    Exactly.

12       Q    -- going to go wrong.  So, --

13   A    Yup.

14       Q    Well, as far as his business and your

15   experience there, is there anything else you can think

16   of that would be relevant to the fact that it, you

17   know, was a business, and you went in and had a service

18   done, and paid for it, and there were other customers

19   there?  Is there anything else that comes to mind?

20   A    No.

21       Q    Okay.

22   A    (Indiscernible) really think about anything.

23       Q    All righty.

24   A    (Indiscernible) -- because basically, like I said,

25   "Dropped the truck off, he did it and, you know, got it

1    back."  And it was about a week later that

2    (indiscernible) seen tape on the doors.  And like I

3    say, "I heard about it through a friend," you know.  It

4    was right down the road that it happened; but I -- I

5    don't know -- I didn't -- you -- when you went in, it

6    didn't -- it -- it looked like a legit business.  I

7    mean, there was tools, and -- I think they were even

8    getting into -- because he was showing me his little

9    remote control cars; I think he was getting into a

10   business of selling those, too.

11        Q    Those are grownup toys; I don't think they're

12   really meant for kids.

13   A    Yeah -- no -- yeah, at $500.00, I don't they're

14   (indiscernible) --

15        Q    Oh, wow.

16   A    Yeah -- yup, (indiscernible) --

17        Q    The little RC cars?

18   A    Yeah, little four-wheelers.

19        Q    Oh, wow.

20   A    Yeah, they're pretty cool.

21        Q    (Indiscernible).

22   A    He had those; they were playing with those in the

23   back.  Yeah -- no, it was -- it looked legit to me, you

24   know; he had speakers, stereos, and that

25   (indiscernible) in there -- and -- and the wiring

 1  harnesses, you know.

 2       Q    Had the business not closed down, it would

 3  have been somebody you would have said, hey, if you

 4  want to get your stuff done, --

 5  A    (Indiscernible).

 6       Q    -- go ahead and have it done down there?

 7  A    Yup.

 8       Q    (Indiscernible).

 9  A    Yup, I probably would have had my stereo done

10  there instead of Hoitt's; what a pain in the butt

11  that's been.

12       Q    Really?

13  A    Oh, God, it just keeps costing more, and more, and

14  more every time I go in there.  The first one was a

15  amp.  And then, there was -- there -- a crossover

16  screwed up, and smoked the amp.  Then, they, under a

17  warranty, put another amp in.  And I -- I want and

18  knocked a little corner off the one that was burnt, so

19  they didn't pull the old switcheroo on me.

20       Q    Yeah.

21  A    And I looked down -- I go, "Hey, why's my old amp

22  in there," after they figured out it was crossed

23  (indiscernible)?  They go, "Oh, (indiscernible), the

24  amp's fine probably not bad."  And I was, like, "Huh."

25  (Indiscernible) was, like, "(Indiscernible)."  And

1    then, I turned it up right there and then, and it

2    started bleeping out again.  I go, "(Indiscernible),

3    sound like that amp" -- "(Indiscernible), we'll replace

4    it."

5         Q    Good for you.

6    A    Yeah -- no, I was, like, "Hey, I marked that

7    thing."  And then, the lady -- she's, like, "No, that

8    doesn't go on here."  I was, like, "Well, it did."  She

9    goes, "Well, I'll be talking to them about that."

10   (Indiscernible) she goes, "Well, they thought since it

11   was -- that was screwed up, that it probably wasn't the

12   amp.  They thought the amp was still good, so they

13   reinstalled it."  I was, like, "Well, why didn't you

14   just leave my warrantied one in there, instead of

15   taking it out?"

16        Q    Yeah, no kidding.

17   A    And I was, like -- Hmm, little --

18        Q    It's pretty bad --

19   A    -- hokey-fanokey there.

20        Q    -- when you have to watch your -- you have to

21   watch --

22   A    Exactly.

23        Q    -- what they're doing, you know.

24   A    (Indiscernible), yeah -- no, but yeah.

25        Q    Well, that's unfortunate he wasn't able to be

1  open, to hook --

2  A    Yeah.

3        Q    -- you up on that end.

4  A    No kidding.

5        Q    So, --

6  A    Because yeah -- no, I would have been, probably

7  happy.  It's always good to see the neighbor -- hey --

8        Q    Yeah, exactly.

9  A    -- you don't want to mess with your neighbor,

10  yeah.

11       Q    There's some follow-through on that.

12  A    You don't want to mess with the neighbors, seeing

13  them everyday, have your kids -- because yeah, I think

14  his daughter -- she comes over and plays with my little

15  daughter; I think he has a ten-year-old -- or at least

16  his girlfriend's daughter.  I don't know if it's his; -

17  -

18       Q    Mmm Hmm.

19  A    -- I don't know if -- does he have any kids?

20       Q    I don't know.

21  A    Yeah.

22       Q    I don't know if they're her children, or --

23  or --

24  A    Yeah.

25       Q    -- his children.  Do you ever see any of the

1    people that worked at the business around, since then,

2    or --

3    A    No, like I say, you know, "I didn't really -- I

4    went in there the once."  I didn't -- like I say, "I

5    didn't even really know him."

6        Q    Okay, well, let me get a timestamp off this.

7    All righty, well, I'm going to end -- end the

8    recording.  The time is 11:28 a.m.

1                          CERTIFICATION

2

3

4       I, Debra Smerling, the assigned transcriber,

5 hereby certify the foregoing transcript of recorded

6 proceedings is a true and accurate non-compressed

7 transcript of the proceedings recorded.

8

9

10 _____

11      Signature

12

13

14

15 _____

16      G & L Transcription of N.J.

17

18

19

20

21

22

23

24

25