DAVID J. COHEN, ESQ.
California Bar No. 145748
**BAY AREA CRIMINAL LAWYERS, PC**
300 Montgomery Street, Suite 660
San Francisco, CA 9410
Telephone:  (415) 398-3900

Attorneys for Defendant **Jason Scott Colette**

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. 4:05-CR-00042-01-RRB |
| ) | |
|       Plaintiff(s), ) | |
| ) | **MOTION FOR NEW TRIAL PURSUANT** |
| v. ) | **TO FED. R. CRIM. P. 33(b)(1)** |
| ) | |
| JASON SCOTT COLETTE, ) | Date: September 22, 2008 |
| ) | Time: 9:00 a.m. |
|       Defendant(s). ) | |
| ) | |
| _____ ) | |

**I.**

## Procedural History Of Case

On November 28, 2005, law enforcement officers in Fairbanks, Alaska, executed a search warrant on the residence and business of Jason Scott Colette. The search warrants, which are attached as Exhibit 1, were issued, partly, on the testimony of a drug dealer, Eugene Johnson ("Johnson"). (The transcript of the application for the search warrant is attached as Exhibit 2). Aside from the information provided by Eugene Johnson, the investigating agents also used information based on their interview of Sharon Powers, Mr. Colette's former girlfriend.

While executing the warrants, law enforcement officers discovered $38,848.00.00 in U.S. currency, approximately twenty-three ounces of cocaine, and numerous firearms, including an Ingram Model 10A1 and a .45cal/9mm machine gun with silencer. Subsequently, Mr. Colette and Karen Kristina Koch ("Koch"), Mr.

1

1  Colette's girlfriend and housemate, were arrested. On December
2  14, 2005, the United States Attorney issued an indictment against
3  Mr. Colette.    The indictment, which is attached as Exhibit 3,
4  included  the  following  counts:  Possession  with  intent  to
5  distribute  cocaine,  21  U.S.C.  §§  841(a)(1)  and  841(b)(1)B);
6  Distribution of cocaine, 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C);
7  Two counts of possession of a firearm in furtherance of a drug
8  trafficking  crime,  18  U.S.C.  §§  924(c)(1)(A)(i)  and
9  924(c)(1)(B)(ii); Criminal forfeiture- $38,848 in U.S. currency,
10 21 U.S.C. §§ 853(a)(1) and 853(a)(2); and Criminal forfeiture-
11 firearms,  21  U.S.C.  §§  853(a)(1)  and  853(a)(2).    Koch  was
12 indicted on making a false, fictitious or fraudulent statement in
13 violation of 18 U.S.C. § 1001(a)(2), which was dismissed with
14 prejudice after she prevailed on a motion to suppress evidence.
15      Rex Butler ("Butler"), Attorney at Law, represented Mr.
16 Colette during his criminal trial.  Prior to Mr. Colette's trial,
17 Butler requested Rule 16, *Brady*, *Giglio*, and *Jencks* material from
18 the government.    On July 27, 2006, Assistant United States
19 Attorney,  Bryan  Schroder  ("Schroder"),  sent  possible  *Giglio*
20 materials  to  Butler.    The  letter  and  materials,  which  are
21 attached  as  Exhibit  4,  consist  of  twenty-two  pages  of  law
22 enforcement history of potential witness Johnson and a one-page
23 email containing terms of an agreement with the State of Alaska
24 concerning Johnson.  On July 28, 2006, Schroder sent additional
25 possible  *Giglio*  materials  to  Butler.    (The  letter  which
26 accompanied the *Giglio* materials is attached as Exhibit 5)  These
27 materials  consisted  of  the  State  of  Alaska  indictment  and
28 attachments relating to Johnson.

On July 28, 2006, Schroder faxed Butler Jencks Act materials consisting of Alcohol, Tobacco, Firearms, and Explosives Special Agent Eric Cohoon's ("Cohoon") Report of Investigation. The fax cover sheet states, "other applicable material has been provided in previous discovery." (The fax cover sheet and materials are attached as Exhibit 6) At no time did the government provide Butler with any grand jury testimony of Cohoon or Drug Enforcement Agency ("DEA") Agent Foran ("Foran"), or a transcript or recording of an interview with Johnson.

Prior to trial, Mr. Colette, through counsel, also requested information regarding any unidentified informants who provided information or testified before the magistrate against him. Specifically, Mr. Colette inquired as to whether or not his former girlfriend, Sharon Powers, was the other informant who spoke to the investigating agents and gave them information which assisted them in procuring a warrant to search Mr. Colette's residence and business. Mr. Colette filed a motion, which is attached as Exhibit 7, in order to discover the identity of all informants in his case. However, the government vigorously opposed the motion, which was eventually denied. (The government's opposition is attached as Exhibit 8). Powers and Colette had a tumultuous relationship which had ended on bad terms. Mr. Colette suspected that Powers was providing false information against him as an act of revenge for anything he might have done to upset her during or after their relationship. However, despite his requests, no information regarding Power's participation in the investigation was ever provided to Mr. Colette.

3

On August 2, 2006, Mr. Colette's criminal jury trial began. (The criminal trial transcript is attached as Exhibit 9). Prior to Johnson's testimony at Mr. Colette's trial, Butler requested any prior statements made by Johnson on November 28, 2005. (Criminal Trial Transcript ("CTT") Pg. 1-149, lines 10-15, 19-22) The Court inquired as to the existence of any such statements, and Schroder stated that all the statements in their possession were previously turned over to the defense. (CTT Pg. 1-149, line 25; 1-150, lines 2-6) Further, Schroder stated that he had asked the officers involved in this case for "anything out there I don't have" and they had repeatedly told him there was nothing. (CTT Pg. 1-150, lines 19-22) Butler stated there was likely a recording of the interview of Johnson, which contained information about Mr. Colette that would probably be presented at trial. (CTT Pg. 1-151, line 11 to 1-152, line 4) Schroder stated that no tape existed, but that he would check with the officers involved to confirm. (CTT Pg. 1-150, line 19 to 1-151, line 5-13) Subsequently, Schroder did, in fact, confirm that no tape existed.

Later, after the direct-examination of Johnson, during cross-examination, Butler requested any handwritten notes from the interview with Johnson. (CTT Pg. 1-253, lines 1-13) The Court stated that if there were notes of the Johnson interview, "they need to be provided for purposes of cross-examination." (CTT Pg. 1-254, lines 17-25) Further, regarding Butler's request for the recording of the Johnson interview, the Court stated, "if there's a tape, he's clearly entitled to the tape." (CTT Pg. 1-254, line 25) Schroder stated that the government had asked Alaska State Trooper Sergeant Wall ("Wall") if there were any

4

written notes of the Johnson interview, and Wall stated that there were not. (CTT Pg. 1-254, lines 14-16)

On August 3, 2006, the jury found Mr. Colette guilty of possession with intent to distribute cocaine and distribution of cocaine. (CTT Pg. 3-87, lines 7-15)   Mr. Colette was found not guilty of the two counts of possession of a firearm in furtherance of a drug trafficking crime. (CTT Pg. 3-87, lines 16-24).

David J. Cohen ("Cohen"), Attorney at Law, represented Mr. Colette during his sentencing and the subsequent criminal forfeiture trial. (The sentencing transcript is attached as Exhibit 10). Mr. Colette was sentenced to 96 months imprisonment, five years supervised release, and $200.00 in special assessments for being convicted of possession with intent to distribute and distribution of cocaine. (Sentencing Transcript Pgs. 74-76)

On September 4, 2007, Mr. Colette's forfeiture trial began. (The forfeiture trial transcript is attached as Exhibit 11). Prior to sentencing and during sentencing on September 4, 2007, Cohen moved for production of Jenck's Act materials relating to Johnson's prior statements and DEA Agent Foran's grand jury testimony. (Forfeiture Trial Transcript ("FTT") Pg. 1-26, line 24 to 1-27, line 23)   Assistant U.S. Attorney James Barkeley ("Barkeley") stated that he had proof, in the form of a letter from Schroder to Butler, that all Jencks Material was given to the defense (FTT Pg. 1-28, lines 1-5) (the same letter mentioned above, dated July 28, 2006) (See Exhibit 6).

