1  (indiscernible).  I'm married.  My wife is an elementary

2  schoolteacher, also with the Lower Yukon School District.  I

3  have one child, six years old.  I'm a gardener and I like

4  music.  No military service, and this is the first -- first

5  time (indiscernible).

6        JUROR NO. 30:  My name's (juror states name).

7  (Indiscernible) Alaska is 48 years.  My employer's Dish Alaska.

8  I own the company; I'm self-employed.  Basically when you own

9  the company, you do everything.  Okay, highest level of formal

10 education is some college.  I'm currently married.  My spouse

11 is a retired R.N.  I don't know what she (indiscernible)

12 employed at.  I have five children, 35 to 42.  When you own the

13 company, it is your hobby.  Military (indiscernible) E-3, three

14 years in the Army.  And I had one jury service, a criminal

15 case, and we reached a verdict.

16       JUROR NO. 31:  My name is (juror states name).  I've

17 been here in Alaska for 30 years.  My employer is the

18 Department of Public Works, Ft. Wainwright.  I'm a pipefitter-

19 welder.  Highest level of education is graduated high school.

20 I'm married.  My wife is a homemaker.  We have three children,

21 7, 14, and 15.  Hobbies are fishing and woodworking.  We attend

22 (indiscernible) church.  No military background.  I was on a --

23 served on a jury and we were able to reach a verdict.

24       JUROR NO. 32:  My name is (juror states name).  I've

25 been in Alaska 33 years.  I'm a retired laborer.  I've been

1  retired for four years.  My -- I graduated college.  I'm

2  married.  My husband's been a local truck driver but has

3  recently retired, when the company got sold.  I have a 19-year-

4  old daughter.  I like to read and do other outdoor things --

5  gardening, biking, snowmachining, run a dog team.  I am not --

6  have been in the military.  I have been called for jury service

7  before, have served on a couple of grand juries.

8          JUROR NO. 33:  My name is (juror states name).  I've

9  lived here 11 years, work for the university for the last five

10  years in the facilities plant.  Got my BA at the University of

11  Montana.  My wife works for Head Start.  We have four

12  daughters, age 34 through 17.  Like hunting, fishing,

13  motorcycling.  No prior military or jury duty.

14          JUROR NO. 34:  My name is (juror states name).  I've

15  been in Alaska for 17 years.  My employer is the DOD.  I'm a

16  Department of Defense civilian.  I'm in human resources.  For

17  the past 16 years prior to that, I was a fishing guide.  I have

18  two years of college.  I'm single.  I have two girls, age 18

19  and 20.  Many different sporting activities; one included the

20  Fairbanks Interior Table Tennis Club, was the president of.

21  I'm a U.S. Army retired sergeant major.  I've been on prior

22  jury service, two criminal cases.  And one verdict was reached

23  and one was not.

24          JUROR NO. 35:  My name is (juror states name).  Lived

25  in Alaska for 26 years.  Work for (indiscernible) Resources,

1   North Pole Refinery.  I'm an operator.  Before that, I worked

2   for Alaska West Express as a transfer facility operator.  High

3   school.  I'm married.  She works for UAF, in something to do

4   with getting teachers and mentors.  I have one son, he's two

5   and a half.  Enjoy playing hockey, snowmachining, boating.  No

6   military and no jury service.

7           THE COURT:  Thank you.  Mr. Schroder, did you have any

8   questions for any members of the panel -- for the panel?

9           MR. SCHRODER:  I don't think so.  No, Your Honor.

10          THE COURT:  Mr. Butler, any questions?

11          MR. BUTLER:  If I may just take a moment here, Judge.

12          THE COURT:  All right.

13          MR. SCHRODER:  Your Honor, though, there -- there's

14  probably one issue, though, we need to bring up with you and

15  counsel.....

16          THE COURT:  Okay.

17          MR. SCHRODER:  .....before we go on here.

18          THE COURT:  Okay.  Mr. Butler.

19      (At sidebar with the Court and counsel)

20          THE COURT:  Yes.

21          MR. SCHRODER:  After the door shuts -- (states name),

22  if you remember, she is the woman who said her husband had a

23  past felony.

24          MR. BUTLER:  Yeah.

25          MR. SCHRODER:  He's working through the ATF.  There's

1  only one agent here, so he's working through Cohoon to try to

2  get his rights restored to use explosives, because I think he

3  was involved in the mining too.  She said she was a mining

4  engineer.

5        MR. BUTLER:  Oh, (indiscernible).

6        THE COURT:  I thought he has a misdemeanor.

7        MR. BUTLER:  A felony.

8        MR. SCHRODER:  She said a felony.

9        MR. BUTLER:  She said for $100 --

10        THE COURT:  Is that the one in Nevada?

11        MR. SCHRODER:  Yeah.

12        MR. BUTLER:  Yeah, $100 --

13        MR. SCHRODER:  Yeah, it was --

14        MR. BUTLER:  -- yes.

15        MR. SCHRODER:  -- a minor (indiscernible) --

16        MR. BUTLER:  $100 is a felony?

17        MR. SCHRODER:  I don't know.  But I mean, we don't have

18  a problem with her.  I just wanted to let you -- you know, let

19  you know that he's working through the ATF to try to get his --

20        THE COURT:  He's not physically here, is he?

21        MR. SCHRODER:  No.  No.

22        MR. BUTLER:  Okay, but her husband's working through

23  ATF to get his gun rights restored --

24        MR. SCHRODER:  Well, it's -- yeah, like --

25        MR. BUTLER:  -- or explosive (indiscernible).

1      MR. SCHRODER:  Explosives, I think, for work purposes.

2  That's the way I understand it.

3      MR. BUTLER:  And we have an ATF agent.

4      MR. SCHRODER:  Right, who is --

5      THE COURT:  That's just good that you know that, you

6  can use that.  I'm not sure that that's justification to excuse

7  for cause, that that certainly is something you can consider

8  and bring --

9      MR. BUTLER:  Right.

10      MR. SCHRODER:  Yeah, I just wanted to be sure it's

11  clear.

12      THE COURT:  But if you want to talk to her again, so we

13  can bring her back, yeah.

14      MR. BUTLER:  Yeah, I would like to, Judge, about

15  that --

16      THE COURT:  Yes.

17      MR. BUTLER:  -- just to see what her -- I mean, we've

18  got an ATF agent here.  And I appreciate counsel letting me

19  know about it.

