1          MR. BUTLER:  Objection.

2          THE COURT:  Sustained.

3          MR. BUTLER:  Move to strike.

4          MR. SCHRODER:  We'll move on.

5          THE COURT:  Sustained.  Okay.

6          MR. SCHRODER:  So --

7    BY MR. SCHRODER:

8    Q    But you mentioned a couple other items you found in the

9    bedroom as well as the -- before you started -- at the

10   beginning, when you first went in the bedroom, you mentioned a

11   couple other items.

12   A    Yes, sir.

13   Q    One was a currency counter.  And would you explain what

14   that is?

15   A    Sure.  It's similar to what you'd have at the -- the bank

16   teller stations, where you can take currency in stacks, then

17   place it on there.  I believe you press a button and it tells

18   you the exact count or will break money down to certain

19   denominations.  There was -- the currency counter located

20   directly on the -- the dresser to the -- near the corner, if

21   you went into the left of the room.

22          MR. SCHRODER:  Okay, Your Honor, we'd like to look at a

23   few pictures.

24          THE COURT:  Okay.  Are you talking about using the

25   overhead or what --

1          MR. SCHRODER:  Overhead.  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. SCHRODER:  We're already keyed up to do that, Your

4     Honor.

5          THE COURT:  Well, that thing's supposed to come down,

6     right?

7          UNIDENTIFIED SPEAKER:  Yeah.

8          THE COURT:  Mr. Schroder, could you pull that screen

9     down for us?  Because we got a button that's not bringing it --

10         MR. SCHRODER:  If I take a running jump.

11         MR. BUTLER:  I'll offer to stand on his shoulders, Your

12    Honor.

13         THE COURT:  Okay.  This could be quite a --

14         THE CLERK:  They had it down earlier.

15         THE COURT:  It was down before, it won't come down.

16      (Side conversation)

17         THE CLERK:  Mr. Schroder, can you look up to see lights

18    under that projector right there?

19         MR. SCHRODER:  I see -- I do see a red --

20         THE COURT:  You see --

21         MR. SCHRODER:  -- one and a green one.

22         THE CLERK:  All right.  Just shut it all off and turn

23    it back on?  Did it work?

24         THE COURT:  Yes.

25         THE CLERK:  When I hit floor, it wouldn't come down --

WALL - DIRECT

1           THE COURT:  Okay.  So we got the screen working, and

2    let's see if we're okay.  Okay, the idea is -- so that the jury

3    understands the technique, first the pictures are shown to the

4    witness, if they're authenticated, then the question's whether

5    or not they'll be admitted.  If they're admitted, then we show

6    them up on the screen.  So at first you may not see the

7    picture, because we haven't decided whether or not it comes in

8    the evidence.

9    BY MR. SCHRODER:

10   Q    Sergeant Wall, we're showing you on the screen what has

11   been marked as Government Exhibit Number 1.  Do you recognize

12   this image?

13   A    Yes, sir.

14   Q    And how do you recognize it?

15   A    This is a -- a photograph of the -- the bedroom that we

16   were just discussing.

17   Q    Okay.  And is it consistent with the interior layout of

18   the master bedroom in the defendant's residence at the time you

19   served the search warrant?

20   A    Yes, sir.

21   Q    Did you take the photo?

22   A    I did not.

23   Q    But were you there when the photos were taken?

24   A    I was, sir.

25   Q    Okay.  Is Government Exhibit Number 1 a fair and accurate

WALE - DIRECT

1    representation of the interior layout of the master bedroom,

2    including the location of the safe, in the defendant's

3    residence when you served the warrant on November 28th, 2005?

4    A    It was, sir.

5            MR. SCHRODER:  Your Honor, government moves Exhibit

6    Number 1 into evidence.

7            THE COURT:  Any objection?

8            MR. BUTLER:  No objection, Judge.

9            THE COURT:  1 will be received, without objection.

10   Okay, I -- it's been received.

11       (Plaintiff's Exhibit 1 admitted)

12           MR. SCHRODER:  Okay.  So -- if we could have the --

13           THE CLERK:  No.

14           MR. SCHRODER:  -- lights down just a bit.

15           THE CLERK:  We can't get them off yet.

16           MR. SCHRODER:  Oh.

17           THE COURT:  Can't get the lights?

18           THE CLERK:  Uh-uh (negative).

19           THE COURT:  This is a newfangled courtroom.  You must

20   be able to turn the lights down.

