1   A    Yes, sir.

2   Q    And that's why you checked it ahead of time, didn't you?

3   A    We do that as a course of business, sir.

4   Q    Okay.  And that also gives you an idea of whether the

5   person may be savvy as it relates to dealing with law

6   enforcement.  Isn't that right?

7   A    That's correct.

8   Q    I mean, the more history, there may be more savvyness in

9   the way that they deal with law enforcement, isn't that right?

10  A    It may be, or it may be that they're just not as adept at

11  getting away with it.

12  Q    Okay.  And Mr. Johnson had some savvyness about him,

13  didn't he?

14         MR. SCHRODER:  Objection, Your Honor.  This is improper

15  impeachment to go -- using this witness to try to go into

16  criminal history of another witness.

17         THE COURT:  Well, I don't know exactly where you're

18  going, but -- are you done with this line --

19         MR. BUTLER:  Well, just -- well, the part about the

20  savvyness, if I can get that answered, I'd like to get that

21  answered.

22         THE COURT:  Well, you got that answered about three

23  different ways.  I mean, three different times he said that

24  he's -- may be or may not be.  I don't know.

25         MR. BUTLER:  Okay.  Well, all right, if he answered

1    that as to Mr. Johnson, then that would be my last question on

2    that area --

3            THE COURT:  Okay.

4            MR. BUTLER:  -- Judge.

5            THE COURT:  Any redirect?

6            MR. BUTLER:  On that area.

7            THE COURT:  Oh, on that area.  I thought I heard you

8    say last question.

9            MR. BUTLER:  No, on that area, Judge.

10           THE COURT:  All right.

11   BY MR. BUTLER:

12   Q    Now, when you went into Mr. Colette's residence, sir,

13   no -- you didn't let anyone know outside of getting the search

14   warrant and what have you that you were going in that

15   residence.  Isn't that right?

16   A    What do you mean, outside of the -- our invest --

17   Q    Outside of normal law enforcement channels.

18   A    No, sir.  The court system and the -- and law enforcement.

19   Q    So that execution of the search warrant was by surprise,

20   wouldn't you say?

21   A    That's correct.

22   Q    And when you went in there, you didn't find firearms

23   laying out in bedrooms and things like that, did you?

24   A    No, sir.

25   Q    Okay.  Firearms and things were locked away in a safe,

WALL - CROSS

```
 1  isn't that right?

 2  A    That's correct.

 3  Q    Okay.  Have you ever had to go into a safe to get

 4  something out?

 5  A    Yes, sir.

 6  Q    It takes a little bit of time, doesn't it?

 7  A    Some safes, yes.

 8  Q    It's not the kind of thing you just grab up and wave or --

 9  you can't just grab something and wave it around if it's locked

10  up in a safe.  Isn't that right?

11  A    No.  It depends what type of safe you have, but some of

12  them take more time than others.

13  Q    And the safe was in the bedroom.  Right, sir?

14  A    Yes, sir.

15  Q    And you've testified I think to drugs that were found,

16  that was locked up in the safe.  Right?

17  A    Yes, sir.

18  Q    All the guns were locked up in the safe, isn't that right?

19  A    Yes, sir.

20  Q    And the gun that you describe as a -- I guess it's an

21  automatic weapon of some sort?

22  A    It's an Ingram submachine gun, sir.

23  Q    Okay.  It was legal for Mr. Colette to own it at the time,

24  wasn't it?

25  A    That's my belief, sir, yes.
```

WALL - CROSS

1   Q   Well, in fact, you saw the paperwork that he went through

2   to get it, didn't you?

3   A   Yes.

4   Q   It was right there in the safe?

5   A   Correct.

6   Q   Went through the federal process, so to speak, right?

7   A   Well --

8   Q   It's not a state process, is it?  It's a federal process.

9   A   That -- that is correct.  I guess it's a -- it's a two-

10  part question, the belief of -- that legally possessing that

11  type of firearm, yes.  In that circumstance, no.

12  Q   Well, that's your opinion about the circumstance.  Isn't

13  that right, sir?

14  A   Well, not necessarily the -- the lab I believe field

15  test -- or tested the product of -- believe it was cocaine.  So

16  you're asking what I believed at the time --

17  Q   No, no, what I asked you was, it was legal for him to

18  possess it at the time, was it not?

19  A   The firearm, yes.

20  Q   Yes.  Other words, it wasn't something was -- that was

21  bought off the street?

22  A   That's correct.

23  Q   The receipts and everything are right there, was --

24  weren't they?

25  A   A receipt and a tax stamp, sir.

1  Q    And the tax stamps with his picture on them, right, sir?

2  A    That's correct.

3  Q    Including for the suppressor?  It was all legal?

4  A    That's correct.

5  Q    Okay.  And in fact, there were no bullets in the firearm

6  when you found it, was -- were there, sir?

7  A    I don't believe there were, sir.

8  Q    And in fact, there were no bullets to that firearm even in

9  the safe, were there?

10 A    I don't recall that, sir.

11 Q    Do you recall, sir, were there any bullets belonging to

12 that firearm in the safe?

13 A    I don't recall, sir.  I didn't empty any ammunition out of

14 the safe.

15 Q    Now, are you the case officer here?

16 A    I was part of the case -- I was the case manager for the

17 state.  Once the items were located inside the safe, there are

18 certain federal thresholds that were met.  Special Agent Foran

19 as well as ATF took over the -- Eric Cohoon with ATF took over

20 the investigation.

21 Q    You all transferred the case to them, right?

22 A    We did.

23 Q    But it was a state case, right?

24 A    Initially, sir, yes.

25 Q    Okay.  And you basically looked at the photographs and you

1  testified about what was in the photographs for us.  Didn't you

2  do that, sir?

