1           THE WITNESS:  Yes, sir.

2           THE COURT:  I thought so.  All right, so we need your

3     input.  Just give us your name for the record and --

4           MR. BIDERMAN:  It's Mike Biderman, Your Honor.

5           THE COURT:  Yes, okay.

6           MR. BIDERMAN:  The public defender agency.

7           THE COURT:  Okay.  Well, what do you -- you -- you've

8     been listening.  Do you want to talk to your client, or what do

9     you want to do?

10          MR. BIDERMAN:  Yeah, could I talk to my client for a

11    minute?

12          THE COURT:  You -- it -- I think it would be good if

13    you talked to your client.  We'll go off the record.

14          THE CLERK:  Off record.

15      (Court recessed at 4:21 p.m., until 4:29 p.m.)

16      (Jury not present)

17          THE CLERK:  All rise.  His Honor the Court, this United

18    States District Court is again in session.  Please be seated.

19          THE COURT:  All right, counsel.  Okay.  So what's going

20    on?

21          MR. SCHRODER:  Your Honor, I think we're still in the

22    same position.  And the government would renew -- we would

23    renew our objection.  And I would cite certainly as a useful

24    authority the Alaska -- *Davis v. Alaska*, a U.S. Supreme Court

25    case of 415 U.S. 306.

1          THE COURT:  415 U.S. --

2          MR. SCHRODER:  306.

3          THE COURT:  -- 306.  You see, this is why --

4          MR. SCHRODER:  And I think the appropriate sections

5    come on starting on page 110.

6          THE COURT:  Page 110.

7          MR. SCHRODER:  The issue is this.  What the Court has

8    said is that, subject to the broad discretion of the trial

9    judge --

10         THE COURT:  Right.

11         MR. SCHRODER:  -- to preclude the repetitive and unduly

12   harassing testimony.  And I think --

13         THE COURT:  Okay.

14         MR. SCHRODER:  -- that's what we've got going on here,

15   Your Honor.  We've got testimony that's designed -- what it's

16   designed to do is intimidate the witness.

17         THE COURT:  I'm try -- okay.  All right.

18         MR. SCHRODER:  Because he's -- you know, he's

19   potentially in danger if he reveals these names.  And the

20   government would argue that the fact that he's admitted he had

21   multiple sources, the fact that he's admitted he bought cocaine

22   from those multiple sources, that appropriately gets to the

23   issue of what the cross-examination is getting to.  The names

24   of those sources are not relevant to this --

25         THE COURT:  Okay.

1          MR. SCHRODER:  -- and are just meant to intimidate.

2          THE COURT:  Okay, that may be true, but that -- let me

3    hear -- you need -- did you want to say something?

4          MR. BIDERMAN:  I just -- I'd like to concur with Mr.

5    Schroder.  I mean, this does act as a chilling effect on my

6    client.  I feel as his lawyer and -- I know Mr. Johnson, I know

7    his circumstances -- that divulging these names will severely

8    put his life in danger, Your Honor.

9          THE COURT:  Okay.

10         MR. BIDERMAN:  I see a -- the media's here today.  I

11   don't want this to happen, Your Honor.  I fear for my client's

12   life if this happens.

13         THE COURT:  Okay.  Mr. Butler.

14         MR. BUTLER:  Judge, all the government has to do then

15   is dismiss the count of delivery, because my client has a right

16   to --

17         THE COURT:  Dismiss the --

18         MR. BUTLER:  -- bring out evidence --

19         THE COURT:  -- count of delivery -- okay, dismiss the

20   count of delivery.  Okay, go ahead.

21         MR. BUTLER:  They charged him with delivering.

22         THE COURT:  All right.

23         MR. BUTLER:  And I -- and so our position is this,

24   Judge.  My client has a right to a -- he has a constitutional

25   right to confront the witness against him.  This witness says,

1  "I received drugs from Jason Colette."  Well, I think the jury

2  has a right to evaluate that testimony in light of the drug

3  sellers that he knows and is doing business with prior to the

4  date that he was raided.

5       THE COURT:  Okay.

6       MR. BUTLER:  And so I submit that this business of

7  saying, well, I'm going to -- I -- what did he say, "The police

8  said they wanted drugs on the table, so I, quote, unquote, gave

9  them Jason."  Well, now they've charged Mr. Colette with

10  delivery, and so this is another "I gave them Jason."  Doesn't

11  mean that Jason did it.  But -- and so I believe -- I submit to

12  you that my client has a constitutional right under

13  confrontation clause to examine this witness who's claiming to

14  have purchased drugs from Mr. Colette.

15       THE COURT:  All right.

16       MR. BUTLER:  And the best way to do that is to put the

17  evidence out there of who his sources are.

18       THE COURT:  All right.

19       MR. BUTLER:  He doesn't want to give up his sources --

20  I submit that this business of, well, it could cause him to be

21  shot, killed, or hurt -- well, first of all, I ask the Court

22  not to buy into that.  But in addition, as long as he's on the

23  witness stand, as long as the government's using him for this

24  purpose, then my client has the right to cross-examine him on

25  it.

```
 1          THE COURT:  Okay.  Any response from the government, or
 2  from counsel?
 3          MR. SCHRODER:  The government would just again
 4  reiterate that there -- this is of absolutely minimal, if any,
 5  relevance.  There's nothing to be done with the information
 6  once -- even if it came out.
 7          THE COURT:  Is there any Fifth Amendment issues?
 8          MR. BIDERMAN:  Your Honor, I feel that there
 9  actually -- there may be.  This could open up Mr. Johnson to
10  additional delivery of cocaine charges.
11          THE COURT:  Okay.  See --
12          MR. BIDERMAN:  Right now he faces one, Your Honor.
13          THE COURT:  Okay.  Let me just say this.  I -- there
14  may be some Fifth Amendment issues.  I think that Mr. Butler
15  has developed the evidence that he needs to develop to make the
16  argument.  And the fact that defendant has refused to testify
17  is sufficient for you to argue.  I don't think you need the
18  names.  And when you balance the probative -- I mean, the
19  prejudice -- the potential prejudice to the defendant, there's
20  very little probative value beyond what you have already.  I
21  don't even see what is there.  And this is one of those that's
22  heading rapidly in a direction, but we aren't even sure what
23  direction it's heading in.  I think you've got more than you
24  need to make your argument, and I don't think the names are
25  necessary, especially given potential Fifth Amendment
```

1  implications.

