1   A    When you rob a dope dealer, they don't call the police and

2   say, "They just robbed me for my dope."

3   Q    Sounds like you've got some experience there.

4   A    It's -- I guess it's -- that's --

5   Q    Is that a fair statement?

6   A    -- that's just -- I can't say that that's a fair

7   statement, but that's how I perceived it to be, I guess.

8   Q    Now, the Salsbury, who did -- who made the buy from you,

9   you've been in contact with Salsbury, right?

10  A    No.

11  Q    You've had some conversation -- when's the last time you

12  talked to Salsbury, sir?

13  A    I believe November 8th.

14  Q    And isn't it true that Salsbury told you that the

15  authorities were on to you?

16  A    No, sir.

17  Q    When did you find out, sir, that Salsbury's the one who

18  purchased from you undercover, sir?

19  A    Maybe January, February.

20  Q    So long after the raid on your house.  Isn't that true?

21  A    Right.

22  Q    Now, you testified yesterday that you -- and if I say this

23  wrong, please feel free to correct me, because I'm far from

24  perfect as a human being.

25  A    Yeah, we all --

1  Q    You said --

2  A    -- are.

3  Q    You said something -- didn't you say something yesterday

4  about you would be afraid to tell on sources because of your --

5  you know, it could --

6  A    I don't remember saying it --

7  Q    -- because of retaliation?

8  A    I don't remember saying that.

9  Q    Are you afraid to tell on sources because of retaliation?

10 A    Yeah.

11 Q    And that's kind of your blanket position when it comes to

12 sources, right?

13 A    What you mean?

14 Q    Other words, when it comes down to a source of cocaine,

15 your position is, you're not going to say anything because of

16 retaliation, potential retaliation?

17 A    Well, I have a family to look out for.  I have little ones

18 at home, so --

19 Q    So that's your position, right?

20 A    I guess you could say that.

21 Q    But, now, if you're willing to go rob a dope dealer for

22 their dope, and you say, well, they're not going to call the

23 police and say I got robbed of dope, you're not thinking about

24 your family then, are you?  Because they could come back after

25 you and hurt your family for robbing them, and then say, he's

JOHNSON - CROSS

```
 1   not going to call the police.  So when you throw your family up
 2   there, that's not really what you're thinking about, it is?
 3   A    What do you mean, when I --
 4   Q    Well, you're not really concerned about your family if
 5   you're willing to go rob a dope dealer, are you?
 6   A    Well, that was the business I was in, so I wasn't
 7   thinking -- I don't know.  My family still came first.  I never
 8   involved my family or anybody that was close to me in what I
 9   was doing in the streets.
10   Q    Well, your family lives with you, don't they, sir?
11   A    Yeah.
12   Q    And you're selling dope right out of your house, aren't
13   you?
14   A    On occasion --
15   Q    Aren't you?
16   A    On occasion, maybe I have.  But for the most part --
17   Q    Maybe you have, sir?
18   A    On occasion I have, but for the most part, I have -- I
19   would leave.
20   Q    I mean, you've got your house there with your family, you
21   got your parents' house practically across the street, right?
22   A    Down -- down the way, a block or two.
23   Q    Well, now, wait a minute.  1308 and 1315, those can't be
24   more than two or three houses away from each other, isn't it?
25   A    1315 and 1008 is like two blocks away from each other.
```

1  Q   Oh, it's 1008, I'm sorry.

2  A   Right.

3  Q   Okay.  Now, Mr. Salsbury knew that you lived at -- or had

4  family at 1315 as well as 1008, right?

5  A   I guess so.

6          MR. BUTLER:  Pass the witness, Judge.

7          THE COURT:  Redirect?

8          MR. SCHRODER:  No redirect, Your Honor.

9          THE COURT:  Thank you, sir.  You're excused.  The

10  government's next witness?

11          MR. SCHRODER:  The government calls Special Agent Mike

12  Foran.

13          THE CLERK:  Raise your right hand, please.

14          **MICHAEL FORAN, PLAINTIFF'S WITNESS, SWORN**

15          THE CLERK:  Please be seated.  And, sir, for the

16  record, if you could state your name, spelling your last name,

17  and give your address, please.

18          THE WITNESS:  My name is Michael Foran, F-o-r-a-n.  I

19  live in the Fairbanks North Star Borough.

20          THE CLERK:  Thank you.

21          THE COURT:  Mr. Schroder.

22                      **DIRECT EXAMINATION**

23  BY MR. SCHRODER:

24  Q   Special Agent Foran, who do you work for?

25  A   I work for the Drug Enforcement Administration.

1   Q    How long have you been an agent with the DEA?

2   A    I'll be coming up on nine years here real soon.

3   Q    And where have you been assigned as a DEA agent?

4   A    Initial assignment was Washington, D.C.  After that,

5   Detroit, Michigan.  I moved to Fairbanks about four and a half

6   years ago.

7   Q    And how long were you each in those places?  You mentioned

8   Fairbanks, four and a half years.  How about the other places?

9   A    In D.C., it was just a -- a hiring location.  I was there

10  for about three months.  Detroit, I was there for a bit over

11  four years.  Remainder of time here in Fairbanks.

12  Q    See a lot of things in Detroit?

13  A    A lot of things in Detroit, a lot of things in D.C.

14  Q    Do you have any previous law enforcement experience?

15  A    Yes.  I was a police officer in the city of D.C. and the

16  surrounding areas for about five years prior to being hired by

17  the DEA.  I was a deputy sheriff in Montana and I was a city

18  cop in Palm Beach County, Florida.

19  Q    So how much total law enforcement experience do you have?

20  A    It's getting close to 19 years.

21  Q    Were any of your -- now, as a DEA agent, I think,

22  obviously, your work is related to drug investigations, is that

23  correct?

24  A    Yes.  Yes, it is.

25  Q    How about your other law enforcement experience?  Were you

**FORAN - DIRECT**

1  involved in drug investigations at all in those?

2  A    I was.

3  Q    And please explain that to the jury.

4  A    I was -- my main assignment was as a patrol officer,

5  especially in Florida and Montana.  It was a rural county.

