```
 1   furtherance of the crime; that's your decision, based on the
 2   totality of the evidence; and we are not permitting any of the
 3   witnesses to give an opinion in that regard, because that's
 4   not -- that's for you to decide.  And I'm just being real
 5   straightforward.  And so any suggestion by any witness along
 6   those lines is inappropriate, and -- because you, ladies and
 7   gentlemen, have to decide that.  And I'd even use that word, is
 8   inappropriate, so that the jury understood that.  Because
 9   that's their decision, the jury's decision.
10        And all we're doing is being candid with the jury about
11   something we all know.  You know, you -- guns are there for
12   some reason or another.  They have to conclude beyond a
13   reasonable doubt that these guns were there in furtherance of
14   this conspiracy.  And I'll just talk to them like that, so that
15   there's no issue, no confusion about, you know, where this is
16   coming from, and they are -- and we're not playing games with
17   them.  Because ultimately, they're pretty smart people.
18        MR. BUTLER:  But I'd request of Your Honor if you
19   wouldn't use the word "conspiracy," though, on this particular
20   case.
21        THE COURT:  I don't -- did I -- I don't even think
22   that -- you're right, I won't.  But I --
23        MR. BUTLER:  (Indiscernible).  You just said it, just
24   now.  But (indiscernible) --
25        THE COURT:  Well, I'm going to refer to the actual
```

1  instruction.

2           MR. BUTLER:  Okay.

3           THE COURT:  And I don't think that word is in here, is

4  it?

5           MR. BUTLER:  Shouldn't be.

6           THE COURT:  Based on totality of the --

7  (indiscernible).  Yeah.  I don't think I would say that.

8           MR. BUTLER:  Okay.

9           THE COURT:  Well, how's that for a solution?

10          MR. BUTLER:  Well, I think, to protect my record and --

11          THE COURT:  Uh-huh (affirmative).

12          MR. BUTLER:  -- to protect his rights, I've got to move

13  for a mistrial --

14          THE COURT:  No, I understand that.

15          MR. BUTLER:  -- (indiscernible).

16          THE COURT:  I understand that.

17          MR. BUTLER:  And then the Court would rule what --

18  however the Court deems appropriate.

19          THE COURT:  What I'm trying to think is if we even have

20  to have this evidentiary hearing.  Because she will say --

21  let's just -- offer of proof.  She will say that when the

22  officer came off the stand, he winked at the intern and said,

23  "I got him."  And then she will say, "That's why I

24  responded" --

25          MR. BUTLER:  Well, I don't know if she'll say that.  I

1    thought that's -- was the time --

2            THE COURT:  Okay, that's not (indiscernible).

3            MR. BUTLER:  She didn't say that.  She said that when

4    he walked off the stand, he winked at the young guy and said,

5    "I got him."

6            THE COURT:  Okay.

7            MR. BUTLER:  That's a --

8            THE COURT:  That could mean a whole bunch of things.

9            MR. BUTLER:  I -- yes, sir, it could, but, you know --

10           THE COURT:  But for purposes of my analysis, I'm

11   presuming what you say is true.  And not --

12           MR. BUTLER:  That's what -- she told me that.

13           THE COURT:  I know -- and I know.  But for --

14           MR. BUTLER:  (Indiscernible).

15           THE COURT:  -- purposes of my analysis now --

16           MR. BUTLER:  Right.

17           THE COURT:  -- I'm presuming that's true.

18           MR. BUTLER:  Okay.

19           THE COURT:  And trying to say if it's a -- see if that

20   can be redeemed.  And I think it can by my discussion with the

21   jury and by your making sure you caution.

22           MR. SCHRODER:  I will.

23           THE COURT:  And that the jury understands, anyone that

24   does that is violating a court order.  So what do you think?

25           MR. BUTLER:  Okay, just kind of --

1           THE COURT:  I mean, your motion for a mistrial is

2   certainly part of the record, and I understand it, but --

3           MR. BUTLER:  Okay.  I just want to make sure that's

4   clear, because I said I'd have to talk to my client first.  And

5   so I never really ultimately made the motion.  But I would have

6   to make it.

7           THE COURT:  Well, I presume you've made it.

8           MR. BUTLER:  Okay.

9           THE COURT:  Yeah.

10          MR. BUTLER:  Thank you, Judge.  And the motion for the

11  mistrial would be related to Counts 3 and 4 only, which are the

12  gun counts.

13          THE COURT:  Right.

14          MR. BUTLER:  So I'm not asking for a motion for

15  mistrial on the entire trial.  I'm asking for a motion for

16  mistrial on the 924(c) counts only, which are Counts 3 and 4.

17          THE COURT:  Which will be preserved, regardless of

18  what -- you know, regardless of what -- that's another reason

19  to keep moving ahead.  What if you win on those -- what if I

20  deny your motion for mistrial, you go and you win?  Then it's

21  all academic, right?

22          MR. BUTLER:  Well, I'm actually -- got my fingers

23  crossed I'm going to win those two counts.  Those are the worst

24  ones in the whole thing.

25          THE COURT:  But you got this point on appeal otherwise.

1    I think I can correct the problem, because it was said so

2    quickly.  And if you listen to the tape again, your objection

3    came in, and I'm not sure to the extent it said it.  But I

4    still think that I can talk to the jury and let them know that

5    there's certain rules that we play by, and one of them is that

6    they have to decide this issue.

7         MR. BUTLER:  And without waiving the --

8         THE COURT:  You're not --

9         MR. BUTLER:  -- mistrial issue (indiscernible).

10        THE COURT:  You're not waiving a darn thing.

11        MR. BUTLER:  Okay.  All right, sir.

12        THE COURT:  Okay.

13        MR. BUTLER:  Thank you.

14        THE COURT:  All right.

15    (End of bench conference)

16        THE COURT:  Okay.

17        MR. SCHRODER:  May I have a moment to --

18        THE COURT:  Yes.  Yes.

19        MR. SCHRODER:  -- pass on the information, Your Honor?

20        THE COURT:  Yes.

21    (Pause)

22        MR. SCHRODER:  Would you like the witness back on the

23    stand, Your Honor?

24        THE COURT:  That's fine.  We can bring the jurors in.

25    Are you ready, Mr. Butler?

1          MR. BUTLER:  Yes, sir, Judge.

2          THE COURT:  Okay.

3      (Jury present at 10:47 a.m.)

