COHOON  -  DIRECT

1    A    There was a Remington Model 740 .30-06 rifle, which was

2    also loaded with five rounds of ammunition in the magazine and

3    one in the chamber.

4    Q    Okay.  And you said there was one other?

5    A    Yes.  There was a -- a Colt Sporter, which is a variation

6    of a -- the M-16, which is a -- a military weapon.  This is a

7    semi-automatic rifle, completely legal for -- for personal use,

8    its configuration very similar to the M-16.  But this rifle was

9    a -- a kind of an SKS -- it shot an SKS type round.  It is a

10   7.62-by-.39 caliber.  That's really the only difference between

11   it and a -- a semi-automatic -- what they call a AR-15, which

12   shoots a .223 caliber, which is just a different caliber gun.

13   And there was a magazine loaded for it with five rounds of

14   ammunition laying right besides the -- the magazine -- right

15   beside the rifle.

16   Q    These specific firearms that you mentioned, where were

17   they located in the safe in relation to the other firearms?

18   A    As you open the door of the -- the safe, there was a -- a

19   pump-action .410 rifle laying up kind of vertical, across the

20   front.  Those loaded guns were in the front of the stack of 14

21   guns, of the -- not including the pistol up top.  So they were

22   in the front of the safe.

23   Q    Okay.  And one question I forgot to ask you about the

24   Colt.  You said that the magazine was out of it.

25   A    Yes.

COHOON - DIRECT

1  Q    What does it take to load that weapon and make it ready to

2  fire?

3  A    It -- it would just -- it would take seconds to insert

4  that magazine and -- and chamber a round.

5  Q    Okay, let's talk for a moment about the -- again about the

6  machine gun and silencer first.  What did you do with those at

7  the scene?

8  A    All the -- the weapons were removed from the -- from the

9  safe and seized by myself.

10  Q    Okay.  And where did you take them when you left the

11  scene?

12  A    They were taken to my office here in the Federal Building.

13  Q    Okay.  And where are they stored there?

14  A    They're -- they're stored in -- I have a facility for the

15  storage of evidence, firearms.

16  Q    Does anybody else have access to that area?

17  A    Just myself, for the access for the actual guns.

18  Q    Okay.  And for the machine gun, has it been there the

19  entire time?

20  A    No, sir.  Machine gun was sent to our firearms technology

21  branch in West Virginia on July the 14th.  I received it back

22  on the 25th.  It was sent there for testing.  The machine gun

23  and the silencer were analyzed by a firearms examiner just for

24  a -- a definite clarification on what they were.

25  Q    And are those tagged and labeled in some way to track

COHOON - DIRECT

1  them?

2  A    Yes, sir.  I -- I tagged them with our ATF case number, I

3  sign it, and the description of the firearm, the serial

4  numbers, quantity of ammunition, each thing is marked

5  separately, tagged and signed by me.

6  Q    And when you received the machine gun and silencer back

7  from the ATF lab, were you able to identify it as the one that

8  you'd shipped out?

9  A    Yeah -- yes, it was.  The lab technician signed for it

10  there and I signed for it back when I got it -- received it

11  here.

12  Q    And where did you put the machine gun and silencer when

13  they were returned to you?

14  A    They were placed back into my evidence vault.

15  Q    Okay.  Now I'm about to hand you some firearms to

16  identify.  But before, just so everybody understands, have

17  those firearms been rendered safe?

18  A    I've been -- I've -- I've rendered them safe.  They've

19  been inspected by the Marshal Service so they are in fact no

20  ammunition with them.  But they will be handled in the most

21  safe manner.

22      (Side conversation)

23          MR. SCHRODER:  May I approach, Your Honor?

24          THE COURT:  Yes.

25  BY MR. SCHRODER:

1    Q    Now, the -- I've handed you what has been marked as

2    Government Exhibit 20 -- actually there are two, 20 and 21.

3    Can you identify that exhibit?

4    A    Yes, sir.  Exhibit 20 is a Military Armament Corporation,

5    a MAC-10 submachine gun seized from Mr. Colette's residence.

6    Q    Okay.  And how are you able to identify those?

7    A    I identify it by my case number, my signature, and the

8    serial numbers corresponding to the evidence tag and the weapon

9    itself.

10   Q    And can you identify 21 as well?

11   A    21 is a Bowers silencer, also seized from Mr. Colette's

12   residence.  I can recognize it by serial number and my

13   signature affixed to the evidence tag.

14   Q    And have those items been in the care, custody, and

15   control of the Bureau of Alcohol, Tobacco, and Firearms, and

16   Explosives since they were seized by you on November 28th?

17   A    No, they have not.  They were signed out to the lab for

18   analysis and received there on 7/18 --

19   Q    But the --

20   A    -- yes.

21   Q    The lab is part of ATF?

22   A    Yes, yes.  And it is currently in -- you know, the U.S.

23   Attorney's.  I signed it over for you guys, for presentation

24   today.

25            MR. SCHRODER:  Your Honor, the government offers

1  Exhibits 20 and 21 for admission.

2        MR. BUTLER:  No objection, Your Honor.

3        THE COURT:  20 and 21 will be received, without

4  objection.

5     (Plaintiff's Exhibits 20 and 21 admitted)

6  BY MR. SCHRODER:

7  Q   Now, what is the -- just to give the information to the

8  jury, what is the model of that weapon?

9  A   This is a Ingram Model M-10 -- referred to as a MAC-10.

10  It's made by the Military Armament Corporation.  It's called a

11  Ingram.  It's developed I guess around 1970 by the owner,

12  Gordon Ingram.  That's the -- he's the owner of the MAC

13  Corporation.  And this is referred to as a MAC-10 9-millimeter

14  submachine gun, submachine gun meaning it fires a pistol

15  cartridge rather than a rifle cartridge, what is -- still a

16  machine gun.

17  Q   What makes a machine gun a machine gun?

18  A   A machine gun is a -- any weapon designed to discharge --

19  first, machine has to be a firearm, meaning that it expels a

20  projectile through an explosion, whereas a BB gun or something

21  like that uses compressed air, use an explosion to -- to force

22  the projectile out of the chamber.  A machine gun is any

23  firearm that will discharge more than one bullet with a single

24  depression of a trigger.

