1  that there's certainly sufficient evidence in front of the

2  Court and in front of the jury to make a finding of guilty on

3  both Count 3 and 4.  There was testimony by Eugene Johnson

4  about the machine gun, supported by the evidence found at the

5  home after he provided the testimony originally.  And his

6  testimony that it certainly acted as a deterrent to him,

7  because, you know, in the drug world, he was thinking about

8  coming back and getting that dope and decided that that

9  probably wouldn't be a good idea with that big machine gun

10  there.  And in a -- and in addition, Johnson also testified,

11  and I think it was consistent with what we've seen, that the

12  defendant -- you know, he dealt cocaine out of the safe, so the

13  guns were there, again, to act as a deterrent to anybody who

14  was in there doing a deal.

15          As far as Count 4 goes, the guns and drugs testimony

16  that counsel mentioned by the agents, that it is commonplace to

17  have drugs involved with -- or guns involved with drug

18  distribution operations and, again, testimony that drug deals

19  were done out of that safe.  And then I think you go back to

20  the *Rios* factors that we just talked about, proximity,

21  strategic location.  There were -- those weapons were loaded or

22  very close to being loaded in the safe where the deals were

23  done out of.  So I think there's sufficient evidence in front

24  of the Court and in front of the jury to make a finding of

25  guilty on those counts.

1          THE COURT:  All right.  Very well.  I agree with Mr.

2     Schroder, will deny the motion to dismiss or for judgment of

3     acquittal with regard to those two counts.

4          Now with regard to the intent instruction, the -- I

5     have the model jury instruction in front of me.  Do you want me

6     to hand it to you, let you --

7          MR. BUTLER:  No, sir, Judge.  I would just make a

8     motion for the Court to include an intent instruction in the

9     packet, simply because that's the mental state required for the

10    924(c).  So we probably should explain to the jury what they

11    should be looking for in terms of mental state.

12         THE COURT:  Do you have those -- the instruction book

13    with you, Mr. Schroder, to --

14         MR. SCHRODER:  I do, Your Honor, just opened it up now.

15         THE COURT:  Is there an instruction for intent?

16         MR. BUTLER:  I didn't see one in the --

17         THE COURT:  I didn't either.

18         MR. BUTLER:  -- packet.

19         THE COURT:  I know, but is there one in the -- I think

20    that may be one of those things that -- it's just a common

21    experience of mankind type of thing.  I don't think -- let's

22    see --

23         MR. SCHRODER:  Well, I think the additional language

24    that we have in there on "in furtherance of" is sufficient.

25         THE COURT:  Well, we can research it and the parties

1    can research it.  I suspect it's one of those issues that

2    generally it's not instructed on, because it's something that

3    the average layperson understands, intent versus -- what that

4    means.  But I can even give you the model jury instruction

5    booklet, Mr. Butler, for you to page through while we're

6    waiting -- we're waiting for the instructions to be finalized

7    anyhow.

8                MR. BUTLER:  Thank you.

9                THE COURT:  So we'll go off the record.

10               THE CLERK:  Off record.

11        (Court recessed at 3:01 p.m., until 3:06 p.m.)

12        (Jury not present)

13               THE COURT:  Mr. Schroder, do you have something there?

14               MR. SCHRODER:  I do, Your Honor, I'm ready, so -- I'm

15    done.

16               MR. BUTLER:  Judge, there is an instruction -- two

17    things.  One is, there's the standard witness instruction and I

18    think there's an -- there's the instruction that says that when

19    the government has purchased testimony -- 4.9.  4.9 -- let me

20    give it to Your Honor --

21               THE COURT:  Okay.  Let's see, this is civil -- is this

22    criminal?  Yeah.  He's got my book.  We're sharing a book.

23               MR. BUTLER:  And there's the witness instruction,

24    Judge.  We don't have anything about dealing with how to

25    evaluate a witness' testimony in the packet.

1          THE COURT:  Okay.  Okay, we'll get -- we -- that --

2    you're right, that one should be given.  What --

3          MR. BUTLER:  And 3.9, I believe, Your Honor.

4          MR. SCHRODER:  Which one are -- did you just say, Your

5    Honor?

6          THE COURT:  He said just --

7          MR. BUTLER:  4.9.

8          THE COURT:  He said 4.9.  I don't know how that one got

9    left out.  That what you want -- Mr. Butler, what should I look

10   at now?

11         MR. BUTLER:  Judge, 3.9 I think is a -- is that the one

12   that's a general witness instruction about how to evaluate

13   witness testimony?

14         THE COURT:  I've already given that one.

15         MR. BUTLER:  Was that in there?

16         THE COURT:  No, that's in my -- I've already read that.

17   That'll be in the packet.  In fact, let me make --

18         MR. BUTLER:  It will be in the packet, Judge?

19         THE COURT:  It's -- I've already read it to them, and

20   so that the -- everything I've read, it will go to the packet,

21   yes.

22         MR. BUTLER:  Oh, okay.  Okay.

23         THE COURT:  Let me make sure.  In deciding the facts of

24   the case, you may have to decide which testimony to believe and

25   which testimony not to believe.  You may believe everything a

1  witness says or part of it or none of it.  In considering the

2  testimony of any witness, you may take into account the

3  opportunity, ability of the witness to see or hear or know --

4          MR. BUTLER:  That's it.

5          THE COURT:  -- the things -- that's -- I've read that

6  already.  That will be in the packets they have.

7          MR. BUTLER:  Okay.  And will the 4.9 go after that one,

8  Judge?

9          THE COURT:  4.9 -- probably not, no.  That will go in

10  this that I read tomorrow.  Already read this.

11          MR. BUTLER:  Right.

12          THE COURT:  In the packet, it'll go somewhere where we

13  decide to insert it.  We'll just agree where it should go once

14  we get all set.  My packet's back in there now.  Do you have a

15  suggestion where it should go?  You have your packet right in

16  front of you.

17          MR. BUTLER:  Yes.  I'm trying to think what -- Judge,

18  somewhere -- probably before or after, would be my suggestion,

19  when, as in this case, it is alleged that the crime charged was

20  committed on or about a certain date, which probably should

21  have gone after the elements, but it's all right.

