1  But he -- "I got multiple sources of cocaine."  Wouldn't give

2  up even one name, because why?  "I don't -- I'm afraid."

3          Well, here is a man over here that's got hardware like

4  that.  So if he is your source of cocaine and you're not going

5  to give up your sources to law enforcement officers because

6  you're afraid, then why would you, quote, unquote, "I gave them

7  Jason"?  If you don't want to give up your sources of

8  cocaine -- he wouldn't even give up one name in this

9  courtroom -- then, circumstantially, Jason is not a dealer for

10 him, is not a supplier.

11          But let's talk about Jason for a minute too.  If you

12 have cocaine, money, things of that nature, that you want to

13 put somewhere while the law enforcement officers, quote,

14 unquote, clean up the south side, do you give them to someone

15 who's a drug dealer, who might sell your product and get the

16 money, and then can turn around and blow you away if you come

17 to the house?  You're going to put it somewhere with somebody

18 safe who's not going to touch it, not going to sell it, not

19 going to rip you off, somebody who's probably quiet and

20 unassuming.  Not another dealer.  Not someone that you're going

21 to be afraid of.

22          So he admits that he was at Jason's house.  Now, he

23 claims that he went to Mr. Colette's house, he purchased

24 cocaine, and while there, he looked in the safe and he saw the

25 bag -- and you'll have the photographs of it -- he saw this bag

3-28

1    and it has zips in it.  So he was able to focus -- let's
2    imagine for a moment.  Let's imagine that safe, supposedly big
3    enough to put me in -- unlikely.  What does that tell you?  He
4    says, "It was a big safe.  Could put you in it."  Well, maybe
5    20 years ago, you could put me in it, but not today.  What does
6    that tell you?  He does -- he hasn't seen the safe.  He wasn't
7    in that bedroom.  He may have been there long enough to drop
8    off things and ask somebody, "Hold this for me," knowing that
9    they have a safe, but he didn't see the safe.  How do you know
10   he didn't see the safe?  Because when he was on that witness
11   stand -- how big is that safe, Mr. Johnson?  He started out
12   like this, didn't he?  Then he started coming down like this.
13   Four feet, Mr. Johnson?  "Big enough to put you in," he says.
14        But there's another reason why you know he didn't see
15   the safe.  Because -- counsel, let me borrow the exhibit for a
16   moment.  You cannot look in that safe and see a plastic bag
17   with zips in it without what?  Seeing all those guns.  What's
18   he got, a couple of handguns and that -- what he referred to as
19   an Uzi.  It's impossible to be able to look in that safe, focus
20   on a bag with zips, and not see all those guns in there.  He
21   never saw the safe.  He never saw inside the safe.  It's right
22   there.  Mr. Johnson, you lied again.  Tried to make like Mr.
23   Colette, while he was at the house, intimidated him with that
24   Uzi.  You don't intimidate somebody with that when you say,
25   "Hey, look at my brand-new toy, look at my new toy."

1          My colleague here, he wants to argue to you that Mr.

2    Colette had these firearms in furtherance of a drug trafficking

3    crime because he's a gun collector, ladies and gentlemen.  Do

4    you doubt it?  All these weapons, he's a gun collector?  "Look

5    at my new toy."

6          If someone broke into Mr. Colette's house while Mr.

7    Colette and his family were eating dinner, laying in bed,

8    whatever the case may be, he'd have to fight them hand-to-hand

9    to protect his family.  Why?  The guns are locked up in a safe.

10   If I've got guns to protect drugs, I'm going to have them

11   around my house, by the nightstand.  Here's a person with a lot

12   of guns who couldn't use it to protect his family if somebody

13   broke into his house.  He wouldn't have time to jump up, open

14   up the combination of the safe, grab up a gun that was loaded.

15   The fancy gun, this one here, didn't even have bullets for it

16   in the safe, in the house.  Yet they charge Mr. Colette with

17   possession of that firearm in furtherance of a drug trafficking

18   crime.

19         We're talking about evidence.  We're talking about you

20   as judges of the facts.  You wear a robe, just like Judge

21   Beistline does.  You have to make an impartial decision based

22   on the instructions that he gives you and the evidence you

23   heard and your perception of that even.  And if I misstate

24   something, let me say right now, I apologize in advance, I

25   wouldn't do it on purpose.  If I make a mistake, you certainly

1    remember what the evidence was.

2         Do you have a buy of cocaine from Jason Colette in this

3    courtroom?  If you as jurors who must evaluate evidence and

4    evaluate the future of a human being -- you have a right to ask

5    that question.  Well, you set up a buy with Salsbury, you went

6    into Mr. Johnson's house and you purchased cocaine.  Mr.

7    Johnson tells you, supposedly, that he can buy from Mr.

8    Colette.  He essentially says, "He's the source of my cocaine."

9    If that is true, if there's even one scintilla of truth to it,

10   let's go buy cocaine.  What did Mr. Johnson tell you?  "Mr.

11   Colette is a person with whom I have no issues."  Right?

12   That's what he said.  So if that's the case, and you really

13   want to convict that man of being a drug dealer, go make a buy.

14   Let's convict -- let's convince citizens that this man is a

15   drug dealer.  You did it that month earlier on Johnson.

16        It doesn't matter that Mr. Colette has firearms in his

17   house.  It doesn't matter that he has these firearms or others.

18   Because why?  Mr. Johnson says, "He showed me his, quote,

19   unquote, new toy.  I have no issues with him.  Other words,

20   there's no animosity between us.  And he's a source of

21   cocaine."

22        Mr. Johnson should have been an insurance underwriter.

23   Because when he went to Mr. Colette's house with his product,

24   that's the only way he would know the kind of bag it was in --

25   remember, I said, "Well, you didn't say that before."  He said,

1    "I told them what kind of bag these drugs were in.  And I told

2    them they were in zips."  But yet, at the same time, we know he

3    didn't see inside the safe, and he claims that's what happened.

4    He went in there inside the safe.  Mr. Colette pulls out the

5    stuff.  That was his claim.

6         Mr. Johnson created an insurance policy for himself.

7    There it is, right there.  Then -- and I -- this is what I

8    submit to you.  I submit to you that Salsbury told Johnson that

9    they were on to him.  Who else could it have been?  You know it

10   was no elder at the church, unless Salsbury's an elder at the

11   church.  But they grew up together, so he's not an elder at the

12   church.

13        Circumstantial evidence.  The Court told you that if

14   you wake up in the morning and there's snow on the ground, you

15   know it snowed last night.  It doesn't take a rocket scientist

16   to figure out, Mr. Johnson, whether you want to tell it or not,

17   that Salsbury told you they were on to you.  Because he's the

18   one that went in and did the buy on you.  There's nobody else

19   it could have.  There's no leak in the troopers that's going to

20   put the -- a career on the line for Johnson.

