1          MR. COHEN:   -- preponderance of the evidence.

2          THE COURT:   You're right.   Okay.   Anything else?

3          MR. COHEN:   Not on the forfeiture issue.   I have

4    other -- my argument's having to do with the sentencing

5    question.

6          THE COURT:   Right.   So what my plan is now, to ask the

7    government what their sentence recommendation is and why.   Then

8    I'll ask you what your sentence recommendation is and why.

9    Then I'll hear from Mr. Colette and then I'll impose sentence.

10         MR. COHEN:   Let me just -- I'm sorry, Your Honor.   The

11   one -- the one area where I was asking for additional time has

12   to do with the weight of the -- of the cocaine.

13         THE COURT:   And I denied that.

14         MR. COHEN:   And you denied that.   But -- but -- but I

15   don't want -- when I say that I don't have any witnesses today

16   on sentencing, I don't want to be waiving my issues.   And I'm

17   going to address the weight when I make my argument.

18         THE COURT:   Sure.   That's appropriate.

19         MR. COHEN:   All right.   Thank you.

20         THE COURT:   I think we've got -- we're all ready to

21   go.   Any questions, Mr. Schroder?   Are you with us?   Okay.

22   We'll hear from the government then.   Thank you.

23         MR. SCHRODER:   Your Honor, the government concurs with

24   the analysis of the Probation and Pretrial Services Officer in

25   the presentence report, including her analysis of the

1    sentencing guidelines.  The government believes a sentence

2    within the advisory guidelines range is appropriate in this

3    case and recommends a sentence at the upper end of the range at

4    108 months, which is what we put in our sentencing memorandum.

5        The defendant was a significant cocaine dealer in

6    Fairbanks.  He was caught with 23 individually wrapped

7    one-ounce bindles of cocaine, also with $38,000, a little over

8    $38,000 in cash.  And all of this, the Court heard at the

9    trial, Your Honor, divided into hundred-thousand-dollar

10   increments and wrapped in rubber bands in a container with the

11   cocaine and immediately adjacent to another package of cocaine.

12       Now if you remember back on Special Agent Foran's

13   testimony at trial, Your Honor, he said that cocaine

14   conservatively sells for about $12,000 an ounce in Fairbanks,

15   and that $38,000 equates to another 32 ounces of cocaine that's

16   previously been sold.  When you do the -- do the conversion,

17   that's about 900 grams, almost another kilogram.  So when you

18   consider the money and consider the cocaine that was in the --

19   in the defendant's residence, that's just about a kilogram and

20   a half.

21       Now the sentencing guidelines are based on a section

22   between 500 grams and less than two kilograms, so the kilogram

23   and a half's not enough to get us up to the next section, and I

24   think that's why it wasn't addressed that way in the PSR.  But

25   what we're asking the Court to do is consider -- when you

1    consider the guideline sentencing range, consider the range of
2    the amount of cocaine as well and the range of the amount of
3    cocaine that the defendant was caught responsible for is almost
4    the top end of the range.  It's almost the top end of the range
5    there, and we think he ought to get toward the top end of the
6    sentencing guideline range.
7           The other point, Your Honor, is the defense's
8    involvement with drugs is pervasive.  I mean, we would offer
9    that it was his primary vocation.  Now there's been discussion
10   that he certainly had this other business, but, again, if you
11   look in the PSR, it didn't seem he was earning a lot of money
12   there.  He had the $38,000 from cocaine in his possession and
13   if you, you know, run the calculation the other way on the 23
14   grams of cocaine, or 23 ounces that were in the safe, that's
15   another 23 to 27 thousand dollars worth.  So he had, in effect,
16   over $50,000 worth of either cash or product from the cocaine,
17   from the drug business in his possession.  And it was
18   significant in this business.  I mean, you'll read the
19   interviews, you'll read the -- you'll read what's in the PSR.
20   Certainly his employees say there was use.
21          There's -- in some of the discussions, it appears
22   there were sales, although I think it's obviously somewhat
23   contradicted in the interviews, and sale or trade of drugs.
24   And certainly use of drugs was a common occurrence, and amounts
25   of drugs.  I mean, even when you read those interviews -- in my

1   short period of time, I was able to do that -- one thing I saw

2   was the discussion of having a big bag of methamphetamine.   It

3   seems to be backed up by those interviews, not -- not

4   contradicted by the interviews.

5          And also, I think something that's important to

6   understand in the interviews is -- from, again, what I could

7   see -- was the people were told right up front that this was a

8   public -- this was a private investigator paid for by the

9   defendant's sister.  So now they know that whatever they say to

10  this person's going directly back to the defendant, and I think

11  the Court should consider that in how it weighs those -- weighs

12  those interviews.  And what was found by the officers when they

13  searched the business confirms, I think to a large extent, what

14  the -- what the employee said.  There were marijuana in three

15  different tool boxes, including the defendant's.  There was

16  cocaine in one tool box and there was -- the defendant had a

17  gun in his tool box.

18         Also, I think it's important to note that this was

19  pervasive on his personal side of his life, too.  The cocaine

20  business was being run out of his residence.  There's some --

21  some letters that have been provided to the Court that talk

22  about, you know, what the defendant had done as a family

23  person, but, you know, I think what you got to look at is, he

24  was running a cocaine business in the same place where children

25  were living.  And as the Court heard testimony at trial, there

24

1  was cocaine, the scales, the money-counting machine, and a bag

2  of cocaine open in the bedroom.  Not all of it was in the safe.

3  There was a bag of cocaine that was sitting in the bedroom, you

4  know, unprotected from those children getting at it.  Now when

5  you consider that and you consider the guns that were also

6  there and loaded, this was not a proper environment for

7  children.  It was a dangerous environment for children.

8        And I'll briefly address here some of the arguments of

9  the defendant, but the bulk of our counter-arguments, Your

10  Honor, is in our sentencing memorandum.  The original

11  sentencing memorandum of the defendant argued that -- that

12  somehow Apprendi, Blakely and Booker created a new standard

13  that required all facts that lead to an enhancement under

14  sentencing guidelines be alleged in the indictment and proven

15  by the jury.  That's just not accurate, Your Honor.  I mean,

16  Booker holds quite the opposite, that once the sentencing

17  guidelines were held to be advisory, it's appropriate for the

18  court to determine guideline enhancements as they've done in

19  the past.

