1    **DIRECT EXAMINATION READ FROM PREVIOUS TESTIMONY**

2    BY MR. BARKELEY AS MR. SCHRODER:

3    Q    "Sergeant Wall, who do you work for?"

4         THE WITNESS:  Sorry, sir.  Are we starting here?

5         MR. BARKELEY:  Yes, "By Mr. Schroder."  It says

6    "Direct Examination."  Bottom of page 166.

7         THE WITNESS:  Oh, here we are.

8    A    "I work for the Alaska State Troopers.

9    BY MR. BARKELEY AS MR. SCHRODER:

10   Q    "And how long have you been an Alaska State Trooper?

11   A    "Over sixteen years, sir."

12        MR. BARKELEY:  All right.  And again, going out of

13   role for just a moment, ladies and gentlemen.  Sir, since that

14   time, you have one more year now with the troopers?

15        THE WITNESS:  I have, sir.

16        MR. BARKELEY:  And has your --

17        MR. COHEN:  Your Honor, I mean, I'm not saying this

18   is particularly damaging information or that we care, it's just

19   that either we're going to stick to the script or we're not.

20   If he's going to be able to ask a couple of additional

21   questions, so will I.

22        THE COURT:  Okay.  Go ahead.

23        MR. BARKELEY:  Thank you.

24   BY MR. BARKELEY AS MR. SCHRODER:

25   Q    "What is your current position with the troopers?

1    A    "I'm currently a sergeant supervising the Fairbanks ABADE

2    Unit."

3           MR. BARKELEY:  All right.  And that's not true today,

4    is it?

5           THE WITNESS:  It is not, sir.

6           MR. BARKELEY:  All right.  What do you do today?

7           MR. COHEN:  Objection, Your Honor.  I -- I'm sorry,

8    I'm --

9           THE COURT:  Okay.  We're going to have to -- are you

10   going to read from this or are you going to --

11          MR. BARKELEY:  Yes, we are, Your Honor, but his job

12   title has changed.  He's no longer doing that.

13          THE COURT:  But this is as of the date of the last

14   trial.

15          MR. BARKELEY:  All right.  As of this date --

16          THE COURT:  And I think the jury understands there

17   might be -- he might -- a year has passed, he's probably got

18   some more gray hair or whatever --

19          THE WITNESS:  Yeah.

20          THE COURT:  -- but what this -- what we're reading

21   for now is as of that date.

22          THE WITNESS:  Okay, sir.

23   BY MR. BARKELEY AS MR. SCHRODER:

24   Q    "And what is your current position with the troopers?"

25          THE WITNESS:  I'm a Lieutenant Deputy Commander.

Wall - Direct (Reading)                                    1-180

1          MR. BARKELEY:  No, you have to read exactly what it

2    says here.

3          THE WITNESS:  Oh, I'm sorry.  I'm confused.  All

4    right.

5    A     "I'm currently a sergeant, supervising the Fairbanks ABADE

6    Unit.

7    BY MR. BARKELEY AS MR. SCHRODER:

8    Q     "What does ABADE stand for?

9    A     "ABADE stands for the Alaska Bureau of Alcohol and Drug

10   Enforcement.

11   Q     "And what does the ABADE unit do?

12   A     "Primarily, the ABADE unit is responsible for drug

13   interdictions, drug investigations, controlled purchases,

14   controlled deliveries, and the investigation of (indiscernible)

15   and manufacture of illegal narcotics."

16         MR. BARKELEY:  Your Honor, you have a part.

17         THE COURT:  I have a part?

18         MR. BARKELEY:  Yes, you do.  It's at page 167, Your

19   Honor, which is only the second page of the transcript that was

20   provided to you.

21         THE COURT:  I've got it.  "Can everyone hear?  Might

22   help if you just leaned -- just lean -- I was lean into the --

23   go ahead."  The witness, go ahead.  We're going to get used to

24   it.

25         THE WITNESS:  Oh.  "My chair forward, sir?"

1       THE COURT:  "Yes.  The chair -- and a rule -- by the

2   way, ladies and gentlemen, if you can't hear, you raise your

3   hand, okay?  Got the rule down?  All right."

4   BY MR. BARKELEY AS MR. SCHRODER:

5   Q    "Sergeant?"

6       MR. BARKELEY:  Your line.

7   A   "Thank you, sir."

8       MR. BARKELEY:  Thank you.

9   BY MR. BARKELEY AS MR. SCHRODER:

10  Q    "So, Sergeant Wall, you conduct narcotics investigations?

11  A   "Yes, sir.

12  Q    "And how long have you conducted narcotics investigations?

13  A   "It'll be four years, I believe, in September.

14  Q    "Okay.  Do you know the defendant, Jason Colette?

15  A   "I do, sir.

16  Q    "Were you involved in serving a search warrant on the

17  defendant's residence?

18  A   "Yes, sir.

19  Q    "When was that?

20  A   "That was on November 28, 2005.

21  Q    "Were you the officer that applied for the search warrant?

22  A   "I was, sir.

23  Q    "And when did you get the information that was the basis

24  for your request for a search warrant?

25  A   "Through an informant, sir.

1  Q    "And what were the circumstances of your getting access to

2  that information?

3  A    "We made applica -- application and execute -- executed a

4  -- or correction -- we obtained a search warrant and executed a

5  search warrant on the informant's residence earlier that

6  morning.  That informant then cooperated and provided

7  information to us.

8  Q    "And essentially, or generally, what was the basis of the

9  information that allowed you to get a search warrant for that

10 residence?

11 A    "The informant's testimony, sir.

12 Q    "Okay.  Now when you -- using the informant's testimony,

13 what did you do with it?  What did you believe was in the

14 residence you wanted to search?

15 A    "Believed there was a -- a large amount of cocaine,

16 possibly cash, as well as a machine gun.

17 Q    "Okay.  And how did you apply for that search warrant?

18 A    "The informant was transported to the state courthouse,

19 placed on record before a state magistrate and a district

20 attorney, and the application was made on record.

21 Q    "Okay.  And after you obtained the warrant, what did you

22 do?

23 A    "The -- the warrant was obtained.  I then responded to the

24 Fairbanks Police Department and met with officers from the

25 department, as well as other members of DEA and ATF and the

1    University of Alaska Police Department.

2    Q     "So were those the agencies that were involved in serving

3    the warrant?

