

DEFENDANT'S
EXHIBIT
GG

**U.S. Department of Justice**

*United States Attorney*
*District of Alaska*

---

*Federal Building & U.S. Courthouse*
*101 12th Avenue, Room 310*          Commercial: (907) 456-0245
*Fairbanks, Alaska 99707*            Fax Number: (907) 456-0577

September 5, 2007

David J. Cohen
Attorney at Law

Re: <u>United States v. Jason Scott Colette</u>, 4:05-cr-00042-RRB/TWH

Dear Mr. Cohen:

      Enclosed are the following additional Jencks Act materials:

      1 CD-Grand Jury testimony (S.A. Foran & S.A. Cohoon)

      Other applicable material has been provided in previous discovery.

Yours Truly,

NELSON P. COHEN
United States Attorney

JAMES BARKELEY
Assistant United States Attorney

JB/mj

Enclosure–disk

1          IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

2

3

4    STATE OF ALASKA,              )
                                   )
5              Plaintiff           )
                                   )
6              v.                  )
                                   )
7    JASON COLLETTE, et al.,       )
                                   )
8              Defendant           )

9

10          TRANSCRIPT OF GRAND JURY PROCEEDINGS

11

12

13                        Date:    Unknown

14

15   APPEARANCES:

16                        Assistant District Attorney

17

18

19

20          G & L TRANSCRIPTION OF NEW JERSEY
                    40 Evans Place
21          Pompton Plains, NJ 07444
            WWW.WEBTRANSCRIPTION.COM

22

23

24

25

INDEX

1  **WITNESS**              **DIRECT**

2  Agent Cohoon            3

3

4  Grand Juror Questions   21

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. PROSECUTOR:  Please stand and raise your

2     right hand while the foreperson administers the oath.

3     E R I C    C O H O O N, SWORN

4              THE CLERK:  And for the record, would you

5     please state your full name, spelling your last name,

6     and give your address?

7              THE WITNESS:  My name is Eric Cohoon, C-O-H-

8     O-O-N.  Fairbanks, Alaska, 101 12th Avenue, Fairbanks,

9     Alaska.

10             THE CLERK:  Thank you.

11    DIRECT EXAMINATION BY MR. PROSECUTOR:

12        Q    Mr. Cohoon, you sound like you might have a

13    cold?

14    A    Yes, I apologize to the ladies and gentlemen of

15    the jury, I do have -- this isn't my normal voice.

16        Q    And who do you work for?

17    A    I'm a special agent with the Bureau of Alcohol,

18    Tobacco and Firearms assigned to the Fairbanks office.

19    I have been assigned there since approximately June.

20    Prior to that I was assigned to the Biloxi,

21    Mississippi field office.  I have been -- I have been

22    with ATF about six years now.

23        Q    And you have previous law enforcement

24    experience?

25    A    Yes.  I was in the United States Airforce for

Direct - Cohoon                                    4

1  eight years.  I was a military policeman.  I was also

2  a narcotics investigator with the Airforce Office of

3  Special Investigations.  I'm still a reserve agent

4  with the Office of Special Investigations.

5         Also, I worked with the Federal Bureau of

6  Prisons for six years, and I was a correctional

7  officer also working in the special investigative

8  section with the Bureau of Prisons.

9       Q     And as you have laid out here, you have

10  narcotics investigative experience?

11  A     Yes, I attended the ATF national academy when I

12  first came on with ATF.  I also attended the -- the

13  OSI, special agent academy, numerous DEA courses.

14  Like I said , I was a narcotics investigator, that was

15  my primary duty with OSI.  And with aft, a majority of

16  our investigations not only follow up investigations,

17  but there is also a drug and -- investigations.

18       Q     So you have a number of years --

19  A     Yes.

20       Q     -- in narcotics investigations.

21  A     Yes, I do.

22       Q     Are you familiar with the defendant, Jason

23  Collette (phonetic), and the two defendants we've --

24  we have on the indictment here today, Jason Collette

25  and Karen Kock (phonetic)?

Direct - Cohoon                                    5

1  A    Yes, I am.

2       Q    And how did you become involved in this

3  case?

4  A    Let me open up my -- refer back to that.

5  November the 28th, Fairbanks SWAT team served a warrant

6  on the residence of Jason Collette.  And that's --

7  that day was the first time I had ever heard of Jason

8  Collette.

9       Q    Okay.  Were you involved with serving the

10  search warrant?

11  A    Yes, I was.  After the premises was secured, I

12  went in and assisted with the search of the residence.

