```
 1                      TRANSCRIPT OF

 2                   TELEPHONE STATEMENT

 3                    OF SHARON POWERS

 4                       ON 9/5/07

 5

 6         File Name:  sharon_powers_DS_20022.DSS

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20    Transcript Ordered by:  Denise Petty, DCRI

21

22

23           G & L TRANSCRIPTION OF NEW JERSEY
                     40 EVANS PLACE
24              POMPTON PLAINS, NJ 07444
                     (973) 616-1051
25                   (800) 505-4941
                 www.webtranscription.com
```

```
 1   A.      Shoot.  You're making a -- a place that I thought
 2   was completely behind me, but go for it.
 3        Q.      Okay.  Well, first I'd like your
 4   permission to record the interview for posterity, just
 5   to make sure that it's clear to what was and was not
 6   said.
 7   A.      Mm hm.
 8        Q:      So, I -- I do have your permission to
 9   record this call?
10   A.      Well, I guess.  I suppose.  I mean, I suppose I
11   really don't have a choose if I'm being asked under
12   subpoena, correct?
13        Q.      Well, I can't advise as to whether, you
14   know, you have a choice or not with it being under
15   subpoena.  I'm not an attorney.  I record my interviews
16   so that there is no miscommunication as --
17   A.      Mm hm.
18        Q.      -- far as who said what and, you know, to
19   record for posterity what occurred during an interview.
20   A.      Okay.
21        Q.      As a practice.  And just to clarify --
22   today is the -- Wednesday the 5$^{th}$ of September 2007 and
23   it's 9:17 A.M.  And I'm speaking with Sharon Powers,
24   correct?
25   A.      Yes, ma'am.
```

1    Q.    Okay. Thank you. Mr. Cohen has asked me
2 to just go over a couple of questions with you briefly
3 and he wants me to find out whether or not you were the
4 informant who provided the information to Trooper Wall
5 (phonetic) in 2004 regarding Jason having large enough
6 money, you know, a -- a large sum of money anyway and
7 10 to 15 ounces of cocaine in his trailer?
8 A.    That is correct.
9    Q.    That is correct?
10 A.    Mm hm.
11    Q.    You also advised him that you were Jason's
12 girlfriend at the time and you guys were hostile
13 towards each other?
14 A.    It was a very volatile relationship. Mm hm.
15    Q.    Okay. Now, --
16 A.    And I -- I didn't know what he was doing for many
17 years, he had me -- he had me snowballed. He didn't do
18 it out of the home until I went and got myself another
19 place to live and I found out later on down the road.
20 As far I knew, he was just a cheater. He'd also find
21 an excuse to run to the shop because he'd be dealing
22 the drugs out of his shop, not out of his home. Again,
23 when I was informed by him, because I was trying to --
24 starting to kind of pick up on a few things, he flat
25 out admitted to me that and then I was faced with a

```
 1   decision and it went on for a couple of months where,
 2   you know, I begged him not to do this and stuff and
 3   gave him options because I have children, and now that
 4   I know, I can't be involved.
 5        Q.    Mm hm.  All right.  Well -- so he did have
 6   Arctic Car and Alarm -- or Arctic Car, Alarm and Audio,
 7   correct?  I'm sorry.  I'm hearing an echo --
 8   A.   Yes, ma'am.  He did.
 9        Q.    Okay.
10   A.   And a lot of it is very hazy to me because again,
11   it was such a -- a -- whirlwind that dates and times
12   and stuff like that, I don't -- I can't give you exact
13   dates and times --
14        Q.    No.  That's okay.
15   A.   (Indiscernible)
16        Q.    I'm just trying to establish that he did
17   own Arctic Car, Alarm and Audio.
18   A.   Mm hm.
19        Q.    And as far as you're aware, he worked at
20   that business full-time?
21   A.   As -- as far as I know, but apparently he was
22   doing other stuff other than the business, instead of
23   doing what his real business was meant for.
24        Q.    Okay.  Where -- did you believe that the
25   business was an ongoing and profitable business?
```

