COPY

RECEIVED
OCT 2 2 2007
CLERK, U.S. DISTRICT COURT
ANCHORAGE, AK

1 UNITED STATES DISTRICT COURT

2 DISTRICT OF ALASKA

3 UNITED STATES OF AMERICA, ) Case No. 4:05-cr-00042-01-RRB

4         )

      Plaintiff, ) Fairbanks, Alaska

5         ) Wednesday, September 5, 2007

     vs.    ) 8:23 o'clock a.m.

6         )

 JASON S. COLETTE,   ) **TRIAL BY JURY – DAY 2**

7         )

      Defendant. )

8 _____)

9

10        VOLUME II

      **TRANSCRIPT OF PROCEEDINGS**

11   BEFORE THE HONORABLE RALPH R. BEISTLINE

     UNITED STATES DISTRICT JUDGE

12 APPEARANCES:

13

 For the Plaintiff:    JAMES BARKELEY, ESQ.

14         Assistant U.S. Attorney

         U.S. Attorney's Office

15         222 West 7th Avenue, #9

16         Anchorage, Alaska   99513-7567

         (907) 271-5071

17

 For the Defendant:    DAVID J. COHEN, ESQ.

18         Cohen & Paik, LLP

19         177 Post Street, Suite 600

         San Francisco, California 94108

20         (415) 398-3900

 Court Recorder:     LYNN GROVES-KELLEY

21         U.S. District Court

22         101 12th Avenue, Room 229

         Fairbanks, Alaska   99701

23         (907) 451-4792

24

25

1   Transcription Service:          NODAK ROSE TRANSCRIPTS

2                                   721 North 19th Street
                                    Bismarck, North Dakota   58501
3                                   (701) 255-1054

4   Proceedings recorded by electronic sound recording.
    Transcript produced by transcription service.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        FAIRBANKS, ALASKA - WEDNESDAY, SEPTEMBER 5, 2007

2        (Call to Order of the Court at 8:23 a.m.)

3        (Government counsel not present; defense counsel present;

4   defendant present)

5        (Jury not present)

6        THE COURT:  -- morning.  Is Mr. Barkeley here today?

7        MR. COHEN:  Apparently Mr. Barkeley was here and he

8   stepped out.  He'll probably be back shortly.

9        THE COURT:  Okay.  I suppose we should wait.  I can

10  get my desk organized.

11                         (Pause)

12  What time is it?  Is the -- is the computer right, Lynn?  I

13  have 8:24.

14       (Off record, at 8:24 a.m.)

15       (On record, at 8:25 a.m.)

16       (All parties present; jury not present)

17       THE COURT:  -- got all the parties here.  We're on

18  the record.  United States of America v. Jason Colette.  You

19  caught up?  Are we on the record?

20       THE CLERK:  Yes, sir.

21       THE COURT:  Okay.  All right.  Counsel, what did we

22  get resolved after we left court yesterday, anything?

23       MR. COHEN:  I'm sorry, Your Honor.  Can you -- my

24  client was mentioning something to me.  What did Your Honor

25  say?

1    THE COURT:  What -- what did we get resolved?  Last
2  night, the parties were going to check and let me know --
3    MR. COHEN:  Well, Your Honor, I -- I looked at the
4  exhibits -- the exhibit list, and as far as the other exhibits,
5  like I said, I think the -- the jury should know what they are
6  so they can understand --
7    THE COURT:  'Kay.
8    MR. COHEN:  -- what we're all talking about.  Whether
9  or not they're actually sent back to the jury, I suppose that's
10  really the Government's choice as I thought about it.  The only
11  exhibits that I'm interested in personally --
12    THE COURT:  Okay.
13    MR. COHEN:  -- in discussing are Exhibits 28 and 29.
14  I'm saying from the former trial, which are the ATF forms that
15  were found inside the safe.  So --
16    THE COURT:  Okay.
17    MR. COHEN:  So hopefully that -- that's helpful on
18  the --
19    THE COURT:  Okay.
20    MR. COHEN:  -- on the exhibit issue.  As far as the
21  -- as far as the questioning is concerned, it was my
22  understanding in the morning that I would be -- not be
23  permitted to question on cross-examination the Government
24  witnesses any further, but in the afternoon it was my
25  understanding that perhaps the Court was considering allowing

1  me to do that, which if the Court will, that'll be -- that'll

2  be fine.  But that -- you know, my position, of course, is that

3  the entire trial should have been live witnesses.

4        THE COURT:  Oh, I know your position.  You made that

5  clear yesterday.

6        MR. COHEN:  But -- so the -- so the Government's --

7  the only thing about that is, is that Agent Foran -- we

8  attempted to subpoena him, he's apparently not in town, and

9  he's one of the witnesses that's in the previous trial.  So I

10  would not -- unless -- unless he's -- he comes back here, I'm

11  not going to be able to ask him questions on cross-examination,

12  and I'd request that I be permitted to do so.

13        And related to that, Your Honor, I brought this up

14  yesterday, this question about twenty-eight -- I'm sorry, 18

15  U.S.C. §3500, which is the Jencks Act, and the -- Mr. -- Mr. --

16  I -- I made a motion for the -- all the Jencks statements prior

17  to the sentencing.  Mr. Schroder indicated that all the

18  statements had been provided, although I questioned Mr.

19  Schroder about the grand jury transcript which has not been

20  turned over.  Mr. Schroder said he would check to see about

21  that and provide it to me.  He has not yet provided it to me.

22        Agent Foran told me at the sentencing -- not on the

23  record, but when I asked him, he said he -- it was his best

24  recollection that he was the person who testified in the grand

25  jury.

1      Now §3500 says that any time after direct examination

2   of a witness, I'm entitled to -- or the defense is entitled to

3   move for production of the transcript.  I'd asked for

4   production of the transcript.  If the Government is correct and

5   it's already been provided, I'd ask the Government to provide

6   another copy of it because for whatever reason, it wasn't in

7   Mr. Butler's file.  I've been trying to determine from Mr.

8   Butler if he received it or not, but all of the other documents

9   were in Mr. Butler's file.  I don't think this grand jury

10  transcript was turned over.