On September 5, 2007, at the forfeiture trial, Cohen stated that he had made a motion for all Jencks statements prior to

sentencing, including grand jury testimony. (FTT Pg. 2-5, line 13 to 2-6, lines 1-14)   Schroder had previously indicated that all statements had been provided, but had also stated that he would check to make sure and provide anything new that he had found.   (CTT Pg. 1-150, line 19 to 1-151, line 5-13)   At this time, Schroder had not yet provided any materials to Cohen. Barkeley responded by telling the court that he was trying to get to the bottom of the situation and that Schroder was looking for the grand jury testimony, which at this time was presumed to only be Case Agent Foran's. (FTT Pg. 2-11, line 17 to 2-13, line 18)

Later, on September 5, 2007, Barkeley informed Mr. Cohen and acknowledged to the Court that a recording of Agent Foran's grand jury testimony had been located and would be provided to Cohen. (Forfeiture Trial Transcript 2-160, lines 5-17)   However, the grand jury testimony, attached as Exhibit 12, turned out not to be that of DEA Agent Foran, but rather, of Agent Foran *and* Agent Cohoon.   (FTT Pg. 3-142, lines 9-25 and 3-157, lines 17-22) Prior to receiving this evidence, it was unknown to the defense that Cohoon had testified before the grand jury. Barkeley was unable to explain the misrepresentation by Schroder to Butler that all Jencks materials had been previously turned over.   He appeared to suggest that, based on the letter sent by Schroder to Butler before trial, he also believed there was no additional Jencks material in this case.   (FTT Pg. 3-159, lines 13-18)

Upon reviewing the grand jury testimony of Cohoon, Cohen discovered that the grand jury recording indicated that during Cohoon's testimony, Cohoon relied on notes he took during his interview of Johnson and testified to statements of Johnson before the grand jury.   Further, during Cohen's direct

6

examination of Cohoon at the forfeiture trial on September 6, 2007, Cohoon testified that he had taken notes during his interview of Johnson. (FTT Pg. 3-129, lines 3-6 and 20-23) Cohen reminded the Court that Schroder had told both the defense and the Court that such notes did not exist. (Forfeiture Trial Transcript 3-161, lines 4-14)

As a result of this new information, the Court ordered that any existing notes or recordings of the Johnson interview were to be preserved and produced to the defense. On September 5, 2007, Cohen was subsequently provided with three sets of notes, including notes from an interview of Johnson from December 1, 2005, an interview of David Sauer from December 7, 2005, and an interview of Damon Wamsley from December 7, 2005. (FTT Pg. 3-179, lines 4-14) (The notes that Cohoon took during the Johnson interview are attached as Exhibit 13) Barkeley stated his compliance with the Court's order on the record. (FTT Pg. 3-178, line 12 to 17)

On September 7, 2007, after Cohen had made his closing argument, a letter turning over the Johnson interview tape was produced to defense. (FTT Pg. 4-62, lines 12-25) (The letter and tape are attached as Exhibit 14). Later, the jury returned verdicts requiring forfeiture of $38,848.00, the Ingram Model machine gun and silencer, a Colt Sporter rifle, and a Mossberg shotgun. (FTT Pg. 4-121, lines 1-21) The jury found that a Remington rifle should not be forfeited. (FTT Pg. 4-121, lines 12-14). The Remington rifle has never been returned to Mr. Colette or his family.

During September of 2007, in preparing for the forfeiture trial, the defense, through our investigator, Denise Petty,

eventually located Powers, who had left town prior to Mr. Colette's trial. Mr. Colette had been trying to locate Powers before his criminal trial had begun, but despite his efforts, had not been able to locate her. Upon locating Powers, our investigator interviewed her about her participation in the investigation of Mr. Colette. Powers immediately admitted that she had been the other informant against Mr. Colette. (*See* Exhibit 15, the transcript of Powers's statement Pg. 3, lines 1-8).[1] Powers also stated that she had told Trooper Wall all about her rocky relationship with Mr. Colette, specifically describing the relationship as "very volatile." (Transcript of Powers's statement Pg. 3, lines 11-14)    In fact, Agents Foran and Cohoon verified Powers assertion that Wall knew she was Mr. Colette's ex-girlfriend. Cohoon stated that Wall had told him that Powers was Mr. Colette's "old girlfriend" during his grand jury testimony. (Grand Jury transcript Pg. 11, lines 4-9) Agent Foran also indicated in his investigative report, which is attached as Exhibit 16 (*see* bottom of Pg. 1), that Wall had told him that Powers was Mr. Colette's ex-girlfriend.

Mr. Colette had always suspected that Powers was the second informant in his case. However, he never received any information confirming this belief until our investigator was able to locate Powers in 2007, well after the conclusion of Mr. Colette's criminal trial. Further, Agent Wall had told the magistrate who issued the search warrant for Mr. Colette's residence and business that the other informant was a man.

---

[1]    Ms. Powers actually made two statements to defense investigator Denise Petty, both of which are included in Exhibit 15.

(Transcript of search warrant application, Pg. 16, lines 15-16) (*See* Exhibit 2). Alongside lying about the sex of the informant, Wall failed to disclose that the informant was an angry ex-girlfriend of Mr. Colette's, an alcoholic, and that Mr. Colette had a protective order against her. (The protective order against Ms. Powers is attached as Exhibit 17)

## ARGUMENT

### I.

### THIS MOTION FOR NEW TRIAL SHOULD BE GRANTED BECAUSE THE GOVERNMENT HAS VIOLATED THE JENCKS ACT BY WITHHOLDING THE AUDIO-RECORDED INTERVIEW OF JOHNSON, THE NOTES TAKEN BY COHOON DURING HIS INTERVIEW WITH JOHNSON, AND THE RECORDING OF COHOON'S GRAND JURY TESTIMONY.

The Jencks Act states:

> (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

§ 3500(a) and (b).

The Jencks Act defines the term "statement" as being one of the following:

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;

9

                     (2) a stenographic, mechanical,
          electrical, or other recording, or a
          transcript thereof, which is a substantially
          verbatim recital of an oral statement made
          by said witness and recorded
          contemporaneously with the making of such
          oral statement; or
                     (3) a statement, however taken or
          recorded, or a transcription thereof, if
          any, made by said witness to a grand jury.

     § 3500(e).

     Therefore, the Jencks Act requires that there be a statement, as defined by the statute, and that the defense make a timely request for that statement. Whether something is a statement under the Jencks act is a determination made by the Court, not the prosecution. *Ogden v. U.S.*, 303 F.2d 724, 737 (9th Cir. 1962). In *Ogden*, the Ninth Circuit dealt with the timing and form of a defendant's Jencks request in several cases. *Id*. at 733.

     In *Ogden*, the Court stated:

               [T]he burden rests upon the defendant
          to invoke the statue at the appropriate
          time. The Act provides that the Court shall
          order the production of statements to which
          the defendant is entitled on 'motion of the
          defendant.' 'No ritual of words' is
          required, but the defendant must plainly
          tender to the Court the question of the
          producibility of the document at a time when
          it is possible for the Court to order it
          produced, or to make an appropriate inquiry.

     Id.

          A.   **The Audio-Recorded Interview of Johnson, Cohoon's Notes
               from that Interview, and Cohoon's Grand Jury Testimony
               Constitute Statements Relating to the Events and
               Activities Testified to Under the Provisions of the
               Jencks Act.**

          1.   **The Audio-Recorded Interview of Johnson:**

     The recording of Wall's interview of Johnson is a statement under § 3500, because it is a recording made contemporaneously

                                10

with Johnson's statement, as required by § 3500(e)(2). It is well-settled that the Court, and not the government, determines whether evidence amounts to a statement under § 3500. *Ogden* at 737. Since, the Court ruled that Mr. Colette was entitled to the recording at trial, the government should not be permitted to now argue that it is not a statement under the Jencks act.

The recording of the interview clearly relates to the events and activities testified to at trial, because the information Johnson, the government's only eyewitness, testified to at trial was first divulged during the audio-recorded interview. The information Johnson provided to the Court was essentially a restatement of what he had stated during the course of the interview.

**2.    Cohoon's Notes From the Interview of Johnson:**

Cohoon's interview notes constitute a "substantially verbatim recital" under § 3500(e)(2). These notes are a substantially verbatim account of Johnson's statements during the interview. Once Johnson testified as to the subject matter contained in those notes, the notes became a statement by Johnson for the purposes of § 3500, because they related to the subject matter he testified to at trial.

Under § 3500, Cohoon's interview notes also constitute statements of Cohoon relating to the subject matter he testified to at trial. Specifically, Cohoon testified about the information he received from Johnson. Thus, the testimony related to the interview notes, which contained said information. Further, pursuant to § 3500(e)(1), the interview notes are a written statement of Cohoon, which had been adopted by him, because he relied on them during his grand jury testimony, and

presumably to write his police report.    In *U.S. v. Brumel-Alvarez*, 976 F.2d 1235, 1237 (9th Cir. 1992), defendants alleging a Jencks violation were convicted of various charges relating to an international high-level drug trafficking conspiracy in Bolivia and Mexico.    The *Brumel-Alvarez* Court found that a Jencks violation had occurred, because a government memorandum containing statements of three · different witnesses was not produced to the defense.    *Id.* at pg. 1245.    The *Brumel-Alvarez* Court held that "in determining whether the statements in question 'related to' the direct testimony of the witness, it must relate generally to the events and activities testified to."    *Id.*

    In this case, during Cohoon's grand jury testimony, he referred to his case file and read statements made by Johnson into the record.    Thus, Cohoon's testimony not only related to his notes from the Johnson interview, but rather, his testimony was dependant on the use of his notes from the interview.    For example, referring to Johnson, Cohoon stated, "[h]e said approximately 10 days prior, on November the 18th, he had stopped by Jason Collette's business in Fairbanks and arranged to meeting [sic] later that evening to - to buy some cocaine." (Transcript of Grand Jury Proceedings Pg. 6, lines 11-14) In general, Cohoons grand jury testimony contains many recitals of statements made by Johnson (*See* Exhibit 12, pgs. 5-10).    The statements involved arranging purchase of and purchasing cocaine, the Ingram machine gun found at Mr. Colette's residence, and Johnson's past dealing with Mr. Colette.