20      MR. SCHRODER:  Yeah.  (Indiscernible).

21      THE COURT:  What's her -- let's see, her name is --

22      MR. SCHRODER:  (States name).

23      THE COURT:  (States name).

24      MR. SCHRODER:  Uh-huh (affirmative).

25      THE COURT:  Well, this is going to highlight her.  I

1   wonder how I can do this without --

2        MR. BUTLER:  Well, I'll tell you what, let me talk to

3   my client about it and see if we (indiscernible) agreement

4   on -- I'll do it that way, if we don't have to (indiscernible).

5        THE COURT:  Well, if you're close on preempts -- I

6   don't know, she -- either she's -- if I remember correctly,

7   there wasn't controversy about that except that her husband had

8   the -- she's the mining engineer -- her husband in Nevada,

9   before she had met him.

10        MR. BUTLER:  Right.

11        THE COURT:  Okay, so --

12        MR. SCHRODER:  Right, I -- yeah, I just wanted to make

13   sure that -- I mean, like I say, he's trying to get something

14   from the ATF.

15        THE COURT:  I understand.

16        MR. BUTLER:  Yeah.

17        MR. SCHRODER:  So I want to make sure everybody's --

18   understands what's going on --

19        MR. BUTLER:  I appreciate that.

20        MR. SCHRODER:  -- that's all.

21        MR. BUTLER:  Arctic Alarm and Audio is my client's

22   company.

23        MR. SCHRODER:  Business, right.

24        MR. BUTLER:  And his brother pointed out to me on the

25   break that that's probably how people know him, not by his

1  name.

2        THE COURT:  Yeah.

3        MR. BUTLER:  So I don't know whether he's got customers

4  out there who --

5        THE COURT:  Do you want me to ask a question?

6        MR. BUTLER:  It's -- I don't know how he'd feel about

7  that.  But that's how -- maybe (indiscernible) people will know

8  of him who don't --

9        THE COURT:  Is it better --

10        MR. BUTLER:  -- know his name.

11        THE COURT:  -- coming from me as opposed to from you?

12  Or do you want to take it?

13        MR. BUTLER:  No, I'd let you do it, Judge.  I mean --

14        THE COURT:  Arctic Alarm and Audio.  I -- I'll just say

15  the defendant works for Owens, right?

16        MR. SCHRODER:  Right.

17        THE COURT:  Owens Arctic Alarm and Audio.

18        MR. SCHRODER:  Right.

19        THE COURT:  Does anyone have any experience with him.

20        MR. SCHRODER:  Yeah.  That's fine.

21        MR. BUTLER:  Okay.

22        THE COURT:  Okay.

23        MR. BUTLER:  And I need just another couple minutes

24  then to determine if we have any questions for jurors, because

25  I'm -- you know --

1          THE COURT:  Okay, take your time.

2      (End of sidebar)

3          THE COURT:  Okay, well, just -- counsel can review

4  their notes and --

5      (Pause)

6          MR. BUTLER:  Thank you, Judge.

7          THE COURT:  Any questions, Mr. Butler?

8          MR. BUTLER:  No, sir, Your Honor.

9          THE COURT:  All right.  Ladies and gentlemen, one thing

10  that I probably should mention is the defendant owns a business

11  called Arctic Alarm and Audio.  Anyone have any dealings with

12  that business.  Arctic Alarm and Audio.

13          Okay, counsel, are you ready to exercise your

14  peremptory challenges?  Let me ask the government, are you

15  ready to do that?  I mean.....

16          MR. SCHRODER:  Could we get about five minutes, Your

17  Honor?

18          THE COURT:  Oh, yeah.  No, I just -- are you ready to

19  do that?  We'll take 15 --

20          MR. SCHRODER:  Ready to move to that phase, yes.

21          THE COURT:  So what I'll do is, counsel can look at

22  your papers, look at the names, look at the faces, so you can

23  put the face to the name, and when you've done that, I'm going

24  to excuse everybody, and then you'll select -- give you 15

25  minutes to pick the -- to exercise your challenges.  Is that

1  fair for you?  Mr. Butler, you follow that?

2          MR. BUTLER:  Yes, Judge.

3          THE COURT:  So you tell me when you're comfortable.

4  And what we're going to do, so that everyone understands here,

5  this -- we're ready -- we're about done.  Counsel are now

6  looking at their notes, thinking, talking among themselves,

7  then we're going to excuse you to go back to the room.  They'll

8  take whatever time it takes to -- they each have a certain

9  number of challenges they can take, and then the last 14 are

10  members of the jury.  And we come back in, we'll announce who

11  the jury is, we'll then -- I'll read you a couple instructions,

12  we'll break for lunch, and then we'll start evidence -- opening

13  statements will be after lunch.  So that's basically it in a

14  nutshell.  In the old day, in state court, this used to take

15  two days.  So, counsel, you tell me when you're -- when I can

16  excuse the jurors.

17          MR. SCHRODER:  Ready, Your Honor.

18          MR. BUTLER:  Yes, sir.

19          THE COURT:  All right.  So we'll stand in recess for

20  roughly 15 minutes.  The clerk should be here to take you

21  back -- or you can head -- do you remember how to get there?

22  All right.  And then I'll -- the admonition I gave before still

23  stands.  Don't talk to anybody et cetera, et cetera.

24      (Panel not present)

25          THE COURT:  Okay, counsel, you can go to work.  Let me

1   know when you're ready.

2        THE CLERK:  Off record.

3        (Court recessed at 11:54 a.m., until 12:23 p.m.)

4        (Panel not present)

5        THE CLERK:  All rise.  His Honor the Court, this United

6   States District Court is again in session.  Please be seated.

7        THE COURT:  Okay, we're back on the record.  Counsel,

8   did you get a chance to look at the final jurors sheet?

9        MR. SCHRODER:  We did, Your Honor.

10       THE COURT:  Both sides know who the jurors are and

11   they're satisfied?  You -- you're satisfied with the jurors

12   list?

13       MR. BUTLER:  Yes, sir.  Yes, sir, Your Honor.

14       THE COURT:  Okay.  Okay, well, bring them back in.

15   I'll announce to the jurors -- I'll read them a couple

16   instructions -- a few instructions.  It's 12 -- let's see,

17   12:30.  What time do you want to return?  What time you want to

18   start opening statements?  Do you want to start -- let's see,

19   if we're -- do you want an hour and 15 minutes?  Want to start

20   at quarter till 2?