21           THE CLERK:  I'll do it out here, main switch.

22           THE COURT:  Okay, well -- there you are.  Whoops.

23       (Side conversation)

24           THE COURT:  Okay.  Looks like it's working, Mr.

25   Schroder.

1          MR. SCHRODER:  All right.  I need a flashlight.
2    Sergeant Wall, what is this --
3          (Side conversation)
4    BY MR. SCHRODER:
5    Q    Sergeant Wall, what does this photo show?  If you can tell
6    the jurors what this shows?
7    A    Yes.  This is the photograph of the southeast corner of
8    the bedroom off the arctic entryway in the living room.
9    Q    Okay.
10   A    This -- this photograph depicts the Winchester gun safe in
11   the corner, as well as if you look closely to the left of the
12   vacuum cleaner, on top of dresser, you'll see that there's a --
13   a wood box sitting there.  On top of that is the digital scale
14   in question that had the white powdery residue on it.  And
15   barely off to the left of that scale, you can see the edge of
16   the money counter.
17   Q    Sergeant Wall, now I'm going to ask you to take a look
18   at -- and I will turn off for the jury for the moment -- ask
19   you to take a look at Government Exhibit Number 2.
20   A    Yes, sir.
21   Q    And do you recognize this image?
22   A    I do, sir.
23   Q    And how do you recognize it, again?
24   A    Because, as a matter of fact, I believe that's me standing
25   to the -- the right of the safe there as I --

1  Q    Okay.

2  A    -- as the photo was taken.

3  Q    Is this picture consistent with the interior of the safe

4  in the master bedroom at the time you served the -- opened it

5  when you served the search warrant?

6  A    Yes, sir.

7  Q    And is Government 2 a fair and accurate representation of

8  the contents of the safe in the master bedroom of the

9  defendant's residence when you served that warrant on November

10  28, 2005?

11  A    Yes, sir.

12        MR. SCHRODER:  Your Honor, the government moves for

13  admission of Number 2.

14        THE COURT:  Any objection?

15        MR. BUTLER:  No objection, Judge.

16        THE COURT:  2 will be received, without objection.

17    (Plaintiff's Exhibit 2 admitted)

18  BY MR. SCHRODER:

19  Q    Sergeant Wall, what is this -- what does this photograph

20  depict?

21  A    This photograph is the interior of the -- the safe.

22  Present on the -- the top shelf of the safe, you'll see a --

23  the machine gun with the suppressor or silencer attached to it.

24  There's a bag of marijuana bud in front of it.  Then on the --

25  the left, you see numerous firearms, one of which is a AR-15

WALL - DIRECT

1  style weapon.  Then you've got numerous shotguns present.  To

2  the right on the second shelf, you can see the Tupperware

3  container that contained the bundles of cash.  In the front

4  left portion of that Tupperware container, you can also see a

5  baggie of white powder that was opened up of cocaine.  The

6  second shelf right below that, you can depict through the --

7  the guns as they are V'd there.  That is the grocery sack

8  containing the bundles of what appear to be one-ounce bags of

9  cocaine.

10 Q    Now turn this one on, we'll move to Government's Exhibit

11 Number 3.  Sergeant Wall, do you recognize this photo?

12 A    I do, sir.

13 Q    And again, how do you recognize it?

14 A    Because I was present when it was taken, sir.

15 Q    Okay.  And is this a fair and accurate representation of

16 the contents -- again, of the contents of the safe in the

17 master bedroom of the defendant's residence when you served

18 that search warrant on November 28, 2005?

19 A    Yes, sir.

20      MR. SCHRODER:  The government -- Your Honor, government

21 moves Number 3 into evidence.

22      THE COURT:  Any objection?

23      MR. BUTLER:  No objection, Judge.

24      THE COURT:  3 will be received, without objection.

25      (Plaintiff's Exhibit 3 admitted)

1  BY MR. SCHRODER:

2  Q    Sergeant Wall, again, what does this depict?

3  A    This is a -- a closeup of the top shelf inside the gun

4  safe.  This shows the submachine gun, the silencer, as well as

5  the marijuana.  And there's other documents off to the right

6  portion and -- and underneath the -- or the pistol cartridges

7  there on the right-hand side.

8  Q    All right.  We'll turn that off and move to Exhibit Number

9  4.  And again, do you recognize this image?

10 A    Yes, sir.

11 Q    And is it a fair and accurate representation of the

12 contents of the safe in the master bedroom in the defendant's

13 residence when you served the search warrant on November 28th,

14 2005?

15 A    Yes, sir.

16         MR. SCHRODER:  Your Honor, the government moves Exhibit

17 Number 4 into evidence.

18         MR. BUTLER:  No objection, Your Honor.

19         THE COURT:  4 will be received, without objection.

20    (Plaintiff's Exhibit 4 admitted)

21 BY MR. SCHRODER:

22 Q    And Troop -- Sergeant Wall, could you explain what this

23 particular photo shows?