3  A    That's correct.

4  Q    And you were there during the execution of the warrant,

5  weren't you, sir?

6  A    Yes, sir.

7  Q    And that particular firearm was of great interest, wasn't

8  it?

9  A    It was, sir.

10  Q    Okay.  And so had there been bullets in that safe to go

11  with it, that would have probably been of some interest as

12  well, wouldn't it?

13  A    Well, there were boxes of ammunition, sir.  The -- whether

14  the weapon was loaded or unloaded, I'm not familiar with that

15  weapon, so I can rest assured that I didn't handle it until it

16  was cleared by someone that knows how it functions.  So I know

17  from being there that the weapon was unloaded.

18              MR. BUTLER:  If I may have a moment, Judge?

19              THE COURT:  All right.

20        (Pause)

21  BY MR. BUTLER:

22  Q    Sir, you had mentioned on direct that you weren't too

23  much -- and if I misstate this, please correct me -- that you

24  weren't too interested in accurate information, just truthful

25  information.  And I was wondering what the difference was.

WALL - CROSS

1  A    No, the -- I -- I have to correct you.  The -- the

2  question was truthful versus useful.

3  Q    Oh, okay.  Because I thought the term "accurate" was used

4  in a --

5  A    No, sir, it was truthful versus useful.

6  Q    But you do want useful information, don't you?

7  A    Absolutely.

8  Q    And if it's useful, that means it's probably accurate or

9  true, if it's useful?

10  A    Sometimes, yes.  Not -- not all the time.  It has to be

11  legally obtained.  It can be --

12  Q    But the question was in reference to an informant.  If the

13  informant -- you -- because the question was whether, when

14  you're getting information from an informant, you know, useful

15  versus truthful.  And the word accurate was in there somewhere.

16  But if it's coming from an informant and it's useful, then

17  there must be some truth to it, right?

18  A    Not necessarily.  Useful information could be obtained

19  illegally by an informant or it could be something that leads

20  to surveillance or other types of investigations.  As -- as far

21  as truthful information would be something that they would

22  provide testimony before a judge or magistrate for.

23  Q    Truthful -- you said truthful information would go in

24  front of a magistrate?

25  A    That's -- that's my definition of it, yes, sir.

1  Q    But isn't it true that people lie under oath?

2  A    I'm sure they do.

3  Q    Okay.  Or don't tell everything when they're on the

4  witness stand, right?

5  A    I'm sure they do.

6  Q    Okay.  So what a person testifies to doesn't always mean

7  it's truthful, isn't that right?

8  A    I'm sure not for everybody, sir.

9         MR. BUTLER:  Pass the witness, Your Honor.

10        THE COURT:  All right, thank you.  Redirect.

11        MR. SCHRODER:  No redirect, Your Honor.

12        THE COURT:  All right, thank you, sir.  You're excused.

13        THE WITNESS:  Thank you, Your Honor.

14        THE COURT:  Let's just take a 10-minute restroom break,

15  okay, and then we'll come back.  Do you have another witness

16  ready in 10 minutes?

17        MR. SCHRODER:  We do.

18        THE COURT:  All right, thank you.

19     (Side conversation)

20        THE CLERK:  Off record.

21     (Court recessed at 3:25 p.m., until 3:40 p.m.)

22     (Jury not present)

23        THE CLERK:  All rise.  His Honor the Court, this United

24  States District Court is again in session.  Please be seated.

25        THE COURT:  Okay.  Do we have the next witness?  You

1    have your next witness?

2              MR. SCHRODER:  We do.

3              THE COURT:  Okay.  We can bring the jury in as well.

4         (Jury present at 3:40 p.m.)

5              THE COURT:  All right, sir.  Make yourself comfortable.

6              MR. SCHRODER:  You can take a seat.  The government

7    calls Eugene Johnson.

8              THE COURT:  Here's the -- you just make -- head toward

9    this chair up front.  Sir, this chair -- and then when you get

10   there, just remain standing, and my clerk will swear you in.

11   She's right --

12             THE CLERK:  If you could raise your right hand, please.

13             THE COURT:  She's right here.

14             MR. JOHNSON:  (Indiscernible).

15        **EUGENE JOHNSON, PLAINTIFF'S WITNESS, SWORN**

16             THE CLERK:  Please be seated.  Sir, for the record, if

17   you could state your name, spelling your last name, and give

18   your address, please?

19             THE WITNESS:  Eugene Johnson.  J-o-h-n-s-o-n.  1315

20   23rd Avenue.

21             THE COURT:  Okay.  Mr. Schroder.

22                          **DIRECT EXAMINATION**

23   BY MR. SCHRODER:

24   Q   Mr. Johnson, you just gave that address.  Is that in

25   Fairbanks?

JOHNSON - DIRECT

```
 1  A    Yes, sir.

 2  Q    Okay.  Where did you grow up?

 3  A    I grew up here.

 4  Q    And where did you go to school?

 5  A    I went to school at Barnett Elementary.

 6  Q    Okay.  And up through the rest of your education here in

 7  Fairbanks?

 8  A    Oh, I -- I left during high school a little -- for a

 9  little bit.

10  Q    Okay.  Do you have children?

11  A    Yes.

12  Q    How old are they?

13  A    Eight and twelve.

14  Q    Uh-huh (affirmative).  Have you ever been involved in the

15  sale of drugs?

16  A    Excuse me?  I didn't hear you.

17  Q    Have you ever been involved in the sale of drugs?

18  A    Well, at this moment, yes, I have, I guess.

19  Q    Okay.  And how have you been involved?

20  A    November 28th, I got raided.

21  Q    Okay.

22  A    And --

23  Q    When did you start selling drugs?

24  A    Man, probably off and on since I was a teenager.

25  Q    Okay.  And you just mentioned a moment ago -- well, let me
```

JOHNSON    DIRECT

1  ask you another question.  Do you use drugs yourself?