2       MR. BUTLER:  Judge, if there are potential Fifth

3  Amendment implications for this witness and he's going to take

4  the Fifth Amendment, then I'm going to ask the Court to strike

5  all of his testimony.  And I think that that's really the

6  remedy.  That is the remedy versus the remedy of saying to the

7  defense that they cannot develop this evidence in front of the

8  jury when it goes, I submit to this Court, to the very heart of

9  the count that he's been charged with.

10      THE COURT:  Goes to the credibility of the witness and

11  you have -- you're more than free to argue that.  It's been

12  developed as clear as a -- as it can be possibly developed.

13  You're creative, I know you can argue it.  I don't think you

14  need anything more.  Okay, anything else?

15      MR. SCHRODER:  No, Your Honor.

16      THE COURT:  All right.  Now, going to have this witness

17  back here tomorrow -- oh, you have more to say?

18      MR. BIDERMAN:  Nothing else, Your Honor.

19      THE COURT:  Okay.  Quarter till.  Okay?  What else do

20  we have to talk about before we start tomorrow?

21      MR. BUTLER:  Judge, if there --

22      THE COURT:  That's quarter till 9, not quarter till 10.

23  You understand that?

24      MR. BUTLER:  Yes, sir.  Yes, sir.

25      THE COURT:  Okay.  Go ahead.

1    MR. BUTLER:  Judge, if there are any -- if any of the

2    troopers, any of them, have any handwritten notes from the

3    interview with Mr. Johnson, I'd like to have those, since the

4    tape is missing, because it does say in the police report

5    recorded.  So to the extent that maybe somebody -- and I

6    understand Trooper Wall doesn't have it, he's reported to his

7    fellow law enforcement officers there that he doesn't have

8    them, but maybe some other trooper who was there has some

9    handwritten notes.  Because I think the witness has certainly

10    testified to some things that are contrary to what law

11    enforcement has testified here, and that -- specifically

12    Trooper Wall.  So -- plus, I guess, if the deal is written

13    down --

14         THE COURT:  What is he -- I can't think of a --

15         MR. BUTLER:  -- he wants to see it.

16         THE COURT:  I can't think of anything contrary of

17    significance.  Whether or not he -- whether or not there were

18    more guns in the safe, is -- that kind of thing?

19         MR. BUTLER:  No, sir.

20         THE COURT:  What --

21         MR. BUTLER:  One of the things that the witness

22    testified to was that he had a certain deal with Trooper Walls,

23    that he doesn't recall Trooper Walls having -- saying, "I'm

24    going to go make a call to the DA's office before I cut you

25    this deal.  The deal is you're not to do any jail time."  Even

1-254

1  the witness said he love -- he'd love to see that -- or hear

2  that recording.

3          THE COURT:  Uh-huh (affirmative).

4          MR. BUTLER:  He's asked for it, hasn't gotten it.  He

5  would love to have that so that he can enforce, I guess the

6  deal that he's got, which says no jail time.  And so --

7          THE COURT:  But the --

8          MR. BUTLER:  -- I'm just simply asking if there's any

9  written notes anywhere by any of the troopers involved in that

10  in this investigation or on the raid specifically when my

11  client's house was raided, or when Mr. Johnson was interviewed.

12          THE COURT:  If the -- are there notes that were --

13          MR. BUTLER:  Written (indiscernible).

14          MR. SCHRODER:  We've asked Trooper Wall.  He says there

15  aren't any, Your Honor.  But I would agree with you.  I

16  don't -- I haven't heard any significant discrepancy.

17          THE COURT:  I haven't heard significant ones, but if

18  there are notes, maybe there are some in the notes.  I mean, if

19  there's -- this -- now, we want to keep things on board, so

20  that everybody has a fair shot at this thing.  And if there are

21  notes, you know, they need to be provided for purposes of

22  cross-examination.  The witness is still on the stand, he'll be

23  on the stand for a little while tomorrow morning; if there are

24  notes, I think counsel's entitled to them.  If there's no -- if

25  there -- if there's a tape, he's clearly entitled to the tape.

1    Apparently there's not.

2            MR. SCHRODER:  We'll seek those, Your Honor.

3            THE COURT:  Okay.  Keep going.  I got time.  Anything

4    else, Mr. Butler?

5            MR. BUTLER:  Not that I can think of, Judge.

6            THE COURT:  All right.  Mr. Schroder, anything else?

7            MR. SCHRODER:  Nothing from me, Your Honor.

8            THE COURT:  Sir, you're going to have to be here

9    tomorrow.  You understand that?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  So you have to be here at quarter till 9

12   tomorrow morning.  It seems like there's more to talk about.

13   Apparently there's not.  Everyone's talked out.  All right.  I

14   just sure hope the jurors don't read the paper tomorrow

15   morning.  I've told them that -- they're gone.  Told them four

16   times not to do it, so we'll see what happens.  All right.  See

17   you tomorrow morning.

18           THE CLERK:  All rise.  The matter is now adjourned.

19   This court stands in recess, to reconvene tomorrow at 9.

20       (Proceedings concluded at 4:38 p.m.)

21

22

23

24

25

1                            CERTIFICATE

2   I certify that the foregoing is a correct transcript from the
    electronic sound recording of the proceedings in the above-
3   entitled matter.