6  There were some narcotics-related crimes.  There were no

7  detectives in the sheriff's office I was with.  We investigated

8  all of the complaints all the way through.  So -- but narcotic

9  complaints would arise, I'd be the investigator assigned to

10  work on them.  While in D.C., I again worked patrol.  I worked

11  in the southeast quadrant of the city, which was very profuse

12  with drug traffickers and other violent crimes.  A lot of my

13  work was spent arresting and initial investigations of narcotic

14  crimes.  I spent time working on a -- a task force there also

15  directed at violent crimes and drug traffickers.

16  Q    And have you received training as a law enforcement agent?

17  A    Yes, I have.

18  Q    And could you generally describe that training?

19  A    My initial training was at the Indian River Police Academy

20  in Ft. Pierce, Florida.  That's back in '87.  After that, when

21  I was hired in D.C., I went to the Federal Law Enforcement

22  Training Center in Brunswick, Georgia.  And then for the DEA, I

23  went to the DEA Academy at Quantico, Virginia.

24  Q    And how long is the DEA Academy?

25  A    Months.  I think it was close -- I think -- I think it's

1    about 17 weeks.

2    Q    Okay.  Now, do you know the defendant, Jason Colette?

3    A    Yes, I do.

4    Q    And were you involved in serving a search warrant on the

5    defendant's residence?

6    A    Yes, I was.

7    Q    When was that?

8    A    That was on November 28th, in the afternoon.

9    Q    What was your role in executing the search warrant?

10   A    My role in the execution was just perimeter.  The

11   execution was being conducted by a local unit with the

12   Fairbanks Police Department.  And because we do not work with

13   that unit on a regular basis, for training purposes, we stay

14   out of their way when they're doing their job, and then once we

15   take over, they stay out of our way, for the most part.

16   Q    And so -- and they made the -- the other organization made

17   the actual entry into the --

18   A    Yes, they did.

19   Q    -- in the residence?

20   A    Yes.

21   Q    Okay.  Once the residence was secure, did you commence

22   your search?

23   A    Yes.

24   Q    And did you find any evidence that was consistent with

25   what you sought in the search warrant?

1  A    Yes.   What was sought in the search -- it was a Alaska

2  State Trooper search warrant.  I was aware of it in the

3  planning stages, and once evidence was located at the scene, it

4  was adopted by the federal government for prosecution.

5  Q    So in what part of the residence did you find evidence?

6  A    Most of the evidence came from the master bedroom.

7  Q    And what did you find there, generally?

8  A    Generally, on the -- on the dresser, there was a box with

9  a scale.  Next to the box with the scale was a money counter.

10 On the other end of the dresser on the floor was a large gun

11 safe.  Inside the safe there is a -- a variety of weapons,

12 including a -- some of them armed, I mean as loaded, including

13 a -- also there was a submachine gun, which is a machine gun

14 that shoots a smaller-caliber bullet; some marijuana by the

15 machine gun; and there was a large quantity of cocaine packaged

16 in one-ounce bags, 23 of them, in a brown grocery bag; there

17 was a smaller amount of cocaine in a clear plastic bag, in a

18 plastic Tupperware container that contained $38,848.

19 Q    Okay.  Now, was the safe when you first got there -- was

20 it open?

21 A    No, it was locked.

22 Q    Okay.  And how did you get it open, or how did the --

23 A    The troopers --

24 Q    -- officers get it open?

25 A    The troopers called a locksmith.

**FORAN - DIRECT**

1  Q   Okay.  And let's start with the cocaine.  Where did -- in

2  what place in the safe did you find the cocaine?

3  A   Cocaine was at two locations in the safe.  One was in a --

4  again, a plastic Tupperware container.  It was a small quantity

5  of cocaine in a plastic bag next to the currency.  Below that,

6  on another shelf, was a plastic bag with, again, 23

7  approximately one-ounce knots or bags of cocaine, packaged

8  together.

9  Q   And where was the other -- you gave both locations, so --

10  and back to the money that you found in there.  Was that --

11  where was that again, where you found the money?

12  A   The -- the -- the bulk of the money was in a -- the

13  Rubbermaid container.  There was a -- I think it was a few

14  hundred dollars additional currency up on the top shelf next to

15  the machine gun.

16  Q   And how -- was the money loose or was it organized in some

17  way?

18  A   Most of the money was bundled in bundles of $1,000

19  increments.

20  Q   Okay.  And again, how -- you said how much money there was

21  total.  How did you -- who counted that or how did you have it

22  counted?

23  A   I took it to a bank and had the bank count it.

24  Q   Okay.  And what was the total again?

25  A   The total was $38,848.

FORAN - DIRECT

1    Q    Okay.  Did you find any documents in the safe?

2    A    There were some documents recovered from the safe.

3    Q    Okay.  And what were those documents?

4    A    The documents included two ATF forms for the -- for

5    ownership of the machine gun and the silencer.  There were

6    some, I believe, checks to Mr. Colette's business.

7    Q    Okay.  What business is that?

8    A    I think -- I think it was called Arctic Alarm and Audio.

9    Q    Okay.  You said there were, now, guns in the safe, and you

10   talked about the machine gun.  Did it have any attachments?

11   A    It had a silencer attached to the barrel.  And there was a

12   magazine in the bottom of the gun.

13   Q    Okay.  And let's talk for a minute about the other

14   evidence in the bedroom.  I think you said you found a scale.

15   What kind of scale was it?

16   A    A small digital scale, electronic scale.

17   Q    Okay.  Was the scale clean?

18   A    No.  It had a white residue on it.

19   Q    Okay.  And was the residue -- did you test that residue?

20   A    Yes, I tested the residue with a field test kit.  It

21   tested positive for the presence of cocaine.

22   Q    And how were the -- those -- you mentioned the 23

23   individual-wrapped bags of white powder.  How were they

24   packaged?

25   A    It's a -- a common technique for packaging ounce

FORAN - DIRECT

1  quantities of cocaine.  It's a sandwich bag that the cocaine is

2  poured into, weighed out.  The bottom is usually packed tight,

3  spun, a knot's tied in there, and then they clip the top of the

4  bag -- bag away, so you'd have this -- the bottom corner of a

5  sandwich bag packed with one -- approximately one ounce of

6  cocaine.