4          THE COURT:  Okay, we got everybody back.  How are you

5   doing?

6          UNIDENTIFIED JUROR:  Good.

7          THE COURT:  I just returned from a seminar last week or

8   two weeks ago on how to conduct jury trials better and how to

9   keep the jury more involved.  And one thing that was suggested

10  is periodically during the trial when there's legal issues and

11  disputes, we simply tell the -- explain to the jury what's

12  going on and focus them on what the charges are, et cetera.

13  And I thought maybe I'd do that just for a moment here.

14          Just so that you understand, as the evidence is coming

15  in -- and so you -- also you understand, when I admit evidence,

16  it's going to be with you.  You'll be able to take it with you

17  into the jury room.  So all these pictures that you may not

18  have been able to see that well, they'll be in with you.

19  Everything you see here -- the drugs will be in with you for a

20  while, not -- not forever, but you'll have a chance to do what

21  you need to do in that regard as well.

22          But in this particular case, there's several charges,

23  but in Count 3 of the indictment the defendant is charged with

24  possession of a firearm in furtherance of a drug trafficking

25  crime.  And in order to convict the defendant of that, the

1  defendant has to have committed the crime of possession of

2  cocaine with intent to distribute as charged in Count 1 of the

3  indictment, or distribution of cocaine as charged in Count 2 of

4  the indictment; second, the government has to prove that the

5  defendant knowingly possessed a firearm, and then it sets forth

6  the firearms; and third, that the defendant possessed the

7  firearm in furtherance of the crime.  And that last criteria,

8  that the defendant possess the firearm in connection with the

9  two crimes above, has to be a decision you make after

10  considering the evidence beyond a reasonable doubt and looking

11  at all the evidence.

12          We're not permitting witnesses to offer an opinion as

13  to that ultimate decision, because that's your decision.

14  You're being allowed to hear evidence, evidence, evidence, but

15  you have to decide whether or not you believe, based on all the

16  evidence, that the weapons were possessed in furtherance of a

17  drug crime.  Is that clear?  And so it's inappropriate if any

18  witnesses -- renders an opinion as to their belief on that

19  subject, because that's your decision.  You're entitled to all

20  the evidence, but then you have to decide whether the

21  government has proved that charge with a -- beyond a reasonable

22  doubt.  That make sense?  Doesn't hurt to throw it in at this

23  phase of the trial?  Okay.  Did I state that right?

24          MR. SCHRODER:  I believe you did, Your Honor.

25          THE COURT:  Did I, Mr. Butler?

FORAN - DIRECT

1        MR. BUTLER:  Yes, sir, you did, Judge.

2        THE COURT:  All right, thank you.  And where are we?

3   You're conducting your direct examination, right?  I think --

4   is that where we were?

5        MR. SCHRODER:  I just want to make sure we have all the

6   rulings on the --

7        THE COURT:  Well, I think I --

8        MR. SCHRODER:  -- our -- as far as we know.

9        THE COURT:  If you have any question, let me know.

10        MR. SCHRODER:  I'm ready, Your Honor.

11        THE COURT:  Well, go ahead.

12        MR. SCHRODER:  So --

13   BY MR. SCHRODER:

14   Q    Now, where we left off, what I want you to do is explain

15   some of the specific things you mentioned.  Scales, how are

16   scales consistent with a drug distribution operation?

17   A    A person selling narcotics needs to weigh out the amount

18   they're selling.  Their customers expect a certain weight for

19   a certain price.  Most -- almost all drug traffickers I've come

20   across with either have one nearby -- I mean, have one right

21   there or have one nearby they have access to, to weigh the

22   amount of drugs they're receiving, to make sure it's an

23   accurate weight.  Also, if you're putting a dilutant in it, a

24   cut in there, you need to know how much cut you're going to do

25   to how much cocaine.  So if you want to turn one ounce into two

FORAN - DIRECT

1  ounces, you're going to have to weigh out an ounce of the cut

2  to go with an ounce of the powder, to make two ounces of the

3  distribution amount of cocaine.

4  Q    And I believe you talked about packaging materials

5  already.  So how about a currency counter?  How is that

6  consistent?

7  A    Currency counter is convenient to have when you're dealing

8  with large sums of money.  I know when we -- the reason I had a

9  bank count it is because of my experience counting large sums

10  of currency.  I'll count it, have somebody else count it,

11  somebody -- a third person counts it to get a good count, and

12  usually two or three of us have different numbers.  We end up

13  going through it four, five, six times.  A currency counter --

14  which, again, takes time.  Currency counter just flips through

15  thirty, forty, fifty thousand dollars in a matter of seconds.

16  And it gets a count; you run it through twice so you get the

17  same number; you got the -- the right amount of cash.  I mean,

18  that -- that's the number we go with.  I mean, I took it to a

19  bank to have it counted, because I don't have access to -- I

20  don't have a currency counter in my office.

21       Also, with the counterfeit-detection system, drug dealers,

22  like everybody else, they're concerned about getting

23  counterfeit currency in exchange for their drugs.  So by having

24  a counterfeit detector with the currency counter, it prevents

25  him from passing on counterfeit bills -- or I shouldn't say --

FORAN - DIRECT

1  it -- it prevents a drug trafficker from passing on counterfeit

2  bills if they're -- were to be trying to buy something or

3  depositing money in a bank somewhere, because they don't want

4  undue attention to themselves.  If they accidentally accepted a

5  counterfeit bill, they would have -- draw attention to

6  themselves from law enforcement to try to deposit it, because

7  the banks make police reports.  And you might be an innocent

8  victim of receiving a counterfeit bill, but you -- you still

9  get police attention, and a drug trafficker would not want that

10 attention.

11 Q    Was the amount of drugs you saw or found and seized in the

12 residence that day consistent with a personal use amount?

13 A    No, it is not.

14 Q    Why?

15 A    Personal use amounts of cocaine range in the quantities of

16 a tenth of a gram or less, as far as a snort or a -- smoking a

17 rock of cocaine.  That would be a personal use, individual use

18 amount.  You might have a gram or an eightball lasting somebody

19 a couple days or a day, couple days or weeks sometimes,

20 depending on what their addiction is.  But to have over 600

21 grams of cocaine is far beyond -- that -- that -- that would

22 kill you many times over.