25  Q   And what's the serial number on that particular weapon?

COHOON - DIRECT

1   A    Serial number on this weapon is A6041381.

2   Q    Okay.  Now let's talk about the silencer.  What is the

3   model of that?

4   A    This is a Bowers CAC9, serial number S927.  A silencer is

5   a device that either is part of the gun or can be affixed to

6   the gun.  This one can be removed from the -- from the weapon,

7   like that.  This weapon can be fired like this.  This threaded

8   portion of the barrel, this model comes like that.  So it can

9   either have a suppressor or a barrel strat (ph) or a barrel

10  extension.  This Bowers suppressor is a device, and by

11  definition a -- a silencer or a muffler -- sometimes they're

12  called that -- anything that reduces the report of a firearm.

13  When a bullet is discharged from the -- a gun, like I said, the

14  explosion forces the projectile down the barrel.  That rapidly

15  expanding gas basically creates the bang that you hear.  This

16  device here will slow down the expansion of those gases,

17  therefore reducing the report, making it quieter.

18  Q    And could you give us the serial number from the --

19  A    Yes -- yes, I did --

20  Q    -- silencer?

21  A    -- but I'll give it to you again.  S927.

22       MR. SCHRODER:  Your Honor, if I may approach.

23       THE COURT:  All right.

24  BY MR. SCHRODER:

25  Q    Special Agent Cohoon, so what did you do with the rifle

COHOON  - DIRECT

1  that you seized at the --

2  A    The rifle was returned back to my office and --

3  Q    And where did you place the rifle?

4  A    -- placed into the evidence vault for the firearms.

5  Q    And has that been in your evidence vault the entire time?

6  A    Yes, sir.  It's been there the whole time.

7  Q    I'm going to ask you to take a look at Government Exhibit

8  Number 21 -- oh, I'm sorry, this'll be --

9         THE COURT:  22.

10        MR. BUTLER:  22.

11        MR. SCHRODER:  This'll be 22.

12 BY MR. SCHRODER:

13 Q    Do you recognize this exhibit?

14 A    Yes, sir.

15 Q    And how do you recognize it?

16 A    This is the Remington rifle that I found inside Mr.

17 Colette's safe, one of the -- one of the loaded weapons that

18 was inside.  It's a .30-06 rifle.

19 Q    Okay.  And has it been in the care, custody -- your care,

20 custody, and control since you seized it from the --

21 A    Yes, it has, till the --

22 Q    -- residence?

23 A    -- trial started.

24        MR. SCHRODER:  Your Honor, government moves for

25 admission of Number 22.

COHOON - DIRECT

```
 1            MR. BUTLER:  No objection, Your Honor.

 2            THE COURT:  22 will be admitted, without objection.

 3       (Plaintiff's Exhibit 22 admitted)

 4  BY MR. SCHRODER:

 5  Q    Special Agent Cohoon, what is the model of that rifle?

 6  A    This is Remington Model 740, .30-06 rifle, a typical

 7  hunting rifle --

 8  Q    And what is --

 9  A    -- magazine-fed.

10  Q    Oh, excuse me, I didn't mean to interrupt you.

11  A    It's a magazine-fed, gas-operated semi-automatic rifle.

12  Q    Okay.  And what is the -- what's the serial number?

13  A    Serial number on this weapon is 82345.

14  Q    Okay.

15            MR. SCHRODER:  May I approach, Your Honor?

16            THE COURT:  Yes.

17  BY MR. SCHRODER:

18  Q    And the shotgun, what did you do with the shotgun that you

19  seized?

20  A    The shotgun was returned back to the office here and

21  placed into evidence also.

22  Q    And has it been there the entire --

23  A    Yes, it has, until --

24  Q    -- time until today?

25  A    -- the trial started, yes, sir.
```

1  Q    Okay.  And has -- so it's been in the care, custody, and

2  control of the ATF --

3  A    Yes, sir.

4  Q    -- since it was seized?  I'm going to ask you to take a

5  look at Exhibit Number 23.

6         MR. SCHRODER:  May I approach, Your Honor?

7         THE COURT:  Yes.

8  BY MR. SCHRODER:

9  Q    Are you familiar with the -- with this exhibit?

10  A    Yes, sir.  This is a Mossberg Model 500-A shotgun, pump-

11  action shotgun, which I found loaded inside the safe at Mr.

12  Colette's residence.

13  Q    And how are you able to identify it?

14  A    I identify it by the evidence tag with my name and the

15  case number and the serial number.

16  Q    Okay.

17         MR. SCHRODER:  Your Honor, the government moves Exhibit

18  Number 23 into evidence.

19         MR. BUTLER:  No objection, Judge.

20         THE COURT:  23 will be received, without objection.

21      (Plaintiff's Exhibit 23 admitted)

22  BY MR. SCHRODER:

23  Q    And I believe you already gave the model number of the

24  shotgun.  Could you give us the serial number?

25  A    The serial number is L986808.  The pump-action shotgun

COHOON - DIRECT

```
 1   with a pistol grip.
 2   Q    And did you say that that particular weapon did have
 3   ammunition in it when you --
 4   A    Yes, sir.
 5   Q    -- found it?
 6   A    This one was loaded with four rounds of buckshot.
 7   Q    Okay.
 8            MR. SCHRODER:  Approach, Your Honor?
 9            THE COURT:  Yes.
10   BY MR. SCHRODER:
11   Q    And what did you do with the Colt Sporter that you
12   described?
13   A    The Colt Sporter was transported back to the office here
14   and placed into the evidence facility.
15   Q    And has it been there since you seized it?
16   A    Yes, sir, it has.
17   Q    Okay.  I'm going to ask you to look at Government Exhibit
18   24.  And do you recognize that exhibit?
19   A    Yes, sir.  This is the Colt Sporter rifle which I found
20   inside Mr. Colette's safe at his residence.
21   Q    And how do you recognize it?
22   A    I recognize it by the serial number and the evidence tag
23   with my name on it.
24            MR. SCHRODER:  And, Your Honor, the government moves
25   for admission of Exhibit Number 24.
```