22          THE COURT:  Okay.  All right, let -- let's get --

23  here's where -- I've just got -- got the specific intent,

24  general intent that the Ninth Circuit recommends, discourages

25  the use of general specific intent instructions.  I knew

*A & T  TRANSCRIPTS*
*(817) 685-7556*

1  that -- I suspected that.  So there's that.  And here's the

2  testimony that you want.  And I'm going to let you look at

3  this, Mr. Butler, and take care of the brackets.  This is a

4  form that you can work from.  It's 4.9 testimony.  When you've

5  done that, you can give it to Mr. Schroder.

6      MR. SCHRODER:  Now, Your Honor, I think we're going to

7  need to tailor that a little bit, because --

8      THE COURT:  Well --

9      MR. SCHRODER:  -- none of the language in here is

10 accurate.

11     THE COURT:  Well, that's why the two of you can work on

12 it and see if you can come up with an agreement.  And then I

13 know it's -- I know we generally give the instruction, and

14 I've -- what I've given -- what Mr. Butler has is a copy of the

15 form with all the brackets in it.  So gives everybody something

16 to work on.  By the way, I've got the packets here.  We're

17 really keeping it moving at good speed here.  That packet, Mr.

18 Butler, has the language that I read earlier and that I propose

19 to read tomorrow.

20     MR. BUTLER:  Okay.

21     THE COURT:  That's what you have in your hand.

22     MR. BUTLER:  All right, thank you, Your Honor.

23     THE COURT:  We'll stand in recess and let the parties

24 tell me when you're ready to come back, okay?

25     THE CLERK:  Off record.

1          (Court recessed at 3:22 p.m., until 3:29 p.m.)

2          (Jury not present)

3               THE COURT:  -- instructions.  Please be seated.

4               MR. BUTLER:  Now, the Ninth Circuit says a specific

5    intent instruction is not favored, is --

6               THE COURT:  Well, I don't -- let -- you read it

7    yourself.  It's 5.4.

8               MR. BUTLER:  Okay.

9               THE COURT:  And we'll keep working on this.  We're just

10   about done with everything but --

11              MR. BUTLER:  Right.

12              THE COURT:  5.4, I think you'll get their comment.  And

13   I'll be back.  We're going to go -- we're -- got this whittled

14   down to just about the very end.

15              THE CLERK:  Off record.

16          (Court recessed at 3:30 p.m., until 3:38 p.m.)

17          (Jury not present)

18          (Side conversation)

19              THE COURT:  Please be seated.  Okay.  I have brought

20   two pieces of paper in the room.  If you will take the first

21   one that says, "You have heard testimony from."  Everyone have

22   that in your hand?  And then go into your packet to number --

23   let's see -- 22, and place this after 22.  Does that make

24   sense?  Everyone done that?

25              MR. SCHRODER:  Uh-huh (affirmative).

1        MR. BUTLER:  Judge, will this be 22(a)?

2        THE COURT:  It probably -- we'll probably call it 23.

3  But for our purposes, you can call it 22(a).  I mean --

4  whatever.  Because I -- that's just the order -- and we may

5  renumber depending on what else we still do today.  But I --

6  22(a) is probably as good a thing to call it as anything, for

7  now.

8        And then if you'd turn to instruction number 17.  Do

9  you all have that?  And the second page of that, just remove

10 that.  And then replace it with the one I've just handed you.

11 Okay?  The one you removed probably should be thrown away.  I'm

12 throwing all the removed stuff on the ground.  All I did in

13 that change is I changed the word "a" to "any."  So, Mr.

14 Butler, did you come up with an intent instruction?

15        MR. BUTLER:  Judge, I have not, with specific

16 language -- intended to use --

17        MR. SCHRODER:  Your Honor?

18        THE COURT:  Yes.

19        MR. SCHRODER:  I think it's our position that we've

20 met -- you know, we've met what the Ninth Circuit suggests by

21 putting in language that says that the government must show

22 that the defendant intended to use the firearm to promote or

23 facilitate the crime.

24        THE COURT:  I think that you're right, but I'm giving

25 Mr. Butler a chance to give me something other than that.

1  It -- but intent is mentioned in several of the elements, so --

2  intent to distribute is charged in Count -- let's see.  Count 1

3  charges intent to distribute.  This -- it is actually defined

4  in the bottom of instruction number 15.  That's what you were

5  referring to, Mr. Schroder?  You were referring to, intent to

6  distribute means to possess with intent to deliver or transfer

7  possession of -- that's the language you had in mind or did

8  you --

9        MR. SCHRODER:  Well, that's the language for that.  I'm

10  just saying on Count -- when you -- goes to Count 3 and 4, we

11  have language in there about the intent, and that's I think

12  directly out of the statute.  It says:  The government must

13  show the defendant intended to use the firearm to promote or

14  facilitate the crime.  I mean, I think that's the appropriate

15  language.

16        THE COURT:  I -- you're right.  I think you're right.

17  But Mr. Butler is researching it.  There's a adequate

18  description in both of Count 1 and Count 3, which are the ones

19  that address intent.  But on -- if Mr. Butler has something

20  else in mind, he can let me know.  Otherwise, I think we're

21  done.  I think we have packets.  Mr. Schroder, anything else?

22        MR. SCHRODER:  I just had -- I just wanted to get on

23  the record that we have Exhibit Number 30 signed by all the

24  parties.