21        Trooper Wall is not going to get up and lie on the

22   witness stand and say, "I didn't offer Johnson a deal; I

23   couldn't, I had to call the DA's office," while Johnson on the

24   other line -- on the other hand says, "Oh, yes, you did" --

25   well, who are you going to believe?

1          And Mr. Colette sits there, charged with selling to

2    Johnson, with no proof other than Johnson's word.  No proof

3    other than the word of Johnson.  Is his word enough to convict

4    anybody of anything?  He's going to lie to the troopers, he's

5    going to lie in front of you, he'll lie under oath.  As some

6    people say, when is Mr. Johnson is lying?  When his lips are

7    moving.  And it's sad, really.

8          When you're dealing with a person like Johnson and you

9    know already that he lacks credibility, then you have to go to

10   what -- not -- you have to go to circumstantial evidence.  The

11   Court told you at the beginning of the case, circumstantial

12   evidence can be as strong as direct evidence.

13         I spoke of Mr. Colette as an insurance policy.  Well,

14   first of all, Mr. Johnson knows Mr. Colette is a business

15   owner.  So he's working at his own business.  And if any of you

16   have ever worked at your own business, you know what it takes.

17   You know the kind of hours you've got to put in to make it

18   work.  He knows that Mr. Colette, a business owner, is probably

19   a taxpayer, somebody who is unassuming.  He knows this.  Rest

20   assured, Mr. Johnson is no dummy.  In fact, Mr. Johnson -- it's

21   probably fair to conclude that Mr. Johnson believes he's the

22   smartest person in this courtroom when he was in here.  Smarter

23   than anyone else.  "I'm not giving up my sources," essentially,

24   what he said.  That's why I asked him, "You're saying it's none

25   of our business?"  I don't -- he doesn't have to to secure his

1  deal.  He -- all he had to do was put drugs on the table, and

2  he had to do it with a person that he wasn't afraid of, not

3  intimidated by, not, quote, unquote, you know, "I could get

4  hurt, my family."  But, you know, it's almost like being in a

5  Catch-22, isn't it?  Here, on the one hand, this guy talks

6  about, "I won't burn a source because I got family to worry

7  about, myself and my family to worry about."  But on the other

8  hand, he'll run around, according to him, and rob drug dealers.

9       Maybe that was just talk.  I mean, you can't be afraid

10  on one hand, then run around, brazen, with a firearm, robbing

11  drug dealers on the other.  But if you know that the master

12  wants to make a case about guns and drugs, you can say, "Yeah,

13  I thought about robbing him, but when I saw that gun there I

14  said, "Oh, boy, I better not."

15       Now, my colleague over there will try to tell you that

16  Mr. Colette has his guns, these drugs, this money all in one

17  safe, and therefore it's almost impossible to rob him because

18  he's got his guns right there.  Well, we've all watched a

19  little TV.  And while a lot that's on TV you can't rely on; but

20  when people are going to rob you, they're right there in your

21  face with a gun.  Doesn't matter if you've got a gun somewhere

22  loaded.  They're right there in your face with a gun.  But we'd

23  have to assume -- you'd have to assume that Mr. Colette is the

24  kind of person who would try to shoot somebody, a person who

25  went through an extensive background search, who invited the

1  scrutiny of law enforcement.  There was a movie, "Who Framed

2  Roger Rabbit."  Who framed Jason Colette?  "They wanted dope on

3  the table.  I gave them Jason."

4        Sometimes a drug dealer has to write off the drugs, the

5  money, to keep their freedom.  Why?  Because as long as I keep

6  my freedom, as long as I don't give up my sources, I stay in

7  business.

8        Mr. Johnson didn't really even want to admit that he

9  was a drug dealer or how long -- how many things that he -- he

10  didn't want to respond to?  His sources -- let's see.  There --

11  what, I thought I counted at least three things.  He wouldn't

12  tell you where he put his stuff, because why?  He'd lose his

13  deal and probably end up sitting where Mr. Colette's sitting.

14  He wouldn't say where it was.  In fact, what he tried to --

15  "Well, I sold it all."  But yet when they got there, he made a

16  mistake.  He forgot to sell the inostitol, the cutting agent.

17  And how do you know that those drugs were his drugs?  Look at

18  the purities:  40-some percent, 50-some percent, maybe 60

19  percent.  And what did the -- what did Agent Foran tell you --

20  Agent Foran, I'm sorry.  He said that inostitol is the most

21  common what?  Cutting agent.

22        Those drugs were already cut up, bagged in a grocery

23  bag or whatever kind of bag you want to call it.  And in order

24  for Mr. Johnson to know about that bag and know that what was

25  in it was in zips, one ounce is what he called them --

1  circumstantial evidence.  Or that he wouldn't say who tipped
2  him off.  So Mr. Johnson is only going to tell you what he
3  wants you to know.
4       Just excuse me.  I'm cutting down the amount of time
5  I'll be standing in front of you.  I know jurors like to hear
6  that.  I'll be sitting pretty soon, but let me just make sure
7  I've made all my points here.  Ladies and gentlemen, there were
8  no baggies in the safe.  The only baggies at Mr. Colette's
9  house were in the kitchen, where you might expect to find them
10 when you're going to make sandwiches for yourself, your
11 children, whatever the case may be.  There was no inostitol
12 found in Mr. Colette's house, no cutting agent.  Basically what
13 you -- what they found was a bag of drugs, a canister with
14 money, a card in it, some cocaine, all in the safe.
15      They found a scale in a box next to the money -- the
16 money counter, yes.  Oh, yes.  Mr. Johnson really got animated
17 on that money counter, didn't he?  I mean, you saw it.  He
18 really got animated, didn't he?  It was almost as though what,
19 he was recognizing his own object.  You saw it.  He reacted to
20 that more fanciful than the pictures, drugs, anything else in
21 the courtroom, didn't he?  "Oh, yeah, I remember that money
22 counter.  That's Jason's money counter."  He almost jumped out
23 of character, didn't he?  And his character changed.  For the
24 brief moment, his character changed.
25      Mr. Colette lives in a trailer with his family.  He

1   works a business.  Mr. Johnson lives in a house.  And even if

2   we accept for the sake of argument that the other house is his

3   parents' house, as he tried to tell you, he lives in a house

4   and he has numerous cars, numerous cars, vintage and sporty.

5   In fact, he corrected me on the years, didn't he?  But he did

6   say he didn't have a Trans Am.  But he wouldn't tell me what

7   other car it was.  He just merely said, "I don't have a Trans

8   Am."  Car with hydraulics, Caprices, '65 Chevys.  Anybody in

9   here that knows anything about knows that these are collector's

10  items, vintage and expensive.

11           Ladies and gentlemen, Count 1, possession with intent

12  to deliver, to anyone, regardless of whether there's money

13  involved or not, what does that mean?  That means that a person

14  can't come before you and say, "Yes, I possessed it, but I

15  didn't sell it.  I wasn't going to sell it, I was going to give

16  it away."  So therefore the law says possession with intent to

17  deliver to another person, regardless of whether it's -- if

18  there's any finances involved in the transaction or not.