20        And we believe it's appropriate to -- to apply the gun

21  enhancement in this case.  The circumstances I think clearly

22  play out that it was -- these were guns that were possessed by

23  the defendant and I don't think the Court could find that it

24  was clearly improbable that they weren't connected to -- to the

25  cocaine business.  They were sitting next to the cocaine.  They

1    were loaded weapons.  And when we're talking about the pistol

2    grip shotgun and the AR-15, an assault weapon, these aren't

3    common hunting weapons.  They were loaded weapons sitting

4    there, ready to protect that cocaine.

5         And more over, as the Court heard, the defendant had a

6    machine gun with a silencer that was out of the safe during the

7    cocaine deal that the defendant was convicted of.  Now it's

8    true that defendant was not convicted of the 924(c) count, but

9    this is a different standard.  And I think that difference

10   is -- is reflected in the comments to the enhancement where the

11   Guideline Commission states that what this enhancement reflects

12   is the general increased danger of violence when drug

13   traffickers possess weapons.  So it's a charge to reflect that

14   general -- that general increase, not a specific issue of tying

15   that defendant's conduct directly to those guns or tying the

16   guns directly to the drug sales in that case.

17        We have the issue of the amount of drugs.  And as the

18   government stated in our -- in our sentencing memorandum as

19   well, the defendant stipulated at trial that it was over 500

20   grams of a mixture or substance containing cocaine.  The jury

21   found it was over 500 grams of a mixture or substance

22   containing cocaine.  The amount of pure cocaine, you know, what

23   we get, often we see in methamphetamine cases, which is the

24   substance amount times the purity, is a red herring because we

25   didn't charge it that way in this case.  It's charged as a

1   mixture or substance.  It was over 500 grams of a mixture or

2   substance, and the jury found that.

3          Your Honor, a sentence at the top of the guideline

4   range fits consistently with the sentencing factors in 18

5   U.S.C. 3553.  It would show that the government will deal

6   firmly with major drug dealers in this community, it will

7   provide a significant deterrent to other current and would-be

8   drug dealers in this community, and it will protect this

9   community from the defendant.  The trial and the additional

10  information in the PSR, especially information about the

11  defendant's history and the activity in his work place, paints

12  a picture.  It's a picture of a man whose involvement in drugs

13  was pervasive.  It's a picture of a man who has demonstrated

14  little concern for society's rules.  And it's a picture of a

15  man who had no conscience about making his living from

16  spreading illegal drugs in his community.

17         The government recommends a sentence of 108 months

18  confinement, five years supervised release and a fine of

19  $12,500.

20         THE COURT:  Thank you.  Mr. Cohen.

21         MR. COHEN:  Yes, Your Honor.  Let me talk about the --

22  the weight.  I have gone through the file extensively and I

23  have been unable to locate a DEA-7 or a lab report showing the

24  actual weight of the cocaine.  I saw the report having to do

25  with a search of the safe with a gross weight of -- a gross

1    weight, which appears to include the packaging, of 660 grams,

2    something like that.

3                THE COURT:  Six, yeah, whatever.  Wasn't that

4    stipulated to at trial?

5                MR. COHEN:  That's -- I have a disagreement about

6    that.

7                THE COURT:  About whether or not it was stipulated to?

8                MR. COHEN:  Yes.  And I'll explain to the Court why.

9                THE COURT:  Okay.

10                MR. COHEN:  At the beginning of the trial, Mr.

11    Schroder, before the jury was -- before voir dire, Mr. Schroder

12    said, 'I've reached a tentative stipulation with Mr. Butler in

13    connection with the quantity of the drugs.'

14                THE COURT:  Okay.

15                MR. COHEN:  It's not finalized.  Mr. Butler doesn't

16    make any comment at all at that point on the record.  From my

17    review of the record at trial, there was no additional

18    stipulation finalized.  Then after Agent Foran testified, Mr.

19    Schroder said, 'I'd like to read in that stipulation right now

20    that it's 660 grams of cocaine hydrochloride.'  And -- and he

21    did that.  Mr. Butler didn't say anything at that time either.

22    So it's my view that there was never a stipulation that was

23    reached and read into the record, that it was a comment that

24    was made by -- by Mr. Schroder.

25                The second thing that happened was, was that the Court

1   said, 'Well, it looks' -- when the verdict form was  discussed,

2   the Court said, 'Well, it looks like you're asking for a

3   special verdict on the 500 grams.'  And then after some

4   discussion, it was determined that the verdict form made no

5   reference to 500 grams.  And the jury would be asked to submit

6   a verdict of guilty or not guilty, depending on -- as charged

7   in the indictment.

8        Now it's true that the indictment charges more than

9   500 grams in one of the counts, but the verdict form says

10  convict -- guilty, and it's not necessarily required, as the

11  jury was told, that they find whether there's 500 grams or not.

12  And they didn't specifically find that.

13       In any event, whatever the jury found about the weight

14  is really not the issue.  The Ninth Circuit has held, when it

15  comes to minimum and mandatory amount, and when it comes to any

16  starting point for the guidelines, the weight -- the current

17  law in the Ninth Circuit is, the weight of the cocaine is an

18  issue for the Court at sentencing.  And so whether -- whatever

19  happened at the trial, in terms of what the jury found, I

20  believe to be immaterial to that.  I think it would be material

21  if the defense stipulated for all purposes, other than for the

22  purposes of the trial, that the weight was 660 grams.  But from

23  our view of the record, the defense didn't stipulate at all,

24  let alone stipulating for all purposes other than the trial.

25       So I think the government bears the burden of proving

1    at the sentencing hearing what the base offense level is.

2    Under the case -- the recent case of United States vs.

3    Cantrell, 433 F.3rd 1269, the case makes clear that the

4    government bears the burden of showing what the base offense

5    level is.  I think the government, at the very least, ought to

6    submit to the Court a DEA-7 which shows that the weight of the

7    actual cocaine -- I understand it's a mixture containing

8    cocaine -- the weight of the mixture containing cocaine was

9    more than 500 grams, or 660 grams.  I haven't seen a DEA-7.

10          What adds to the confusion, Your Honor, is that the

11   probation report, which the Court has adopted in the way that

12   the Court said earlier, says that the cocaine was 368 grams.

13   It doesn't say that the pure cocaine was 368 grams and the

14   mixture was 660 grams, it just says that there was 660 grams

15   and then the cocaine was 368 grams.  This is not just an

16   academic exercise in which we're engaging because it's the

17   starting point for the Court's analysis as to the base offense

18   level in this case.

19          Let me move on, with the Court's permission hopefully,

20   to the two-point enhancement for the weapon.  Your Honor, I

21   disagree with the government's argument that the -- there's any

22   indication, any indication either in the presentence report, at

23   trial or at any point, that the Court should consider some

24   phantom amount of cocaine that might have been sold with the

25   $38,000.  As I believe we're going to show at this forfeiture

1    hearing, there were other -- the $38,000 was legitimately

2    there.  The government relied, actually, a lot on the $38,000

3    this morning, more than they did in their earlier memoranda.