4    A     "Yes, sir.

5    Q     "Did you observe the residence before serving the warrant?

6    A     "Yes, sir.  I did.

7    Q     "And why was that?

8    A     "To identify the -- the residence with the informant.  We

9    both drove by in my vehicle.  He pointed out the residence.

10   Q     "And did you check to see any sources or did you observe

11   to try to see if anybody occupied the residence?

12   A     "We did.  First of all, we identified the defendant in

13   APSIN, which is the Alaska Public Safety Information Network,

14   similar to the DMV files, to confirm that Mr. Colette's -- that

15   was Mr. Colette's listed address.  Following that, we checked

16   -- or I had my secretary check the Alaska Permanent Fund

17   Dividend records to see who else may have resided in the

18   residence.  Then a Fairbanks tactical team which was going to

19   assist in the entry also placed perimeter units and

20   surveillance teams out prior to obtaining the search warrant,

21   as well as staying on scene until we did execute the warrant.

22   Q     "And what are some of the key reasons why you want to get

23   that information before you serve the warrant?

24   A     "Well, there are several things.  Number one, we'd like to

25   know who's in the residence, what we're facing when we do make

1    entry obviously for officer safety purposes.  We were

2    heightened in our senses here because of the possibility of

3    actually having a machine gun.  Secondly, we like to identify

4    the targets.  If we can take somebody outside the residence,

5    that's -- that would be preferable.  We also like to know if

6    there are children in the residence.  In this case, that was

7    important because the tactical team -- to the tactical team

8    because they wanted to deploy a noise distraction device upon

9    entry.

10   Q    "Okay.  And did you have any indication there were

11   children in the residence?

12   A    "No, sir.

13   Q    "Okay.  So how did they actually make entry into the

14   residence?

15   A    "The Fairbanks Tactical Team entered the residence through

16   the Arctic entry on the south side of the trailer, which was

17   located at 1038 Lakeview, and deployed a noise distraction

18   device, and then proceeded to secure the residence.

19   Q    "And were there any people in the residence when they went

20   in?

21   A    "Yes, sir.

22   Q    "Who?

23   A    "Ms. Koch (ph) and her two children.

24   Q    "Okay.  And after the residence was secure, what did you

25   do with them?

1   A       "They were taken outside and afforded a seat in the back

2   of an FPD detective's car.  It was November and it was -- it

3   was fairly cold outside.

4   Q       "And is that where they stayed while you did the search?

5   A       "No, sir.  They were afforded an opportunity to be

6   transported to a place of their choosing.

7   Q       "Now could you -- after you secured the residence, did you

8   commence your search?

9   A       "Yes, sir.

10  Q       "And could you just basically describe the residence for

11  the jurors?

12  A       "Yes.  Yes, sir.  It was a fourteen-by-seventy trailer.

13  It had a -- an addition, and I believe the bedroom is attached

14  addition on the southeast corner of the trailer.  The -- the

15  trailer ran east to west with vehicles parked on the south.  I

16  believe the southwest portion of the trailer house there was a

17  bedroom closest to the road.  There was then, I believe, a

18  bathroom, another bedroom, then the kitchen, the living room

19  area, and off the living room area you could exit into the

20  Arctic entry or and/or bedroom on the southeast portion of the

21  -- the structure.

22  Q       "Now did you end up finding evidence that was consistent

23  with what you sought in the search warrant?

24  A       "Yes, sir.

25  Q       "And where in the residence did you find that?

1   A      "In the bedroom that was built on in an addition in the

2   southeast corner.

3   Q      "Okay.  And is that -- is -- was that consistent with the

4   testimony that was given to the judge?

5   A      "It was.

6   Q      "Okay.  What did you find in that room?

7   A      "Initially in the room, was a money counter.  There was a

8   scale with white powder residue present on it, there was a -- a

9   -- a gun safe which also was consistent with the information

10  we'd received.  And would you like me to talk about what's

11  inside the safe, sir?

12  Q      "And let me ask, did -- was the safe open or was it

13  locked?

14  A      "No, the safe was locked, sir.

15  Q      "Then how did you get access to it?

16  A      "We called the Action Locksmith and they sent over a

17  technician.  We had to drill the safe.

18  Q      "And when you opened the safe, what did you find?

19  A      "There was twenty-three-plus ounces of cocaine, a what

20  appeared to be an Ingram fully automatic machine gun with a

21  suppressor attached to it, and approximately thirty-eight

22  thousand dollars in cash, as well as other miscellaneous items,

23  checks for a business, and authorization for a firearm and a

24  suppressor.

25  Q      "And how many places did you find a white powdery

1   substance?

2   A    "Myself?  I -- I (indiscernible) inside the safe.  There

3   was a plastic grocery bag similar to what you would obtain at

4   Fred Meyer's with your groceries.  Inside were approximately

5   twenty-three of what appeared to me to be one-ounce bags of

6   cocaine, and then there was a Tupperware container that had

7   cash in it that was -- appeared to be in one-thousand-dollar

8   bundles, which is consistent with that which -- with what --

9   what we see, as well as a -- a baggie that had cocaine in it

10  inside the cash.  There were numerous other firearms, assault

11  rifles, and shotguns and a couple of handguns, as well as -- as

12  well in the safe.

13  Q    "And you said you found documents in the safe?

14  A    "Yes, sir.

15  Q    "What were those?

16  A    "The -- the federal tax stamps authorizing the purchase of

17  and possession of a fully automatic and suppressed weapon, and

18  I believe there were other checks in there that were made out

19  to Arctic Alarm and Audio.

20  Q    "Where was the machine gun located in the safe when you

21  opened it?

22  A    "It was in the top shelf in the safe.

23  Q    "Now where did you find the -- you mentioned some other

24  items you found in the residence or in the bedroom.  Where were

25  those located?

1   A     "Most everything was inside the -- the safe itself.  As

2   far as the cocaine, there was a small amount of cocaine, I

3   believe, that a special agent found in the -- the dresser

4   drawer of the dresser.

5          MR. COHEN AS MR. BUTLER:  "Objection, hearsay,

6   foundation.

7   BY MR. BARKELEY AS MR. SCHRODER:

8   Q     "Did you see that cocaine?

9   A     "There was cocaine present.  There was -- present there

10  other than what was in the safe, sir.