13       Q    And are you aware of the circumstances of --

14  of how the officers, the state officers got that

15  search warrant --

16  A    Yes.

17       Q    -- the information that --

18  A    Yes, I am.

19       Q    -- they used to get that warrant?  And could

20  you kind of explain --

21  A    Sure.

22       Q    -- where that information came from?

23  A    Earlier in the day of November 28th -- excuse me

24  -- we had served a search warrant on a known drug

25  dealer in Fairbanks.  And at the time we served the

1    warrant, he agreed to cooperate with the Fairbanks
2    police  department and go on record and identify one
3    of his sources of -- of cocaine.
4         Q    And why did the informant agree to provide
5    that information?
6    A    Well, he agreed hoping for leniency in his
7    previous illegal activities.
8         Q    Why -- why was the informant -- had the
9    informant been in the residence of Mr. Collette?  Was
10   that part of the information?
11   A    Yes, he had.  He said approximately  10 days
12   prior, on November the 18th, he had stopped by Jason
13   Collette's business in Fairbanks and arranged to
14   meeting later that evening to -- to buy some cocaine.
15             He said later that evening, he went to -- to
16   Mr. Collette's residence, he was let in by a female
17   that -- he didn't know her but he said that he thought
18   it was Collette's girlfriend or wife -- she let him
19   in.
20             He went in, he said the female went -- the
21   children that were there departed the main living area
22   and went into one of the bed -- children's bedrooms,
23   he surmised.  And Collette and the informant smoked
24   some marijuana and then they both got up out of the
25   den and went into the master bedroom for the cocaine

Direct - Cohoon                              7

1  purchase.

2       Q    Just for the grand jurors, there's some

3  context there, but Collette is not charged with using

4  marijuana, that's not an issue that the grand jurors

5  should consider as part of their -- part of their

6  evidence.  Okay.

7            And what happened when they went into the

8  master bedroom?

9  A    The informant said when they went into the master

10 bedroom, he noticed a -- one of the dressers

11 immediately -- it was he identified as a machine gun

12 Oozie or Mach 10 type machine gun with a silencer

13 sitting on one of the dressers.

14           The informant was very impressed by the

15 machine gun, which, in my opinion, which is a very

16 striking weapon, you would know it when you saw it if

17 you have never seen one before.  This -- you know, it

18 is a special weapon but it is a unique weapon to see.

19 It's not one you're going to see all the time.

20           He observed that and he observed a -- there

21 was a large gun safe within the bedroom.  He said the

22 door of the safe was open and there was a quantity of

23 cocaine inside the -- inside of the safe.

24      Q    Now did -- did -- did he and Mr. Collette

25 talk about the gun?

1  A    Yes.  He was, like I stated before, he was

2  impressed by the gun and he asked, you know, what was

3  that.  And Mr. Collette described it as his new toy

4  and the informant said he picked it up and kind of,

5  you know, handled it -- Mr. Collette did, the

6  informant never touched the machine gun.  And he kind

7  of waved it around the room.  He made the statement

8  that he had been to the range and fired it, it was

9  very quiet, you know, really had a high rate of fire.

10 And the informant was very impressed by, you know, Mr.

11 Collette's machine gun.

12      Q    Did -- and did the informant believe -- did

13 he convey that he believed -- thought that Collette

14 had the gun displayed for a reason?

15 A    Yes.  The informant thought it was a -- he

16 described as a "little man with a big gun," it did

17 intimidate him.  You know, he is there to purchase

18 drugs and, you know, I don't know how much he is

19 impressioned by TV, but here is his dealer with a

20 machine gun.  So, it did -- in the informant's

21 opinion, have -- give him the auro of, you know --

22 higher, elevated capacity as a drug dealer because he

23 did possess a silencer and a machine gun.

24      Q    And was the -- what he said, was the

25 informant a bit intimidated --

```
 1   A    Yes.
 2        Q    -- is that why --
 3   A    Yes, he was.
 4        Q    Now, did the informant actually purchase
 5   cocaine from --
 6   A    Yes.
 7        Q    -- Jason Collette?
 8   A    Yes, he said that he purchased three ounces --
 9   three ounces of cocaine that evening.  And -- and then
10   departed the residence.
11        Q    Now, based upon that information, did the
12   state magistrate or judge, did they issue a search
13   warrant for the residence of Collette?
14   A    Yes, the informant went on record with the state
15   magistrate and relayed his facts of Mr. Collette's
16   prior drug purchases from Mr. Collette to the state
17   attorney and a state search warrant was issued for Mr.
18   Collette's residence.
19        Q    Now if you could for us briefly describe the
20   residence itself as you went in there and assisted
21   with the search.
22   A    I'll give you the actual street address here --
23        Q    That's -- that's on the indictment.
24   A    Okay.
25        Q    They have heard that --
```

1  A    All right.  It's a trailer loc -- single story,

2  singlewide trailer, to the best of my ability, it has

3  an arctic (phonetic) porch entrance -- I'm sure you're

4  all familiar with those, probably more so than I am.