1   A.      Oh, yes, ma'am. I did.
2           Q.      Okay.
3   A.      For a long time until I found out differently.
4           Q.      Okay. And do you believe that he made a
5   significant amount of money through Arctic Car, Alarm
6   and Audio?
7   A.      I believed that at one time, yes, I did.
8           Q.      Okay.
9   A.      I mean, he would do four to five auto starts a
10  day and -- and -- and stereos and, you know, you name
11  it, he'd get it and then an auto start at five and $600
12  a shot, when he was popping out four and five a day, I
13  mean, I was under the impression that he was making a
14  good living --
15          Q.      Okay.
16  A.      -- running his shop versus dealing drugs.
17          Q.      Okay. All right. Well, I thank you for
18  your time this morning and I'm going to conclude the
19  interview. And I'm going to go to ahead and speak with
20  Attorney Cohen about this interview this morning and he
21  should be in touch with regarding this interview.
22  A.      Do you know how long because I mean, I have
23  children and I need to know. I -- I have to have a
24  date on this.
25          Q.      Ma'am, I'm sorry. I really would love to

```
 1  give a time, but I can't because he is in trial right
 2  now.  He may call you during lunch break.
 3  A.      Do you know if -- does -- does Jason in fact
 4  (indiscernible) is he doing a telephonic through
 5  prison?
 6          Q.      I haven't been into the courtroom.
 7  A.      Okay.
 8          Q.      I'll be testifying probably to what I've
 9  done as far as my investigation so I'm not probably
10  going to be allowed in the courtroom until I give my
11  testimony.
12  A.      Okay.  All right.  Thank you.  Have a nice day.
13          Q.      Okay.  You're very welcome.  Take care.
14  A.      Mm hm.
15          Q.  Bye bye.
16
17
18
19
20
21
22
23
24
25
```

## CERTIFICATION                                                              7

```
 1        I, Jamie Nania, the assigned transcriber, hereby
 2   certify the foregoing transcript of proceedings is a true
 3   and accurate non-compressed transcript of the proceedings
 4   as recorded.
 5
 6
 7
 8   _____
         Signature
 9
10
11   _____
12       G & L Transcription of N.J.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    TRANSCRIPT OF
 2                  TELEPHONE STATEMENT
 3                   OF SHARON POWERS
 4                      ON 9/5/07
 5
 6        File Name:   sharon_powers_DS_20027.DSS
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20  Transcript Ordered by:   Denise Petty, DCRI
21
22            G & L TRANSCRIPTION OF NEW JERSEY
                      40 EVANS PLACE
23              POMPTON PLAINS, NJ 07444
                      (973) 616-1051
24                    (800) 505-4941
                 www.webtranscription.com
25
```

1  A.     Hello?
2     Q.     Hi.  This is Denise Petty calling once
3  again.  I just needed to touch base with you on one
4  more point regarding the interview before the attorney
5  knows whether he's going to have to speak with you
6  further.  Do you have about five minutes?
7  A.     I can give you a few minutes.  Yes.
8     Q.     Okay.  Great.  Now, when I had talked to
9  you earlier, you had discussed different things about
10 -- such as Jason dealing drugs and your concern for
11 your children and things like that.  And you had also
12 said that you had been the confidential informant to
13 Trooper Wall (phonetic)?
14 A.     I was told that my name would never be mentioned.
15    Q:     Okay.  Did you -- did you discuss with
16 him other than the finances and the drugs?  Did you
17 disclose to him that there were -- there was drug
18 activity coming out of Arctic Car, Alarm and Audio?
19 A.     Well, I -- ma'am, see the thing is, is I was
20 unaware of it initially for several years.  Jason kept
21 this from me.  Okay?  Cause he knew that this was
22 something I would not agree with.  Okay?  So I -- we
23 had a very volatile relationship.  I ended up moving
24 out.  We were still seeing each other.  I had my own
25 place.  He had his.  He owned his own shop, yadda,