11      So I don't see why there's been delay, and I'd ask

12  the Court to ask the Government -- or to order the Government

13  to turn over that -- that transcript, particularly if I'm going

14  to be able to further question Agent Foran.  We're seeking to

15  question Agent Foran and subpoena him.  He -- he's not

16  available, he's not in town.  Apparently, he left on a hunting

17  trip the day after -- I'm sorry -- the day before we sent out

18  our process server to subpoena him.  We subpoenaed DEA, the

19  office, and they -- they would not accept it on his behalf.

20  They accepted it, but it's -- they -- they could not forward it

21  to him because he was out of town.

22      THE COURT:  'Kay.  Anything else?

23      MR. COHEN:  No, Your Honor.

24      THE COURT:  Mr. Barkeley?

25      MR. BARKELEY:  Well, I'll try to address all of those

1  issues in order, Your Honor.  First, with regard to the ex --

2  there's one more issue I don't want to forget which was the

3  whole issue of Wamsley and telephone and all that, which I

4  thought the defense would -- would mention it, but I was

5  instructed to read everything that he provided and all that,

6  so --

7          THE COURT:  Okay.

8          MR. BARKELEY:  -- I want to put that on the list, so

9  I'll get to it last.

10          THE COURT:  Okay.  Go for it.

11          MR. BARKELEY:  With regard to the exhibits, checked

12  with DEA last night.  Pursuant to DEA policy, the cocaine, when

13  someone takes a direct appeal in a criminal case, is shipped

14  back to San Francisco, so it's at the lab, it's not available,

15  it's not going back to the jury room, and the jury's not going

16  to be able to examine it.

17          THE COURT:  'Kay.

18          MR. BARKELEY:  However, Your Honor asked about

19  whether the parties had entered into a stipulation during the

20  trial that would cover some of these things, and I believe the

21  parties did.  You mentioned Exhibit 30, Your Honor, and I have

22  a copy of it here in front of me, and it's signed by Mr.

23  Colette, his counsel Rex Butler, and Mr. Schroder, and there

24  are three stipulations in it:

25          Exhibits 10 and 12 and 14 are cocaine hydrochloride,

1    so if there is any question that there was cocaine, it appears

2    the parties had entered into a stipulation.  The lab results

3    are attached to this stipulation.

4            There's also a stipulation in it that the firearm in

5    question in the safe, the machine gun, is in fact under the law

6    -- well, it's regulated as a machine gun and the -- so is the

7    silencer.

8            So you asked about that stipulation, Your Honor.  I'm

9    simply reporting to the Court that the --

10            THE COURT:  'Kay.

11            MR. BARKELEY:  -- the stipulation is there.  If -- if

12    the question comes up about the cocaine, the Government could

13    simply say the parties have stipulated if that's all right with

14    counsel.

15            THE COURT:  Good.

16            MR. BARKELEY:  The three separate items of cocaine

17    were tested by the lab and the results are in evidence.

18            MR. COHEN:  All right.  Well, that's -- I -- I

19    understand that was the stipulation, there's no question that's

20    the one that was read in at the last trial.  As -- as I

21    indicated at the sentencing hearing, Your Honor, Mr. Colette

22    was not -- did not understand the -- what that stipulation was

23    -- was about.  Mr. Butler showed it to him very quickly, Mr.

24    Butler did not explain to Mr. Colette what the stipulation was

25    or what the implications were of the stipulation, so that Mr.

1    Colette's view is that he didn't understand what he was

2    stipulating to or its significance.

3            The other side of it is, is that there's no question

4    that that was put in the record of the previous trial.  I read

5    the transcript.

6            THE COURT:  Well, the stipulation can come in if the

7    issue comes up.  If there's a dispute as to whether or not

8    that's cocaine, the stipulation can come into evidence.  Next.

9            MR. BARKELEY:  Thank you, Your Honor.  Next topic --

10   oh, to finish the topic of the exhibits, may I ask one question

11   of the agent?  I'll say it -- I'll ask it on the record.  Next

12   to me at counsel table is Special Agent Eric Cohoon with ATF.

13   Sir, the question I have for you is Exhibits 28 and 29 in the

14   trial were -- counsel, am I correct -- the paperwork dealing

15   with the machine gun and the revenue stamps?

16           MR. COHEN:  That's correct.

17           MR. BARKELEY:  Okay.  Do you recall those documents?

18           THE CASE AGENT:  Yes, sir.

19           MR. BARKELEY:  And do you have access to them?

20           THE CASE AGENT:  Yes, sir.

21           MR. BARKELEY:  Are they here in the courtroom today?

22           THE CASE AGENT:  They're not in the courtroom.

23           MR. BARKELEY:  Okay.  All right.  But can you make

24   those available when 28 and 29 are discussed?

25           THE CASE AGENT:  (No audible reply)

1    MR. BARKELEY:  Okay.  So those -- those exhibits will

2    be available.

3    THE COURT:  'Kay.

4    MR. BARKELEY:  And then with regard to the firearms,

5    the weapons themselves --

6    THE COURT:  Mm-hmm (affirmative).

7    MR. BARKELEY:  -- they are here -- they will be here.

8    So they will be available to the jury.

9    There was some discussion yesterday of fourteen

10    firearms, thirteen firearms, whatever.  I read Special Agent

11    Foran's trial testimony very carefully last night, and the only

12    testimony that was adduced dealt with the four firearms that

13    are at issue.  Not --

14    THE COURT:  Okay.

15    MR. BARKELEY:  -- the others were never even

16    mentioned by serial number, make, model, anything.

17    THE COURT:  Okay.  Very well.

18    MR. BARKELEY:  Therefore, they're beyond the scope of

19    this hearing.  But more importantly, they're not going to come

20    up in reading anybody's transcript.  They're not --

21    THE COURT:  Okay.

22    MR. BARKELEY:  -- they were never introduced.

23    THE COURT:  Okay.  Don't look at him.

24    MR. BARKELEY:  All right.  With regard to Jencks --

25    THE COURT:  Well, you can look at him, but talk to

1    me.