    In *Brumel-Alverez*, the court found that statements which generally relate to the events and activities testified to should

12

be produced.    Here, were are dealing with more than general
relation, because Johnson's statements, which were contained in
Cohoon's notes from the interview, constituted a very large
portion of Cohoon's testimony before the grand jury and at Mr.
Colette's criminal trial.

### 3.    Cohoon's Grand Jury Testimony:

As to Cohoon's grand jury testimony, § 3500(e)(3) makes it
clear that recorded or transcribed grand jury testimony of a
witness is a statement.    Though the criminal trial transcript
does not indicate that Butler specifically requested Jencks Act
materials after Cohoon's direct testimony, he was not required to
tender such request.    As earlier indicated, the government told
Butler multiple times prior that no other Jencks material
existed.    (CTT Pg. 1-150, lines 19-22; also see Exhibit 6).
Butler and the Court relied on the government's assertions, and
the government should be estopped from arguing that a timely
request was not made for Cohoon's Jencks materials.    The
relation of Cohoon's grand jury testimony to the events and
issues testified to at trial is explored in the previous section.

### B.    The Defense Made Timely Request For Any Recording or Notes From the Interview of Johnson and Any Grand Jury Testimony by the Prosecution's Witnesses.

In Ogden, the Court implied that the proper time for
requesting Jencks material was after a witness had been heard at
trial.    Id. at 734.    However, the Ogden Court found that when
witnesses and the probable nature of their testimony were known
prior to trial, it was appropriate for the government to produce
Jencks material to the defense prior to trial, though not
expressly required to do so.    Id.    Here, on July 28, 2006,
Schroder faxed Butler "Jencks Act materials" consisting of

13

Cohoon's Report of Investigation.   The fax cover sheet stated that, "other applicable material has been provided in previous discovery."  (*See* Exhibit 6).  The government's letter indicates that as of July 28, 2006, Butler had received all other Jencks materials in previous discovery.  Correspondence between Schroder and Butler imply that the government had adopted a policy, approved and described in *Ogden*, of producing Jencks material prior to trial.

Nevertheless, on August 2, 2006, at criminal jury trial, Johnson testified for the government against Mr. Colette.  Prior to Johnson's direct-examination Butler requested any prior statements made by Johnson.  Schroder informed the Court that all statements in the government's possession had been turned over to Butler, and he specifically stated that there were no notes or tapes.  (CTT Pg. 1-150, line 19 to Pg. 1-151, line 13; Pg. 1-149, line 25; Pg. 1-150, lines 2-6)  The Court clearly stated that Butler was entitled to any tape of Johnson's interview to use for cross-examination.  (CTT Pg. 1-254, line 25)   Schroder did not provide Butler with the tape, which was not produced until September of 2007 at the close of Mr. Colette's forfeiture trial.

Mr. Colette met his burden under *Ogden*, because his attorney plainly tendered to the Court a request for all prior statements of Johnson at a time when the Court could order their production and inquire into their existence.  This is clear, because the Court did inquire into the existence of the tape and notes, and informed the government that Mr. Colette was entitled to both.  (CTT Pg. 1-254, lines 17-25) Further, Butler requested the statements after Johnson's direct-examination, so the request was timely.  (CTT Pg. 1-253, lines 1-13)

Regardless, as earlier indicated, the government had assured Butler both before and during trial that Butler was in possession of all prior statements. Since Schroder is a sworn officer of the Court, the government should be estopped from arguing that a motion for Jencks Act Materials was untimely for any witness at Mr. Colette's criminal trial, because it promotes a policy of permitting the government to lie to the Court and defense counsel, which directly contradicts the statutory purpose "to further the fair and just administration of criminal justice, a goal of which the judiciary is the special guardian". *Campell v. U.S.*, 365 U.S. 85, 92 (1961).

Butler made timely request that any notes relating to Johnson's interview be produced and turned over to the defense. Butler made this request on the record both after Johnson's direct-examination and during his cross-examination. (CTT Pg. 1-253, lines 1-13) The Court clearly stated that Butler was to be provided with any interview notes relating to Johnson to use for cross-examination.    (CTT Pg. 1-254, lines 17-25) However, Schroder did not provide Butler with the notes until September of 2007 at the close of Mr. Colette's forfeiture trial.

A similar case is *U.S. v. McKoy*, 78 F.3d 446 (9th Cir. 1996).    In *McKoy*, the defendants were charged with willfully subscribing false federal income tax returns.    Prior to trial, defendants requested Jencks Materials from the government, and the government agreed to provide the material before trial. While some materials were produced prior to trial, it became clear that the government had withheld statements.

Despite the fact that the court found the government had not acted in bad faith, a mistrial was declared because of the Jencks

Act violations. *Id.* at 448. The *Mckoy* Court held that though the Jencks violations did not occur until after a witness had testified, the defense's pre-trial request for Jencks materials, which the government agreed to, was sufficient to satisfy the defense's request requirement under the Jencks Act. *Id.* at 448, 452.

*McKoy* is factually similar to Mr. Colette's situation. Here, the government stated in a July 26, 2006 letter that Butler was in possession of all Jencks materials. The government repeated the assertion twice on the record, before the Court. Regardless of whether the government acted in bad faith, as in *McKoy*, they were required to provide Mr. Colette with Jencks materials, including Cohoon's grand jury testimony.

However, should the Court find that Butler did not make a timely request for Cohoon's statements to the grand jury, we would point out that Butler did ask for any earlier statements by Johnson both before and after Johnson's testimony. Cohoon's grand jury testimony, because it largely consisted of Cohoon reading and reciting what Johnson had told him during their interview, was not only a statement relating of Cohoon. Rather, it was also a statement of Johnson relating to Johnson's testimony. Therefore, Butler did make a timely request regarding Cohoon's notes.

Also, while we cannot be certain as to what Cohoon read in his case file, he provided a narrative using Johnson's statements. It is logical to assume that Cohoon is reading from a written statement made by Johnson and approved by him or a transcript from a substantially verbatim recital of an oral statement, meeting the requirements under § 3500(e). To assume

16

otherwise is to imply that Cohoon is committing perjury by attributing statements to Johnson, which he never made or adopted.   Cohoon's grand jury testimony contains statements by Johnson, which meets the requirements of § 3500. Therefore, the government should have produced the testimony to Butler when he requested Johnson's prior statements at Mr. Colette's trial.

Further, had Shroder produced Johnson's notes to Butler, Butler would have been put on notice that there might be other notes, written statements, or recordings by Cohoon.  This would have prompted Butler to again request any previous statements by Cohoon, which naturally would have included Cohoon's grand jury testimony.     Because  Shroder  withheld  Cohoon's  notes  and consistently confirmed that there were no other statements in existence, Butler justifiably believed that he had all relevant statements by Johnson and Cohoon.   It was because of Shroder's assurance that Cohoon did not take any notes or make any written recordings that Butler did not persist further in requesting statements by both Johnson and Cohoon.

### C.    The Above-Mentioned Jencks Violation is Such that Mr. Colette Should Be Granted a New Trial.

Once it is determined that a Jencks violation has occurred, the Court must then determine "whether the absence of [the Jencks materials] affected the outcome of the case or handicapped [the defendant] or his counsel in their presentation of the defense." *U.S. v. Rivero*, 554 F.2d 213, 214 (5th Cir. 1977).    "If the District Court concludes on such hearing that there is such a possibility then a new trial [portions omitted] must be granted. If, on the other hand, the Court concludes that there is no reasonable possibility that it affected the outcome of the case

or otherwise significantly prejudiced [the defense] the convictions will stand affirmed." *Id.* The Ninth Circuit has demonstrated its adherence to this standard by holding that reversal is warranted when Jencks material "would have helped the appellant overcome the hard evidence the district court used to convict him...". *U.S. v. Boshell*, 952 F.2d 1101, 1105 (9th Cir. 1991); *see also U.S. v. Pisello*, 877 F.2d 762, 768 (9th Cir. 1989), *U.S. v. Michaels*, 796 F.2d 1112, 1116 (9th Cir. 1986), *U.S. v. Wallace*, 848 F.2d 1464, 1471 (9th Cir. 1988).

  1. **The Withheld Jencks Evidence in this Case Would Have Provided the Defense with a Basis to Destroy the Credibility of *Every* Witness Called By the Prosecution.**

In *Brumel-Alvarez*, the Ninth Circuit reversed a case because of a Jencks violation that resulted from government failure to produce possible impeachment statements that could have been used to attack the credibility of an informant and several law enforcement officers. *Brumel-Alvarez* at 1245-1246. Here, we are dealing with the same type of Jencks material described in *Brumel-Alvarez*, impeachment evidence which could be used to destroy the credibility of Johnson, the informant and key witness for the prosecution, as well as the investigating officers who testified at Mr. Colette's trial.