21       MR. BUTLER:  That would be -- yeah, I'd ask for --

22       THE COURT:  Okay.

23       MR. BUTLER:  -- whatever consideration the Court give

24   us on that.

25       THE COURT:  Okay, so that would be 1:45, we'll bring --

1  okay, let's go, if we're ready.

2          MR. SCHRODER:  I mean, I know we've found out -- I

3  guess -- you've done plenty of trials up here, Judge, but

4  there's no food in the building, so there's --

5          THE COURT:  I know, that's what I was thinking about.

6          MR. SCHRODER:  -- that issue.  So --

7          THE COURT:  That gives them an hour and 15 minutes.

8          MR. BUTLER:  Oh, the juror an -- jurors an hour and 15

9  minutes.  Is that going to be enough, then?

10          THE COURT:  Well, it's the -- we -- they've beat the

11  noon rush hour, so they can make it over to McDonalds and

12  Burger King and back, yeah.

13          MR. SCHRODER:  That's fine with us, Your Honor.

14          THE COURT:  We'll see.  If they complain, we'll deal

15  with it some way.  (Pause)  I take it they're on their way.

16      (Panel present at 12:24 p.m.)

17          THE COURT:  Okay, now you just sit there.  You just --

18  no, you're not in the box anymore.  Just the -- just sit any

19  seat you can have -- you can find.  Any seat you want, and then

20  we'll -- this'll be about -- you just take any seat you can

21  find, no order.  Just any seat you want.  Any seat you want.

22  And no discussion out there.  No discussion.  Any seat you

23  want.

24          UNIDENTIFIED SPEAKER:  Any blue ones?

25          THE COURT:  Just as long as they're blue.

1        THE CLERK:  Any --

2        THE COURT:  Any -- oh, no, you get any set -- any seat

3    you want but those.  We're going to fill those in a second.

4    Just take any seat you can find, but these.  You just take any

5    seat, not these up here.  Okay.  So what we're going to do

6    now -- just take -- grab any seat you can find.  Doesn't matter

7    where it is.

8        Okay.  How you doing?  Still look good.  We're going to

9    call 14 names, and as your name is called, you just take your

10    seat in the jury box and that will be the jurors.  So, Madam

11    Clerk, if you'll do that for us, please.

12        THE CLERK:  Juror number 1, (states name).  Juror

13    number 2, (states name).  Juror number 3, (states name).  Juror

14    number 4, (states name).  Juror number 5, (states name).  Juror

15    number 6, (states name).  Juror number 7, (states name).  Juror

16    number 8, (states name).  Juror number 9, (states name).  Juror

17    number 10, (states name).  Juror number 11, (states name).

18    Juror number 12, (states name).  Juror number 13, (states

19    name).  And juror number 14, (states name).

20        THE COURT:  Okay.  Very good.  Well, ladies and

21    gentlemen, this is the jury.  So you are all excused.  Again,

22    thank you very much.  If you want to stay, you're welcome to

23    stay.  But you're excused, free people, and we're going to now

24    focus on the jury.  Again, thank you.

25        Okay.  Are you ready to go?  All right.  I'm going to

1   read you one instruction, and then we're going to break for

2   lunch, and then we're going to come back and start with the

3   opening statements and the presentation of witnesses.  I'm

4   going to wait till the people have left.  Did you have a

5   question?  Somebody here have a question?  Okay.  If you have a

6   question, don't be afraid -- all right.

7           I'm going to read this one instruction.  Fourteen of

8   you have been chosen as jurors in this case.  Two of you will

9   be selected randomly as alternates at the conclusion of the

10  case.  The law only permits 12 jurors to decide this matter.

11          Before you take the jurors oath, I want to impress upon

12  you the seriousness and importance of being a member of the

13  jury.  Trial by jury is a fundamental right in the United

14  States.  It assures that each case will be decided by citizens

15  who are fairly selected, who come to a case without bias, and

16  who will attempt to render a fair verdict upon the evidence

17  presented.

18          Now, you took an oath when you were examined as to your

19  qualifications to be jurors.  Now you are called upon to take a

20  second oath.  By this oath you will swear or affirm that you

21  will decide the case on the evidence presented according to the

22  law that I will give you.  When you take the oath, you accept

23  serious and important obligations.  The jury system depends on

24  the honesty and the integrity of the individual jurors.  You

25  affirm that you are truly impartial in this case.  You affirm

1  that there is nothing to your knowledge that the parties or I

2  should know about your ability to sit as jurors in the case.

3          So if there's no questions, if you'd please stand, my

4  clerk will administer the oath.

5          THE CLERK:  If you'll raise your right hands, please.

6                  **JURY EMPANELING OATH ADMINISTERED**

7          THE CLERK:  Please be seated.

8          THE COURT:  Okay, I'm going to give you the same

9  instruction I gave before the last break.  It's important that

10  you take this to heart.  And then you -- I guess you get to go

11  out the door this time to your jury room, to see what it's

12  like -- is that the process?  And then they'll take you to the

13  big room, excuse you for lunch.  And is an hour and 15 minutes

14  enough for you to go find something to eat?  Okay.  You get to

15  go home for dinner too.  But we'll give you an hour and 15

16  minutes.  If you think you need a little more, let me know,

17  okay?

18          All right, let me read this instruction.  We are about

19  to take our second break during the trial, and I want to remind

20  you of the instruction I gave you earlier.  Until the trial is

21  over, you are not to discuss this case with anyone, including

22  your fellow jurors, members of your family, people involved in

23  the trial, or anyone else, nor are you to allow anyone to

24  discuss the case with you.  If anyone approaches you and tries

25  to talk to you about the case, please let me know about it

1  immediately.  Do not read or listen to any news reports on the

2  trial.

3         Finally, you are reminded to keep an open mind until

4  all the evidence has been received and you have heard the

5  arguments of counsel, the instructions of the Court, and the

6  view of your fellow jurors.

7         That having been said, you -- you're the jurors, you've

8  taken the oath.  We'll recess for an hour and 15 minutes and

9  we'll come back and you'll hear opening statements from each --

10  from counsel, okay?  Stand in recess.

11    (Side conversation)

12    (Jury not present at 12:33 p.m.)

13       THE CLERK:  Okay.  No one closed the door behind them.

14  My goodness, it's like my house.  Okay.  Anything else that we

15  have to do, counsel, before we recess?