24 A    Yes, sir.  This is a -- a closeup of the Tupperware

25 container which contained the money and an open bag of cocaine.

1    You can also see the -- obviously the barrels of several

2    weapons as well as the magazines for what appears to be an AR-

3    15 M-16 style rifle.  And next to that you can see the top of

4    the bag containing the multiple bags of cocaine.

5    Q    Okay.  Now we will move on to Government's Exhibit Number

6    5.  Do you recognize this image?

7    A    Yes, sir.

8    Q    And again, how do you recognize it?

9    A    I was present, sir.

10   Q    And is this a fair and accurate representation of the

11   contents of the safe in the master bedroom in the defendant's

12   residence when you served the search warrant on November 28th,

13   2005?

14   A    Yes, sir.

15          MR. SCHRODER:  Your Honor, government moves Exhibit

16   Number 5 into evidence.

17          MR. BUTLER:  No objection, Judge.

18          THE COURT:  5 will be received, without objection.

19      (Plaintiff's Exhibit 5 admitted)

20   BY MR. SCHRODER:

21   Q    Sergeant Wall, from this -- all these are coming,

22   obviously, from different angles.  So could you explain what

23   this angle in this photograph shows?

24   A    Yes.  This is a photograph after the Tupperware container

25   was removed from the safe, and it's more of an angle to show

1    the cocaine from the top.  That's the way it was resting on

2    that shelf, as well as the weapons.  And you can see other --

3    see the weapons below it.

4    Q    Okay.  Now we move on to Number 6.

5    A    Yes, sir.

6    Q    Sergeant Wall, do you recognize this image?

7    A    Yes, sir.

8    Q    And again, how do you recognize it?

9    A    I was present, sir.  I believe that's me holding the item.

10   Q    Okay.  And is this picture a fair and accurate

11   representation of the plastic bin that was taken from the safe

12   in the master bedroom at the time you served the search warrant

13   on November 28, 2005?

14   A    Yes, sir.

15            MR. SCHRODER:  Your Honor, government moves admission

16   of Number 6.

17            MR. BUTLER:  No objection to Number 6, Judge.

18            THE COURT:  6 will be received, without objection.

19        (Plaintiff's Exhibit 6 admitted)

20   BY MR. SCHRODER:

21   Q    And can you -- now, this -- Sergeant Wall, was the

22   Tupperware container still in the safe when this photograph was

23   taken?

24   A    No, sir.

25   Q    Okay.  So explain what it depicts.

1   A    Basically, you couldn't take a photograph directly down on

2   the Tupperware container inside the safe, obviously for room

3   purposes.  So the Tupperware container was removed from the

4   safe, it was tilted and a photograph was taken depicting the

5   cash bundles and loose currency as well as the open bag of

6   cocaine.

7   Q    Want to ask you to look at Government Exhibit Number 7.

8   A    Yes, sir.

9   Q    Do you recognize this image?

10  A    I do, sir.

11  Q    And, again, how do you recognize it?

12  A    I was present.

13  Q    Okay.  Is Government Exhibit Number 7 a fair and accurate

14  representation of the contents of the plastic shopping bag

15  found in the safe in the master bedroom in the defendant's

16  residence when you served the search warrant on November 28th,

17  2005?

18  A    Yes, sir.

19         MR. SCHRODER:  Your Honor, government moves for Exhibit

20  Number -- or admission of Number 7 into evidence.

21         MR. BUTLER:  No objection to Number 7, Judge.

22         THE COURT:  7 will be received, without objection.

23    (Plaintiff's Exhibit 7 admitted)

24  BY MR. SCHRODER:

25  Q    Sergeant Wall, could you tell us what this depicts?

1  A    Yes, sir.  That's the -- the grocery sack that was inside

2  the safe, had been taken out of the safe and laid on the bed,

3  opened up.  The bags of cocaine were then spread out on top of

4  the bag for photographic purposes.

5  Q    Okay.  And how many of those bags did you count?

6  A    Believe there's 23, sir.

7  Q    Okay.  All right.  Now I want you to -- show you what has

8  been marked as Government Exhibit Number 8.  Do you recognize

9  that image?

10  A    Yes, sir.

11  Q    And is it consistent with -- is it a fair and accurate

12  representation of the items found in the master bedroom in the

13  defendant's residence when you served the search warrant on

14  November 28th, 2005?

15  A    Yes, sir.

16        MR. SCHRODER:  Your Honor, government moves admission

17  of Number 8.