2  A    I smoke marijuana, yes.

3  Q    Okay.  Let me take you back to last November.  You said

4  the police searched your house.  Do you remember what day that

5  was?

6  A    I believe November 28th.

7  Q    Okay.  Do you know what they were looking for?

8  A    When they came in, they said they were looking for money

9  and dope.

10  Q    Okay.  Did they find any of either?

11  A    No.

12  Q    Did they have information related to you selling drugs?

13  A    Yes.

14  Q    And what information was that?

15  A    Basically I think they just had me -- somebody had wore a

16  wire on me.

17  Q    Now, did you agree to provide information to the law

18  enforcement officers?

19  A    When the -- when they were in my house, the state

20  troopers, Officer Wells, we had made a agreement.

21  Q    Okay.  And what information did you agree to provide them?

22  A    They basically -- they wanted -- they said they wanted

23  some -- they wanted dope on the table.  So --

24  Q    And did you have information to do that?

25  A    Yes.

1    Q    Okay.  Did the officers agree to provide you a benefit if

2    that information worked out?

3    A    Yeah.

4    Q    And what was that benefit?

5    A    It was no jail time.

6    Q    Was that your understanding of what it meant?

7    A    Yes, sir.

8    Q    At what time did you -- or at that time, did you also

9    provide testimony in a state court?

10   A    Yes.

11   Q    And do you remember the purpose of that testimony?

12   A    I believe so.

13   Q    What was it?

14   A    The -- the warrant for Jason, I believe.

15   Q    Okay.  Did you tell the truth at that hearing?

16   A    Yes, I did.

17   Q    Uh-huh (affirmative).  So do you know the defendant, Jason

18   Colette?

19   A    Yes.  Yes, I do.

20   Q    And how do you know him?

21   A    We're acquaintances, I guess.

22   Q    And how would you define acquaintances?

23   A    I know him.  We talked before, but it wasn't like we're

24   going on vacation, hanging out --

25   Q    Okay.

JOHNSON - DIRECT

1  A    -- having barbecues or anything like that, no.  Was just

2  somebody I knew, and we talked, and he's -- he's helped me out

3  with some of my vehicles before and so kind of business

4  relationship.

5  Q    Now, did you agree to cooperate with the law enforcement

6  officers?  Did that relate to Jason Colette?

7  A    Yes.  Yes, it did.

8  Q    And how did it relate to him?

9  A    Well, they wanted dope on the table, and I gave them

10 Jason.

11 Q    Okay.  Do you do business with him, drug business?

12 A    Who?

13 Q    Jason Colette.

14 A    I have, yes.

15 Q    Okay.  When was the last -- prior to when the police came

16 to your house, when was the last time that you had seen him,

17 the defendant?

18 A    Maybe a couple days to a week, maybe, something like

19 there.  Give or take --

20 Q    Okay.

21 A    -- a little bit.

22 Q    And where did you see him that last time you saw him?

23 A    At his place.

24 Q    Okay.  And what were you doing when you saw him then?

25 A    I was over there buying dope.

1  Q    Okay.  And when you say buying dope, what were you buying?

2  What kind?

3  A    Cocaine.

4  Q    Okay.  And it was -- you said it was at his residence?

5  A    Yes.

6  Q    Okay.  Now, where in the house -- had you done this

7  before?  Had you bought from him before?

8  A    Yes.  Yes, I have.

9  Q    Okay.  And where in the house did this happen?

10 A    Usually when -- when it did happen, we were in his

11 bedroom.

12 Q    Okay.  And was there anybody else in the house?

13 A    Usually he's by himself.

14 Q    Okay.  Was there anybody else around that you knew of?

15 A    The last time I seen him, I think his girlfriend was at

16 the house --

17 Q    Okay.

18 A    -- with him.

19 Q    Was she ever involved in the deals?

20 A    No, sir.

21 Q    Okay.  So how did it start out when you went into the

22 house?  What happened?

23 A    What do you mean?

24 Q    Oh.  So you said you did -- you bought in the bedroom, is

25 that what -- you just said that?

1  A    Yes.

2  Q    Okay.  And so how much cocaine did you buy that day?

3  A    Maybe a ounce or two.

4  Q    Okay.  And do you remember how much you paid?

5  A    I think 11 --

6  Q    And --

7  A    -- 1,100.

8  Q    Okay.  Was that total or for an ounce?

9  A    It's for one ounce.

10 Q    Okay.  And where did he keep his drugs?

11 A    When I was there, I seen it in his safe.

12 Q    Okay.  And how much -- the day you were there, this day

13 we're talking about, a few days before your -- the search of

14 your house, how much drugs did you see in his safe?

15 A    It's hard to say.  It was a lot.  It was a bag.

16 Q    And when you say bag, well, how was it contained?

17 A    I think it was a grocery bag full -- full of zips.

18 Q    Okay.  Well, let's ask the old grocery-bag question.

19 Paper or plastic?

20 A    Plastic.

21 Q    Okay.  And when --

22 A    A brown plastic.

23 Q    -- you say zips, what's that --

24 A    Ounce.

25 Q    -- term mean?

1  A    Ounces.

2  Q    Okay.  And how were the ounces packaged?

3  A    I believe sandwich bags.

4  Q    Okay.  Did you see any money?

5  A    I can't recall if I did.

6  Q    Did you ever see weapons in the defendant's bedroom?

7  A    I remember seeing -- he had showed me a Uzi before.

8  Q    Okay.  And which occasion was that where you saw this?

9  A    I think it was the last time I stopped by.

10  Q    Okay.  And what do you mean by -- when you say an Uzi,

11  what do you mean by that?