4   _Teresa K. Combs_____          _1/30/07_____

5   Teresa K. Combs, Transcriber       Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **INDEX**

2     OPENING STATEMENT OF PLAINTIFF:                 Page 1-162

3                                                      FURTHER
                      DIRECT   CROSS   REDIRECT   RECROSS   REDIRECT
4     PLAINTIFF'S WITNESSES

5     Ronald Wall           1-166   1-191
6     Eugene Johnson        1-214   1-222

7     PLAINTIFF'S EXHIBITS                              ADMITTED

8     1        Photograph - bedroom                     1-178

9     2        Photograph - interior of safe            1-180

10    3        Photograph - interior of safe            1-181

11    4        Photograph - Tupperware container        1-182

12    5        Photograph - interior of safe, cocaine   1-183

13    6        Photograph - Tupperware container        1-184

14    7        Photograph - grocery bag, cocaine        1-185

15    8        Photograph - top of dresser              1-186

16    9        Photograph - scale, Nik wipe             1-188

17

18

19

20

21

22

23

24

25

1           UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF ALASKA

3   UNITED STATES OF AMERICA,      )   Case 4:05-cr-00042-01-RRB
                                   )
4              Plaintiff,          )   Fairbanks, Alaska
                                   )   Wednesday, August 2, 2006
5        vs.                       )   8:50 o'clock a.m.
                                   )
6   JASON SCOTT COLETTE,           )
                                   )
7              Defendant.          )
    _____)   **TRIAL BY JURY - 2ND DAY**

8

                          **VOLUME 2**

9

                   **TRANSCRIPT OF PROCEEDINGS**

10

          BEFORE THE HONORABLE RALPH R. BEISTLINE
11               UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:        BRYAN SCHRODER, ESQ.
                              Assistant U.S. Attorney
14                            U.S. Attorney's Office
                              222 West 7th Avenue, #9, Room 253
15                            Anchorage, Alaska  99513-7567
                              (907) 271-5071
16
    For the Defendant:        REX LAMONT BUTLER, ESQ.
17                            Rex Lamont Butler and Associates, Inc.
                              Signature Building
18                            745 West 4th Avenue, Suite 300
                              Anchorage, Alaska  99501
19                            (907) 272-1497

20  Court Recorder:           ROBIN M. CARTER
                              U.S. District Court
21                            222 West 7th Avenue, #4, Room 229
                              Anchorage, Alaska  99513-7564
22                            (907) 677-6127

23

24

25

                        *A & T TRANSCRIPTS*
                         *(817) 685-7556*



1    APPEARANCES (Continued):

2    Transcription Service:    A & T Transcripts
                               2517 Shady Ridge Drive
3                              Bedford, Texas  76021
                               (817) 685-7556
4

5    Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **FAIRBANKS, ALASKA - WEDNESDAY, AUGUST 2, 2006**

2

3          (Call to Order of the Court at 8:50 a.m.)

4          (Defendant present; jury not present)

5               THE COURT:  Mr. Butler, are you ready to go, start off?

6               MR. BUTLER:  Yes, sir, Judge.

7               THE COURT:  Do you have any further questions?

8               MR. BUTLER:  I do have some questions of the witness.

9               THE COURT:  Of this witness?

10              MR. BUTLER:  Yes, sir.

11              THE COURT:  I was -- here's what I was considering to

12  just tell the jury, so that it just -- everything isn't left in

13  a big vacuum.  I -- when we left yesterday, we were considering

14  the issue of whether Mr. Johnson had to disclose the names of

15  persons other than the defendant who he alleged he purchased

16  drugs from.  After considering the matter, it appears that

17  disclosure is not required in the context of this case, so Mr.

18  Butler is going to proceed with other matters.  I can tell him

19  that, or we can just ignore the matter, or --

20              MR. BUTLER:  I would just rather ignore it, Judge.

21              THE COURT:  Just ignore it.

22              MR. BUTLER:  Yes, sir.

23              THE COURT:  Okay.  But you understand --

24              MR. BUTLER:  Right.  I'm not going to go back there.

25              THE COURT:  You're not going to revisit that issue?

1          MR. BUTLER:  No, sir.

2          THE COURT:  Okay.  I just was trying to make it easier

3    for you.  But if that's okay.  All right.

4          MR. BUTLER:  I appreciate it, though.

5          THE COURT:  Okay.  Let's see.  Is the jury here?

6          THE CLERK:  Not all of them.

7          THE COURT:  Okay, so we're still waiting for jurors.

8          MR. BUTLER:  Okay.

9          THE COURT:  What other issue?  So that -- you're just

10   going to pick up and we're not going to discuss that matter

11   further.  I think that the jurors will just have to figure it

12   out for themselves that that's -- that matter's over with.  Mr.

13   Schroder, what do you have?  Anything on any of those subjects?

14         MR. SCHRODER:  I don't think anything on any of those

15   subjects, Your Honor.

16         THE COURT:  On any subject?

17         MR. SCHRODER:  I just -- I was curious about how you

18   were thinking about proceeding with jury instructions.

19         THE COURT:  You mean when we're going to discuss them?

20   Today.

21         MR. SCHRODER:  Okay.

22         THE COURT:  Probably at -- this afternoon.

23         MR. SCHRODER:  Okay.

24         THE COURT:  Do you have something unusual about those?

25   Or -- I mean, those --

1           MR. SCHRODER:  No, I --

2           THE COURT:  -- are unusual ones you've sent, all those

3    extra instructions on the forfeiture.  But I suppose that we

4    can just do that, unless I'm advised otherwise.

5           MR. SCHRODER:  Well, and I'm partially -- I mean, the

6    way I read the rule, Your Honor, it all comes down to whether

7    the -- depending on what happens on the main charges, of

8    course --

9           THE COURT:  Oh, I understand that.

10          MR. SCHRODER:  And then whether the defense wants to

11   have the additional hearing.

12          THE COURT:  Right, okay.

13          MR. SCHRODER:  So --

14          THE COURT:  All right.  Well, we're getting them all

15   typed up.

16          MR. SCHRODER:  I'm just trying to be prepared.

17          THE COURT:  Okay.  We're getting those typed up.  What

18   about the stipulation?  How's that coming?  All right.