7  Q    And did you find any of those types of bags anywhere in

8  the residence?

9  A    Yes.  There was 100 of those bags in the kitchen.

10 Q    Okay.  Now let's talk about the currency counter for a

11 minute.  I mean, it's pretty obvious, but I'll ask you anyway.

12 What's a currency counter?

13 A    A currency counter is something that currency is counted

14 on.  It's a -- you put the currency in the upper receiver part

15 of it, it spins and it counts the bills as they come through.

16 And most commonly seen at banks.

17 Q    Did this one have any special features?

18 A    It had an attachment for a counterfeit detection device

19 also, to check -- to check counterfeit bills.

20 Q    Okay.  And in your experience, how common are currency

21 counters?

22          MR. BUTLER:  Objection.  Foundation.

23          THE COURT:  Foundation.

24          MR. SCHRODER:  Your Honor, I think we've laid

25 foundation of the experience of the officer.

FORAN - DIRECT

1              THE COURT:  In terms of currency counters?

2              MR. SCHRODER:  In terms of currency counters found --

3      how common are currency counters --

4              THE COURT:  Okay.

5              MR. SCHRODER:  I'll re-ask the question.

6              THE COURT:  Well, if that's the best foundation, the

7      objection's sustained.  But if you --

8              MR. SCHRODER:  Okay.

9              THE COURT:  -- want to try and make a better foundation

10     that would be fine.

11             MR. SCHRODER:  Okay.

12     BY MR. SCHRODER:

13     Q    So let me ask you -- let's -- let me ask you bit more

14     about your qualifications, Special Agent Foran.  How much of

15     your career has been spent doing drug law enforcement?

16     A    More than half.

17     Q    And what specific training -- you talked generally about

18     your training a little while ago.  What specific training do

19     you have in drug law enforcement?

20     A    Extensive.  The training at the DEA academy is the best in

21     the world.  They -- we train investigators from all over the

22     world in both the U.S. and overseas.  The -- it's a -- starts

23     off in the most basic forms of investigations, retail

24     distribution, working up to major complex conspiracy, large,

25     local, and international drug trafficking organizations, how

**FORAN - DIRECT**

1  they operate.  At the retail level, it's what -- what are

2  call -- are cuts, or adulterants where people break cocaine

3  down, how it's packaged, how it's distributed, to -- the next

4  level is how cocaine is transported, in -- in state, between

5  states, and internationally.  How cocaine is hidden, secreted,

6  in compartments.  How money launderers -- how -- how funds are

7  collected, how money's transferred, how money launderers

8  operate, whole networks, how -- what -- what -- how currency

9  is -- is moved at the local, regional, state, and national,

10  international levels, as far as for interdiction purposes.  How

11  drug dealers maintain various locations for sales, use, storage

12  of narcotics.  How -- I can go on all day.  Let's see --

13  Q    Do you have -- I mean, in addition to the DEA training,

14  did you have other training specific to drug law enforcement?

15  A    Yes.  In addition to the DEA, in the academy I routinely

16  go on training classes throughout -- located throughout the

17  country on specific elements of narcotic investigations and

18  money laundering.  The two other police academies I've been to,

19  both had subject matter on drug investigations and how to

20  conduct them.

21  Q    Now, based upon your -- I mean, make a conservative

22  estimation; how many drug arrests have you took part in?

23  A    Overall, probably over 1,000.

24  Q    Okay.  And how many drug cases have you participated in?

25  A    Oh -- oh, more than that.

FORAN - DIRECT

1  Q    And how many of those involved drug distribution

2  operations?

3  A    At the -- at the DEA -- a lot of the arrests at the patrol

4  level were mainly -- were -- were the lowest end, usually the

5  users, people that have possession charges.  At the DEA, we

6  target distribution organizations, hundreds of arrests,

7  investigations involving the distribution organizations.

8  Q    And how many search warrants have you participated in

9  executing in drug cases?

10 A    Oh, probably three to six hundred.  I'm not even sure.  I

11 don't keep stats on those.

12 Q    And how many of those involved drug distribution

13 operations?

14 A    Almost all of them.  We usually get a retail -- I'd say a

15 user -- there's nowhere to search.  You -- whereas if you

16 identify a distribution organization, that's where you want to

17 do a search at.

18 Q    Have you worked undercover?

19 A    Yes, I have.

20 Q    Have you bought drugs undercover?

21 A    Yes, I've purchased crack cocaine and methamphetamine

22 while working undercover capacities.

23 Q    Have you participated in drug task forces?

24 A    Yes, I have.

25 Q    Okay.

FORAN - DIRECT

1        MR. SCHRODER:  Your Honor, I'm going to go back to my

2    question.

3        THE COURT:  Well, I never had any question about his

4    expertise as a drug investigator.  The question had to do

5    specifically with regard to his expertise with regard to money

6    counters, I thought.

7        MR. SCHRODER:  So the -- I will rephrase the question.

8        THE COURT:  Okay.

9    BY MR. SCHRODER:

10   Q    In the context of your participating in investigations and

11   searches of drug distribution organizations, have you commonly

12   seen currency counters?

13   A    I've seen them, but they're not common.

14   Q    Now, Special Agent Foran, what happened to the drugs you

15   found during the search?

16   A    They were collected by me, processed as evidence, sent to

17   our laboratory, analyzed, maintained there, then sent back to

18   me for trial.

19   Q    And how many different bags of white powder did you seize

20   from the residence?

21   A    There were three exhibits taken.  One exhibit was the 23

22   bags, one exhibit was the one bag with the currency, and the

23   other exhibit was one bag in the box by the scale on the

24   dresser.

25   Q    Now, what do you -- how do you mark or label the drugs

FORAN - DIRECT

1  when you get them, when you seize them?

2  A    We mark them with an exhibit number based on where we are

3  in the investigation, so it'll have a unique case number for

4  the case that's involved and it'll have a sequential number for

5  where this exhibit was in an overall investigation.

6  Q    Okay.  Now, in this particular case, once you seized the

7  drugs, where did you store them?

8  A    The drugs were never stored here.  They were processed and

9  then sent to our laboratory, the -- the -- our narcotics are

10 stored at our laboratory.

11 Q    Okay.  And once you sent them off, when did you see them

12 again?