23 Q    I've got a couple more questions.  We've asked a -- some

24 questions about your experience, but there's one particular

25 area I want to focus on now as we end.  You talked about how

FORAN - DIRECT

1  many investigations of drug distribution operations you

2  participated in.  How many of those did you -- were there

3  weapons involved?

4  A    A majority.  There were evidence -- evidence of weapons

5  involved.  There might not have been a gun seized during a

6  specific search warrant.  There might --

7          MR. BUTLER:  Objection as to foundation on that

8  question.

9          THE COURT:  You want more specific -- more foundation?

10 Is that what you're asking for?

11         MR. BUTLER:  Yes, Judge.  May we approach?

12         THE COURT:  All right.

13     (Bench conference as follows:)

14         THE COURT:  Yes.

15         MR. BUTLER:  Judge, the problem with this kind of

16 testimony is we don't have any statistical data for cross-

17 examination purposes, no report other than for him to be able

18 to come in here and say, "Yeah, I find a -- most or a lot of

19 the cases that I have been in on involve guns."  The problem

20 is, from the defense standpoint, we are giving this expert an

21 opportunity to make this kind of statement without the ability

22 to really cross-examine him on it.  And that is a problem

23 (indiscernible).

24         THE COURT:  So what would you -- how would you suggest

25 he ask the question?

1          MR. BUTLER:  Well, I suggest that he not be allowed to

2    answer that kind of question because it's to -- because it's a

3    law enforcement officer working for law enforcement with no

4    statistical data, just plain, "Yeah, most of the operations I

5    find."  We have no way of cross-examining him, no way to

6    confront the witness on the truth or veracity of his statement.

7    And the fact that they make these statements are -- in fact, I

8    think in a lot of trials, the defense lawyers don't even object

9    to this coming in.

10          THE COURT:  They don't.

11          MR. BUTLER:  And I think they should.

12          THE COURT:  But it's based on --

13          MR. BUTLER:  To --

14          THE COURT:  -- knowledge and experience, as opposed to

15    testing that can be redone, as you're suggesting.

16          MR. BUTLER:  Well, then the thing is, is that -- is it

17    really something that the jury needs to hear for them to make

18    their decision.  Is it really something that an expert, for

19    example, or even a law enforcement officer, needs to convey to

20    the jury for the jury to make this decision, as to some kind of

21    issue here that in order for them to understand it or -- they

22    have to be enlightened by --

23          THE COURT:  Well, the case law suggests that the

24    government is entitled to inform the jury of the culture

25    associated with that and that if guns are customarily found in

1   a situation where drugs are sold, customarily, looking at the

2   case law in the Ninth Circuit, they're allowed to ask those

3   questions.  Now, I personally would prefer they were leading

4   questions, just so we could avoid any surprises, but that's

5   just my -- I don't know if you can do that and satisfy Mr.

6   Butler.  But I don't --

7            MR. BUTLER:  Well, I --

8            THE COURT:  -- want any more surprises.

9            MR. BUTLER:  That's -- that -- I'm with you on that.

10           THE COURT:  I don't know if you can do leading

11   questions.  Isn't --

12           MR. SCHRODER:  I mean, I -- I've only -- the question I

13   just asked, and I have one other of foundational, just to tie

14   back into --

15           THE COURT:  I understand.

16           MR. SCHRODER:  -- you know, how -- and then the two

17   questions --

18           THE COURT:  This is pretty close to general knowledge,

19   but it -- maybe it is for me because I'm in this profession.

20   But I don't know how it is for the schoolteacher or the miner

21   or whatever, if they understand this.  But I think that the

22   government is entitled to at least put -- express what the

23   officer's experience has shown in this regard without, again,

24   getting to the ultimate issue or overemphasizing a point.  And

25   I wish it could be done with a leading question.  Then we can

1  find out right now what the question is and we can all know

2  what the answer is, probably.

3          MR. SCHRODER:  Well, I could ask, you know, drug

4  distribution organizations use firearms to protect drugs and

5  proceeds of drugs.

6          THE COURT:  Yes or to -- yes or no, what do you say

7  about that?  How would you phrase that question, so you

8  don't --

9          MR. BUTLER:  Well, I think that that'd be the same

10 thing that the Court said you can't go to the ultimate issue.

11         THE COURT:  The ultimate issue is whether or not this

12 particular defendant utilized these weapons in order to commit

13 this crime.

14         MR. BUTLER:  Okay.  Well, I guess --

15         THE COURT:  Not that --

16         MR. BUTLER:  -- that's the way to ask it then.  But I

17 can't think of any (indiscernible) --

18         THE COURT:  Okay.

19         MR. SCHRODER:  And then I -- and I have a second

20 question, and I can ask it leading, you know, isn't it true

21 that drug distribution operations can use guns to serve a

22 deterrent purpose.

23         THE COURT:  Of course, anybody can use guns to -- for a

24 deterrent purpose.  Well, that would be cross-examination, I

25 guess, but --

1          MR. BUTLER:  Yes.

2          THE COURT:  And it's probably true that people have

3  drug operations without guns.  But I think, just in looking at

4  the case law in the Ninth Circuit, I mean, I would be changing

5  a law to say you couldn't do this.

6          MR. SCHRODER:  Right.

7          THE COURT:  So I won't change law.  Okay.

8          MR. SCHRODER:  So you want me to not ask the other --

9          THE COURT:  I would rather --

10          MR. SCHRODER:  -- background question.  Just get to

11  the --

12          THE COURT:  Yeah, why don't you --

13          MR. SCHRODER:  -- few final questions and be done.

14          THE COURT:  Yeah.  He's got --

15          MR. SCHRODER:  Okay.

16          THE COURT:  -- plenty of background.

17          MR. SCHRODER:  Right.  Well, I just hadn't asked

18  (indiscernible) --

19          THE COURT:  Okay, yeah.

20          MR. SCHRODER:  -- weapons before.

21          THE COURT:  Well, I -- I'm satisfied based on his years

22  of experience --

23          MR. SCHRODER:  Okay.

24          THE COURT:  -- in this area he knows the answer to this

25  question.