COHOON - DIRECT

```
 1              MR. BUTLER:  No objection, Judge.
 2              THE COURT:  24 will be received, without objection.
 3         (Plaintiff's Exhibit 24 admitted)
 4    BY MR. SCHRODER:
 5    Q    Is there any model number on that as well as the name?
 6    A    Colt Sporter Lightweight.  That's --
 7    Q    Okay.
 8    A    -- that's all.  It's a -- it's the -- one of the -- I
 9    found this weapon inside the safe.  It had a magazine loaded
10    right beside it with five rounds of 7.62-by-.39 ammunition and
11    it --
12    Q    And where is the magazine now?
13    A    This magazine is empty.
14    Q    Okay.
15    A    It's right here.  It's a functional part of the firearm,
16    so -- store it with it.
17    Q    And what's the serial number?
18    A    Serial number on this firearm is LH010714.
19              MR. SCHRODER:  Your Honor, may I approach?
20              THE COURT:  Yes.
21    BY MR. SCHRODER:
22    Q    Special Agent Cohoon, what did you -- the ammunition that
23    you said -- three of the weapons were found with ammunition
24    either in it or nearby.  What did you do with the ammunition?
25    A    The ammunition was -- was transported back here and placed
```

COHOON - DIRECT

```
 1  into the evidence vault.
 2  Q    And where has that ammunition been until --
 3  A    It's been --
 4  Q    -- today?
 5  A    It's been under control of myself, the evidence custodian,
 6  the whole time.
 7           MR. SCHRODER:  May I approach, Your Honor?
 8           THE COURT:  Yes.
 9  BY MR. SCHRODER:
10  Q    Now I'm asking you to look at Government's Exhibit Number
11  25.  Do you recognize that exhibit?
12  A    Yes, sir.
13  Q    And how do you recognize it?
14  A    It has my signature on it.  It has the date, case number,
15  ATF case numbers, the five rounds of .30-06 ammunition taken
16  out of the Remington Model 740 semi-automatic rifle.
17  Q    And that's your signature on the --
18  A    Yes, sir.
19  Q    -- tag?
20           MR. SCHRODER:  Your Honor, government moves for
21  admission of Number 25 -- Government Exhibit Number 25.
22           MR. BUTLER:  No objection, Judge.
23           THE COURT:  25 will be received, without objection.
24      (Plaintiff's Exhibit 25 admitted)
25  BY MR. SCHRODER:
```

COHOON - DIRECT

1  Q    I've handed you Government's Exhibit Number 26.  And can

2  you -- do you recognize that exhibit?

3  A    Yes, sir, I can recognize it by my signature and the ATF

4  case number.  It's five rounds of 7.62-by-.39 ammunition which

5  was taken out of the magazine that was next to the Colt Sporter

6  rifle inside Mr. Colette's safe.

7  Q    And has that been in your care, custody, and control since

8  you seized it on November 28th, 2005?

9  A    Yes, sir, it has.

10         MR. SCHRODER:  Your Honor, the government moves for

11  admission of Number 26.

12         MR. BUTLER:  No objection, Judge.

13         THE COURT:  26 will be received, without objection.

14     (Plaintiff's Exhibit 26 admitted)

15         MR. SCHRODER:  May I approach one more time, Your

16  Honor?

17         THE COURT:  Yes.

18  BY MR. SCHRODER:

19  Q    Now I've handed you what has been marked as Government

20  Exhibit Number 27.  And do you recognize that exhibit?

21  A    Yes, this is recognized by my signature and the case

22  number.  It's a --

23  Q    And --

24  A    -- five -- four rounds of 12-gauge shotgun shells.

25  Q    And has that -- those -- has that ammunition been in your

COHOON - DIRECT

```
 1   care, custody, and control since you seized it --
 2   A    Yes, it has.
 3   Q    -- from the residence?
 4   A    Yes, it has.
 5        MR. SCHRODER:  Your Honor, the government moves for
 6   Exhibit Number 27.
 7        THE COURT:  Any objection to 27?
 8        MR. BUTLER:  No objection.
 9        THE COURT:  27 will -- receive -- be received, without
10   objection.
11        (Plaintiff's Exhibit 27 admitted)
12   BY MR. SCHRODER:
13   Q    And which weapon did these rounds come out of?
14   A    These rounds were found loaded into the -- the Mossberg
15   pump-action pistol-grip shotgun.
16        MR. SCHRODER:  May I approach?
17        THE COURT:  All right.
18   BY MR. SCHRODER:
19   Q    Now, you'd mentioned that during your search you found
20   documents related to the weapon.
21   A    Yes, sir, I did.
22   Q    And what were they, again?
23   A    I found two ATF Form 4s for Mr. Colette's machine gun and
24   silencer.
25   Q    And where were they found?
```

COHOON - DIRECT

1   A    They were found in the top portion of the safe.

2   Q    And did you seize those forms?

3   A    Yes, I did.

4   Q    And where did you place them when they were returned to

5   your office?

6   A    They were placed in evidence, in the evidence vault.

7   Q    And have -- where have they been since that time?

8   A    They've been there.

9   Q    Okay.  And I'm going to hand you what has been marked as

10  Government Exhibit -- or I've handed you what has been marked

11  as Government Exhibit Number 28.  Can you identify that

12  exhibit?

13  A    Yes.  This is ATF Form 4, the application for tax pay

14  transfer of a registration of a firearm.  This is the -- the

15  paperwork to fill out with ATF to register a machine gun.  This

16  is the actual registration for the -- the MAC-10 machine gun

17  that Mr. Colette applied to ATF and was granted, the $200 tax

18  stamp affixed to the top of it.