25        THE COURT:  Okay, and then that will be -- that'll --

1          MR. SCHRODER:  We ask that that be admitted, and we
2     will --
3          THE COURT:  That is admitted.  That will be --
4          MR. SCHRODER:  -- submit it.
5          THE COURT:  -- admitted.  And that will go back to the
6     jury as part of the exhibits.
7        (Plaintiff's Exhibit 30 admitted)
8          MR. SCHRODER:  Yes, sir.  Thank you.
9          THE COURT:  So, Mr. Butler, the ball is in your court.
10         MR. BUTLER:  Judge, I believe that -- okay.  Judge, I
11    think this is adequate.
12         THE COURT:  Okay.
13         MR. BUTLER:  I do.
14         THE COURT:  All right.  I think I agree with you there.
15    So that package in front of you, Mr. Butler -- I don't know if
16    you've got something to clip it together with -- that's a draft
17    copy of the instructions.  I mean, it -- we won't finalize them
18    until the very end tomorrow, just in the event something comes
19    up.  But when we finalize them, we do the verdict forms, we
20    blue-back the forms, and they're ready to go.  But I think both
21    counsel can pretty well presume these are the instructions that
22    we'll be working under tomorrow.  Okay?  Mr. Schroder?
23         MR. SCHRODER:  Looks good, Your Honor.
24         MR. BUTLER:  Yes, sir.
25         THE COURT:  Are we done --

```
1          MR. BUTLER:  Thanks, Judge.

2          THE COURT:  -- for the day?  What we'll do tomorrow is,

3   after the jury begins deliberations, I'll take up briefly the

4   instructions with regard to the forfeiture, so -- we'll take

5   care of that tomorrow, so that we don't have to do all the work

6   tonight.  Okay?

7          MR. SCHRODER:  Sure.

8          MR. BUTLER:  Okay.

9          MR. SCHRODER:  Good.

10         THE COURT:  Okay.  Tomorrow -- what time did I tell the

11  jury to be here?

12         MR. BUTLER:  9 (indiscernible).

13         THE COURT:  No, I -- no, no, no.  This is very

14  important.  I told them that we're going to start at 8:30

15  tomorrow.

16         MR. BUTLER:  Oh.

17         UNIDENTIFIED SPEAKER:  You said 8:20.

18         THE COURT:  I said 8:20, and I wanted them to be there

19  at 8:20 so we could start at 8:30.

20         MR. BUTLER:  Okay.

21         THE COURT:  Now repeat that back.

22         MR. BUTLER:  Thank you.

23         THE COURT:  Do you have that, Mr. Butler?

24         MR. BUTLER:  Gladly --

25         THE COURT:  It's 8:30 tomorrow.
```

1          MR. BUTLER:  All right.  Thank you, Judge.

2          THE COURT:  And make sure your client knows where

3    you're staying, so that we know where to call then.  All right,

4    thank you.

5          THE CLERK:  All rise.  This matter is now adjourned.

6    This court stands in recess till 8:30 tomorrow.

7       (Proceedings concluded at 3:46 p.m.)

1                              CERTIFICATE

2   I certify that the foregoing is a correct transcript from the
    electronic sound recording of the proceedings in the above-
3   entitled matter.

4   _Teresa K Combs_____        _1/30/07_____

5   Teresa K. Combs, Transcriber          Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **INDEX**

| | DIRECT | CROSS | REDIRECT | RECROSS | FURTHER REDIRECT |
|---|---|---|---|---|---|

**PLAINTIFF'S WITNESSES**

| | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| Eugene Johnson | | 2-8 | |
| Michael Foran | 2-34 | 2-87 | 2-104 |
| Eric Cohoon | 2-107 | 2-135 | |

**PLAINTIFF'S EXHIBITS**                                    ADMITTED

| | | |
|---|---|---|
| 10 - Cocaine powder | | 2-48 |
| 11 - Cocaine packaging material | | 2-50 |
| 12 - Cocaine from Rubbermaid container | | 2-51 |
| 13 - Plastic bag, playing card | | 2-52 |
| 14 - Cocaine from dresser | | 2-53 |
| 15 - Plastic bag | | 2-54 |
| 16 - Scale | | 2-55 |
| 17 - Box for scale | | 2-57 |
| 18 - Photograph - sandwich bags | | 2-58 |
| 19 - Currency counter | | 2-60 |
| 20 - MAC-10 submachine gun | | 2-117 |
| 21 - Silencer | | 2-117 |
| 22 - Remington .30-06 rifle | | 2-122 |
| 23 - Mossberg Model 500-A shotgun | | 2-121 |
| 24 - Colt Sporter rifle | | 2-123 |
| 25 - Five rounds of .30-06 ammunition | | 2-124 |
| 26 - Five rounds of 7.62-by-.39 ammunition | | 2-125 |
| 27 - Four rounds of 12-gauge shotgun shells | | 2-126 |

1                        **INDEX** (Continued)

2     PLAINTIFF'S EXHIBITS (Continued)                      ADMITTED

3       28 - ATF Form 4, machine gun                    2-128

4       29 - ATF Form 4, silencer                       2-130

5       30 - Stipulation                                2-204

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COPY
FILED
FEB 3 2007
UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
Deputy

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF ALASKA

3    UNITED STATES OF AMERICA,      )    Case 4:05-cr-00042-RRB
                                    )
4              Plaintiff,           )    Fairbanks, Alaska
                                    )    Thursday, August 3, 2006
5         vs.                       )    8:29 o'clock a.m.
                                    )
6    JASON SCOTT COLETTE,           )
                                    )
7              Defendant.           )
     _____)    **TRIAL BY JURY - 3RD DAY**

8

                        **VOLUME 3**
9

                  **TRANSCRIPT OF PROCEEDINGS**
10

11        BEFORE THE HONORABLE RALPH R. BEISTLINE
                UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13   For the Plaintiff:        BRYAN SCHRODER, ESQ.
                               Assistant U.S. Attorney
14                             U.S. Attorney's Office
                               222 West 7th Avenue, #9, Room 253
15                             Anchorage, Alaska  99513-7567
                               (907) 271-5071
16
     For the Defendant:        REX LAMONT BUTLER, ESQ.
17                             Rex Lamont Butler and Associates, Inc.
                               Signature Building
18                             745 West 4th Avenue, Suite 300
                               Anchorage, Alaska  99501
19                             (907) 272-1497

20   Probation Officer:        TONI OSTANIK
                               U.S. Probation/Pretrial Services
21                             101 12th Avenue, Room 332
                               Fairbanks, Alaska  99701
22                             (907) 456-0266

23   Court Recorder:           ROBIN M. CARTER
                               U.S. District Court
24                             222 West 7th Avenue, #4, Room 229
                               Anchorage, Alaska  99513-7564
25                             (907) 677-6127