19  However, each of you has notepads there, don't you?  Now, these

20  notepads, are they yours?  Who do they belong to?  Belong to

21  the court.  The court controls them.  So while you may have

22  them in your hand for now and the court will get them back, I

23  submit to you that when the court gets them back from you,

24  that's not you delivering them to the court.  They belong to

25  the court.  They will always belong to the court.  You won't

1    take them out of this courtroom except to deliberate.

2          Count 2, delivery of cocaine. Question: Even by a

3    preponderance of the evidence, more likely than not. Not clear

4    and convincing. Not beyond a reasonable doubt. But even by a

5    preponderance of the evidence. If Mr. Johnson said to you

6    anything, "I bought this, I sold that, I bought cocaine from

7    Jason Colette," could you even by any stretch of the

8    imagination find him guilty? Even if the Court said, "For that

9    count, ladies and gentlemen, you can use preponderance of the

10   evidence, more likely than not it's true," I submit to you the

11   answer is: What? No way.

12         Possession of the firearm and silencer in furtherance

13   of a drug trafficking crime. Possession of these firearms in

14   furtherance of a drug trafficking crime. Why? Because they're

15   in your safe at home. A safe that is safe from -- you got

16   children in the house. If you have a safe, that's probably

17   where you're going to put belongings to protect them from

18   theft.

19         Now, my colleague will come back maybe and say, that's

20   why the drugs are in the safe. And because the drugs are there

21   and the guns are there, therefore the guns are there in

22   furtherance of a -- that's a leap, ladies and gentlemen.

23   There's no evidence here that Mr. Colette ever armed himself

24   and sold a drug to anyone. There's no evidence here he ever

25   sold a drug to anyone. There's no evidence in this courtroom

1    that he sold a drug to any human being on earth.  You have to

2    put a lot of faith into Mr. Johnson in order to make that leap

3    of faith.  And I submit to you, it's going to be your decision.

4    You are the judges.  It should not happen.

5            Ladies and gentlemen, I submit to you, this is not even

6    a close question as to possession of firearms in furtherance of

7    drug trafficking.  Do you have a person selling drugs with a

8    gun in their pocket, gun down here in front of their pants, or

9    the gun behind their back, on the street selling drugs, pulling

10   guns, wanting to rob people?  Do you have that?  Have any

11   evidence of that?  Do you have any evidence that he sold a drug

12   to anybody?

13           If a person says, "Look at my new toy," that's not

14   language of, "These guns, you mess with me, I'm going to shoot

15   you."  Remember, Mr. Johnson said what?  "I had no issues with

16   him."  You can believe that.  "I'm uncomfortable being up here

17   because he's a person I have no issues with."

18           Drug dealers have issues among themselves, don't they?

19   I mean, Agent Foran -- both agents as much as said that.  Isn't

20   that what they basically told you in their expertise, that they

21   have to protect their drugs from each other, they have to

22   protect themselves from being ripped off, they carry guns for

23   that purpose.  And the fact that they may do business with each

24   other -- they have issues among themselves.  That's why Mr.

25   Johnson wouldn't tell you who his sources were.  He won't even

1  tell law enforcement.  They're holding the keys to his jail

2  time, and he's still, "I ain't telling you.  I'm not even going

3  to tell you who told me you were coming for me."  He's the man

4  in this courtroom.  At least that's the way he acted.

5       If he's got no issues with Jason Colette, Jason Colette

6  is not a source of dealings, didn't sell him anything, didn't

7  threaten him in any way with guns -- there's no evidence that

8  Mr. Colette ever threatened another human being in his life

9  with any kind of a firearm or anything like that.  There's no

10 evidence that he ever used a firearm in furtherance of a drug

11 crime.  Where is your evidence?  The fact that he's got some

12 loaded guns in a gun safe locked up, that's your evidence?

13      They may argue that, well, the purpose that they were

14 in the safe with the guns is -- no.  Don't fall for that,

15 please do not fall for that.  Require some evidence.  Require

16 some evidence that in the person's mind, they intended the guns

17 to support the drugs.  Please require some evidence.  And it's

18 got to be more than a preponderance.  It's got to be more than

19 just clear and convincing, which I submit it is not.  It's got

20 to be beyond a reasonable doubt.

21      Now I'm going to relinquish the floor to my colleague,

22 who will say whatever he's going to say and argue to you

23 whatever he's going to argue.  I wish I had the last word.  I

24 don't get it, but that's okay.  Because the evidence is in.

25 The evidence is in.  And it must be evidence beyond a

1  reasonable doubt, beyond a reasonable doubt.  You must be

2  firmly convinced, firmly convinced.  And I submit that as you

3  speak with your fellow jurors and you decipher the case, you go

4  over it, the evidence and what have you, I submit to you,

5  ladies and gentlemen, that you will conclude and certainly we

6  hope you will conclude that Mr. Colette is not guilty.

7          Mr. Johnson is far from credible in any way, shape, or

8  form.  Mr. Johnson is a manipulator, savvy criminal, who loves

9  to be in control.  Thank you for your time and your attention.

10         THE COURT:  Thank you.  Mr. Schroder.

11                    **FINAL ARGUMENT OF PLAINTIFF**

12  BY MR. SCHRODER:

13         Let me start off by touching on a few of the points

14  that defense counsel made in his closing.  And I'll just kind

15  of go down them in order as I took my notes.  The defendant

16  called for making the buy; the government should have made a

17  buy.  What the agents had was good, solid information that a

18  large amount of cocaine was in a place.  They also had

19  information -- and defense brought that up pretty clearly --

20  that there was someone, it appears, giving information about

21  what they were doing.  They were not going to wait any length

22  of time to set up a buy to go get drugs that -- where they knew

23  where they were.  They weren't going to give any extra time for

24  those drugs to be sold anywhere else.  They had the

25  information, they went to a magistrate, they got a search

1   warrant and they went and they got the drugs, and that was the

2   right thing for them to do.

3        Talked about Eugene Johnson changing his tune on his

4   memory of whether Sergeant Wall had asked the DA as part of

5   their deal.  I think if you go back and look at your notes or

6   search your memory, what you're going to find was Mr. Johnson

7   said all along, he didn't dispute whether that call had been

8   made, he said he just didn't remember.  He didn't -- you know,

9   as far as he knows, it might have been made, he said, but he

10  just didn't remember.  Even the first day, he said he didn't

11  remember whether that call had been made or not.  As far as he

12  was concerned, what he was being told by the trooper was the

13  deal.  I don't think it really mattered to him whether the

14  trooper was checking it -- was getting it approved by somebody

15  else.  What mattered to him was the information he was getting

16  firsthand, and that was coming from the trooper.