4           But going to the -- going to the weapons.  I had a

5    disagreement about whether they were loaded or not loaded.

6    There's clear testimony at the trial that the weapons were not

7    loaded, several of the ones that were found around the safe.

8    And looking at the presentence report, it appears that the only

9    weapons that were loaded were rifles.  And it's clear from the

10   sentencing letters that have been submitted that Mr. Colette is

11   an avid hunter.  In fact, he had just returned from a hunting

12   trip not long before this particular search warrant was

13   executed.

14          The statement that was made by Mr. Johnson about the

15   oozie being on the dresser in the bedroom, that's a statement

16   that Mr. Johnson made for the first time at the trial.  His

17   statements that he made earlier in December, in November, to

18   the officers -- which were recorded and for whatever reason the

19   government has been unable to produce the tape of these

20   statements.  It clearly says in the reports that they were

21   recorded.  The government hasn't been able to produce the tape,

22   as the -- as the trial transcript shows.

23          He said back then when he was first interviewed, 'I

24   knew -- I knew that he had an oozie.'  He didn't say anything

25   about, 'I went there a couple of days before.  I saw that oozie

31

1    out there on the dresser.'  Okay.  He did say before, 'I was

2    thinking about stealing it.'  But he didn't say before, 'I saw

3    it out there on the dresser and that was the reason when I saw

4    it there, I just reconsidered my whole thought about stealing

5    it.'

6            Now when it comes to Mr. Womsley (ph) and all the

7    other employees, I disagree that any of them say there was any

8    type of large bag of methamphetamine at the business.  They all

9    say uniformly there were no sales of drugs at the business.

10   And Mr. Womsley (ph) denies ever saying that there was a gun at

11   the business, which I understood had to do with protection and

12   Mr. Colette's sale of drugs, as is indicated in the presentence

13   report.

14           In view of the fact that we have two conflicting

15   hearsay statements -- and that's, by the way, the only employee

16   that says anything about a gun and drugs.  In view of the fact

17   that we have two conflicting statements, my view is, is the

18   government has not -- and the government's statement that

19   they're submitting as part of the presentence report is a

20   telephone interview.  It's a telephone interview, which was a

21   brief interview, not a follow-up interview, not an in-person

22   interview, not a taped interview, not an interview as extensive

23   as the one we submitted.

24           I submit that the government has not -- has not

25   sustained their burden on showing that the Court should rely on

1     Mr. Womsley's (ph) testimony or statement, hearsay statement,

2     in making a determination about the two-point enhancement.

3          Now with respect to Mr. Johnson, Mr. Johnson is a

4     person that the Court should not use -- and he's the sole

5     witness there that really talked about a connection between the

6     gun and the drugs.  The Court should not use the testimony of

7     Mr. Johnson and the statement of Mr. Johnson about that oozie

8     in awarding this two-point enhancement.

9          The statement was manufactured at the time of trial,

10    number one.  Number two, exhibits have been submitted to the

11    Court as part of Mr. Butler's motion to dismiss and motion for

12    a new trial, which clearly show that Mr. Johnson was under

13    investigation for armed robbery.  He was adjudicated a

14    delinquent based on a charged robbery and sent to juvenile

15    hall.  He was -- he was -- there was a search warrant executed

16    on his residence after an undercover buy of cocaine from him.

17    There were weapons found at his residence.  There was money

18    found at his residence.

19          He owned automatic weapons in the past.  He admitted

20    to that.  He had been charged with felony vehicle theft but not

21    prosecuted.  He was charged with larceny and not prosecuted.

22    He was investigated concerning larceny from a building,

23    residential burglary, no-force burglary and vehicle theft.  And

24    Trooper Wall testified at trial that Mr. Johnson lied to him

25    during the interview on that same morning.  Trooper Wall

33

1    indicated that yes, we thought there was some type of leak of

2    the information we had, that Mr. Johnson had access to it,

3    because when we got there to execute the search warrant, the

4    place had been cleaned out of drugs.

5         And they asked him, they said, 'What is that?  What's

6    the leak?  What are your sources of supply?'  Mr. Johnson would

7    not give that information.  He just didn't tell the authorities

8    that information.  The only thing he talked about was Mr.

9    Colette.  Finally, Mr. Johnson was promised basically a free

10   pass in exchange for fingering Mr. Colette.  Mr. Johnson --

11   there's evidence at trial and it's basically undisputed that

12   that's what he was promised.  Trooper Wall says that, Mr.

13   Johnson says that.  And part of his testimony, of course, has

14   to do with this gun.

15        The jury didn't believe him.  The jury rejected that.

16   Okay.  Under all of these circumstances, for the Court to

17   substantially enhance Mr. Colette's sentence based upon the two

18   points, when really the only testimony having to do with the

19   gun is Mr. Johnson's and it's not to be believed, we argue

20   would not be appropriate.

21        Now there's a case called United States vs. Pike, 473

22   United States -- I'm sorry -- F.3d 1053, which was decided by

23   the Ninth Circuit in January of this year, and Pike talks about

24   the tail-wagging-the-dog situation, where in some circumstances

25   the government may have the burden of proving an enhancement by

34

1    clear and convincing evidence rather than preponderance of the

2    evidence, and there's a six-prong test.

3        Our view is, is that that's something the Court should

4    consider here because two of the prongs have to do with whether

5    the jury has acquitted of the very conducted that -- that the

6    government -- on which the government is now seeking an

7    enhancement, and whether the very conduct could be the subject

8    of a separate offense.  That was the case here.  The jury

9    looked at that and the jury acquitted.  And so that's something

10   I think the Court should consider.  I think the Court should

11   apply the clear and convincing standard.

12       There was evidence at the trial that all these weapons

13   were possessed legally, all of them.  Mr. Colette had the

14   appropriate tax stamps for them and had the appropriate

15   paperwork for them.  He was an avid hunter.  The weapons were

16   possessed not only in the gun safe but around the house.  This

17   was a large safe.  Even Mr. Johnson agreed it was a large safe.

18   The photographs at trial showed it was a large safe.  It was a

19   gun safe, Your Honor.  It was a safe that was there for

20   people -- people who have weapons, that -- that hunt, that use

21   guns, they keep those guns in a gun safe.