11  Q     "Okay.

12         MR. COHEN AS MR. BUTLER:  "Objection.  That didn't

13  answer the question.

14         THE COURT:  "He's asking what you saw.  Is that what

15  that --

16  BY MR. BARKELEY AS MR. SCHRODER:

17  Q     "The question is did you see additional -- doesn't matter

18  who found it, but did you see additional cocaine that was

19  outside of the safe?

20  A     "I didn't see it when it was located, sir, but I know that

21  it was there.

22         MR. COHEN AS MR. BUTLER:  "Objection.

23         THE COURT:  "Sustained.

24         MR. COHEN AS MR. BUTLER:  "Move to strike.

25         MR. BARKELEY AS MR. SCHRODER:  "We'll move on.

1       THE COURT: "Sustained.  Okay.

2  BY MR. BARKELEY AS MR. SCHRODER:

3  Q    "So -- but you mentioned a couple of other items you found

4  in the bedroom as well as the -- before you started -- at the

5  beginning when you first went in the bedroom, you mentioned a

6  couple other items.

7  A    "Yes, sir.

8  Q    "One was a currency counter, and would you explain what

9  that is?

10 A    "Sure.  It's similar to what you'd have at the -- the bank

11 teller stations where you -- you can take currency in stacks,

12 then place it on there.  I believe you press a button and it

13 tells you the exact count or it will break money down to

14 certain denominations.  There was the currently counter located

15 directly on the dresser to the -- near the corner if you went

16 into the -- in the left of the room.

17      MR. BARKELEY AS MR. SCHRODER:  "Okay.  Your Honor,

18 we'd like to look at a few pictures.

19      THE COURT:  "Okay.  Are you talking about using the

20 overhead or what?

21      MR. BARKELEY AS MR. SCHRODER:  "Overhead.  Yes, Your

22 Honor.

23      THE COURT:  "Okay.

24      MR. BARKELEY AS MR. SCHRODER:  "We're already keyed

25 up to do that, Your Honor.

1        THE COURT:  "Well, that's -- that thing's supposed to

2  come down, right?"

3        MR. BARKELEY:  And unidentified speaker says, "Yeah."

4        THE COURT:  "Mr. Schroder, could you pull that screen

5  down for us because we have a button that's not bringing it --

6        MR. BARKELEY AS MR. SCHRODER:  "If I take a running

7  jump."

8        THE COURT:  Mr. Cohen, your turn.

9        MR. BARKELEY:  Mr. Cohen, you have a line there.

10       MR. COHEN AS MR. BUTLER:  "I would offer to stand on

11  his shoulders, Your Honor.

12       THE COURT:  "Okay.  This could be quite a" -- the

13  Clerk -- Clerk says, "They had it down earlier.

14       THE COURT:  "It was down before.  It won't come

15  down."  Clerk says, "Mr. Schroder, can you look up to see the

16  lights under the projector right there?

17       MR. BARKELEY AS MR. SCHRODER:  "I do see a red red --

18       THE COURT:  "You see --

19       MR. BARKELEY AS MR. SCHRODER:  -- "and a green one."

20       THE COURT:  Court says, "All right.  Just shut it all

21  off and turn it back on.  Did it work?  Yes."  And the Clerk

22  says, "When I hit the cord, it wouldn't come down."  "Okay.  So

23  we've got the screen working and let's see if we -- we're okay.

24  Okay.  The idea is so that the jury understands the technique,

25  first the pictures are shown to the witness.  If they're

1  authenticated, then the question's whether or not they'll be

2  admitted.  If they're admitted, then we show them up on the

3  screen.  So at first, you may not see the picture because we

4  haven't decided whether or not it comes in the evidence."

5           MR. BARKELEY:  All right.  Your Honor, if counsel

6  will permit me or the Court will -- a little leeway here, we're

7  not going to go through -- that is, that procedure again today.

8  Counsel and I have agreed that Exhibits 1 through 9 have

9  already been admitted into evidence, and I will not go through

10 repeated questions to ask permission to publish.  They can be

11 displayed to the jury at this time.  Correct, counsel?

12          MR. COHEN:  I am not -- are you saying we're not

13 going to read this part of the transcript or --

14          MR. BARKELEY:  I'm not going to ask permission to

15 publish each time.  The transcript we will read, yes.

16          MR. COHEN:  Oh, I -- I see what you're saying.  We're

17 just going to read --

18          MR. BARKELEY:  I'm just asking for a little leeway

19 not to be completely literal with the transcript here.

20          MR. COHEN:  Oh, okay.

21          MR. BARKELEY:  Not testimony, but Mr. Schroder

22 talking.

23          MR. COHEN:  We should have done it before the

24 overhead.  All right.  That's fine.

25          (Government's Exhibits 1-9 previously admitted)

1          MR. BARKELEY:  So, Madam Clerk, are we in fact up and

2  ready now on this?

3          THE CLERK:  (Indiscernible.)

4          MR. BARKELEY:  Thank you.

5          THE CLERK:  Push the lights button.

6                          (Pause)

7          MR. BARKELEY:  Okay.

8          THE CLERK:  (Indiscernible.)

9          MR. BARKELEY:  Face down?

10          THE CLERK:  No.  Push the lights button one more

11  time.

12          MR. BARKELEY:  Oh, okay.  The first is to publish and

13  the second -- right?  That turned it off again.

14          THE COURT:  Well, I can see it on my screen.

15          MR. BARKELEY:  Yes, I -- I see it at counsel table.

16  Should I put the lights button again?

17          THE CLERK:  Do you have the light button pushed on

18  the podium for the jury to see?

19          MR. BARKELEY:  I'm going to push "Jury."  Is that --

20  that's what I would use as -- okay.  All right.

21          THE COURT:  Lights.

22                          (Pause)

23  BY MR. BARKELEY AS MR. SCHRODER:

24  Q    "Sergeant Wall, we're showing you on the screen what has

25  been marked as Government Exhibit Number 1.  Do you recognize

1  this image?

2  A    "Yes, sir.

3  Q    "And how do you recognize it?

4  A    "This is a -- a photograph of the bed -- bedroom that we

5  were just discussing.

6  Q    "Okay.  And is it consistent with the interior layout of

7  the master bedroom in the defendant's residence at the time you

8  served the search warrant?