5  And it's just a one -- one residence dwelling, single-

6  family dwelling -- describe it.

7       It has a den, kitchen and the master bedroom

8  on one end, and the two bedrooms on the other end, I

9  guess the children's reside -- the children's

10 bedrooms.  And a restroom, a bathroom down there.

11     Q    Now when the officers went in and secured

12 the residence, was there anybody there?

13 A    Yes.  There was a white female, later identified

14 as Karen Kock, K-O-C-K -- I don't know if it's "Koke"

15 (phonetic) or "Cook" (phonetic).  She was there and I

16 believe two children were there at the time the search

17 warrant was executed.

18     Q    Now, did she -- did she speak to officers?

19 A    She spoke with Sergeant Ron Wall (phonetic),

20 special agent of -- DEA.  They questioned her about

21 who was in the residence, you know, this was

22 immediately after the search warrant -- trying to, you

23 know, just identify who is who.  She said that she --

24 didn't stay in the master bedroom, that she had stayed

25 there with her children in one of the -- one of the

1    other bedrooms at the other end of the trailer.

2         Q    And who did she indicate -- was she asked

3    who lived in the master bedroom?

4    A    Yes, she did.  She identified Jay -- Jason

5    Collette, and a Sharon Powers (phonetic), which --

6    Trooper -- Sergeant Wall said that -- had relayed that

7    Sharon Powers was a -- Collette's old girlfriend.  So

8    she gave Mr. Collette's old girlfriend as being the

9    resident in the master bedroom.

10        Q    And so now let's talk about the search

11   itself.

12   A    Sure.

13        Q    And, specifically, the master bedroom.  What

14   did you find when you went into the master bedroom?

15   A    When we served the search warrant, the master

16   bedroom -- I'll describe the safe.  There was a large

17   -- probably four foot tall, safe and it was locked

18   when we served the search warrant.

19        There was a -- on a dresser right beside the

20   safe there was a -- 31 gross grams of cocaine in a

21   plastic baggy with a playing card.  There was a -- a

22   money counter, electronic bill counter for counting US

23   currency, located on the dresser also.

24        We couldn't get the safe open, obviously,

25   because it was  locked.

1  Q    Now did you -- did you attempt to try to get
2  the combination for the safe --
3  A    Yes, we --
4  Q    -- did the officers attempt to do that?
5  A    Yes.  Karen Koch [sic], she denied knowing
6  anything about that -- anything in that bedroom.  They
7  tried to con -- or they did contact Mr. Collette at
8  his business about the safe, would he relay the
9  combination because we had a search warrant, we were
10 going to search what was in the safe.  He -- he
11 declined to give us the combination to the safe.  So a
12 locksmith was called in to drill the safe open.
13 Q    And what was -- what was found -- describe
14 the contents of the safe when it was opened.
15 A    Okay.  The safe was opened and inside had 678
16 gross grams of cocaine.  This was 23 one-ounce
17 individual packages, a little bit smaller than your
18 fist, in individual plastic baggies, with a tan
19 Walmart type bag.
20      Also inside the safe was a -- a Tupperware
21 bowl with a -- over $38,000 -- $38,848 cash banded up
22 it about thousand dollar increments -- were inside the
23 safe also.
24      There was also 63 gross grams of cocaine
25 packaged in a small baggy with a playing card also.

Direct - Cohoon                                    13

1          Inside the safe was 14 firearms, including

2  -- I have a breakdown here -- eight shot guns, four

3  rifles, a handgun, a machine gun with a silencer.

4          There was no documentation inside the safe

5  -- identification other than two ATF issued tax

6  (phonetic) stamps for the machine gun and the silencer

7  -- on these ATF -- attached to them were Mr.

8  Collette's picture and a -- the ATF $200 tax stamp,

9  which is required for legal possession of the machine

10 gun --

11     Q     What --

12 A     -- and silencer.

13     Q     -- what kind of -- you said you found --

14 what kind of machine gun and silencer did you find?

15 A     We found an Ingram model 1A, Mach 10, 9-

16 millimeter -- machine gun -- Bowers silencer, which

17 was attached to -- and that's what the paperwork

18 indicated was licensed to Mr. Collette.

19     Q     The silencer was attached --

20 A     Yes.

21     Q     -- to the machine gun?

22 A     Yes, it was.

23     Q     So in your analysis, it appears the gun was

24 legally owned.

25 A     Yes, the gun was registered with the National

1  Firearms branch with ATF.

2      Q    Okay.  Was -- was the gun loaded at the

3  time?

4  A    No, it was not.

5      Q    Was there ammunition for the gun in the

6  safe?

7  A    I did not find any 45 or 9 millimeter -- that

8  model gun, Mr. Collette had two upper receivers for

9  the firearm so it could shoot either 9 millimeter or

10  45 -- I didn't discover any 9-millimeter or 45-caliber

11  ammunition.  He had four magazines there, they weren't

12  loaded either.