1  yadda, and I spent a lot of time over at his house and
2  stuff like that.  Then he -- then there was just --
3  there were -- there were certain things, I mean,
4  initially I just thought it was him cheating on me.
5  And then, I mean, there were always excuses, he had to
6  run down to the shop for this or that or his friend
7  Monty (phonetic) would call him and say he left cell
8  phone inside the shop so he'd run down there.  He was
9  hiding this from me and -- and -- and I was naive
10 enough to, you know, not even recognize some of the,
11 you know, behavior that he was doing and then -- and
12 then I -- I did.  I recognized some of the behavior and
13 -- and then he sat me down one day and flat out told
14 me.  And then I saw him in Mount Washington with a kilo
15 -- a brick -- a kilo of cocaine in his bedroom.  Okay?
16 I saw it with my own eyes.
17      Q.    Okay.
18 A.    And -- and I weighed my options for a couple of
19 months, you know, are we -- are we gonna remain
20 together after this many years or are we not.  But I
21 couldn't not -- knowing the situation, I couldn't be
22 with him anymore, but I couldn't -- I couldn't bring
23 myself to understand why he would choose drugs and
24 whores over myself and my children.  But I gave him
25 those options.  I (indiscernible) turned him in a

```
 1  couple months later after I found out and --
 2        Q.      To Trooper Wall (phonetic)?
 3  A.    Huh?
 4        Q.      To Trooper Wall (phonetic), correct?
 5  A.    Correct.
 6        Q.      And you -- you --
 7  A.    And I -- and I told Jason I did and he didn't
 8  believe me.  I begged him not to do what he was doing
 9  and he continued on.
10        Q.      And you advised Trooper Wall (phonetic) of
11  all this?  I mean, earlier you had discussed the fact
12  that he had been dealing drugs out of the Arctic Car,
13  Alarm and Audio and is this information --
14  A.    (Indiscernible) that -- that was my assumption
15  that then when, I mean, we -- but we weren't -- at this
16  point, we weren't living together any longer.  We had
17  separate households, although I did spend a lot of time
18  at his house.  And -- and there was just weird
19  behavior, it was like if I was at his house somebody
20  would knock on the door and he'd like open the door and
21  shake his head no at him and shut the door on him and
22  make him walk away because he was trying to hide it
23  from me.
24        Q.      Okay.  Well, I guess what I need --
25  A.    The safe (indiscernible)
```

```
 1         Q.      -- to get to you is --
 2   A.      The safe that was in his bedroom, I purchased for
 3   him for Christmas 2002.  He has hunting rifles at the
 4   time and I had children and we lived together --
 5         Q.      I understand --
 6   A.      -- that's why I bought him that safe for
 7   Christmas.  I didn't know that once I left town, it was
 8   gonna turn into his (indiscernible) with all of his
 9   drugs and cash and stuff (indiscernible) prior to me
10   leaving town, I did see the cash, I did see the drugs
11   and I did tell Trooper Wall (phonetic) and I was also
12   told that I wouldn't be mentioned in this and so now I
13   get to be dragged through the mud again and my life
14   turned upside down.
15         Q.      Ma'am, I -- the only question that I
16   needed to ask of you is if you did or did not tell
17   Trooper Wall (phonetic) whether Jason was selling drugs
18   out of Arctic Car, Alarm and Audio?  Simply put that's
19   it.
20   A.      Everything was kind of a whirlwind.  I don't know
21   exactly what I said to him.
22         Q.      Would that have been -- did you have the
23   knowledge that he -- or -- or the belief that he was
24   dealing drugs at that time out of Arctic Car, Alarm and
25   Audio?  Is it possible that you had said that?
```

```
 1   A.      It -- it may be possible.  I don't know.
 2           Q:      Okay.  All right.  Well, I'm going to talk
 3   to the attorney about this and advise him of this
 4   information and somebody will be back in touch with
 5   you.  Okay?
 6   A.      Okay.  Bye.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CERTIFICATION                                              7

1       I, Jamie Nania, the assigned transcriber, hereby
2  certify the foregoing transcript of proceedings is a true
3  and accurate non-compressed transcript of the proceedings
4  as recorded.
5
6
7
8  _____
        Signature
9
10
11
12 _____
        G & L Transcription of N.J.
13
14
15
16
17
18
19
20
21
22
23
24
25