2          MR. BARKELEY:  Yes, Your Honor.  With -- with -- with

3    regard to Jencks, Your Honor, I think what you have before you

4    is a -- is a post-trial, post-conviction, post-sentencing

5    argument that a -- and I'm -- I'm assuming and I -- I -- I

6    believe the Court should assume that it's true, that the

7    assertion is that Special Agent Foran testified in grand jury.

8          THE COURT:  Mm-hmm (affirmative).

9          MR. BARKELEY:  So assuming that's true, the question

10   before you, Your Honor, is you have a motion to compel the

11   production of Jencks material after the witness testified,

12   after the witness was cross-examined, after the conviction, and

13   after the imposition of sentence.  I think it's really a direct

14   appeal issue.  If there was a problem, it's one that -- there

15   has to be some kind of showing made before it can even be

16   pursued.

17         But I did follow up -- I mean, I'm trying to get to

18   the bottom of this.  I called Mr. Schroder last night and spoke

19   with him.  He does not recall promising counsel that he would

20   give him Mr. -- Special Agent Foran's testimony.  That's what

21   Mr. Schroder told me.

22         MR. COHEN:  Well, it's on the record at the

23   sentencing.

24         MR. BARKELEY:  I told him it was on the record, he

25   said, well, may -- maybe so, I don't know, but I don't remember

1    doing it.  Now --

2              THE COURT:  'Kay.

3              MR. BARKELEY:  -- he has not -- he will be looking

4    for grand jury transcript today because the way -- since grand

5    jury only convenes in Anchorage --

6              THE COURT:  Are you -- who are you talking to, him or

7    me?  You look like you're --

8              MR. BARKELEY:  Both of you, Your Honor.  I'm --

9              THE COURT:  Okay.  I'm looking at you, so I'd like to

10   see -- okay, go ahead.

11             MR. BARKELEY:  Yes, Your Honor, okay.  So Mr.

12   Schroder will be looking to see whether --

13             THE COURT:  Okay.

14             MR. BARKELEY:  -- he can come up with a transcript of

15   Special Agent Foran's grand jury testimony.

16             THE COURT:  Okay.

17             MR. BARKELEY:  I did not put Foran on.  I don't know

18   what happened --

19             THE COURT:  Okay.

20             MR. BARKELEY:  -- and -- and -- I -- I -- I can only

21   tell the Court I'm trying to get to the -- to the bottom of it,

22   but I am taking the position that it's irrelevant in these

23   proceedings and it's too lake to bring it up after -- after the

24   trial.  Even the statute, by its literal terms, seems to

25   contemplate that the material be available for cross-

1  examination, and cross-examination has been conducted, it's

2  completed.  And for what it may be worth, I'm going to offer

3  the following, Your Honor:

4          I think to move things along here, as well as a

5  tactical and evidentiary matter, having observed the jury, my

6  decision is that the Government isn't even going to read

7  Special Agent Foran's testimony.  I read it carefully.  It's

8  seventy-five pages of absolutely nothing with regard to the

9  forfeiture.

10         THE COURT:  Okay.

11         MR. BARKELEY:  It all deals with facilitation.

12  Therefore, Your Honor, the question about the Jencks material

13  is now put you in a context in which not even the testimony of

14  that witness will be relied upon in this proceeding and,

15  therefore, its availability for cross-examination would seem to

16  be moot at this point anyway, except with regard to the

17  criminal trial in which I'm still attempting to get some kind

18  of an answer for counsel --

19         THE COURT:  Okay.  Very well.

20         MR. BARKELEY:  -- and the Court.  With regard to

21  Trooper Wall, I thought I heard what the Court said at closing

22  last night was that he should be available for cross-

23  examination today.

24         THE COURT:  I'm going to clear this all up as -- I'm

25  -- in a minute.

1      MR. BARKELEY:  Okay.  I called him and I told him to

2  be available and that as soon as the Court told us what was

3  going on this morning, I'd tell him to come over.

4      THE COURT:  Okay.

5      MR. BARKELEY:  And he's ready to do so if you say do

6  it.

7      THE COURT:  Okay.

8      MR. BARKELEY:  With regard to Damon Wamsley --

9  Womsley [sic], this is their witness in Florida --

10     THE COURT:  Okay.

11     MR. BARKELEY:  -- who the Court asked me to review

12 statements he had made in a civil deposition context and -- and

13 see whether the Government would stipulate to them coming in.

14 I think the essence of them is that he would say he was an

15 employee and that's -- the business generated a lot of cash and

16 so on.  Forfeiture defense material.  The Government will not

17 stipulate to his testimony.  The Government would like at least

18 an opportunity to cross-examine him.  That was a deposition

19 that wasn't even attended by any opposing party, so I don't

20 think it's -- it has much worth without at least the

21 opportunity to ask some questions.

22     However, the Government would agree to allow him to

23 testify telephonically so that he doesn't have to be dragged

24 here from Florida, if counsel is able to make contact with him.

25     THE COURT:  Okay.

1    MR. BARKELEY: And -- and my notes indicate those are
2    the issues that the Court wanted us to address.
3    THE COURT: All right. Now let me ask you a
4    question.
5    MR. BARKELEY: Yes.
6    THE COURT: When -- well, I've got a whole bunch of
7    issues and we want -- I like to start on time, that's something
8    I always like to do, and so we're going to start -- so let me
9    give the guidelines here that we're going to follow.
10   Things have been a little confused in the trial
11   because the Government -- I thought when they were going to
12   present testimony from the prior trial, they were going to use,
13   quote, actors. It looks like they're going to actually use the
14   witnesses who testified at the prior trial. It now appears
15   that the Government's case is going to be comprised of three
16   witnesses whose testimony was presented in the prior trial who
17   will be read to this jury. True?
18   MR. BARKELEY: True, Your Honor, except for possible
19   rebuttal witnesses.
20   THE COURT: That's your -- except for rebuttal.
21   MR. BARKELEY: Yes.
22   THE COURT: You notice when they come in, we swear
23   them in to read the transcript accurately. So that's what
24   we've done, that's the way we've been proceeding.
25   Mr. Cohen has said, well, when they're done, I want

1    to cross-examine them, and I had a little -- I was a little

2    confused about whether they were going to be actors or real

3    people.  Now it's clear they're going to be real people.