Informant Johnson was the government's key witness. He was the only witness, other than law enforcement agents involved in the investigation, that the prosecution called to testify against Mr. Colette. The withheld Jencks materials would have provided the defense with an arsenal of information that served to impeach and discredit Johnson, demonstrate cause for Johnson's testimony to be extremely biased against Mr. Colette, and most importantly,

18

implicate Johnson for the crimes that Mr. Colette was accuses of committing.

During trial, Johnson lied repeatedly.  Johnson testified that he received a no jail time offer in exchange for his testimony, which was untrue.  (CTT Pg. 2-14, lines 3-25)  When asked at trial if he used drugs, Johnson testified that he only smoked marijuana, though in his previous interview, he admitted a lot of cocaine use.  (Johnson Interview Transcript, 26: lines 9-13)  In his interview, Johnson lied about being a drug dealer, which he later admitted at trial.  (CTT Pg. 2-10, line 24 to 2-11, line 1)  Also, in the interview, Johnson never mentions the machine gun that was found at Mr. Colette's residence.  Despite a detailed account of the events during his interview, the machine gun was never mentioned by Johnson until the criminal trial.  On all of these points Mr. Colette could have impeached Johnson at trial, had the government produced the Johnson recording.

However, more importantly, records of previous interviews with Johnson also contained information regarding the police raid on Johnson's home.  Specifically, Johnson made a statement that he was tipped off that the police were going to raid his home, which Johnson plainly stated as the reason that the officers failed to locate any cocaine on the premises.  (*See* Officer Carson's police report, Pg. 2, which is attached as Exhibit 18).

Based on information about the raid, Johnson cleaned out his entire home of all illegal materials, specifically cocaine.  The officers searching Johnson's home had every reason to believe they were going to find cocaine and guns, the same type of illegal materials that Johnson eventually stated was in Mr.

19

Colette's home.   (*See* Exhibit 19, the affidavit for the search warrant for Johnson's residence).

The defense was denied an opportunity to point out that these circumstances were likely not mere coincidence.  Johnson had cleaned his house and rid himself of all illegal materials after he knew he was going to be raided.  The jury should have had the opportunity to assess the coincidence that the materials that were apparently cleared out of Johnson's home were the same type of materials Johnson lead the authorities to in Mr. Colette's home.  The defense could have easily argued that the cocaine and weapons found in Mr. Colette's home were put there by Johnson, so that Johnson could avoid the materials being found by the police during the raid on his home.  Further, to avoid any possibility of being charged, Johnson could then use the drugs and weapons he stored at Mr. Colette's home to make it appear as if Mr. Colette was the guilty party.

By storing his drugs and weapons at Mr. Colette's house, Johnson would have created the perfect "set-up."  He would come up clean when the officers searched his home and, just in case, be able to trade information about Mr. Colette, because Johnson knew Mr. Colette would be vulnerable as long as Johnson's drugs and weapons were stored in Mr. Colette's home.  When all of this information is coupled with Johnson's testimony that he is, in fact, a drug dealer, thief, and addict, it creates a very strong basis for not only doubting Johnson's credibility, but also for finding that the guilt for these crimes may very well lie with Johnson, the key witness against Mr. Colette.  Further, Johnson's testimony indicated that he had the knowledge and wherewithal to execute a plan to set this up.  He testified that he knew where

Mr. Colette's safe was and that it was open in his presence less than a week before Johnson's place was raided. (CTT Pg. 1-218, lines 15-19 and Pg. 1-220, line 11)

This new information about Johnson could easily have affected the outcome of Mr. Colette's trial. The evidence clearly indicates that there was a possibility that Johnson, the government's star witness, was the guilty party in this case. However, the Jencks material that the defense now possesses did more than create a basis to discredit and implicate Johnson. The Jencks materials also cast a revealing light on the law enforcement officials who investigated and helped to prosecute this case. The only witnesses called by the prosecution in this case, other than Johnson, were investigating Agents Cohoon and Foran, and TrooperWall. By withholding Jencks material, the government also denied Mr. Colette, through counsel, the opportunity to discredit the three investigating officers who took the stand against him.

Specifically, the Jencks material indicated that Cohoon lied to the grand jury when he stated that Mr. Colette declined to offer the combination to the safe in the master bedroom. (Cohoon's grand jury testimony Pg. 12, lines 10-12) In fact, Mr. Colette merely stated he needed to speak to his lawyer. He never stated that he would not give them the combination after doing so. Cohoon also testified untruthfully before the grand jury when he stated that Mr. Colette had told him that Koch shared the master bedroom at Mr. Colette's residence. (*See* Grand Jury Transcript Pg. 22, lines 17-23) In fact, Mr. Colette was never interviewed and never made such a statement about Ms. Koch. Mr.

Colette declined to make any statements and asked for counsel when the investigating agents contacted him.

Further, in Cohoon's grand jury testimony, Cohoon stated that Johnson had asked about the MAC-10 based on his own curiosity. (Cohoon's grand jury testimony Pg. 7, line 24 to Pg. 8, line 11) However, later on during the grand juror questions and at trial, Cohoon implied that Mr. Colette initiated the discussion of the MAC-10. (Cohoon's grand jury testimony Pg. 23, lines 15-22) Cohoon, during his grand jury testimony had also stated that the gun was "unloaded" and that "there was no magazine in the magazine well." (Cohoon's grand jury testimony Pg. 16, lines 21-22) However, at trial, Cohoon changed his testimony by stating that there was a magazine in the receiver, which prevented him from being able to see if the MAC-10 was loaded. (CTT Pg. 2-112, lines 1-4) Without a magazine present, which is the true way the MAC-10 was discovered, it was quite obvious that gun was unloaded.

The testimony of Cohoon created a false impression of Mr. Colette, specifically that he was uncooperative with law enforcement and irresponsible and overzealous with the MAC-10. The jury was given the impression that Mr. Colette was attempting to use the firearm to make Johnson feel unsafe or intimidate him. However, Cohoon's grand jury testimony indicates that Johnson was both impressed and curious about the gun, not terrified of it. Thus, the false testimony unfairly prejudiced Mr. Colette before the jury.

The prosecution's failure to turn over Cohoon's grand jury testimony prevented Butler from having access to the above-mentioned information. Butler could have questioned Cohoon about

these inconsistencies at trial. Not only could butler have impeached Cohoon with these contradictory statements, but rather, Butler could have used the information to demonstrate to the jury that there was a pattern of dishonesty and misconduct surrounding the prosecution and its witnesses.

Further, after discovering and reviewing the withheld evidence, it is clear that the officers involved in this case were untruthful with Schroder and the Court. Shroder stated that he had asked the officers involved in this case about the above-mentioned Jencks materials on multiple occasions. Despite having these materials in their possession, these law enforcement officials blatantly denied their very existence, according to Shroder. Much weight and credibility is afforded to the law enforcement officials involved in any criminal proceeding. In this case, the officers behind the investigation and arrest of Mr. Colette intentionally lied to Schroder, the U.S. attorney assigned to this case. The officers were aware that Mr. Schroder needed the Jencks materials to provide to the defense pursuant to the Court's order. Yet, despite that knowledge, the officers withheld the evidence.

In this case, had the Jencks materials been provided at trial, the credibility of the prosecution's star witness and the entire team of law enforcement officials involved in the investigation and prosecution of this case would have been severely damaged. The Jencks material in this case indicates that the government's star witness committed perjury and may have been responsible for planting the illegal materials Mr. Colette was charged with possessing. Further, the remaining witnesses were dishonest with the Court and intentionally withheld

23

evidence.  If Johnson and the team of investigative officers and law enforcement agents involved in this case had been discredited, it is quite apparent that the outcome of this case would likely have been different, as these were the only witnesses that testified against Mr. Colette at his criminal trial.

In the absence of any reliable witness testimony, the government would have had to prove its case solely through circumstantial evidence.  As Mr. Colette never wavered in his claim of innocence and none of the prosecution's witnesses were reliable, the presence of the drugs and weapons in Mr. Colette's home was the only bit of evidence left to the prosecution. However, the mere presence of the drugs and weapons did little to implicate Mr. Colette.  It is undisputed that Mr. Colette did not live in his house alone.  He lived there with Koch, who also faced criminal charges in this matter.  He also had many unsavory characters visiting and spending time in home.

Further, the withheld evidence, which demonstrated that the drugs and weapons could very likely have been planted by Johnson, would have been available had Schroder complied with the Court's order to turn Johnson's statements over to the defense.   In support of the above-mentioned defense arguments, it should be noted by the Court that after extensive fingerprint analysis and testing, Mr. Colette's fingerprints were never found anywhere on the cocaine seized by law enforcement. (CTT Pg 2-99, lines 12-16)

Thus, without any credible witnesses or strong evidence indicating Mr. Colette's ownership of the illegal materials discovered, the jury could easily have voted not guilty for lack of evidence on the part of the government, as well as significant

1  evidence that Johnson, the government's key witness, may have

2  been the person guilty for the crimes charged.