16       MR. BUTLER:  Judge, could I inquire of my colleague on

17  the other side, in terms of witnesses, who he plans to call

18  this afternoon?

19       THE COURT:  Who do you plan to call today?  Today,

20  not --

21       MR. SCHRODER:  Depends --

22       THE COURT:  Is it -- oh, come on.

23       MR. SCHRODER:  Depends on how long the cross-

24  examinations are going to be.

25       THE COURT:  No, he just -- he wants to know who your

1    first witness is today.

2              MR. SCHRODER:  We're going to call Sergeant Wall first.

3              MR. BUTLER:  Sergeant Wall.

4              THE COURT:  Okay.

5              MR. SCHRODER:  Uh-huh (affirmative).

6              MR. BUTLER:  And is there a plan to call Mr. Johnson

7    today?

8              MR. SCHRODER:  (No audible response).

9              THE COURT:  Okay.

10             MR. BUTLER:  Okay.  If I could inquire -- I mean, I

11   know that counsel doesn't have to give any verbatim statements

12   until after the witness testifies, but if Mr. Johnson is going

13   to testify against my client, will we be getting the statements

14   that he made to the state when he was originally arrested and

15   what have you?

16             MR. SCHRODER:  I know of no other statements other than

17   the defense has.  Assuming Mr. Butler has all the discovery

18   that we've turned over.

19             MR. BUTLER:  I have what they turned over, Judge.  I

20   don't have his statements that he made when he was arrested.

21   And I submit that we should be allowed to have those if he's

22   going to testify against my client.

23             THE COURT:  Well --

24             MR. BUTLER:  Counsel says he doesn't have them, but --

25             THE COURT:  Do they -- I mean, are there statements or

1  aren't there statements?

2      MR. SCHRODER:  He was not arrested originally, and --

3  at all -- he wasn't arrested.

4      THE COURT:  Okay.

5      MR. SCHRODER:  But, I mean, that probably is neither

6  here nor there.  I mean, my understanding was there were --

7  whatever was put into the reports, and the same day that he

8  was -- this all happened, he was taken to testify in front of

9  the state magistrate.

10     THE COURT:  Okay.

11     MR. SCHRODER:  And I believe that we've provided that.

12 There's a transcript of that and there's also the recording of

13 that.

14     THE COURT:  Well, if it turns out that you don't have

15 something that you're entitled to, then his cross-examination

16 can continue over until tomorrow morning.

17     MR. BUTLER:  Okay.

18     THE COURT:  If you --

19     MR. SCHRODER:  I mean, I'll ask again, Your Honor, but

20 I -- you know, I have the -- informed the officers in -- again

21 this week, and I always ask them, is there anything out there I

22 don't have that I need --

23     THE COURT:  Well --

24     MR. SCHRODER:  And they --

25     THE COURT:  I -- and of course --

*A & T TRANSCRIPTS*
*(817) 685-7556*

1        MR. SCHRODER:  -- said no.

2        THE COURT:  -- I don't know.  So all I'm saying is that

3   he's entitled to what he's entitled to, if it turns out there's

4   something that comes up as a surprise, then I'll ask him to

5   continue cross-examination tomorrow morning.  If there's

6   nothing, then maybe we'll be done today.

7        MR. BUTLER:  Okay.  Judge --

8        THE COURT:  Does that make sense?

9        MR. BUTLER:  Yes, sir.  Under --

10       THE COURT:  Okay.

11       MR. BUTLER:  Under state law, when they take somebody

12  in and question them like that, they usually record, under what

13  we call the *Stephan-Harris* rule.

14       THE COURT:  Right.

15       MR. BUTLER:  And so it appears to me that, at the very

16  least, this young man, after they arrest -- well, they detained

17  him, they --

18       THE COURT:  Okay.

19       MR. BUTLER:  It's more likely than not they interviewed

20  him.  Because that's probably the only way he was able to be

21  released back on the streets without being formally put in a

22  jail cell.

23       THE COURT:  I understand.

24       MR. BUTLER:  Now, it appears to me that there's got to

25  be a recording of that statement, and that statement would

1    probably include information that he said about my client,

2    which the government's going to be using against him in this

3    courtroom.  And so I would like to have at least the taped

4    statement of him when he was detained.

5          MR. SCHRODER:  I will go to the officers and

6    specifically --

7          THE COURT:  Okay.

8          MR. SCHRODER:  -- ask that question to --

9          THE COURT:  And I don't --

10         MR. SCHRODER:  -- confirm.

11         THE COURT:  He -- what we're being told is it -- that

12   one does not exist and he's going to check again to see if one

13   exists, and if one exists, he'll provide it to you.

14         MR. BUTLER:  Okay.

15         THE COURT:  How about that, for clear?

16         MR. BUTLER:  That -- that's fine.

17         THE COURT:  Okay.  Now the lunch is only an hour and 10

18   minutes.  Okay.

19         THE CLERK:  Off record.

20      (Court recessed at 12:39 p.m., until 2:02 p.m.)

21      (Jury not present)

22         THE CLERK:  All rise.  His Honor the Court, this United

23   States District Court is again in session.

24         THE COURT:  Ready?

25         THE CLERK:  Please be seated.

 1              THE COURT:  Are you going to speak from there or from

 2    the podium?

 3              MR. SCHRODER:  What's that, Your Honor?

 4              THE COURT:  Are you going to speak from the podium?

 5    Oh.

 6              MR. SCHRODER:  If I may move --

 7              THE COURT:  Okay.  Do you have all the gear ready?

 8              MR. SCHRODER:  I -- I'm not doing any gear in the

 9    opening.

10              THE COURT:  I know, but the microphone.

11              MR. SCHRODER:  Oh.

12              THE COURT:  I mean, is it all ready and hooked up or

13    is --

14              MR. SCHRODER:  I will hook it right now.

15              THE COURT:  It's just a lot better to do it before the

16    jury gets in.  Is the jury in their assembly room?  Because --

17    but I am going to read them a few instructions beforehand,

18    so -- are their note -- you got the notepads out?  Okay, bring

19    them back in.

20         (Jury present at 2:04 p.m.)

21              THE COURT:  See, this is the phase where everyone's

22    in -- quite uncertain what to do.  And the jurors all stand and

23    counsel all stands, wondering who sits down first.  And they're

24    standing for you.  So you sit down and everybody else will sit

25    down.  Or else we're going to be standing up the whole doggone

1   day.