18        MR. BUTLER:  No objection to 8, Judge.

19        THE COURT:  8 will then be received, without objection.

20    (Plaintiff's Exhibit 8 admitted)

21  BY MR. SCHRODER:

22  Q    And can you explain to the jurors what they're seeing in

23  this photograph?

24  A    Yes, sir.  That's a closeup on the top of the dresser.

25  That -- we had seen the scale in an earlier photograph.  That

WALL - VOIR DIRE

 1  is the scale which was inside the box there, and the money

 2  counter which was presently open at the time.

 3  Q    And we have one more, Government's Exhibit Number 9.  Do

 4  you recognize this image?

 5  A    Yes, sir.

 6  Q    And again, how do you recognize it?

 7  A    I was present in the -- in the room.

 8  Q    Okay.  And is this a fair and accurate representation of

 9  items found in the master bedroom in the defendant's residence

10  when you served the search warrant on November 28th, 2005?

11  A    Yes, sir.

12  Q    Okay.

13        MR. SCHRODER:  Your Honor, the government moves exhibit

14  of -- Exhibit Number 9.

15        MR. BUTLER:  If I may inquire --

16        THE COURT:  All right.

17        MR. BUTLER:  -- Judge, just one question.

18        THE COURT:  Very well.

19        MR. BUTLER:  If I may voir dire the witness just on one

20  question.

21                        VOIR DIRE

22  BY MR. BUTLER:

23  Q    There's something pink in this photograph that's not in

24  the -- in Plaintiff's Exhibit Number 8.

25  A    Yes, sir.

1  Q    So when we say is this an accurate depiction, can -- would

2  you please tell the Court, at least, what that is before we

3  decide whether there's an objection now, please?

4  A    Yes, sir.  That is a Nik wipe.  It's a -- a cocaine wipe

5  that is used to do a presumptive test for the presence of

6  cocaine.  The wipe itself is pink.  If you touch the wipe to

7  any substance with cocaine present in it, it will turn blue.

8  And in the photograph, Your Honor, you can see that there's

9  a -- a blue dot there.  So that shows that there was a

10  presumptive test showing a positive presence for cocaine.

11  Q    Okay.

12         MR. BUTLER:  With that explanation, Judge, no

13  objection.

14         THE COURT:  Okay.  9 then will be received, without

15  objection.

16      (Plaintiff's Exhibit 9 admitted)

17                  **DIRECT EXAMINATION, CONTINUED**

18  BY MR. SCHRODER:

19  Q    So again, just briefly explain what you're seeing here.

20  A    Yes, sir.  That is a closeup of the scale.  You can see

21  that there's a white powder present on the scale itself.

22  The -- and then the Nik wipe which is right next to it.  It's

23  kind of bled out in the -- the photograph on the overhead, but

24  my copy on the screen here shows the -- the blue dot showing

25  the indication of cocaine.

1   Q    Okay.

2          THE COURT:  So the jurors understand, all these --

3   you'll have the actual photographs for deliberation purposes.

4          MR. SCHRODER:  And that's it, Your Honor.  We're -- we

5   can bring the lights back up.

6          THE COURT:  Okay.

7   BY MR. SCHRODER:

8   Q    Sergeant Wall, just a few final questions here.  Do you

9   know a Eugene Johnson?

10  A    I do, sir.

11  Q    And did you serve a search warrant on his residence in

12  November 2005 as well?

13  A    Yes, sir, earlier that morning.

14  Q    And what were the circumstances of that search?

15  A    Similar to these that we described earlier, with a few

16  differences.  We'd conducted controlled purchases of cocaine or

17  a controlled purchase of cocaine from Eugene at his residence

18  through use of a confidential informant and utilized the

19  Fairbanks tactical team to execute a warrant on that residence

20  as well.

21  Q    Now, while you were conducting that search, did he offer

22  to cooperate with you?

23  A    Yes, sir.

24  Q    And was that the information that ended up leading to the

25  search warrant for the defendant's residence?

1  A    Yes, sir.

2  Q    All right.  What did you agree to do if he provided you

3  information?

4  A    I can't agree to do anything.  But through the district

5  attorney's office, an agreement was reached with Mr. Johnson

6  that in lieu of his cooperation, if the information he indeed

7  gave was credible and proved to be valid, Mr. Johnson would

8  have a reduction in his charge from a MICS 3 or misconduct

9  involving a controlled substance 3 to a MICS 4, which means for

10 the reduction from a sale to the possession, with the

11 opportunity not to serve any jail time or go to jail that day.

12 Q    And on this situation was there a written agreement?

13 A    No, sir.

14 Q    Okay.  In these kind of situations, what do you tell the

15 potential cooperator about telling the truth?