12  A    Like maybe a handgun, semi-auto -- fully-automatic

13  handgun --

14  Q    Okay.

15  A    -- machine gun.

16  Q    Was there anything attached to it that you remember?

17  A    I believe there was a silencer on it.

18  Q    Okay.  Do you remember whether it had a magazine in it or

19  not?

20  A    I'm not too sure.

21  Q    Okay.  Did the defendant draw your attention to the gun at

22  any point?

23  A    Yeah, because he was showing it to me, like, "Hey, look

24  what I got."  I looked at it, but --

25  Q    And did he handle it at all?

JOHNSON - CROSS

1  A    He was showing me.

2  Q    Okay.  All right.  Had you seen any other weapons when you

3  were there before, any other guns?

4  A    I think so, but I'm not too sure.  I can't say for sure if

5  I did.

6  Q    Okay.  Did you ever consider going back and stealing any

7  of the defendant's cocaine?

8  A    Yeah, that was probably -- probably the reason why I gave

9  Jason up, because there's been a few times I was thinking about

10  going and -- I seen that stash.  I was broke, shit, was

11  thinking --

12  Q    So --

13  A    -- about going to get it.

14  Q    So did you ever go do that?

15  A    No.

16  Q    And why not?

17  A    Well, I'd seen a Uzi with a silencer on it.  That kind of

18  made me think twice.

19       MR. SCHRODER:  That's all the government's questions,

20  Your Honor.

21       THE COURT:  Thank you.  Mr. Butler.

22                    **CROSS-EXAMINATION**

23  BY MR. BUTLER:

24  Q    Good afternoon, Mr. Johnson.

25  A    Good afternoon.

JOHNSON - CROSS

1  Q    You've spoken to law enforcement on several occasions,

2  haven't you?

3  A    Yes, sir.

4  Q    In preparation for your testimony here?

5  A    Excuse me?

6  Q    In preparation for your testimony here, haven't you?  You

7  spoke to law enforcement in preparation for your testimony

8  here, haven't you, sir?

9  A    Yes, sir.

10 Q    Okay.  How often have you spoken to them?

11 A    Maybe two or three times, maybe.

12 Q    And maybe more, isn't that right?

13 A    I believe three times.

14 Q    When was the last time?

15 A    Maybe a day or two ago.

16 Q    And have you -- when was the last time you spoke to

17 Trooper Wall, even if it was just "Hello"?

18 A    Maybe a month ago.

19 Q    Did you see him today?

20 A    Yes.  Yes, I did.

21 Q    Where did you see him, sir?

22 A    In the hallway.

23 Q    What did you say, or what did he say to you?  What did he

24 say to you, sir?

25 A    He said, "Hi, Eugene."

JOHNSON - CROSS

1   Q    What did you say, sir?

2   A    I asked him did he get ate up in there.

3   Q    Uh-huh (affirmative).  What did he say?

4   A    He said, "No."

5   Q    What else did he say to you?

6   A    That was it.

7   Q    So I asked you a few minutes ago when is the last time you

8   spoke to Sergeant Wall, even if it was just to say hello -- you

9   said a month ago, didn't you?

10  A    We don't talk -- I don't call him to say hello.  He

11  doesn't call me to say hello to me.

12  Q    Sir, but the last time you talked to Sergeant Wall, even

13  if it was just to say hello, was a few minutes ago, not a month

14  ago.  Isn't that right?

15  A    Yes, you're right.

16  Q    Now, what did you mean by asking him, "Did you get ate up

17  in there?"  What did you mean, sir?

18  A    I was wondering if you ate him up in here.

19  Q    Uh-huh (affirmative).  Why would you be concerned about

20  that?

21  A    Why not?

22  Q    But why would you be concerned about that?

23  A    Why not?

24  Q    Were you concerned about being ate up in here?

25  A    Yeah.  Yes, sir.

JOHNSON - CROSS

1  Q    Why would you have had that fear if you're telling the

2  truth, sir?

3  A    This is not a comfortable situation that I'm in by any

4  means, so I'm very uncomfortable.

5  Q    Are you uncomfortable because you may lie in here, or are

6  you uncomfortable for some other reason?

7  A    I'm uncomfortable because I'm up here testifying against

8  somebody I don't have --

9  Q    You don't have what, sir?

10 A    I don't have issues with.  I -- I don't hate Jason, I

11 didn't have problems with Jason.  Yeah, I have issues with

12 being here.

13 Q    To quote you, they wanted drugs on the table, so you,

14 quote, unquote, gave them Jason.  That was your testimony,

15 wasn't it?

16 A    Yes, sir.

17 Q    And have you also told law enforcement that you -- that

18 you've seen in the safe?  It was open or something when you

19 were there?

20 A    Well, after I've -- I've been there, he's -- he's opened

21 it.

22 Q    So it was open, what, a few days before you were busted?

23 A    Last time I seen him, he opened it.

24 Q    So that would have been a couple, three days before you

25 were busted, right?