19          MR. BUTLER:  (Indiscernible) close at hand.

20          THE COURT:  Yeah.  Should I advise the -- there was an

21   article in the paper on this.  Should I ask the jury anything

22   about that?

23          MR. BUTLER:  I heard about it.  I didn't see it,

24   though.

25          MR. SCHRODER:  Yeah, we saw it.  It was -- it seemed

```
 1   pretty straightforward.  I mean --

 2          THE COURT:  It seemed -- I could bring a copy.  Would

 3   you like to see it?

 4          MR. BUTLER:  Yes, sir, I would --

 5          THE COURT:  I'll get --

 6          MR. BUTLER:  -- like to see it if you don't --

 7          THE COURT:  I'll get it for you.  Well, let's go off

 8   the record while you read the stipulation --

 9          MR. BUTLER:  Right.

10          THE COURT:  -- and I will go get you the newspaper.

11          MR. BUTLER:  All right.

12          THE CLERK:  Off record.

13      (Court recessed at 8:53 a.m., until 8:56 a.m.)

14      (Jury not present)

15          THE CLERK:  All rise.  His Honor the Court, this United

16   States District Court is again in session.  Please be seated.

17          THE COURT:  Okay.  Mr. Butler, you've -- any concerns

18   about the newspaper?

19          MR. BUTLER:  No, sir, Judge.

20          THE COURT:  Okay.  I'll just keep continuing to advise

21   them not to read the paper as I have been.

22          MR. BUTLER:  Yes, sir.

23          THE COURT:  All right.  And where's the witness?

24          MR. SCHRODER:  He called a few minutes ago, or his

25   attorney called our office a few minutes ago.  They said they'd
```

```
 1  be here by about five to 9.  So we'll check again and see if
 2  they're --
 3          THE COURT:  Okay.
 4          MR. SCHRODER:  -- running a little late.
 5          THE COURT:  It's five to 9 now.
 6          MR. SCHRODER:  I know it is.  We're checking again.  We
 7  just looked out a couple minutes ago.
 8      (Pause)
 9          THE COURT:  Still waiting?
10          MR. SCHRODER:  Still waiting.
11          THE COURT:  Okay.  Well, I'll wait in my chambers.
12          THE CLERK:  Off record.
13      (Court recessed at 8:58 a.m., until 9:05 a.m.)
14      (Jury not present)
15          THE CLERK:  All rise.  His Honor the Court, this United
16  States District Court is again in session.  Please be seated.
17          THE COURT:  Okay.  We'll bring the jury in.  Good
18  morning, sir.
19          MR. JOHNSON:  Good morning.
20          THE COURT:  Ready to go?
21          MR. JOHNSON:  Yes, sir.
22          THE COURT:  Okay.
23      (Jury present at 9:05 a.m.)
24          THE COURT:  Well, good morning, ladies and gentlemen.
25  How are you doing?  You have your -- everyone have the right
```

1  notepad?  Okay, why don't you -- I think maybe -- the two of

2  you switch.  Okay.  Everyone else got the right pad?  Okay.

3  All right.  Very well.  Ladies and gentlemen, we're going to

4  continue where we left off yesterday.  We have the same witness

5  on the stand.  Sir, you're still under oath.  We're not going

6  to swear you in again.  And, Mr. Butler, you can continue

7  cross-examination.

8          MR. BUTLER:  Thank you, sir.

9      **EUGENE JOHNSON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN**

10                **CROSS-EXAMINATION, CONTINUED**

11  BY MR. BUTLER:

12  Q    Good morning.  Good morning, Mr. Johnson.

13  A    Good morning.

14  Q    Mr. Johnson, after you received information that

15  authorities were either on to you or on to the south side, you

16  had to determine what to do with whatever you had in your

17  house, right?

18  A    No, sir.

19  Q    All right.  Well, you made some decisions about what to do

20  with what you had in your house, didn't you, sir?

21  A    I just cleaned my house up thoroughly.  I --

22  Q    But as a dope dealer, you wouldn't throw dope away; you'd

23  probably want to put it somewhere where you felt it would be

24  safe.  Isn't that right?

25  A    I didn't have any.  It was already gone.

1    Q    Well, if you did have some, you'd want to make sure that

2    you put it somewhere where you wouldn't get ripped off, isn't

3    that right?

4    A    Yeah, that's true.

5    Q    You'd want to put it with someone who probably was not in

6    the business, isn't that right?

7    A    No, you're not right.

8    Q    Well, I mean, if you give it to somebody who's in the

9    business, they might sell your cocaine and you not get the

10   money, right?

11   A    Can you repeat that?

12   Q    You'd want to put it with someone who is not in the

13   business of selling cocaine, wouldn't you?

14   A    No.

15   Q    You'd want to put it with someone who was in the business?

16   A    I just -- I usually handled it all myself.  I don't try

17   and --

18   Q    Okay.

19   A    -- put anybody involved.

20   Q    And you were -- of course, you know who the informant was

21   that you sold to, don't you?

22   A    Now I do, yes.

23   Q    Okay.  And who was that person?

24   A    Alvin Salsbury (ph).

25   Q    Okay.  And he had been arrested -- he'd been arrested

 1  probably, what, a couple months before you?

 2  A    I'm not sure.

 3  Q    Okay.  And you know him pretty well, don't you?

 4  A    I don't know him well -- that well.

 5  Q    Well, you know him, though, don't you?

 6  A    Well, he's -- he's from the south side, yeah.

 7  Q    Okay.  And he has done business with you before, hasn't

 8  he?

 9  A    Prior to my case when -- not -- not much.

10  Q    But he has purchased from you before, hasn't he, sir?

11  A    We -- we always haven't got along.  We had gotten into a

12  couple scuffles and arguments in the last five, six years.  We

13  haven't always got along, I don't think.

14  Q    But, sir, within that five- or six-year period, he's

15  purchased cocaine from you before, hasn't he?