13 A    I saw them the other day when they were shipped back to

14 me.

15 Q    Okay.  And where have they been since they were returned

16 to you?

17 A    At the -- our laboratory.  The --

18 Q    Since they were returned --

19 A    -- the -- the --

20 Q    -- to you here.

21 A    I'm -- I'm sorry, I -- I -- I got them out of the safe

22 this morning.

23 Q    Okay.  And were you able to identify the packages when

24 they were returned to you as the ones you sent?

25 A    Yes, I was.

1  Q    And how so?

2  A    Was my handwriting on the evidence label on the packages

3  and my handwriting on the evidence seal on the bag.

4  Q    Okay.  And were the still -- seals still intact?

5  A    The seals -- my seals were still intact, correct.

6  Q    All right.  I'm going to hand you what has been marked as

7  Government Exhibit 10.

8         MR. SCHRODER:  May I approach, Your Honor?

9         THE COURT:  Yes, uh-huh (affirmative).

10  BY MR. SCHRODER:

11  Q    Now I'm asking you to look at Government Exhibit 10.  Can

12  you identify this exhibit?

13  A    Yes, I can.

14  Q    And how do you identify it?

15  A    It's in the evidence bag that I sent to the laboratory.

16  Q    Okay.  And which bag is this?  Can you identify this --

17  which --

18  A    This -- this -- the cocaine in this bag came from the

19  cocaine that was in the safe, the 23 one-ounce bags.

20  Q    Okay.  And has the bag in the -- been in the possession

21  and custody and control of the Drug Enforcement Administration

22  since its seizure?

23  A    Yes, it has.

24         MR. SCHRODER:  Your Honor, government moves Exhibit 10

25  for admission.

FORAN - DIRECT

```
 1              THE COURT:  Any objection?
 2              MR. BUTLER:  No, Judge.
 3              THE COURT:  10 will be received, without objection.
 4         (Plaintiff's Exhibit 10 admitted)
 5              MR. SCHRODER:  Okay.
 6  BY MR. SCHRODER:
 7  Q    Now, Special Agent Foran, how much cocaine is in there?
 8  A    Specifically, I don't recall.  I believe it's over 600
 9  and -- oh, it's over 600 grams of cocaine powder.
10  Q    And how much is that much cocaine worth in Fairbanks?
11  A    It -- it depends on the purity, how much it's cut down.
12  At this -- right here, if this were to be distributed at the
13  local level, cocaine at the local level now in Fairbanks is
14  selling for fifty to sixty dollars for half a gram.  Hundred
15  dollars is a rough price for a gram.  So it's 600-plus grams.
16  A conservative number as is would be -- my math here -- 100
17  times 600.  That -- 60,000.  I'm guessing.  I could be wrong on
18  that, 60,000.  But if it's at a higher purity, a dope
19  trafficker is going to step on it or cut it and turn this 600
20  grams into 1,200 or 1,800 grams, depending on the purity.  So
21  that's what is sold at the retail levels.  This has a potential
22  value of up to $150,000 at the retail level, depending where
23  it's at.
24  Q    How much of it's sold by the ounce, as it was packaged?
25  A    Sold by the ounce, 23 one-ounce packages, ounce prices in
```

```
 1   Fairbanks range between 900 and $1,800 usually depending on
 2   quantity.  So the price would go between probably twenty-one
 3   and forty thousand dollars at the ounce level.
 4           MR. SCHRODER:  Your Honor, may I -- I'm going to show
 5   the witness Government Exhibit 11.
 6           THE COURT:  All right, very well.
 7           MR. SCHRODER:  May I approach?
 8           THE COURT:  Uh-huh (affirmative).
 9   BY MR. SCHRODER:
10   Q    Are you familiar with Exhibit 11?
11   A    Yes, I am.
12   Q    And how are you familiar with it?
13   A    This is the packaging material that the 23 one-ounce bags
14   of cocaine were packaged in.  In this evidence envelope here,
15   there's all these small plastic bags that have been numbered --
16   not by me; I believe by the chemist who did the analysis -- and
17   the brown shopping bag that all the cocaine was packaged in
18   when it was recovered from the safe.
19   Q    And has this bag been in the possession, custody, and
20   control of the Drug Enforcement Administration since --
21   A    Yes.
22   Q    -- its seizure?
23   A    Yes, it has.
24           MR. SCHRODER:  Your Honor, the government moves for
25   admission of Exhibit 11.
```

1       MR. BUTLER:  No objection.

2       THE COURT:  11 will be received without objection.

3    (Plaintiff's Exhibit 11 admitted)

4       MR. SCHRODER:  And I believe you already described that

5  so -- well -- may I approach, Your Honor?

6       THE COURT:  Yes.

7  BY MR. SCHRODER:

8  Q    Special Agent Foran, are you familiar with this exhibit?

9  A    Yes, I am.

10  Q    And how are you familiar with it?

11  A    This is the cocaine that came from the Tupperware that --

12  or Rubbermaid container that contained the currency from the

13  safe.

14  Q    And how can you identify it as that?

15  A    The label on here has the case number, my name printed,

16  and my signature, and the date seized, location seized, in all

17  my handwriting, and the evidence seal on the top.

18  Q    Okay.  And has this bag been in the possession, custody,

19  and control of the Drug Enforcement Administration since its

20  seizure?

21  A    Yes, it has.

22       MR. SCHRODER:  Your Honor, the government moves for

23  admission of Number 12.

24       THE COURT:  12, Mr. Butler?  Any -- 12 --

25       MR. BUTLER:  No objection to 12 coming in --

1          THE COURT:  Okay.

2          MR. BUTLER:  -- Judge.

3          THE COURT:  All right.  12 will be received, without

4    objection.

5      (Plaintiff's Exhibit 12 admitted)

6          MR. SCHRODER:  May I approach, Your Honor?

7          THE COURT:  Yes.

8    BY MR. SCHRODER:

9    Q    I've handed you what's been marked as Government Exhibit

10   Number 13 for admission, or Government 13.  Can you identify

11   this package?

12   A    This is the plastic bag and a playing card that was -- the

13   plastic bag contained the cocaine that was in the safe in

14   the -- in the money bin, money container.  And the plastic

15   evidence -- or the playing card was in with the cocaine in the

16   bag.