FORAN - DIRECT/CROSS

1          MR. SCHRODER:  I'll ask him the two final questions.

2          THE COURT:  And lead him.

3          MR. SCHRODER:  And lead him.  So --

4          THE COURT:  Okay.  All right.

5          MR. BUTLER:  I thought it was leading (indiscernible).

6      (End of bench conference)

7          THE COURT:  Isn't that the fun part, when we're all

8  back talking here, and you're just looking at each other or

9  looking at the wall?  That's the funnest part of this whole

10  thing.  Okay, Mr. Schroder.

11  BY MR. SCHRODER:

12  Q    Okay, Special Agent Foran, we're just going to have two

13  final questions.  Isn't it true that drug distribution

14  operations use guns to protect drugs and drug proceeds?

15  A    Frequently.  Not every time.

16  Q    And isn't it also true that drug distribution operations

17  can use guns to serve a deterrent purpose?

18  A    Absolutely.

19          MR. SCHRODER:  No further questions, Your Honor.

20          THE COURT:  All right, thank you.  Mr. Butler.

21          MR. BUTLER:  Thank you, Judge.

22                          CROSS-EXAMINATION

23  BY MR. BUTLER:

24  Q    Good morning, Mr. Foran.

25  A    Good morning, sir.

FORAN - CROSS

1  Q    You assisted in executing the search warrant at Mr.

2  Colette's home.  Is that right, sir?

3  A    Yes, sir.

4  Q    And you had a chance, I guess, to see the -- I think you

5  described it as a submachine gun?

6  A    Yes, sir.

7  Q    Okay.  And the magazine?

8  A    Yes, sir.

9  Q    Right?  Which had no bullets in it, isn't that right?

10  A    I did not note it.  I don't recall seeing bullets there.

11  Q    Okay.  In fact, you don't even recall seeing bullets for

12  that firearm in that safe anywhere?  Do you recall -- you don't

13  recall that at all, do you?

14  A    I didn't collect any bullets from that gun, sir, no.

15  Q    Did you handle the firearm at all?

16  A    Not at the time, sir.

17  Q    Have you ever handled it?

18  A    Yes, I have.

19  Q    Okay.  And when you went in there, the safe was opened by

20  a locksmith.  That's correct, sir?

21  A    That is correct.

22  Q    Now, you've been qualified as an expert because you're

23  with DEA.  Isn't that correct?

24  A    I believe it's based on my overall background, including

25  my time with the Drug Enforcement Administration.

FORAN - CROSS

1  Q   Okay.  And you're here because you're with the DEA, isn't

2  that right, sir?

3  A   That is correct.

4  Q   Okay.  Now, you've been sitting here, haven't you, in the

5  trial?

6  A   Yes, sir.

7  Q   And you heard Mr. Johnson specifically say, "Oh, I

8  remember that currency counter"?

9  A   I do.

10  Q   And would you agree that he seemed to be quite happy with

11  himself about the currency counter?

12  A   He seemed more upbeat at that point than other times when

13  he was testifying.

14  Q   Almost as though he recognized something that belongs to

15  him, wouldn't you say?

16  A   No, I wouldn't say that at all.

17  Q   Now, you testified about money launderers, didn't you?

18  A   Some testimony about it, yes.

19  Q   Some money launderers will buy and sell automobiles, don't

20  they?

21  A   Yeah, commonly.

22  Q   And you sat here through the testimony of Mr. Johnson

23  about the number of vehicles that he's had, right?

24  A   I heard you ask him questions, yes.

25  Q   Well, you heard him confirm it, right?

FORAN - CROSS

1  A    Some of the vehicles he said he owned.  Some of the

2  vehicles you asked about, he did not own.

3  Q    Well, some -- only -- the only one he said he didn't own

4  was the Trans Am, remember?

5  A    I -- that -- I'll take your word for it.  I don't recall

6  specifically what he didn't own, but I remember that came up.

7  Q    And how do money launderers launder money with vehicles?

8  Tell the jury.

9  A    One technique is to -- to launder money is, you need to

10 turn your ill-gotten gains into a legitimate thing that you can

11 use.  So you need to try to -- try to show a source for it,

12 whether it's a business that you run or whether it's a home

13 operation.  A money launderer could buy a car and then sell the

14 car, even for the same price, and claim -- you get -- every --

15 the IRS is watching everything.  And then claim on the sale

16 that he bought the car for a lesser amount and sold it for a

17 greater amount, thereby creating the impression that this

18 person made so many dollars from selling this car, to justify

19 if they're ever -- and -- I'm trying to think -- audited by the

20 IRS, they could show where this money came from.  It -- it's --

21 it's -- it's kind of a shell game.  It's just making the money

22 appear legitimate when it really came from another source.

23 Q    Drug dealers maintain various locations.  You said that,

24 didn't, you --

25 A    They can.

FORAN - CROSS

```
 1   Q    -- this morning?

 2   A    They can maintain various locations.

 3   Q    Okay, can.  And you've been involved in this case long

 4   enough to know that there were two locations associated with

 5   Mr. Johnson, weren't there?

 6   A    There were two case -- two locations reported to be

 7   associated with him, yes.

 8   Q    And normally when you -- you testified that in many of

 9   your investigations that drug dealers have guns.  Is that

10   right?

11   A    Yeah, many drug dealers carry firearms, yes.  Or have

12   read --

13   Q    Some don't, of course --

14   A    Some don't, of course, but many have read -- readily --

15   readily accessible firearms.  They might not be on their person

16   but they might be nearby.

17   Q    So like in bedrooms?

18   A    Any -- anywhere near where a person spends time.

19   Q    Okay.  Sometimes scattered about a house?

20   A    Sometimes.

21   Q    Right.

22   A    Sometimes, yes.

23   Q    That's your experience, right?

24   A    Absolutely.

25   Q    Okay.  And of course -- were you involved in the search of
```

FORAN - CROSS

1  Mr. Johnson's home when they found guns?

2  A    I was.

3  Q    In Mr. Johnson's home?

4  A    Yes, sir, I was there.

5  Q    Okay.  And so you know that there were what, at least

6  three weapons found in various locations?

7  A    To my recollections, there was a handgun found I believe

8  above the TV, on a TV stand or something in the master bedroom.

9  There was two rifles -- the master bedroom is on the main floor

10 of the house.  I believe there was two rifles.  I was told they

11 came from a closet, a downstairs room.  I don't know

12 specifically where they came from.