19  Q    And are you familiar with these forms in your work?

20  A    Yes, sir, somewhat.

21  Q    And is it a record that's regularly maintained by the

22  Bureau of Alcohol, Tobacco, Firearms --

23  A    Yes, sir.

24  Q    -- and Explosives?

25  A    Yes, sir.

COHOON - DIRECT

```
 1  Q    Is it -- does it reflect a -- an activity of your agency?
 2  A    Yes.  We issue a -- there's a transfer tax on certain
 3  types of firearms.  Machine guns, silencers, destructive
 4  devices, sawed-off shotguns can be legally owned by citizens in
 5  the United States as long as they aren't prohibited by, you
 6  know, prior convictions.  This is initiated by the purchaser.
 7  His fingerprints, pictures, and a local area check is conducted
 8  and signed off.  In this case Mr. Colette signed off a -- with
 9  the Alaska State Troopers office.  ATF issues the stamps.  The
10  guns are going into the community, and wherever the community
11  is, the chief law enforcement officer there is the one that
12  grants the certification here.  This was granted by the highway
13  patrol.  Mr. Colette answered these pertinent yes-and-no
14  questions, went to a dealer in this type -- ATF-licensed
15  dealers for these type of guns, paid his $200; the tax stamp
16  was issued to him and it was a lawful transfer of a machine gun
17  to Mr. Colette.  And that's what's reflected on this form.
18         MR. SCHRODER:  Your Honor, the government requests the
19  admission of Exhibit Number 28.
20         MR. BUTLER:  No objection, Your Honor.
21         THE COURT:  28 will be received, without objection.
22      (Plaintiff's Exhibit 28 admitted)
23         MR. SCHRODER:  May I approach, Your Honor?
24         THE COURT:  Yes.
25  BY MR. SCHRODER:
```

COHOON - DIRECT

1  Q    And do you recognize that form?

2  A    Yes, sir.  This is another ATF Form 4 that I seized in Mr.

3  Colette's safe on the day of the search warrant.

4  Q    And how do you recognize it?

5  A    I recognize it by my signature on the evidence tag, the

6  zero number on the -- or the actual number, the identifier on

7  top of it.

8  Q    And again, does this reflect a regular activity of your

9  agency --

10  A    Yes.

11  Q    -- using these forms?

12  A    Yes, sir.

13  Q    All right.

14  A    This is the -- the Form 4 with the same certification on

15  the back, Mr. Colette's picture, the answers.  This is for a

16  silencer registered to Mr. Colette --

17  Q    And --

18  A    -- two --

19  Q    Oh --

20  A    -- $200 tax stamp also.

21  Q    Excuse me.

22        MR. SCHRODER:  The government offers Exhibit Number 28

23  for admission.

24        MR. BUTLER:  29.  No objection.

25        MR. SCHRODER:  29, that's correct.  Sorry, Your Honor.

COHOON - DIRECT

1          THE COURT:  29 will be received, without objection.

2      (Plaintiff's Exhibit 29 admitted)

3  BY MR. SCHRODER:

4  Q    And just now, if you could again say what does that form

5  show?

6  A    This shows that Mr. Colette has a registered silencer in

7  his name, a Bowers 9-millimeter S926 silencer to him.

8  Q    And what is the serial number listed on that form for the

9  suppressor?

10  A    S926.

11  Q    Now, is that -- does that -- is that the same as the

12  one --

13  A    No, it is not.

14  Q    And are you aware of why there's -- it's not the same?

15  A    There was a shipping error.  The manufacturer shipped the

16  wrong one to the dealer and the dealer inadvertently

17  transferred a silencer to Mr. Colette.

18  Q    But there's no problem with the fact that the two numbers

19  are --

20  A    No.

21  Q    -- not the same?

22  A    He has a silencer registered to him.  It's not a -- it's

23  not the fact that he has an illegal silencer, it's just -- it

24  was a -- a typographical error.  Typographical, that's the

25  word.  But yes, just one number -- it's one number off.

1  Q    Now, Special Agent Cohoon, we've talked a bit about your

2  qualifications, but I want to ask you a few more questions

3  before we finish here.  You talked about how much of your

4  career was spent doing drug law enforcement.  Do you have

5  specific training in drug law enforcement?

6  A    Yes.  Back to my basic police academy I first took, took

7  a -- just a ground overview of narcotics, just techniques, to

8  identify people possibly hiding, using narcotics; as a OSI Air

9  Force officer, special investigation -- investigator with them,

10  narcotics investigation within their academy, learned

11  techniques to identify users, dealers of illegal drugs.  Also

12  in the ATF it's -- it's brushed on as a -- a broad -- main --

13  mainly we concentrate on our AT -- alcohol, tobacco, firearms,

14  and explosives, but there is a -- a -- a great deal of

15  narcotics covered because there -- they -- they cross over so

16  often.  I actually am co-located in the office with DEA because

17  of the common thread in our mission.

18  Q    And just a reminder, you spent part of your career as a

19  narcotics investigator before --

20  A    Yes, sir.

21  Q    -- you got to ATF?

22  A    Yes.  Four years with the Air Force.

23  Q    You know, based upon a conservative estimation, how many

24  drug arrests do you estimate you've taken part in?

25  A    Just -- I assist the task force here, and I assist with

COHOON - DIRECT

1   their investigations, so probably over 100, just drug arrests,

2   you know, with no gun involved.

3   Q    Yeah.

4   A    Majority of my time is spent investigating cases that will

5   not have a gun, but, you know, I assist other fellow law

6   enforcement officers.

7   Q    And how many drug cases and investigations have you

8   participated in?

9   A    Including my Air Force time and -- and -- and with ATF,

10  probably around 100 with drugs and guns.

11  Q    And how many of those involved drug distribution

12  operations?

13  A    Maybe around 50 with distribution.

14  Q    Uh-huh (affirmative).  And how many involved weapons of

15  those?

16  A    Of the cases I'm involved with, probably a --

17          MR. BUTLER:  Objection.  Relevance.

18          THE COURT:  Overruled.

19          MR. BUTLER:  Objection.  403.

20          THE COURT:  Overruled.

21  BY MR. SCHRODER:

22  Q    How many times have -- or could you just answer the

23  question, I guess, you (indiscernible).

24  A    Could you repeat it, Mr. Schroder?

25  Q    Yeah.  How many of those -- the case -- you said you

COHOON - DIRECT

1    participated in cases involving drug distribution operations.

2    How many of those involved -- were there weapons involved?

3    A    Well, drug distribution, it would -- it would be high,

4    probably 90 percent.  When you get that high in a distribution,

5    they're going to have firearms.

6    Q    And understanding you're an ATF agent --

7    A    Yes.

8    Q    -- that the reason you get involved --

9    A    That's why -- that's why I'd be there.

10    Q    -- in many of these investigations is for firearms

11    purposes, right?

12    A    Yes, sir.

13    Q    Okay.  And how many times have you been involved in

14    executing search warrants?

15    A    Probably over 100 times.

16    Q    Okay.  And how many of those involved drug distribution

17    organizations?

18         MR. BUTLER:  Same objection.  Relevance and 402 and

19    403.