*A & T TRANSCRIPTS*
*(817) 685-7556*

```
1   APPEARANCES (Continued):

2   Transcription Service:    A & T Transcripts
                              2517 Shady Ridge Drive
3                             Bedford, Texas  76021
                              (817) 685-7556
4

5   Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**FAIRBANKS, ALASKA - THURSDAY, AUGUST 3, 2006**

1

2

3      (Call to Order of the Court at 8:29 a.m.)

4      (Defendant present; jury not present)

5          THE COURT:  -- and to pick up that language that we

6  discussed yesterday.  Are you aware of that?

7          MR. BUTLER:  Yes, sir, Judge, I picked that up --

8          THE COURT:  You --

9          MR. BUTLER:  -- that we needed to --

10         THE COURT:  Okay.

11         MR. BUTLER:  -- change that.

12         THE COURT:  Also -- did you have that, Mr. Schroder?

13         MR. SCHRODER:  Yes.

14         THE COURT:  Okay.  Also, Mr. Schroder, I'm looking at

15 the verdict form on verdict 3.  Could you look to that and see

16 if it's necessary to do it in that fashion?  You see it has the

17 machine gun, the silencer, and then both.  And I don't know if

18 you need the "both" -- or maybe you do.  I don't know -- see

19 what I'm saying.  "We find that he had the machine gun, we find

20 he had the silencer, we find he had both the machine gun and

21 silencer."

22         MR. SCHRODER:  Well, I was just -- I mean, we could do

23 kind of an and/or thing.  What I wanted to make sure was they

24 weren't confused about thinking they had to pick one or the

25 other.

1          THE COURT:  Well, the and/or thing?

2          MR. SCHRODER:  And/or's fine.

3          THE COURT:  Well, I don't even know why they would be

4    confused by that, because "We unanimously find beyond a

5    reasonable doubt the weapons involved were" -- and then they

6    say yes.  But if you want and/or, that would -- if that makes

7    you feel better, and then -- and, slash, or.  And then strike

8    the last paragraph, the "both."

9          MR. SCHRODER:  Right.

10         THE COURT:  I -- I'm just asking you how you want your

11   verdict form --

12         MR. SCHRODER:  Right.

13         THE COURT:  -- so that it makes sense.

14         MR. SCHRODER:  Right.

15         THE COURT:  Are you following us, Mr. Butler?

16         MR. BUTLER:  Yes, Judge, I am.

17         THE COURT:  So I'm waiting for you, Mr. Schroder, to

18   tell me what you think.  How do you want your verdict to read?

19         MR. SCHRODER:  Oh, I thought you were going to take

20   out --

21         THE COURT:  I will.

22         MR. SCHRODER:  -- the final -- the "both" --

23         THE COURT:  Is that what you --

24         MR. SCHRODER:  -- and do an "and/or."

25         THE COURT:  I will do -- okay, I was just make --

```
 1   let -- thinking you were still thinking about it.
 2           MR. SCHRODER:  No.  No, sir.
 3           THE COURT:  No, you're not thinking about it.
 4           MR. SCHRODER:  No, I --
 5           THE COURT:  Okay.  So it's going to read -- it will
 6   read, the first paragraph:  We unanimously find beyond a
 7   reasonable doubt that the weapons involved were -- then it
 8   says:  Indicate below your factual findings for each of the
 9   following statements.
10           MR. SCHRODER:  Okay.
11           THE COURT:  Ingram Model 10A1 .45-caliber 9-millimeter
12   machine gun, as set forth in 28 U.S.C. Section 45, serial
13   number, blank, yes or no.  And/or -- I don't know if even the
14   "and/or" is necessary when you tell them that they have to do
15   each -- make a finding with regard to each of the following.
16   But if you want it, we can keep the "and/or."  Then it would --
17   "and/or the silencer, a Bowers 9-millimeter suppressor, Model
18   CAC9, as set forth in U.S.C." -- yes, no.  And then we'll
19   strike the last paragraph.
20           MR. SCHRODER:  Okay.
21           THE COURT:  Okay.  That resolves that issue.  Mr.
22   Schroder, any other changes or modifications to the jury
23   instructions?
24           MR. SCHRODER:  No, Your Honor.
25           THE COURT:  Mr. Butler?
```

1          MR. BUTLER:  Judge, it appears that number 21 --

2          THE COURT:  Okay.

3          MR. BUTLER:  -- may potentially be a partial duplicate

4   of number 8.

5          THE COURT:  Okay.  Let's just take a look at that.

6   It's a -- it's -- I think it's probably more than a partial

7   duplicate.  It may be an exact.

8          MR. BUTLER:  Number 8 has a little more information

9   and --

10          THE COURT:  You know, I can do either way.  Sometimes

11   they say in -- the new vogue jury instructions say it never

12   hurts to give the reasonable doubt instruction twice.

13          MR. BUTLER:  Thank you, Judge.  And --

14          THE COURT:  Any objection to that?

15          MR. BUTLER:  No, sir.

16          THE COURT:  Okay.  All right.

17          MR. BUTLER:  And, Judge, on instruction number 17, the

18   very last sentence, starting with "Mere possession" --

19          THE COURT:  Yes.

20          MR. BUTLER:  -- "of a firearm by an individual

21   convicted of a drug crime is insufficient to convict the

22   defendant" --

23          THE COURT:  Okay.

24          MR. BUTLER:  -- the word is -- it says "by an

25   individual convicted."

1          THE COURT:  Okay.

2          MR. BUTLER:  Now, my client is not convicted of

3   anything.

4          THE COURT:  Well, I under -- this is language right

5   from *Rios*.  This just tells the mere possession of a -- of the

6   firearm by an individual convicted of a drug crime is

7   insufficient to convict the defendant -- in other words --

8          MR. BUTLER:  See --

9          THE COURT:  -- if he's not convicted of a drug crime,

10  they won't even be -- care about this language, because this --

11  they don't even get to this issue unless they find that he has

12  either -- guilty of Count 1 or 2.  So if I had a not guilty of

13  Count 1 or Count 2, then they don't even get to this third

14  element.  So what would -- how would you change that language?

15         MR. BUTLER:  Well, I'm just wondering if the word

16  should be "suspected."  So that the jury won't get the

17  impression that my client has a drug conviction.

18         THE COURT:  The first thing they have to address is

19  whether or not he committed the crime of possession of cocaine.

20  Then if they -- if they don't find that, then there's no reason

21  for them -- then they can't possibly convict him of this crime.

22  Or we could say:  Mere possession of the firearm by an

23  individual --

24         MR. BUTLER:  Suspected.

25         THE COURT:  Well, it's not -- that's not right either.

*A & T TRANSCRIPTS*
*(817) 685-7556*

1    So, Mr. Schroder, what do you think?

2              MR. SCHRODER:  Again, I pulled the language right out

3    of *Rios*, Your Honor.

4              THE COURT:  No, this is the *Rios* language, I know that.

5              MR. SCHRODER:  So -- I mean, we could say found guilty

6    of instead of convicted.  I mean that may sound -- may refer

7    them back to -- I mean, it's -- the -- what you're talking

8    about is the first element, unless they find the first element.

9              MR. BUTLER:  "Charged," maybe, instead of "convicted."

10             THE COURT:  I --

11             MR. SCHRODER:  I think that's --

12             THE COURT:  Mr. Schroder.

13             MR. SCHRODER:  -- confusing.

14             THE COURT:  I think this language is appropriate and I

15   don't think it's misleading in the context of this instruction.

16   And it's exactly what they advised us to do in the *Rios* case.

17   I've already modified *Rios* to your liking.  We could strike

18   that whole sentence, and that would -- I don't think you want

19   that.

20             MR. BUTLER:  No, sir, I sure don't.

21             THE COURT:  Okay.  Anything else, Mr. Butler?

22             MR. BUTLER:  No, sir.

23             THE COURT:  Okay.  Looks like we've got the

24   instructions.  So, Mr. Schroder, are you ready?

25             MR. SCHRODER:  Yes, sir.