17       There's also the issue of the two residents.  And

18  again, I think if you go back and you search your memory and

19  you search your notes, what you're going to find is that Mr.

20  Johnson pretty clearly said there were two residents and the

21  second one was his parents.  And he said that his mailing

22  address is still at his parents' house.  I mean, I -- I think,

23  again, if you look at your experience and bring that to the

24  table, you're going to find that up here, that's really not all

25  that odd that young people have their parents' addresses who

1   are living only two blocks away, might still have their mailing

2   address.  They might have moved in and out with them a couple

3   of times, as a matter of fact.  That kind of thing doesn't

4   indicate any falsehood.  And I think when you again search your

5   memory and your notes, you'll find there was no falsehood

6   there.  That was something that he pretty clearly explained.

7          We talked about a black scale.  Defense talked about a

8   black scale and that -- there's a couple points there.  Defense

9   raised the issue of Mr. Salsbury.  Well, keep in mind, Mr.

10  Salsbury -- nothing Mr. Salsbury ever said is in evidence in

11  this court.  You didn't hear from him.  You didn't see anything

12  written, anything from him.  It's all been speculation about --

13  to what Mr. Salsbury might or might not have said.

14         What the defense was trying to imply here is that Mr.

15  Salsbury had a -- or that Mr. Johnson had a scale that somehow

16  ended up in Mr. Colette's house, as when he was cleaning up his

17  house and somehow he took his equipment, including his scale,

18  to the defendant's house.  Now, that started coming out in Mr.

19  Johnson's testimony or Mr. -- in Mr. Johnson's testimony.  One

20  of the things you'll remember the government did -- and you're

21  going to have that in your evidence package -- is we introduced

22  the box for the scale.  Because the box for the scale as well

23  as the scale were at the defendant's house.  If it was Mr.

24  Salsbury's scale and he was sneaking it out with all his drugs

25  and everything else to somehow implant it in the defendant's

3-43

1  house, sure as heck wasn't going to put it in the box, sure

2  wasn't going to take the box as a separate entity and put it in

3  a different part of the house.  That makes no sense.

4          And you're going to hear a few other things I'm going

5  to talk about that has to do with this theory that we've heard

6  from the defense that somehow it was Mr. Johnson putting his

7  drugs in the defendant's house, in his bedroom, in his safe.

8  And I'll talk about that as we go along.  And I think at the

9  end of the day, what you're going to find out is that theory --

10  there's no common sense, there's nothing behind that theory but

11  just speculation.

12          Talked about Mr. Johnson and the size of the safe.  I

13  think when you look in the -- look at the photos, what you're

14  going to see is it's a big safe.  That's what Mr. Johnson said,

15  it's a big safe.  Whether it's this big or this big or

16  contention of whether Mr. Butler could fit inside of it or not,

17  those aren't some kind of blatant inconsistencies.  It's not a

18  little safe, it's a big safe.  That's what he said when he was

19  asked to describe it.  He went on, you know, kind of like this.

20  And I think if you do kind of like this, you're going to see

21  that's about what matches with the photograph that I showed you

22  earlier in Exhibit Number 2.

23          And another point I think it's important to remember

24  with this whole thing about the safe, defense is arguing, well,

25  Mr. Johnson's not telling you the truth because he didn't see

1   the safe.  Well, then we're getting into argument that -- but

2   Mr. Johnson put his drugs in the safe.  You can't have it both

3   ways.  I mean, he was either there or he wasn't.

4        We heard that the guns -- arguments that the guns

5   aren't access -- the safe's locked so the guns wouldn't be

6   accessible to use for any kind of a protection in a drug

7   incident.  But what we know is the safe is locked when Mr.

8   Colette is not there, because that's when the officers got

9   there.  And he's not in the house, it was locked.  What we also

10  know is that when he's there, it's open, and those weapons are

11  accessible.  Especially when -- or, more specifically, when

12  he's there doing a drug deal, the safe is open and the weapons

13  are accessible.

14       Talked a little bit about cutting agent.  I think

15  you'll see the cutting agent argument doesn't mean anything.

16  You heard it's commonly used.  Because one drug dealer was

17  using it or one wasn't or both were using it, or that the

18  cocaine in this case was cut, that doesn't point to any

19  particular person, the fact that it was cut.  You heard the

20  agent talk about almost all cocaine at this level is cut.  And

21  the most common use, most common cutting agent here in

22  Fairbanks is inositol.

23       You heard about baggies.  You'll see the picture.  The

24  government introduced the picture of the baggies.  It's true, I

25  think every one of you probably have baggies in your house.  I

1    think the question comes down to do you have boxes for 600

2    baggies in your house at any given time.  That's the issue.

3            And last, before I go into the -- into some other notes

4    here, defense talked about Mr. Colette living in a trailer, Mr.

5    Johnson living in a house and fixing up cars.  I think what you

6    heard from Mr. Johnson was that he had fix-up cars, car --

7    maybe some of those cars if they were in really fine condition

8    would be worth money, but I don't think we heard any evidence

9    that he had any cars like that.  What we know for sure is that

10   the defendant had $38,000 in his house, in his safe with the

11   drugs.

12           Now, when we talk about -- obviously Mr. Johnson's an

13   important figure in this case.  He was one of the important

14   witnesses that you heard.  And as I said earlier, obviously,

15   you know -- no saint, he's a drug dealer.  He admitted he's a

16   drug dealer.  But another important thing for you to understand

17   is, when you're trying to stop drug dealers, you don't get

18   information from the saints of the community.  You get

19   information from people who are other drug dealers.  Those are

20   the people you have to rely on in that process.  And you got a

21   glimpse of that culture a little bit in the trial, and

22   hopefully for most of you that's the last time you'll ever have

23   to get a glimpse of that -- you know, that kind of underside.

24           But there's some important things to remember.  Defense

25   said that this case is built on the words and credibility of

1    Eugene Johnson.  Simple fact is, that's not true.  What Eugene

2    Johnson did in this case was start it off.  He started off by

3    providing information to the police that allowed them to get a

4    search warrant, and that search warrant led them to the

5    defendant's home, where they found evidence.  They found

6    cocaine, they found money, they found packing materials, they

7    found scales, they found baggies, they found the evidence of a

8    cocaine distribution operation.  That's not all based on Mr.

9    Johnson's word.  That's what they found.  That's the evidence.

10   That's the evidence that's been admitted and is going to be

11   there in the back room with you when you deliberate.

12        Now -- but Mr. Johnson was certainly -- again, he was

13   an important witness, and one of the things that you're going

14   to have to determine in that back room is whether he was being

15   straight with you.  And I think there's a way you can do that.

16   Now, he admitted to be a drug dealer.  Defense counsel tried

17   to -- really played heavily on the fact that he didn't provide

18   some information.  And that's true, he didn't want to provide

19   some information.  Defense counsel tries to convert that into

20   telling you that he lied to you.  Those are two distinctly

21   different things, and the government would assert that

22   that's -- that he didn't lie to you, that what he gave you was

23   accurate information.