22       This -- this safe had guns in it.  This safe had cash

23   in it which we -- we believe was from the business.  This safe

24   had cocaine in it.  This safe had a little bit of marijuana in

25   it -- marijuana in it.  This safe had receipts and documents

1    from Mr. Colette's business in it, and cancelled checks and

2    checks from the business in it.  The jury found that just

3    because the guns were in the same safe as the -- as the drugs,

4    that didn't necessarily mean there was a connection as between

5    the two of them.

6           In light of all the circumstances here and Mr.

7    Colette's enthusiasm for guns, that's our view.  Without more,

8    just the fact that they were found together, that's not enough

9    for the government to satisfy its burden by a preponderance of

10   the evidence, particularly where that safe contained other guns

11   and business documents in addition to the cocaine.  So the very

12   fact that the money was there isn't sufficient.

13          And while -- while Mr. Schroder argues that the

14   $38,000 was all proceeds of drug money, that's an inference

15   that he's -- that he's making based upon -- it's speculation,

16   basically.  He doesn't have any information that that

17   $38,000 -- any specific information, even from Mr. Johnson.

18   Mr. Johnson said nothing about the $38,000.  He didn't even see

19   the $38,000 a couple of days before when he was there.

20          A two-point gun enhancement, Your Honor, substantially

21   enhances the sentence here.  The government has not proved by a

22   preponderance of the evidence that it should apply and -- and

23   we ask that the Court deny that.  And also, the fact that Mr.

24   Schroder made so many points about how Mr. Colette has been

25   involved in the use of marijuana -- there was use of drugs at

1   the business.  There were personal -- there was personal use of

2   drugs.  That's fine.  But how does that reflect on the use of a

3   gun during the course of the possession for sale of drugs?

4         At this point, Your Honor, I'd like to move on and

5   talk about the 3553(a) sentencing factors.  I'm just going to

6   pour myself a little water, if the --

7         THE COURT:  That's fine.

8         MR. COHEN:  -- Court doesn't mind.

9         THE COURT:  No, that's fine.

10        MR. COHEN:  Actually, before I do that, let me just

11  address my point that I made in the sentencing memorandum under

12  4A1.3, that the Court should consider criminal history category

13  II as the starting point, as being over-representative.  Again,

14  Mr. Colette, who is 33 years old, has no prior felony

15  convictions.  He's had absolutely no contact with the law

16  involving anything like this type of seriousness.  The two

17  misdemeanors that are counted, they put him in a criminal

18  history category II.  If he had one criminal history -- one

19  point, he'd be in criminal history category I.  Only one point

20  is getting him into criminal history category II.  One of them

21  is a -- is a fight that he got into where he -- he served I

22  think a couple of days, maybe three days, in jail and that was

23  it.  And the other one was, he failed to submit I believe to a

24  breathalyzer when he was pulled over by the police when he was

25  driving.

1    That's it.  That's all he's got.  I don't think it's
2  appropriate for the Court to look at his juvenile record and I
3  don't think that the -- the government is arguing that the
4  Court should look at his juvenile record.  So I think the Court
5  should consider that the criminal history category II is
6  over-representative.

7    Now let me talk about, please, the 3553(a) sentencing
8  factors.  And I'd ask the Court in particular to focus on the
9  letters that have been submitted in support of our views at
10  sentencing.  Your Honor, I have to tell you that I've been --
11  I've been doing this for quite a while and, you know, it's not
12  frequent, Your Honor, that this many letters are submitted with
13  this type of support.  People who have known Mr. Colette for a
14  number of years -- in some cases, many, many years -- who talk
15  about the fact that he's a hard-working person, that he was
16  hard-working at the business.  And I disagree with Mr. Schroder
17  that there's no evidence in the record, or no information in
18  the record, that there was any appreciable money coming from
19  the business.  I think that that's just not correct.

20    The information is that Mr. Colette was a hard worker.
21  He was working all the time.  He was helping to take care of
22  two children with his girlfriend, who are 11 and five years
23  old.  He was a very, very good family man.  He's skilled at --
24  at what he does, at working on the cars and installing the
25  stereos.  And there's a lot of insight here as to Mr. Colette's

1   life.

2          And I think collectively looking at what these -- what

3   all of these people are saying, is that this is a very, very

4   different picture of Mr. Colette than what the government

5   presents.  And it isn't a picture of a man who, even

6   considering these convictions, at the age of 33 -- a relatively

7   young man.  He's a man who has a lot to live for.  He's a man

8   who has accomplished a great deal in his life.  He's a man who

9   is absolutely well loved by his family and by his friends.  He

10  has skills.  He's a kind man.  And he has a lot to offer.

11         And the question the Court needs to answer, under the

12  recent Ninth Circuit case law, is -- is it a -- going on to the

13  3553(a) factors and considering them all, which the Court I

14  think needs to do on the record and make it clear that the

15  Court has considered them all, is coming out with a sentence,

16  and then that sentence is going to be reviewed for

17  reasonableness.  This is after using the guidelines as a

18  starting point.  And I think that Mr. Butler went through these

19  factors in his initial sentencing memorandum, talking about the

20  nature of the offense, Mr. Colette's history, the seriousness

21  of the offense, respect for law, just punishment, deterrence,

22  protection of the public, education, rehabilitation and other

23  correctional treatment, and pointed out very clearly that how

24  long does a person who's previously spent only three days in

25  jail -- how long does such a person have to spend in jail

39

1    before the concerns of punishment are addressed, before the

2    concerns of deterrence are addressed, before the concerns of

3    rehabilitation are addressed, before -- before all the --

4    before all the concerns having to do with sentencing are

5    addressed?

6            This is a case that has been in the newspaper in this

7    community.  The Court made reference to that during the course

8    of the trial.  There have been, as I understand it, several

9    articles about this.  I don't have any doubt that the

10   sentencing in this case will also be published in the

11   newspaper.  So the question is what needs to be done for

12   deterrence in light of the fact that Mr. Colette was acquitted

13   of these guns.  How much time is too much time?  He's been in

14   jail since November 29th of 2005.  He's been in jail already

15   for a long period of time.

16           The government is arguing that a minimum mandatory of

17   60 months applies in this case.  We have our disagreement with

18   that.  But 60 months, Your Honor, is a long, long time in

19   federal prison for somebody who's never served time in prison

20   and it adequately addresses for all the reasons, particularly

21   given Mr. Colette's background, it adequately addresses all the

22   concerns in 3553(a).  To the extent that the 500 grams is not

23   there and the Court agrees with my view that the government has

24   not shown by a preponderance of the evidence -- all they have

25   to do is bring in a DEA-7 -- what the weight was, we should go

40

1    with 368 grams, criminal history category I, and the Court

2    should consider imposing a sentence on Mr. Colette of 41

3    months, which is also an extraordinarily long sentence under

4    the circumstances.