9  A    "Yes, sir.

10 Q    "Did you take the photo?

11 A    "I did not.

12 Q    "But were you there when the photos were taken?

13 A    "I was, sir.

14 Q    "Okay.  Is Government Number 1 a fair and accurate

15 representation of the interior layout of the master bedroom,

16 including the location of the safe, in the defendant's

17 residence when you served the warrant on November 28th, 2005?

18 A    "It was, sir."

19      MR. BARKELEY:  Okay.  So -- there's some discussion

20 of getting the lights off yet.

21      THE COURT:  So we need to go over to page 179, right?

22      MR. BARKELEY:  Yes, Your Honor.

23      THE COURT:  Line five.

24      MR. BARKELEY:  All right.  It's not clear from the

25 context, Your Honor, but I think Mr. Schroder at this point has

<u>Wall - Direct (Reading)</u>                                    1-194

1    a Exhibit 2 up, so I intend to put that up.

2              THE COURT:  Okay.

3                        (Pause)

4              MR. COHEN:  Your Honor, I don't -- I don't agree.  I

5    think that this -- I think that the question is as to --

6              THE COURT:  It is still as to line --

7              MR. COHEN:  I think it's to the last photograph.

8              MR. BARKELEY:  Still on one?

9              MR. COHEN:  Yeah.

10             THE COURT:  Yep.

11             MR. BARKELEY:  All right.  I think you're right.  The

12   vacuum cleaner gives it away.  Thank you, counsel.

13   BY MR. BARKELEY AS MR. SCHRODER:

14   Q    "Sergeant Wall, what does this photo show?  If you can

15   tell the jury what this shows?

16   A    "Yes.  This is a photograph of the southeast corner of the

17   bedroom off the Arctic entryway and the living room.

18   Q    "Okay.

19   A    "This -- this photograph depicts the Winchester gun safe

20   in the corner.  As well is if you look closely to the left of

21   the vacuum cleaner on the top dresser, you'll see that there's

22   a wood box sitting there.  On the top of it is the digital

23   scale in question that had white powdery residue on it.  And

24   barely off to the left of that scale, you see the edge of the

25   money counter.

1  Q    "Sergeant Wall, I'm now going to ask you to take a look at

2  -- turn off for the jury a moment, and ask you to take a look

3  at Government Exhibit Number 2.

4  A    "Yes, sir.

5  Q    "Do you recognize -- yes, sir.  And do you recognize this

6  image?

7  A    "I do, sir.

8  Q    "And how do you recognize it again?

9  A    "Because as a matter of fact, I believe that's me standing

10  to the -- to the right of the gun safe there as --

11  Q    "Okay.

12  A    "-- as the photo was taken.

13  Q    "Is this picture consistent with the interior of the safe

14  in the master bedroom at the time you served the -- opened it

15  when you served the search warrant?

16  A    "Yes, sir.

17  Q    "And does government's exhibit -- Government 2 a fair and

18  accurate representation of the contents of the safe in the

19  master bedroom of the defendant's residence when you served

20  that search warrant" -- I apologize -- "that warrant on

21  November 28, 2005?

22  A    "Yes, sir."

23            THE COURT:  (Indiscernible.)

24            MR. BARKELEY:  Oh, I'm sorry.  (Indiscernible --

25  voice too low.)

1  BY MR. BARKELEY AS MR. SCHRODER:

2  Q    "About this photograph, Sergeant Wall, what is this --

3  what does this photograph depict?"

4          THE COURT:  On 201?

5          THE WITNESS:  (Indiscernible), sorry.

6  A    "This was -- this photograph was the interior of the safe.

7  Present on the -- the top shelf of the safe, you'll see a --

8  the machine gun with the suppressor or silencer attached to it.

9  There's a bag of marijuana bud in front of it.  Then on the

10  left, you see numerous firearms, one of which is AR-15 style

11  weapon, and then you've got numerous shotguns present.  To the

12  right on the second shelf, you can see the Tupperware container

13  that contained the bundles of cash.  In front left of the

14  Tupperware container, you can also see a baggie of white powder

15  that was open -- opened up of cocaine.  The second shelf right

16  below that, you -- you can depict through the -- the guns as

17  they are viewed there.  That is the grocery sack containing the

18  bundles of what appeared to be one-ounce bags of cocaine.

19  Q    "Now turn this one on.  We'll move to Government's Exhibit

20  Number 3.  Sergeant Wall, do you recognize this photo?

21  A    "I do, sir.

22  Q    "And again, how do you recognize it?

23  A    "Because I was present when it was taken, sir.

24  Q    "And is this a fair and accurate representation of the

25  contents -- again, of the contents of the safe in the master

1  bedroom of the defendant's residence when you served that

2  search warrant on November 28, 2005?

3  A    "Yes, sir.

4  Q    "Sergeant Wall, again, what does this depict?"

5         THE COURT:  Page 182, line 3.

6         THE WITNESS:  Yes, sir.

7  A    "This is a -- a close-up of the top shelf inside the gun

8  safe.  This shows the submachine gun, the silencer, as well as

9  the marijuana, and there are other documents off to the right

10  portion and -- and underneath the -- where the pistol cartridge

11  is there on the right-hand side.

12  BY MR. BARKELEY AS MR. SCHRODER:

13  Q    "All right.  We'll turn that off and move to Exhibit

14  Number 4.  And again, do you recognize this image?

15  A    "Yes, sir.

16  Q    "And is it a fair and accurate representation of the

17  contents of the safe in the master bedroom in the defendant's

18  residence when you served the search warrant on November 28,

19  2005?

20  A    "Yes, sir.

21  Q    "And troop -- Sergeant Wall, could you explain what this

22  particular photo shows?

23  A    "Yes, sir.  This is a close-up of the Tupperware container

24  which contained the money and the open bag of cocaine.  You can

25  also see the -- obviously the barrels of several weapons as

1   well as a magazine for what appears to be the AR-15 M-16 style

2   rifle.  And next to that, you can see the top of the bag

3   containing multiple bags of cocaine.

4   Q    "Okay.  Now we will move on to Government's Exhibit Number

5   5.  Do you recognize this image?

6   A    "Yes, sir.

7   Q    "And again, how do you recognize it?

8   A    "I was present, sir.

9   Q    "And is this a fair and accurate representation of the

10  contents of the safe in the master bedroom in the defendant's

11  residence when you served the search warrant on November 28,

12  2005?