13      Q    Four -- four magazines --

14  A    Four magazines, two 9 millimeter and two 45.

15      Q    Now, let's go back to the drugs you found --

16  A    Sure.

17      Q    -- there for a minute.  Based on your

18  training and your experience doing narcotics

19  investigation, what does -- what does having 23

20  individually packaged one-ounce bags of cocaine

21  indicate to you was going on there at the residence?

22  A    Through my training and experience, it -- it was

23  obvious to me that Mr. Collette was engaged in dealing

24  cocaine.  He had it packaged up, it had -- a scale was

25  also discovered.  Large money -- a large amount of

Direct - Cohoon                                15

1   currency, $38,000 in cash is -- is a large amount to

2   most people, myself included.  And with the totality

3   of the circumstances, it was obvious to me I felt he

4   was dealing cocaine.

5        Q    And you feel that the amount of the cash

6   supported that --

7   A    Yes.

8        Q    -- part of your analysis?

9   A    Yes, it did.

10        Q    Okay.

11   A    And with the currency counter -- it just appears

12   that he was running a -- a drug business.

13        Q    Let's go back and talk about the weapons a

14   little bit.  And one of the things I forgot to ask you

15   about the Mach 10.  What size is something like that?

16   I mean, probably -- some of the grand jurors probably

17   understand what that is, and -- and know what size it

18   is, but maybe some don't.

19   A    A Mach 10 is a -- it's an all metal open bolt

20   firing machine pistol, a submachine gun.  A submachine

21   gun, I don't want to get real technical because I'm

22   not a -- I'm not the all -- know all of machine guns,

23   I have a working knowledge of machine guns and working

24   knowledge of firearms because that's what I'm paid to

25   do.

1          A submachine gun means it shoots sub-rifle

2     ammunition, it shoots pistil ammunition in an

3     automatic function.  Meaning it fires more than one

4     projectile with the pull of a trigger.  Most guns you

5     shoot, bang, bang -- each time you pull the trigger.

6     This gun, when you pushed the trigger it will shoot

7     however how many bullets until you let off.

8          It is a very small -- this -- this weapon is

9     probably no more than -- without the silencer, 12

10    inches long.  It had a folding stock -- attached to

11    it, when it was fired it would probably be that long

12    with the silencer -- it probably would be closer to

13    three feet long.  It's a very -- it's a very -- it

14    does what it's designed to do, it shoots a lot of

15    bullets very fast.

16    Q    And is it -- in any of its configurations,

17    is it concealable?

18    A    Yes, you could conceal it, yes.

19    Q    And what was the -- what was the condition

20    of the Mach 10 when you found it?

21    A    It was unloaded.  There was no magazine in the

22    magazine well.  It was -- it was dirty; it had been

23    fired, it wasn't out of the box new.  The overall

24    condition of it was it was in good condition firearm.

25    But it had been fired.

Direct - Cohoon                                17

1    Q    Now let's talk a minute about some of the

2    other -- the other weapons in the safe.   Were any of

3    those loaded?

4    A    Yes, there were -- there were two firearms

5    loaded.   There was -- the Remington 30-06 was loaded

6    with -- one in the chamber.   That's a semi-automatic

7    rifle, a hunting rifle.

8         And there was a Mossberg model 500A shot

9    gun.   This was a small pump action shot -- shot gun,

10   excuse me, with a pistol grip.   It's an all black

11   firearm, it's a -- like I said it's pump action,

12   meaning each time you fire the trigger you work a

13   slide to the rear, which cycles the weapon ejecting

14   the spent ammunition and inserting another cartridge.

15   A black, ribbed barrel for cooling of the barrel.

16        It's more a self defense weapon, you -- you

17   could use it hunting, but -- I don't know how many of

18   you hunt, but most times when you hunt with a long

19   gun, you have a stock where you can engage, you know,

20   stabilize the weapon on your shoulder.   This one has a

21   pistol grip, it's probably 30 inches long -- a legal

22   firearm, but it was loaded in the -- in the safe also.

23   Q    Now you talked about some of the other

24   things that were found in the master bedroom, but

25   outside of the safe.

Direct - Cohoon                                    18

1   A    Yes.

2        Q    Would you run through that again, what those

3   items were?

4   A    We found the -- the 31 gross grams of cocaine on

5   top of the dresser.  There was the cash counter,

6   electric cash counter with a -- a counterfeit currency

7   detector within one of the features of the cash

8   counter.

9        The scale -- I don't know if -- it was found

10  in the bedroom, I don't know if it was found in the

11  safe, I think it was in the safe or in the dresser, I

12  know it was one of those two, that's where the

13  majority of the drug evidence came from.