4    Here's my position.  You listening?

5              We're going to proceed as we have with the Government

6    presenting its three witnesses who will come in, be sworn to

7    read their testimony accurately, and we'll proceed to read

8    direct and cross-examination as we did yesterday.  If Mr. Cohen

9    then wants to examine any of the three witnesses after we've

10   completed the whole process, then they'll be sworn in as a

11   witness, as opposed to just a reading transcript person, and he

12   is free to question that witness as he would, but he can only

13   do it one time, he can't do it in cross and then call him in

14   his own case.

15             In other words, this is all -- this is a forfeiture

16   trial.  You can question -- you can have free access to the

17   witnesses one time.  So when -- for instance, the sergeant is

18   through testifying, you want him called as your witness, we'll

19   swear him in, and you can question him.  If you say, no, I want

20   to wait until after lunch, after they're done, I'll say, fine,

21   that's your option.  Clear?

22             MR. COHEN:  Yes, Your Honor.

23             THE COURT:  Okay.

24             MR. COHEN:  May I -- I'm sorry, I had a couple of

25   points, but I'll let Your Honor obviously --

1      THE COURT:  Well, I just want to make sure that's

2 clear because I'm -- that's the rule and way we're going to

3 proceed.

4      MR. COHEN:  Well, can I -- can I address my point to

5 that issue then?

6      THE COURT:  Okay.

7      MR. COHEN:  All right.  My preference would be to

8 allow the Government to finish its case --

9      THE COURT:  Fine.

10      MR. COHEN:  -- and then -- and then call them after

11 lunch.  This is my -- my issue though.  I think that they're

12 hostile witnesses, and I would ask the Court if I do take that

13 position, that I be permitted to ask them leading questions on

14 direct.

15      THE COURT:  Are you -- I'm going to give you full

16 leeway.  You may be permitted -- may be, if necessary,

17 permitted to call -- ask leading questions.  I'm not sure it'll

18 even be necessary.  If you try the -- you try the old-fashioned

19 way.  If you need -- you know, if you need to call leading -- I

20 just want to get done --

21      MR. COHEN:  Well --

22      THE COURT:  -- I want to make sure you have a fair

23 access to examine these witnesses, whether you use leading or

24 direct, we try to -- it's just better quality of evidence if

25 it's direct, you don't lead, but if it appears that it's



1  necessary for you to lead, I might -- I will be lenient in that

2  regard.

3          MR. COHEN:  It certainly would move things along.

4          THE COURT:  Well, that's what I'm saying, okay?

5          MR. COHEN:  All right, Your Honor.

6          THE COURT:  Is that clear?

7          MR. COHEN:  Yes, Your Honor.

8          THE COURT:  Okay.  With regard to the Florida

9  witness, I considered last night your offer of proof.  I do

10  have an arrest warrant I could sign right now, and I thought

11  about that.  But given the timing, given the distance, it

12  probably would not be practical to try to arrest this person

13  and have him to trial before Friday.  That's just impractical.

14  If you think that by signing it, we're giving you bargaining

15  power over him to get him on the telephone, I'll be happy to

16  cooperate in that regard.

17          However, when I considered the offer of proof, the

18  testimony appears only marginally relevant, and duplicative.

19  You've got a number of other witnesses who, I understand,

20  worked there as well who are prepared to testify that this was

21  a legitimate business, and that may -- becomes relevant if it

22  explains the cash.  That's what you want to show, this cash

23  wasn't all drug proceeds, it's the proceeds of a legitimate

24  business.  I think that's what you want from this witness and

25  others.

1    MR. COHEN:  Well, I'm trying to show that it was

2  facilitating a legitimate business.

3    THE COURT:  That's fine.

4    MR. COHEN:  Right.

5    THE COURT:  I'm saying that you've got witnesses to

6  do that.  I'm told, by you, that you even have an expert to say

7  that.

8    MR. COHEN:  Well, I have an expert that analyzed the

9  business that will say that it's -- that it's plausible -- very

10  plausible --

11    THE COURT:  Okay.  All right.

12    MR. COHEN:  -- that this -- this cash came from the

13  business.

14    THE COURT:  So, I would agree to the telephonic

15  testimony if you can find him.  I think it's almost an abuse of

16  power to try to arrest the guy when we know we can't get him up

17  here in time, and so we'll -- everyone proceed as best they

18  can, but this seem -- it seems really -- just duplicative

19  testimony and just marginally relevant --

20    MR. COHEN:  Well --

21    THE COURT:  -- although I understand how it is

22  relevant with regard to your theory.  Okay?

23    MR. COHEN:  Your Honor, with respect to Mr. Wamsley,

24  if the Court were to sign the arrest warrant -- and I've

25  already -- I can have the investigator explain that it's signed

1    and that we're -- that that's the situation, then we'd ask him

2    to get on the telephone.

3            THE COURT:  Okay.  I'll order it signed.  I guess the

4    -- I don't sign it, looks like the Clerk signs it.  So you can

5    -- you can tell your investigator that and I'll be -- on the

6    next break, we'll take care of it.

7            MR. COHEN:  All right.

8            THE COURT:  All right.  Now with regard to Mr.

9    Johnson, now you're telling me that you want to wait until the

10   Government's through, and then you want to present your case.

11           MR. COHEN:  Based upon what the Court --

12           THE COURT:  Okay.

13           MR. COHEN:  -- has said this morning, yes.

14           THE COURT:  That's all right.  Okay.  So now Mr.

15   Johnson.  I am confused why the Government wants to have him --

16   have an actor read the first half knowing that the defendant is

17   going to want him to read the second half.  That just --

18           MR. BARKELEY:  Thank you -- thank you for bringing up

19   another issue I forgot, Your Honor.  No problem.  He can take

20   the stand at the beginning.

21           THE COURT:  Good.  That just makes perfect sense.

22   Otherwise, we're going to confuse the jury.  We're trying to

23   make it simple, okay?