3

## II.

4
### RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE
5  ### STATES THAT, UPON PRESENTATION OF NEWLY DISCOVERED EVIDENCE, A
   ### MOTION FOR NEW TRIAL MUST BE GRANTED WHERE
6  ### IT WILL SERVE THE INTERESTS OF JUSTICE

7  Mr. Colette now seeks a new trial under Rule 33 of the

8  Federal Rules of Criminal Procedure, which states explicitly

9  that, "[u]pon the defendant's motion, the court may vacate any

10 judgment and grant a new trial if the interest of justice so

11 requires."  Rule 33(b)(1) further states, "[i]f an appeal is

12 pending, the court may not grant a motion for a new trial until

13 the appellate court remands the case."  However, in cases such as

14 the present one where an appeal is pending, the proper procedure

15 is to file the motion in district court, and if the court is

16 inclined to grant the motion, the appellate court will remand the

17 case.  *Zamloch v. U.S.*, 187 F.2d 854 (9th Cir. 1951).

18 In order to prevail on a motion for new trial under Rule 33,

19 the motion must be timely filed and fall into one of two

20 categories.  If there is no prosecutorial misconduct, the

21 defendant must satisfy a five-part test relating to the nature

22 and weight of the newly discovered evidence.  In the alternative,

23 the defendant may demonstrate prosecutorial or any other form of

24 government  misconduct to demonstrate that a new trial is

25 required in the interest of justice. *U.S. v. Walgren*, 885 F.2d

26 1417 (9th Cir. 1989).

27 **A.    Mr. Colette's Motion is Timely Filed.**

28

Rule 33(b)(1) states, "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." This motion is timely filed, because Mr. Colette was found guilty on counts of possession with intent to distribute and distribution of cocaine on August 3, 2006, a period less than three years from today's date.

**B.   Mr. Colette Meets the Requirements of the Five-Part Test.**

A motion for new trial must be granted where the following five criteria are met: (1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of due diligence on the part of the defendant; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative or merely impeaching; and, (5) the evidence must be such as, on new trial, it would probably result in an acquittal. *U.S. v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991); *U.S. v. Lopez*, 803 F.2d 969, 977 (9th Cir. 1986); *U.S. v. Brashier*, 548 F.2d 1315, 1327 (9th Cir. 1976).

**1.   The Audio Recording of Cohoon's Interview of Johnson:**

**a.   This evidence is newly discovered.**

Mr. Colette's criminal jury trial ended on August 3, 2006, at which time the jury found Mr. Colette guilty of possession with the intent to distribute cocaine and distribution of cocaine. Despite repeated requests for any recordings of Johnson's interview, Butler was assured by Schroder that no such tape existed. (CTT Pg. 1-150, lines 5-13) The forfeiture trial in this matter commenced on September 4, 2007. On September 7, 2007, after we made our closing argument at the forfeiture hearing, we were presented with a tape recording of Wall's

interview with Johnson.     Clearly, this evidence is newly
discovered as it was never presented to the defense before or
during Mr. Colette's criminal trial.

**b.    Mr. Colette demonstrated due diligence in his pursuit of the recording of the interview with Johnson.**

Though Butler, both before and after Johnson's testimony,
had expressly requested any tape recording or notes relating to
the interview of Johnson, none were produced.  In fact, Schroder
told Butler that no such tape or notes existed, despite the
Court's definitive instruction to Schroder that the defense was
entitled to any tape recordings or notes from Wall's interview
with Johnson.  (CTT Pg. 1-254, line 25)  Schroder maintained that
he had asked Wall if a tape recording of the interview existed
and was told by Wall that there was no such tape. (CTT Pg. 1-254,
lines 14-16)

Further, before trial, Shroder wrote a letter (previously
identified as Exhibit 6) to Butler stating that he had previously
turned over all Jencks material in this case.  Quite clearly, Mr.
Schroder provided false information to Butler before trial.
Additionally, Schroder misled both the defense as well as the
Court on the record at trial when he stated that this tape did
not exist.  And, unless Schroder perjured himself when he told
the Court that he was instructed by Wall that there was no such
tape, Officer Wall intentionally provided false information to a
U.S. attorney, which he knew would be relayed to defense counsel
and the Court.  Therefore, the government should be precluded
from arguing that Mr. Colette was not diligent, because it was
the government's own misconduct that caused the defense to
terminate its requests for the tape.

27

c.    **The newly discovered recording of the interview of Johnson is material to the issues raised at trial**.

Johnson was the government's star witness in this case. He alone could testify that Mr. Colette possessed and distributed cocaine. As earlier indicated, Johnson was the only prosecution witness besides the investigating officers. Based on the interview of Johnson that was withheld from the defense, it is clear that Johnson committed perjury during the trial and was severely lacking in credibility.

The Ninth Circuit has recognized that there are occasions where impeachment and/or credibility evidence is so powerful that a new trial must be granted. "In some situations, however, the newly-discovered evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible. In such a case, if the witness' testimony were uncorroborated and provided the only evidence of an essential element of the government's case, the impeachment evidence would be 'material' under *Walgren*." *U.S. v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992).

However, more importantly, as earlier discussed, the withheld evidence also provides a basis to believe that Johnson may have been the party who placed the cocaine and weapons in Mr. Colette's home. The evidence indicates that Johnson knew he was going to being raided by the police, thereby giving him the proper motivation to try and frame Mr. Colette for his own crimes. Considering Johnson's criminal history and the fact that his testimony was exchanged for a deal with the government, this evidence serves fatally discredit Johnson as a witness in this case.

### d. The newly discovered evidence is not cumulative or merely impeaching.

This case is precisely the type of situation described in *Davis*. The fact that Johnson perjured himself multiple times, on its own, may have sufficed to be powerful enough to sway the jury. In this case, the withheld evidence created a basis to believe Johnson may have been the guilty party in this matter. Further, Johnson was the *only* witness called on by the government at Mr. Colette's criminal trial to give eyewitness testimony as to Mr. Colette's alleged drug-related activities. As there were no additional witnesses who claimed to witness drug-related crimes committed by Mr. Colette, Johnson's testimony was clearly uncorroborated and provided the only non-circumstantial evidence in the government's case. Further, it cannot reasonably be denied that evidence which indicates that a prosecution witness may be guilty of what the accused is on trial for is powerful.

Regardless, the Ninth Circuit has previously held that a new trial may be granted where the government's key witness is revealed to be liar. In *United States v. Hinkson*, the Ninth Circuit granted the defendant a new trial, because the government's key witness was proven to be a liar and a forger. 2008 *U.S. App. LEXIS* 11530. Clearly, in a case where the honesty and character of the government's key witness is destroyed by the discovery of new evidence, precedent indicates that a new trial ought be granted to the defendant.

In either case, the new evidence, though highly valuable as impeachment evidence, went beyond discrediting Johnson. The fact that the evidence indicated that Johnson had a motivation to plant evidence and frame Mr. Colette made the evidence more

29

exculpatory in nature than merely impeaching.  Evidence that goes
directly to the issue of guilt of another party must be afforded
serious consideration, well beyond that given to evidence of
impeachment alone.

   **e. The evidence, if presented at a new trial, would
    likely result in acquittal.**

  Assuming that Butler would have been given the opportunity
to present evidence indicating that Johnson committed multiple
acts of perjury and may have been guilty of crimes for which Mr.
Colette was being charged, the evidence would have created a
definite basis for a jury to have reasonable doubt of Mr.
Colette's guilt, an alternative guilty party.  This evidence not
only meant the difference between believable and completely
unreliable testimony by Johnson, the government's key witness,
but rather, the possibility of an entirely different defendant.
Had the prosecution suffered that blow of having their key
witness impeached and possibly implicated for the accused's
crimes, their case would likely have been shattered, thereby
resulting in a verdict of not guilty for Mr. Colette.

  **2. Cohoon's Recorded Grand Jury Testimony:**
   **a. This evidence is newly discovered.**

  As earlier stated, it was not until September 5, 2007, more
than a year after Mr. Colette's criminal trial that we
inadvertently discovered that Cohoon had testified before the
Grand Jury and that the government possessed a transcript of that
testimony.  Barkeley, the U.S. Attorney handling the forfeiture
trial, instructed that we were to be provided with DEA Agent
Foran's Grand Jury testimony.  However, Barkeley sent Cohoon's
testimony as well, accompanied by a letter stating that
Schroder's pre-criminal trial assurance that he had sent all

Jencks materials had referred to Cohoon's investigative report, not the Grand Jury testimony by Cohoon that we had only just become aware of.  Because this evidence was received over a year after the criminal trial, it is newly-discovered.

### b.  Mr. Colette exercised due diligence in attempting to discover Cohoon's grand jury testimony.

On July 27 and 28 of 2006, Schroder sent *Giglio* materials to Butler.  Schroder also faxed Butler Jencks Act materials on July 28, 2006.  The cover sheet of that fax explicitly stated that any "other applicable materials" were "provided in previous discovery." (*See* Exhibit 7) Butler took Schroder at his word and proceeded under the belief that no additional materials relating to Cohoon existed.  Because the government either conned or inadvertently caused Butler to believe that he had received all relevant Jencks materials, the prosecution should be precluded from arguing that Butler did not use due diligence in trying to discover said evidence.  It is not in the interests of justice to allow the prosecution to profit from either intentionally or negligently misleading the defense and the Court.