2          Okay, ladies and gentlemen, ready to go?  Got your

3   notepads and everything.  I want to read you some instructions

4   now.  And, again, you'll have these in writing later.  You are

5   now ready to serve as jurors.  To assist you in your task, I'm

6   going to summarize for you the way in which the trial will be

7   conducted.  After you heard the evidence, I will briefly

8   explain some of the law that you'll need to know.

9          The trial will proceed in the following manner.  First,

10  the government, through counsel, will make an opening statement

11  outlining what the government expects to prove.  Next,

12  defendant, through counsel, may make an opening statement or

13  may reserve it.  You are reminded that the statements of

14  counsel are not evidence, but are merely an indication of what

15  evidence counsel expect to be presented.

16         The government will then present its evidence.  When

17  the government has concluded its case, the defendant may

18  present evidence, but is under no obligation to do so.  If the

19  defendant presents any evidence, the government may present

20  rebuttal evidence.

21         After the evidence is presented, the parties will have

22  an opportunity to argue the case to you.  That will be

23  explained later.  After the arguments end, I will tell you

24  about the law that applies to the case, then you will meet

25  together to evaluate the evidence, apply the law to the

1    evidence, and reach a verdict if you are able.

2         I will rely on you to determine the facts.  This must

3    be done by relying solely upon the evidence received in this

4    trial.  You must not be governed by mere sentiment, conjecture,

5    sympathy, passion, prejudice, public opinion, or public

6    feeling, but must base your conclusions only upon a fair

7    consideration of the evidence.  That evidence may include the

8    sworn testimony of witnesses, exhibits submitted into the

9    record, facts agreed to by the attorneys, and facts judicially

10   noted by the Court.

11        The evidence should be considered and viewed by you in

12   light of your own observation and experiences in everyday life,

13   but you may not consider any other source of information not

14   presented to you in this case.  Therefore, during the trial,

15   you must avoid reading any newspaper articles about the case or

16   listening to or watching any news stories about the case.

17        It will be my duty to decide what laws must be applied.

18   In so doing, I will look to a number of sources:  the statutes

19   of the United States, the decisions of the United States

20   Supreme Court and other learned courts, and the evidence

21   presented to you by attorneys who have appeared before you.

22   You must apply the law as I give it to you.  You may not apply

23   the law as you think it is or should be or as somebody else may

24   have told you it is.

25        At no time during the course of the trial will it be my

1  intention by anything I say or do or by any questions that I

2  may ask to suggest what you should find to be facts on any

3  questions submitted to you or that I believe or disbelieve any

4  witness.  If anything I do or say seems to so indicate, you

5  will disregard it and form your own opinion.  What the verdict

6  shall be is your sole and exclusive duty and responsibility.

7          There are rules of law that prevent some types of

8  information from being presented as evidence in a court of law.

9  This is why objections may be made to certain questions of

10 counsel, answers of witnesses, or exhibits.  There will likely

11 be bench conferences and legal arguments outside of your

12 presence to discuss these rules.  Basically, these rules are

13 designed to do two things.  First, they try to keep you focused

14 on important and reliable evidence by keeping out interesting

15 but not very important and reliable information.  Second, the

16 rules help you decide the case objectively, without being

17 swayed by information that might cause you to respond

18 emotionally.  It is because the law protects what you hear that

19 we have such confidence in the impartiality and the integrity

20 of the jury.

21          You should not be influenced by the fact that

22 objections are made to questions or to the presentation of

23 evidence or that requests are made that I take certain actions,

24 nor should you be influenced by the number of objections or

25 requests that are made.  Objections or requests are not

1  evidence.

2       You should draw no conclusions about the case to my

3  response to objections or requests.  My rulings on these

4  matters must be determined by the law and will not reflect

5  anything about the merits of the case or my views of the

6  evidence or the witness.  So please remember that my rulings

7  that exclude evidence or that bar questions are designed to

8  help you decide the case fairly.  Of course, if I decide that

9  certain evidence should be excluded, you must disregard it.

10 You may not speculate as to why the evidence was excluded or

11 what it may have been.

12      Now, the evidence you are about -- you are -- you

13 consider in deciding what the facts are consists of the sworn

14 testimony of witnesses, the exhibits which are to be received

15 into evidence, and any facts to which the attorneys stipulate.

16 The following things are not evidence and you must not consider

17 them as evidence in deciding the facts of the case:  Statements

18 and arguments of the attorneys; questions and objections of the

19 attorneys; testimony that I instruct you to disregard; and

20 anything you may see or hear when the court is not in session,

21 even if what you see or hear is done or said by one of the

22 parties or by one of the witnesses.

23      Some evidence is admitted for a limited purpose.  When

24 I instruct you that an item of evidence has been admitted for a

25 limited person -- purpose, you must consider it only for that

1  limited purpose and no other.

2          Evidence may be direct or circumstantial.  Direct

3  evidence is direct proof of a fact, such as testimony by a

4  witness about what that witness personally saw or heard or did.

5  Circumstantial evidence is indirect evidence.  That is, it is

6  proof of one or more facts from which you can find another

7  fact.  Let me give you an example.

8          If before you go to bed on a winter night, you look out

9  your window and see it's snowing, and you reach out the window

10 and feel it on your hand, you have personal knowledge that it

11 is snowing.  This is direct evidence.  But if when you go to

12 sleep the sky and ground are clear, and you later awaken and

13 the ground is white and covered with snow, you conclude that it

14 snowed even though you did not see the snow fall.  This is

15 circumstantial evidence.  You are to consider both direct and

16 circumstantial evidence.  The law permits you to give equal

17 weight to both, but it is for you to decide how much weight to

18 give to any evidence.

19         In deciding the facts of this case, you may have to

20 decide which testimony to believe and which testimony not to

21 believe.  You may believe anything a witness says, or part of

22 it, or none of it.  In considering the testimony of any

23 witness, you may take into account the opportunity and ability

24 of the witness to see or hear or know the things testified to;

25 the witness' memory; the witness' manner while testifying; the

1   witness' interest in the outcome of the case and any bias or

2   prejudice; whether other evidence contradicted the witness'

3   testimony; the reasonableness of the witness' testimony in

4   light of all the evidence; and any other factors that bear on

5   believability.  The weight of the evidence as to a fact does

6   not necessarily depend on the number of witnesses who testify.