16 A    He needs to -- to tell me the truth.  If he does not tell

17 me the truth, then any agreements that we make are null and

18 void.

19 Q    Okay.  How important is getting truthful information to

20 you versus getting potentially useful information?

21 A    Truthful is the information that we're after.  We can't

22 use information that may be accurate that isn't truthful.  We

23 need individuals that can provide testimony that is true,

24 accurate, and that we can use in court, instead of information

25 that leads us places that we can't forward charges or recommend

1   prosecution.

2   Q    And, did you give those instructions to Mr. Johnson?

3   A    Yes, sir.

4   Q    Okay.

5        MR. SCHRODER:   Your Honor, that's the end of our

6   questions on direct.

7        THE COURT:  All right.  Mr. Butler.

8        MR. BUTLER:   Thank you, Judge.

9                        **CROSS-EXAMINATION**

10  BY MR. BUTLER:

11  Q    Good afternoon, Trooper Wall.

12  A    Good afternoon, sir.

13  Q    In terms of Mr. Johnson, when you agreed to -- well, first

14  of all, you conducted, you said, a controlled buy from Mr.

15  Johnson?

16  A    Yes, sir.

17  Q    When would that have occurred?

18  A    You know, I don't have the exact date.  It would have been

19  probably within a -- a month or so prior to the execution of

20  the search warrant.

21  Q    Like November 8th?  Does that sound like it might be --

22  A    That -- that could have been, sir.

23  Q    -- around about that time?  And at that time, you

24  received -- what was it, 40-some grams of cocaine?

25  A    I believe it was 44, sir.

WALL - CROSS

1  Q    All right, 44 grams.  And you -- and the -- Mr. Johnson

2  was paid what, $2,000 for that?

3  A    Yes, sir.

4  Q    And that particular cocaine, it was noted to appear to

5  have come off the corner of a brick.  Isn't that right?

6  A    Yes, sir.  It was -- whether it was a brick or not, it had

7  a -- a compacted area to it that was -- appeared to be a corner

8  shape to it.

9  Q    But in fact, the way it was written up in the reports --

10 and you saw the reports, right?

11 A    I did, sir.

12 Q    It was written up as it appeared to have come off the

13 corner of a brick.  Is that right?

14 A    Correct.

15 Q    Would you explain to the jury what a brick is?

16 A    Sure.  A brick is basically like a -- a brick in building

17 a house.  A brick is a block.  Cocaine is often compressed into

18 certain shapes for transport or distribution.

19 Q    And in fact, it was noted in the report, was it not, sir,

20 that this brick appeared to be the kind, the -- at least the

21 shape of which normally what you would -- what a person would

22 buy if they bought a kilo of cocaine.  Right?

23 A    Yes, sir.

24 Q    And so when you saw it appeared to be the corner of a

25 brick, it looked like it came straight off of the corner of a

WALL - CROSS

```
 1  kilo of cocaine, didn't it?
 2  A    From the photographs of kilos of cocaine that I've seen.
 3  I haven't purchased a kilo in a brick, so --
 4  Q    Okay.  And when you see something like this, it also could
 5  lend credence to or make -- or infer that this person is close
 6  to the source of cocaine.  Isn't that right?
 7  A    That's correct, sir.
 8  Q    And that's what you really look for, isn't it?
 9  A    It is, sir.
10  Q    And so one could -- at least a law enforcement officer
11  like yourself could reasonably conclude that Mr. Johnson may
12  have purchased that particular cocaine from the source, or he
13  may have a kilo of cocaine in his house?
14  A    That is correct.
15  Q    And you had information that Mr. Johnson sold -- had --
16  was purchasing and selling kilos of cocaine.  Isn't that right?
17  A    I don't believe the information that I had indicated an
18  amount, that it was that large.
19  Q    You --
20  A    Multiple kilos --
21  Q    Oh, I'm sorry, I didn't want to cut you off.
22  A    No.  I mean, multiple kilos, I don't recall that.
23  Q    You used an informant in that case, didn't you?
24  A    We did, sir.
25  Q    And you debriefed that informant, didn't you?
```

WALL - CROSS

```
 1  A    I did not.  One of my investigators did.

 2  Q    Okay.  And you reviewed those reports, didn't you?

 3  A    I reviewed them at that time.

 4  Q    And don't you recall the informant telling you all that

 5  Mr. Johnson was selling about a kilo a week?

 6  A    I don't recall that exact amount, sir.  I could look at

 7  his report and -- and refresh my memory.

 8  Q    Do you have it there with you?

 9  A    I do not, sir.

10  Q    We'll come back to that.

11  A    Sure.

12  Q    Don't let me forget, will you?  Mr. Johnson also had

13  firearms, didn't he?

14  A    He did, sir.

15  Q    How many firearms did he have?

16  A    I don't recall.  There were numerous rifles present in the

17  residence.

18  Q    And where in the residence, roughly, were they?

19  A    I'm trying to recall.  I believe some of them were

20  downstairs and some of them were upstairs in -- in separate

21  bedrooms.

22  Q    In the bedrooms, not locked up in a safe?

23  A    The -- no, sir.

24  Q    Okay.

25  A    I wasn't at the -- Johnson's residence during the entire
```

1   search.