JOHNSON - CROSS

```
 1   A    Yes.
 2   Q    In fact, you told law enforcement, "I bought drugs from
 3   Jason."  Right?
 4   A    Yes.
 5   Q    And you said that you'd bought drugs from Jason just a few
 6   days before you were arrested, didn't you?
 7   A    Yes.
 8   Q    And so on that occasion, you were, what, in his bedroom,
 9   and you saw the safe open?  Right?
10   A    We initially -- we walked into the bedroom, then he opened
11   the safe.
12   Q    You saw inside the safe, you saw that Uzi, was it?
13   A    The Uzi wasn't in the safe.
14   Q    It was on top of the dresser?
15   A    Yes.
16   Q    I see.  And you remember that?
17   A    Yes.
18   Q    So when he opened the safe, all you saw was what, the
19   drugs?
20   A    Yes.
21   Q    And the -- and those were drugs that you said, "Oh, I
22   thought about ripping him off, but then I saw that Uzi."  Is
23   that -- was that in essence your testimony, sir?
24   A    Can you repeat that?
25   Q    "I thought about ripping him off, but I saw that Uzi."  Is
```

1  that -- in essence was your testimony, wasn't it?

2  A    I don't think so.  I think I said he had showed me the

3  Uzi, and prior from being over there, that was -- that was

4  something I was thinking about.  That wasn't like I was

5  planning it out loud.

6  Q    Okay.

7  A    So --

8  Q    And this idea of, "I'm going to rip -- I'm thinking about

9  ripping Jason off, but the Uzi sort of made me not," you never

10  told police that before, did you?

11  A    What?

12  Q    That I saw the -- that I -- it was -- "that I thought

13  about ripping Jason off, but once I saw the Uzi, I decided not

14  to."  You never told him that before today, did you?

15  A    I had said something to Officer Wells, I believe.

16  Q    How long ago was that?

17  A    When -- when they came in my house.

18  Q    Is that Officer Wells or Officer Wall -- Sergeant Wall?

19  A    Walls, Trooper Walls.

20  Q    So your testimony -- was that conversation recorded?

21  A    I hope so.

22  Q    Well, do you know?

23  A    I don't know.

24  Q    Did you see a recording?

25  A    No.

1   Q    Now, you said you hope it was recorded?

2   A    Yeah.

3   Q    Why do you hope it was recorded?

4   A    Just -- just -- it needs to be.

5   Q    Well --

6   A    Me and Officer Wells had a deal.  I would like --

7   everything that me and Officer Wells talked about, hopefully

8   it's on tape.

9   Q    Okay.  But you haven't seen or heard that tape, have you?

10  A    No.

11  Q    Have you asked for it?

12  A    Yes.

13  Q    Was it given to you?

14  A    Not yet.

15  Q    How long have you been asking for it?

16  A    At least since March.

17  Q    So your testimony is that you had a deal with Officer

18  Wells -- Walls -- you said Officer Wells, but Trooper Walls --

19  let me call him Trooper Walls --

20  A    Trooper Walls --

21  Q    -- okay.

22  A    -- yes.

23  Q    And you're saying that he made promises to you?

24  A    Yes, sir.

25  Q    And those promises, did he make a phone call before he

JOHNSON CROSS

1   made you the promises or did he make them right on the spot to

2   you?

3   A    No phone calls.  He said --

4   Q    So --

5   A    -- long as I produce -- long as I don't give him nothing

6   small, no jail time.

7   Q    That's what he said to you?

8   A    Yes.

9   Q    Did he say, "I can't make a deal with you, I got to go

10  make a call first"?

11  A    I don't recall that.

12  Q    You would have recalled it if it said -- if it was said.

13  Is that your testimony?

14  A    Excuse me?

15  Q    You would have recalled it if that's what Trooper Wall --

16  Walls had said to you, wouldn't you?

17  A    I'm not sure.

18  Q    When you looked into the safe, what did you see?

19  A    Bag of dope.

20  Q    Anything else?

21  A    That's the only thing I could recall.

22  Q    How big is the safe?

23  A    Put you in it.

24  Q    So huge?

25  A    Yeah.

JOHNSON — CROSS

1  Q    It'd have to be, wouldn't it?  Since the -- it's a

2  recorded record, they don't have a camera, so it had to --

3  anyway, but you didn't see any money in there.  Right?

4  A    It was a long time ago.  I can't recall.  I could have,

5  but I'm not for sure if I have -- or if I did.

6  Q    But you don't remember seeing any money in there?

7  A    I -- I -- I'm not sure.

8  Q    And you don't recall seeing any guns in there, isn't that

9  right?

10 A    I don't -- I'm not -- I'm not sure if I seen any guns in

11 the safe at all.  I remember seeing the Uzi on the dresser when

12 were doing business.

13 Q    Sir, I'm going to show you exhibits that have been marked

14 and admitted into evidence.

15    (Side conversation)

16        MR. BUTLER:  With the Court's permission, I'd like to

17 show the witness Plaintiff's Exhibit Number 5, Number 4, and

18 Number 2.

19        THE COURT:  Very well.

20        MR. BUTLER:  And I'd like to actually show them to the

21 jury before I show them to the witness.  May I, Judge?

22        THE COURT:  Just to remind them what's there.

23        MR. BUTLER:  Yes.

24        THE COURT:  Those are ones that -- already been --

25        MR. BUTLER:  I mean, actually, I'm a little technically

1    challenged, so --

2         THE COURT:  Well, okay.  So you're saying you can't put

3    it up there?

4         MR. BUTLER:  That's correct, Judge.

5         THE COURT:  Okay, how do you want to show it to them,

6    just --

7         MR. BUTLER:  Like this.

8         THE COURT:  Okay, go ahead.

9    BY MR. BUTLER:

10   Q    Plaintiff's Exhibit Number 2.  Sir, I'm handing you

11   Plaintiff's Exhibit Number 2.  You take that.  Your testimony

12   is, you saw inside --

13        THE CLERK:  Mr. Butler, you'll need the lapel mic if

14   you're in the center.

15        THE COURT:  Okay.

16   BY MR. BUTLER:

17   Q    Your testimony is, you saw inside that safe, but you don't

18   recall seeing guns?