16  A    He could have.

17  Q    Well, you know he has, don't you?

18  A    Well, he wore a wire on me, yes.

19  Q    And in order for him to be confident enough to go and wear

20  a wire on you, he must have known enough about you to have

21  purchased from you before.  That would be a fair conclusion,

22  wouldn't it?

23  A    That could be.

24  Q    In fact, how long have you been selling drugs?  You said

25  since you were what, a teenager?

JOHNSON    CROSS

```
 1   A    Yeah, off and on.
 2   Q    And you mentioned yesterday on direct that you did
 3   elementary school here and then you left for a while.  You
 4   were, what, in California, weren't you?
 5   A    Yes.
 6   Q    And, what, you engaged in the same business there, didn't
 7   you?
 8   A    I went to high school.
 9   Q    And you engaged in the same business there, didn't you,
10   sir?
11   A    No, sir.
12   Q    So you just did it just here in Fairbanks?
13   A    When I moved back when I was 19, 20, yeah.
14   Q    Now, at the time that you were -- that you sold to the --
15   to Mr. Salsbury, there was a person named Wolfman in your
16   garage with you where the drugs were, wasn't there?
17   A    Can you repeat that?  I didn't understand that.
18   Q    At the time that you sold to Mr. Salsbury, there was a guy
19   in your house, in your garage with you, where you keep your
20   drugs, named Wolfman, wasn't there?
21   A    I don't -- I don't believe so.
22   Q    So if the undercover -- or Mr. Salsbury told authorities
23   that Wolfman walked into the garage with Johnson, the
24   undercover would not be telling the truth?
25   A    I'm not sure of that.  It was like nine months ago.
```

JOHNSON - CROSS

2-12

1  Q    All right.

2  A    Wolfman could have been there, but Wolfman's always at my

3  house.

4  Q    Okay.  How about Bang, B-a-n-g?

5  A    Do I know Bang?

6  Q    Bang was there too, wasn't he?

7  A    I can't recollect if he was or not.

8  Q    Now, Bang is in the drug trade too, isn't he?

9  A    If -- he's a addict.

10 Q    Wolfman's in the business too, isn't he?

11 A    He's a addict.

12 Q    But he's also in the business, isn't he?

13 A    I've never seen him sell anything.

14 Q    So these are addicts that just hang out at your house?

15 A    Not -- Bang's, like, my cousin and somebody I grew up

16 with, and Wolfman's the same thing.  He helps me out with my

17 vehicles and other things.

18 Q    And you pay him how?

19 A    Cash.

20 Q    Or drugs.  Right?

21 A    When I used to have drugs, sometimes, yeah.

22 Q    Now, Salsbury, this person that you've known for what,

23 four to five years or longer?

24 A    Well, he -- he's a Coffee (ph), so he -- he's from the

25 south side, and same here.  So --

JOHNSON CROSS

```
1   Q    You all kind of grew up together --

2   A    -- you cross paths with --

3   Q    -- didn't you?

4   A    -- people that lived in your neighborhood, I guess.

5   Q    You all kind of grew up together, didn't you?

6   A    We didn't go to school or anything.  We actually didn't

7   get along for years.

8   Q    So if he told authorities that you were going through a

9   kilo a week, he'd be lying?

10  A    I would believe so.  I would say so.

11  Q    So is it fair to say, sir, that if anyone says something

12  that's contrary to what you say, that person would be lying,

13  but not you; is that a fair statement here?

14  A    All depends, the circumstances, I guess.

15  Q    Well, like the trooper, for example.  If he says that he

16  didn't cut the deal with you, he had to get authority to do it

17  and told you that, and you're saying otherwise, then the

18  trooper is not telling the truth.  Is that your position?

19       MR. SCHRODER:  Objection, Your Honor.  I think that's

20  mischaracterizing what the witness has said previously.

21       THE COURT:  Well, I --

22       MR. SCHRODER:  He says he didn't remember.

23       THE COURT:  I -- you know, you can re -- ask that him

24  that question again.  I thought he -- it's a little vague in my

25  recollection what -- how he answered that question.
```

```
 1              MR. BUTLER:  Okay.
 2    BY MR. BUTLER:
 3    Q   If the trooper said that he didn't make you a promise
 4    because he didn't have the authority, that only the district
 5    attorney could make you a promise, you're saying that the
 6    trooper's not telling the truth when he says that.  Is that
 7    right?
 8    A   Me and the trooper had a deal, yeah.
 9    Q   So he did cut a deal with you?  You said that yesterday,
10    right?
11    A   Yes.
12    Q   And that that deal had certain terms.  You said that
13    yesterday, didn't you?
14    A   Yes.
15    Q   And that he didn't stop and make a phone call or anything
16    as -- or tell you, "I can't -- I don't have that authority"?
17    That's your testimony, isn't it?
18    A   I'm not sure.  He could have, but I don't remember.  Under
19    the circumstances, I'm pretty stressed out.  I just got my door
20    kicked in, it was like 40 below, I was naked, M-16s in my face.
21    I was -- had a lot of things on my mind.
22    Q   But isn't it true that as you sit there under oath, your
23    position is that the trooper cut you a deal with certain terms?
24    That's your testimony?
25    A   Yes.  Yes.
```

1  Q    Are you wavering from that today?

2  A    What do you mean by that?

3  Q    Are you backing away from that statement today?

4  A    No, I'm not.

5  Q    I mean, here's your chance to do it if that's what you

6  want to do.

7  A    That's not what I'm doing.

8  Q    Now, Mr. Salsbury says that you weighed the cocaine on a

9  scale at your house.  Is that a true statement?

10  A    Yes.

11  Q    And that you weighed it on a black scale in the kitchen.

12  Is that a true statement, sir?

13  A    That's false.

14  Q    Why is it false?

15  A    Because I don't think I had a black scale.

16  Q    Can you tell us why Salsbury would make it up that you

17  had -- that you weighed it out on a black scale in the kitchen?