17   Q    And how can you identify the exhibit?

18   A    This exhibit has its case number and a corresponding

19   exhibit number to the DEA exhibit number sent to the

20   laboratory.

21   Q    And has this been -- this bag been in the possession,

22   custody, and control of the DEA since its seizure?

23   A    Yes, it has.

24          MR. SCHRODER:  Your Honor, the government moves for

25   admission of Number 13.

FORAN - DIRECT

1          MR. SCHRODER:  No objection, Judge.

2          THE COURT:  13 will be received, without objection.

3      (Plaintiff's Exhibit 13 admitted)

4  BY MR. SCHRODER:

5  Q    And you mentioned what was shown in this bag, Special

6  Agent Foran.  What's -- based upon your experience that we've

7  talked about, what's the purpose of the card being in with the

8  bag of cocaine?

9  A    Cards have a lot of purposes.  A common use of a playing

10 card or a credit card or a hard-edged substance is to dilute or

11 cut cocaine.  Cocaine, when it comes -- when it's shipped up

12 here, imported, is usually in a harder, chunkier state.  Most

13 cuts are fine powders.  Inositol is a good example.  It's a

14 fine powder, and you need to mix it in so that your customers

15 don't see the cocaine up top; they shake the bag, and all the

16 shake or the cut all sinks to the bottom, then they're going to

17 know that what they're getting isn't good quality.  So they try

18 to hide it by grinding it up or smashing it up and dividing it

19 into a similar substance so it blends in together.  In this

20 case a credit card, playing card, are commonly used to just

21 break it down and -- and -- and crush it up real fine so that

22 all of the cocaine mixes together with the cut to -- to

23 blend -- to blend its appearance.

24         MR. SCHRODER:  May I approach, Your Honor?

25         THE COURT:  Yes.

FORAN - DIRECT

1  BY MR. SCHRODER:

2  Q    I've handed you what's been marked as Government Exhibit

3  14.  And could you identify this exhibit?

4  A    Yes.  This is the quantity of cocaine that came from the

5  dresser of the master bedroom.

6  Q    And how are you able to recognize it?

7  A    It's -- the evidence label on the front of the bag has --

8  is my handwriting.  The evidence seal up top is my handwriting.

9  My signature's on the bag, and it's what I sent to the

10  laboratory.

11  Q    Okay.  And has this bag been in the possession, custody,

12  and control of the Drug Enforcement Administration since its

13  seizure?

14  A    Yes, it has.

15        MR. SCHRODER:  Your Honor, the government moves for

16  exhibit of Number 14 -- or admission of Number 14.

17        MR. BUTLER:  No objection, Judge.

18        THE COURT:  14 will be received, without objection.

19      (Plaintiff's Exhibit 14 admitted)

20  BY MR. SCHRODER:

21  Q    I've handed you what's been marked as Government Exhibit

22  15.  Could you identify that material?

23  A    This is the plastic bag that contained the last exhibit,

24  Exhibit Number 14.  Also was a playing card with this exhibit

25  that was in the plastic bag -- I mean that was with -- in this

1  plastic bag with the cocaine.  It's now in the other bag.

2  Q   And how are you familiar with that?

3  A   This has the same case number and same corresponding

4  exhibit number as the prior exhibit.

5  Q   Okay.  Has this bag been in the possession, custody, and

6  control of the Drug Enforcement Administration since its

7  seizure?

8  A   Yes, it has.

9          MR. SCHRODER:  Your Honor, the government moves for

10  admission of Exhibit 15.

11          MR. BUTLER:  No objection, Your Honor.

12          THE COURT:  15 will be received, without objection.

13      (Plaintiff's Exhibit 15 admitted)

14          MR. SCHRODER:  May I approach, Your Honor?

15          THE COURT:  Yes.

16  BY MR. SCHRODER:

17  Q   Special Agent Foran, can you identify this exhibit?

18  A   This the scale that -- it's in the photographs -- that

19  came from the top of the dresser in Mr. Colette's master

20  bedroom.

21  Q   Okay.  And how are you able to recognize that?

22  A   It's in the DEA evidence envelope with my information that

23  I handwrote on the label and my name again on the evidence seal

24  up top.

25  Q   Now, you had -- you'd testified earlier that the drugs we

1  were talking about here you sent to the DEA lab.  This piece of

2  evidence, where has it resided since the seizure?

3  A    This -- our narcotic evidence is sent to a narcotics

4  storage facility at the laboratory.  Our non -- this would be

5  considered a nondrug item.  Our nondrug items are sent to a

6  evidence custodian in Anchorage where they're in safekeeping

7  down in their office down there.

8  Q    And when was it returned to you?

9  A    I believe it was returned to me on Friday, last week.

10  Q    And where has it been since that time?

11  A    It's been in Anchorage, Alaska.

12  Q    I mean where has it been since it was returned to you?

13  A    I'm sorry, it's been in my evidence room.

14  Q    Okay.

15         MR. SCHRODER:  Your Honor, the government moves for

16  admission of Number 16.

17         MR. BUTLER:  No objection.

18         THE COURT:  16 will be received, without objection.

19      (Plaintiff's Exhibit 16 admitted)

20  BY MR. SCHRODER:

21  Q    Now, in addition to the scale, did you find any -- the

22  scale itself -- did you find anything else related to the

23  scale --

24  A    Yes, sir, I did.

25  Q    -- during your search?  And --

1  A    Yes, I did.

2  Q    -- what was that?

3  A    It was the box the scale apparently came in when it was

4  purchased.

5  Q    And where was that found?

6  A    That was on top of the refrigerator in the kitchen of the

7  Colette residence.

8  Q    And did you seize that box?

9  A    Yes, I did.

10  Q    And where has it been since you seized it?

11  A    It was in the evidence vault down in Anchorage up until

12  recently.  Now it's -- it's been in my evidence room since last

13  Friday.

14       MR. SCHRODER:  May I approach, Your Honor?

15       THE COURT:  Yes.

16  BY MR. SCHRODER:

17  Q    I've handed you what has been marked as Government's

18  Exhibit 17.

19  A    Correct.

20  Q    And can you -- are you familiar with that exhibit?

21  A    Yes, I am.

22  Q    And how are you familiar with it?

23  A    This is the box that I seized from the house.  It has the

24  same brand name, same -- a -- a photograph, if you want to call

25  it, on the front of the box as the previous scale.  It has an

FORAN - DIRECT

1   evidence -- evidence envelope with my name and everything

2   written on it.  This evidence is different from the last bag in

3   one way.  It has been opened and resealed by the evidence

4   custodian down in Anchorage.  And my previous seal is inside.