13 Q    An SKS was one of them, wasn't it?

14 A    I don't recall.  There were two rifles in the closet.  I

15 don't recall even look -- even looking at them for more than

16 probably a minute or two.

17 Q    Now, the drugs in this case, you had sent to where, to

18 Washington, D.C., or --

19 A    No, sir.

20 Q    Where?

21 A    San -- San Francisco, the western -- the -- the DEA

22 Western Regional Laboratory.

23 Q    Okay, San Francisco.  And what they do there is they can

24 actually tell you how much cocaine you have, roughly, and how

25 much cut you have, roughly, isn't that right?

1  A    They can give us -- they give us an -- pretty much a

2  scientific amount of the pure -- overall weight and the amount

3  of the pure drug.  So the difference would be a -- an -- an

4  adulterant of -- of some form.

5  Q    Okay.  And then -- now, in this case, in this search of

6  Mr. Colette's home, you didn't find any inositol or any other

7  cutting agent, did you?

8  A    I didn't find any.  I'm -- I'm not aware of any being

9  found or -- or not found, for that matter.

10 Q    But of course, there was some found at Mr. Johnson's home.

11 Right, sir?

12 A    I believe there was some there, yes.

13 Q    And in this case, the cocaine hydrochloride -- what is

14 cocaine hydrochloride?

15 A    That'd be a cocaine salt, a cocaine powder, as -- as

16 opposed to cocaine base, which would be crack cocaine.

17 Q    Okay.  And this was like the cocaine hydrochloride which

18 was admitted in the courtroom?

19 A    That's correct.  It's the cocaine --

20 Q    That's --

21 A    -- powder or cocaine salt, correct.

22 Q    Okay.  And 58 percent purity on the large corpus -- the

23 larger, I should say.

24 A    Correct.  The -- the -- the --

25 Q    Okay.

FORAN - CROSS

1  A    -- the -- the first of the drug exhibits.

2  Q    58 percent purity.  What does that mean?

3  A    That means of the amount of cocaine that was in the bag,

4  58 percent of it would be 100 percent pure cocaine.

5  Q    Okay.  And the other 42 percent would be?

6  A    Non -- not cocaine.

7  Q    Were you able to determine whether that 42 percent was

8  inostitol?

9  A    I wasn't able to, no.

10 Q    Okay.  Then Exhibit, I guess, 12, cocaine hydrochloride,

11 24.3 gram -- now the other one was 634.6 grams.  My colleague

12 will correct me if I'm wrong on that.

13          MR. SCHRODER:  (Indiscernible).

14          MR. BUTLER:  Okay.  Now --

15          THE WITNESS:  I'll take your word for it.  You're

16 looking at the papers.

17 BY MR. BUTLER:

18 Q    All right.  When -- and he'll -- okay.  Exhibit Number 12,

19 24.3 grams, 68 percent purity.  So 32 percent other.  Right?

20 A    That would be the difference, correct.

21 Q    And you've already explained to the jury what a cutting

22 agent is, right?

23 A    What a -- yes, what a cut -- correct.

24 Q    And inostitol is a common cutting agent, isn't it?

25 A    It's the most common cutting agent here in Fairbanks for

FORAN - CROSS

```
 1  cocaine.
 2  Q   And you found two bottles of it at Mr. Johnson's house,
 3  didn't you?
 4  A   I don't recall finding any there.
 5  Q   Okay.  Well, he testified that he had it here.
 6  A   Exactly.  I --
 7  Q   You recall it --
 8  A   -- yes, I --
 9  Q   -- okay.
10  A   -- I won't -- I won't disagree that there was some
11  inositol there.  I think he said he had a bottle, you said he
12  had two.  But obviously there was some there.
13  Q   How do you say it?
14  A   I call it inostitol.
15  Q   Okay.
16  A   There's an O in it.
17  Q   Okay.  Inostitol.  That's what I'm calling it.  2.9 grams
18  in the smaller amount, 2.9 grams, 36 percent pure.  So that's
19  what, 64 percent other?
20  A   Correct.
21  Q   So that's a heavier cut?
22  A   That would be stepped on or cut to a lower level, yes.
23  Q   Now, when you as a DEA agent see cocaine that appears to
24  come from the brick, what does that mean?  Tell the jury what a
25  brick is first.
```

FORAN - CROSS

1   A    A brick would be a terminology for a kilogram of cocaine.

2   Most cocaine coming out of South America, up through Mexico,

3   however it's coming in here, is usually packaged -- commonly

4   packaged in a kilogram package referred to as a brick.  I've

5   seen -- the most common shape for a brick is a flat rectangle.

6   I'll hold it up -- my hands, like this big, and I don't know

7   how many inches it is, but I've handled a few.  And they're

8   about this long, this wide, and about this thick.  They weigh

9   approximately 2.2 pounds without the packaging, which would be

10  the kilogram weight.

11  Q    So that would be similar to the shape, at least, of a

12  brick you'd build a house with, but just larger?

13  A    Not really.  I mean, the -- the dimensions are all

14  different.  But -- so I -- I won't --

15  Q    Okay.

16  A    -- I won't -- I won't compare it to a house brick, no.

17  Q    But rectangular in shape?

18  A    Rectangular and flatter than a house brick, correct.

19  And.....

20  Q    Flatter?

21  A    Flatter than a house brick and usually wider.

22  Q    Oh, okay, you mean narrow --

23  A    Narrow -- yeah, exactly.

24  Q    Oh.  Oh --

25  A    A house --

FORAN - CROSS

1   Q    -- okay.

2   A    -- brick would be this tall.  Kilo brick is this tall.

3   And, I mean, it's a -- it's -- it's really -- it's a bad

4   comparison to a house brick.

5   Q    Okay.  So the cocaine that has been admitted in this

6   courtroom has been cut, hasn't it, all of it?

7   A    All of it -- to -- to -- it appears to have been cut based

8   on the laboratory analysis.

9   Q    And you're not questioning the laboratory analysis.  I

10  mean, it's your lab, right?

11  A    No.  Exactly, no.  It -- it -- it -- it appears -- based

12  on the laboratory analysis, everything appears to have been cut

13  at one point in the stage.