20         THE COURT:  Overruled.

21         MR. SCHRODER:  Okay.

22         THE WITNESS:  Search warrants involving narcotics are

23    probably 80 percent of the time.

24    BY MR. SCHRODER:

25    Q    Okay.  I just have a couple more questions.  How do --

COHOON - DIRECT

1    speaking from your experience and your training in --

2    generally, how do drug distribution organizations use firearms?

3          MR. BUTLER:  Objection.  402, 403.

4          THE COURT:  If you know.  If he knows, just from his

5    general experience.

6          THE WITNESS:  From my experience, drug distribution

7    organizations and through my firearms investigations, they are

8    used as a tool to protect their ill-gotten gains, intimidate,

9    to threaten, to -- to -- to utilize -- to protect what they

10   have.  They're -- they can be victimized by other drug dealers

11   that operate outside the parameters of law enforcement.

12   They -- they'd hesitate to report thefts of drugs because

13   they'd have --

14         MR. BUTLER:  Objection.  The question goes beyond --

15         THE COURT:  Sustained.

16         MR. BUTLER:  I mean the answer goes beyond the

17   question.

18         THE COURT:  Sustained.  I think he's answered the

19   question.

20   BY MR. SCHRODER:

21   Q    And one final question.  Isn't it true that guns in a drug

22   distribution operation can serve a purpose as a deterrent?

23   A    Yes, sir.

24   Q    Okay.

25         MR. SCHRODER:  No further questions, Your Honor.

COHOON    CROSS

```
 1              THE COURT:  Mr. Butler, what's your timing?  Do you

 2   want to try to do it before lunch or do you want to come back

 3   after lunch?  You can choose.

 4              MR. BUTLER:  Well, if --

 5              THE COURT:  You choose.  I mean, you get lunch either

 6   way.

 7              MR. BUTLER:  Judge, I probably would prefer to go

 8   before, because I -- my cross-examination is probably going to

 9   be short rather than --

10              THE COURT:  Okay.  Well, let's go for it.

11              MR. BUTLER:  Okay.  But may I have 60 --

12              THE COURT:  Oh, sure, whatever you --

13              MR. BUTLER:  -- 30 --

14              THE COURT:  -- need.

15              MR. BUTLER:  -- to 60 seconds?

16              THE COURT:  Yeah.  (Pause) Mr. Butler.

17              MR. BUTLER:  Good after --

18              THE COURT:  Go ahead.

19              MR. BUTLER:  Thank you, Judge.
```

                              **CROSS-EXAMINATION**

```
21   BY MR. BUTLER:

22   Q    Good afternoon, Mr. Cohoon.

23   A    Good morning, Mr. Butler.

24   Q    I said the name correctly, didn't I?

25   A    Yes, sir.
```

COHOON - CROSS

```
 1  Q    Cohoon, okay.  Mr. Cohoon, how long have you been in
 2  Alaska now?
 3  A    Since last May.
 4  Q    Okay.  So a little over a year?
 5  A    Yes, sir.
 6  Q    What percentage of households in Alaska have guns?
 7  A    I do not know.
 8  Q    Have you worked in other places where you probably didn't
 9  have as many hunters, fishermen, gun enthusiasts as you have in
10  Alaska?
11  A    My father was a game warden.  I grew up in the south,
12  North Carolina, Mississippi.  There's plenty of guns there.
13  I -- I -- I can't make an intelligent decision on how many guns
14  are in Alaska.  From what I've observed in the last year, there
15  are -- there are plenty of avid hunters in Alaska.
16  Q    And do you ever get into gun safety issues?
17  A    Yes, sir.
18  Q    You ever hold, like, any seminars for citizens about gun
19  safety issues?
20  A    Yes, I have.  I've put on -- I've put on presentations for
21  schools, practicing gun safety, gun locks, gun -- you know,
22  general gun safety rules.
23  Q    And a gun safe is a safe way of keeping guns away from
24  children and things like that in a household, isn't it?
25  A    Yes, sir, it is.  I'm also a firearms instructor.  I've
```

COHOON    CROSS

```
 1  been a firearms instructor for six years.
 2  Q    And when --
 3       (Side conversation)
 4  Q    While we're waiting on those photographs from yesterday,
 5  sir, the documents -- Government's Exhibits, I think 28 and 29,
 6  you still have them up there?
 7  A    I have 29 here --
 8  Q    Okay.
 9  A    -- so --
10  Q    But anyway, you remember what 28 was.  It's --
11  A    Yes, sir.
12  Q    -- similar to 29?
13  A    Yes, sir.
14  Q    Just that 28 was in reference to what you refer to as the
15  machine gun, 29 to the silencer, right?
16  A    Yes, sir.
17  Q    Now, this kind of gun that we're talking about -- for
18  example, you got a -- you have a -- there's a Fred Meyers here,
19  isn't it?
20  A    Yes, sir, I believe there's two in Fairbanks.
21  Q    Okay.  And do they sell guns over the counter here?
22  A    Yes, sir, they do.
23  Q    Okay.  Shotguns, right?
24  A    Yes.
25  Q    Guns with a scope on them, like one of the guns that was
```

 1   admitted here?

 2   A    Yes, sir.

 3   Q    Handguns?

 4   A    Yes.

 5   Q    Some of them big handguns, look like, right?

 6   A    All calibers.

 7   Q    Okay.  This particular gun, Government's Exhibit 20, can

 8   you walk into Fred Meyers and buy that?

 9   A    No, sir, you have to go to a specific Title II dealer that

10   deals in that type of firearms.

11   Q    Can you go to -- okay, can you go into Fred Meyers and buy

12   that Bowers silencer?

13   A    No, sir.

14   Q    So it sounds like the government really regulates this

15   type of weapon, the sale of the -- the possession of, anyway.

16   A    It -- it's the only national registry for any firearms.

17   Q    It's what, sir?

18   A    It's the only national registry we have for any firearms

19   in the country.

20   Q    Okay.  And I probably didn't quite understand your answer,

21   which made me -- but, I mean, I'm missing something, forgive

22   me.