```
 1          THE COURT:  All right.  Then -- bring in the jury.
 2      (Jury present at 8:38 a.m.)
 3          THE COURT:  Good morning, ladies and gentlemen, how are
 4  you doing?  You look great, if that makes you feel any better.
 5  Here's the plan.  We're going to do closing arguments now.  The
 6  procedure is, the government gets to argue first and then we'll
 7  hear from the defendant and then the government gets to give a
 8  brief response to that.  Then I will read the instructions,
 9  then we'll put all 14 of your names in our spindle here.  See
10  that fancy box?  That's the spindle.  We'll give that thing a
11  crank of a yank, and then my clerk will pull two names out who
12  are the alternates.  And then the remainder will deliberate for
13  the -- as long as necessary.
14          There's one instruction I wanted to read before the
15  arguments.  And I'll read that to you now.  At the close of the
16  trial, counsel have the right to argue the case to the jury.
17  The arguments of counsel, based upon study and thought, may be
18  and usually are distinctly helpful.  However, it should be
19  remembered that arguments of counsel are not evidence and
20  cannot rightfully be considered as such.  It is your duty to
21  give careful attention to the arguments of counsel, so far as
22  the same are based upon the evidence which you have heard and
23  the proper deduction therefrom and the law as given to you by
24  the Court in these instructions.  But arguments of counsel, if
25  they depart from the facts or from the law, should be
```

1    disregarded.

2         Counsel, although acting in the best of good faith, may

3    be mistaken in their recollection of testimony given during the

4    trial.  You are the ones to finally determine what testimony

5    was given in this case as well as what conclusions of fact

6    should be drawn therefrom.  Mr. Schroder.

7                   **CLOSING ARGUMENT OF PLAINTIFF**

8    BY MR. SCHRODER:

9         Morning, ladies and gentlemen.  I said at the -- in my

10   opening statement that this case was about drugs and guns, and

11   that's what the evidence has shown.  The government's evidence

12   has shown that 23 individually-wrapped ounces of cocaine,

13   packaged ready for sale, were found in the defendant's

14   residence, in the defendant's bedroom, in the defendant's safe,

15   on November 28th, 2005.  In addition to the packaged cocaine,

16   law enforcement officers found two additional bags of cocaine,

17   one in the bedroom dresser, one in the -- also in the safe,

18   packed with playing -- with a playing card inside, ready for

19   the cocaine to be cut and mixed.  One of those bags was found

20   in a Tupperware tub in the safe with $38,000 wrapped in

21   thousand-dollar increments, the ill-gotten gain of the

22   defendant's cocaine business.

23        Also in the bedroom and in the kitchen, the officers

24   found a digital scale to weigh the cocaine, plastic sandwich

25   bags to pack it up consistent with what was found in the

1  individually-wrapped bags, and a digital money counter, just

2  what a drug dealer needs to wrap -- to count over $38,000 in

3  cash.

4        What the agents found corroborates what Eugene Johnson

5  had told them they would find in the residence.  What was going

6  on in the residence was that Jason Colette was dealing cocaine.

7  In fact, the defendant had sold Eugene Johnson cocaine just a

8  few days before, which is when and where he got his information

9  that he provided to the police.

10        Now, you don't have to like Eugene Johnson, you don't

11  have to want Eugene Johnson to be -- as a neighbor.  What you

12  need to understand is that you can check Eugene Johnson's

13  story.  What he said was corroborated by what the police found

14  when they served the search warrant.

15        The officers also found guns.  And you heard the

16  agents, men with almost 40 years of law enforcement experience,

17  tell you that where you find drugs, you often find guns, and

18  guns can be used to protect drugs and drug proceeds and also to

19  hinder drug-trafficking rivals, to deter drug-trafficking

20  rivals.

21        That was the case here.  The defendant had a machine

22  gun and silencer that he tactically showed Eugene Johnson.

23  It's tactic work, because Eugene Johnson left his residence

24  that day, he was thinking about that gun.

25        Defendant also kept a loaded pistol-grip shotgun, an

1    assault rifle with magazines loaded and ready, and even a high-

2    powered rifle, all ready in his safe with the cocaine, so he'd

3    be able to handle if there was -- handle any trouble that would

4    come.

5              The judge will -- because, as you will hear from the

6    judge, the -- it's the government's responsibility to prove

7    each and every element of the offenses beyond a reasonable

8    doubt, I'm going to take a few minutes and I'm going to go

9    through those elements with you and the proof that the

10   government has offered to prove each and every one of those

11   elements.  Now, the judge will also give you those elements as

12   part of your instructions, so you'll hear them again from him

13   and you'll also have those elements to read when you get back

14   in the jury room.

15             For charge 1, the elements are:  The defendant

16   knowingly possessed over 500 grams of cocaine and that the

17   defendant possessed it with intent to deliver it to another

18   person.  Now, if you'll allow me to show you a couple things as

19   we go through the process here, we know the -- as I said

20   before, we know the defendant possessed the cocaine because it

21   was in his safe along with his other possessions, including

22   documents that indicated that, you know, he was the owner of

23   the machine gun in the safe.  And we can see the cocaine

24   clearly and the Tupperware tub clearly with the other cocaine

25   and the money in it.

1          We also know that the substance was cocaine.  This is

2    Exhibit 10.  You'll see also Exhibit 12 and Exhibit 14 in the

3    jury room that were the smaller versions, but this is the 23

4    individually-wrapped packages.  This is the cocaine.  We know

5    it's cocaine because it was tested by the lab, and you're going

6    to have a stipulation in the back, which is Exhibit 30, which

7    is going to tell you that the parties have agreed this is

8    cocaine, and, in fact, about 660 grams of cocaine, all total,

9    among the three exhibits.

10          Now, we know the defendant intended to deliver the

11   cocaine for a number of reasons.  First, it was too much

12   cocaine for personal use.  Second, it was packaged in sale

13   amounts, those one-ounce bundles, one-ounce increments.  And

14   you heard Eugene Johnson saying that's what he bought, one or

15   two of those.  Third, it was in the same room as the other