24        I think you could tell he holds his information

25   closely.  And I don't -- I think that came across.  He gives it

1  out when it's in his own interest, and I think he was giving it

2  out because it was in his interest in this case.  I don't think

3  there's much question about that.  But that does not mean that

4  the information he gave was not accurate.  It was in his

5  interest in this case to provide that information and it's in

6  his interest to provide accurate information.  And, remember,

7  he answered the questions the Court required him to answer.

8          Now, the judge will read you an instruction that you

9  should consider Mr. Johnson's testimony carefully, and you

10  should.  That's appropriate.  But I think there's two key

11  points to consider with him.  One is, while he's getting the

12  benefit for his cooperation, he gets a partial reduction in his

13  charges -- that's what you heard from Sergeant Wall -- part of

14  the deal is, he's got to tell the truth.  If he doesn't tell

15  the truth, then his deal could be nullified.  So I think --

16  what I submit to you is, what he told you was accurate and it

17  was truthful.  May not have been everything -- everybody that

18  the defense counsel wanted to hear, but the information you got

19  from him was accurate because he knew it needed to be accurate

20  and truthful.  It was to his benefit for it to be accurate and

21  truthful, and so that's what he gave you.

22          And then second, and most important, and I've said this

23  a number of times already and I'll say it one more time, the

24  reason you can check his credibility for what he gave you here

25  is because you can corroborate that.  This is not a case where

1  he's coming in to tell you -- where the government's case is

2  solely based on the testimony of an informant.  Like I said

3  before, he started off, he provided the information, but we

4  could check his information by what the police found when they

5  went into that home.  And again, he said, defendant deals

6  cocaine in his bedroom out of a safe.  The officers go into the

7  home, they go into the bedroom, they find the safe.  He says

8  there's a number of zips in there in a brown shopping bag

9  wrapped in one-ounce increments.  The officers go in there,

10  they open the safe, they find bundles of cocaine wrapped in

11  one-ounce packages in a brown shopping bag exactly as he

12  described.  He said he saw an -- what he -- an Uzi, what he

13  described as a submachine or a machine gun.  When the officers

14  opened the safe, right there, front and center, is a MAC-10

15  machine gun with a silencer on top, just as he described it.

16        He may have been guarding his information, he may

17  not -- willing to provide every bit of information that the

18  defense wanted to ask him, but he was not lying to you.  What

19  he did was give up another drug dealer to try to save himself.

20  And in that culture, I don't think that's a surprise.  But it's

21  not the same thing as lying.  And I think when you check what

22  he said, corroborate it, check your notes, check your memory,

23  what you're going to find out is the information he gave you

24  was accurate.

25        And let me make one final point.  Considering all the

3-49

1  discussion of Eugene Johnson, the evidence in front of you --

2  and I focus on this again -- the evidence in front of you is

3  that over 600 grams of cocaine, $38,848 in cash, and the guns

4  were found in the defendant's home, in the defendant's bedroom,

5  in the defendant's safe.  Any other theory you've heard is

6  speculation and is not supported by that evidence.  And that's

7  because there is only one logical explanation.  It's the

8  defendant's cocaine and it's the defendant's money.

9       Now, in Counts 3 or 4, which are the gun counts, you've

10  got to decide whether you're going to -- whether the defendant

11  used the guns in furtherance of the drug deal.  Now, there are

12  a number of ways criminals can use guns, and you heard defense

13  counsel implying that having them and threatening people and

14  shooting people, certainly that's one way.  But there are other

15  much more subtle ways and effective and important ways that

16  drug dealers use guns.  You heard the agents talk about that.

17  They can be used to protect, they could be used to deter, and

18  that's what the government argues that was exactly what was

19  happening in this case.

20       Defendant has $23,000 or more with the cocaine.  He had

21  $38,000 of cash.  It was in a room he used for drug deals.  And

22  in that room was an intimidating, fully-automatic machine gun

23  with a silencer, capable of firing 1,000 rounds of bullets a

24  minute, sitting right on the top shelf, had a magazine

25  inserted.  And you heard the agents say, couldn't -- even if

1    there wasn't any bullets in it at the time, you couldn't tell

2    that thing was unloaded if it was sitting there with a magazine

3    in it.  It had the intimidating effect.

4         When Eugene Johnson -- his testimony was, when he was

5    there to buy the drug, that testimony that was supported by the

6    corroborating information -- he told you it was out, it was

7    visible, the defendant showed it to him, the defendant talked

8    about it, he made sure that he noticed that gun when he was in

9    there.

10         Now, the defendant legally owned the gun, that's true.

11    But that just means he was smart enough not to want to get in

12    any more trouble about having a gun he wasn't supposed to own.

13    Bottom line is -- and the bottom line is that even a legally

14    owned gun -- and certainly the other guns were probably -- I

15    think were legally owned as well -- a legally owned gun can

16    still be used to do illegal things, and that includes using

17    them to protect cocaine and the money that buys cocaine.

18         And let's -- remember I focused a lot on the machine

19    gun, but I'll go back as well.  There were three other weapons

20    that the government's talked about.  The government has

21    introduced into evidence the 12-gauge shotgun, the .30-06

22    rifle, and the Colt Sporter.  On Count 4, you're going to see

23    when you get back and you see the instructions and the verdict

24    sheets -- you're going to see that there's about 13 different

25    weapons listed in Count 4.  It was all the weapons found in the

1    safe.  What the government's focused on is the three weapons

2    that have been introduced and are going to be there in the back

3    with you, and we ask you as the jury to focus on those weapons

4    as well.  You'll have them back there, you'll have the serial

5    numbers, you'll have the model numbers.  And the government

6    asks you to focus on those, because those were the weapons that

7    were loaded, they were strategically placed to help protect

8    that cocaine and the money.

9         Did it need -- and -- but why did it need protection?

10   I think that's going to be common sense.  Drug dealers like

11   Eugene Johnson consider robbing each other -- and Jason

12   Colette.  But firepower is a deterrent, and it deterred Eugene

13   Johnson in this case.  The defendant, you can see, had plenty

14   of firepower, and that furthered his cocaine business by

15   protecting his assets.

16        Now, one of the instructions defense counsel talked to

17   you about, and I'll talk to you about it too, because it's an

18   important one -- it's the reasonable doubt instruction.  You

19   have to find him as guilty beyond a reasonable doubt.  The

20   government has to prove that for each and every element, and

21   that's completely appropriate, and we've done that.  But one of

22   the important things is that you'll read it when you get in the

23   back and you'll hear the judge say it, that common sense is a

24   key aspect of that.  And common sense is maybe the key thing

25   that you all as citizens bring to a -- the jury and bring to

1    the legal system.