5        Your Honor, I have one additional concern which has to

6    do with -- well, actually I have two -- I have two additional

7    points.  One is, is that in considering the weight -- my weight

8    arguments and in considering my arguments having to do with the

9    two-point adjustment for the -- for the weapon, or the weapons.

10   I'm hoping the Court is mindful of the <u>Ameline</u> opinion, the <u>en</u>

11   <u>banc</u> opinion at 409 F.3d 1073, which says that the court can't

12   place the burden on us to disprove facts having to do with the

13   offense level or the enhancement.  I hope the Court remains

14   mindful of that.

15       And then let's see.  I had a -- I had a final point

16   that I wanted to make and it's -- I had a final -- it's

17   probably going to come back to me.  If the Court will forgive

18   me.  I have -- I have one other point.  It will probably come

19   back to me in a second.

20       THE COURT:  Why don't you just wait on that and I'll

21   see if --

22       MR. COHEN:  All right.

23       THE COURT:  -- Mr. Schroder has any response --

24       MR. COHEN:  All right.

25       THE COURT:  -- and then we'll let you have some time.

41

1          MR. COHEN:  All right.

2          THE COURT:  Mr. Schroder, if you had any response.

3    You don't have to.

4          MR. SCHRODER:  Yes.  For one -- I'll be very brief.

5    Government's Exhibit number 30 at trial was the stipulation

6    signed by the defendant.

7          THE COURT:  Okay.

8          MR. SCHRODER:  So there was a stipulation.  It was

9    entered into evidence.

10         THE COURT:  With regard to the drug quality [sic]?

11         MR. SCHRODER:  With regard to the drug --

12         THE COURT:  Quantity.

13         MR. SCHRODER:  -- quantity.  Right, Your Honor.  And

14   if the Court would like, I have the DEA lab reports.  I'm happy

15   to admit those.

16         MR. COHEN:  I would appreciate seeing both of those

17   documents if the government has them.

18         THE COURT:  When you say you have them, do you

19   literally have them in your hand?  Let's take a two-minute

20   recess so that Mr. Cohen can remember his point and so that you

21   can look at those documents.  And then I'll come -- I'm going

22   to take -- take two minutes.  And Mr. Schroder, when we come

23   back, you can finish up.

24         MR. SCHRODER:  Yes, Your Honor.

25         THE CLERK:  Court now stands in recess for two

42

1    minutes.

2        (Recess at 10:08 a.m., until 10:21 a.m.)

3        THE CLERK:  Please rise.   The United States District

4    Court again resumes session.   The Honorable Ralph Beistline is

5    presiding.  Please be seated.

6        THE COURT:  Thank you.   Where are we?

7        MR. COHEN:  Your Honor, I've had an opportunity to

8    review these documents, the DEA-7 and the -- and Exhibit 30.

9        THE COURT:  Mm-hmm (affirmative).

10       MR. COHEN:  I'd ask that they be in evidence at the

11   hearing because I think -- to support the government's

12   contentions.   The only point I have about the stipulation is,

13   is that Mr. Colette -- Mr. Colette's position is, he did not

14   understand the significance of the stipulation.   It was not

15   explained to him by Mr. Butler, and he says that -- that he was

16   asked to sign it but he didn't understand that it was going to

17   result in calling into play the five-year minimum mandatory and

18   what all the implications were.

19       THE COURT:  Okay.

20       MR. COHEN:  And in fact, he had forgotten that he

21   signed it, in our earlier discussion.

22       THE COURT:  Okay.

23       MR. COHEN:  But I'd ask that the Court put these into

24   evidence.   I remember what I was going to say earlier.

25       THE COURT:  Okay.  So first of all, the documents that

43

1    you referred to -- I don't know how we're going to refer to

2    them in the record -- will be admitted into evidence.  How do

3    you want to call them?

4            MR. COHEN:  You want to mark them 1 and 2?

5            MR. SCHRODER:  We'll mark -- hang on a second.  Let me

6    get a sticker, Your Honor.

7            THE COURT:  Did you want to say -- did you want to

8    wait until Mr. Schroder finished to tell us what you

9    remembered?

10           MR. COHEN:  It's up to you.

11           THE COURT:  I think we ought to --

12           MR. COHEN:  Okay.  That's fine.

13           THE COURT:  -- keep Mr. Schroder going --

14           MR. COHEN:  Sure.

15           THE COURT:  -- and then let you respond.

16           MR. SCHRODER:  Your Honor, we'll mark a copy of the

17   stipulation as Government Exhibit number 1 for the purpose of

18   the hearing.

19               (Plaintiff's Exhibit 1 identified)

20           THE COURT:  Very well.

21           MR. SCHRODER:  And the copy of the DEA lab report as

22   Government Exhibit 2 for purposes of the hearing.

23               (Plaintiff's Exhibit 2 identified)

24           THE COURT:  Very well.  All right.  They will be

25   admitted without objection.  Mr. Schroder, you can continue

44

1   with your comments.

2            (Plaintiff's Exhibits 1 and 2 admitted)

3            MR. SCHRODER:  And just a couple of things, Your

4   Honor.  The loaded weapons, I think that's stated clearly in

5   Exhibit -- or in the PSR in paragraph number 9 -- or 19, that

6   we're talking about -- especially, I think, in the government's

7   case, we're really focusing on in addition to the machine gun,

8   we're focusing on the pistol grip shotgun that was introduced

9   into evidence that was loaded and the AR-15, the assault rifle,

10  that was also introduced into evidence at trial.

11           THE COURT:  So why are you -- why are you telling me

12  that?  You're responding to --

13           MR. SCHRODER:  Mr. Cohen was -- was implying that

14  these were -- these were hunting weapons, and I'm just making

15  the point again that, you know, in our opinion they're not

16  hunting weapons.

17       (Side conversing)

18           THE COURT:  Okay.

19           MR. SCHRODER:  There's a discussion -- I'm not going

20  to belabor the discussion of Eugene Johnson, Your Honor.  I'm

21  not sure the way Mr. Cohen relayed that testimony is accurate.