13  A    "Yes, sir.

14  Q    "Sergeant Wall, from this -- all these are coming,

15  obviously, from different angles, so could you explain what

16  this angle in this photograph shows?

17  A    "Yes.  This is a photograph after the Tupperware container

18  was removed from the safe, and it was -- and it's more of an

19  angle to show the cocaine from the top.  That's the way it was

20  resting on the -- that shelf, as well as the weapons, and you

21  see the other -- see the other weapons below it.

22  Q    "Okay.  Now we'll move on to number six.

23  A    "Yes, sir.

24  Q    "Sergeant Wall, do you recognize this image?

25  A    "Yes, sir.

1  Q    "And again, how do you recognize it?

2  A    "I was present, sir.  I believe that's me holding the

3  item.

4  Q    "Okay.  And is this picture a fair and accurate

5  representation of the plastic bin that was taken from the safe

6  in the master bedroom at the time you served the search warrant

7  on November 28, 2005?

8  A    "Yes, sir.

9  Q    "And can you -- now this, Sergeant Wall, was the con --

10 Tupperware container still in the safe when this photograph was

11 taken?

12 A    "No, sir.

13 Q    "Okay.  So explain what it depicts.

14 A    "This -- you couldn't take the photograph directly down

15 into the Tupperware container inside the safe, obviously for

16 room purposes, so the Tupperware container was removed from the

17 safe, it was tilted, and a photograph was taken depicting the

18 cash bundles or loose currency, as well as the open bag of

19 cocaine.

20 Q    "I want to ask you to look at Government Exhibit Number 7.

21 A    "Yes, sir.

22 Q    "Do you recognize this image?

23 A    "Yes, sir.

24 Q    "And again, how do you recognize it?

25 A    "I was present.

<u>Wall - Direct (Reading)</u>                                    1-200

1    Q    "Okay.  Is Government's Exhibit Number 7 a fair and

2    accurate representation of the contents of the plastic shopping

3    bag found in the safe in the master bedroom in the defendant's

4    residence when you served the search warrant on November 28,

5    2005?

6    A    "Yes, sir.

7    Q    "Sergeant Wall, could you tell us what this depicts?

8    A    "Yes, sir.  That's the -- the grocery sack that was inside

9    the safe, had been taken out of the safe, and laid on the bed,

10   opened up, the bags of cocaine were then spread out on top of

11   the bag for photographic purposes.

12   Q    "And how many of those bags did you count?

13   A    "I believe there were twenty -- there's twenty-three, sir.

14   Q    "Okay.  All right.  Now I want you -- I want to show you

15   what has been marked as Government Exhibit Number 8.  Do you

16   recognize that image?

17   A    "Yes, sir.

18   Q    "And is it consistent with -- is it a fair and accurate

19   representation of the items found in the master bedroom in the

20   defendant's residence when you served the search warrant on

21   November 28, 2005?

22   A    "Yes, sir.

23   Q    "And can you explain to the jurors what they're seeing in

24   this photograph?

25   A    "Yes, sir.  That's a close-up on top of the dresser that

1   we -- that we had seen the scale in an earlier photograph.

2   That is the scale which was inside the box there and the money

3   counter which was presently open at the time.

4   Q    "And we have one more.  Government's Exhibit Number 9."

5              MR. COHEN:  Umm --

6              MR. BARKELEY:  Sorry, counsel.  Did you -- did you

7   have something, counsel?

8              MR. COHEN:  No, go ahead.

9              MR. BARKELEY:  Okay.

10  BY MR. BARKELEY AS MR. SCHRODER:

11  Q    "Do you recognize this image?

12  A    "Yes, sir.

13  Q    "And again, how do you recognize it?

14  A    "I was present in the -- in the room.

15  Q    "Okay.  And is this a fair and accurate representation of

16  items found in the master bedroom in the defendant's residence

17  when you served the search warrant on November 28, 2005?

18  A    "Yes, sir.

19  Q    "Okay.

20             MR. COHEN AS MR. BUTLER:  "If I may inquire?

21             THE COURT:  "All right.

22             MR. COHEN AS MR. BUTLER:  "Judge, just one question.

23             THE COURT:  "Very well.

24             MR. COHEN AS MR. BUTLER:  "If I may voir dire the

25  witness just on one question.

<u>Wall - Direct (Reading)</u>                          1-202

1                           VOIR DIRE

2   BY MR. COHEN AS MR. BUTLER:

3   Q    "There's something pink in this photograph that's not in

4   -- in Exhibit Number 8.

5   A    "Yes, sir.

6   Q    "So when we say this -- when we say this is an accurate

7   depiction, can -- would you please tell the Court at least what

8   that is before we decide whether there's an objection now,

9   please?

10  A    "Yes, sir.  That is a NIC wipe.  It is a -- a cocaine wipe

11  that is used to do a presumptive test for the presence of

12  cocaine.  The wipe itself is pink.  If you touch the wipe to

13  any substance with cocaine present in it, it will turn blue.

14  And in the photograph, Your Honor, you can see that there's a

15  blue dot there, so that shows that there was a presump -- that

16  there was presumptive test showing the positive presence for

17  cocaine."

18          MR. BARKELEY:  I think that's your "okay", counsel.

19          MR. COHEN AS MR. BUTLER:  "With that -- with that

20  explanation, Judge, no objection."

21          MR. BARKELEY AS MR. SCHRODER:  "Your Honor, because

22  the color is washed out, may I have permission to show Exhibit

23  9 to the jury?

24          THE COURT:  "All right.  Agreeable?

25          MR. COHEN AS MR. BUTLER:  "With the pink?  That's

<u>Wall - Direct (Reading)</u>                    1-203

1   what we -- we were noticing that.

2          THE COURT: "Show it to them.

3          MR. COHEN AS MR. BUTLER: "Okay.  That's what I

4   thought.  Okay.