14       We also found paperwork inside of the -- the

15  master bedroom --

16       Q    Let's talk -- let's talk about those items,

17  did you find any packaging materials?

18  A    Yes, we found plastic bags, you know, a common

19  container used to package cocaine for resale, plastic

20  type, baggy type.

21       Q    And were any of these -- as I kind of how

22  understand from what your testimony -- you found the

23  package contained in the safe.  You found another bag

24  with some loose cocaine in the safe.

25  A    Right.

1       Q     Now, the bag out in the master bedroom

2    containing all of -- were any of these substances

3    field tested there --

4    A     Yes.

5       Q     -- to determine what they were?

6    A     The substance found outside of the -- on the

7    dresser was tested and the field test, presumptive

8    test -- for positive for cocaine (phonetic).  Also, a

9    sample was taken from the cocaine found inside of the

10   safe and it tested positive for the presence of

11   cocaine also.

12      Q     Now, is there any -- any other field test

13   done on any of the other items that you found?

14   A     Not that I'm aware of.  Unless the residue off of

15   the scales, I think was tested also.

16      Q     What did that --

17   A     And it tested positive.

18      Q     Now, given your -- again, your training and

19   experience, and now adding in those items that were

20   found in the bedroom but outside the -- outside of the

21   safe, scales, currency counting machine, plastic bags,

22   what does that tell you about -- what was going on in

23   that bedroom?

24   A     It tells me that that room was used to -- as the

25   central location of that home to -- for cocaine sales.

1  It was measured, paid for, bought and sold and

2  transferred within that room.

3      Q    And that was the room the informant said, I

4  believe --

5  A    Yes.

6      Q    -- you testified earlier that when he did

7  his deal he did it in that room.

8  A    Yes, he did.

9      Q    Now, did you find any -- any other items in

10 that bedroom to indicate who occupied the bedroom?

11 A    Like I mentioned before, we found within the

12 safe, Jason Collette's ATF forms that identified him.

13      Also we found numerous documentation for Ms.

14 Karen Koch; we found a driver's license, her deceased

15 father's driver's license, numerous documentation of

16 her.

17      We found no -- no paperwork for Sharon

18 Powers at all, indicating she had ever been there.  If

19 she had, she never left any paperwork or anything.

20      We found documentation that Ms. Koch was

21 living there, we found a typical person's bedroom;

22 men's clothes, women's clothes, makeup, jewelry.

23      Q    And what kind of documents did you find?

24 A    Driver's license, checkbooks -- just standard

25 documentation for Mrs. -- Mrs. Koch -- Ms. Koch.

1    Q    And no indication of a Sharon Powers?

2  A    No.   No.

3          MR. PROSECUTOR:   Any questions by the grand

4  jurors before we excuse the witness?

5          JUROR:   --

6          MR. PROSECUTOR:   Sure.

7          JUROR:   Did you guys interview Sharon

8  Powers?

9  A    No, we have not.

10          JUROR:   That's pretty much what I got.

11          JUROR:   Did you try to locate this Sharon

12  Powers?

13  A    No, we have not.   We know of her, she will be

14  interviewed.   But she hasn't been interviewed as of

15  now.

16          MR. PROSECUTOR:   This is one of those cases

17  that as -- the agent laid out in the kind of

18  timetable, developed very quickly.   November 28th --

19  and it has been moving pretty rapidly since then.   So

20  there are certainly a number of investigative leads

21  that the agents have on their to-do list.

22  A    We had -- I had no -- we had no reason to believe

23  that Sharon Powers didn't live there -- at the time, I

24  mean, it -- Mr. Schroeder (phonetic) said, it happened

25  pretty quick, we're just identifying people.   We

1  didn't realize who Karen Koch was at the time.  We

2  just took her at her word that she was living here,

3  and then when we go in -- there is no this other

4  person.  That's who lives here.

5           So, yes, she will be talked to but we didn't

6  find anything to indicate that she was living there at

7  that time.

8           JUROR:  And her -- her testimony or her

9  statements that were made to you and the other agents

10 only dealt with what you just now described and

11 nothing about Jason Collette or --

12 A    Ms. Koch's statement?

13           JUROR:  Yes.

14 A    We have not talked to her.  She requested an

15 attorney and we haven't had any further contact with

16 her.

17           JUROR:  Okay.  And -- and you haven't

18 interviewed Mr. Collette either.

19 A    We attempted to interview him, he also requested

20 legal counsel.  We did talk to him and when we were --

21 identifying who lived at the house, he did identify

22 Karen as sharing the bedroom with him.  She -- he and

23 her were the only adults that lived in the residence.

24           JUROR:  And you just said that he identified

25 her as living in the bedroom with him.

1   A    Yes, sir.

2              JUROR:  You said your informant was

3   intimated by the sight of the -- automatic weapon?