24           MR. BARKELEY:  Done, done.

25           THE COURT:  So Mr. Johnson's going to come in here in

1  about two minutes, right?  He's going to read -- he's going to

2  be sworn in to promise to read his testimony -- accurately read

3  the testimony.  Then we'll do it, then he goes.  He's still

4  under subpoena, comes back after lunch, and you're free to use

5  him as you feel appropriate, as long as it's relevant to the

6  forfeiture charge that we're dealing with here today.  Okay.

7  Another issue taken care of.

8              Last one.  What -- can you tell me what substantial

9  means?

10             MR. BARKELEY:  In terms -- in terms of the

11 substantial connection requirement?

12             THE COURT:  Yes.  There's no definition in the jury

13 instructions.  What's a substantial connection?

14             MR. BARKELEY:  I think it's in the definition of

15 facilitation, Your Honor.  If you look at the definition of

16 facilitation, there are several paragraphs (indiscernible)

17 being devoted to defining substantial connection, including

18 legal authorities saying it's doubtful, but the safer practice

19 is to say that that test applies --

20             THE COURT:  I'm going to say --

21             MR. BARKELEY:  -- in these proceedings.

22             THE COURT:  Yeah, I'm not even sure --

23             MR. BARKELEY:  It means not incidental, Your Honor.

24 It means not incidental --

25             THE COURT:  Mm-hmm (affirmative).  Then why can't we

1    just say not incidental?

2         MR. BARKELEY:  -- of substance, not coincidental.

3         THE COURT:  Okay.  That's what I thought it meant,

4    but I don't know why we can't just say it's not incidental

5    because we do say that.  But anyhow, I'm going to work on that

6    a little bit as we get going because we have the jury --

7         MR. BARKELEY:  Yes, we can, Your Honor.  We can say

8    that.  That's -- I believe that's all it means.

9         THE COURT:  I can't find any authority -- I mean, I

10   don't see in the statute where that's even required to say

11   substantial connection, but you say it in -- to make sure

12   things are absolutely safeguarded, you want to use that

13   language --

14        MR. BARKELEY:  Yes, it's a --

15        MR. COHEN:  That's from the case law, Your Honor.

16        THE COURT:  I saw the case, I know, but that's a

17   civil case, I think.

18        MR. BARKELEY:  Yes, it is.

19        THE COURT:  Okay.  This is a criminal case we're

20   dealing with today.

21        MR. BARKELEY:  It is, Your Honor.  I simply informed

22   the Court that the better practice recommended to people in my

23   job is to use the civil standard in a criminal case.

24        THE COURT:  All right.

25        MR. COHEN:  Your Honor, again, on the direct

1  testimony issue, some of the questions that I'm going to ask
2  Sergeant Wall and Mr. Johnson have to do with their
3  credibility.  In other words --
4          THE COURT:  'Kay.
5          MR. COHEN:  And that's what I would ask in my cross-
6  examination.
7          THE COURT:  'Kay.
8          MR. COHEN:  I will ask them on direct examination
9  questions going to their veracity.  I -- the Court, well, as
10 long as it's relevant to the forfeiture charge, their veracity
11 in what --
12         THE COURT:  Okay.  I understand that.
13         MR. COHEN:  Yes.
14         THE COURT:  I think credibility is always
15 appropriate.
16         MR. COHEN:  Thank you, Your Honor.
17         THE COURT:  Okay.  But he can only -- you can wear
18 that one out, too.  You know, you can go for so long, then
19 we're going in circles, but I understand you have some leeway
20 with regard to credibility.
21         MR. COHEN:  Yes, Your Honor.
22         THE COURT:  Okay.  Let's -- let's get Mr. -- did we
23 do it all, counsel?  Did I cover everything?  So we can get
24 going, can't we?
25         MR. COHEN:  I think we can, Your Honor.

1    MR. BARKELEY:  Yes, I think we can, Your Honor.  Did
2  you want Trooper Wall first?  He -- I have to --
3    THE COURT:  No, no, I think -- he's not going to --
4  he's going to call Trooper Wall after lunch.
5    MR. COHEN:  Based upon the Court's comments this
6  morning.  Yes, Your Honor.
7    MR. BARKELEY:  All right.
8    THE COURT:  So it'll be -- Mr. Johnson will be first.
9  We'll bring in Mr. John -- yes, go ahead.
10    MR. BARKELEY:  I have one other matter, Your Honor.
11  I think it's incumbent on the Government to disclose that Mr.
12  Foran may have come back early from his hunting trip, so he may
13  be available to the defense.  The Government still is not going
14  to call him, not going to transcript, but I'm just letting the
15  Court know and counsel --
16    THE COURT:  They can do what they --
17    MR. BARKELEY:  -- he may be available.  And you're
18  going to face a (2)(e) issue when you get him with the
19  subpoena, but we'll deal with that then.
20    THE COURT:  Okay.  Well, I'm going to -- all right.
21  So that's -- thank you for telling him Mr. Foran's available,
22  but he's not going to be a witness for the Government.  Okay.
23    MR. COHEN:  Right.  And again, Your Honor, it was my
24  position, and it still is, just so the record is clear, that
25  there were two -- that the Government should have proceeded

1    without this read-back procedure. I'm not going to reiterate

2    that, the Court knows that I object to the entire procedure.

3            But secondly, if the Government is going to proceed

4    with the read-back procedure, I've tried to make it clear, I

5    thought the idea was to present to the jury -- this jury

6    exactly what was presented to the last jury; all the exhibits,

7    all the testimony. To the extent that Agent Foran's testimony

8    is not going to be there, it's going to be a change in what was

9    presented to the last jury, and I don't think that's consistent

10   even with what the Government's theory was. But -- so I wanted

11   to raise that for the record.

12           THE COURT: Okay. All right.

13           MR. BARKELEY: And for the record, the Government's

14   going to say that the Government isn't obligated to put on the

15   entire criminal trial. I'm attempting to be efficient. What

16   Special Agent Foran said at the trial has no bearing on the

17   forfeiture in the Government's judgment.