### c.  The grand jury testimony of Cohoon is material to the issues raised at trial.

We have already demonstrated that Butler would have been able to impeach Cohoon at Mr. Colette's criminal trial had he been able to review Cohoon's grand jury testimony.  Cohoon gave false statements to the grand jury when he stated:  (1) that Mr. Colette declined to offer the combination to the safe in the back bedroom.  In fact, Mr. Colette merely stated that he needed to speak to his attorney before giving out that information (Grand Jury transcript Pg. 12, lines 6-12); (2)  that Koch shared the master bedroom at Mr. Colette's residence (Grand Jury Transcript

31

Pg. 22, lines 17-23); (3) that Mr. Colette initiated a conversation about the machine gun with Johnson when, before the grand jury, he had testified that it was Johnson who had asked Mr. Colette about the machine gun during the alleged the drug deal (Grand Jury Transcript Pg. 7, line 24 to Pg. 8, line 11 and Pg. 23, line 17 to Pg. 24, line 10); and (4) that a magazine was present in the machine gun when he testified at trial, despite clearly testifying that there was no magazine in the machine gun before the grand jury. (Grand Jury Transcript Pg. 16, line 21-22 and CTT Pg. 2-112, lines 1-4)

However, beyond Cohoon's untruthful testimony regarding these matters, the fact that Cohoon's grand jury statement was kept from the defense served to raise an issue material to the trial itself, the credibility of the investigating officers as well as the reliability of the investigative findings against Mr. Colette. The fact that the prosecution or the officers withheld this evidence would have undermined the reliability of the evidence and testimony relating to the police investigation in this case.

Hence, because the testimony of the grand jury contradicted testimony given at trial, the evidence was material to the issues presented at trial. Further, the materiality of the evidence is clear in terms of the tremendous effect that the withholding of the evidence had on the defense's ability to properly challenge the prosecution's case.

> **d.    The newly discovered is not cumulative or merely impeaching.**

This evidence cannot be argued to be cumulative as no evidence relating to Cohoon's grand jury testimony was turned

over to the defense or presented at trial.   This evidence, similarly to the evidence earlier discussed, would have created yet another basis to discredit the investigating officers as well as the results of the investigation itself.   For the same reasons discussed above, this evidence served to do more than merely impeach Cohoon during his testimony.

### e.   The evidence, if presented at a new trial, would likely result in acquittal.

The ability of the defense to use this evidence, in conjunction with the other items of evidence described in this section, would have been a key component in challenging the prosecution.  Had the defense been able to discredit the findings of the investigative law enforcement team that worked on this case, the jury would have been far less likely to accept the evidence resulting from the investigation.   For the same reasons stated in the above section, this evidence, had it been presented at trial, would likely have resulted in acquittal.

### 3.   Cohoon's Notes from His Interview with Johnson:

### a.   The notes Cohoon took during his interview of Johnson are newly discovered.

The notes from Cohoon's interview with Johnson were not produced until Mr. Colette's forfeiture trial was in its final stages.   Prior to the notes being turned over to the defense at the forfeiture trial, the defense had no knowledge that the notes existed, let alone knowledge of any information contained within the notes.  As the criminal trial had concluded long before the notes were produced, the notes from the Johnson interview clearly constitute newly discovered evidence.

**b.  Mr. Colette exercised due diligence in requesting any noted from Johnson's interview.**

Despite Butler's explicit and repeated requests, both before and after Johnson's testimony, that any notes relating to Cohoon's interview with Johnson be turned over to the defense, the defense was never presented with the opportunity to view the notes at any stage of the criminal trial.  Further, on multiple occasions, Schroder represented to Butler that no such notes existed.  (CTT Pg. 1-254, lines 14-16)  As Butler expressly requested these notes on the record at trial, as well as before the trial commenced, Butler clearly exercised due diligence in attempting to procure this evidence.  (CTT Pg. 1-149, lines 10-15, 19-22 and 1-253, lines 1-13)  Because the prosecution, both on and off the record, assured Butler that this evidence did not exist, the prosecution should be precluded from raising any argument that Butler failed to exercise due diligence in his many requests that this evidence be produced.

**c.  Cohoon's notes from the interview of Johnson are material to the issues raised at trial.**

The information contained within these notes as well as the very existence of the notes themselves are material to this case.  These notes were essentially an additional recording of the interview conducted with Johnson.  Therefore, the notes are material to the case same reasons that the recording of the interview itself is material.  They served to impeach Johnson as well as created a basis to believe that the drugs and weapons found in the possession of Mr. Colette may have, in fact, have belonged to Johnson.

Additionally, the fact that Schroder denied that these notes existed both during and before trial would likely have had a

34

serious affect on the trial outcome. Either Schroder knew that the notes existed, in which case, he would have been guilty of violating his sworn duty as an officer of the Court, or it was the investigating officers who lied, thereby creating a strong basis to disbelieve their testimony at trial and the validity of their findings throughout the investigation.

If Schroder was the party intending to mislead the Court, such prosecutorial misconduct would likely have resulted in a mistrial, as the prosecution would have been guilty of lying to the Court and the defense, intentionally withholding evidence, and generally denying Mr. Colette his constitutional right to a fair trial. If, in fact, the investigating officers were the parties who lied, they too would have been derelict in their duties as both sworn officers and witnesses in Mr. Colette's trial. A jury could have easily been persuaded to vote not guilty in a case where they learned that the investigating officers were withholding evidence and lying to the Court. The jurors would have had reason to believe that these officer were corrupt, and may have found any evidence presented by them to be unreliable as a result. Therefore, this evidence was highly material to the issues presented at trial.

> **d.    The newly discovered is not cumulative or merely impeaching.**

There can be no logical argument that this evidence is cumulative. The only other recording of the Johnson interview was also withheld from the defense, and consequently, was never considered at trial. In fact, it was stated that this evidence did not even exist during trial. Thus, there was nothing

presented at trial relating to these notes or the interview recording that this evidence would serve to corroborate.

As earlier stated, the Ninth Circuit has recognized that newly discovered impeachment evidence can be sufficiently material so as to warrant a new trial. *Davis* at 825. In fact, the Ninth Circuit, in *Davis*, specifically addressed the issue of newly discovered evidence which indicated that the officers involved in a case may have been dishonest or corrupt. "If newly-discovered evidence establishes that a defendant in a narcotics case has been convicted solely on the uncorroborated testimony of a crooked cop involved in stealing drug money, the 'interest of justice' would support a new trial under *Rule 33*." *Id*.

While the circumstances in this case do not involve theft on the part of the officers, it is clear, based on Schroder's statement that the officers withheld evidence from him, that the officers in this case were attempting to prejudice the defense at trial. It is unclear whether the officers were trying to avoid any reasonable doubts of the jury that may have specifically resulted from the evidence surrounding Johnson's involvement and potential guilt in this case. However, it is clear and uncontested that the officers had these notes as well as the recording of the Johnson interview, and yet, despite knowing that Johnson somehow disposed of a substantial amount of cocaine, as well as firearms, never disclosed this highly relevant evidence to the prosecution, defense, or Court.

This type of dishonest and questionable behavior on the part of the investigating agents, had it been discovered during trial, would likely have done more than impeach the officers' testimony.

Rather, it would have tainted the entire investigation and the evidence that resulted.    Therefore, this evidence cannot be accurately cast as   "merely impeaching."

       **e.    The evidence, if presented at a new trial, would likely result in acquittal.**

If the defense would have been given the opportunity to use this evidence at trial, the defense could have presented evidence that the officers had intentionally withheld these notes from Schroder, the defense, and the Court.    However, because Schroder failed to discover that the officers possessed more evidence than they had represented to him, the defense never had that opportunity.    Therefore, the jury deliberated without ever considering evidence that the investigating officers in this case engaged in police misconduct and possible evidence tampering.

Further, the use of this evidence to impeach and question Cohoon would have been valuable in terms of creating doubt in the jury's mind related to specific investigation findings.    The investigative law enforcement team apparently knew that Johnson had disposed of his cocaine and weapons somewhere.    (*See* Exhibit 15).    Yet, he never provided that information to anyone involved in this case, including the prosecution.

Clearly, the defense had an interest in questioning Cohoon as well as the other officers about why they never investigated the possibility that the drugs that Johnson lead them to were the same drugs that Johnson had cleared out of his home upon learning that he was being investigated and his home would soon be raided. In fact, the investigating officers did have a motivation for ignoring Johnson as a potential defendant in this case.    When Johnson first made his deal to turn over evidence against Mr.

Colette, the officers and Johnson agreed that if the investigation of Mr. Colette did not work out, Johnson could trade future assistance in other investigations for leniency. This offer, which was not testified to during the criminal trial was recorded. (*See* Johnson's recorded statement Pg. 9, lines 5-18; The recorded statement is attached as Exhibit 20). The officers knew that Johnson could be of help in future investigations, thereby making it less beneficial to charge Johnson in this case rather than Mr. Colette.