7       You may hear testimony from persons who because of

8   education or experience are permitted to state opinions and the

9   reasons for their opinions.  Opinion testimony should be judged

10  just like any other testimony.  You may accept it or reject it,

11  and give it as much weight as you believe it deserves

12  considering the witness' education and experience, the reason

13  given for the opinion, and all the other evidence in the case.

14      Now, the distinguishing features of a criminal trial

15  are what are known in the language of the law as the

16  presumption of innocence and the burden of proof beyond a

17  reasonable doubt.  The law presumes a defendant to be innocent

18  of crime.  Thus, a defendant, although accused, begins the

19  trial with no evidence favoring conviction.  The presumption of

20  innocence alone is sufficient to acquit a defendant, unless you

21  are satisfied beyond a reasonable doubt of the defendant's

22  guilt after careful and impartial consideration of all the

23  evidence in the case.

24      Proof beyond a reasonable doubt is proof that leaves

25  you firmly convinced that the defendant is guilty.  It is not

1  required that the government prove guilt beyond all possible

2  doubt.

3        A reasonable doubt is a doubt based upon reason and

4  common sense and is not based purely on speculation.  It may

5  arise from a careful and impartial consideration of all the

6  evidence or from lack of evidence.  If after a careful and

7  impartial consideration of all the evidence you are not

8  convinced beyond a reasonable doubt that the defendant is

9  guilty, it is your duty to find the defendant not guilty.  On

10  the other hand, if after a careful and impartial consideration

11  of all the evidence you are convinced beyond a reasonable doubt

12  that the defendant is guilty, it is your duty to find the

13  defendant guilty.

14        If you wish, you may take notes to help you remember

15  what witnesses said.  If you do not take notes, please keep

16  them to -- if you do take notes, please keep them to yourself

17  until you and your fellow jurors go to the jury room to decide

18  the case.  Do not let notetaking distract you so that you do

19  not hear other witnesses -- other answers by witnesses.  When

20  you leave, your notes should be left in the jury box.

21        Whether or not you take notes, you should rely on your

22  own memory of what has -- what was said.  Notes are only to

23  assist your memory.  You should not be overly influenced by the

24  notes.

25        I will say now a few words about your conduct as

1  jurors.  First, you are not to discuss this case with anyone,

2  including your fellow jurors, members of your family, people

3  involved in the trial, or anyone else, nor are you allowed to

4  permit others to discuss the case with you.  If anyone

5  approaches you and tries to talk to you about the case, please

6  let me know about it immediately.

7         You must avoid contact with any of the persons who are

8  participating in the trial.  This includes the parties, the

9  lawyers, the witnesses, and any persons that you see in close

10  contact with these individuals.

11         Second, do not read any news stories or articles or

12  listen to any radio or television reports about the case or

13  about anyone who has anything to do with it.

14         Third, do not do any research, such as consulting

15  dictionaries, searching the Internet, or using other reference

16  materials, and do not make any investigation about the case on

17  your own or visit the scene where any of the events took place.

18         Fourth, if you need to communicate with me, simply give

19  a signed note to the bailiff to give to me.

20         Fifth, do not make up your mind about what the verdict

21  should be until after you have gone to the jury room to decide

22  the case and you and your fellow jurors have discussed the

23  evidence.  You are expected to evaluate the evidence

24  independently until you are told to deliberate as a group.

25  Keep an open mind until then.  Remember that you are to decide

1  the case only on the evidence presented here in court.

2          At the end of the trial, you will have to make your

3  decision based on what you recall of the evidence.  You will

4  not have a written transcript of the trial, although you may

5  ask that testimony be replayed if necessary.

6          That's it.  You ready?  Any questions?  All right.

7  We'll first hear from counsel for the government.  Mr.

8  Schroder.

9                  **OPENING STATEMENT OF PLAINTIFF**

10  BY MR. SCHRODER:

11          This is a case about guns and drugs.  All too often,

12  when you find gun -- find drugs and proceeds of drugs, you find

13  guns there to protect them.

14          Late November of last year, local law enforcement

15  officers developed information on a local drug dealer named

16  Johnson.  They used the evidence to get a search warrant.  They

17  went for Mr. Johnson's residence, and while they were doing the

18  search, he agreed to cooperate with them.  Now, in return for

19  potential leniency, he agreed to provide information on a

20  supplier, the defendant in this case, Jason Colette.

21          Mr. Johnson described to the officers how he had

22  recently bought cocaine from the defendant at his residence.

23  He described how they did the deal in the defendant's bedroom,

24  where the cocaine was kept in a large safe, a gun safe.  He

25  described a large amount of cocaine that he saw as well as the

1  packaging, which was in small one-ounce increments in plastic

2  bags.  He also described what he -- or also described what he

3  referred to as an Uzi, meaning a machine gun.  The machine gun

4  when they did the deal was out of this -- out of the safe, it

5  was on a dresser, and the defendant handled it and described it

6  as a new purchase that he had made.  Mr. Johnson explained that

7  in addition to the defendant, there was a girlfriend at the

8  residence, but that she was not involved in any of the drug

9  deal.

10      Now, law enforcement officers took that information and

11  they had Mr. Johnson testify to a state magistrate to get a

12  search warrant for the defendant's residence.  Upon obtaining

13  that warrant, the officers prepared to search the defendant's

14  house the same day, in the middle of the afternoon.  Now,

15  because of that -- because of the machine gun and their

16  concerns about the report of a machine gun being there, the

17  officers used the Fairbanks Police Department's Special Entry

18  and Response Team, known as a SERT team -- it's basically

19  Fairbanks Police Department's version of a SWAT team -- to go

20  into the house and make it secure.  They did that.  After

21  quickly entering and making the residence safe and secure, the

22  officers found a woman.  They found her children.  But the

23  defendant was not there.  He was later found at his business.

24      When the officers started their search, they found a

25  large safe in the master bedroom, as described by Mr. Johnson.

1  The safe was locked.  When they had it opened by a locksmith,

2  they found on the top shelf, right on the top shelf, a MAC-10

3  submachine gun -- or machine gun with a silencer and a magazine

4  inserted, again, as described by Mr. Johnson.  The gun was not

5  loaded, but that was not obvious, certainly, to the naked eye,

6  because it had a magazine inserted in it.

7          Also in the safe, in a brown plastic shopping bag, like

8  the kind you go and you get a -- when you go to the

9  supermarket, the officers found 23 individually wrapped one-

10  ounce bags of a white powdery substance.  That substance was

11  later tested and determined to be cocaine.  They were each

12  approximately one ounce in weight, again, as described by Mr.