2   Q    But you were there for part of it, sir?

3   A    For part of it, sir.

4   Q    And you saw that these guns were not locked up in a safe?

5   A    That's correct, sir.

6   Q    And in fact, if a gun is just laying out somewhere in a

7   bedroom, it's certainly more easily accessible than having to

8   run to a safe and unlock a safe, isn't it?

9   A    That is correct, sir.

10  Q    Now, you said Mr. Johnson cooperated with you?

11  A    He did, sir.

12  Q    He didn't cooperate right away, though, did he?

13  A    No, sir.

14  Q    In fact, you had to kind of twist his arm a little bit,

15  didn't you?

16  A    We had to discuss it, discuss his options with him, sir.

17  Q    In fact, he gave -- he didn't even -- he wasn't even

18  honest with you at first, was he?

19  A    No, sir.

20  Q    Sort of misled you, didn't he?

21  A    Yes, sir.

22  Q    Until he felt -- I guess until he felt that something was

23  on the table for him?  Is that a fair statement?

24  A    That's correct.

25  Q    Okay.  And in fact, you wanted to know, didn't you, why

WALL - CROSS

```
 1   there were no drugs in the house when you all raided him on
 2   that morning, did -- would -- didn't you?
 3   A    That is correct, sir.
 4   Q    And did he ever tell you who alerted him that you all were
 5   coming?
 6   A    No, sir.
 7   Q    He refused to give you that information, didn't he?
 8   A    He did, sir.
 9   Q    And even to this very day -- supposedly he's cooperating
10   with you -- he hasn't given you that information, has he?
11   A    That's correct, sir.
12   Q    So in terms of what information Mr. Johnson has, you don't
13   know what all he has, do you, sir?
14   A    No, sir.
15   Q    And you don't even know how truthful he's being about
16   being alerted.  Isn't that right?
17   A    That's correct.
18   Q    But in fact, you believe that he was alerted, because
19   there were not drugs there readily when you went in.  Isn't
20   that right?
21   A    I believe that was something I needed to -- to check out,
22   sir.
23   Q    Did you offer Mr. Johnson anything extra to get him to
24   tell you who told him that the police were coming to raid him?
25   A    Yes, sir.
```

WALL - CROSS

1  Q    What did you offer him?

2  A    We offered the -- the district attorney's office offered,

3  indeed, if Mr. Johnson had received some information indicating

4  that here was an inside leak within the departments, that he

5  would basically dismiss his charges --

6  Q    Okay.

7  A    -- if we could prove that.

8  Q    But Mr. Johnson refused to give that information, isn't it

9  right?

10  A    That is correct, sir.

11  Q    And, of course, so Mr. Johnson learns that you all are

12  going to raid him; the house is essentially clean of drugs when

13  you get there, but Mr. Johnson with -- is continue -- continues

14  to withhold that information from you.  Is that a fair

15  statement?

16  A    If he had the information, sir, yes.

17  Q    Well, but you believe Mr. Johnson, don't you?  I mean, you

18  trust Mr. Johnson, don't you?

19  A    No, sir.  Today's informant is tomorrow's defendant.  I --

20  I trust the gentlemen I work with, I trust my team.  Mr.

21  Johnson -- his information is information, sir.  I use it if it

22  can be supported.

23  Q    And Mr. Johnson is untrustworthy because you know that he

24  started out by lying to you, isn't that right?

25  A    That's -- that's common, sir, that people often mislead

 1  you until they're at a point where either they feel comfortable

 2  with you to disclose the information or they feel that there's

 3  something in it for them.

 4  Q   Now, Mr. Johnson, who told you, "I'm -- I was alerted that

 5  you all were coming, that's why there's no drugs here, but I'm

 6  going to tell you what I did with the drugs" -- he didn't tell

 7  you what he did with those drugs, did he?

 8  A   No, sir.

 9  Q   And even to this very day, you don't know where he took

10  those drugs, do you?