19   A    No.

20   Q    And this would have been just a couple of days before you

21   were raided by the police?

22   A    Anything can happen in a couple days.

23   Q    Sir, that's your testimony.  Is that right?

24   A    Yes.

25   Q    You saw dope, but you did -- you don't remember seeing

*A & T TRANSCRIPTS*
*(817) 685-7556*

1  guns.  Is that right?

2  A    I remember seeing that Uzi with the silencer on it.

3  Q    Plaintiff's Exhibit Number 4.  Take a look at it, sir.

4  You saw inside that safe but all you saw was dope in there.  Is

5  that your testimony?

6  A    Yes, sir.

7  Q    Plaintiff's Exhibit Number 5.

8          THE CLERK:  Mr. Butler, I'm not recording you in the

9  center.

10 BY MR. BUTLER:

11 Q    Plaintiff's Exhibit Number 5, sir.  You see it?

12 A    Yeah.

13 Q    What shelf was the dope on when you saw it?

14 A    I don't recall.

15 Q    Was it even on a shelf?

16 A    I recall Jason reaching in and grabbing it out.

17 Q    And you said it was a shopping bag or some sort?

18 A    Yes.

19 Q    Now, you never said that before today either, did you?

20 A    Excuse me?

21 Q    You never said before today that it was in a shopping

22 bag --

23 A    Yes.

24 Q    -- did you, sir?

25 A    Yes, I have.

1  Q    When did you say that?

2  A    To Officer -- or Trooper Walls.

3  Q    Are you sure that's what you said?  Are you sure that's

4  what you said, sir?

5  A    I'm not 100 percent -- percent sure, but I -- I -- I

6  remember mentioning that to him.

7  Q    That it was in some -- what kind of bag was it in?

8  A    It looked like a grocery bag.

9  Q    So you -- well, tell us what you saw.  You're saying you

10 saw Jason reach into a grocery bag?

11 A    I seen Jason reach into a safe, grab a grocery bag out,

12 and when -- when they opened the grocery bag, there was at

13 least 40, 50 zips.

14 Q    Okay.  And how many of them did you buy?

15 A    Maybe one or two.

16 Q    Maybe one or two.  Now, you said you spent $1,100, right?

17 A    So that was -- yeah, I got one that day.

18 Q    Well -- but you're not sure, are you?

19 A    Right.

20 Q    May have gotten 10?

21 A    No, I would have remembered that.  It's a lot of money.

22 That'd been over $10,000.  I'm poor.  And seeing that much

23 money --

24 Q    So your testimony --

25 A    -- you remember.

JOHNSON - CROSS

1  Q    -- is that you went to Jason Colette's house and you

2  bought one ounce of cocaine a few days before you were busted.

3  Is that your testimony?

4  A    Yes.

5  Q    Now, when you were -- when they bought from you

6  undercover, they bought four 44 grams from you, wasn't it?

7  About an ounce and a half?

8  A    Right.

9  Q    Where did that come from?

10  A    Jason wasn't the only person I was dealing with.

11  Q    Where did it come from?  Who sold it to you?

12  A    I bought from many people.

13  Q    Who did you buy that from, sir?

14  A    I don't recall.

15  Q    So you have numerous sources of cocaine.  Is that right?

16  A    Yes.

17  Q    And there's no record here that you told Trooper Walls, "I

18  bought it -- I saw a grocery bag in Jason Colette's safe."

19  Isn't that right?

20  A    Repeat that again?

21  Q    You have not seen a record that reflects you saying to

22  Trooper Walls, "I saw Mr. Colette pull drugs out of a grocery

23  bag."  Isn't that right?

24  A    I believe I had -- I had told him that.

25  Q    But you're not sure, are you?

JOHNSON - CROSS

1    A    Yeah, I'm not sure.

2    Q    Okay.

3    A    I -- I'm pretty sure that's when -- when we were in the --

4    the city court, when we're -- we're getting the search, that

5    was said in front of Officer -- me and Officer Wells was there

6    and another judge.

7    Q    That it was in the grocery bag?

8    A    Yeah.

9    Q    Okay.  When they were questioning you, preparing you for

10    the -- for your testimony today, did they show you any

11    photographs?

12    A    No, sir.

13    Q    Have you ever seen any photographs?

14    A    No, sir.

15    Q    So when I showed you the photographs that -- of Mr.

16    Colette's safe, you were surprised, weren't you?

17    A    No, sir.

18    Q    Now, you said this was a very large safe, right?

19    A    Yes.

20    Q    How tall was it?

21    A    I'm not sure.

22    Q    Was it tall as you?

23    A    At least.

24    Q    Taller than you?

25    A    I'm not sure.

1  Q   How wide was it?

2  A   Wide as you.

3  Q   Would you show the jury, in your own estimation, how wide

4  the safe was?  You just did two things now, so just.....

5  A   It's right here.

6  Q   So show that to the jury.  What do you have, about three

7  and a half to four feet there?  Is that what you have, sir?

8  A   I'm not sure what it is.

9       MR. BUTLER:  With the Court's permission, I'd like to

10 show the witness Plaintiff's Exhibit Number 1, and I'd like

11 also to publish it to the jury on the way.

12      THE COURT:  Is it -- it's an admitted exhibit, is that

13 what it is?

14      MR. BUTLER:  Yes, Judge.

15      THE COURT:  Okay.

16      MR. BUTLER:  Right, counsel?

17      MR. SCHRODER:  Yes.

18      THE COURT:  That's fine.  Just remember, you're not

19 recorded as you're walking back and forth.

20      MR. BUTLER:  Yes, sir.

21 BY MR. BUTLER:

22 Q   I handed you, sir, Plaintiff's Exhibit Number 1.  That's

23 that wide safe that you're talking about?