18  A    I don't know.  I don't know why he would.  Obviously he's

19  a hater.

20  Q    Could that -- could it be that the black scale and

21  whatever else you cleaned your house up of just wasn't there

22  when the authorities arrived, because you had cleaned it out of

23  the house?

24  A    The authorities found my scale when they got to my house.

25  That was the only thing they found, I believe.

JOHNSON - CROSS

1    Q    Well, they found a scale.  But that was a scale that you

2    probably forgot, right, when you were cleaning up?

3    A    No, that was a scale I put in my coat.  I had -- I was

4    going to leave, I was going to put it up.  And they took my

5    coat and everything that was in my coat.

6    Q    Oh, that -- the scale that was in your coat, you were

7    going to save that?

8    A    I was about to put it outside, yeah.

9    Q    I see.  But -- so the -- so when he says a black scale,

10   you don't recall a black scale?

11   A    No, sir.

12        (Side conversation)

13        MR. BUTLER:  With the Court's permission, Judge, I'd

14   like to show the witness Plaintiff's Exhibits 8 and 9 when we

15   get them.

16        THE COURT:  Very well.

17   BY MR. BUTLER:

18   Q    Now, if you -- any scale that you had at your house would

19   have -- probably have cocaine residue on it, wouldn't it?  I

20   mean, that's what you used it for.  You used it to weigh out

21   cocaine, right?

22   A    Yes.

23   Q    Okay.

24        MR. BUTLER:  Judge, may I show the jury?

25        THE COURT:  Yes.  The same way you did yesterday?

*A & T TRANSCRIPTS*
*(817) 685-7556*

JOHNSON - CROSS

1          MR. BUTLER:  Yes, sir.

2          THE COURT:  Okay.

3    BY MR. BUTLER:

4    Q    Sir, do you see a black scale in those photographs?

5    A    Yes.

6    Q    That scale looks familiar, doesn't it?

7    A    Not at all.  The money counter does, though.  Because the

8    money counter right there, I believe that's Jason's.  I

9    remember him showing me that, that money counter right there.

10   Q    Yes.

11   A    Yeah.  That -- I've never seen that scale.  That wasn't in

12   my house.

13   Q    And in fact, sir, you realize that this conversation by

14   Salsbury with authorities regarding a black scale took place on

15   November 8.  Are you aware of that?

16         MR. SCHRODER:  Your Honor, I'm going to object to

17   the -- kind of the idea that -- just reading in the report and

18   asking him questions about the report.  The report's hearsay.

19         MR. BUTLER:  Well, actually, I didn't read the report,

20   but I -- when I was asking this witness questions, because he

21   knows Salsbury and he can get -- maybe shed some light on

22   whether Salsbury would have been telling us the truth about the

23   black scale and Wolfman, Bang, and other people.

24         THE COURT:  Well, I don't know where you're going.  You

25   can't read the report in, but this question's okay for now.

1  Ask the question, you can answer the question.

2  BY MR. BUTLER:

3  Q    Sir, you realize -- well, you realize that this

4  conversation with -- by Salsbury was back on November 8th, long

5  before police went anywhere near Mr. Colette's house.  You

6  understand that, don't you?

7  A    Yeah.  They went in Colette's house the same way they went

8  into my house.

9  Q    Which was what day, sir?

10  A    November 28th.

11  Q    Okay.

12         MR. BUTLER:  (Indiscernible).

13         THE COURT:  Yes, uh-huh (affirmative).

14  BY MR. BUTLER:

15  Q    Now, they -- now, the police found some inostitol in your

16  house.  Is that right?

17  A    Some what?

18  Q    Inostitol; is that what you call it?

19  A    Say it again?

20  Q    Inostitol.

21  A    Inositol?

22  Q    Is that what you call it?

23  A    I believe that's how you pronounce it.

24  Q    Okay.  And what do you do with that?

25  A    It's a weightlifting supplement.

*A & T TRANSCRIPTS*
*(817) 685-7556*

JOHNSON - CROSS

1  Q    That's all it is, sir?

2  A    Some people use it to cut their cocaine, I believe.

3  Q    Okay.  Now, did you have weights in your house?

4  A    Dumbbells.

5  Q    Okay.  So you're a weightlifter or you're a drug dealer

6  who cuts cocaine with inostitol?

7  A    I work out.

8  Q    But you were cutting your cocaine with the inostitol,

9  weren't you?

10  A    I didn't get a chance to, I don't think.

11  Q    Sir, you've been selling drugs off and on since you were a

12  teenager.  You buy cocaine, you cut it with inostitol, don't

13  you?

14  A    Sometimes, I guess.

15  Q    Well, you said, "I guess."

16  A    Sometimes I didn't have inositol.  Just -- other times --

17  Q    But when you --

18  A    -- it could have been a lot of things.

19  Q    When you have it, sir, you cut cocaine with it, do you

20  not?

21  A    Yes, sir.

22  Q    All right.  So you had two bottles of it in your house.

23  Right?

24  A    I'm not sure.

25  Q    Okay.  But you do know you had it in your house, isn't

JOHNSON - CROSS

1  that right, sir?

2  A    Maybe.  Maybe a bottle.

3  Q    All right.  And tell the jury what you do with inostitol

4  and cocaine.

5  A    I'm not understanding your question.

6  Q    Tell -- explain to the jury what you do with inostitol and

7  cocaine.

8  A    Inositol is basically what we use to cut cocaine, to make

9  more cocaine.  That's pretty much it.

10  Q    So how do you make more cocaine out of inostitol, sir?

11  A    Just mix.

12  Q    Mix it up?

13  A    Yeah.

14  Q    So, other words, if a person -- if you -- you could -- so

15  you could take once ounce of cocaine and make two ounces,

16  right, with --

17  A    It's possible.

18  Q    -- with the inostitol.  Isn't that what happens?

19  A    I don't know the -- the percentagewise, but pretty much,

20  yeah.

21  Q    All right.  And that's what you've done in the past,

22  right, sir?