5   So there's a slight difference in this one as the other two.

6   This one has been opened for examination.

7   Q   Okay.  And is that -- where has that box been since -- did

8   I ask -- I'm sorry, I didn't ask you that question.  Where has

9   that box -- where has that piece of evidence been since it was

10  seized?

11  A   It's been in the evidence vault in Anchorage until

12  recently, where it's been in my evidence room.

13  Q   Has it been in the care, custody, and control of DEA the

14  entire time?

15  A   Yes, it has.

16          MR. SCHRODER:  Your Honor, the government moves for

17  admission of Number 17.

18          MR. BUTLER:  No objection.

19          THE COURT:  17 will be received, without objection.

20      (Plaintiff's Exhibit 17 admitted)

21          MR. SCHRODER:  May I approach, Your Honor?

22          THE COURT:  Yes.

23  BY MR. SCHRODER:

24  Q   I've handed you what's been marked as Government Exhibit

25  Number 18, a photograph.  Do you recognize that image?

FORAN - DIRECT

1  A    Yes, I do.

2  Q    And how do you recognize it?

3  A    It's a photograph of sandwich bags that I instructed the

4  photographer to take a photograph of that I located in the

5  kitchen.

6  Q    And when was the photo taken?

7  A    It was taken at the day of the search warrant, November

8  28th.

9  Q    And where was it -- you said in the kitchen, but where was

10 it taken?

11 A    In -- in the -- in the -- it was in the kitchen, in -- in

12 the kitchen of Mr. Colette's trailer.

13 Q    Okay.  And is that a fair and accurate representation of

14 the boxes containing plastic bags in the defendant's residence

15 when you served the search warrant on November 28th, 2005?

16 A    Yes, it is.

17        MR. SCHRODER:  Your Honor, the government moves for

18 admission of 18.

19        MR. BUTLER:  No objection.

20        THE COURT:  18 will be received, without objection.

21      (Plaintiff's Exhibit 18 admitted)

22 BY MR. SCHRODER:

23 Q    And what does this photo show, for the jurors, when they

24 get a chance to look at it?

25 A    The photo shows four boxes of sandwich bags.  The count of

1   this box here is 300, the count here is 110; count here is 200;

2   count here is 50.  That puts it over 660 sandwich bags in the

3   kitchen.

4   Q    And are those bags consistent with what you -- how you saw

5   the cocaine packaged?

6   A    The bag here, 300-count bag, is most consistent with --

7   it's -- when you have the 23 bags, all you have is the bottom

8   corner.  It's usually of the cheaper sandwich type bags.  Any

9   of -- any of these bags could have been used.  However, I don't

10  know which brand of bag it was.  It's common -- they -- they

11  appear to be -- come from sandwich bags.

12  Q    Okay.  Now, what happened to the currency counter you

13  found during the search?

14  A    It was collected as evidence.

15  Q    Okay.  And what did you do with the currency counter?

16  A    It was turned in to the evidence vault in Anchorage,

17  Alaska.

18  Q    Okay.  And when was it -- was it returned to your office

19  at some point?

20  A    Returned to my office on Friday.

21  Q    Okay.  Now, do you recognize this exhibit?

22  A    Yes, I do.

23  Q    And how do you recognize it?

24  A    There's evidence tape on both sides, both in my

25  handwriting, both with the case, location of seizure.

1  Q    Okay.  And what is it?

2  A    This is a currency counter.

3  Q    And the currency counter that you seized from the

4  defendant's residence on November 28th?

5  A    Yes, this is the currency counter that was on the dresser

6  in the photographs in the Colette bedroom.

7  Q    And has it been in the care, custody, and control of the

8  Drug Enforcement Administration since that time?

9  A    Yes, it has.

10         MR. SCHRODER:  Your Honor, the government moves for

11  admission of Exhibit Number 18 [sic].

12         MR. BUTLER:  No objection, Judge.

13         THE COURT:  18 [sic] will be received without

14  objection.

15     (Plaintiff's Exhibit 19 admitted)

16         MR. SCHRODER:  If I may approach, Your Honor?

17         THE COURT:  Yes.

18  BY MR. SCHRODER:

19  Q    Now, we've talked about -- at the beginning and then a few

20  minutes ago about your qualifications and the investigations

21  you've done, the search warrants you've served, and how those

22  have related to drug distribution operations.  Based upon that

23  experience, do you have -- was what you found in the

24  defendant's residence that day consistent with a drug

25  distribution operation?

FORAN - DIRECT

1  A    Absolutely.

2  Q    And why so?

3  A    It had all the elements.  It had the cocaine, it had the

4  money, it had the scales, it had the packaging material, had a

5  currency counter.  It had firearms to protect the currency --

6              MR. BUTLER:  Objection.

7              THE WITNESS:  -- the drugs.

8              THE COURT:  It had --

9              MR. SCHRODER:  We'll talk about that in a moment, Your

10  Honor.

11             THE COURT:  Okay, so --

12             MR. SCHRODER:  Just -- if you'll finish with what you

13  were --

14             MR. BUTLER:  May we approach, Judge?

15             THE COURT:  All right.

16             MR. SCHRODER:  -- without that -- no --

17             THE COURT:  So we'll strike the part about the firearms

18  for now.

19             MR. SCHRODER:  Or I could ask some more foundation

20  questions.

21             THE COURT:  Or you can ask -- but at this point I don't

22  think there's adequate foundation for that.

23             MR. SCHRODER:  Understand.

24             THE COURT:  Does that satisfy you, Mr. Butler?

25             MR. BUTLER:  At some point I would like to approach,

1  Judge.

2          THE COURT:  Okay.

3          MR. SCHRODER:  We can do it now.

4          THE COURT:  Okay.

5          MR. SCHRODER:  So --

6          THE COURT:  Well, how about this.  We've been at this

7  for an hour and 15 minutes.  Let's take a 15-minute recess.