14  Q    Now, those sandwich bags that you found in Mr. Colette's

15  house, they were in the kitchen, right?

16  A    Correct.

17  Q    And you know children lived there, right?

18  A    I believe two kids lived there, yes.

19  Q    Okay.  And they're sandwich bags?

20  A    Yeah.  I believe over 600 sandwich bags, correct.

21  Q    So make sandwiches, whatever.  Or other foods can go in

22  those bags, right, especially Ziploc ones?

23  A    Yeah.  I use them all the time at my house.

24  Q    Do you have the ability to find fingerprints?

25  A    Do I?  Yeah, I've -- I've been -- I've been trained in

FORAN - CROSS

1    fingerprint recovery.

2    Q    And when I ask do you, I mean you have a -- you have

3    access to a lab and things.  You can order fingerprints, right?

4    A    I can request fingerprints out of things we process for

5    fingerprints.

6    Q    Okay.  And you could find fingerprints on plastic bags,

7    right?

8    A    I've been trained on how to find fingerprints on plastic

9    bags.  I believe our laboratory can find -- has some limited

10    success with fingerprints on plastic bags.

11    Q    Playing cards, you can find a fingerprint on sometimes,

12    right?

13    A    Sometimes.

14    Q    I mean, you can actually find a fingerprint -- your

15    operation is sophisticated enough to find fingerprints on a

16    dollar bill.  Isn't that right?

17    A    I've never known that to happen.

18    Q    You haven't?

19    A    No.  But I -- if you're telling me that they could find it

20    on a dollar bill, I'll take your word for it.  I -- I mean, I

21    know fingerprints can be found on paper.  A dollar bill is

22    paper.  So I -- I could -- I -- I -- I could assume they can.

23    I don't.....

24    Q    Okay.

25    A    .....I've never sent a dollar bill to the lab to have it

FORAN - CROSS

1  fingerprinted and I've never been -- firsthand experience with

2  that.  But if you --

3  Q    Okay.  But in all your experience, no one has ever told

4  you, we found fingerprints on a dollar bill?

5  A    I -- I don't recall.  I mean, I've --

6  Q    Okay.

7  A    I don't recall any specifically about a dollar bill,

8  correct.

9  Q    Uh-huh (affirmative).  But you know it could be found on

10 paper.  You can even find it on skin, can't you, flesh?

11 A    Yes.

12 Q    Now, my client's fingerprints weren't found on any of this

13 stuff, on any of the drugs, were they?

14 A    No one's finger --

15 Q    Or the scale?

16 A    No one's fingerprints were found on anything.

17 Q    When you say no one's fingerprints were found, you mean

18 not usable fingerprints, or no fingerprints at all?

19 A    Well, at the time of submission of the evidence, I put a

20 request in to have everything fingerprinted.  As of today, the

21 lab has not processed anything for fingerprints.  There's a

22 backlog.

23 Q    But fingerprints -- fingerprint analysis certainly could

24 help us in this case, couldn't it?

25 A    It -- it could help, yes.

FORAN - CROSS

1  Q    Now, when you talk about personal use of cocaine, .10 -- a

2  tenth of a gram or less, that's kind of a small amount, isn't

3  it?

4  A    That's the instruction I've been given, sir.  As far as

5  with my training and experience, in my training aspect they

6  said a usable amount of cocaine is approximately a tenth of a

7  gram.

8  Q    Is there any way we can show the jury what a tenth of a

9  gram is?

10 A    I have -- I --

11 Q    I mean, a line is bigger than a tenth of a gram, isn't it?

12 A    I don't know, sir.  I've never weighed out a tenth of a

13 gram.  I'm just going from my training.

14 Q    Okay.  So you go on basically what somebody has told you?

15 A    Instruction, yes, sir.

16 Q    All right.  But, now, you've seen -- well, sometimes

17 people's orientation are movies.  You see people put out a

18 line, a straw, they -- all of that?

19 A    I've seen movies, sir.  Yes, I've seen a lot of things in

20 movies which I know not to be true.

21 Q    Okay.  But you know that people sometimes snort a line?

22 A    I -- I -- I've seen that to be done, yes.

23 Q    All right.  And that line would be greater than a tenth of

24 a gram, wouldn't it?

25 A    Not to my knowledge.

1  Q   Do -- have you seen a tenth of a gram of cocaine?

2  A   Never weighed out independently, no, sir.

3  Q   Okay.  So it terms of what may be a line a couple inches

4  long with cocaine, snortable cocaine, you don't know whether

5  that's a gram or not.  Right?

6  A   A line could be -- I have no idea.  When you say a line, a

7  couple inches long, what's the width of it?  I mean, I -- we're

8  talking about dimensions here that I -- I'm not comfortable

9  answering your questions because I've never weighed a line of

10  cocaine.  I don't know.  Lines can vary from a fraction of an

11  inch to multiple inches long.  It's a very open-ended area.

12  Q   Now, in terms of the use of cocaine, certainly it depends

13  on how often a person uses and what their addiction is.  Isn't

14  that right?

15  A   Or their tolerance level, correct.

16  Q   But you said 600-and-some-odd grams, or what's in this

17  case, would kill a person, right?

18  A   From my -- from my information, yes, that'd be a lethal --

19  multiple lethal dose of cocaine, yes.

20  Q   But you wouldn't expect somebody to sit down and use that

21  much cocaine at one sitting, right?

22  A   No, like I said, it would kill a person multiple times

23  over, sir.

24  Q   Right.  So even if a person has an ounce in their house,

25  you wouldn't expect them to snort up a whole ounce at one time.

FORAN - CROSS

1  Right?

2  A    No, I think -- I -- I -- no, that would -- that would not

3  be what I consider personal use, no, sir.

4  Q    But that would -- but if a person bought an ounce for

5  themselves, you would expect that they'd be using it over a

6  period of time.  Right?

7  A    That's an open-ended speculation on your part, sir.  I --

8  I don't know what to tell you on that.

9  Q    Okay.  How long have you worked in Alaska, sir?

10  A    About four and a half years now.

11  Q    And I'll suspect that if you've been here four and a half

12  years in law enforcement, you know that lots of people have

13  guns up here --

14  A    Yes.

15  Q    -- in their home, right?

16  A    Yes.

17  Q    In fact, there are a lot of hunters and gun enthusiasts

18  here in Alaska, aren't there?