23   A    Yes, it is.  It's -- they're -- they're regulated.

24   They're -- you have to have --

25   Q    Oh.

CONDON    CROSS

```
 1  A    -- a special stamp and a background check.
 2  Q    Okay.  Okay.  Okay.  And it takes a while to get it,
 3  doesn't it?  It's not an overnight type --
 4  A    No, it's -- it's not a instant background check like you'd
 5  get at Fred Meyers.  It -- it takes time for it to go to D.C.
 6  and come back.
 7  Q    Can you look at the document in front of you?
 8           MR. BUTLER:  Your Honor, may I approach, please?
 9           THE COURT:  Yes, that'd be fine.
10           MR. BUTLER:  (Indiscernible).
11           THE COURT:  Yes, yeah.
12  BY MR. BUTLER:
13  Q    Sir, I'm going to hand you that.
14  A    Sure.
15  Q    And can you tell us how long this process takes for this
16  particular firearm, sir?
17  A    It looks like Jason -- Mr. Colette did his part 10/29/04.
18  Q    Now, do you see a January date on any of that, a January
19  '05?
20  A    Yes.  1/20/05, when it -- the certification by the state
21  troopers.
22  Q    Okay.  And -- but not received until when?  October?
23  A    October 17th, '05.
24  Q    Okay.  So it takes a while to --
25  A    Yes, sir.
```

COHOON    CROSS

```
 1  Q    Now, if I go buy one of these other firearms at Fred
 2  Meyers -- we're talking about the shotguns, the Mossberg -- you
 3  can buy a Mossberg at Fred Meyers, can't you?
 4  A    Yes, if -- if they carry Mossberg.  You can buy a similar
 5  type gun.
 6  Q    Okay.  And the gun with the scope that -- was that the
 7  .30-06?
 8  A    Yes, sir.
 9  Q    Okay.  Those kinds of guns, if I want to buy them at Fred
10  Meyer today, how long does it take before I can walk -- go home
11  with it?
12  A    If there's no prohibiting factors, there -- you can within
13  three business days walk out of there with the gun.
14  Q    Now, the -- what I'd like to do is show you what's been
15  previously marked and admitted as Plaintiff's Exhibit Number 3.
16          MR. BUTLER:  May I, Judge?  And may I --
17          THE COURT:  Yeah.
18          MR. BUTLER:  -- show the jury this?
19          THE COURT:  Yes, same as before.
20  BY MR. BUTLER:
21  Q    Sir, this paperwork would have been kept with that gun,
22  then, sounds like.  It was on the top shelf, you said?
23  A    Yes, it was inside the -- I believe on the top shelf
24  underneath the ammunition over here.
25  Q    Okay.  And there was no ammunition for that weapon in that
```

COHOON - CROSS

```
 1  house at all that -- was there?

 2  A    There was no ammunition in that safe for that gun.

 3  Q    Okay.  I mean, you didn't find any.  Right?

 4  A    No.  No, sir.

 5  Q    And -- but there was ammunition in that safe for other

 6  weapons or guns or rifles or whatever you want to call it?

 7  A    Yes.  Yes.

 8  Q    Okay.  Give me just a moment, sir, because I think -- and

 9  just for -- to make sure I've got things covered here, sir, any

10  inconsistency in the silencer paperwork and the silencer owned

11  by my client was not my client's doing.  Right?

12  A    Correct.

13  Q    Okay.  Thank you.

14           MR. BUTLER:  Pass the witness, Your Honor.

15           THE COURT:  Redirect.

16           MR. BUTLER:  No redirect, Your Honor.

17           THE COURT:  All right, thank you, sir.  You're excused.

18  Ladies and gentlemen, we'll take a lunch break.  We'll come

19  back at 1:30, okay.  Just remind you all, remember the

20  admonitions I gave before.  Don't talk to anyone about the

21  case.  Don't read any newspaper articles about the case, all

22  the things I've said before.  Any questions about that?  And

23  we'll return at 1:30 then.  Thank you very much.

24      (Jury not present at 12:14 p.m.)

25           THE COURT:  Okay.  Robin, close the door.  Keep them
```

1   closed.

2          UNIDENTIFIED SPEAKER:  We need a (indiscernible) that

3   door.

4          THE COURT:  Okay.  All right.  Counsel, anything

5   before --

6          MR. SCHRODER:  No, Your Honor.

7          THE COURT:  All right.  And are you ready to go after

8   lunch?

9          MR. SCHRODER:  I will be.  I think we're going to -- I

10  have to -- I neglected to read in the stipulation for the guns,

11  which I want to do --

12         THE COURT:  Okay, we'll --

13         MR. SCHRODER:  -- we've done it --

14         THE COURT:  -- do that.  So I guess what we're

15  saying -- the reason this is -- I'm going to turn the things

16  over to Mr. Butler and say, after lunch, it's going to be --

17  ball's going to be in your court, so to speak.  You understand

18  that?  Okay.  All right.  So anything that you have to say

19  be --

20         MR. BUTLER:  I'm trying to determine what ball to play,

21  Judge.

22         THE COURT:  Okay, well, think about it and we'll see

23  you after -- at 1:30.

24         MR. BUTLER:  Yes, sir.

25         THE CLERK:  Off record.

1        (Court recessed at 12:14 p.m., until 1:35 p.m.)

2        (Jury not present)

3            THE COURT:  -- from the government's perspective?

4            MR. SCHRODER:  We're going to read in the parts of the

5    stipulation related to the weapons.

6            THE COURT:  Okay.

7            MR. SCHRODER:  And then we will rest, Your Honor.

8            THE COURT:  Okay.  And you have that in a -- you said

9    in a jury instruction?  Did you have that for me, or --

10           MR. SCHRODER:  I will.  We're -- actually, I'm

11   having -- we had to change a couple of the exhibit numbers.

12   I'm having a new one printed out and we'll --

13           THE COURT:  Okay.

14           MR. SCHRODER:  -- and we'll hand it to the Court.

15           THE COURT:  Because that would just simply be included

16   within the instructions?

17           MR. SCHRODER:  That's our intent, Yes, Your Honor.

18           THE COURT:  Okay.  Mr. Butler, what do you have to say?

19           MR. BUTLER:  Judge, we're waiting for the government to

20   close, and then we will probably close.

21           THE COURT:  Okay.  So then what do you need, some time

22   to do -- so what do you --

23           MR. BUTLER:  Jury instructions.  I'd like to have some

24   time with Mr. Colette here, if I can.