16   material for a cocaine distribution operation.  There was a

17   scale, scale to weigh it, packaging materials in the kitchen,

18   those bags to wrap it in like they found it in, and a currency

19   counter to keep track of the profits.  And as Special Agent

20   Foran told you, somebody again with years and years of

21   experience looking -- work -- investigating the drug trade,

22   those are the hallmarks of a cocaine distribution operation.

23          Count 2 is distribution of cocaine.  The elements are:

24   that the defendant, first, knowingly delivered cocaine; and,

25   second, that he knew it was cocaine or some other prohibited

1    drug.   Now, you've heard testimony that the defendant delivered

2    cocaine to Eugene Johnson that time that Mr. Johnson was there

3    buying cocaine two -- a couple of days to a week before the

4    November 28th date of the search warrants.   That's where he got

5    the information that he provided to the police.   He was there,

6    he bought cocaine that day.

7         How can we tell that the defendant knew it was cocaine?

8    He sold it to for him for $1,100 an ounce.   And you don't sell

9    any other kind of white powder, I don't think, out there for

10   $1,100 an ounce.   He knew it was cocaine.

11        Again, Eugene Johnson guards his information closely, I

12   think you can tell that.   But the information he gave was

13   accurate.   And again, I go back to you can evaluate it by

14   checking it against what he told you on the stand and told the

15   police they would find at the residence.   Told them that

16   defendant dealt drugs out of his bedroom, dealt drugs out of

17   his safe, and when the police went in there, that's what they

18   found.   They found in the safe -- drugs ready for sale in the

19   safe in the bedroom.   And he said they were in one-ounce

20   packets.   He described them, he described the brown shopping

21   bag they were in.   That's in the packing materials you'll see.

22   And described the machine gun and the silencer.   That's what he

23   told the police, that's what he told you.   All of that is true.

24   That checks what he says.

25        And no matter what reason the defendant might give that

1    suggests Eugene would -- Johnson would give you false

2    information, corroboration of the testimony shows that what he

3    told you on the stand, he was straight, what he provided, the

4    information he provided here.

5         Count Number 3 is possession of a firearm in

6    furtherance of a drug trafficking crime.  First element of that

7    is that the defendant committed one of the first two offenses,

8    count 1, possession with intent to distribute cocaine, or Count

9    2, distribution of cocaine.

10        Second is the defendant knowingly possessed, in this

11   case, the Ingram Model 10, MAC-10 machine gun.  You got the

12   serial number, you'll see it, it's going to go -- to be in

13   evidence.  And the Bowers suppressor, either one of those

14   things.  And, third, that the defendant possessed that firearm

15   in furtherance of a drug trafficking crime.

16        Now, based on the reasons I discussed, the government

17   will ask you to find the defendant guilty of Counts 1 and 2,

18   the underlying drug trafficking crimes.  The defendant

19   possessed the silencer and the -- or the machine gun and the

20   specially fitted silencer because it was in his safe.  That's

21   how we know he possessed it and -- along with his other

22   belongings.  And especially we know that he possessed it

23   because in the safe were the documents that indicated that he

24   had purchased the weapon.

25        And you've heard from the agents that the gun was found

1  in the safe.  And you'll have the gun and the silencer to look

2  at.  And how do we know it was used in furtherance of the drug

3  trafficking crime?  Because you heard testimony from Eugene

4  Johnson, he came in to buy on that last time, it was out of the

5  safe, it was on the dresser.  The defendant specifically drew

6  his attention to this, hey, look at this, showed it to him,

7  displayed it to him.

8         And we also know it's used in furtherance of the drug

9  trafficking crime -- another way we can tell is you can look at

10 those pictures of this being top center, right on top of that

11 safe.  So when Eugene Johnson or anybody else comes in there to

12 do the deal, that safe is opened up to get the cocaine, the

13 first thing sitting right on top is this gun.

14        Count 4 is also possession of a firearm in furtherance

15 of a drug trafficking crime.  Again, first element is

16 conviction of either Count 1 or 2, the underlying drug

17 trafficking crime.  Second, that the defendant knowing --

18 knowingly possessed a firearm -- in this case what we've

19 presented to you as evidence is three weapons, a pistol-grip

20 12-gauge shotgun, a loaded .30-06 rifle, and a Colt Sporter.

21 The shotgun, the rifle were loaded; the Sporter had a magazine

22 loaded nearby, right near the weapon.

23        Again, we'll ask you to find the defendant guilty of

24 Counts 1 and 2.  He possessed these guns, again, because they

25 were in his safe, in his bedroom, in his home.  The defendant

1  possessed these in furtherance of the drug trafficking crime

2  because these were loaded weapons in a strategic position --

3  and we'll just start with the shotgun -- loaded possessions in

4  a strategic position in the safe to be ready to use if there

5  was a problem.  Loaded with a round in the chamber.  The

6  Sporter had the magazine nearby, loaded, ready to put in if

7  need be.

8         The other things about these is, again, they -- you

9  heard the agent say they're in the front of the safe; anybody

10 coming in when that safe is open to do the cocaine deal,

11 they're going to see certainly a machine gun, but they're also

12 going to see these things sitting toward the front of the safe,

13 again telling anybody who's involved in the drug business that

14 this guy has plenty of firepower.

15        Defendant was running a cocaine distribution operation.

16 He had all the material needed to package and distribute

17 cocaine and to count the ill-gotten gains.  He also had cocaine

18 itself, again, the 23 individually-wrapped packages, ready for

19 sale.  You heard different estimates of numbers, but at a

20 minimum, over $23,000 worth of cocaine and over $38,000 in

21 cash.

22        He distributed that cocaine to Eugene Johnson on the

23 occasion Mr. Johnson talked about here, which led to a police

24 search of his residence, and just as Mr. Johnson described, the

25 police found the evidence of Jason Colette's drug distribution

1    operation.  Defendant also had guns, as we see, an

2    intimidating, fully-automatic, silenced machine gun, plus a

3    loaded pistol-grip shotgun, a high-powered rifle, and a -- and

4    an assault weapon.