2          The judge will tell you that a reasonable doubt is one

3    based on reason and common sense and is not one based on

4    speculation.  And what the government asserts here is that

5    we've proven guilty beyond a reasonable doubt all of these

6    charges, and any doubts that might be raised by the defense

7    would be based purely on speculation, not on the evidence, and

8    certainly when you search your common sense and your reason,

9    you'll find that those theories raised by the defense just

10   don't hold water.

11         And I have a -- three, I think, key areas that I want

12   to flag for you, particular issues where that's going to come

13   out.  One is whether the defendant possessed cocaine with

14   intent to distribute.  Now, you heard Special Agent Foran

15   testify that based on his training and experience, the evidence

16   found at the defendant's house was -- added up to a cocaine

17   distribution operation.  I don't think you really needed that

18   expert testimony.  I think when you look and you say that there

19   were 23 individually-packed one-ounce bags of cocaine, scales,

20   baggies, money counters, you're going to add -- that adds up to

21   you that that wasn't a personal use deal.  That was

22   distribution.  And I think you can -- that -- you'll -- your

23   common sense will tell you that.

24         But I'm -- I think, very importantly, common sense will

25   not allow you to believe this theory that somehow Eugene

1   Johnson took his cocaine, his equipment, his money, and gave it

2   to the defendant to hold.  And that's a very -- you know,

3   that's something the defense has floated here, and your common

4   sense is just not going to allow to accept that, and I'll talk

5   to you a couple reasons why.

6          The evidence that you heard -- the evidence you heard

7   is they're acquaintances.  No more evidence that they are close

8   personal friends, anything other than people who sold cocaine

9   to each other and maybe did some car work, did some stereo work

10  for each other.  So why would Mr. Johnson give $38,000 in cash,

11  23-plus thousand dollars in cocaine, and all of his equipment

12  to somebody he barely knows to hold for him and hope that they

13  don't go to the police?  Why would he do that?

14         Second, why would the defendant do that?  Why would he

15  hold a significant amount of illegal drugs, something that

16  could send him to jail for who knows how long, somebody he

17  barely knows or knows as an acquaintance?  That makes no sense.

18         And I think, last but not least, what makes no sense

19  is, why would Mr. Johnson pick this person to store his money,

20  to store his cocaine, to keep him from getting in trouble, and

21  then at the first problem, who does he give up?  His own

22  cocaine.  He gives up his own 23 ounces of cocaine and his own

23  $38,000 when he -- when the police show up?  And plus he

24  knew -- you know, he supposedly was tipped off that they were

25  coming.  So first thing that happens, he gives up his own drugs

1  and his own money; that makes absolutely no sense.

2       The defendant's theory is the rawest of speculation

3  with no -- nothing to support it, no evidence to support it.

4  And that does not add up to anywhere near reasonable doubt.

5  And you'll find that when you apply your common sense.

6       Finally, the last area where you need to use that

7  common sense is determining whether these guns were used to

8  protect the cocaine and money or deter people from going after

9  the cocaine or money.  And defendant argues he's a gun

10  enthusiast, and so he owns guns for that purpose.  But common

11  sense tells us you can have more than one use of an item.

12       Now, you heard Special Agent -- you know, he may well

13  be a gun enthusiast.  We heard Special Agent Foran's a gun

14  enthusiast, we heard the defense talk about a lot of people in

15  Alaska are gun enthusiasts.  But the big difference between a

16  gun enthusiasts, all the gun enthusiasts I think he's talking

17  about and the defendant, is that those people aren't storing

18  cocaine in their same place they're storing their guns.  Even

19  if he used his guns for recreational purposes, that doesn't

20  mean he's not using them for drug purposes.  And the fact that

21  they're strategically positioned, they're intimidating-looking,

22  some loaded, means they're there for at least one purpose, is

23  there and ready to protect those drugs.

24       And my final point I want to make, and it kind of runs

25  along the same line.  I think one of the things we've learned

1  in this process is that there are things that can have dual

2  roles or dual uses.  Defendant is like that.  You heard the --

3  his counsel say he's a businessman, runs a -- the audio shop.

4  But he's also a cocaine dealer.  And our possessions are

5  capable of multiple uses as well.  We've seen it in this case.

6  The home that doubles as a cocaine business.  A safe that

7  doubles as a secure container and secure protection for

8  cocaine.  And the defendant would like you to believe that his

9  guns are for recreation only, but the proximity of those drugs

10  to the cocaine and the money, the way they're tactically useful

11  as a visible deterrent, the way they were used with Eugene

12  Johnson to deter him, tells you that the weapons were there to

13  help protect the drugs and the ill-gotten gains of the

14  defendant, protect them from other human predators.  And we

15  heard a bit about that too.

16          The government asks that you return verdicts of guilty

17  on all counts.  Thank you.

18          THE COURT:  All right, thank you.  We're going to take

19  a 10-minute restroom recess and then we'll come back.  I'll

20  read the instructions, we'll pick the alternates, and we'll be

21  done.  So stand in recess for 10 minutes.  Yeah, I want to talk

22  to them for a second, make sure everything's clear.

23      (Jury not present)

24          THE COURT:  All right, counsel, anything else before we

25  stand -- take our recess?

1          MR. SCHRODER:  Nothing from the government, Your Honor.

2          THE COURT:  Mr. Butler, anything?

3          MR. BUTLER:  No, sir.

4          THE COURT:  I'm going to come back and I'll read the

5     instructions, and then we'll pick the alternates, and then

6     they'll begin their deliberations, okay.  So we'll stand -- 10-

7     minute recess.

8          THE CLERK:  Off record.

9          (Court recessed at 10:13 a.m., until 10:27 a.m.)

10         (Jury not present)

11         THE COURT:  -- in.

12         (Side conversation)

13         (Jury present at 10:27 a.m.)

14         THE COURT:  Okay.  I'm going to read the instructions

15    to you.  The evidence has now been presented and you have heard

16    arguments of counsel.  I will now give you the instructions

17    concerning the law to be applied to this case.  The

18    instructions on the law which -- given to you at the beginning

19    of the trial are still applicable and I will not take up your

20    time reading them again.  You will have the full set of the

21    Court's instructions with you in the jury room to refer to.

22         Under your oath as jurors, each of you has sworn to

23    decide the case solely on the evidence in this trial and the

24    law as to which I will instruct you.

25         The defendant is charged in Count 1 of the indictment

1   with possession with intent to distribute cocaine, in violation

2   of Section 841(a)(1) of Title 21 of the United States Code.  In

3   order for the defendant to be found guilty of that charge, the

4   government must prove each of the following elements beyond a

5   reasonable doubt:  first, that the defendant knowingly

6   possessed 500 grams or more of a mixture or substance

7   containing a detectable amount of cocaine; and second, that the

8   defendant possessed it with the intent to deliver it to another

9   person.  It does not matter whether the defendant knew that the

10  substance was cocaine.  It is sufficient that the defendant

11  knew that it was some kind of prohibited drug.