22  I don't think there was any discussion of somebody -- that

23  leads you to the conclusion that somebody promised him the

24  moon.  But the Court heard that testimony.  The Court doesn't

25  have to believe Eugene Johnson.  What he said was corroborated

45

1   by the officers, what the officers found in the -- in the

2   house, which was the -- which was the weapons.  We're not -- we

3   don't have to prove a 924(c) here.  That's not what this

4   enhancement is about.  The standard is that it's not clearly

5   improbable that the gun was not used, and I think -- or the gun

6   was not related.  And I think the location of the guns next to

7   the cocaine and the fact they were loaded, I don't think the

8   Court will find that it's not clearly improbable.

9           In final, on the misdemeanor or the criminal history,

10  Your Honor, the juvenile record adds no points to the criminal

11  history, but I think it may be instructive to the Court to help

12  paint the picture that a reduction is not -- is not appropriate

13  in this case in the criminal history level.  And that's it,

14  Your Honor, for us.

15          THE COURT:  All right.  Very good.  Thank you.  Mr.

16  Cohen, you had something you remembered.

17          MR. COHEN:  Right.  I just have a couple of quick

18  comments --

19          THE COURT:  Okay.

20          MR. COHEN:  -- arising out of what Mr. Schroder just

21  said.  First of all, the assault rifle, the testimony at trial

22  was that it was not loaded, and so I disagree with that.

23  Secondly --

24          THE COURT:  Okay.  You're -- we use different --

25  you're talking about -- some people refer to it as a machine

46

1  gun.  It was clear that was not loaded; right?  I mean, that's

2  not disputed?

3          MR. SCHRODER:  Your Honor, and let me make it clear, I

4  don't want to mislead the Court.  The AR-15 had a magazine

5  loaded next to it --

6          THE COURT:  I understand that.

7          MR. SCHRODER:  -- but the magazine was --

8          THE COURT:  But that's --

9          MR. SCHRODER:  -- not inserted.

10         THE COURT:  Okay.  So we're talking about two

11 different weapons --

12         MR. SCHRODER:  Right.  Right.

13         THE COURT:  -- is all.

14         MR. SCHRODER:  Right.

15         THE COURT:  I'm just trying to clear that up.

16         MR. SCHRODER:  Right.

17    (Side conversing)

18         THE COURT:  The machine gun was not loaded.  The other

19 one had a clip, but there was no chambers in the -- no bullets

20 in the chamber.

21         MR. COHEN:  The AR-15 was not loaded.

22         THE COURT:  I thought that had the clip without the

23 bullet in the chamber.

24         MR. COHEN:  That's what I'm saying.

25         THE COURT:  Okay.

1        MR. COHEN:  That's what I'm saying.  Okay.  So --

2        THE COURT:  So we all agree.

3        MR. COHEN:  Okay.

4        THE DEFENDANT:  No.

5        THE COURT:  No, we don't agree.

6        MR. COHEN:  Okay.

7        THE DEFENDANT:  No, I don't.

8        MR. COHEN:  Okay.

9        THE DEFENDANT:  No.  That gun was not --

10       THE COURT:  So it didn't have a clip?

11       THE DEFENDANT:  The clip was not in the gun.  The clip

12  was sitting over on another shelf --

13       THE COURT:  Okay.

14       THE DEFENDANT:  -- on the other side of the safe.  The

15  gun was not loaded.

16       THE COURT:  The clip -- okay.

17       MR. COHEN:  And I believe that Mr. Colette is correct,

18  that that's what the trial testimony was.

19       THE COURT:  Okay.

20       MR. COHEN:  I don't think that was disputed.  So I

21  just -- that's that point.  The next point is that Mr. Johnson

22  admitted to the state magistrate that he was promised no time.

23  He admitted that.  And the Court's --

24       THE COURT:  I remember all that.

25       MR. COHEN:  Yeah.  And the Court's already reviewed

48

1  that, so I --

2      THE COURT:  Well, I --

3      MR. COHEN:  -- know that's -- the Court's reviewed

4  that motion.

5      THE COURT:  I remember basically what was said.  I'm

6  not sure I agree exactly your -- the way you restated it, but I

7  remember that he expected -- he was hoping for no time.

8      MR. COHEN:  He said -- he said --

9      THE COURT:  That was his perspective.

10     MR. COHEN:  He said under oath the he was told he

11 would get no time --

12     THE COURT:  Right.

13     MR. COHEN:  -- in exchange for him testifying at the

14 search warrant proceeding.

15     THE COURT:  I remember that.

16     MR. COHEN:  Okay.  That didn't necessarily come out at

17 the trial.  He did admit that it was his understanding he would

18 get no trial.  It was clearly the case at the -- at that

19 proceeding.  And that's something the Court, I think, can

20 consider at sentencing, not only the testimony at trial, which

21 I think was consistent with that.

22     The point that I remembered was this.  I have a

23 concern that Mr. Butler did not make a motion under the Jencks

24 Act for all statements of the witnesses who testified at trial

25 prior to his cross examination.  And -- and I'd like to -- I'd

49

1    like to make that motion and ask the government to provide to

2    the defense any and all statements that have not already been

3    provided, to the extent there are any.

4              THE COURT:  Okay.

5              MR. COHEN:  And finally, Your Honor, I have a -- I

6    summarized a series of documents having to do with Mr. Johnson,

7    which I believe -- I know that they're documents I received

8    from -- or not I received, but the defense received from the

9    government.  And many of them may be exhibits in other

10   proceedings in this matter, but I was -- I was hoping that I

11   could submit them as an exhibit in this sentencing here so I

12   have a complete record, because these are documents that talk

13   about the search warrant on Mr. Johnson -- Mr. Johnson.  That

14   was executed on the 28th of November of 2005.

15             All the events leading up to that, the application for

16   electronic surveillance, his charges that arose from that, his

17   interviews.  Perhaps not all of his interviews, but I'm not

18   sure to what extent they can provide it.  But some of his

19   interviews -- the money that was recovered.  So I'm hoping the

20   Court would accept this as an exhibit at sentencing in support

21   of my theory that the Court should not use the statements, the

22   hearsay statements of Mr. Johnson or his statements at trial,

23   to enhance Mr. Colette's sentence.

24             THE COURT:  And those are the items that -- you listed

25   a number of things about Mr. Johnson --

50

1          MR. COHEN:  Right.  I listed a number of things that

2     these documents support.  But these are more complete and I'd

3     like to put them into the record, Your Honor.

4          THE COURT:  What's the government's position?

5          MR. SCHRODER:  Your Honor, I think I would object in

6     just putting a pile of documents into the record.  I mean, if

7     they're going to be used for some purpose in the sentencing and

8     indeed they are -- I haven't seen them, so I don't know if

9     they're documents that we provided in discovery -- then I don't

10    know that I'd have any objection to that.  But not just to

11    create a record.

12         MR. COHEN:  Well, it's not only to create a record,

13    it's because there are documents to substantiate what the Court

14    heard about Mr. Johnson at the trial, what the Court knows

15    about Mr. Johnson from the search warrant proceeding, for the

16    motions that were filed after the trial, from what I said

17    today.  I'd hope that the Court reviews that prior to -- or

18    looks at that prior to imposing sentence.