5          MR. BARKELEY AS MR. SCHRODER:  "Okay?

6          MR. COHEN AS MR. BUTLER:  "Okay.

7          THE COURT: "Doesn't show up on the overhead.

8                       (Pause)

9   BY MR. BARKELEY AS MR. SCHRODER:

10  Q    "So again, just briefly, explain what you're seeing here.

11  A    "Yes, sir.  That is a closeup of the scale.  You can see

12  that there is a white powder present on the scale itself.  The

13  -- and then the NIC wipe, which is right next to it.  It's kind

14  of bled out in the -- the photograph on the overhead, but my

15  copy on the screen shows that -- shows the -- the blue dot

16  showing the indication of cocaine.

17  Q    "Okay.

18         THE COURT:  "So the jurors understand, all these --

19  you'll have the actual photographs for deliberation purposes.

20         MR. BARKELEY AS MR. SCHRODER:  "And that's it, Your

21  Honor.  We can bring the lights back up.

22         THE COURT:  "Okay.

23                       (Pause)

24  BY MR. BARKELEY AS MR. SCHRODER:

25  Q    "Sergeant Wall, just a few final questions here.  Do you

1  know a Eugene Johnson?

2  A    "I do, sir.

3  Q    "And did you serve a search warrant on his residence in

4  November 2005 as well?

5  A    "Yes, sir.  Earlier that morning.

6  Q    "And what were the circumstances of that search?

7  A    "Similar to these -- that we described earlier, with a few

8  differences.  We conducted controlled purchases of cocaine or a

9  controlled purchase of cocaine from Eugene at his residence

10 through use of a confidential informant, and utilized the

11 Fairbanks Tactical Team to execute the search warrant on the

12 residence as well.

13 Q    "Now while you were conducting that search, did he offer

14 to cooperate with you?

15 A    "Yes, sir.

16 Q    "And was that the information that ended up leading to the

17 search warrant for the defendant's residence?

18 A    "Yes, sir.

19 Q    "All right.  What did you agree to do if he provided you

20 information?

21 A    "I can't agree to do anything, but through the District

22 Attorney's Office, an agreement was reached with Mr. Johnson

23 that in lieu of his cooperation, if the information he indeed

24 gave was credible and proved to be valid, Mr. Johnson would

25 have a reduction in his charge from mix three to misconduct

1  involving a controlled substance three to a mix four, which

2  means a reduction from a sale to the possession with the

3  opportunity not to serve any jail time or go to jail that day.

4  Q     "And on this situation, was there a written agreement?

5  A     "No, sir.

6  Q     "Okay.  In these kind of situations, what do you tell the

7  potential cooperator about telling the truth?

8  A     "He needs to -- to tell me the truth.  If he does not tell

9  me the truth, then any agreements that we made are null and

10  void.

11  Q     "Okay.  How important is getting truthful information to

12  you versus getting potentially useful information?

13  A     "Truthful as the information that we are after.  We can't

14  use information that may be accurate that isn't truthful.  We

15  need individuals that can provide testimony that is true,

16  accurate, and that we can use in court, instead of information

17  that leads us to places that we can't forward charges or

18  recommend prosecution.

19  Q     "And did you give those instructions to Mr. Johnson?

20  A     "Yes, sir.

21        MR. BARKELEY AS MR. SCHRODER:  "Okay.  Your Honor,

22  that's the end of our questions on direct.

23        THE COURT:  "All right.  Mr. Butler?

24        MR. COHEN AS MR. BUTLER:  "Thank you, Judge.

25        CROSS-EXAMINATION AS READ FROM PREVIOUS TESTIMONY

1    BY MR. COHEN AS MR. BUTLER:

2    Q    "Good afternoon, Trooper Wall.

3    A    "Good afternoon, sir.

4    Q    "In terms of Mr. ju -- Johnson when you agreed to -- well,

5    first of all, you conducted, you said, a controlled buy from

6    Mr. Johnson?

7    A    "Yes, sir.

8    Q    "When would that have occurred?

9    A    "You know, I don't have the exact date.  It would have

10   been probably within a month or so prior to the execution of

11   the search warrant.

12   Q    "Like November 8th?  Does that sound like it might be?

13   A    "That -- that could have been, sir.

14   Q    "Around about that time -- at that time you received, what

15   is it, forty-some grams of cocaine?

16   A    "I believe it was forty-four, sir.

17   Q    "All right.  Forty-four grams.  And you -- and Mr. Johnson

18   was paid what, two thousand dollars for that?

19   A    "Yes, sir.

20   Q    "And that particular cocaine was noted to appear to have

21   come off the corner of a brick, isn't that right?

22   A    "Yes, sir.  It was -- whether it was a brick or not, it

23   had a compo" -- excuse me -- "a compacted area to it that was

24   -- appeared to be the corner shape to it.

25   Q    "But in fact, the way it was written up in the reports --

1  and you saw the reports, right?

2  A    "I did, sir.

3  Q    "It was written up as it appeared to have come off the

4  corner of a brick, isn't that right?

5  A    "Correct.

6  Q    "Would you explain to the jury what a brick is?

7  A    "Sure.  A brick is basically like a -- a brick in a

8  building of a house.  A brick is a block.  Cocaine is often

9  compressed into certain shapes for transport or distribution.

10 Q    "And in fact, it was noted in the report, was it not, sir,

11 that this brick appeared to be the kind -- the -- at least the

12 shape of which normally what you would -- what a person would

13 buy if they bought a kilo of cocaine, right?

14 A    "Yes, sir.

15 Q    "And so when you saw it appeared to be the corner of a

16 brick, it looked like it came straight off the corner of a kilo

17 of cocaine, didn't it?

18 A    "From the photographs of kilos of cocaine that I've seen,

19 I haven't purchased a kilo in a brick so --

20 Q    "Okay.  And when you see something like this, it also

21 would lend credence to or make or infer that this person is

22 close to the source of cocaine, isn't that right?

23 A    "That's correct, sir.

24 Q    "And that's what you really look for, isn't it?

25 A    "It is, sir.

1  Q    "And so one could -- at least a law enforcement officer

2  like yourself could reasonable conclude that Mr. Johnson may

3  have purchased that particular cocaine from the source, or he

4  may have a kilo of cocaine in his house.

5  A    "That is correct.

6  Q    "And you had information that Mr. Johnson's sold, had, was

7  purchasing and selling kilos of cocaine, isn't that right?

8  A    "I don't believe the information that I had indicated an

9  amount, that it was just -- that it was large.