4   A    Yes, he was.

5              JUROR:  He wasn't intimidated enough to --

6   the residence or -- evidently, or to sit there and

7   talk to the guy about it.

8   A    He was there to buy -- he explained it as a

9   business deal, he was there to do his business and, as

10  soon as he did it, he left.  He was impressed about

11  the gun.  To the point of coveting it.

12             JUROR:  He said -- never picked the gun up,

13  he asked him about the gun (phonetic)?

14  A    I'm sorry?

15             JUROR:  He said that Collette never picked

16  up the weapon until he asked him about it?

17  A    He walked into the -- to the bedroom, the dresser

18  is right beside the safe, and he noticed it then --

19  what's that.  He said, you know, you don't ask a lot

20  of questions when you're going in to buy dope.  Mr.

21  Collette said, hey, this is my new toy.  The

22  informant was impressed.  He -- under no terms he --

23             JUROR:  Well, I would be impressed too.  The

24  point is, Collette didn't walk in and grab the gun and

25  say, hey, this is my new toy.  The informant asked

1  him, what is this, that's when Collette picked it up

2  and told him it was his new toy.

3  A    I don't know the exact sequence -- did he ask

4  what it was or did -- was it -- both -- they both

5  looked at it at the same time -- it's hard to walk in

6  there and look at the safe without seeing the gun.

7  And it was the first time -- the informant had been

8  there before and bought drugs and never seen the gun.

9  This time he sees it.  And it's like, wow -- he was --

10 the first time he had seen anything like that.

11        JUROR:  Did you track the guns and find out

12 whether Mr. Collette owned the guns?

13 A    He --

14        JUROR:  Purchased it through the legal

15 process?

16 A    He owns the machine gun, it was legal -- through

17 ATF.  You can own a machine gun.

18        JUROR:  What about the rest of the guns?

19 A    The other guns have been traced.  They -- I

20 haven't got the traces back, but the tracing process

21 will tell us who the first retail purchaser of those

22 firearms are.

23        JUROR:  Going back to that machine gun-- you

24 said it's a 9-millimeter and a 45?

25 A    Yes.  At least they are not both at the same

Grand Juror Questions                        25

1  time.  You can change the upper receiver, which
2  changes the barrel and the slide.  So it's just --
3  it's just a housing to hold the upper receiver.
4          JUROR:  Right.
5  A    And then you change the magazine so you can shoot
6  9 millimeter or 45.
7          JUROR:  And was -- repeating, but I thought
8  you said there was no ammunition found at all for the
9  gun?
10 A    I did not find any ammunition.
11         JUROR:  Not in the safe or the room or
12 anything.
13 A    There was ammunition for other guns.
14         JUROR:  Right, but not for that one.
15 A    Not for that one.
16         JUROR:  That one was empty and -- it was
17 empty at the time and there was no --available at the-
18 -
19 A    Right.  Right.
20         JUROR:  The other thing was -- I seen it
21 written in the indictment and I have heard it referred
22 to as a silencer on the gun.  Is that accurate?  I
23 mean, my under -- just my own understanding and
24 clarify in my mind is -- my -- I understand there is
25 no such thing as a silencer.  There is a suppressor.

1  A    Yes, it is a suppressor.

2          JUROR:  Okay -- difference between them?

3  A    Well, a silencer is  kind of just a

4  determination.  If it silences it one decibel,

5  suppresses -- muffle -- muzzle -- that silences  it

6  one decibel, it is considered a suppressor or

7  silencer, needing to be registered.  And it is -- it

8  is classified as a silencer.

9          JUROR:  And a silencer is the proper term

10  for it.

11  A    As far -- yes.

12          MR. PROSECUTOR:  Silencer is the term used

13  in the law.

14          JUROR:  It is.

15  A    I mean, it's not silence as --

16          JUROR:  Right.

17  A    -- nothing.  But it -- it reduces the report of

18  the firearm significantly.

19          JUROR:  Is it --

20          MR. PROSECUTOR:  Ma'am.

21          JUROR:  It is legal to have that silencer?

22  A    Yes, it's considered a -- you have to register it

23  just like a machine gun.  You have to pay a one-time

24  $200 transfer and apply with ATF to have that and also

25  have a local law enforcement officer sign off on it,

1  then you can have it, submit your fingerprints to the

2  FBI, go through a background check.  And the tax stamp

3  will be issued and you can transfer the gun for

4  individual ownership.

5          MR. PROSECUTOR:  And just to partially

6  answer your question, the term silencer, as it is

7  defined in the statute, in -- US Code -- the

8  definitions are in section 921, for this section we're

9  talking about, 924 -- it says, "The terms firearms,

10 silencer and firearm muffler mean any device for

11 silencing, muffling or diminishing the report of a

12 portable firearm.