18           THE COURT: Okay.

19           MR. COHEN: All right, Your Honor.

20           THE COURT: Very well. Let's -- I don't want to

21   bring the jury in until we've got Mr. Johnson, so if you can

22   bring him in, then we'll bring the jury in --

23           MR. BARKELEY: Yes. If we may have one moment to do

24   that, Your Honor.

25           THE COURT: Okay.

1                    (Pause - side conversation)

2          THE COURT:  All right.  Sir, you can come on up and

3    get comfortable here.

4                         (Pause)

5    And we'll wait until the jury comes in to swear you in.  All

6    right.  Counsel, we're going to go get the jury.  Ready to

7    bring the jury in?

8          MR. COHEN:  Yes, Your Honor.

9          THE COURT:  Mr. Barkeley, ready for the jury?

10         MR. BARKELEY:  Yes, Your Honor.  May the record

11   please reflect that Mike Biderman with the State Public

12   Defender's Office is here in the courtroom.  He's here because

13   Mr. Johnson is about to testify.

14         THE COURT:  Okay.  All right.  And that's how we're

15   going to do that.  Sir, you're his counsel then for this

16   proceeding?

17         MR. BIDERMAN:  Well, actually, Your Honor, for this

18   proceeding, we've got a Federal PD appointed to represent Mr.

19   Johnson --

20         THE COURT:  Right.

21         MR. BIDERMAN:  -- Mr. Coe.

22         THE COURT:  So where's he?

23         MR. BIDERMAN:  Oh, he's available telephonically if

24   needed.

25         THE COURT:  Okay.  So you don't want me to call him

1    then?

2              THE WITNESS:  I do.

3              MR. BIDERMAN:  Yeah, Mr. Johnson would.

4              THE COURT:  Okay.  Do you have a phone number for

5    him?

6              THE WITNESS:  Yeah, I do.  276-6173.

7              THE COURT:  Okay.  One more time, please.

8              THE WITNESS:  276-6173.

9              THE COURT:  907-276-6173?

10             THE WITNESS:  Mm-hmm (affirmative).

11             THE CLERK:  And his name?

12             THE WITNESS:  Charles Coe.

13             THE COURT:  Charles C-O-E.

14             THE WITNESS:  C-O-E, yeah.

15             THE COURT:  And I guess we'll just make that call.  I

16   think he's expecting the call.

17             THE WITNESS:  Yeah, he is.

18             MR. BARKELEY:  Your Honor, may I approach the witness

19   and give him a copy of the transcript of his testimony?

20             THE COURT:  Yes.

21             MR. BARKELEY:  Thank you.

22             THE COURT:  I thought that's what he had.

23                        (Pause)

24             THE CLERK:  Mr. Coe, can you hear us okay?

25             MR. COE:  Hello?

1       THE COURT:  Mr. Coe?

2       MR. COE:  Yes.

3       THE COURT:  Yes.  This is Judge Beistline.  How are

4  you doing this morning?

5       MR. COE:  I'm doing fine.

6       THE COURT:  Here's what we've got.  You're on the

7  speaker, your client is now in the witness box, we haven't

8  sworn him in.  All we're going to do this morning is he's going

9  to read the testimony from his prior -- that he read in the

10  prior trial.  That will be it this morning, and then he may be

11  called back this afternoon by the defendant to testify as a

12  regular witness, but that's all we're going to do this morning.

13  Do you understand that?

14       MR. COE:  Yes.  And then you'll -- someone

15  (indiscernible) a relative time this afternoon --

16       THE COURT:  We'll just try to keep --

17       MR. COE:  -- and maybe will call me back in the

18  afternoon.

19       THE COURT:  Yeah, we'll just call you back.  I'm

20  guessing it'll be mid to late afternoon.  I just don't know the

21  order that the defendant is going to present his witnesses.

22       MR. COE:  I should apprise the Court that tomorrow --

23  tomorrow morning, hopefully, this will be done -- his testimony

24  will be done today because tomorrow I'm in another courtroom in

25  the morning.

2-29

1    THE COURT:  Okay.  Well, it's important that his

2 attorney hear that.  I don't know if his attorney is even

3 listening.

4    MR. COHEN:  I'm sorry, Your Honor.

5    THE COURT:  This gentleman -- the witness' attorney

6 will be available all day today, but won't be available

7 tomorrow morning, so he's suggesting that if you call Mr.

8 Johnson back this afternoon, it would be good for him so that

9 you can get it done while he's available.

10    MR. COHEN:  All right.  I'll do my best to

11 accommodate him.  I'm not going to guarantee.

12    THE COURT:  Okay.  Well, do your best so that --

13 okay.

14    MR. COE:  Thank you -- thank you.

15    THE COURT:  All right.  All right.  So what we're

16 going to do, so everybody understands, is we're going to go

17 right now and bring the jury in, then we're going to ask the

18 witness to stand and to swear that he'll read the transcript

19 accurately, and then we're just going to roleplay, and that's

20 what we're going to do for the next hour or so.  And, Mr. Coe,

21 if you have any issues, you can --

22    MR. COE:  Yes, I understand, Your Honor.

23    THE COURT:  Then that's all we're going to do this

24 morning.  I don't even think we have to tell the jury that

25 you're on the phone for this morning because nothing's going to

1    happen other than what's transcribed in the last trial.  Okay?

2         MR. COE:  That's okay, Your Honor.

3         THE COURT:  Counsel?

4         MR. BARKELEY:  Yes, Your Honor.

5         THE COURT:  Counsel?

6         MR. COHEN:  That's fine with me.

7         THE COURT:  Okay.  All right.  Let's bring the jury

8    in.  Let me ask the witness.  Any questions?  You know you're

9    just going to read?

10        THE WITNESS:  (No audible reply)

11        THE COURT:  Okay.

12        MR. BARKELEY:  And, Your Honor, the record should

13   reflect that counsel, the defendant, and the Court have been

14   given copies of the transcript along with the witness so that

15   everyone will be reading from the same transcript.

16        THE COURT:  Okay.  Let's see.  This is Wall.

17   Johnson.  Yes.  Thank you.  All right.  We'll bring the jury

18   in.