The defense had a right to raise these questions. However, the defense was prevented from exploring these issues at trial because this evidence was intentionally withheld. Because this evidence served to affect the juror's perception of the prosecution's witnesses, as well as the investigation of Mr. Colette, the verdict was likely affected by the withholding of this evidence. Had this evidence been available, the jury would have had a clear basis to find that there was a reasonable doubt regarding Mr. Colette's guilt in this case.

4. **Additionally, since trial, we discovered that there was an additional informant whose statements to Wall, at least in part, were the bases for the issuance of the warrant that lead to criminal proceedings against Mr. Colette.**

a. **The information regarding Sharon Powers is newly discovered evidence.**

Though Mr. Colette suspected that Sharon Powers, an angry former girlfriend, was the confidential informant relied upon by police before the magistrate who issued the warrant, the defense could never verify this fact, because the government refused to disclose Power's identity. After much time and effort, our private investigator was able to

locate Powers in September of 2007, well after the conclusion of Mr. Colette's trial, at which time we Powers stated that she was, in fact, the other confidential informant in this case. (Transcript of Powers's Statement Pg. 3, lines 1-8) This information, which we learned over a year after the criminal trial concluded, is quite obviously newly discovered.

> **b. Mr. Colette demonstrated due diligence in his requests for information regarding the identity of any unknown informants in his case.**

Mr. Colette had previously filed a motion to reveal the identity of all confidential informants relied upon in this case. (*See* Exhibit 7)  However, the motion was vigorously opposed by the government and, as a result, denied. (*See* Exhibit 8)  Because Powers left Fairbanks, the defense would never have been able to discover the truth, but for our continued diligence in attempting to locate her.  Despite our best efforts, our private investigator did not locate Powers until September 5, 2007, well after the outcome of Mr. Colette's trial.  Upon locating Powers, we immediately confirmed that she was the confidential informant in this case.  Had the defense not proceeded with such diligence, this evidence would have remained unknown indefinitely.

> **c. This information is material to the issues raised at trial.**

Powers had lived with Mr. Colette and worked in the same building as Agent Wall for over five years.  Wall knew of Powers previous relationship with Colette and had enough contacts with her to also know that she was an alcoholic

and highly unstable.  This would explain why Wall never disclosed her identity to the magistrate who issued the warrant.  Powers's participation in the investigation of Mr. Colette is material because she was likely responsible for committing some of the crimes Mr. Colette was charged with in this case.  Further, credibility is always an issue at trial, particularly the credibility of informants and law enforcement agents ultimately responsible for the arrest and charges.

The use of Powers as an informant raised several credibility issues in this case.  First, Wall was dishonest with the magistrate in regards to Powers, because he failed to disclose that he knew and worked in the same building as Powers, that Powers is an alcoholic, that she was Mr. Colette's girlfriend, that Mr. Colette and Power's relationship was extremely volatile, and that Mr. Colette had previously filed a restraining order against Powers. (The protective order against Powers is attached as Exhibit 17).

Further, Wall lied to the magistrate by telling him that the informant was a man and not a woman.  These facts were necessary for the magistrate to determine the reliability of the Powers. (Transcript of Application for Search Warrant Pg. 16, lines 15-16) Since the withheld evidence and lies go directly to Mr. Colette's guilt and Wall's credibility, taking into consideration that Wall was a prosecution witness at trial, the new evidence is material.

### d.    The newly discovered is not cumulative or merely impeaching.

The evidence is not cumulative, because no other evidence relating Powers was presented at Mr. Colette's criminal trial.  Further, aside from casting a shadow of doubt on the credibility of the issuance of the warrant which led to Mr. Colette's arrest and charges, this new evidence also severely impeaches the testimony of Wall. The evidence indicates that Wall intentionally misled the magistrate who issued the warrant in this case regarding Powers's identity, sex, and relationship to Mr. Colette. Had Mr. Colette been afforded the opportunity to present this evidence at trial, Wall's credibility would have been seriously put into question, if not completely destroyed.

### e.    The evidence, if presented at a new trial, would likely result in acquittal.

The combined effects of Wall's testimony being discredited, as wells as culpability for the crimes Mr. Colette was indicted on being attributed to Powers, this evidence could easily have resulted in acquittal on some or all of the offenses charged.  Thus, the evidence of Powers's role in the investigation, issuance of the warrant, and resulting criminal charges was vital to the defense and cannot possible be categorized as cumulative and merely impeaching.

5.    **Even if the Court Finds that Each Item of Evidence, Standing Alone, is Not Sufficient to Warrant a New Trial, the Combined Effect of All of the New Evidence Clearly Demonstrates that Mr. Colette is Entitled to a New Trial.**

Each item of new evidence in this case should be viewed in light of the other new evidence, which the government withheld, including the recording of the Johnson interview, the interview notes, the grand jury testimony, and the fact that officers lied about the existence of Sharon Powers as the original informant.  Taking all new evidence into account, it is likely that a new trial would result in an acquittal.

The prosecution had two elements to its case.  The prosecution had evidence in the form of witness testimony, and the prosecution had circumstantial evidence.  As earlier indicated, the weight of the testimony of the prosecution's witnesses would have been severely diminished, if not destroyed, by all of the above-mentioned new evidence.  It is clear that Johnson lied at trial and may have been responsible to putting the drugs and weapons in Mr. Colette's home.  Further, the investigating officers had all of the information to make these determinations, and withheld said information from everyone involved in trying this case.  The officers, according to Schroder, lied about the evidence existing, and caused Schroder to convey the same lies to the Court.

The star witness for the prosecution and the investigating officers would have had a markedly different effect on this case had all of the newly discovered evidence been presented.  Instead of giving credibility to the prosecution's case, these witnesses would likely have created an overwhelming sense of doubt about the validity of the prosecution's case.

Further, the circumstantial evidence of the illegal drugs and weapons being found at Mr. Colette's house could have easily been challenged, if not completely refuted, with the information regarding Johnson and the possibility that he, in fact, was the person who owned and put the materials in Mr. Colette's safe.    And, even if the jury was not persuaded of Johnson's guilt, there could have been other arguments made regarding who actually was in possession of the illegal materials found in Mr. Colette's home.    As earlier stated, he did not live alone and reportedly had many people in his home who had involvements with drug use and crimes.

We believe that the combined affect of discrediting the prosecution's witnesses, demonstrating prosecutorial or law enforcement misconduct, and providing an alternative theory on why the drugs were present in Mr. Colette's home would have, considered as a whole, created a basis for reasonable doubt and a verdict of not guilty.    Mr. Colette was entitled to present this evidence to a jury.    He was denied that opportunity and, as a result, was never given a full and fair trial.    For these reasons, we respectfully request that the Court grant Mr. Colette's motion for a new trial.

    **C.    Should the Court Find that Mr. Colette Did Not Meet the Five-Part Test for a New Trial Based on Newly Discovered, Evidence, This Motion Must Be Granted in Interest of Justice Based on Prosecutorial and Police Misconduct.**

Under Rule 33, a new trial motion should be granted "if required in the interest of justice."    In cases in which the newly-discovered evidence was available to the

43

prosecutor and not submitted to the defense, the defendant's burden of establishing the right to a new trial is far different than if the newly-discovered evidence came from a neutral third party. U.S. v. Agurs (1976) 427 U.S. 97, 111.

In Agurs, the Court stated that "the fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal." Id. The Agurs Court explained its reasoning by further stating that "If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the state's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice." Id.

In this case, it is undisputed that the newly discovered evidence was in either the possession or constructive possession of the prosecution. All the evidence that U.S. Attorney Schroder denied existed was eventually turned over to the prosecution by Assistant U.S. Attorney, James Barkeley. It is further undisputed that Barkeley received the evidence from law enforcement officials involved in the investigation of Mr. Colette. Schroder, in denying the existence of this evidence before trial and on the record during trial, was dishonest and

severely prejudiced Mr. Colette.  Further, withholding evidence from the defense and lying to counsel, as well as the Court, was a violation of his duty as an officer of the Court.  Even if Schroder was honest in his statements that the investigating officers lied to him about having the undisclosed evidence, the fact that the officer possessed this evidence constituted constructive possession on the part of Schroder.

In this case, it is clear that misrepresentation were made by the investigating agents in this case.  In cases where officers were found to have engaged in misconduct, new trial have been granted in the interests of justice. For example, "if newly-discovered evidence establishes that a defendant in a narcotics case has been convicted solely on the uncorroborated testimony of a crooked cop involved in stealing drug money, the 'interest of justice' would support a new trial under *Rule 33*." *U.S. v. Davis* (1992) 960 F.2d 820, 825.  In this case, officers have lied to the prosecution and Court, withheld evidence relating to their investigation, and perjured themselves on the stand.