13  Johnson.

14          There was an additional bag of cocaine in the safe, in

15  a small plastic tub, along with bundles of cash, wrapped in

16  certain bundles, totaling over $38,000 worth of cash.

17          Also in the safe were a number of guns, but there were

18  three of particular note.  There was a .12-gauge -- two were

19  loaded -- a .12-gauge pump shotgun with a pistol grip, shorter

20  shotgun; a .30-06 hunting rifle; and a Colt Sporter, which is a

21  civilianized version of, like, the M-16 that the military uses.

22  It was not actually loaded, but there were rounds in a magazine

23  that were located nearby the gun.

24          Finally in the safe, the officers found a -- two

25  important documents.  They are ATF forms that describe the

1   ownership of the machine gun and the silencer.  And those were

2   both registered to the defendant, gave his name, gave his

3   address, and had photographs of him on the forms.

4          Now, in the bedroom the officers also found a scale,

5   small scale with white powdery residue on it, small digital

6   scale.  They found a money counter, a currency counter.  And in

7   the kitchen of the residence they found hundreds of plastic

8   boxes with hundreds of the plastic small sandwich bags,

9   consistent with what was seen in the safe in the bedroom.

10         Now, the evidence will show that the defendant was

11  distributing cocaine from his bedroom -- or from his residence,

12  specifically in his bedroom.  The evidence will also show that

13  the defendant specifically distributed cocaine to Mr. Johnson

14  on that occasion.  And finally, the evidence will show that the

15  defendant kept a machine gun with a silencer along with other

16  guns at the ready, to protect his cocaine and protect his

17  money.  At the end of the evidence, the government will ask you

18  to return a verdict of guilty on all counts.  Thank you.

19         THE COURT:  Thank you.  Mr. Butler.

20         MR. BUTLER:  Judge, I may reserve.  May I have a

21  moment?

22         THE COURT:  All right.

23     (Pause)

24         MR. BUTLER:  Judge, the defense will reserve.

25         THE COURT:  Okay.  All right.

1          MR. BUTLER:  Thank you.

2          THE COURT:  Is the government ready with its first

3     witness?

4          MR. SCHRODER:  We're ready, Your Honor.  The government

5     calls Sergeant Ron Wall.

6          THE COURT:  All right.  All right, sir, if you'll just

7     make your way up towards this chair in the front.

8          SERGEANT WALL:  Yes, sir.

9          THE COURT:  And when you get there, just remain

10    standing long enough for my clerk to swear you in.

11         SERGEANT WALL:  Yes, sir.

12         THE CLERK:  If you'd raise your hand, please.

13              **RONALD WALL, PLAINTIFF'S WITNESS, SWORN**

14         THE CLERK:  Please have a seat.  Sir, for the record,

15    if you could state your name, spelling your last name, and give

16    your address, please.

17         THE WITNESS:  It's Ronald Wall, W-a-l-l.  Address is

18    1979 Peger Road, Fairbanks.

19         THE CLERK:  Thank you.

20         THE COURT:  All right, thank you.  Mr. Schroder.

21                      **DIRECT EXAMINATION**

22    BY MR. SCHRODER:

23    Q    Sergeant Wall, who do you work for?

24    A    I work for the Alaska State Troopers.

25    Q    And how long have you been an Alaska State Trooper?

*A & T TRANSCRIPTS*
*(817) 685-7556*

WALL - DIRECT

```
 1  A    Over 16 years, sir.
 2  Q    And what is your current position with the troopers?
 3  A    I'm currently a sergeant supervising the Fairbanks ABADE
 4  unit.
 5  Q    And what does ABADE stand for?
 6  A    ABADE stands for the Alaska Bureau of Alcohol and Drug
 7  Enforcement.
 8  Q    And what does the ABADE unit do?
 9  A    Primarily, the ABADE unit is responsible for drug
10  interdictions, drug investigations, controlled purchases,
11  controlled deliveries, the investigation of cultivation and
12  manufacture of illegal narcotics.
13       THE COURT:  Okay.  Can everyone hear?  Might help if
14  you just lean -- just --
15       THE WITNESS:  My chair forward, sir.
16       THE COURT:  -- the chair (indiscernible).  And a rule,
17  by the way, ladies and gentlemen, if you can't hear, you raise
18  your hand.  Okay?  We got the rule down.  All right.
19       THE WITNESS:  Thank you, sir.
20  BY MR. SCHRODER:
21  Q    So, Sergeant Wall, you conduct narcotics investigations?
22  A    Yes, sir.
23  Q    And how long have you conducted narcotics investigations?
24  A    It'll be four years, I believe, in September.
25  Q    Okay.  Do you know the defendant, Jason Colette?
```

WALL - DIRECT

```
1   A    I do, sir.

2   Q    Were you involved in serving a search warrant on the

3   defendant's residence?

4   A    Yes, sir.

5   Q    And when was that?

6   A    That was on November 28th of 2005.

7   Q    Were you the officer that applied for the search warrant?

8   A    I was, sir.

9   Q    And where did you get the information that was the basis

10  for your request for a search warrant?

11  A    Through an informant, sir.

12  Q    And what were the circumstances of your getting access to

13  that information?

14  A    We had made application and executed a -- or, correction,

15  we'd obtained a search warrant and executed a search warrant on

16  the informant's residence earlier that morning.  That informant

17  then cooperated and provided information to us.

18  Q    And essentially or generally, what was the basis of the

19  information that allowed you to get a search warrant for that

20  residence?

21  A    The informant's testimony, sir.

22  Q    Okay.  Now, when you -- using the informant's testimony,

23  what did you do with it -- what did you believe was in the

24  residence you wanted to search?

25  A    Believed there was a -- a large amount of cocaine,
```

WALL - DIRECT

1  possibly cash, as well as a machine gun.

2  Q    Okay.  And how did you apply for that search warrant?

3  A    The informant was transported to the state courthouse,

4  placed on record before a state magistrate and a district

5  attorney, and application was made on record.

6  Q    Okay.  And after you obtained the warrant, what did you

7  do?

8  A    The -- the warrant was obtained.  I then responded to the

9  Fairbanks Police Department and met with officers from that

10  department, as well as other members of DEA and ATF and the

11  University of Alaska Police Department.

12  Q    So were those the agencies that were involved in serving

13  the warrant?