11  A   No, sir.

12  Q   You don't even know what those particular drugs look like,

13  because he didn't lead you to them.  Isn't that right, sir?

14  A   That is correct, sir.

15  Q   Now, Mr. Johnson also had a second place where he kept his

16  drugs, didn't he?

17  A   We believe so, sir.

18  Q   Well, isn't it true that you all were given information

19  directly from Mr. Johnson that there was a second place where

20  he kept drugs?

21  A   I don't recall that, sir.  I know we executed a search

22  warrant on a second place.

23  Q   And the reason why you executed a search warrant on the --

24  on that second place was because that was, quote, unquote, Mr.

25  Johnson's safe house, wasn't it?

WALL - CROSS

```
 1  A    That was the information we had from the previous
 2  informant, sir.
 3  Q    And you believe that Mr. Johnson had a safe house, don't
 4  you?
 5  A    I believe that there was probable cause to make that
 6  assumption.  I never saw the safe house.  I don't know the
 7  veracity of that statement.
 8  Q    So Mr. Johnson -- he cleaned out the house.  Now, knowing
 9  that Mr. Johnson is a drug dealer, he cleaned out the house;
10  who -- did you ever come -- did he ever tell you about Mr.
11  Monty or a person named Monty?
12  A    No, he did -- he may have mentioned him, but I don't know
13  as though he said anything in particular about Monty.
14  Q    And so if Mr. Johnson's going to clean out his house,
15  you'd expect him to clean it up of drugs, maybe a scale, things
16  of that nature, wouldn't you?
17  A    I would believe so.
18  Q    Do you know what it would take to get that information out
19  of Mr. Johnson, who his source was that you all were coming?
20  A    Do I know what it would take?
21  Q    Yes.
22  A    Obviously not, sir, because if there is a -- an
23  information leak, Mr. Johnson was unwilling to -- to tell me
24  who it was or divulge that information.  And that's if in fact
25  there was a leak or that was something that he wanted me to
```

WALL - CROSS

1  believe.  So -- that I would believe he had information that --

2  that I wanted.

3  Q    But you do want that information, don't you?

4  A    If it's in fact true, absolutely, I do.

5  Q    And Mr. Johnson, whom I guess you placed -- place some

6  degree of trust in, hasn't told you, "I was just lying when I

7  said that," has he?

8  A    He has not, sir.

9  Q    Is Mr. Johnson employed?

10  A    I don't know, sir, at this time.

11  Q    In fact, at the time that you busted him, he wasn't

12  employed, was he?

13  A    That's correct, sir.  I believe Mr. Johnson when we asked

14  him what he did, he buys and sells and fixes cars.

15  Q    Forgive me, I can't see with glasses or without them.

16  Hold on just a second.  Now, you all paid -- let's see, we

17  talked about you paid Mr. Johnson $2,000, didn't you?

18  A    The informant paid Mr. Johnson $2,000 for the cocaine,

19  yes, sir.

20  Q    And on the morning that you raided Mr. Johnson, that would

21  have been November 28th, right, because the warrant was

22  obtained on the 25th?

23  A    That's possible, sir.  We executed the search warrant on

24  Mr. Johnson's residence early that morning, the same morning

25  that we executed the warrant on Mr. Colette's.

1  Q    Okay.  And, sir, during the course of questioning -- I'm

2  talking about police reports -- I have what was given to me in

3  discovery.  If you want to see it, let me know.

4  A    Thank you, sir.

5  Q    All right.  Now, in Mr. Johnson's bedroom was a .30-06

6  rifle and an SKS rifle.  Right?  Oh, the SKS rifle was

7  discovered in the downstairs area, right?

8  A    If that's what the report indicates, sir.

9  Q    Well, I'm going to show you the report, if the Court will

10  let me, because you're the witness, not me.

11          THE COURT:  Okay.

12          MR. BUTLER:  May I, Judge?

13          THE COURT:  Yes, that'd be fine.

14          THE WITNESS:  Okay, sir.

15  BY MR. BUTLER:

16  Q    Sir, does that refresh your recollection of when the

17  search warrant was executed?

18  A    Well, that refreshes me from reviewing Investigator

19  Carson's report.

20  Q    And does that refresh your recollection, sir?

21  A    As to what was found at the residence, yes, sir.

22  Q    Okay.  Now, Mr. Johnson, his case could have been turned

23  over to the federal authorities as well, isn't that right?

24  A    Believe he could have been charged with having a domestic

25  violence conviction and possessing a firearm.

1    Q    And possessing more than one firearm, right?

2    A    Correct.  I don't know if it's multiple charges or a

3    single charge, sir.