24 A   Yeah, that's pretty wide.  Who has a safe like that?

25 Q   Pardon?

1  A   Who has a safe like that?  That's pretty big.  You got a

2  safe like that?

3  Q   So your testimony is that you're not used to seeing a safe

4  like that.  Is that your testimony?

5  A   You said that.  I didn't say that.

6  Q   You didn't say that?

7  A   I said, that's a big safe -- safe.  I said, who has one

8  like that.  I think those were my exact words.

9  Q   Okay.  So it's unusual for you to see something like that?

10  A   I don't have one.  I'm used to my lifestyle, what I have.

11  Q   Now, you said Mr. Colette helped you out with your

12  automobiles.

13  A   Yes, sir.

14  Q   What do you mean, sir?  You fix -- he fixed your stereo

15  system or your remote start?

16  A   Stereos.

17  Q   And you said stereos and you said automobiles.  How many

18  of them?

19  A   Maybe two or three.

20  Q   And now, during this time that we're talking about, you

21  were unemployed, weren't you?  Well, let me rephrase that.  You

22  were not working for someone else, were you?  Did you have a 9-

23  to-5?

24  A   No.  No, I didn't.

25  Q   No kind of job of that nature.  Is that right?

JOHNSON - CROSS

```
 1  A    Not at that time.
 2  Q    Okay.  But you had two places that you were paying rent
 3  on, didn't you?
 4  A    No, sir.
 5  Q    Well, didn't you have a place where you kept dope?
 6  A    No.
 7  Q    You didn't tell Trooper Walls that you had another address
 8  and that's where you kept your dope?
 9  A    I don't recall that.
10  Q    Sir, isn't it true that you had another address where you
11  kept your dope?
12  A    No.  It's not true.
13  Q    Well, why is it that when the troopers came to your house
14  and raided it, that you didn't have any dope there?
15  A    Because it was gone.
16  Q    You had taken it out of there, right?
17  A    It was gone.
18  Q    You had taken it out because you knew they were coming.
19  Isn't that what you told the troopers?
20  A    Oh, yeah.  I cleaned up.
21  Q    Because you knew they were coming?
22  A    Right.
23  Q    How did you find that out?
24  A    Somebody that I -- I went to church with had whispered
25  something in my ear, they were cleaning up the south side.  So
```

```
 1   I decided to clean up.

 2   Q    They were cleaning up the south side.  How big is the

 3   south side?

 4   A    You never been over there?

 5   Q    How big is the south side, sir?  Listen, I don't want to

 6   be rude, but I'm not really allowed to answer your questions

 7   unless you're asking me to clarify a question.  The Court --

 8   the judge will tell you that.  I have to ask you questions,

 9   sir.  So how big is the south side?

10   A    I'm not sure.

11   Q    Now, who was it that told you this?

12   A    One of my elders.

13   Q    Who was it, sir?

14   A    I don't want to reveal that.  I don't feel --

15   Q    Who told you that, sir?

16   A    One of my elders.

17   Q    Who's that, sir?  Who was it?

18   A    Somebody I went to church with.

19   Q    Sir, your testimony here to -- now, you didn't say that to

20   the trooper when they asked who it was, did you?

21   A    They didn't ask.

22   Q    They never asked you who it was?

23   A    They wanted to know -- yeah, they did ask, actually.  They

24   wanted to know who gave me up the information.

25   Q    And you refused to tell them, isn't that right?
```

```
 1   A    Right.
 2   Q    Okay.  And you didn't tell them it was an elder from the
 3   church.  Why did you bring the church into it today?
 4   A    I wasn't planning on telling.....
 5   Q    Sir, why.....
 6   A    I was -- I was not planning on telling anybody who told me
 7   that.
 8   Q    Sir, why did you bring the church into it today?  You
 9   didn't tell the troopers that someone from the church told you.
10   A    The troopers were trying to make me a deal.  They told me
11   if I gave up who -- if I gave up who told me they were coming,
12   I would have no charges, I would have had a clean slate.
13   Q    And you turned them down, I see.  Isn't that right?
14   A    Right.
15   Q    And -- but you didn't say it was an elder from the church,
16   or from a church, or anything of that nature, did you, sir?
17   A    No, sir.
18   Q    You told them essentially it was none of their business.
19   Right?
20   A    For the most part.
21   Q    And so when it comes down to you and information, if you
22   feel it's nobody's business, you're not going to say what it
23   is.  Is that -- that's a fair statement, isn't it?
24   A    I'm not sure.
25   Q    Well, you don't mind telling a state trooper that it's
```

JOHNSON - CROSS

```
 1  basically none of his business.  Right?
 2  A    Right.  I got to do -- I had to protect my family, my --
 3  got to do what I got to do.  Blood's thicker than water.
 4  Q    And maybe it was a source of cocaine that told you that
 5  too, isn't that right?
 6  A    No.
 7  Q    And that may be the reason why you don't want to give that
 8  up, isn't that right?
 9  A    No, you're wrong.
10  Q    Who's Monty?
11  A    Excuse me?
12  Q    Who is Monty?
13  A    Monty is how I met Jason.
14  Q    Friend of yours?
15  A    We were.
16  Q    Person you hang out with --
17  A    We did.
18  Q    -- right?  Person who imports dope, isn't that right?
19  A    I don't know.
20  Q    You're under oath, sir.  I'll ask you again.  He is a
21  person who imports dope, isn't he?
22  A    I don't know.
23  Q    He -- does he sell dope, sir?
24  A    I don't know.
25  Q    Well, tell us about your friend that you said that's how
```

JOHNSON - CROSS

1    you met Jason.  Your friend is on the run right now, isn't he?