23  A    Yes, sir.

24  Q    And so that means in order to take cocaine and cut it with

25  inostitol, you would want to get a high-strength cocaine, cut

JOHNSON - CROSS

```
 1  it up, put your inostitol in it, right?  You don't want it --
 2  you don't want to buy it cut, you want to buy it and then cut
 3  it with inostitol; isn't that the term that they use, cut it
 4  with inostitol?
 5  A    I believe so.
 6  Q    All right.  So you want to buy, cut it with inostitol, and
 7  increase the volume of the cocaine.  Right, sir?
 8  A    Yes.
 9  Q    Okay.  Now, sir, you physically lived at 1008 23rd Avenue
10  in Fairbanks, right?
11  A    I do not.  I used to.
12  Q    At the time that you were raided, you were living at 1008
13  23rd Avenue in Fairbanks, right?
14  A    Yes.
15  Q    However, your home listed for, I guess, driver's license
16  purposes and what have you, was 1315 23rd Avenue, right?
17  A    Right.
18  Q    So those places are not too far apart from each other, are
19  they?
20  A    No.
21  Q    And in fact, on occasion, when you had to -- when you were
22  going to sell cocaine, you'd go over to 1315 23rd Avenue, in
23  the back yard somewhere, wouldn't you?
24  A    No, sir.  That's my parents' house.  I don't do anything
25  at my parents' house.  Never have.
```

JOHNSON - CROSS

1  Q    Your parents -- well, your parents live there, sir, but

2  isn't it true that you would keep stuff there in the back yard

3  somewhere, wouldn't you?

4  A    No, sir.   Toys.   My kid's sled and my station wagon.

5  Other than that, no.

6  Q    Now, even though you were living at 1008 23rd Avenue, if

7  law enforcement authorities indicate that your address, you're

8  listed in the state --

9  A    When they raided my house, they came in at both locations.

10 They found nothing at both locations.   They kicked my parents'

11 door in and my door in at the same time.

12 Q    Sir, if the State of Alaska says for their state records

13 you're listed as living at 1315 23rd Avenue, that's correct,

14 isn't it?

15 A    What?   Say that again, sir?

16 Q    For APSIN purposes, the -- for State of Alaska records,

17 you're listed as living at 1315 23rd Avenue?

18 A    Yeah, that's my mailing address.

19 Q    Okay.   But physically, you're at the other address.

20 Right?

21 A    At the time when this happened, yes, I was.

22 Q    And again, if Salsbury said that if you needed cocaine,

23 you would go over to 1315 and get it and bring it over to 1008,

24 your position is that that's not true?

25 A    That's not true.

JOHNSON - CROSS

1  Q    So, once again, someone is telling an untruth about you.

2  Right?

3  A    I never went to 1315 to got -- get any dope, never.

4  Q    Now, the safe that you told authorities that Mr. Colette

5  had, you didn't describe it as a gun safe, did you?

6  A    I just seen a big safe.  No, I didn't describe it as a gun

7  safe.

8  Q    So even though you supposedly saw inside the safe, you

9  never told the authorities it was a gun safe.  Right?

10  A    I didn't know what kind of safe it was.

11  Q    And you still don't, right?

12  A    Now I do.  You said it was a gun safe.

13  Q    You're going what -- from what I said?

14  A    You said it was a gun safe, yes.

15  Q    Okay.  So then would it be true to say that the testimony

16  you give in this courtroom might be based on what other people

17  say to you and not your personal knowledge?

18  A    That's not true.

19  Q    You testified yesterday that Mr. Colette would -- that

20  you -- he would work on your cars.  Right?

21  A    Yes.

22  Q    One of those cars was a mid-'80s blue Malibu station

23  wagon, right?

24  A    Yes.

25  Q    One was a 1994 gray convertible Mustang?

```
1   A     '98.

2   Q     Oh, '98.  Okay.  One was a maroon Monte Carlo, mid-'80s?

3   A     Yes.

4   Q     A white -- is it white or silver Supersport Monte Carlo?

5   A     Silver.

6   Q     A blue Chevy Caprice, 1965?

7   A     1970.

8   Q     1970.

9   A     He never worked on that car.

10  Q     Okay.

11  A     Just the station wagon, the -- the station wagon, which is

12  the blue Malibu wagon.  I had a '93 Chevy truck he put a deck

13  in.  Maybe one more car.  He didn't put decks in -- work on all

14  my cars.  Maybe a handful of them, like a couple of them.

15  Q     A black Trans Am, 1997?

16  A     No, I never had a black Trans Am.

17  Q     A Chevy Impala, 1965?

18  A     I had a '66.

19  Q     Oh, '66.  Now, some of these cars are kind of vintage,

20  they're kind of expensive cars, wouldn't you say?

21  A     They were junkers.  I was trying to fix them up, if I

22  could resell them.

23  Q     In fact, the 1966 Chevy Impala had hydraulics on it,

24  right?

25  A     Yeah.
```

JOHNSON - CROSS

1   Q    So that's not a junker, right?

2   A    It kind of was.

3   Q    But, now, for your purposes when you were doing your drug

4   business, you drove a 1979 brown Chevy van.  Right?

5   A    Orange, yeah.  Orangeish-brown, I guess.

6   Q    Now, who is Mike Brown?

7   A    I don't know him, know him.  I know who he is, but I don't

8   know him, know him.

9   Q    But isn't it true -- true, excuse me, true -- that Mike

10  Brown has fronted you dope in the past?

11  A    No, it's not true.

12  Q    Didn't you -- did you front him the dope?

13  A    No.

14  Q    You know Mike Brown to be a drug dealer, though, don't

15  you?

16  A    No, I don't.

17  Q    Then how is it that you know Mike Brown?

18  A    He's from here.  His family's from the south side.  When I

19  was kids, they were kids.

20  Q    What kind of deals have you had, sir -- tell the jury --

21  with Mike Brown?