8  Then we can come --

9      (Jury not present at 10:16 a.m.)

10          THE COURT:  Okay.  Mr. Butler.

11          MR. BUTLER:  Judge, it was my impression -- and I may

12  be wrong on this -- but it's my impression that the Court --

13  based on the documents that have gone back and forth between

14  the defense and the government, that the witness was not going

15  to be allowed to testify that these guns were there to protect

16  the drugs.

17          THE COURT:  Hmm.

18          MR. BUTLER:  I thought -- because I thought you'd --

19          THE COURT:  Well --

20          MR. BUTLER:  And -- okay, (indiscernible).

21          THE COURT:  Okay, you can respond, Mr. Schroder.

22          MR. SCHRODER:  The -- I don't think that's exactly what

23  Special Agent Foran said.  And it wasn't our intent for it to

24  come out that way.

25          THE COURT:  The question was, was --

1          UNIDENTIFIED SPEAKER:  Right.

2          THE COURT:  Pardon.

3          UNIDENTIFIED SPEAKER:  Sorry.

4          THE COURT:  The question was, was this consistent with

5    a drug --

6          MR. SCHRODER:  Right.

7          THE COURT:  -- operation.

8          MR. SCHRODER:  Right.

9          THE COURT:  And then you said specifically, and he

10   named a list of things.

11         MR. SCHRODER:  Right.

12         THE COURT:  And you objected to the final part about

13   the weapons portion.  So that's where we are.

14         MR. BUTLER:  Right, because I believe counsel's

15   understanding is the same as mine, that the witness was not

16   supposed to be allowed to say that these guns were there to

17   protect the drugs, because that's a conclusion -- if it's going

18   to be drawn at all, it is to be drawn by a jury.  My

19   understanding, he wasn't allowed to say that.  And this

20   violation of what I believe the Court's order was is serious.

21         THE COURT:  Okay.  Mr. Schroder.

22         MR. SCHRODER:  I don't think that the agent has given

23   an opinion about how the guns were being used in this case.

24   The question was, what was found that was consistent with that.

25   The government does not have a problem with striking the

1    comment about the guns in the context of this question, because

2    what I intend to do, Your Honor, is come back -- I'm going to

3    ask -- I didn't ask any foundation question about weapons.

4            THE COURT:  Right.

5            MR. SCHRODER:  I'm going to do that.  And then the

6    question I'm going to ask the agent about weapons is:  Based

7    upon your experience, how have you seen weapons used in a drug

8    distribution organization?  And I won't go any farther to try

9    to -- any further to try to tie it to this particular

10   situation.  I won't ask him that opinion.

11           THE COURT:  Okay.  I've already -- I think I ruled that

12   you can do that, but you can't ask for the ultimate question.

13   You can't ask him -- opinion, do you believe in the

14   circumstances that these weapons were being used in furtherance

15   of --

16           MR. SCHRODER:  Right.

17           THE COURT:  -- a drug conspiracy.  That's the jurors'

18   decision.

19           MR. SCHRODER:  And I have no intent to do that and

20   I'm -- I -- we didn't mean it to --

21           THE COURT:  Well --

22           MR. SCHRODER:  -- come out as it sounded like that.

23           THE COURT:  I -- kind of -- I'd have to relisten to

24   everything to see how it came out, because it was kind of --

25   the objection came in, it was kind of unclear.  But what do you

1   want me to do, Mr. Butler?

2          MR. BUTLER:  Judge, I'd like to have a moment with my

3   client.  The problem is, is that either the witness was not

4   told what the Court's parameters were, or the witness was told

5   and ignored what the Court's parameters were.  Because he

6   specifically said that the guns were there to protect the

7   drugs, specifically.  That's what he said.  And that goes in

8   violation of what the Court ordered.  And I need to talk to my

9   client, because I might be moving for a mistrial.

10          THE COURT:  Okay.  I don't know how easy it is for the

11   clerk to pull up exactly what was said.  Can that be done?

12   Okay.  Let's listen to what -- so we don't have to guess what

13   was said.

14   10:21:19

15      (Portion of proceedings played)

16   10:21:33

17          THE COURT:  Okay, firearms.

18          MR. SCHRODER:  Well, I think we should hear the

19   question though, took, Your Honor, just to --

20          THE COURT:  Okay, you want to go back a little further

21   then?  Okay.

22          MR. SCHRODER:  Yeah, just to -- 10 seconds, probably.

23   10:22:15

24      (Portion of proceedings played)

25   10:22:35

1          THE COURT:  Okay.  All right.  Mr. Schroder, now we've

2    heard it, what's your argument?

3          MR. SCHRODER:  The government -- Your Honor, I think

4    the question was general.  I think the answer was general.

5    I -- I'm certainly willing to clarify it and I'm -- as I've

6    told the Court exactly how I'm going to ask the question when I

7    get to it to get that information out.  We're not going to ask

8    for a conclusion from the witness on the weapons.  I don't

9    think that's worthy of a mistrial at this point in the middle

10   of trial.

11         THE COURT:  Okay.  Mr. Butler.

12         MR. BUTLER:  Judge, I'd like to have a moment to talk

13   with my client --

14         THE COURT:  Oh, right, okay --

15         MR. BUTLER:  -- so I can talk -- so I can find out what

16   his wishes are.  It's his trial.  And I need to explain some

17   things to him.  And I differ with my colleague that this is

18   just general.  He specifically said that the guns were there to

19   protect the money and the cash and the drugs.

20         THE COURT:  Okay.  So we'll take a -- another -- how

21   about we take 10 minutes, so everybody can do what they have to

22   do.

23         MR. SCHRODER:  Thank you.

24         MR. BUTLER:  Thank you, Judge.

25         THE CLERK:  All rise.  Court is now in recess for 10

1  minutes.

2      (Court recessed at 10:23 a.m., until 10:37 a.m.)

3      (Jury not present)

4          THE COURT:  -- explain to the lady in the back that

5  she's supposed to stay quiet?  Did you explain that to her?