19  A    Yeah.  I'm one of them.

20  Q    How many guns do you own?

21  A    I don't know.  Seven.

22  Q    Roughly?

23  A    Seven, eight, nine.  I'd --

24  Q    Okay.

25  A    -- have to think about it.

1  Q    And you know that hunting is big up here, isn't it?

2  A    Yes, sir.

3  Q    And gun enthusiasts sometimes have all kinds of guns.

4  Right?

5  A    A gun enthusiast can have a variety of guns.

6  Q    Now, the -- this particular gun that you called a

7  submachine gun, that particular -- it takes a long time to get

8  that gun, doesn't it?

9  A    I don't know how long it takes, sir.  I couldn't -- you

10 could probably get one pretty quick, it might take a while; I

11 don't know.

12 Q    Well, you know that the federal government regulates those

13 guns pretty -- a lot more than they regulate a .38 or .44 Mag

14 or Desert Eagle.  Right?

15 A    I'm not an expert in that area, but I -- I believe so.

16 Q    Okay.

17         MR. BUTLER:  If I may have a moment, Judge --

18         THE COURT:  Yes, that's fine.

19         MR. BUTLER:  -- I might be finished.  (Pause) Pass the

20 witness, Judge.  Thank you.

21         THE COURT:  All right.  Mr. Schroder, any redirect?

22         MR. SCHRODER:  Think I just have one question, Your

23 Honor.

24         THE COURT:  All right.

25                         REDIRECT EXAMINATION

FORAN - REDIRECT

```
 1  BY MR. SCHRODER:
 2  Q    There was a bit -- there was a question about cutting of
 3  cocaine.  How many times in -- again, based on your training
 4  and experience, how many times in the process of when cocaine
 5  comes out of the source country to where it gets used can it be
 6  cut?
 7  A    Well, in --
 8           MR. BUTLER:  Objection.  Foundation.  I mean, it's a
 9  vague -- I'm sorry.  Foundation.
10           THE COURT:  I think a foundation in terms of
11  expertise -- I think that's been established.  You --
12  overruled.
13           MR. BUTLER:  It's 403 objection.
14           THE COURT:  Overruled.
15           THE WITNESS:  It varies.  It depends on where it comes
16  in.  The most pure cocaine I've come across, like coming off a
17  brick, is usually in the 80 percentile range.  So I've never
18  seen 100 percent pure cocaine.  It just comes in with --
19  I'll -- I'll call it natural adulterants to begin with, when
20  it's coming in the kilos from South America or wherever it's
21  being processed at.
22           It's common for each trafficker, once the kilogram or
23  the brick is opened, to step on it, cut it, put a dilutant in
24  there.  And at certain stages, sometimes it's repackaged,
25  recompressed into kilo shape.  So even a guy down the line, he
```

1  gets what looks like a kilo brick, you can't even be sure that

2  that hasn't been stepped on once already.  Most people will

3  step on it -- hopefully they know -- I'll use the term "step on

4  it" instead of cutting it --

5          MR. BUTLER:  Objection.  His answer's long and

6  narrative, goes beyond the question, Judge.

7          THE COURT:  Sustained.

8  BY MR. SCHRODER:

9  Q    How many times in the process in your experience can it be

10  cut?

11  A    An infinite amount of times.

12          MR. BUTLER:  Objection.  That's impossible for the

13  witness to know.

14          THE COURT:  How many -- that -- you -- your objection

15  is probably well taken, how many times can you do it; as much

16  as you want, I suppose, huh.

17  BY MR. SCHRODER:

18  Q    Can it be cut multiple times?

19  A    Absolutely.

20          MR. SCHRODER:  No further questions, Your Honor.

21          THE COURT:  Mr. Butler?

22          MR. BUTLER:  No questions.  Thank you, Judge.

23          THE COURT:  All right.  Thank you, sir, you're excused.

24  The government's next witness.

25          MR. SCHRODER:  Your Honor, the -- at this point, we've

1  talked a little bit about the cocaine and its composition and

2  weight.  What I'd like to do now is read in the -- from the

3  stipulation --

4          THE COURT:  Okay.

5          MR. SCHRODER:  -- the information we stipulated to on

6  the cocaine.

7          THE COURT:  Okay, this -- rather than call a witness,

8  the parties have stipulated that if a witness were to be

9  called, that they would testify as Mr. Schroder is now going to

10  indicate.

11          MR. SCHRODER:  Plaintiff Exhibit Number 10 is cocaine

12  hydrochloride, net weight of 634.6 grams.

13          THE COURT:  And just as I understand it, this will be

14  an exhibit as well, the stipulation?  And --

15          MR. SCHRODER:  We're going to do it as a -- read it

16  into the record and have you --

17          THE COURT:  Okay, so in other words, they don't have

18  to --

19          MR. SCHRODER:  -- do it as a --

20          THE COURT:  -- write everything down you say, because

21  it's going to --

22          MR. SCHRODER:  Right.  It'll be a jury instruction.

23          THE COURT:  They can write if they want, but they'll

24  have this information, okay.

25          MR. SCHRODER:  Correct, Your Honor.  Yeah.  So Exhibit

COHOON - DIRECT

1  Number 10, cocaine hydrochloride, net weight of 634.6 grams of

2  58 percent purity.  Plaintiff Exhibit 12 is cocaine

3  hydrochloride, net weight of 24.3 grams of 68 percent purity.

4  And Plaintiff Exhibit 14 is cocaine hydrochloride, net weight

5  2.9 grams of 36 percent purity.

6            THE COURT:  Okay.

7            MR. SCHRODER:  Your Honor, the government calls Special

8  Agent Eric Cohoon.

9            THE COURT:  All right.  Sir, you've seen how we do

10 this.  Just get to the chair, my clerk will swear you in.

11            **ERIC COHOON, PLAINTIFF'S WITNESS, SWORN**

12            THE CLERK:  Please have a seat.  And, sir, for the

13 record, if you could state your name, spelling your last name,

14 and give your address, please.

15            THE WITNESS:  Eric Cohoon.  C-o-h-o-o-n.  2210 Flight

16 Street, North Pole.

17            THE CLERK:  And can you verify the spelling of your

18 first name, please?