25           THE COURT:  No, I meant what about closing arguments.

1    Now -- you ready to do that today?  It's 2 o'clock -- it's only

2    2 --

3            MR. BUTLER:  Well, by the time we ferret out jury

4    instructions, it might be difficult.

5            THE COURT:  I just looked at your instructions.

6    They're pretty simple and straightforward.  You can have all

7    the time you want with your client, if that was your question.

8            MR. BUTLER:  Let me just --

9            THE COURT:  I'm just -- well, you go -- you can think.

10   I don't know why the government -- and I'm looking at your

11   verdict form -- has two -- asks the jury to make a finding with

12   regard to a mixture or substance containing a detectable

13   amount, and then 500 grams or more.  It's almost like a lesser

14   included.  Is that what you intended?

15           MR. SCHRODER:  No, Your Honor, I mean, my -- what we're

16   trying to do is prevent kind of an *Apprendi* problem.  But --

17   because above 500 grams is the --

18           THE COURT:  I understand that.

19           MR. SCHRODER:  -- cutoff line for a 841(a)(1)(B), so --

20           THE COURT:  I'm not saying you can't do this.  I'm just

21   saying you charged 500 grams or more.  The evidence was

22   based -- that, and then you -- this reminds me of a lesser

23   included.  If they don't agree on that, well, then they can do

24   this.  But that's okay, if you want to --

25           MR. SCHRODER:  That's -- yeah, that wasn't my intent.

1    I mean --

2          THE COURT:  I -- you -- you're the one that -- you're

3    entitled to a -- this is not an illegal verdict form.  It just

4    is --

5          MR. SCHRODER:  Right.

6          THE COURT:  -- it requires them to go through one more

7    step that's -- every step is a potential subject of confusion.

8    And apparently you want them to find yes and yes.

9          MR. SCHRODER:  Yes.

10          THE COURT:  First, it's a detectable amount, and --

11          MR. SCHRODER:  No, no, no.  I -- no, you're right, I

12    want one or the other.

13          THE COURT:  Well, that -- how are they going to know

14    that from this?  They're going to say -- they're going to go

15    the first thing, and if they think there was a detectable

16    amount, they're going to write yes.  And they're going to turn

17    the page, and I think this 500 grams or more, they're going to

18    write yes.

19          MR. SCHRODER:  Oh, I didn't have an "or"?  I mean, that

20    was the intent.

21          THE COURT:  Well, it doesn't say "or" to me.

22          MR. SCHRODER:  Okay.  Then I -- that's probably a

23    mistake.

24          THE COURT:  Where do you want "or" written?  That would

25    solve that --

1          MR. SCHRODER:  At this point, Your Honor, I mean --
2    yeah, part of what I too was anticipating, you know, a broad
3    range of how the facts might come in.  I think you're probably
4    right, and at this point the way the evidence has come in, we
5    probably don't need that.
6          THE COURT:  And I'm going to defer to you on that,
7    because it's your instruction and -- I mean, I can simply
8    strike out the A and the -- they simply decide whether or not
9    the government has proven, 500 -- well, what -- it's just --
10   we, the jury, duly empaneled and sworn -- find guilty or not
11   guilty of possession with intent to distribute cocaine, as
12   charged in Count 1 of the indictment.  Count 1 charges 500
13   grams or more.
14         MR. SCHRODER:  Right.  Yes, sir.
15         THE COURT:  That's all you want then.
16         MR. SCHRODER:  I think that is all we want at this
17   point.
18         THE COURT:  Well, you got -- you can change your mind,
19   but I'm just raising the issue --
20         MR. SCHRODER:  Right.  No --
21         THE COURT:  -- now.
22         MR. SCHRODER:  -- I think you're right.
23         THE COURT:  Okay.  And that would -- applies to the
24   next one too, verdict 2.  That would count there, so it would
25   just be a guilty or not guilty there.

1          MR. SCHRODER:  Right.  Right.

2          THE COURT:  And not have to go and figure whether

3   there's a detectable amount or 500 grams --

4          MR. SCHRODER:  Right.

5          THE COURT:  -- or more.

6          MR. SCHRODER:  Right.

7          THE COURT:  Because you're charging 500 grams or more.

8   That's the charge.

9          MR. SCHRODER:  Right.  Right.

10         THE COURT:  So he's either guilty or not guilty of

11   that.

12         MR. SCHRODER:  And I think at -- you're right.  I think

13   at this point, the way the evidence has come in, they're either

14   going to find that --

15         THE COURT:  You find it or not.  Because --

16         MR. SCHRODER:  -- or not.  Right.

17         THE COURT:  Isn't that right?

18         MR. SCHRODER:  Yes.  I agree.

19         THE COURT:  Okay.  Mr. Butler, you have any thoughts

20   about this?

21         MR. BUTLER:  Judge, I've listened to the -- what's been

22   happening back and forth and --

23         THE COURT:  The discussion.

24         MR. BUTLER:  Yes, sir.  I didn't want to say colloquy,

25   because I never really liked that word.  So I --

1          THE COURT:  Well, that's -- okay.

2          MR. BUTLER:  -- the discussion between you --

3          THE COURT:  Okay.

4          MR. BUTLER:  -- and my colleague there, Judge, and I

5    agree that because of the way the facts came out, it probably

6    just needs to be 500 grams or more.

7          THE COURT:  Yeah, that's what I would think.  Oh --

8    say, so if my secretary's listening, we're going to modify

9    verdict number 1, and it's just going to be:  We, the jury duly

10   empaneled and sworn to try the above-entitled cause, do find

11   the defendant, Jason Scott Colette, guilty or not guilty of

12   possession with intent to distribute cocaine, as charged in

13   Count 1 of the indictment.  Bam.  And with regard to verdict

14   number 2, we -- it'll be just the same:  We, the jury duly

15   empaneled and sworn to try the above cause, do find the

16   defendant guilty or not guilty of distribution of cocaine, as

17   charged in Count 2 of the indictment.  No --

18         MR. BUTLER:  Judge, as it relates to the counts

19   involving the weapons, I do have some objections to those.

20         THE COURT:  Let me hand you each of these proposed

21   instructions so you know what I'm reading from.  Okay, so we've

22   got 1 and 2.  What is your concern about 3 and 4, Mr. Butler?