5          Is the defendant a gun enthusiast?  Maybe.  But what we

6    know is he's a cocaine dealer and he's got drugs and money to

7    protect.  One function of those guns was to protect -- again,

8    we have many functions of guns, but certainly one of the

9    functions of those guns was to protect the cocaine and the

10   money that was sitting next to it in the safe.

11         Now, the government has provided extensive evidence of

12   the defendant's drug trafficking operation.  That evidence is

13   the foundation of the facts that you are tasked to find in this

14   case.  Don't let yourself be swayed by any speculations that's

15   unsupported by evidence and facts.

16         The facts are that the defendant was running a cocaine

17   distribution operation.  He distributed cocaine to Eugene

18   Johnson and he kept guns close and strategically placed near

19   his cocaine and his money to protect them.  The government will

20   ask you to find a verdict of guilty on all counts.

21         THE COURT:  All right, thank you.  Mr. Butler.

22         MR. BUTLER:  Thank you, Judge.

23                   **CLOSING ARGUMENT OF DEFENDANT**

24   BY MR. BUTLER:

25         Good morning, ladies and gentlemen.  So I don't forget,

1    thank you for your attention that you've paid to this case.

2    I'd like to go over a few things with you.  Let me start with a

3    couple of jury instructions.  Proof beyond a reasonable doubt

4    is the level at which you are required to find the evidence in

5    order to convict anyone, any person, in our country.  You can't

6    do it based on mere speculation.

7         And there are several evidentiary standards with the

8    law.  One is what is called by a preponderance of the evidence.

9    That's an evidentiary standard where it's more likely than not

10   that the -- that one side will win if they produce 51 percent

11   over 49 percent in evidence.  Other words, you -- imagine a set

12   of scales.  Evidence on one side, evidence on another, and you

13   weigh it and you make the decision based on what is called the

14   preponderance of evidence, so -- there's another evidentiary

15   standard in the law.  It's called clear and convincing; the

16   evidence was clear and convincing.  That's an even greater

17   burden of evidence, much more than mere preponderance of

18   evidence.  And then, when a person in our country is accused of

19   a crime, the evidentiary standard is beyond a reasonable doubt.

20        Now, the Court has read you an instruction on beyond a

21   reasonable doubt.  You'll be given those instructions.  And

22   that instruction reads in part:  Proof beyond a reasonable

23   doubt must be proof that leaves you firmly convinced that the

24   defendant is guilty.  It is not required that the government

25   prove guilt beyond all possible doubt.  However, reasonable

1    doubt is a doubt based on reason and common sense and is not

2    based purely on speculation.  It may arise from a careful and

3    impartial consideration of all the evidence or even the lack of

4    evidence.

5            Now, as I speak to you as jurors, I'm speaking to each

6    one of you individually, even though I'm talking to you as a

7    group.  And the reason for that is because each one of you

8    individually has to make up your mind about this case.  Now, as

9    a group, you'll talk about the evidence, you'll talk about your

10   perception of the evidence, because we all have different

11   perceptions.  You'll talk about how you -- in your mind, you've

12   put this evidence together.  But in the end, when it comes time

13   for you to vote, you must vote your own conscience about the

14   evidence.  So each of you equally have a vote about how you

15   perceive the evidence that came into this case.

16           Now, I have one opportunity to speak to you this

17   morning.  My colleague will come back again and speak again to

18   you.  And the reason for that is because that table there bears

19   the burden of proof completely, unequivocally, and so they give

20   them another opportunity to respond to what I say and to

21   attempt to persuade you to find Mr. Colette guilty.

22           On or about October 29th, 2004, Jason Colette made

23   application for a fancy firearm and silencer.  In this

24   courtroom it's been referred to as a machine gun.  And if you

25   like guns, you may like something like that.  For some people,

1    the gun looks eerie; for some people, any gun is eerie.  But as

2    all of you know, in Alaska probably many of the people that you

3    know own a variety of guns.  And even if you conclude that the

4    gun owner has done something wrong, broken some law, in this

5    case today you must decide whether the ownership of these guns

6    was in furtherance of a crime.

7          Agent Foran, I believe it was, told you that drug

8    dealers don't like law enforcement scrutiny.  They don't like

9    law enforcement attention.  That's what he said to you.  If you

10   don't like law enforcement attention and you're a drug dealer,

11   you don't apply for that kind of a firearm.  Why?  Because the

12   process to get that kind of firearm, you don't walk into Fred

13   Meyer today, put your money down, fill out your paperwork, and

14   come back three days later and pick it up.

15         How long did it take?  It took all the way until

16   October 17th, 2005, after scrutiny by law enforcement, and even

17   the chief law enforcement of the city had to sign off on it.

18   If you're a drug dealer, ladies and gentlemen, you do not

19   invite that kind of scrutiny.  After extensive checks -- the

20   agent said for that kind of purchase you have to have extensive

21   checks.  And why do you have the local law enforcement officer

22   as the one who has to sign off on it too?  Because the local

23   law enforcement officer knows more about what's going on in the

24   community than anyone else, than people outside of the

25   community.

1          On or about November 8th, 2005, a controlled buy took

2    place in which Eugene Johnson sold 44 grams of cocaine to --

3    Mr. Salsbury (ph) is that name he gave you.  Unbeknownst to

4    him, Mr. Salsbury was working for law enforcement.  What is the

5    good thing about a controlled buy?  What does it mean, what

6    does it do?  It lets you know whether a person is in fact a

7    person who, what, sells drugs.  Is this person an individual

8    who sells drugs?  You make what, a controlled buy.

9          Now, none of us here are privy to the conversation

10   between Mr. Johnson and Trooper Wall when Mr. Johnson alleged

11   that Mr. Colette was a drug dealer.  In fact, I'm not sure that

12   Mr. Johnson said to them up -- he's a drug dealer.  Mr. Johnson

13   tells you, "They said they wanted cocaine on the table, or dope

14   on the table, so I gave them Jason, a person that I don't have