12        To possess with intent to distribute means to possess

13  with intent to deliver or transfer possession of a controlled

14  substance to another person, with or without any financial

15  interest in the transaction.

16        The defendant is charged in Count 2 of the indictment

17  with distribution of cocaine, in violation of Section 841(a)(1)

18  of Title 21 of the United States Code.  In order for the

19  defendant to be found guilty of that charge, the government

20  must prove each of the following elements beyond a reasonable

21  doubt:  first, that the defendant knowingly delivered cocaine;

22  and second, that the defendant knew that it was cocaine or some

23  other prohibited drug.

24        The defendant has been charged in Count 3 of the

25  indictment with possession of a firearm in furtherance of a

1   drug trafficking crime, in violation of Section 942(c) of Title

2   18 of the United States Code.  In order for the defendant to be

3   found guilty of that charge, the government must prove each of

4   the following elements beyond a reasonable doubt:  first, that

5   the defendant committed the crime of possession of cocaine with

6   intent to distribute, as charged in Count 1 of the indictment,

7   or distribution of cocaine, as charged in Count 2 of the

8   indictment; second, that -- second, the defendant knowingly

9   possessed a firearm, to wit, a Ingram Model 10A1 .45-caliber 9-

10  millimeter machine gun, as set forth in 28 U.S.C. Section

11  5845(b), serial number A6041381, with a silencer, a Bowers 9-

12  millimeter suppressor, Model CAC9, as set forth in 18 U.S.C.

13  Section 921(a)(2), (4), serial number S927; and third, the

14  defendant possessed the firearm in furtherance of the crime.

15         A person has possession of something if the person

16  knows of its presence and has physical control over it, or

17  knows of its presence and has the power and intention to

18  control it.  To prove that the firearm was possessed in

19  furtherance of the drug trafficking crime, the government must

20  show that the defendant intended to use the firearm to promote

21  or facilitate of the crime.  Mere possession of the firearm by

22  an individual convicted of a drug crime is insufficient to

23  convict the defendant.  Whether the firearm was possessed in

24  furtherance of the drug trafficking crime may be shown by any

25  number of factors, including one's conduct, the circumstances

1   at the time, and any other evidence which might reasonably bear

2   on the issue.

3          The defendant is charge in Count 4 of the indictment

4   with possession of a firearm in furtherance of a drug

5   trafficking crime, in violation of Section 924(c) of Title 18

6   of the United States Code.  In order for the defendant to be

7   found guilty of that charge, the government must prove each of

8   the following elements beyond a reasonable doubt:  first, the

9   defendant committed the crime of possession of cocaine with

10  intent to distribute, as charged in Count 1 of the indictment,

11  or distribution of cocaine, as charged in Count 2 of the

12  indictment; and second, the defendant knowingly possessed a

13  firearm, to wit, Remington Mohawk .48 12-gauge shotgun, serial

14  number 5279681, and/or a Harrington and Richardson Topper Model

15  .48 12-gauge shotgun, serial number AM250982, and/or American

16  Arms 10-gauge shotgun, serial number A220016, and/or a

17  Remington Woodmaster Model 740 .30-06, serial number 83245,

18  and/or Winchester Model 190 .22 rifle, serial number B1822823,

19  and/or a Stevens Model 67E 12-gauge shotgun, serial number

20  D395391, and/or Winchester Model 94 .30-06 rifle, serial number

21  4139992, and/or a Colt Sporter 7.62-.39 rifle, serial number

22  LH010714, and/or an Armis Bost (ph) I-bar 12-gauge double-gauge

23  shotgun -- double-barrel shotgun, serial number 1928, and/or a

24  Mossberg Model 500A 12-gauge shotgun, serial number L100810,

25  and/or a Mossberg Model 500E 410-gauge shotgun, serial number

1  P317355, and/or a Colt Super 38, .38 semi-auto pistol, serial

2  number 126180, and/or a Mossberg Model 500A 12-gauge shotgun,

3  serial number L986808; third, the defendant possessed the

4  firearm in furtherance of the crime.

5        A person has possession of something if the person

6  knows of its presence and has physical control over it or knows

7  of its presence and has the power and intention to control it.

8  To prove that the firearm was possessed in furtherance of the

9  drug trafficking crime, the government must show that the

10  defendant intended to use the firearm to promote or facilitate

11  the crime.  Mere possession of the firearm by an individual

12  convicted of a drug crime is insufficient to convict the

13  defendant.  Whether the firearm was possessed in furtherance of

14  the drug trafficking crime may be shown by any number of

15  factors, including one's conduct, the circumstances at the

16  time, and any other evidence which might reasonably bear on the

17  issue.

18        You are instructed that each count of the indictment

19  charges a separate and distinct offense.  You must decide each

20  count separately on the evidence and the law applicable to that

21  count, uninfluenced by your decision as to any other count.

22  You may acquit or convict the defendant on any or all of the

23  counts.  A defendant's guilt of innocence of a crime charged in

24  one count should not affect your verdict on the other count.

25  This says guilt -- no, let's see -- a defendant's guilt or

1  innocence, that's right.  Defendant's guilt or innocence of a

2  crime charged in one count should not affect your verdict on

3  any other count.

4      The indictment is not evidence.  The defendant has pled

5  not guilty to the charge.  The defendant is presumed to be

6  innocent and does not have to testify or present any evidence

7  to prove innocence.  The government has the burden of proving

8  every element of the charge beyond a reasonable doubt.

9      Proof beyond a reasonable doubt is proof that leaves

10  you firmly convinced that the defendant is guilty.  It is not

11  required that the government prove guilt beyond all possible

12  doubt.

13      A reasonable doubt is a doubt based upon reason and

14  common sense and is not based purely on speculation.  It may

15  arise from a careful and impartial consideration of all the

16  evidence or from lack of evidence.  If after a careful and

17  impartial consideration of all the evidence you are not

18  convinced beyond a reasonable doubt that the defendant is

19  guilty, it is your duty to find the defendant not guilty.  On

20  the other hand, if after a careful and impartial consideration

21  of all the evidence you are convinced beyond a reasonable doubt

22  that the defendant is guilty, it is your duty to find the

23  defendant guilty.

24      A defendant in a criminal case has a constitutional

25  right not to testify.  No presumption of guilt may be raised

1  and no inference of any kind may be drawn from the fact that

2  the defendant did not testify.

3       You have heard testimony from a witness who received

4  favored treatment from the government in connection with this

5  case.  For this reason, in evaluating the witness' testimony,

6  you should consider the extent to which or whether the witness'

7  testimony may have been influenced by this factor.  In

8  addition, you should examine the witness' testimony with

9  greater caution than that of other witnesses.

10      An act is done knowingly if the defendant is aware of

11  the act and does not act through ignorance, mistake, or

12  accident.  You may consider evidence of the defendant's words,

13  acts, or omissions along with any other -- any -- along with

14  all the other evidence in deciding whether the defendant acting

15  knowingly.