19         THE COURT:  I know Mr. Johnson's history.  I listened

20    to -- I did pretrial motions.  I saw him testify at trial.  I

21    know he was a drug dealer.  I know he had quite a -- quite a

22    history of illegal conduct in the past and, you know, there's

23    no secret about that.  He didn't -- he didn't come in and

24    create an image of being an angel.  That's not my impression of

25    him.

1          MR. COHEN:  Well, I'd ask -- I'd ask --

2          THE COURT:  But on the other hand --

3          MR. SCHRODER:  If there's something specific they want

4    the Court to consider, we can --

5          THE COURT:  Right.  On the other hand --

6          MR. SCHRODER:  -- discuss that, Your Honor.

7          THE COURT:  -- just take the package of documents and

8    say, "here, they're admitted," that's -- that's kind of a

9    stretch.  If you want me to look at something specific that

10   might cause me to think even worse of him, I mean, I know he

11   was a drug dealer and he was basically the confidential

12   informant here because of his drug dealing.  That's why he got

13   caught.  That's why he --

14         MR. COHEN:  Well, I think the pile of documents can be

15   reviewed in a very short period of time.  They show -- they --

16   they -- while there's a lot of -- there are a lot of documents,

17   it's very clear what they are.  They're search warrant

18   applications and all that.

19         THE COURT:  Well, you know, I can't -- you want me to

20   do this.  You want me to review them right now, or do you want

21   the government to review them and see what they oppose?

22         MR. COHEN:  The government's seen them.  The

23   government knows what they are.

24         THE COURT:  What are they, Mr. Schroder?

25         MR. SCHRODER:  Well, they appear to be a number of --

52

1          THE COURT:  It looks like to me a two-inch-thick pile
2     of documents.
3          MR. SCHRODER:  Criminal history and documents related
4     to the search warrant, Your Honor.  That's what it appears to
5     me.
6          THE COURT:  Is that -- it's quite a ways away.  Is
7     that about two inches thick or is it --
8          MR. SCHRODER:  It's a good two inches.
9          THE COURT:  Okay.  Well, how can I expect Mr. Schroder
10    to respond to your request when he's just holding a two-inch
11    pile of documents?  He can't -- he can't judge whether or not
12    they're admissible by their weight.  He'll got to look at them.
13    So we'll take a recess and you tell me after you've looked at
14    them whether or not you're going to object to their
15    admissibility; okay?
16         THE CLERK:  Court now stands in recess.
17       (Recess at 10:32 a.m., until 10:57 a.m.)
18         THE CLERK:  The United States District Court is again
19    in session, the Honorable Ralph Beistline is presiding.  Please
20    be seated.
21         THE COURT:  Okay.  Mr. Schroder, what's the situation?
22         MR. SCHRODER:  Your Honor, a couple of things.  One,
23    half of the pile is a complete copy of the other part.
24         THE COURT:  So we only need half?
25         MR. SCHRODER:  So it's only half.

53

1           THE COURT:  Okay.

2           MR. SCHRODER:  There are some documents in the front

3    half that are -- I'm concerned about whether they're

4    appropriate for the -- for the Court to consider, maybe even

5    for me to see.  There's a page in here that looks to me like

6    it's defense counsel notes.

7           THE COURT:  Okay.  Well, take them out.

8           MR. SCHRODER:  So we've tried to push that out.

9    There's two complete copies of the -- what we've got here is,

10   we've got police reports for the original -- the original buy

11   from Eugene Johnson that led to then the subsequent search

12   warrant, so there's a complete police report for the buy and

13   the search warrant, two complete copies of his criminal

14   history --

15          THE COURT:  We don't need two complete copies.

16          MR. SCHRODER:  Well, they're different -- from

17   different sources, so --

18          THE COURT:  I see.  Okay.

19          MR. SCHRODER:  -- they were hard to just prepare.

20          THE COURT:  Okay.

21          MR. SCHRODER:  So I didn't take those out.

22          THE COURT:  Okay.

23          MR. SCHRODER:  It's my argument, Your Honor -- and

24   there's also a couple of documents in here related to a person

25   who I don't know who she is.  I think the agent implied that

54

1   it's Mr. Johnson's girlfriend.

2           THE COURT:  Okay.

3           MR. SCHRODER:  I don't think that's appropriate to

4   consider.  I guess I would argue the Court's heard all this

5   through motions practice, through trial.  All of these issues

6   are -- are old news.  The Court spent a lot of time listening

7   to this.  You know, I'd certainly invoke the -- the spirit of

8   Rule 403, that for the Court to take time to go through all

9   this after it's heard the testimony and Mr. Johnson's been

10  cross-examined on these issues would be, you know, undue delay,

11  waste of time and a needless presentation of cumulative

12  evidence.

13          THE COURT:  Okay.  Mr. Cohen.

14          MR. COHEN:  I'm not aware that there were copies in

15  there.  If that's the case, I agree with Mr. Schroder on that.

16  Again, this is not a jury trial.  I don't think Rule 403

17  applies.  And I want to make sure we have a complete record in

18  the case, and I don't think there's anything wrong with -- with

19  the Court considering all those documents.

20          THE COURT:  You don't want me to consider the

21  counsel's notes, do you?

22          MR. COHEN:  I don't.  I thought those were out of

23  there, actually.  So --

24          THE COURT:  Okay.

25          MR. SCHRODER:  I'm going to take -- I've separated the

55

1    copies from the front part.  I haven't taken anything -- I've

2    marked them, but I haven't taken anything out.

3            MR. COHEN:  All right.

4            THE COURT:  And what you want me to know is that Mr.

5    Johnson's got quite a criminal record and is not really a

6    believable witness.

7            MR. COHEN:  Well, I do.  But --

8            THE COURT:  That's what you want.

9            MR. COHEN:  I do.  But actually, the -- the actual

10   specifics of -- of his conduct -- the other thing is, is I

11   think that Agent Foran would be able to confirm with the

12   Court -- and I know that he's here in the courtroom.  I think

13   he would be able to confirm with the Court that Mr. Johnson in

14   fact did receive no time after his arrest.

15           THE COURT:  Okay.  That's fine with me, I mean, I

16   don't dispute that.

17           MR. COHEN:  I'm not saying the Court disputes it.  I'm

18   just --

19           THE COURT:  Yeah.

20           MR. COHEN:  -- saying that that, and the other

21   information, I think there's specific information about what

22   kind of parent Mr. Johnson is.  I mean, if the Court's saying,

23   'Listen, I'm not -- I'm not considering what Mr. Johnson has to

24   say for the purpose of this sentencing,' then --

25           THE COURT:  I'm not saying that.  I'm just saying I

1  know about him.  I mean, I've seen him, I've heard him.