10  Q    "You --

11  A    "Multiple kilos --

12  Q    "Oh, I'm sorry.  I didn't want to cut you off.

13  A    "No.  I mean, multiple kilos, I don't recall that.

14  Q    "You used an informant in that case, didn't you?

15  A    "We did, sir.

16  Q    "And you debriefed that informant, didn't you?

17  A    "I did not.  One of my investigators did.

18  Q    "Okay.  And you reviewed those reports, didn't you?

19  A    "I reviewed them at that time.

20  Q    "And don't you recall the informant telling you all that

21  -- telling you all that Mr. Johnson was selling about a kilo a

22  week?

23  A    "I don't recall that amount, sir.  I could look at his

24  report and refresh my memory.

25  Q    "Do you have it there with you?

1   A     "I do not, sir.

2   Q     "We'll come back to that.

3   A     "Sure.

4   Q     "Don't let me forget, will you?  Mr. Johnson also had

5   firearms, didn't he?

6   A     "He did, sir.

7   Q     "How many firearms did he have?

8   A     "I do not recall.  There were numerous rifles present in

9   the residence.

10  Q     "And where in the residence roughly were they?

11  A     "I'm trying to recall.  I believe some of them were

12  downstairs and some of them were upstairs in separate bedrooms.

13  Q     "In the bedrooms, not locked up -- not locked up in a

14  safe.

15  A     "No, sir.

16  Q     "Okay.

17  A     "I wasn't at the Johnson residence during the entire

18  search.

19  Q     "But you were there for part of it, sir.

20  A     "For part of it, sir.

21  Q     "And you saw that these guns were not locked up in a safe.

22  A     "That's correct, sir.

23  Q     "And in fact if a gun is just laying out somewhere in a

24  bedroom, it's certainly more easily accessible than having to

25  run to a safe and unlock a safe, isn't it?

1  A    "That is correct, sir.

2  Q    "Now you said Mr. Johnson cooperated with you.

3  A    "He did, sir.

4  Q    "He didn't cooperate right away though, did he?

5  A    "No, sir.

6  Q    "In fact, you had to kind of twist his arm a little bit,
7  didn't you?

8  A    "We had to discuss it -- discuss his options with him,
9  sir.

10 Q    "In fact, he gave -- he didn't even -- he wasn't even
11 honest with you at first, was he?

12 A    "No, sir.

13 Q    "Sort of misled you, didn't he?

14 A    "Yes, sir.

15 Q    "Until he felt -- I guess until he felt that something was
16 on the table for him, is that a fair statement?

17 A    "That's correct.

18 Q    "Okay.  And in fact, you wanted to know, didn't you, why
19 there were no drugs in the house when you all raided him on
20 that morning.  Did -- well, didn't you?

21 A    "That is correct, sir.

22 Q    "And did he ever tell you who alerted him that you all
23 were coming?

24 A    "No, sir.

25 Q    "He refused to give you that information, didn't he?

1    A     "He did, sir.

2    Q     "And even to this very day, supposedly he's cooperating

3    with you, he hasn't given you that information, has he?

4    A     "That's correct, sir.

5    Q     "So in terms of what information Mr. Johnson has, you

6    don't know what all he has, do you, sir?

7    A     "No, sir.

8    Q     "And you don't even know how truthful he's being about

9    being alerted, isn't that right?

10   A     "That's correct.

11   Q     "But in fact, you believe that he was alerted because

12   there were not drugs there readily when you went in, isn't that

13   right?

14   A     "I believe that that was something I needed to -- to check

15   out, sir.

16   Q     "Did you offer Mr. Johnson anything extra to get him to

17   tell you who told him that the police were coming to raid him?

18   A     "Yes, sir.

19   Q     "What did you offer him?

20   A     "We offered -- the District Attorney's Office offered

21   indeed if Mr. Johnson had received some information indicating

22   that here was an inside leak -- that there was an inside leak

23   within the departments, that he would basically dismiss his

24   charges --

25   Q     "Okay.

1   A    "-- if we could prove that.

2   Q    "But Mr. Johnson refused to give that information, isn't

3   it right?

4   A    "That is correct, sir.

5   Q    "And, of course -- so Mr. Johnson learns that you all are

6   going to raid him, the house is essentially clean of drugs when

7   you get there, but Mr. Johnson, with -- he has continue --

8   continues to withhold that information from you, is that a fair

9   statement?

10  A    "If he had the information.  Yes, sir.

11  Q    "Well, but you believe Mr. Johnson, don't you?  I mean,

12  you trust Mr. Johnson, don't you?

13  A    "No, sir.  Today's informant is tomorrow's defendant.  I

14  -- I trust the gentlemen I work with, I trust my team.  Mr.

15  Johnson -- his information is information, sir.  I use it if it

16  can be supported.

17  Q    "And Mr. Johnson is untrustworthy because you know that he

18  started out by lying to you, isn't that right?

19  A    "That's -- that's common, sir, that people often mislead

20  you until they are at a point where either they feel

21  comfortable with you to disclose the information, or that they

22  feel there's something in it for them.

23  Q    "Now Mr. Johnson, who told you I'm -- I was alerted that

24  you all were coming, that's why there's not drugs here, but I'm

25  -- but I'm going to tell you what I did with the drugs, he

1  didn't tell you what he did with those drugs, did he?

2  A    "No, sir.

3  Q    "And even to this very day, you don't know where he took

4  those drugs, do you?

5  A    "No, sir.

6  Q    "You don't even know what those particular drugs look like

7  because he didn't lead you to them, isn't that right, sir?

8  A    "That is correct, sir.

9  Q    "Now Mr. Johnson also had a second place where he kept his

10 drugs, didn't he?

11 A    "We believe so, sir.

12 Q    "Well, isn't it true that you all were given information

13 directly from Mr. Johnson that there was a second place where

14 he kept drugs?

15 A    "I don't recall that, sir.  I know we executed a search

16 warrant on a second place.

17 Q    "And the reason why you executed a search warrant on the

18 second place, because that was, quote unquote, 'Mr. Johnson's

19 safe house,' wasn't it?

20 A    "That was the information we had from the previous

21 informant, sir.

22 Q    "And you believe that Mr. Johnson had a safe house, don't

23 you?

24 A    "I believe that that was probable cause to believe --

25 probable cause to make that assumption.  I never saw the safe

1 house.  I don't know the veracity of that statement.