13         JUROR:  Okay, thank you.

14         MR. PROSECUTOR:  Any other questions for the

15 agent?  You're excused, Agent Cohoon.

16         THE WITNESS:  Thank you.

17         THE CLERK:  Leave the microphone.

18         THE WITNESS:  Oh, okay.

19         JUROR:  Hope your cold gets better.

20         (Pause in dialog, witness exits)

21         MR. PROSECUTOR:  So, ladies and gentlemen,

22 this is the -- this is the only witness the government

23 intends to put on.  So do you all have any questions

24 of me based upon the testimony?

25         JUROR:  The -- the fifth count, I believe it

1  is, is the one that's against Karen Kock for false

2  statement --

3             MR. PROSECUTOR:  Let me --

4             JUROR:  -- a material false statement.

5  Because she is not being charged with anything else in

6  this arrest, and all these indictments -- I fail to

7  see where the materiality plays into it.  You're not

8  alleging anything other  --  anything other than she

9  didn't tell the truth.

10            MR. PROSECUTOR:  That's correct.  That she -

11  - she tried to --

12            JUROR:  So how did it impede the -- how did

13  it impede the -- what impact materiality did it have

14  for this -- for these indictments?

15            MR. PROSECUTOR:  That she was trying to

16  steer -- steer the agents away from any -- any

17  involvement on her part or potential involvement on

18  her part within the -- within the master bedroom.  .

19            Now, we -- we're not going to then turn

20  around and charge her with the drug offenses if we

21  don't believe that we yet don't have -- have enough

22  evidence to link her to that.  Now, that may -- we may

23  come back to you in the future and ask for that.

24            This as -- this is different than some of

25  the -- how some of the cases developed, it's not a

1  long-term investigation that coming to a head; it

2  happened quickly.  And there is investigative leads

3  and things they'll follow up on, which they are going

4  to do.

5         But, you know, we certainly believe that her

6  trying to implicate another person in that room to

7  steer the agents' efforts away from whether she might

8  be involved in that operation, is -- is material.

9         JUROR:  What kind of business does Mr.

10  Collette run besides the obvious one?

11         MR. PROSECUTOR:  He is the -- he runs a

12  business called, "Arctic Alarm and Stereo," I believe

13  it's called.  It's an alarm and stereo sales and

14  installation business in Fairbanks.

15         JUROR:  -- Bobby Mason (phonetic) -- Road --

16  (phonetic).

17         JUROR:  What's the significance of going

18  after the whole closet full of shotguns and what not?

19  You know what, I guess what I'm getting at is why are

20  we going after the guy's entire collection of

21  firearms, which are -- up to this point, legitimate,

22  legally owned hunting guns --

23         MR. PROSECUTOR:  Some.  Some.

24         JUROR:  -- I mean, if we want to -- if we

25  want to go after those, why aren't we going after his

Grand Juror Questions                          30

1  bed and his dresser and, you know, everything else

2  that was in there --

3          JUROR:  The whole trailer.

4          JUROR:  -- say -- itself --

5          MR. PROSECUTOR:  It's the govern -- it's the

6  government's position that the fact that he was not

7  just -- had the cocaine in the safe, but from the

8  information of the informant that he was doing deals

9  out of that safe, it's the government's position that

10 he -- those guns in there, he was using those for also

11 for purposes of, you know, at least implying to people

12 who came in, that they were there for his protection

13 and protection of the drug deal.  Same -- same as the

14 shot -- as the machine gun.

15          And I think that's further supported by at

16 least two of the guns, and one being, as the agent

17 testified, a small pistol grip shotgun, were loaded

18 and ready to go.

19          JUROR:  Could any of those guns been

20 obtained through or as payment for drugs?

21          MR. PROSECUTOR:  Tats possible, but we -- I

22 can't say that we have any evidence of that.

23          THE WITNESS:  They don't know anything about

24 them yet--

25          MR. PROSECUTOR:  Right.

1          THE WITNESS:  -- they haven't got their

2    statements back on them.

3          MR. PROSECUTOR:  So we're, again, continuing

4    to do work on that.  But, you know, the proximity of

5    those guns to the sales amounts of cocaine, along with

6    the informant giving evidence that they were -- he was

7    actually selling out of that safe, and that safe was

8    opened -- took things out of, it's the government's --

9    government's theory that those guns -- and, certainly,

10   probably many of them legitimately owned, but he was

11   using those as a way to help intimidate, to some

12   extent, that people who came in there to buy, to show

13   them that he had weapons available to him to protect -

14   - to protect his cocaine business.  Sir?

15         JUROR:  How -- how old were the kids in the

16   house?

17         MR. PROSECUTOR:  I -- don't know that

18   question.  Although they -- and, again, I can't

19   testify as to -- evidence.  They are younger children,

20   as I understood.