19                        (Pause)

20   You need a pen.  Lynn, he needs a pen.

21        THE WITNESS:  Thank you, Your Honor.

22        THE COURT:  Make sure it writes.

23      (Jury in at 8:54 a.m.)

24        THE COURT:  Okay.  Good morning, ladies and

25   gentlemen.  How are you?  One, two, three, four, five, six,

1  seven, eight, nine, ten, eleven, twelve, thirteen. You're all

2  here. Good. Thank you. This clock's running a little fast.

3  It's 8:30 sharp. Remember that's when we were going to start,

4  8:30 sharp? And I apologize for being a few minutes late, but

5  that's not our practice, we just had to take care of a few

6  things, but we're just going to take right off. Any questions,

7  any issues, anything we can do help you as we get going? Okay.

8          Government's next -- remember what we're doing is the

9  Government is presenting witnesses from an earlier trial. This

10 is the Government's next witness and, Mr. Barkeley, you can

11 introduce him and then we'll swear him in and --

12         MR. BARKELEY: Thank you, Your Honor. The Government

13 calls for a reading of the testimony of Eugene Johnson, the

14 plaintiff's witness in the underlying trial.

15         THE COURT: And this actually is Eugene Johnson

16 reading his own testimony, is that true?

17         MR. BARKELEY: That's true, Your Honor.

18         THE COURT: All right, sir. If you'll stand --

19         MR. BARKELEY: I believe so. I think that's what the

20 witness will say.

21         THE COURT: Okay. And just let me tell the jury one

22 thing. Both the witness yesterday and the witness today were

23 sworn in at the prior trial, so this was sworn testimony that

24 they gave at the prior trial. We're just swearing them in now

25 to read the transcript accurately, okay? So Madam Clerk.

1    THE CLERK:  Sir, if you could raise your right hand,
2  please.

3  **EUGENE JOHNSON, GOVERNMENT'S WITNESS, SWORN TO READ TESTIMONY**

4    THE CLERK:  Thank you.  You may be seated.  And sir,
5  for the record, could you please state your full name and spell
6  your last name?

7    THE WITNESS:  Eugene Johnson.  J-O-H-N-S-O-N.

8    THE CLERK:  And your city and state of residence.

9    THE WITNESS:  Fairbanks, Alaska.

10    THE CLERK:  Thank you.

11    THE COURT:  Okay.  Now we'll take up with direct
12  examination.  It's on the bottom of page 1 with Mr. Barkeley
13  reading for Mr. Schroder.  Begin at line 23.

14    MR. BARKELEY:  Thank you, Your Honor.  Good morning,
15  Mr. Johnson.  You have the transcript in front of you there?

16    THE WITNESS:  Yes.

17    MR. BARKELEY:  All right, sir.  I'm going to begin at
18  the bottom of page 1-214.  You see where it says "Direct
19  Examination" --

20    THE WITNESS:  Yeah.

21    MR. BARKELEY:  -- "By Mr. Schroder"?

22    THE WITNESS:  Yes.

23    MR. BARKELEY:  I'll be playing the role of Mr.
24  Schroder here.  Begin with that question.

25    **DIRECT EXAMINATION READ FROM PREVIOUS TESTIMONY**

Johnson - Direct (Reading)                              2-33

1   BY MR. BARKELEY AS MR. SCHRODER:

2   Q    "Mr. Johnson, you just gave that address.  Is that in

3   Fairbanks?

4   A    "Yes."

5           MR. BARKELEY:  You have to read exactly what it says

6   here.  See at the top of the next page?

7   A    "Yes, sir."

8           BY MR. BARKELEY AS MR. SCHRODER:

9   Q    "Okay.  Where did you grow up?

10  A    "I grew up here.

11  Q    "And where did you go to school?

12  A    "I went to school at Barnette Elementary.

13  Q    "Okay.  And up through the rest of your education, here in

14  Fairbanks?

15  A    "Oh, I -- I left during high school for a little bit.

16  Q    "Okay.  Do you have children?

17  A    "Yes.

18  Q    "How old are they?

19  A    "I have a eight and twelve-year-old.

20  Q    "Uh-huh (affirmative).  Have you ever been involved in the

21  sale of drugs?

22  A    "Excuse me?  I didn't hear you.

23  Q    "Have you ever been involved in the sale of drugs?

24  A    "Oh, at this moment, yes, I have, I guess.

25  Q    "Okay.  And how have you been involved?

1    A      "November 28th, I got raided.

2    Q      "Okay.  When did you start selling drugs?

3    A      "Man, probably off and on since I was a teenager.

4    Q      "Okay.  And you just mentioned a moment ago -- well, let

5    me ask you another question.  Do you use drugs yourself?

6    A      "I smoke marijuana, yes.

7    Q      "Okay.  Let me take you back to last November.  You said

8    the police searched your house.  Do you remember what day that

9    was?

10   A      "I believe it was November 28th.

11   Q      "Okay.  Do you know what they were looking for?

12   A      "When they came in, they said they were looking for money

13   and dope.

14   Q      "Okay.  Did they find any of either?

15   A      "No.

16   Q      "Did they have information related to you selling drugs?

17   A      "Yes.

18   Q      "And what information was that?

19   A      "Basically, I think they just had me -- somebody had wore

20   a wire on -- wire on me.

21   Q      "Now did you agree to provide information to the law

22   enforcement officers?

23   A      "In the -- when they were in my house, they -- the State

24   Troopers, Officer Wells, had made a agreement.

25   Q      "Okay.  And what information did you agree to provide

Johnson - Direct (Reading)

1  them?

2  A    "They basically -- they -- they wanted -- they said they

3  wanted some -- they wanted dope on the table, so --

4  Q    "And did you have information to do that?

5  A    "Yes.

6  Q    "Okay.  Did the officers agree to provide you a benefit if

7  that information worked out?

8  A    "Yeah.

9  Q    "And what was that benefit?

10  A    "No jail time.

11  Q    "Was that your understanding of what it meant?

12  A    "Yes, sir.

13  Q    "At what time did you -- or at that time, did you also

14  provide testimony in a state court?