**III.**

**BY FAILING TO DISCLOSE *GIGLIO* MATERIAL TO THE DEFENSE, THE GOVERNMENT HAS VIOLATED THE WELL-SETTLED REQUIREMENTS SET FORTH IN *BRADY V. MARYLAND*.**

A prosecutor has a constitutional duty to disclose material, exculpatory evidence to the defense, regardless of whether defense counsel makes a specific request.  *U.S. v. Bagley* (1985) 473 U.S. 667, 682; *Brady v. Maryland* (1963) 373 U.S. 83, 87.  Further, where the prosecution represents to the defense that certain evidence has been

45

provided or does not exist, the defense cannot be penalized for relying on the prosecution's representations it is keeping the defense apprised of any findings in the investigation of the defendant. *Strickler v. Greene* (1999) 527 U.S. 263, 276. The duty extends not only to information relevant to guilt, but also to evidence that tends to impeach the prosecution's witnesses. *Bagley* at 676; *Giglio v. U.S.* (1972) 405 U.S. 150, 154.

A breach of that duty violates due process when: (1) the prosecution suppressed impeachment evidence that was actually or constructively in its possession, regardless of good or bad faith of the prosecutor; and (2) the suppressed evidence was material. *Brady* at 87; *see* also *Kyles v. Whiley* (1995) 514 U.S. 419; *Paradis v. Arave*, 130 F.3d 385, 392 (9th Cir. 1997). Evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley* at 682. A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." *Id.* The effect of omitted evidence must be evaluated on the basis of the record as a whole. *Bagley* at 683; *see* also *U.S. v. Agurs*, (1976) 427 U.S. 97, 112. And the effect of undisclosed evidence must be considered cumulatively, not item by item. *Kyles* at 436-37.

**A.    The Government Violated Its Duty to Disclose Exculpatory Evidence.**

Impeachment evidence is exculpatory evidence, which the prosecution must disclose to defense. The Johnson

46

interview recording and notes, as well as Cohoon's grand jury testimony must be considered exculpatory, because they constitute impeachment evidence.

Johnson is an admitted drug dealer and an apparent liar. During Mr. Colette's criminal trial Johnson lied repeatedly. Cohoon's interview notes and grand jury testimony contain statements by Johnson, which could have been used to impeach him at trial. Further, Cohoon lied to the grand jury on several occasions, all of which have been discussed in previous sections. The grand jury testimony and notes should have been produced to defense, because Colette could have used them to impeach Johnson and Cohoon at trial on the above issues.

In addition, by producing the notes, recording, and grand jury testimony to the defense at the forfeiture trial, the government shed a revealing spotlight onto the credibility of the officers involved in this case. During Mr. Colette's criminal trial, the Court informed Schroder that he was required to produce the above evidence, and he responded that he had repeatedly asked the officers in this case whether they had turned over everything he needed, and they had answered yes. (CTT Pg. 1-150, lines 19-22; Pg. 1-254, lines 14-16) When the evidence was produced to Mr. Colette at the forfeiture trial, the officer's statements to Schroder were proved to be untrue. The fact that sworn officers lied to a prosecutor to the detriment of a criminal defendant is impeachment evidence that Colette should have had at trial.

B.    **The Withheld Impeachment Evidence was Actually or Constructively in the Prosecution's Possession.**

Good or bad faith on the part of the prosecutor is irrelevant to this determination.    All of the items of evidence were produced to Mr. Colette by the prosecution during his criminal forfeiture trial.    Whether the prosecution had the items in their possession and failed to turn them over, or the items were in the possession of law enforcement officers who lied about the existence of such evidence, the prosecution must be held accountable.

If the  prosecutor had the evidence, it was in their actual possession.    If law enforcement possessed the items, then the prosecution was in constructive possession of the evidence, because knowledge will be imputed to the prosecutor where the impeaching evidence is known to other members of the "prosecution team", including prosecutors in the same office, the police, or other investigative agencies involved in the prosecution.    *Kyles* at pg. 437-38 (police); *U.S. v. Endicott*, 869 F.2d 452, 455-56 (knowledge of promises made by Bureau of Alcohol, Tobacco and Firearms agents to witness is imputed to prosecutor, even though prosecutor may have been unaware of the promises, because the investigative officers were "part of the prosecution"); *U.S. v. Steel*, 759 F.2d 706, 714 (9th Cir. 1985) (Knowledge of information held by F.B.I. imputed to prosecutor because investigative officers were part of the prosecution); *U.S. v. Butler*, 567 F.2d 885, 889-91 (9th Cir. 1978) (government is responsible for non-disclosure by D.E.A. agents because

1  they are "an arm of the prosecutor").   Therefore, the
2  prosecution possessed the evidence.

3      C.   **The Suppressed Evidence Was Material to the Case.**

4      The evidence was material, because there is a
5  reasonable probability that had the evidence been disclosed
6  to the defense, the outcome would have been different,
7  which clearly indicates that confidence in the outcome has
8  been sufficiently undermined.   This is a totality of the
9  circumstance test, which requires looking at all items of
10  undisclosed evidence cumulatively.   Johnson was the
11  government's star witness in this case.   If Johnson's
12  testimony had not been presented at trial, Colette would
13  have likely been found not guilty of all charges.
14  Therefore, evidence that would have destroyed the jury's
15  reasonable ability to believe Johnson's testimony would
16  clearly, after the fact, constitute evidence undermining
17  the trial outcome.

18      Further, had the above evidence been produced,
19  Cohoon's credibility at trial would have been lessened.   In
20  addition, evidence that the officers in this case lied to
21  a federal prosecutor about the existence of evidence would
22  have cracked the structure within which this trial took
23  place, thereby toppling the government's case.   Taken
24  cumulatively, the damage to the government's case had this
25  evidence been disclosed strongly suggests that the outcome
26  would have been different, and certainly undermines
27  confidence in the outcome.   There cannot be confidence in
28  an outcome, which is the byproduct of failure to produce

material exculpatory evidence to the defense.  Here, Mr. Colette's right to due process has been violated.

### D.    The Effect of the Prosecution's Failure to Comply with Brady in Regards to the Above-Mentioned Items of Evidence Must Be Considered Cumulatively, Not Item By Item.

"For the purposes of *Brady*, materiality is measured 'in terms of suppressed evidence considered collectively, not item by item." *U.S. v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004) (quoting *Kyles* at 436).  In assessing a Brady violation, the reviewing court must assess the "cumulative effect" of the suppressed evidence.  *Kyles* at 421.

The extent of damage that the withheld evidence could have exacted on the prosecution's case has been explored throughout the analysis in the earlier sections of this motion.  However, to reiterate, the combined effect of the evidence did not merely impeach one witness or even a majority of the prosecution's witnesses.  The withheld *Giglio-Brady* material in this case served to cast doubt and an err of impropriety on *every* witness called by the prosecution in this case.  Taken individually, the items of evidence did much to demonstrate that the *Brady* materials could have had a profound effect on the trial verdict.  However, taken cumulatively, the prosecution is left with no credible witnesses, an impending allegation of prosecutorial misconduct, and a possibility that one of its own witnesses is responsible for the crimes charged against Mr. Colette.

For these reasons, in conjunction with those given in the other sections of this motion, Mr. Colette respectfully

1 | requests that the Court grant the defense's motion for a
2 | new trial

### IV.
### CONCLUSION

In this case, there are three separate bases for granting Mr. Colette's motion for new trial.  First, the government withheld Jencks evidence from the defense.  Mr. Colette was convicted on the basis of four witnesses' testimony:  Johnson, Cohoon, Wall, and Foran.  The Jencks evidence, which was not produced until after Mr. Colette's trial, served to destroy the credibility of every witness called by the prosecution, thereby eliminating any credibility afforded to the vast majority of the prosecution's case.

Second, Rule 33 of the Federal Rules of Criminal Procedure requires a new trial in the interests of justice.  All evidence that was not provided to the defense during trial constitutes new evidence.  When new evidence is received after trial, a new trial must be granted where it serves the interests of justice.  In this case, Mr. Colette was convicted on the basis of testimony that would have been discredited had the new evidence been known to the defense during trial.  Further, the new evidence created a basis to find guilt for the charged crimes with another party.  Therefore, the interests of justice undoubtedly require that a new trial be granted.

Finally, if a Brady violation results in the violation of a criminal defendant's due process right then the Court should grant his motion for new trial.  *U.S. v. Walgren*,

51

885 F.2d 1417, 1427 (9th Cir. 1989). Under *Brady* and *Giglio*, the prosecution had an obligation to turn over the above-mentioned evidence to the defense. The evidence was critical to the defense's case and exculpatory in nature. The *Brady* rule exists to prevent this very situation, a conviction rooted in prosecutorial misconduct or negligence. Mr. Colette has a right to have a trial where all relevant, particularly exculpatory evidence is presented to the jury.

For these reasons, Mr. Colette respectfully requests that this Court grant his motion for a new trial pursuant to the requirements and dictates of the Jencks Act, Rule 33 of the Federal Rules of Criminal Procedure, and *Brady v. Maryland*.

Dated: July 23, 2008             Respectfully submitted,

                                 /s/ David J. Cohen
                                 300 Montgomery Street
                                 Suite 660
                                 San Francisco, CA 94104
                                 (415) 398-3900
                                 (415) 398-7500