14  A    Yes, sir.

15  Q    Did you observe the residence before serving the warrant?

16  A    Yes, sir, I did.

17  Q    And why was that?

18  A    To identify the -- the residence with the informant.  We

19  both drove by in my vehicle.  He pointed out the residence.

20  Q    And did you check to see any sources or did you observe to

21  try to see if anybody occupied the residence?

22  A    We did.  First of all, we identified the defendant in

23  APSIN, which is the Alaska Public Safety Information Network,

24  similar to the DMV files, to confirm that that was Mr.

25  Colette's listed address.  Following that, we checked -- or I

WALL - DIRECT

1    had my secretary check the Permanent Fund Dividend records to

2    see who else may have resided at that residence.  Then the

3    Fairbanks tactical team which was going to assist with the

4    entry also placed perimeter units and surveillance teams out

5    prior to our obtaining the warrant, as well as staying on scene

6    until we did execute the warrant.

7    Q    And what are some of the key reasons why you want to get

8    that information before you serve the warrant?

9    A    Well, there are several things.  Number 1, we'd like to

10   know who's in the residence, what we're facing when we do make

11   entry, obviously, for officer safety purposes.  We were

12   heightened in our senses here because of the -- the possibility

13   of actually having a -- a machine gun.  Secondly, we like to

14   identify the targets.  If we can take somebody outside their

15   residence, that's -- that would be preferable.  We also like to

16   know if there's children in the residence.  In this case, that

17   was important to the tactical team because they wanted to

18   deploy a noise-distraction device upon entry.

19   Q    Okay.  And did you have any indication there were children

20   in the residence?

21   A    No, sir.

22   Q    Okay.  So how did they actually make entry into the

23   residence?

24   A    The Fairbanks tactical team entered the residence through

25   an arctic entry on the south side of the trailer which was

WALL - DIRECT

 1  located at 1038 Lakeview, and deployed a noise-distraction

 2  device and then proceeded to secure the residence.

 3  Q    And were there any people in the residence when they went

 4  in?

 5  A    Yes, sir.

 6  Q    And who?

 7  A    Ms. Koch and two children.

 8  Q    Okay.  And after the residence was secure, what did you do

 9  with them?

10  A    They were taken outside and afforded a seat in the back of

11  an FPD detective's car.  It was November and it was -- it was

12  fairly cold outside.

13  Q    And is that where they stayed while you did the search?

14  A    No, sir.  They were afforded the opportunity to be

15  transported to a place of their choosing.

16  Q    Now, could you -- after you secured the residence, did you

17  commence your search?

18  A    Yes, sir.

19  Q    And could you just basically describe the residence for

20  the jurors?

21  A    Yes, sir.  It's a 14-by-70 trailer.  It had a -- an

22  addition, and I believe the bedroom is attached to the addition

23  on the southeast corner of the trailer.  The -- the trailer ran

24  east to west with vehicles parked on the south -- I believe

25  southwest portion of the trailer house.  There was a bedroom

WALL - DIRECT

1  closest to the road.  There was then I believe a bathroom,

2  another bedroom, then the kitchen, the living room area, and

3  off of the living room area you could exit into the arctic

4  entry or into a bedroom on the southeast portion of the -- the

5  structure.

6  Q    Now, did you end up finding evidence that was consistent

7  with what you sought in the search warrant?

8  A    Yes, sir.

9  Q    And where in the residence did you find that?

10  A    In the bedroom that was built on in an addition in the

11  southeast corner.

12  Q    Okay.  And is that -- is -- was that consistent with the

13  testimony that was given to the judge?

14  A    It was.

15  Q    Okay.  What did you find in that room?

16  A    Initially in the room was a money counter.  There was a

17  scale with a white powder residue present on it.  There was

18  a -- a gun safe which was also consistent with the information

19  we'd received.  And would you like me to talk about what's

20  inside the safe, sir?

21  Q    And let me ask, did -- was the safe open or was it locked?

22  A    No, the safe was locked, sir.

23  Q    And how did you get access to it?

24  A    We called the Action Locksmith, and they sent over a

25  technician who had to drill the safe.

1  Q    And when you opened the safe, what did you find?

2  A    There was 23-plus ounces of cocaine, a -- what appeared to

3  me a Ingram fully-automatic machine gun with a suppressor

4  attached to it, and approximately $38,000 in cash, as well as

5  other miscellaneous items, checks for business and the

6  authorization for the firearm and the suppressor.

7  Q    And how many places did you find a white powdery

8  substance?

9  A    Myself, I -- I viewed it inside the -- the safe.  There

10  was as plastic grocery bag similar to what you would obtain at

11  Fred Meyers with your groceries.  Inside were approximately 23,

12  what appeared to me to be one-ounce bags of cocaine.  And then

13  there was a Tupperware container that had the cash in it that

14  was -- appeared to be in $1,000 bundles, which is consistent

15  with what -- what we see.  And as well as a -- a baggie that

16  had cocaine in it inside the cash.  There were numerous other

17  firearms, assault rifles, and shotguns and a couple of handguns

18  as well in the safe.

19  Q    And you said you found documents in the safe?

20  A    Yes, sir.

21  Q    What were those?

22  A    The -- the federal tax stamps authorizing the purchase

23  of -- and possession of a fully-automatic and a suppressed

24  weapon.  And I believe there were other checks in there that

25  were made out to Arctic Alarm and Audio.

WALL - DIRECT

```
 1  Q    Where was the machine gun located in the safe when you
 2  opened it?
 3  A    It was in the -- the top shelf in the safe.
 4  Q    Now, where did you find the -- you mentioned some other
 5  items you found in the residence -- or in the bedroom.  Where
 6  were those located?
 7  A    Most everything was inside the -- the safe itself.  As far
 8  as the cocaine, there was some cocaine I believe that a special
 9  agent found in the -- the -- the dresser.
10       MR. BUTLER:  Objection.  Hearsay, foundation.
11  BY MR. SCHRODER:
12  Q    Did you see that cocaine?
13  A    There was cocaine present there other than what was in the
14  safe, sir.
15  Q    Okay.
16       MR. BUTLER:  Objection.  That didn't answer the
17  question.
18       THE COURT:  So he's asking what you saw.  Is that what
19  that --
20  BY MR. SCHRODER:
21  Q    The question is, did you see additional -- doesn't matter
22  who found it, but did you see additional cocaine that was
23  outside of the safe?
24  A    I didn't see it when it was located, sir, but I know that
25  there was --
```