4    Q    In fact, Mr. Johnson told you that the guns weren't his,

5    but you might find his fingerprints and DNA on the guns, isn't

6    that right?

7    A    I don't recall, but we discussed the firearms with Mr.

8    Johnson.

9    Q    And you don't recall whether he said, "The guns aren't

10    mine, but you might find my fingerprints and DNA on them"?

11    A    I -- I don't recall that statement.  I know that as far as

12    I was concerned, he was in possession of the firearm, sir.

13            MR. BUTLER:  Your Honor, may I approach the witness?

14            THE COURT:  Yeah, that'd be fine.

15    BY MR. BUTLER:

16    Q    Sir, if you could just read this to yourself, then I'll

17    see if that refreshes your recollection.

18    A    Okay.  JLC-05 --

19    Q    No, you got to read it to yourself (indiscernible).

20    A    Oh, I'm sorry.

21    Q    That's what the rules are, so you have to read it to

22    yourself.  I'd like to have you read it out loud, but that's

23    not what the rules say.

24            THE COURT:  Just follow the rules.

25            MR. BUTLER:  Yes, sir.

WALL - CROSS

```
 1            THE WITNESS:  Okay, sir.
 2   BY MR. BUTLER:
 3   Q    Sergeant Wall, does that jog your recollection about Mr.
 4   Johnson and the kilo-a-week information you received from --
 5            MR. SCHRODER:  Your Honor, objection.  I -- we need to
 6   have his memory and not counsel reading from the report.
 7            MR. BUTLER:  Well, I can -- (indiscernible) --
 8            THE COURT:  Well, I'll -- this report is not his
 9   report.
10            MR. SCHRODER:  Correct.
11            MR. BUTLER:  Right.
12            THE COURT:  But he's read it, and you can ask him if it
13   refreshes his --
14            MR. BUTLER:  Right.
15            THE COURT:  -- recollection one way or the other.
16            MR. BUTLER:  Right, that's what I was asking, Judge.
17            THE COURT:  Okay.
18   BY MR. BUTLER:
19   Q    Sir, does that jog your recollection about the information
20   from the informant about a kilo a week, Mr. Johnson doing?
21   A    It -- it doesn't, sir.  That was Investigator Carson.
22   It -- it's been a while.  I don't remember what the exact
23   amounts were.
24   Q    Did Mr. Johnson ever admit to you all that he was moving a
25   kilo a week?
```

WALL - CROSS

1   A    He did not, sir.

2   Q    Did he ever admit to you how much cocaine he was moving

3   per week?

4   A    No, sir.

5   Q    Is it -- would it be correct for me to conclude that Mr.

6   Johnson kind of keeps his information close to the vest?

7   A    Yes, sir, that'd be one way to term it.

8   Q    And is that one of the reasons why you would say or you

9   would conclude that Mr. Johnson is not all that reliable?

10  A    No, that's -- that wouldn't be an accurate statement.

11  Q    That would not be accurate?

12  A    Would not be.

13  Q    That -- what part of that statement would not be accurate,

14  sir?

15  A    Well, I don't believe that because he withholds

16  information of his own choosing, that that would definitely

17  determine whether or not his information was true and accurate.

18  Q    Even though that information is information you would want

19  to have?

20  A    Whether or not it's information that I would want to have,

21  sir, that's information that he's got to be willing to give me.

22  Just because a person doesn't tell me something doesn't mean

23  that they are not guilty of something or they don't know

24  information that I want.  I can't compel them to give me that

25  information.  That doesn't necessarily mean that they're being

1    dishonest or -- about a subject or untruthful.  It just means
2    that they're withholding that information.
3    Q    Would you want to know whether he was moving a kilo a
4    week, sir?
5    A    Absolutely.
6    Q    Okay.  And you would want to know where that kilo, that
7    brick, for example, would be coming from, wouldn't you?
8    A    Yes, sir.
9    Q    Now, when you were questioning Mr. Johnson, you mentioned
10   a minute ago about he had a conviction for domestic violence.
11   But did you check his background?
12   A    The background was checked beforehand, yes, before the
13   execution of the warrant.
14   Q    Okay.  And did his background play any role in how you
15   viewed the information you were getting from him?
16   A    I would say not so much his background, but more of his
17   personality.
18   Q    What do you mean, sir?
19   A    Mr. Johnson had an assault in his background that didn't
20   necessarily deal with anything, but Mr. Johnson did want to
21   provide information that was favorable to him if he knew that
22   we were going to cooperate with him.  That's -- that's more of
23   an accurate statement as far as his personality.
24   Q    But when you look at a person like that, you certainly
25   want to know what their criminal history is as well, don't you?