2    A    I don't know.

3    Q    When is the last time you saw him, sir?

4    A    Since he found out I turned in Jason.  Since November.

5    Q    That's the last time you saw him, right?

6    A    He -- he came by, I think --

7    Q    And you told him --

8    A    -- well, he --

9    Q    -- what was going on with you, right?

10   A    Right.

11   Q    And you told him that so that he could sort of, what,

12   disappear a little bit or kind of -- right?

13   A    Repeat that?

14   Q    You told him that so that he could avoid law enforcement,

15   didn't you, sir?

16   A    No.  He was at --

17   Q    Well, isn't it true that he certainly doesn't want to talk

18   to law enforcement?  You know that, right?

19   A    No, I don't know that.

20   Q    Well, why is it that you haven't seen Monty since November

21   28th, 2005, this good friend of yours?  Why not?

22   A    He was a little pissed off because I gave up Jason.

23   Q    Okay.  But this is your good friend, right?

24   A    I didn't say he --

25   Q    This is your good friend, isn't it, sir?

1  A    -- I -- I did not say he was my good friend.  You said

2  that.

3  Q    But he is, isn't he?  He's your friend.  You afraid to

4  admit that, sir?

5  A    No, not at all.

6  Q    All right.  He's your friend, isn't he?

7  A    We haven't talked in months.

8  Q    He is your friend, though, isn't he, sir?  Or is that none

9  of our business?

10 A    We have differences, I guess.  But we're friends, I guess.

11 Q    All right.  And you're friends in the drug business,

12 aren't you, sir?

13 A    I don't know what you're talking about.

14 Q    He -- are you friends in the drug business?  Yes or no?

15 A    With who?  Jason, yes, I am.

16 Q    Monty.  Okay.  How about with Monty?

17 A    No.

18 Q    Tell the jury who some of your sources of cocaine are, by

19 name.  Tell them.

20 A    Jason Colette.

21 Q    That's all you're going to tell them today?  Didn't you

22 say earlier that you have numerous sources of cocaine?

23 A    Right.

24 Q    All right, who are they, sir?  Aren't you cooperating with

25 law enforcement?

JOHNSON - CROSS

```
 1  A    I believe I am.
 2  Q    And part of your cooperation, you got to answer these
 3  questions under oath and tell the truth, don't you?
 4  A    Right.
 5  Q    All right.  Who are some of your sources of cocaine?
 6  A    Since November 28th, I haven't had any sources of cocaine.
 7  Q    Sir, who were your sources of cocaine prior to November
 8  28th, 2005?
 9  A    Jason Colette.
10  Q    Any others?
11  A    There was a few others.
12  Q    Who are they, sir?  Or is that none of our business?
13  A    I don't believe any of those other people are here on
14  trial.
15  Q    Is that --
16  A    I'm not a witness to them.
17  Q    Is that a soft way of saying it's none of our business?
18  A    You said that.
19  Q    Well, are you going to answer the question or not?
20  A    I believe I already did.
21       MR. BUTLER:  I asked the -- I'm going to ask the Court
22  to order the witness to answer the question.
23       MR. SCHRODER:  Yeah -- government would object, Your
24  Honor.  Because I think we're at or beyond the bounds of
25  impeachment.  I mean, he's admitted he has sources, he's
```

1    admitted who the one on trial is and what the names of those

2    sources is and -- something that could be a danger to him if he

3    decides, you know, he were to say those things.  That doesn't

4    add anything to the impeachment.

5            THE COURT:  Well, I could --

6            MR. BUTLER:  I'm going to object to that --

7            THE COURT:  No, wait, wait, wait.  We're about done for

8    the day, aren't we?  Why don't we take this up outside the

9    presence of the jury.  Is that fair?

10           MR. BUTLER:  Yes, sir.

11           THE COURT:  You -- you're on the edge of your seats.

12   It's time to make sure you come back tomorrow.  So we're going

13   to recess for the day.  We're going to take up a number of

14   things.

15           MR. SCHRODER:  Your Honor, I am sorry.  I -- the

16   government would prefer that we get this done.

17           THE COURT:  Well --

18           MR. BUTLER:  It won't happen today.

19           THE COURT:  Pardon?

20           MR. BUTLER:  It will not happen today.  I'm not nearly

21   finished.

22           THE COURT:  Well, so what do you propose?  He's --

23   it's --

24           MR. BUTLER:  No, he's -- he wants me to finish my

25   cross-examination today, and I'm saying I don't see how I can

1   do it by 4:30.

2            THE COURT:  Okay.

3            MR. BUTLER:  So I'm agreeing with the Court.  We're

4   almost finished today.  We need to break and deal with this

5   issue.

6            THE COURT:  Well, I don't know what -- is there

7   something I need to know, Mr. Schroder, that -- terms of

8   scheduling that --

9            MR. SCHRODER:  No, Your Honor, other than we just -- we

10  have the witness here and we'd like to push forward --

11           THE COURT:  Okay.

12           MR. SCHRODER:  -- and get it done.

13           THE COURT:  I know, but I think we got it -- I think we

14  need to adjourn for the day.  We can take it up and get the

15  things done right.  So we'll stand in recess.  We're going to

16  start tomorrow at 9.  But I'd like you to be there by 10 to 9

17  so we can start right at -- trial.  We're going to be back here

18  at 8:30 talking about things, and we'll be here for a while

19  longer.  So we stand in recess, you go back there, and they'll

20  come get you and we'll be done for the day.  Okay?  Thank you

21  very much.

22       (Side conversation)

23       (Jury not present at 4:20 p.m.)

24           THE COURT:  Okay, the jury is gone.  Gone.  All right.

25  Sir, do you have an attorney with you here today?