22  A    I just see him around.  I say, "What's up?"  He has about

23  three or four brothers and sisters that we all grew up with

24  there from the neighborhood.  So we --

25  Q    Well, so he -- he's one of those people that you don't

*A & T TRANSCRIPTS*
*(817) 685-7556*

```
 1   really want to name as a drug dealer.  Is that a fair
 2   statement, sir?
 3   A   I didn't say that.
 4   Q   But that's what's really going on here, isn't it?
 5   A   That's what you're saying.
 6   Q   How about Darren Edwin?
 7   A   Darren Edwin?
 8   Q   Yes, sir.
 9   A   I know Darren Edwin.
10   Q   Uh-huh (affirmative).  In fact, you've fronted him some
11   dope in the past, haven't you?  Haven't you, sir?
12   A   Yes.
13   Q   Okay.  In fact, on one occasion you fronted him 10 ounces,
14   didn't you?
15   A   No.  (Indiscernible) --
16   Q   How many ounces did you front him that he sold and never
17   gave you the money for?
18   A   I never fronted him any ounces.
19   Q   Oh, what did you front him, then?
20   A   If he -- if he was sick and was hurting, I would hook him
21   up.
22   Q   Sir, how much did you front him?
23   A   Like a half a gram at a time, a gram.
24   Q   But isn't it true, sir, that on one occasion you fronted
25   him some dope; he sold it, didn't pay the money, and you went
```

JOHNSON - CROSS

1   after him?

2   A    No, that's not correct.

3   Q    Tell the jury what it means by fronting, will you?

4   A    Fronting is credit.  Credit is, you don't pay until you

5   get the money, I guess.

6   Q    Okay.  You don't pay until you get the money.  And Mr.

7   Edwin made the mistake of not paying you on one occasion,

8   didn't he?  Or more than one occasion?  Mr. Johnson?

9   A    Excuse me?

10  Q    Mr. Edwin made the mistake of not paying you on at least

11  one occasion, didn't he?  You don't want to answer that

12  question?

13  A    I'm -- I'm sitting here thinking about the answer to the

14  question, and I guess you could say that, yeah.

15  Q    And you remember being angry with him about it?

16  A    A little bit.

17  Q    And do you remember threatening him about it?

18  A    Not -- no.  No, I don't.

19  Q    What did you say to him when you were angry with him,

20  then?

21  A    I wasn't that angry.  Darren's like a relative to me,

22  so --

23  Q    Like a cousin or something?

24  A    A distant cousin, yeah.

25  Q    All right.  But you were angry with him, and when you were

1  angry with him, you had words with him about not paying you

2  like he's supposed to.  Do you remember?

3  A   It wasn't that serious.  He was living with me.  He --

4  Q   Was he living downstairs, below you?

5  A   Yes.

6  Q   All right.  So he's not living with you, he's living below

7  you, wasn't he, sir?

8  A   Well, the whole house -- we stayed in the whole house.

9  The downstairs was my den.

10 Q   Anyway, after the -- after you confronted him -- that's a

11 fair statement, right?  Confronted him about what he owed you?

12 A   No.

13 Q   Well, after whatever conversation you had with him, he

14 grabbed his family and moved out pretty quickly, didn't he?

15 A   No.  His butt is in jail, I think.  He got in trouble and

16 went to jail.

17 Q   Okay.

18 A   He's from here, and from the area.

19 Q   Now, we talked a little bit about the -- what you

20 described as an Uzi.  Do you remember seeing that Uzi at Mr.

21 Colette's shop, remember he was showing his customers?  In

22 fact, it was to you that he said, "Look at my new toy."

23 Remember that?

24 A   Right, but that wasn't at his shop.

25 Q   Okay.  But that's what he said, he said, "Look at my new

JOHNSON - CROSS

```
 1   toy."  Right?
 2   A    He wasn't at his shop when that happened.  We were at his
 3   house, yes.
 4   Q    But you'd seen it at the shop too, hadn't you?
 5   A    I don't recall seeing it at the shop.
 6   Q    Remember him boasting about how it took one year to get
 7   because of all the processing that the feds do over those kinds
 8   of weapons?
 9   A    I believe so, something like that.
10   Q    And you remember him being very happy and proud of this
11   particular toy?
12   A    Yes, sir.
13   Q    Uh-huh (affirmative).  We talked a little bit yesterday
14   about Monty.  What's Monty's full name, sir?
15   A    I'm not sure.  I know him by Monty, Lamont.
16   Q    Lamont?
17   A    Yeah.
18   Q    Is that his middle name or --
19   A    I'm not sure.
20   Q    -- his full -- and where does he live?
21   A    I'm not sure.
22   Q    What type of work does he do?
23   A    I think he's a diesel mechanic.
24   Q    How long have you known him?
25   A    Off and on, for a few years now, I guess.  Like --
```

```
 1   Q    Where is he now?
 2   A    I'm not sure.  I haven't talked to him since, like,
 3   November 29th -- 28th, 29th.
 4   Q    Now, when you were thinking about robbing Mr. Colette, you
 5   were going to use one of those guns that you had in your house,
 6   weren't you?
 7   A    If I -- I was to rob him, I -- I -- yeah, I would have had
 8   a gun on me, probably, yeah.
 9   Q    And to think like that, you know, I mean, that's -- you
10   have no problem robbing someone, right?
11   A    If I'm broke and he -- a dope dealer has a lot of dope and
12   I need dope to come up, to feed my family or do whatever I need
13   to do --
14   Q    A -- robbery is on, isn't it?
15   A    Yeah.  They're doing dirt anyway.  I might as well get
16   them before the police do.
17   Q    But robbery is a -- that's violence, that takes it up a
18   level, doesn't it, sir?
19   A    I guess you could say that.
20   Q    And if you felt you needed the money, you wouldn't stop at
21   just a dope dealer, would you?
22   A    That would probably be my first pick, so --
23   Q    Uh-huh (affirmative).  And then --
24   A    They usually don't call the police.
25   Q    Pardon me?
```