6          DEPUTY U.S. MARSHAL:  Yes, I did, Your Honor.

7          THE COURT:  Okay.  Oh, you did?

8          DEPUTY U.S. MARSHAL:  Yes.

9          THE COURT:  Okay, good.  Thank you.  Otherwise she'll

10  be removed from the courtroom.  Is that clear?  I don't want

11  any more outbursts.  I can't see her -- no more outbursts.

12          UNIDENTIFIED SPEAKER:  Okay.

13          THE COURT:  Okay, we can't have that.  All right, Mr.

14  Butler, your turn.

15          MR. BUTLER:  Judge, I'm going to request a -- an

16  evidentiary hearing on the issue.  It would probably take about

17  15 or 20 minutes.

18          THE COURT:  On what issue?

19          MR. BUTLER:  On the issue of what just occurred in

20  terms of --

21          THE COURT:  Evidentiary hearing.

22          MR. BUTLER:  Yes, sir.  May we approach?

23          THE COURT:  Yes.  Let's go back here.

24      (Bench conference as follows:)

25          MR. BUTLER:  Judge, the young lady, albeit Jason

1   Colette's sister --

2           THE COURT:  Uh-huh (affirmative).

3           MR. BUTLER:  -- says that when the agent walked off the

4   witness stand --

5           THE COURT:  Uh-huh (affirmative).

6           MR. BUTLER:  -- he winked at somebody at the

7   prosecution table and said, "I got him."

8           THE COURT:  Is that true?

9           MR. SCHRODER:  I didn't hear it.

10          MR. BUTLER:  Well, supposedly it was the young guy

11  that's the intern.  She said he winked at him and told him, "I

12  got him."

13          THE COURT:  Well, I don't know what -- let -- let's

14  presume that's true.

15          MR. BUTLER:  That makes it an intentional violation of

16  your order, which means that they're forcing the defense to be

17  between a rock and a hard place, a bell that can't be unrung,

18  or moving for a mistrial.

19          THE COURT:  Well, what's your position, Mr. Schroder?

20          MR. SCHRODER:  Your Honor, my position is, I don't

21  think it's a bell that was rung specifically, again, against

22  the order.  I think it was kind of a generic question and a

23  generic answer.  Certainly we didn't intend to do that.  I

24  mean, I have specific questions that I intend to ask on this

25  issue based upon your ruling and I've been through those

1    questions with the agent, so it was a surprise to me that he'd

2    said that.  But I -- again, I think it's a generic enough

3    question and generic enough answer that I don't think the

4    jury's going to get that.

5         MR. BUTLER:  Judge, this -- I don't believe that you

6    can call it just a generic question, generic answer from an

7    expert who's asked to -- the ultimate question of, "Is this the

8    kind of operation?"  "Yes."  "Why?"  And then he rattles off

9    these various elements, including that guns were there to

10   protect the money and drugs.  Okay, that's a clear violation

11   of -- I would ask my colleague, did he tell the agent what the

12   Court's order was?

13        THE COURT:  Well, it was -- he was in the courtroom.

14   Doesn't matter whether he told him, but did you tell him?

15        MR. SCHRODER:  I didn't specifically tell him because

16   he was in the courtroom and because, like I say, we'd worked

17   through questions and --

18        THE COURT:  Yeah.

19        MR. SCHRODER:  -- and I hadn't heard that before.  So

20   I --

21        MR. BUTLER:  If in fact he winked his eye at your

22   intern and said, "We got him," or "I got him," then that makes

23   it an intentional violation.  There's no negligence to it.  And

24   so then that forces the defense to be between a rock and a hard

25   place, in a Catch-22 position, which we should not be in.

1  We're trying to play by the rules, you know.  And I think

2  we're -- all are, and I'm not accusing you of anything,

3  obviously.  But I'm -- but this is what I was told.  The young

4  lady said the reason why she responded the way she did was

5  because the guy walked off the stand, winked at the young guy

6  that's -- that --

7           THE COURT:  The (indiscernible).

8           MR. SCHRODER:  No, that's not right, because she --

9           MR. BUTLER:  All right.

10          MR. SCHRODER:  She -- the outburst --

11          THE COURT:  Yeah.

12          MR. SCHRODER:  -- came when I -- it was my comment that

13  I say, we didn't intend that, and that's when the outburst

14  came.

15          THE COURT:  Yeah.

16          MR. BUTLER:  All right, (indiscernible).

17          THE COURT:  (Indiscernible) the timing was wrong, yeah.

18          MR. BUTLER:  (Indiscernible).

19          MR. SCHRODER:  I'm just a little concerned about, given

20  what she's been doing, she's trying to put the agent on the

21  spot here, and that concerns me.

22          THE COURT:  I was troubled with her during jury

23  selection when she spoke to a juror, and I told her then to be

24  quiet.  And that -- it was a minor issue, no big deal, and the

25  juror wasn't even selected.

1          MR. SCHRODER:  Okay.

2          THE COURT:  So that was enough to -- it was a -- just a

3    casual comment like, "We're members of the family," something.

4    That was the first issue.  Then I -- and I'm not totally able

5    to hear what she says.  The last time it was picked up on the

6    microphone and that's why I was able to hear what -- figure out

7    what she said.  And that's why we had her cautioned.  That's a

8    completely different issue than whether the -- this agent is

9    intentionally attempting to violate a court order.

10          And then a -- and a secondary issue is the -- is,

11    even -- I mean, the question -- the big question as to whether

12    or not the agent can comment is a close question as well.  It

13    may well be that an expert can comment.  I have made as rules

14    for this case that they cannot comment as to the ultimate

15    question.  They can comment -- if he would have stopped at that

16    point, "guns, and there were guns," that would have --

17          MR. SCHRODER:  Right.

18          THE COURT:  That -- I don't think I would have -- we'd

19    be having this discussion.  But then he said a few more words

20    that brought it inconsistent with what I had said.  That's the

21    troubling thing.  Now, I can deal with it through -- and

22    usually the way I deal with these things is, I'm very

23    straightforward with the jury.  I mean, I just talk to them, I

24    say -- I tell, here's the jury instruction:  You have to decide

25    whether or not the defendant possessed the firearms in