19            THE WITNESS:  E-r-i-c.

20            THE CLERK:  Thank you.

21            THE COURT:  All right.  Mr. Schroder.

22            **DIRECT EXAMINATION**

23 BY MR. SCHRODER:

24 Q    Special Agent Cohoon, who do you work for?

25 A    I'm a special agent with the Federal Bureau of Alcohol,

*A & T TRANSCRIPTS*
*(817) 685-7556*

COHOON - DIRECT

1  Tobacco, and Firearms, and Explosives.

2  Q    And how long have you been assigned -- or how long have

3  you been an ATF agent?

4  A    I've been a ATF agent for about six years.

5  Q    And where have you been assigned as an ATF agent?

6  A    My first five years, I was assigned to the Biloxi,

7  Mississippi field office.  And for about a year I've been here

8  in Fairbanks.

9  Q    And do you have previous law enforcement experience?

10  A    Yes, sir.  In 1987, I joined the Air Force and was a

11  military policeman for about four years, then I worked as a

12  narcotics investigator with the Air Force Office of Special

13  Investigations.  I worked for the Federal Bureau of Prisons for

14  six years.  During that time I was a senior correctional

15  officer and a special investigative support technician.  Then I

16  was hired with ATF.  I'm also currently in the Air Force

17  Reserve as a special agent with the Office of Special

18  Investigations.

19  Q    So how many total years of law enforcement experience do

20  you have?

21  A    About 19.

22  Q    Okay.  As an ATF agent, is your work primarily related to

23  weapons investigation?

24  A    Yes, sir.

25  Q    Okay.  Now, is there a crossover there to narcotics

COHOON - DIRECT

1   investigations?

2   A    Yes, sir.  Many times a -- a firearms investigation will

3   lead to narcotics or a narcotics investigation will lead to

4   firearms.

5   Q    Now, where -- about your previous law enforcement

6   experience, I think you mentioned, were there drug

7   investigation, was that part of your work in --

8   A    Yes.

9   Q    -- those assignments as well?

10  A    When I was with the Air Force, I had four years as a --

11  a -- strictly as a narcotics investigation officer.  And --

12  Q    And have you received training as a law enforcement

13  officer?

14  A    Yes, sir.  I -- I attended the military police academy to

15  be a military police officer in the Air Force.  I attended the

16  special agents academy and the advanced special agent academy

17  for the Office of Special Investigation, and also I've attended

18  the ATF academy.

19  Q    Do you know the defendant, Jason Colette?

20  A    Yes, I do.

21  Q    And were you involved in serving a search warrant on the

22  defendant's residence?

23  A    Yes, I was.

24  Q    When was that?

25  A    On November 28th of '05.

2-110

1  Q    And what was your role in executing the search warrant?

2  A    The actual execution and securing of the residence was

3  done by the Fairbanks tactical team.  I went in and assisted

4  with the search once the residence had been secured.

5  Q    Okay.  And did you find evidence that was consistent with

6  what you sought in the search warrant?

7  A    Yes, we did, eventually, after -- we had to have a safe

8  opened that was locked inside the bedroom.

9  Q    And in -- what part of the residence was that?

10 A    In the bedroom.

11 Q    Okay.  And you talked about the safe.  Was the safe

12 locked?

13 A    Yes, sir, it was.

14 Q    And how was it opened?

15 A    A locksmith was called in from Fairbanks here to -- to

16 drill it open.

17 Q    And when you opened the safe, what did you find?

18 A    Inside the -- the safe was 14 firearms, which were made up

19 of eight shotguns, four rifles, a handgun, and a machine gun.

20 Q    Did you see anything else in the safe besides the guns?

21 A    Yes.  There was a -- a quantity of prepackaged cocaine in

22 small egg type plastic wrap, in a Safeway or Wal-Mart type

23 grocery bag.  There was a Tupperware container with an amount

24 of cash and some more cocaine in there.  There was also a -- a

25 small bag of marijuana, ammunition, and Mr. Colette's ATF Form

COHOON - DIRECT

1  7s, which is his registration for the machine gun and silencer.

2  A silencer was also found --

3  Q    Okay.  I was --

4  A    -- affixed to the machine gun.

5  Q    I was going to ask you that.  So it was affixed to the

6  machine gun at the time you found it?

7  A    Yes, sir, it was.

8  Q    Where was that located in the safe?

9  A    It was located in the top portion of the -- of the safe.

10  Q    Was the gun loaded when you found it?

11  A    No, sir, it was not.

12  Q    Did it have a magazine?

13  A    Yes, it did.

14  Q    And where was the magazine?

15  A    That type pistol, the magazine feeds up through the pistol

16  grip, so it was inserted into the lower part of the gun.

17  Q    Did you find any ammunition --

18  A    Yes.

19  Q    -- for that weapon?

20  A    No, not for the machine gun.  There was no ammunition in

21  the safe for that.

22  Q    But when you saw the machine gun, could you tell whether

23  it was loaded or not?

24  A    No, sir.  You -- you can't tell if a gun -- I mean, some

25  guns you probably can.  But that particular model, you can't

COHOON - DIRECT

1    tell if it's loaded or not just by looking at it.  And as a

2    matter of safety, you treat them all as if they're loaded

3    anyway, but that gun in fact did not have any ammunition in the

4    magazine.

5    Q    Were there other weapons in the safe, though, other

6    firearms that had -- that were loaded or had readily accessible

7    ammunition?

8    A    Yes, sir.  There was a total of three firearms that

9    were -- two were actually physically loaded.  One of the

10   weapons had a -- a magazine with ammunition within two inches

11   of the -- the rifle.

12   Q    Okay.  And so what were those weapons?

13   A    One was a -- a Mossberg Model 500-A 12-gauge shotgun.

14   It's a pump-action.  And it was loaded with four rounds of

15   buckshot.

16   Q    And was that a normally-configured shotgun?

17   A    The Mossbergs come in several different varieties.  This

18   one was -- had a pistol grip attached to the -- the rear, where

19   the shoulder stock would be.  Completely legal, but it does

20   make it a smaller weapon, not -- designed to be fired at that

21   point from the hand rather than the shoulder.  The gun was

22   loaded with a -- a -- a round in the chamber and three I

23   believe in the magazine, total of four rounds.

24   Q    So -- and what was the next weapon you found that was

25   loaded?