23         MR. BUTLER:  Judge --

24         THE COURT:  I don't have mine in front of me now, I

25   gave them away.  But go ahead.  I think it's got all the

 1  language in it you wanted.

 2          MR. SCHRODER:  Now, these are just the proposed

 3  instructions -- or the proposed forms?

 4          THE COURT:  Yes.

 5          MR. SCHRODER:  Well, there was -- I -- I've been

 6  working through these the last couple nights too, Your Honor,

 7  just try --

 8          THE COURT:  Okay.

 9          MR. SCHRODER:  And I did have a couple of things.

10          THE COURT:  On which ones?

11          MR. SCHRODER:  3 and 4.

12          THE COURT:  Okay, well, that's what Mr. Butler's

13  looking at now too.

14          MR. SCHRODER:  Right.

15          THE COURT:  So do you want to tell us what yours are,

16  just --

17          MR. SCHRODER:  My -- mine were, one, I --

18          MR. BUTLER:  I have no objection to the way these are

19  written.  I have objections as to the way the government's

20  proposals are.

21          THE COURT:  I didn't know there was a difference, but

22  go ahead.  So you're content with what I've just handed -- the

23  verdict form now.

24          MR. BUTLER:  I am, Judge.

25          THE COURT:  So what about -- Mr. Schroder.

1          MR. SCHRODER:  My concern was --

2          THE COURT:  Are you referring to the verdict form?

3          MR. SCHRODER:  I'm referring to the form.

4          THE COURT:  Okay.  What's your concern?

5          MR. SCHRODER:  On jury verdict 3 --

6          THE COURT:  Okay.

7          MR. SCHRODER:  -- I think we probably need to add in a

8  line where they decide it was a machine gun and a silencer.  I

9  mean, we have the weapon listed --

10          THE COURT:  Okay.  Well --

11          MR. SCHRODER:  -- but I think we need to add in that

12  they specifically decide --

13          THE COURT:  Okay.

14          MR. SCHRODER:  -- it's a machine gun and specifically

15  decide it's a silencer.

16          THE COURT:  Will you write it?

17          MR. BUTLER:  I object to that, Judge.  I mean --

18          THE COURT:  Well, you write like you would want it, so

19  that we know what you're talking about, and then Mr. Butler can

20  look and see and he can object.

21          MR. SCHRODER:  I have a sample already.

22          THE COURT:  Oh, you have a sample, okay.

23          MR. SCHRODER:  I do.  And the other -- just --

24          THE COURT:  Let me see why Mr. Butler objects.

25          MR. BUTLER:  Because, Judge, I submit to you that the

1    way it's written in verdict 3, that the Ingram Model 10A1 .45-

2    caliber, 9-millimeter machine gun, serial number blah-blah-

3    blah, and then the silencer, a Bowers 9-millimeter suppressor.

4    What more needs to be added?

5              THE COURT:  What more do you need?

6              MR. SCHRODER:  The way it's written, we describe the

7    weapons.

8              THE COURT:  Right.

9              MR. SCHRODER:  I think the jury also, because it's --

10   there's an enhancement for those, the jury should find that

11   they are specifically a silencer and specifically a machine

12   gun.  We -- what's in there now is just how we've described the

13   weapon.

14             THE COURT:  Okay.  Well, let's talk -- we'll talk about

15   it in a few minutes, because I think --

16             MR. SCHRODER:  Okay.

17             THE COURT:  -- we have the jury ready to go.  So what

18   we're going to do now is we're going to come back in.  I'm

19   going to ask you if you have anything further.  You're going to

20   stand up, read in your stipulation.  Then I'm -- and then you

21   rest.  And then we'll turn to Mr. Butler, ask him what he wants

22   to do.  I think I've already -- is that my copy that I couldn't

23   find?  Oh, I see, thank you.  Decide whether you're going to

24   present witnesses or whether or not the defendant's going to

25   testify -- and I've already told defendant that's up to him

1   ultimately.

2           MR. BUTLER:  Right.  And if you wish to address him

3   further, Judge, I have no problem with that now.  If -- however

4   you want to do it.  But after my colleague rests, then I'm --

5   when the court points to my table or gives me the signal, I'm

6   going to rise and say that the defense rests.

7           THE COURT:  Okay.  And that means you're not going to

8   give a opening statement, you're not going to give a -- oh,

9   you're going to give your closing statement, obviously --

10          MR. BUTLER:  Yes, sir --

11          THE COURT:  -- but you're not --

12          MR. BUTLER:  -- absolutely.

13          THE COURT:  -- going to present any more witnesses.

14          MR. BUTLER:  Unless counsel waives.  Then I could --

15  would consider waiving.

16          THE COURT:  Okay.  So, Mr. Colette, I've already told

17  you before, you have a right to testify.  You know that.

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  And if you choose not to testify, which is

20  fine, you have a constitutional right to, I read an instruction

21  to the jury.  It's two sentences.  And I just say something to

22  the effect, they can't hold that against you.  You understand

23  that?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  And it's a standard instruction we always

1   give.  I just don't have it right in front of me.  Okay.  So do

2   you have any questions about anything about your right to

3   testify or anything of that nature?

4           THE DEFENDANT:  No, sir.

5           THE COURT:  Okay.  In state court we're required to

6   tell you about seven different times you have a right to

7   testify.  We're not required to do it in federal court, but

8   it's one of the things that kind of is -- I keep doing for some

9   reason.

10          THE DEFENDANT:  Well, I think we only got five times

11  left.

12          THE COURT:  Okay.  Well, no, we got about -- only two

13  times left.  But I think I've done it -- okay.  Now we got some

14  more things -- they're just coming out like -- counsel, I want

15  to give you some more jury instructions.

16          MR. SCHRODER:  Allow me (indiscernible).

17          THE COURT:  All right, yes, Mr. Schroder's turn.

18          MR. BUTLER:  Thank you.

19          THE COURT:  Did you do some -- these -- it's not in the

20  right order.  In fact, I -- you see the top one, possession?  I

21  don't think I have to give that, because it's included in

22  every -- it's given like three other times.  But we're getting

23  ahead of ourselves.  Let's bring the jury in.

24      (Jury present at 1:46 p.m.)

25          THE COURT:  Okay, we've got the whole group back.