15   any issues with."  So when they pull out that fancy firearm and

16   say somehow they want you to believe that Mr. Colette tried to

17   intimidate Mr. Johnson, there was no intimidation of Mr.

18   Johnson.

19         Sure, Mr. Johnson came in and said, "Yeah, well, I

20   thought about robbing him.  You know, you rob a drug dealer,

21   they don't go to the police."  But Mr. Johnson knew what the

22   charges were against Mr. Colette.  Mr. Johnson wants to secure

23   his deal.  You heard him on the witness standing talking about

24   it:  "I don't want to go to jail, I'm not supposed to go to

25   jail, I'm not supposed to have jail time, that was the deal."

1   He said, "Trooper Wall cut the deal with me."  The first day he

2   testified he said Trooper -- deal -- cut the deal with him

3   without making any calls to the district attorney's office,

4   without anything like that happening.  Then, on day 2 -- we

5   don't know what happened, after he left the witness stand and

6   before he came back to the witness stand the next day, but when

7   he came back to the witness stand the next day, what did he say

8   to you?  "Yeah, it may have happened after all, I was under a

9   lot of stress," he may have made the call.  You saw him right

10  in front of you change his tune, right in front of your face.

11          So even if you say, I don't know whether this guy tells

12  the truth or not, I don't know if what he's saying was the

13  truth or not, you saw him at least on that occasion, right here

14  in front of you, say one thing day 1 and something different on

15  day 2.  Because why?  He needs to secure his deal.  And the

16  only way he's going to secure his deal is he's got to do what?

17  Please the master.

18          But at the same time, do you doubt that he's a savvy

19  criminal?  "I'm going to rob this person.  You start with drug

20  dealers, and then if there's no drug dealers and, yeah, I need

21  some money," what does that mean?  That means he'll rob one of

22  us here in this courtroom.  And when he cleaned up his house of

23  the drugs and drug paraphernalia -- and we'll get back to

24  that -- he didn't clean it up of the guns.

25          This case is built on the words and the credibility of

1    Mr. Johnson, a person whose word no one in this courtroom would

2    rely on to make an important decision.  This is why my

3    colleague, when he argued to you, said, "We've corroborated Mr.

4    Johnson, we've corroborated Mr. Johnson."  Well, I'm going to

5    tell you why in a few minutes, why Mr. Johnson has not been

6    corroborated.

7            Mr. Johnson didn't want to admit to you that he had two

8    residences.  He's living at 1008 23rd, he's listed in APSIN

9    at -- what was it -- 1315 or 1215 23rd.  And I asked him, I

10   said, "Well, why would the informant say you went over to this

11   address with the back yard, then came over?"  "Well, I wouldn't

12   keep any drugs at my parents' house.  That's my parents'

13   house."  Then he told you, "Well, I get my mail at that house."

14   Of course I asked him and I think he eventually admitted that

15   under the Alaska records, that's his address over -- at that

16   house.  And I think it was Agent Foran that told you that drug

17   dealers often have more than one residence, more than one

18   place, a place where they keep their drugs.

19           But yet you're being asked in this courtroom to rely on

20   the words and the credibility of Mr. Johnson.  You saw him up

21   there on the witness stand.  He wouldn't even tell anyone who

22   his, quote, unquote, sources of cocaine are.  What did he say?

23   "Well, I'm not -- I got a family to be concerned about."  Well,

24   now, if you're running around robbing people and robbing drug

25   dealers -- you know, again, this guy is lying to you.  It's

1    just that simple.  If you have a family that you're worried

2    about, you're not going to run out there and rob a drug dealer,

3    or anybody else.

4           But he told you, "I will not tell on my drug sources."

5    Why not?  It's obvious.  He wants to cut his deal, stay out of

6    jail, don't go back to jail.  So what will he do when he stays

7    out of jail if he hasn't burned these drug suppliers, ladies

8    and gentlemen?  What is he doing right now while we're in this

9    courtroom?  He doesn't work.  He's got two places to pay for.

10   He's got all of those cars.

11          Agent Foran told you, drug dealers commonly launder

12   money through cars, some of them vintage, some of them

13   sporty -- while he lives a life of deception driving around in

14   that 1979 brown or copper van, whatever color it is.  This is a

15   person who lives a life of deception and will tell the trooper,

16   "It's none of your business."  He as much as said it on the

17   witness stand.  Well, quite frankly, I wouldn't tell the

18   trooper it's none of his business.  Would you?  The question

19   is, who's running the show here.

20          Somewhere between November 8th, 2005, after this

21   controlled buy that tells you clearly that Mr. Johnson is a

22   drug dealer, and November 28th, '05, when his house was raided,

23   Mr. Johnson received some information, right?  Now, he wouldn't

24   tell you who told him that information.  But he received

25   information that they said they're going to clean up the south

1  side.  He said he got it from an elder at the church.  Well,
2  Mr. Johnson -- I submit to you, probably no one in this
3  courtroom believes Mr. Johnson is going to church.  And how
4  would an elder know what you're involved in and what you're
5  doing, so they can walk up to you and say you, "Hey, you know
6  what's going on; they're cleaning up the south side."
7      Well, how big is the south side?  Two houses, both of
8  them belonging to Mr. Johnson?  That doesn't make any sense.
9  They're cleaning up the south side; I better get rid of my
10 drugs.  You better believe that whatever information he
11 received was more pointed than, "We're cleaning up the south
12 side."  And based upon that, he had to get rid of -- what did
13 Mr. Salsbury tell police about this black scale?  "I don't have
14 a black scale."  So why would Mr. Salsbury -- well, we forgot.
15 Mr. Johnson's not going to tell the truth about anything,
16 unless it benefits Mr. Johnson.
17     So Mr. Johnson has to get rid of things.  Do you doubt
18 that Mr. Johnson has money?  All those cars that he's
19 laundering money with?  Salsbury says this guy's moving a kilo
20 a week.  The drugs that they bought seemed like it came off the
21 brick.  Who has the inostitol in the house, the cutting agent?
22     Mr. Johnson admits that he was at Mr. Colette's house
23 days before November 28th, 2005.  Now, here's a guy that won't
24 tell on his sources of cocaine -- not even one -- he didn't
25 give you one name in this courtroom, would he, not one name.