16      When, as in this case, it is alleged that the crime

17  charged was committed on or about a certain date, if the jury

18  finds a crime was committed, it is not necessary that the proof

19  show that it was committed on that precise date.  It is

20  sufficient if the proof shows that the crime was committed on

21  or about that date.

22      The punishment provided by the law for the crime is for

23  the Court to decide.  You may not consider punishment in

24  deciding whether the government has proved its case against the

25  defendant beyond a reasonable doubt.

1           If it becomes necessary to during your deliberations to

2    communicate with me, you may send a note through the bailiff

3    signed by your foreperson or by one or more members of the

4    jury.  No member of the jury should ever attempt to communicate

5    with me except by a signed writing, and I will respond to the

6    jury concerning the case only in writing or here in open court.

7    If you send out a question, I will consult with the lawyers

8    before answering it, which may take some time.  You may

9    continue your deliberations while waiting for the answer to any

10   question.  Remember that you are not to tell anyone, including

11   me, how the jury stands, numerically or otherwise, on the

12   question of the guilt of the defendant until after you have

13   reached a unanimous verdict -- until after you have reached a

14   unanimous verdict or have been discharged.

15          As jurors, you have a duty to consult with one another

16   and to deliberate with a view to reaching an agreement, if that

17   can be done without violence to individual judgment.  Each

18   juror must decide the case for himself or herself, but only

19   after an impartial consideration of the evidence with the other

20   jurors.  In the course of deliberations, a juror should not

21   hesitate to reexamine his or her own views and change his or

22   her opinion if convinced it is erroneous, but no juror should

23   have -- surrender an honest conviction as to the weight or

24   effect of the evidence solely business of the opinion of the

25   other jurors or for the mere purpose of returning a verdict.

1    You were accepted as jurors in this case in reliance

2 upon your answers to the questions asked you concerning your

3 qualifications.  You are just as much bound by those answers

4 now and until you are finally discharged from further

5 consideration of this case as you were then.  The oath taken by

6 you obligates you to try this case well and truly and to render

7 a true verdict according to the law and the evidence.  Both the

8 government and the defendant have a right to expect that you

9 will conscientiously consider and weigh the evidence and apply

10 the law of the case and that you will reach a just verdict.

11    Upon returning to the jury room to commence your

12 deliberations, you will take with you these instructions, the

13 exhibits, and verdict forms.  You will then select one of your

14 fellow jurors to act as foreperson, who will preside over

15 deliberations and who will complete and sign the verdict to

16 which you have agreed.  Before you may return a verdict in this

17 case, it must be unanimous.

18    Verdict forms have been prepared for you.  If you reach

19 a unanimous agreement on a verdict, your foreperson will fill

20 in the form that has been given to you, sign and date it.  This

21 process shall be followed for each verdict form.  After you

22 have finished, advise the Court that you are ready to return to

23 the courtroom.

24    On the day you reach your verdicts, if you should agree

25 upon your verdict before 4:30 p.m., you should have your

```
 1   foreperson date and sign the verdict forms unanimously agreed
 2   upon by your members and return them immediately into open
 3   court in the presence of the entire jury, together with any
 4   exhibits and these instructions.  In the event that you do not
 5   complete this process before 4:30 p.m., you may go to your
 6   homes or place of abode for the night, but you must return to
 7   the jury room to continue your deliberations at 9 a.m. the
 8   following morning.
 9            Did you hear all that?  Aren't you glad that there's
10   copies of this in -- for you to read?  Any questions?  I'm
11   going to -- we're now going to pick the two alternates.  Does
12   everyone feel okay?  Is -- anybody that doesn't think they can
13   continue for any reason?  Let me know now.  Otherwise, we're
14   going to put the 14 names in this spindle, give it a crank of a
15   yank.  Whoop, we got it in there.  Now we spin it.  We're
16   worried because the -- it's starting to fall apart after years
17   of use.  Is everybody in agreement that it's been spun enough?
18   Okay.  Now we're picking two names.
19            THE CLERK:  Juror number 14.  Juror number 6.
20            THE COURT:  Okay.  You know, it seems like whenever we
21   have two alternates, everyone stays healthy, and when we don't
22   have alternates, everyone gets sick and we have to start over
23   again.  So the -- it's in -- critical that we have alternates.
24   We appreciate your presence here today and the good work you've
25   provided.  So the alternates, when we excuse -- leave here in a
```

1   minute are just free to leave or go back to the Clerk's office

2   and be excused from there.

3           Now you can take your notes with you.  And you continue

4   deliberations.  I think that -- has the process been made to

5   get them lunch, is that --

6           THE CLERK:  Yes.

7           THE COURT:  Okay.  So -- all right.  We'll stand in

8   recess.  The -- it'll be a few minutes before we can get the

9   exhibits and the instructions in to you, but we're working on

10  that now.  So thank you very much.  And again, thank you very

11  much to the alternates.

12          THE CLERK:  Okay, the two alternates, if you can just

13  leave your notebooks on your chairs.

14          THE COURT:  And let me say one more thing I didn't --

15  don't think I said with regard to the notes.  You can take your

16  notes with you now.  When it's done, we will take the notes

17  back and we tear out the parts that you wrote on.  We destroy

18  the notes so they're not read by anyone, so don't worry about

19  that.  Those notes are confidential.  We keep them but we

20  destroy them as soon as it's over with.  And I don't see them,

21  no one sees them, they're just literally destroyed, okay?  All

22  right, thank you.

23      (Jury not present)

24          THE COURT:  I don't know what happened to the

25  alternates.  They all left.  Okay.  You can go take care of the

1    alternates if you want.  Is somebody taking care of the

2    alternates?

3              THE CLERK:  Oh, I'll get rid of them.

4              THE COURT:  Okay, because they're just standing there,

5    wondering --

6              THE CLERK:  Do you have the papers that they have --

7              THE COURT:  We'll get -- but my main concern --

8              THE CLERK:  (Indiscernible).

9              THE COURT:  -- is to get the alternates --

10             THE CLERK:  I'll (indiscernible).

11             THE COURT:  Okay.

12             THE CLERK:  Which jurors were they?

13             THE COURT:  6 and 14.

14             THE CLERK:  6 and 14.

15             THE COURT:  Okay, counsel, anything else that I

16   neglected or that you want to bring to my attention before we

17   recess for the morning?  The government have anything?

18             MR. SCHRODER:  No, Your Honor.

19             THE COURT:  No objection --

20             MR. SCHRODER:  Do you want to take up the forfeiture

21   instructions after lunch?  That'd be fine us.

22             THE COURT:  Okay, well, let's just take a look for a

23   second -- let's take -- the next issue, Mr. Butler, any

24   problems so far as to what we've done so far?

25             MR. BUTLER:  No, sir, Judge.