2         MR. COHEN:  Well, I don't --

3         THE COURT:  I've looked at his record.

4         MR. COHEN:  I'm not -- I'm not confident --

5         THE COURT:  A jury heard him.

6         MR. COHEN:  Well, none of these exhibits were put in

7  during the course of the trial.  I'm not -- I'm not certain --

8  I know that some of them were made exhibits to the motions

9  hearings, to the --

10        THE COURT:  Mm-hmm (affirmative).

11        MR. COHEN:  -- motion to suppress and the post-trial

12  motions.

13        THE COURT:  They were.

14        MR. COHEN:  What I'm concerned about coming into this

15  case is that I'm not sure that every one of those documents has

16  been submitted and reviewed by the Court, and that's what my

17  concern is in a case where the government's asking for a

18  substantial period of time in custody.  They're asking for nine

19  years.  So that's all.  And, you know, I ask that the --

20        THE COURT:  Do you want me to look at the documents?

21  Do you want me to physically look at the pile?

22        MR. COHEN:  Well, I'd like to mark it as an exhibit.

23        THE COURT:  Well, let me look at it so I know what

24  we're talking about.  This is half of them.  This is the ones

25  that are not duplicate; right?

1        MR. COHEN:  I'm not sure that there are duplicates.  I

2  have to confirm that.  I'm not sure that's correct.

3        THE COURT:  Well, there they are.  You know, I don't

4  like doing this last minute during sentencing when we've had

5  years to get this all squared away.

6      (Pause - side conversing)

7        THE COURT:  Okay.

8        MR. COHEN:  I'm just -- I need to compare it to see if

9  there are --

10        THE COURT:  Okay.

11        MR. COHEN:  -- copies.

12        THE COURT:  Nothing in here surprises me.  Some of

13  it -- most of it, I think I've already seen.  Maybe not all of

14  it, but it indicates that he's had problems in state court as

15  well as federal court.

16      (Pause)

17        THE COURT:  Why don't we go off the record while Mr.

18  Cohen's reviewing those.

19      (Recess at 11:07 a.m., until 11:09 a.m.)

20        MR. COHEN:  I agree, other than the fact that -- the

21  documents having to do with the girlfriend, I agree about that.

22  The only other documents are two letters from Mr. Schroder,

23  indicating that much of this material, if not all, was provided

24  to the defense on July 27th and July 28th --

25        THE COURT:  Okay.

58

1           MR. COHEN:  -- which was just a few days before the

2   trial.

3           THE COURT:  Okay.  So what --

4           MR. COHEN:  Nothing.  I don't think there's any --

5           THE COURT:  Okay.  So what is the --

6           MR. COHEN:  -- any dispute about that.  So --

7           THE COURT:  Okay.  So the documents --

8           MR. COHEN:  So as to the documents the Court reviewed,

9   I removed the attorney notes from them.

10          THE COURT:  Okay.

11          MR. COHEN:  And I'd ask that we mark these as Exhibit

12  E, and that we put it into evidence at the hearing.

13              (Plaintiff's Exhibit E identified)

14          THE COURT:  Very well.  I've reviewed them myself.

15  We'll go ahead and have them part of the record.  Okay.  Next.

16              (Plaintiff's Exhibit E admitted)

17          MR. COHEN:  All right.

18          THE COURT:  You said that's the one last matter you

19  had, actually.

20          MR. COHEN:  Right.  But I'm an attorney.  Now that I

21  have more time, I have a couple of very quick ones.  Actually,

22  I made the point about Mr. Johnson did get no time.  The two

23  other points are that earlier on, I spoke with some of the

24  family members here and they heard Mr. Schroder say -- and Mr.

25  Colette agrees with me, Mr. Jason Colette.  He said that the

59

1   street value for the cocaine was $12,000 an ounce, and I've

2   spoken to Mr. Schroder and what he meant to say was $1,200 an

3   ounce.  He also said that the money was bundled in $100,000

4   bundles and what he meant to say was $1,000 bundles.

5              THE COURT:  $1,000.  I understood that.

6              MR. COHEN:  Okay.  With that, I have Exhibit E here --

7              THE COURT:  Okay.

8              MR. COHEN:  -- for the deputy clerk.

9              THE COURT:  Okay.  Anything else, sir?

10             MR. COHEN:  No, Your Honor.

11             THE COURT:  Anything?

12             MR. SCHRODER:  The only thing, Your Honor, is I can

13  represent to the Court I've talked to Special Agent Foran.  We

14  don't know what the final outcome on Mr. Johnson is.

15             THE COURT:  It's still pending?  Maybe or --

16             MR. SCHRODER:  We could find out, but we just -- we

17  just don't know.

18             THE COURT:  Okay.  It's likely it wasn't much?

19             MR. SCHRODER:  Right.

20             THE COURT:  Okay.  So we're done now, Mr. Cohen?

21             MR. COHEN:  Yes.  I have -- I have a printout.  I'm

22  sorry.  I have a printout from the Alaska trial court cases on

23  line, which apparently the family just --

24             THE COURT:  Okay.

25             MR. COHEN:  -- printed out, that shows the -- that

60

1   apparently shows the outcome of the -- of the case against Mr.

2   Johnson.

3         THE COURT:  Which was --

4         MR. COHEN:  That's what I'm looking at.

5      (Side conversing)

6         THE COURT:  Eighteen months with 18 months suspended

7   and 18 months probation.  I can even hear that.

8         MR. COHEN:  That's what Mr. Colette is saying.  I'm

9   just looking at the document to see if that's -- if there's

10  something on the document that says that.

11        THE COURT:  Eighteen months with 18 months --

12        MR. COHEN:  1/21 to 7/25.  9/4/2006.  Yeah, the

13  last -- the last entry is -- the last entry is -- is apparently

14  the -- the change of plea.  I don't -- I don't see the actual

15  sentence on this -- on this document, so maybe it wasn't -- it

16  was not updated.

17        THE COURT:  Okay.

18        MR. COHEN:  So I have no reason to disagree with what

19  Mr. Colette is saying.  He's probably --

20        THE COURT:  I don't either.

21        MR. COHEN:  He's probably correct about that, and I'd

22  ask the record to reflect that it is correct.

23        THE COURT:  I don't know if it's correct but it

24  probably is because he had some reason to say it, and we know

25  that he didn't expect any jail time.  So 18 months with 18