2 Q    "So Mr. Johnson, he cleaned out the house.  Now knowing

3 that Mr. Johnson is a drug dealer, he cleaned out the house --

4 who -- did you ever come -- did he ever tell you about Mr.

5 Monty or a person named Monty?

6 A    "No.  He did -- he did -- he may have mentioned him, but I

7 don't know as though he said anything in particular about

8 Monty.

9 Q    "And so if Mr. Johnson's going to clean out his house,

10 you'd expect him to clean it up of drugs, maybe a scale, things

11 of that nature, wouldn't you?

12 A    "I would believe so.

13 Q    "Do you know what it would take to get that information

14 out of Mr. Johnson, who his source was that you all were come

15 -- that you all were coming?

16 A    "Do I know what it would take?

17 Q    "Yes.

18 A    "Obviously not, sir, because if there was -- because if

19 there is a -- an informant leak -- information leak, Mr.

20 Johnson was unwilling to -- to tell me who it was or divulge

21 that information.  And if that is in fact -- there was a leak

22 or that there was something that he wanted me to believe, so

23 that I would believe he had information that I wanted.

24 Q    "But you do want that information, don't you?

25 A    "If in fact it's true, absolutely, I do.

1    Q    "And Mr. Johnson, whom I guess you place -- place some

2    degree of trust in, hasn't told you I was just lying when I

3    said that, has he?

4    A    "He has not, sir.

5    Q    "Is Mr. Johnson employed?

6    A    "I do not know, sir, at this time.

7    Q    "In fact, at the time that you busted him, he wasn't

8    employed, was he?

9    A    "That's correct, sir.  I believe that Mr. Johnson, when

10   asked -- asked him what he did, he buys and sells and fixes

11   cars.

12   Q    "Forgive me, I can't see with glasses or without them.

13   Hold on just a second.  Now you all -- hey, let's see.  We

14   talked about that you paid Mr. Johnson two thousand dollars,

15   didn't you?

16   A    "The informant paid Mr. Johnson two thousand dollars for

17   the cocaine.  Yes, sir.

18   Q    "And on the morning that you raided Mr. Johnson, that

19   would have been November 28th, right?  Because the warrant was

20   obtained on the 25th.

21   A    "That's possible, sir.  We executed the search warrant on

22   Mr. Johnson's residence early that morning, the same morning

23   that we executed the search warrant on Mr. Colette's.

24   Q    "Okay.  And, sir, during the course of questioning -- I'm

25   talking about police reports, I have what was given to me in

1  discovery.  If you want to see it, let me know.

2  A    "Thank you, sir.

3  Q    "All right.  Now in Mr. Johnson's bedroom was a .30-06

4  rifle and an SKS rifle, right?  Or that SKS rifle was

5  discovered in the downstairs area, right?

6  A    "If that's what the report indicates, sir.

7  Q    "Well, I'm going to show you the report, if the Court will

8  let me, because you're the witness, not me.

9          THE COURT:  "Okay.

10         MR. COHEN AS MR. BUTLER:  "May I, Judge?

11         THE COURT:  "Yes, that'll be fine.

12         MR. COHEN AS MR. BUTLER:  "Okay, sir.

13  BY MR. COHEN AS MR. BUTLER:

14  Q    "Sir, does that refresh your recollection of when the

15  search warrant was executed?

16  A    "Well, that refreshes me from reviewing Investigator

17  Carson's report.

18  Q    "Does that refresh your recollection, sir?

19  A    "As to what was found in the residence?  Yes, sir.

20  Q    "Okay.  Now Mr. Johnson -- this case could have been

21  turned over to the federal authorities as well, isn't that

22  right?

23  A    "Well, he could have been charged with having a domestic

24  violence conviction and possessing a firearm.

25  Q    "And possessing more than one firearm, right?

1   A    "Correct. I don't know if it's multiple charges or if

2   it's a single charge, sir.

3   Q    "In fact, Mr. Johnson told you that the guns weren't his,

4   but you might find his fingerprints and DNA on the guns, isn't

5   that right?

6   A    "I don't recall, but we discussed the firearms with Mr.

7   Johnson.

8   Q    "And you don't recall whether he said the guns aren't

9   mine, but you might find my fingerprints and DNA on them?

10   A    "I don't recall that statement. I know that as far as I

11   was concerned, he was in possession of the firearms, sir.

12         MR. COHEN AS MR. BUTLER: "Your Honor, may I approach

13   the witness?

14         THE COURT: "That would be fine.

15   BY MR. COHEN AS MR. BUTLER:

16   Q    "Sir, if you could just read this to yourself and I'll see

17   if that refreshes your recollection.

18   A    "Okay. JLC-05 --

19   Q    "No, you've got to read it to yourself.

20   A    "Oh, I'm sorry.

21   Q    "That's what the rules are, so you have to read it to

22   yourself. I'd like to have you read it out loud, but that's

23   not what the rules say.

24         THE COURT: "Just follow the rules.

25         MR. COHEN AS MR. BUTLER: "Yes, sir.

1   A    "Okay, sir.

2   BY MR. COHEN AS MR. BUTLER:

3   Q    "Sergeant Wall, does that jog your recollection about Mr.

4   Johnson and the kilo a week information you received from him?

5            MR. BARKELEY AS MR. SCHRODER:  "Your Honor,

6   objection.  I -- we need to have his -- his memory and not

7   counsel reading from the report.

8            MR. COHEN AS MR. BUTLER:  "Well, I can --

9            THE COURT:  "Well, this -- the report is not his

10  report.

11           MR. BARKELEY AS MR. SCHRODER:  "Correct.

12           MR. COHEN AS MR. BUTLER:  "Right.

13           THE COURT:  "But he's read it and you can ask him if

14  it refreshes his --

15           MR. COHEN AS MR. BUTLER:  "Right.

16           THE COURT:  "-- recollection one way or the other.

17           MR. COHEN AS MR. BUTLER:  "Well, that's what I was

18  asking, Judge.

19           THE COURT:  "Okay.

20  BY MR. COHEN AS MR. BUTLER:

21  Q    "Sir, does that jog your recollection about the

22  information from the statement about a kilo a week Mr. Johnson

23  doing?

24  A    "It -- it doesn't sir.  That was Investigator Carson.  It

25  -- it's been awhile, and I don't remember what the exact