21         JUROR:  Preteen?

22         MR. PROSECUTOR:  As -- that's what I

23   understand.  But again, I -- that -- that's not

24   charged -- or, really, that's not an element of any of

25   the offenses that are involved here.  Sir?

1              JUROR:  I think in order to prove that he

2      was using his -- armada [sic] to be used as self-

3      defense or to deter potential robbers, the informant

4      would have to have mentioned that he saw the guns in

5      the safe.  If the -- potential buyers or informant

6      didn't even see them in the safe or didn't see -- said

7      he saw cocaine in the safe -- potentially, but did he

8      see all those guns in --

9              MR. PROSECUTOR:  I don't think he mentioned,

10     that I'm aware of, of the guns in the safe.  He

11     seemed, as I understand it, fairly focused on the

12     machine gun once he saw it.  That was really captured

13     in --

14             JUROR:  Could you not --

15             JUROR:  -- I don't think I would need an

16     armada --

17             JUROR:  I mean, if he saw cocaine in the

18     safe he would have had to have seen --

19             JUROR:  -- and it's not unusual for a -- to

20     have large armadas -- scares me a little --

21             MR. PROSECUTOR:  But most Alaskans don't

22     store them with a pound and a half of cocaine -- I

23     don't mean to make light of what you're saying, but I

24     think the government's position is you need to kind of

25     consider the totality of the circumstances and

1    everything that was going on in --

2              JUROR:  Most Alaskans can't afford --

3         MR. PROSECUTOR:   -- and --

4              JUROR:   -- that's where he stores his.

5              JUROR:   Yeah, but you don't have a pound and

6    a half of cocaine in your bedroom, or you better not.

7              JUROR:   --

8              JUROR:   I got guns in my bedroom, too, but I

9    don't have any cocaine.

10             JUROR:   -- deliberations --

11             JUROR:   -- inviting anybody to come in your

12   room --

13             JUROR:   No, I don't invite people into my

14   bedroom.

15             THE CLERK:  Excuse me, especially the folks

16   in the front row, be quiet, someone in the back is

17   asking a question.

18             JUROR:  Did the informant indicate whether

19   or not the Mach 10 was loaded when it was shown to

20   him?

21             MR. PROSECUTOR:  He did not.  And, again, I

22   would add, one of the things I would ask you to

23   consider is the lang -- the charging language.  Under

24   that statute, as I read it to you, he could be charged

25   with carrying or using the weapon, that's not how we

1  have charged him in this case.

2          We have charged him with possession in

3  furtherance of the drug trafficking -- so we're not --

4  the government has not tried to argue that he -- he's

5  using -- he's actually used the weapon in any -- any

6  information that we have.  But just that he's had the

7  weapons as part of helping to further his drug

8  trafficking crime by -- by at least indicating he has

9  those available for protection to people who buy from

10 him.

11         JUROR:  On -- they said that they found

12 clothing in the master bedroom.  Did they find any

13 other clothing in the other part of the trailer, or

14 whatever it --

15         MR. PROSECUTOR:  Not to my -- not to my

16 knowledge.  Although the clothing is off -- the

17 clothing issue is rather difficult because trying to

18 compare, you know, what she might wear and what size

19 she is versus someone else.

20         I think our focus has been on the fact that

21 they found driver's license, checkbook, those kinds of

22 personal identification documents in the master

23 bedroom.

24         JUROR:  Those would indicate she had been in

25 the master bedroom.

1          JUROR:  So after the search warrant and

2    everything happened, and they searched the house and

3    tried to interview Collette and Kock or Koch --

4    whatever her name is -- they're still free?  I mean,

5    they are still -- he's still running his business and

6    she's still doing whatever she does and there's been

7    no arrests made?

8          MR. PROSECUTOR:  Um -- I want to be careful

9    about this because I'm not sure what's appropriate for

10   me to tell you all.  I think it's probably

11   inappropriate for me to -- perfectly legitimate

12   concern, yes, sir.  But -- well, no, it's public

13   knowledge, because it was in the Fairbanks paper, he

14   was arrested.

15         JUROR:  Oh -- okay, I read the article.

16         JUROR:  Don't --

17         JUROR:  Well, I get them way late because I

18   work out of the town -- okay, thank you.

19         MR. PROSECUTOR:  Right.  But this is -- we

20   go through this process -- the grand jury is required

21   to issue an indictment even on those --

22         JUROR:  Her as well, she was arrested?

23         MR. PROSECUTOR:  No.

24         JUROR:  No, okay.

25         MR. PROSECUTOR:  All right, then I will let

1    you adjourn to your deliberations.  And I believe I

2    also have the next case, so I'll be ready to go

3    whenever you are.

4                    JUROR:  After this I think we need to take a

5    break.

6                    JUROR:  I think you're right.

7                    (Requested matter concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25