15  A    "Yes.

16  Q    "And do you remember the purpose of that testimony?

17  A    "I believe so.

18  Q    "What was it?

19  A    "The warrant for Jason, I believe.

20  Q    "Okay.  Did you tell the truth at that hearing?

21  A    "Yes, I did.

22  Q    "Uh-huh (affirmative).  So do you know the defendant,

23  Jason Colette?

24  A    "Yes, yes, I do.

25  Q    "And how do you know him?

1    A    "We're acquaintances, I guess.

2    Q    "And how would you define acquaintances?

3    A    "I know him.  We talked before, but it wasn't -- but --

4    but it wasn't like we're going on vacation or hanging out.

5    Q    "Okay.

6    A    "Having barbeques or anything like that, no.  Was just

7    somebody I knew and we -- we talked and he -- he's helped me

8    out with some of my vehicles before and some private business

9    for, and so kind of -- well, a business relationship.

10   Q    "Now did you agree to cooperate with the law enforcement

11   officers?  Did that relate to Jason Colette?

12   A    "Yes.  Yes, I -- it -- it did.

13   Q    "And how did it relate to him?

14   A    "Well, they wanted dope on the table and I gave them

15   Jason.

16   Q    "Okay.  Do you do business with him, drug business?

17   A    "Who?

18   Q    "Jason Colette.

19   A    "I have, yes.

20   Q    "Okay.  When was the last -- prior to when the police came

21   to your house, when was the last time that you had seen him,

22   the defendant?

23   A    "Maybe a couple days, a week maybe, something like there,

24   give or take --

25   Q    "Okay.

1   A      "-- a little bit.

2   Q      "And where did you see him that last time you saw him?

3   A      "At his place.

4   Q      "Okay.  And what were you doing when you saw him then?

5   A      "I was over there buying dope.

6   Q      "Okay.  And when you say buying dope, what were you
7   buying, what kind?

8   A      "Cocaine.

9   Q      "Okay.  And it was -- you said it was at his residence?

10  A      "Yes.

11  Q      "Okay.  Now where in the house -- had you done this
12  before?  Had you bought from him before?

13  A      "Yes.  Yes, I have.

14  Q      "Okay.  And where in the house did this happen?

15  A      "It was usually -- when it did happen, we were in his
16  bedroom.

17  Q      "Okay.  And was there anybody else in the house?

18  A      "Usually he was by himself.

19  Q      "Okay.  The last time" -- I'm sorry.  "Okay.  Was there
20  anybody else around that you knew of?

21  A      "The last time I seen him, I think his girlfriend was at
22  the house --

23  Q      "Okay.

24  A      "-- with him.

25  Q      "Was she ever involved in the deals?

1  A      "No, sir.

2  Q      "Okay.  So how did it start out when you went into the

3  house?  What happened?

4  A      "What do you mean?

5  Q      "Oh, so you said you did -- you bought in the bedroom, is

6  that -- is that what you just said then?

7  A      "Yes.

8  Q      "Okay.  So how much cocaine did you buy that day?

9  A      "Maybe a ounce or two.

10 Q      "Okay.  And do you remember how much you paid?

11 A      "I think eleven -- eleven hundred.

12 Q      "Okay.  Was that the total for an ounce?

13 A      "It's for one ounce.

14 Q      "Okay.  And where did he keep his drugs?

15 A      "When I was there, I seen it in his safe.

16 Q      "Okay.  And how much -- the day you were there, this day

17 we're talking about, a few days before your -- the search of

18 your house, how much drugs did you see in his safe?

19 A      "It's hard to say.  It was a lot.  It was in a bag.

20 Q      "When you say bag, well, how was it contained?

21 A      "I think it was a grocery bag full of zips.

22 Q      "Okay.  Let's ask the old grocery bag question, paper or

23 plastic?

24 A      "Plastic.

25 Q      "Okay.  And when --

1   A    "A brown plastic.

2   Q    "-- when you say zips, what's that mean?

3   A    "Ounce.

4   Q    "Ounces.  Okay.  And how were the ounces packaged?

5   A    "I believe in sandwich bags.

6   Q    "Did you see any money?

7   A    "I can't recall if I did.

8   Q    "Did you ever see weapons in the defendant's bedroom?

9   A    "I remember seeing -- he had showed me a Uzi before.

10  Q    "Okay.  And which occasion was that where you saw this?

11  A    "I think it was the last time I stopped by.

12  Q    "Okay.  And what do you mean by -- when you say an Uzi,
13  what do you mean by that?

14  A    "Like a handgun, semi-auto, fully automatic handgun.

15  Q    "Okay.

16  A    "Machine gun.

17  Q    "Was there anything attached to it that you remember?

18  A    "I believe there was a silencer on it.

19  Q    "Okay.  Do you remember whether it had a magazine in it or
20  not?

21  A    "I'm not too sure.

22  Q    "Okay.  Did the defendant draw your attention to the gun
23  at any point?

24  A    "Yeah, because he was showing it to me, like, hey, look
25  what I got.  I looked at it, but --

1    Q    "And did he handle it at all?

2    A    "He was showing me.

3    Q    "Okay.  All right.  Had you seen any other weapons when

4    you were there before or any other guns?

5    A    "I think so, but I'm not too sure.  I can't say for sure

6    if I did.

7    Q    "Okay.  Did you ever consider going back and stealing any

8    of the defendant's cocaine?

9    A    "Yeah.  That probably -- probably the reason why I gave up

10   Jason because there's been a few times I was thinking about

11   going -- and I seen that stash.  I was broke, shit, thinking

12   about going to get it.

13   Q    "So did you ever go do that?

14   A    "No.

15   Q    "And why not?

16   A    "Well, I'd seen that Uzi with the silence on it.  That

17   kind of gave me -- made me think twice.

18           MR. BARKELEY AS MR. SCHRODER:  "That's all the

19   Government's questions, Your Honor.

20           THE COURT:  "Thank you.  Mr. Butler?

21           **CROSS-EXAMINATION READ FROM PREVIOUS TESTIMONY**

22   BY MR. COHEN AS MR. BUTLER:

23   Q    "Good afternoon, Mr. Johnson.

24   A    "Good morning."

25           MR. COHEN:  So, it really says good afternoon, right?