1  Q    "And that may be the reason why you don't want to give

2  that up, isn't that right?

3  A    "No, you're wrong.

4  Q    "Who's Monty?

5  A    "Excuse me?

6  Q    "Who is Monty?

7  A    "Monty is how I met Jason.

8  Q    "Friend of yours?

9  A    "We were.

10  Q    "Person you hang out with?

11  A    "We did.

12  Q    "Right.  Person who imports dope, isn't that right?

13  A    "I don't know.

14  Q    "You're under oath, sir.  I'll ask you again.  He is a

15  person who imports dope, isn't he?

16  A    "I don't know.

17  Q    "Does he sell dope, sir?

18  A    "I don't know.

19  Q    "Well, tell us about your friend that you said that's how

20  you met Jason.  Your friend is on the run right now, isn't he?

21  A    "I don't know.

22  Q    "When is the last time you saw him, sir?

23  A    "Since he found out I turned in Jason.  Since November.

24  Q    "That's the last time you saw him, right?

25  A    "He -- he came by, I think.

1    Q      "And you told him --

2    A      "Well, he --

3    Q      "-- what was going on with you, right?

4    A      "Right.

5    Q      "And you told him that -- that so he could sort of, what,

6    disappear a little bit or kind of, right?

7    A      "Repeat that?

8    Q      "You told him that so he could avoid law enforcement,

9    didn't you, sir?

10   A      "No.  He was at --

11   Q      "Well, isn't it true that he certainly doesn't want to

12   talk to law enforcement?  You know that, right?

13   A      "No, I don't know that.

14   Q      "Well, why is it that you haven't seen Monty since

15   November 28, 2005, this good friend of yours.  Why not?

16   A      "He was a little pissed off because I gave up Jason.

17   Q      "Okay.  But this is your good friend, right?

18   A      "I didn't say he --

19   Q      "This is your good friend, isn't it, sir?

20   A      "I -- I did not say he was my good friend.  You said that.

21   Q      "But he is, isn't he?  He's your friend.  You're afraid to

22   admit -- are you afraid to admit that, sir?

23   A      "No, not at all.

24   Q      "All right.  He's your friend, isn't he?

25   A      "We haven't talked in months.

Johnson - Cross (Reading)                    2-64

1  Q    "He is your friend though, isn't he, sir, or is that none

2  of our business?

3  A    "We had differences, I guess, but we were friends, I

4  guess.

5  Q    "All right.  And you're friends in the drug business,

6  aren't you, sir?

7  A    "I don't know what you're talking about.

8  Q    "He -- are you friends in the drug business, yes or no?

9  A    "With who, Jason?  Yes, I am.

10  Q    "Monty.  Okay.  How about with Monty?

11  A    "No.

12  Q    "Tell the jury who some of your sources of cocaine are by

13  name.  Tell them.

14  A    "Jason Colette.

15  Q    "That's all you're going to tell them today?  Did you say

16  earlier that you have numerous sources of cocaine?

17  A    "Right.

18  Q    "All right.  Who are they, sir?  Aren't you cooperating

19  with law enforcement?

20  A    "I believe I am.

21  Q    "Part of your cooperation, you've got to answer these

22  questions under oath and tell the truth, don't you?

23  A    "Right.

24  Q    "All right.  So who are -- who are some of your sources of

25  cocaine?

1    A    "Since November 28th, I haven't had any sources of

2    cocaine.

3    Q    "Sir, who were your sources to cocaine prior to November

4    28th, 2005?

5    A    "Jason Colette.

6    Q    "Any others?

7    A    "There was a few others.

8    Q    "Who are they, sir, or is that none of our business?

9    A    "I don't believe any of those other people are here on

10    trial.

11    Q    "Is that --

12    A    "I'm not a witness to them.

13    Q    "Is that a soft way of saying it's none of our business?

14    A    "You said that.

15    Q    "Well, are you going to answer the question or not?

16    A    "I believe I already did."

17        MR. COHEN:  Your Honor, may we approach?

18        THE COURT:  Yes.  This is -- we're no longer on text.

19        MR. COHEN:  Correct.  That's my request.

20        THE COURT:  Okay.

21        MR. BARKELEY:  Yes.

22    (Side bar not transcribed)

23        THE COURT:  Okay.  Ladies and gentlemen, we've got a

24    -- we ran out of pages.  We've got to get -- make us some more

25    copies, so we'll take a brief recess, about ten minutes or so.

1  So we'll stand in recess.  You can just go back in there and

2  we'll get these cop -- the rest of the copying taken care of.

3  Is that door locked or --

4          THE CLERK:  Yes, sir.

5          THE COURT:  Okay.  You can just go back out and I

6  think it's unlocked.  If it's not, let us know.

7                              (Pause)

8      (Jury out at 9:34 a.m.)

9          THE COURT:  Okay.  It looks like we need some more of

10  the transcript, is that right?  Mine ends on page 245.

11          MR. COHEN:  Yes, Your Honor.  It continued the next

12  day, pages 8 to 34.

13          THE COURT:  And who has copies of those?

14          MR. BARKELEY:  I do, Your Honor.  They're -- they're

15  in the office, so --

16          THE COURT:  Okay.  We'll go get copies -- three

17  copies, okay?

18          MR. BARKELEY:  Yes, sir.

19          THE COURT:  And you had something else, Mr. Barkeley?

20          MR. BARKELEY:  I do, Your Honor.

21          THE COURT:  'Kay.

22          MR. BARKELEY:  I wasn't going to -- I wanted to ask

23  it back there, but here we are --

24          THE COURT:  Okay.  Well, we can go back here, too.

25          MR. BARKELEY:  Okay.  Thank you.

1          THE COURT:  No, we'll go back here.  I thought your
2     concern was the jury.  Let's go.
3          (Side bar not transcribed)
4          THE COURT:  You can stay here or you can go to the
5     restroom.  We're going to be (indiscernible - background noise)
6     recess for ten minutes, okay?  Do you want to sit here or do
7     you want to go --
8          THE WITNESS:  I'm good.
9          THE COURT:  Huh?
10          THE WITNESS:  I'm good.  I'm comfortable.
11          THE COURT:  Okay.  If you're comfortable, there's
12     water and whatever.
13          THE WITNESS:  Thank you.
14          THE COURT:  And we're -- we're off the record for ten
15     minutes.
16          THE CLERK:  This matter is in brief recess.
17          (Recess at 9:37 a.m., until 9:50 a.m.)
18          (Jury not present)
19          THE CLERK:  -- again in session.
20          THE COURT:  Okay.  Please be seated.  So we've got --
21     is -- is this the new transcript?
22          MR. BARKELEY:  It is, Your Honor.  It's --
23          THE COURT:  Pretty long.
24          MR. BARKELEY:  -- 2-8 at the upper right-hand corner
25     of the front page.

1    THE COURT:  All the way through 2-34.

2    MR. BARKELEY:  Yes, Your Honor.

3    THE COURT:  Okay.

4    MR. BARKELEY:  And the witness has a copy as do

5  counsel and the defendant --

6    THE COURT:  'Kay.

7    MR. BARKELEY:  -- and the Court.

8    THE COURT:  We're ready for the jury then.  I'll just

9  tell the jury that this is the next day continuing -- I'll let

10  them now that there was a break and now we're picking up the

11  next day.

12    MR. COHEN:  Yes, Your Honor.

13                    (Pause)

14    (Jury in at 9:51 a.m.)

15    THE COURT:  Okay.  Ladies and gentlemen, what

16  happened in the transcript is they broke for the day, and so

17  they came back and started the next morning, and so that's what

18  we're doing here, so this is -- the testimony begins the next

19  morning during the first trial.  So, Mr. Cohen, you can begin.

20  **CROSS-EXAMINATION READ FROM PREVIOUS TESTIMONY CONTINUED**

21  BY MR. COHEN AS MR. BUTLER:

22  Q    "Good morning.  Good morning, Mr. Johnson.

23  A    "Good morning.

24  Q    "Mr. Johnson, after you received information that

25  authorities were either on to you or onto the south side, you

1  had to determine what to do with whatever you had in your

2  house, right?

3  A     "No, sir.

4  Q     "All right.  Well, you made some decisions about what to

5  do with what you had in your house, didn't you, sir?

6  A     "I just cleaned up my house thoroughly.  I --

7  Q     "But as a dope dealer, you wouldn't throw dope away, you'd

8  probably want to put it somewhere where you felt it would be

9  safe, isn't that right?

10 A     "I didn't have any.  It was already gone.

11 Q     "Well, if you did have some, you'd want to make sure that

12 you put it somewhere where you wouldn't get ripped off, isn't

13 that right?

14 A     "Yeah, that's true.

15 Q     "You'd want to put it with somebody who probably was not

16 in the business, isn't that right?

17 A     "No.  No, you're not right.

18 Q     "Well, I mean, if you give it to somebody who's in the

19 business, they might sell your cocaine and you not get the

20 money, right?

21 A     "Can you repeat that?

22 Q     "You'd want to put it with someone who was not in the

23 business of selling cocaine, wouldn't you?

24 A     "No.

25 Q     "You'd want to put it with someone who was in the

1    business.

2    A     "I just -- I usually handle it all myself.  I don't try

3    and --

4    Q     "Okay.

5    A     "-- put anybody involved.

6    Q     "And you were -- of course you know who the informant was

7    that you sold to, don't you?

8    A     "Now I do, yes.

9    Q     "Okay.  And who was that person?

10   A     "Alvin Salsbury (ph).

11   Q     "Okay.  And he had been arrested -- he'd been arrested

12   probably what, a couple of months before you?

13   A     "I'm not sure.

14   Q     "Okay.  And you know him pretty well, don't you?

15   A     "I don't know him well -- that well.

16   Q     "Well, you know him though, don't you?

17   A     "Well, he -- he's from the south side, yeah.

18   Q     "Okay.  And he has done business with you before, hasn't

19   he?

20   A     "Prior to my case, when -- not -- not much.

21   Q     "But he has purchased from you before, hasn't he, sir?

22   A     "We -- we always haven't got along -- we had got into a

23   couple of scuffles, arguments.  In the last five, six years, we

24   haven't always got along.  I don't think --

25   Q     "But, sir, within that five or six-year period, he's

1    purchased cocaine from you before, hasn't he?

2    A    "Could have.

3    Q    "Well, you know he has, don't you?

4    A    "Well, he wore a wire on me, yes.

5    Q    "And in order for him to be confident enough to go and

6    wear a wire on you, he must have known enough about you to have

7    purchased from you before.  That would be a fair conclusion,

8    wouldn't it?

9    A    "That could be.

10   Q    "In fact, how long have you been selling drugs?  You said

11   since you were what, a teenager?

12   A    "Yeah, off and on.

13   Q    "And you mentioned yesterday on direct that you did

14   elementary school here and when you left -- and then you left

15   for awhile.  You were what, in California, weren't you?

16   A    "Yes.

17   Q    "And what -- what -- you engaged in the same business

18   before, didn't you?

19   A    "I went to high school.

20   Q    "And you engaged in the same business there, didn't you,

21   sir?

22   A    "No, sir.

23   Q    "So you just did -- just here in Fairbanks?

24   A    "When I moved back, I was nineteen, twenty, yeah.

25   Q    "Now at the time that you were -- that you sold to the --

1    to Mr. Salsbury, there was a person named Wolfman in your

2    garage with you where the drugs were, wasn't there?

3    A    "Can you repeat that?  I didn't understand that.

4    Q    "At the time that you sold to Mr. Salsbury, there was a

5    guy in your house -- in your garage with you, where you keep

6    your drugs, named Wolfman, wasn't there?

7    A    "I don't -- I don't believe so.

8    Q    "So if the undercover -- or Mr. Salsbury told authorities

9    that Wolfman walked into the garage with Johnson, the

10    undercover would not be telling the truth?

11    A    "I'm not sure of that.  It was like nine months ago.

12    Q    "All right.

13    A    "Wolfman could have been there, but Wolfman's always at my

14    house.

15    Q    "Okay.  What about Bang, B-A-N-G?

16    A    "Do I know Bang?

17    Q    "Bang was there, too, wasn't he?

18    A    "I can't really rec -- recollect if he was or not.

19    Q    "Now Bang is in the drug trade, too, isn't he?

20    A    "If he is -- if -- he's a addict.

21    Q    "But he's also in the business, isn't he?

22    A    "He's a addict.

23    Q    "But he's also -- he's also in the business, isn't he?

24    A    "I've never seen him sell anything.

25    Q    "So these are addicts that just hang out at your house?

1    A    "Not -- Bang is like my cousin and somebody I grew up

2    with.  Wolfman is the same thing.  He helps me out with my

3    vehicles and other things.

4    Q    "And you pay him how?

5    A    "Cash.

6    Q    "Or drugs, right?

7    A    "When I used to have drugs, sometimes, yeah.

8    Q    "Now Salsbury, this person that you've know for what, four

9    to five years or longer?

10   A    "Well, he's a coffee (ph), so he's from the south side.

11   Same here, so --

12   Q    "You all kind of grew up together --

13   A    "We crossed paths with --

14   Q    "-- didn't you?

15   A    "-- people that live in the neighborhood, I guess.

16   Q    "You all kind of grew up together, didn't you?

17   A    "We didn't go to school or anything.  We actually didn't

18   get along for years."

19        MR. COHEN:  Now, Your Honor, can I ask that the --

20   that the witness bring the microphone closer to his mouth.  I'm

21   having a hard time --

22        THE COURT:  Yes, a little -- a little closer.

23        THE WITNESS:  Okay.

24   BY MR. COHEN AS MR. BUTLER:

25   Q    "So if he told authorities that you were going through a

1  kilo a week, he'd be lying?

2  A    "I would believe so.  I would say so.

3  Q    "So is it fair to say, sir, that if anyone says something

4  that's contrary to what you say, that person would be lying,

5  but not you?  Is that a fair statement here?

6  A    "All depends the circumstances, I guess.

7  Q    "Well, like the trooper, for example.  If he says that he

8  didn't cut the deal with you, he had to get authority to do it,

9  and told you that, and you're saying otherwise, then the

10  trooper is not telling the truth, is that your position?

11       MR. BARKELEY AS MR. SCHRODER:  "Objection, Your

12  Honor.  I think that's mischaracterizing what the witness has

13  said previously.

14       THE COURT:  "Well, I --

15       MR. BARKELEY AS MR. SCHRODER:  "He says he didn't

16  remember.

17       THE COURT:  "Well, I -- you know, you can't -- ask

18  him that question again.  I thought it's a little vague in --

19  in my recollection how he answered that question.

20  BY MR. COHEN AS MR. BUTLER:

21  Q    "Okay.  If the trooper said that he didn't make you a

22  promise because he didn't have the authority, that only the

23  District Attorney could make you a promise, you're saying that

24  the trooper is not telling the truth when he says that, is that

25  right?

1   A       "Me and the trooper had a deal, yeah.

2   Q       "So he did cut a deal with you.  You said that yesterday,

3   right?

4   A       "Yes.

5   Q       "And that -- that deal had certain terms.  You said that

6   yesterday, didn't you?

7   A       "Yes.

8   Q       "And that he didn't stop to make a phone call or anything

9   as -- or tell you I can't, I don't have that authority.  That's

10  your testimony, isn't it?

11  A       "I'm not sure.  He could have, but I don't remember it

12  under the circumstances.  I'm pretty stressed out.  I just got

13  my door kicked in and it was like forty below, I was naked,

14  with M-16's in my face.  I -- I was -- I had a lot of things on

15  my mind.

16  Q       "But isn't it true that as you sit here -- sit there under

17  oath, your position is that the trooper cut you a deal with

18  certain terms.  That's your testimony.

19  A       "Yes.  Yes.

20  Q       "Are you wavering from that today?

21  A       "What do you mean by that?

22  Q       "Are you backing away from that statement today?

23  A       "No, I'm not.

24  Q       "I mean, here's your chance to do it if that's what you

25  want to do.

2-76

1    A    "That's not what I'm doing.

2    Q    "Now Mr. Salsbury says that you weighed the cocaine on a

3    scale at your house.  Is that a true statement?

4    A    "Yes.

5    Q    "And that you weighed it on a black scale in the kitchen.

6    Is that a true statement, sir?

7    A    "That's false."

8         THE COURT:  Now you're getting quiet again.

9    A    "That's false.

10   BY MR. COHEN AS MR. BUTLER:

11   Q    "Why is it false?

12   A    "Because I don't think I had a black scale.

13   Q    "Can you tell us why Salsbury would make it up, that you

14   had -- that you weighed it out on a black scale in the kitchen?

15   A    "I don't know.  I don't know why he would.  Obviously,

16   he's a hater (ph).

17   Q    "Could that -- could it be that the black scale and

18   whatever else you cleaned your house up of just wasn't there

19   when the authorities arrived because you had cleaned it out of

20   the house?

21   A    "The authorities found my scale when they got to my house.

22   That was the only thing they found, I believe.

23   Q    "Well, they found a scale, but that was a scale that you

24   probably forgot, right, when they -- when you were cleaning up?

25   A    "No, that was a scale I put in my coat.  I had -- I was

1  going to -- I was going to put it up and they took my coat --

2  every -- and they took my coat and everything that was in my

3  coat.

4  Q    "Oh, that -- the scale that was in your coat, you were

5  going to save that?

6  A    "I was about to put it outside, yeah.

7  Q    "I see.  But so the -- so when he says a black scale, you

8  don't recall a black scale.

9  A    "No, sir.

10        MR. COHEN AS MR. BUTLER:  "With the Court's

11  permission, Judge, I'd like to show the witness Plaintiff's

12  Exhibits 8 and 9 when we get them.

13        THE COURT:  "Very well.

14  BY MR. COHEN AS MR. BUTLER:

15  Q    "Now if you -- now if you -- any scale that you had at

16  your house would have -- probably had cocaine residue on it,

17  wouldn't it?  I mean, that's what you use it for.  You used it

18  to weigh out cocaine, right?

19  A    "Yes.

20        MR. COHEN AS MR. BUTLER:  "Okay.  Judge, may I show

21  the jury?

22        THE COURT:  "Yes.  The same way you did yesterday.

23        MR. COHEN AS MR. BUTLER:  "Yes, sir.

24        THE COURT:  "Okay."

25        MR. COHEN:  Your Honor, do you mind if I also show

1    them Exhibit 1?

2              THE COURT:  No.  Oh, Exhibit 1.

3              MR. COHEN:  (Indiscernible - away from microphone).

4    Mr. Butler didn't show it to them.

5              THE COURT:  Mr. Barkeley, what's you view on that?

6              MR. BARKELEY:  No objection, Your Honor.  They're

7    already it in the opening also, I believe.

8              THE COURT:  Right.

9                        (Pause)

10   BY MR. COHEN AS MR. BUTLER:

11   Q    "Sir, did you see a black scale" -- or I'm sorry.  "Sir,

12   do you see a black scale in these -- in those photographs?

13   A    "Yeah.

14   Q    "That black scale" -- I'm sorry -- "That scale looks

15   familiar, doesn't it?

16   A    "Not at all.  The money counter does though because the

17   money counter is right there.  I believe -- I believe that's

18   Jason's.  I remember him showing me that -- the money counter

19   right there.

20   Q    "Yes.

21   A    "Yeah, that -- I've never seen that scale.  That wasn't in

22   my house.

23   Q    "And in fact, sir, you realize that this conversation by

24   Salsbury with authorities regarding a black scale took place on

25   November 8th.  Are you aware of that?

1          MR. BARKELEY AS MR. SCHRODER:  "Your Honor, I'm going

2   to object to the kind of idea in the -- just reading in the

3   report and asking him questions about the report.  The report

4   is hearsay.

5          MR. COHEN AS MR. BUTLER:  "Well, actually I didn't

6   read the report, but I -- when I was asking this witness

7   questions, because he knows Salsbury and he can get -- maybe

8   just shed some light on whether Salsbury would have been

9   telling us the truth about the black scale and Wolfman, Bang,

10  and other people.

11         THE COURT:  "Well, I don't know where you're going

12  and you can't read the report in, but this question's okay for

13  now.  Ask the question.  You can answer the question.

14  BY MR. COHEN AS MR. BUTLER:

15  Q    "Sir, you realize -- well, you realize that this

16  conversation with -- by Salsbury was back on November 8th, long

17  before police went anywhere near Mr. Colette's house.  You

18  understand that, don't you?

19  A    "Yeah.  They went to Colette's house the same way they

20  went into my house.

21  Q    "Which was what day, sir?

22  A    "November 28th.

23         MR. COHEN AS MR. BUTLER:  "Okay.

24         THE COURT:  "Yes.  Uh-huh (affirmative).

25  BY MR. COHEN AS MR. BUTLER:

1   Q      "Now they -- now the police found some Inositol in your

2   house, is that right?

3   A      "Some what?

4   Q      "Inositol.  Is that what you call it?

5   A      "Say it again?

6   Q      "Inositol.

7   A      "Inositol.

8   Q      "Is that what you call it?

9   A      "I believe that's how you pronounce it.

10  Q      "Okay.  And what do you do with that?

11  A      "It's a weightlifting supplement.

12  Q      "That's all it is, sir?

13  A      "Some people use it to cut their cocaine, I believe.

14  Q      "Okay.  Now did you have weights in your house?

15  A      "Dumbbells.

16  Q      "Okay.  So you're a weightlifter or you're a drug dealer

17  who cuts cocaine with Inositol?

18  A      "I work out.

19  Q      "But you were cutting your cocaine with the Inositol,

20  weren't you?

21  A      "I didn't get a chance to, I don't think.

22  Q      "Sir, you've been selling drugs off and on since you were

23  a teenager.  You buy cocaine, you cut it with Inositol, don't

24  you?

25  A      "Sometimes, I guess.

<u>Johnson - Cross (Reading)</u>                    2-81

1    Q    "Well, you said I guess.

2    A    "Sometimes I didn't have Inositol, just other times.

3    Q    "But when you --

4    A    "It could have been a lot of things.

5    Q    "-- when you have it, sir, you cut cocaine with it, do you

6    not?

7    A    "No, sir.

8    Q    "All right.  So you had two bottles of it in your house,

9    right?

10   A    "I'm not sure.

11   Q    "Okay.  But you do know you had it in your house, isn't

12   that right, sir?

13   A    "Maybe.  Maybe a bottle.

14   Q    "All right.  And tell the jury what you do with Inositol

15   and cocaine.

16   A    "I'm not understanding your question.

17   Q    "Tell -- explain to the jury what you do with Inositol and

18   cocaine.

19   A    "Inositol is basically what we use to cut cocaine to make

20   more cocaine.  That's pretty much it.

21   Q    "So how do you make more cocaine out of Inositol, sir?

22   A    "Just mix.

23   Q    "Mix it up?

24   A    "Yeah.

25   Q    "So other words, if a person -- if you -- you could -- so

1  you could take one ounce of cocaine and make two ounces, right,

2  with --

3  A     "It's possible.

4  Q     "-- with the Inositol.  Isn't that what happens?

5  A     "I don't know the percentage, but pretty much, yeah.

6  Q     "All right.  And that's what you've done in the past,

7  right, sir?

8  A     "Yes, sir.

9  Q     "And so that means in order to take cocaine and cut it

10 with Inositol, you would want it to get -- you would want to

11 get a high-strength cocaine, cut it up, put your Inositol in

12 it, right?  You don't want it -- you don't want to -- don't

13 want to buy it cut, you want to buy it and then cut it with

14 Inositol.  Isn't that the term that they use, cut it with

15 Inositol?

16 A     "I believe so.

17 Q     "All right.  So you want to buy, cut it with Inositol, and

18 -- and increase the volume of the cocaine, right, sir?

19 A     "Yes.

20 Q     "Okay.  Now, sir, you physically lived at 1008 23rd Avenue

21 in Fairbanks, right?

22 A     "I do not.  I used to.

23 Q     "At the time that you were raided, you were living at 1008

24 23rd Avenue in Fairbanks, right?

25 A     "Yes.

1    Q     "However, your home listed for, I guess, driver's license
2    purposes and what have you was at 1315 23rd Avenue, right?
3    A     "Right.
4    Q     "So those places are not too far apart from each other,
5    are they?
6    A     "No.
7    Q     "And in fact, on occasion, when you had to, when you were
8    going to sell cocaine, you'd go over to 1315 23rd Avenue in the
9    backyard somewhere, wouldn't you?
10   A     "No, sir.  That's my parents' house.  I didn't do anything
11   in my parents' house.  Never have.
12   Q     "Your parents -- well, your parents live there, sir, but
13   isn't it true that you would keep stuff there in the backyard
14   somewhere, wouldn't you?
15   A     "No, sir.  Toys, my kid's sled, my stationwagon.  Other
16   than that, no.
17   Q     "Now even though you were living at 1008 23rd Avenue, if
18   law enforcement authorities indicate that your address --
19   you're listed in the state --
20   A     "When they raided my house, they came in at both loca --
21   both locations.  They found nothing in both locations.  They
22   kicked my parents' door in and my door at the same time.
23   Q     "Sir, the State of Alaska says for their state records,
24   you're listed as living at 1315 23rd Avenue.  That's correct,
25   isn't it?

1   A    "What?  Say that again, sir?

2   Q    "For APSIN purposes, the -- for State of Alaska records,

3   you are listed as living at 1315 23rd Avenue.

4   A    "Yeah, that's my mailing address.

5   Q    "But phys -- okay.  But physically, you're at the other

6   address, right?

7   A    "At the time when this happened, yes, I was.

8   Q    "And again, if Salsbury said that if you needed cocaine,

9   you would go over to 1315 and get it and bring it over to 1008,

10  your position is that that's not true.

11  A    "That's not true.

12  Q    "So once again, someone is telling an untruth about you,

13  right?

14  A    "I never went to 1315 to buy -- get any dope.  Never.

15  Q    "Now the safe that you told authorities that Mr. Colette

16  had, you didn't describe it as a gun safe, did you?

17  A    "I just seen a big safe.  No, I didn't describe it as a

18  gun safe.

19  Q    "So even though you supposedly saw inside the safe, you

20  never told the authorities it was a gun safe, right?

21  A    "I didn't know what kind of safe it was.

22  Q    "And you still don't, right?

23  A    "Now I do.  You said it was a gun safe.

24  Q    "You're going what, from what I said?

25  A    "You said it was a gun safe, yes.

1    Q    "Okay.  So then would it be true to say that the testimony
2    you give in this courtroom might be based on what other people
3    say to you and not your personal knowledge.
4    A    "That's not true.
5    Q    "You testified yesterday that Mr. Colette would -- that
6    you -- he would work on your cars, right?
7    A    "Yes.
8    Q    "One of those cars was a mid-eighties blue Malibu
9    stationwagon, right?
10   A    "Yeah.
11   Q    "One was a 1994 gray convertible Mustang.
12   A    "A '98.
13   Q    "Oh, '98, okay.  One was a maroon Monte Carlo, mid-
14   eighties?
15   A    "Yes.
16   Q    "A white -- is it white or silver Supersport Monte Carlo?
17   A    "Silver.
18   Q    "A blue Chevy Caprice, 1965?
19   A    "1970.
20   Q    "1970.
21   A    "He never worked on that car.
22   Q    "Okay.  Just the stationwagon -- the stationwagon, which
23   is the blue Malibu wagon.  I had a '93 Chevy truck -- truck he
24   put a deck in, maybe one more car."  I'm sorry.  "Okay."  This
25   is your line -- line 11.

1   A    "Just the stationwagon -- the stationwagon, which is the

2   blue Malibu wagon.  I had a '93 Chevy truck he put a deck in,

3   maybe one more car.  He didn't put decks in -- work on all of

4   my cars.  Maybe a handful of them -- like a couple of them.

5   Q    "A black Trans Am, 1997?

6   A    "No, I never had a black Trans Am.

7   Q    "A Chevy Impala, 1965?

8   A    "I had a '66.

9   Q    "Oh, '66.  Now some of these cars are kind of vintage,

10  they're kind of expensive cars, wouldn't you say?

11  A    "They were junkers.  I was trying to fix them up, if I

12  could resell them.

13  Q    "In fact, the 1966 Chevy Impala had hydraulics on it,

14  right?

15  A    "Yeah.

16  Q    "So that's not a junker, right?

17  A    "It kind of was.

18  Q    "But now for your purposes, when you were doing your drug

19  business, you drove a 1979 brown Chevy van, right?

20  A    "Orange.  Yeah, orangish-brown, I guess.

21  Q    "Now who is Mike Brown?

22  A    "I don't know him to know him.

23  Q    "But --

24  A    "I know he is -- who he is, but I don't know him, know

25  him.

1  Q    "But isn't it true -- true -- excuse me -- true that Mike

2  Brown has fronted you dope in the past?

3  A    "No, it's not true.

4  Q    "Didn't you -- did you front him the dope?

5  A    "No.

6  Q    "You know Mike Brown to be a drug dealer though, don't

7  you?

8  A    "No, I don't.

9  Q    "Then how is it that you know Mike Brown?

10  A    "He's from here.  His family's from the south side.  When

11  I was kids -- when I was kids, they were kids.

12  Q    "What kind of deals have you had, sir -- tell the jury --

13  with Mike Brown?

14  A    "I just seen him around.  I say what's up.  He has about

15  three or four brothers and sisters that we all grew up with.

16  They're from the neighborhood, so we --

17  Q    "Well, so he's one of those people that you don't really

18  want to name as a drug dealer, is that a fair statement, sir?

19  A    "I didn't say that.

20  Q    "But that's what's really going on here, isn't it?

21  A    "That's what you're saying.

22  Q    "How about Darren Edwin (ph)?

23  A    "Darren Edwin?

24  Q    "Yes, sir.

25  A    "I know Darren Edwin.

1  Q    "Uh-huh (affirmative).  In fact, you fronted him some dope

2  in the past, haven't you -- haven't you, sir?

3  A    "Yeah.

4  Q    "Okay.  In fact, on one occasion, you fronted him ten

5  ounces, didn't you?

6  A    "No.

7  Q    "How many ounces did you front him that he sold and never

8  gave you the money for?

9  A    "I've never fronted him any ounces.

10  Q    "Oh, what did you front him then?

11  A    "If he -- if he was sick and was hurting, I would hook him

12  up.

13  Q    "Sir, how much did you front him?

14  A    "Like a half a gram at a time.  Gram.

15  Q    "But isn't it true, sir, that on one occasion, you fronted

16  him some dope, he sold it, didn't pay the money, and you went

17  after him?

18  A    "No, that's not correct.

19  Q    "Tell the jury what it means by fronting, will you?

20  A    "Fronting means credit.  Credit is you don't pay until you

21  get the money, I guess.

22  Q    "Okay.  You don't pay until you get the money, and Mr.

23  Edwin made the mistake of not paying you on one occasion,

24  didn't he, or more than -- or more than one occasion?  Mr.

25  Johnson?

1   A      "Excuse me?

2   Q      "Mr. Edwin made a mistake of not paying you on at least

3   one occasion, didn't he?  You don't want to answer that

4   question?

5   A      "I'm sitting here thinking about the answer to the

6   question.  I guess you could say that, yeah.

7   Q      "And you remember being angry with him about it?

8   A      "A little bit.

9   Q      "And you remember threatening him about it?

10  A      "No, no, no I don't.

11  Q      "What did you say to him when you were angry with him

12  then?

13  A      "I wasn't that angry.  Darren is like a relative to me,

14  so --

15  Q      "Like a cousin or something?

16  A      "A distant cousin, yeah.

17  Q      "All right.  But you were angry with him and when you were

18  angry with him, you had words with him about not paying you

19  like he's supposed to.  Do you remember?

20  A      "It wasn't that serious.  He was living --

21  Q      "He wasn't" -- I'm sorry.

22  A      "It wasn't that serious.  He was living with me.  He --

23  Q      "Was he living downstairs below you?

24  A      "Yes.

25  Q      "All right.  So he's not living with you, he's living

1  below you, wasn't he, sir?

2  A    "Well, the whole house -- we stayed in the whole house.

3  Downstairs was my den.

4  Q    "Anyway, after the -- after you confronted him -- that's a

5  fair statement, right, confronted him about what he owed you?

6  A    "No.

7  Q    "Well, after whatever conversation you had with him, he

8  grabbed his family and moved out pretty quickly, didn't he?

9  A    "No.  His buddy's in jail, I think, but -- or he got in

10  trouble and went to jail.

11  Q    "Okay.

12  A    "He's from here and from the area.

13  Q    "Now we talked a little bit about the -- what you

14  described as an Uzi.  Do you remember seeing that Uzi at Mr.

15  Colette's shop?  Remember, he was showing his customers?  In

16  fact, it was to you that he said look at my new toy, remember

17  that?

18  A    "Right, but that wasn't at his shop.

19  Q    "Okay.  But that's what he said.  He said look at my new

20  toy, right?

21  A    "He wasn't at his shop when that happened.  We were at his

22  house, yes.

23  Q    "But you'd seen him at the shop, too, hadn't you?

24  A    "I don't recall seeing it at his shop.

25  Q    "Remember him boasting about how it took one year to get

1  because of all the processing that the feds do over those kinds

2  of weapons?

3  A      "I believe so.  Something like that.

4  Q      "And you remember him being very happy and proud of this

5  particular toy?

6  A      "Yes, sir.

7  Q      "Uh-huh (affirmative).  We talked a little bit yesterday

8  about Monty.  What's Monty's full name, sir?

9  A      "I'm not sure.  I know him by Monty -- Lamont.

10  Q      "Lamont?

11  A      "Yeah.

12  Q      "Is that his middle name or --

13  A      "I'm not sure.

14  Q      "-- his full -- and where does he live?

15  A      "I'm not sure.

16  Q      "What type of work does he do?

17  A      "I think he's a diesel mechanic.

18  Q      "How long have you known him?

19  A      "Off and on for a few years now, I guess, like --

20  Q      "Where is he now?

21  A      "I'm not sure.  I haven't talked to him since like

22  November 29th -- 28th, 29th.

23  Q      "Now when you were thinking about robbing Mr. Colette, you

24  were going to use one of those guns that you had in your house,

25  weren't you?

1  A    "If I -- I was to rob him, I -- I -- yeah, I would have a

2  gun on me probably, yeah.

3  Q    "And to think like that, you know, I mean, that's -- you

4  have no problem robbing someone, right?

5  A    "If I'm broke and he has dope -- if I'm broke and he, a

6  dope dealer, has a lot of dope, I need dope to come up, feed my

7  family or do whatever I need to do.

8  Q    "A robbery is on, isn't it?

9  A    "Yeah, they're doing dirt anyway.  I might as well get

10  them before the police do.

11  Q    "But robbery is -- uh, that's violence.  That takes it up

12  a level, doesn't it, sir?

13  A    "I guess you could say that.

14  Q    "And if you felt you needed the money, you wouldn't stop

15  at just a dope dealer, would you?

16  A    "That would probably be my first pick, so --

17  Q    "Uh-huh (affirmative).  And then --

18  A    "They usually don't call the police.

19  Q    "Pardon me?

20  A    "You rob a dope dealer, they don't call the police and say

21  they just got robbed for my dope.

22  Q    "Sounds like you've got some expertise there.

23  A    "It's -- I guess it's that.

24  Q    "Is that a fair statement?

25  A    "That's just -- I can't say that's a fair statement, but

1    that's how I perceived it to be, I guess.

2    Q      "Now the Salsbury who did -- who made the buy from you,

3    you've been in contact with Salsbury, right?

4    A      "No.

5    Q      "You've had some conversation -- when's the last time you

6    talked to Salsbury, sir?

7    A      "I believe November 8th.

8    Q      "And isn't it true that Salsbury told you that the

9    authorities were on to you?

10   A      "No, sir.

11   Q      "When did you find out, sir, that Salsbury's the one who

12   purchased from your -- from you undercover, sir?

13   A      "Maybe January, February.

14   Q      "So long after the raid on your house, isn't that true?

15   A      "Right.

16   Q      "Now you testified yesterday that you -- and if I say this

17   wrong, please feel free to correct me because I'm far from

18   perfect as a human being --

19   A      "Yeah.  We all --

20   Q      "-- you said --

21   A      "-- are.

22   Q      "-- you said something -- didn't you say something

23   yesterday about you would be afraid to sell -- to tell on

24   sources because of your -- you know, it could --

25   A      "I don't remember saying it.

1  Q    "-- because of retaliation.

2  A    "I don't remember saying that.

3  Q    "Are you afraid to tell on sources because of retaliation?

4  A    "Yeah.

5  Q    "And that's kind of your blanket position when it comes to

6  sources, right?

7  A    "What you mean?

8  Q    "Other words, when it comes to a source of cocaine, your

9  position is you're not going to say anything because of

10  retaliation -- potential retaliation.

11  A    "Well, I have a family to look out for.  I have a -- I

12  have little ones at home, so --

13  Q    "So your pos -- so that's your position, right?

14  A    "I guess you could say that.

15  Q    "But now if you're willing to go rob a dope dealer for

16  their dope and you say, well, you're not going to call the

17  police and say I got robbed of dope, you're not thinking about

18  your family then, are you?  Because they could come back after

19  you and hurt your family for robbing them and then say he's not

20  going to call the police.  So when you throw your family up

21  there, that's not really what you're thinking about, is it?

22  A    "What do you mean?  When I --

23  Q    "Well, you're not really concerned about your family if

24  you're willing to go rob a dope dealer, are you?

25  A    "Well, that was the business I was in, so I wasn't

1    thinking -- I don't know.  My family still comes first.  I

2    never involved my family or anybody that was close to me in

3    what I was doing in the streets.

4    Q    "Well, your family lives with you, don't they, sir?

5    A    "Yeah.

6    Q    "And you're selling dope right out of your house, aren't

7    you?

8    A    "On occasion.

9    Q    "Aren't you?

10   A    "On occasion maybe I have, but for the most part --

11   Q    "Maybe you have, sir?

12   A    "On occasion I have, but for the most part I -- I have --

13   I would have -- I -- I would leave.

14   Q    "I mean, you've got your house there with your family,

15   you've got your parents' house practically across the street,

16   right?

17   A    "Down -- down the way a block or two.

18   Q    "Well, now wait a minute.  1308 and 1315, those can't be

19   more than two or three houses away from each other, isn't it?

20   A    "1315 and 1008 is like two blocks away from each other.

21   Q    "Oh, it's a 1008.  I'm sorry.

22   A    "Right.

23   Q    "Okay.  Now Mr. Salsbury knew that you lived at or had

24   family at 1315 as well as 1008, right?

25   A    "I guess so.

1    MR. COHEN AS MR. BUTLER:  "Pass the witness, Judge."

2    THE COURT:  Okay.  Looks like that takes care of it.

3  Sir, you're excused for a little while.  You might be required

4  to come back after lunch, okay?

5    THE WITNESS:  You guys going to call me?

6    THE COURT:  Someone will call you.

7    THE COURT:  All right.  Government's next witness?

8  How's the jury holding up?  Okay?

9    MR. BARKELEY:  The Government calls for a reading of

10  the trial testimony of Special Agent Eric Cohoon, Your Honor.

11    THE COURT:  'Kay.

12    MR. COE:  Your Honor, this is Mr. Coe.  Is the -- is

13  Mr. Johnson being excused --

14    THE COURT:  Yeah, he's left --

15    MR. COE:  -- for right now?

16    THE COURT:  -- he's left the building.  He's left the

17  building.

18    MR. COE:  I can't hear you, I'm sorry.

19    THE COURT:  Yes, he's left the building.

20    MR. COE:  Okay.

21    THE COURT:  All right.  Thank you.

22    MR. COE:  And you'll call me this afternoon --

23    THE COURT:  Yes.

24    MR. COE:  -- if necessary?

25    THE COURT:  Yes, yes, right.  For the jury's benefit,

1   this gentleman was his -- his -- his attorney, the gentleman

2   was listening in.  Okay.  Are you ready for a break or can you

3   keep going for awhile?  Okay.  If anyone's uncomfortable, just

4   let me know.  We can -- we're not here to make you miserable.

5   Okay.

6             MR. BARKELEY:  Counsel, did I give you copies of

7   Cohoon -- okay.

8             MR. COHEN:  (Indiscernible - away from microphone)

9       **ERIC COHOON, GOVERNMENT'S WITNESS, SWORN TO READ TESTIMONY**

10            THE CLERK:  Thank you.  You may be seated.  And sir,

11  for the record, could you please state your full name, spelling

12  your last?

13            THE WITNESS:  My name is Eric Cohoon, C-O-H-O-O-N.

14            THE CLERK:  And your city and state of residence.

15            THE WITNESS:  North Pole, Alaska.

16            THE CLERK:  Thank you.

17            THE COURT:  Okay.  So we'll begin.

18            MR. BARKELEY:  Thank you, Your Honor.

19            **DIRECT EXAMINATION READ FROM PREVIOUS TESTIMONY**

20  BY MR. BARKELEY AS MR. SCHRODER:

21  Q    "Special Agent Cohoon, who do you work for?

22  A    "I'm a Special Agent with the Bureau of -- with the

23  federal Bureau of Alcohol, Tobacco, Firearms, and Explosives.

24  Q    "And how long have you been assigned or how long have you

25  been an ATF agent?

1  A     "I've been an ATF agent for about six years.

2  Q     "And where have you been assigned as an ATF agent?

3  A     "My first five years, I was assigned to the Biloxi,

4  Mississippi, field office, and for about a year I've been here

5  in Fairbanks.

6  Q     "And do you have previous law enforcement experience?

7  A     "Yes, sir.  In 1987, I joined the Air Force and was a

8  military policeman for about four years.  Then I worked as a

9  narcotics investigator with the Air Force Office of Special

10 Investigations.  I worked for the Federal Bureau of Prisons for

11 six years.  During that time, I was a Senior Correctional

12 Officer and a Special Investigative Support Technician.  Then I

13 was hired with ATF.  I'm also currently in the Air Force

14 Reserve as a Special Agent with the Office of Special

15 Investigations.

16 Q     "So how many total years of law enforcement experience do

17 you have?

18 A     "About nineteen.

19 Q     "Okay.  As an ATF agent, is your work primarily related to

20 weapons investigation?

21 A     "Yes, sir.

22 Q     "Okay.  Now is there a crossover there to narcotics

23 investigations?

24 A     "Yes, sir.  Many times a firearm investigation will lead

25 to narcotics or narcotics investigation will lead to firearms.

1    Q    "Now where -- about your previous law enforcement

2    experience, I think you mentioned where there are drug

3    investigations, is that part of your work in those assignments

4    as well?

5    A    "Yes.

6    Q    "When I was with" -- I'm sorry.  That's your line.  Ten.

7    A    Okay.  "When I was with the Air Force, I had four years as

8    a -- a -- strictly as a narcotics investigations officer,

9    and --

10   Q    "And have you received training as a law enforcement

11   officer?

12   A    "Yes, sir.  I -- I attended the military police academy to

13   be a military police officer in the Air Force.  I attended the

14   special agents academy and the advanced special agent academy

15   for the Office of Special Investigations, and I've also

16   attended the ATF academy.

17   Q    "Do you know the defendant, Jason Colette?

18   A    "Yes, I do.

19   Q    "And were you involved in serve -- serving a search

20   warrant on the defendant's residence?

21   A    "Yes, I was.

22   Q    "When was that?

23   A    "On November 28th of '05.

24   Q    "And what was your role in executing the search warrant?

25   A    "The actual execution and securing of the residence was

1    done by the Fairbanks Tactical Team.  I went in and assisted

2    with the search once the residence had been secured.

3    Q     "Okay.  And did you find evidence that was consistent with

4    what you sought in the search warrant?

5    A     "Yes, we did, eventually, after we had had the safe opened

6    that was locked inside the bedroom.

7    Q     "And in what part of the residence was that?

8    A     "In the bedroom.

9    Q     "Okay.  And you talked about the safe.  Was the safe

10   locked?

11   A     "Yes, sir.  It was.

12   Q     "And how was it opened?

13   A     "A locksmith was called in from Fairbanks here to -- to

14   drill open the safe -- drill -- drill it open.

15   Q     "When you opened the safe, what did you find?

16   A     "Inside the safe was fourteen firearms which were made up

17   on eight shotguns, four rifles, a handgun, and a machine gun.

18   Q     "Did you see anything else in the safe besides the guns?

19   A     "Yes, there was a -- a quantity of pre-packaged cocaine in

20   small egg-type (ph) plastic wrap in a Safeway or Walma --

21   Walmart type grocery bag.  There was a Tupperware container

22   with an amount of cash and some more cocaine in there.  There

23   was also a -- a small bag of marijuana, ammunition, and Mr.

24   Colette's ATF form sevens which is his registration for the

25   machine gun and silencer.  A silencer was also found --

1   Q     "Okay.  That was --

2   A     "-- affixed to the machine gun.

3   Q     "I was going to ask you that.  So it was affixed to the

4   machine gun at the time you found it?

5   A     "Yes, sir.  It was.

6   Q     "Where was that located in the safe?

7   A     "It was located in the top portion of the safe on the --

8   top portion of the -- of the safe.

9   Q     "Was the gun loaded when you found it?

10  A     "No, sir.  It was not.

11  Q     "Did it have a magazine?

12  A     "Yes, it did.

13  Q     "And where was the magazine?

14  A     "That type pistol, the magazine feeds up through the

15  pistol grip, so it was inserted into the lower part of the gun.

16  Q     "Did you find any ammunition --

17  A     "Yes.

18  Q     "-- for that weapon?

19  A     "No, not for the machine gun.  There was no ammunition for

20  the -- in the safe for that.

21  Q     "But when you saw the machine gun, could you tell whether

22  it was loaded or not?

23  A     "No, sir.  You can't tell if a gun -- I mean, some guns

24  you probably can, but that particular model, you can't tell if

25  it is loaded or not just by looking at it.  And as -- as a

1  matter of safety, you treat them all as if they were loaded

2  anyway.  But that gun in fact did not have any ammunition in

3  the magazine.

4  Q      "Were there other weapons in the safe though -- other

5  firearms that had -- that were loaded or had readily accessible

6  ammunition?

7  A      "Yes, sir.  There were a total of three -- three firearms

8  that were -- two were actually physically loaded.  One of the

9  weapons had a magazine with ammunition within two inches of the

10 -- the rifle.

11 Q      "Okay.  And so what were those weapons?

12 A      "One was a Mossberg Model 500A 12-gauge shotgun.  It's a

13 pump action, and it was loaded with four rounds of buckshot.

14 Q      "And was that a normally configured shotgun?

15 A      "The Mossbergs come in several different varieties.  This

16 one was -- had a pistol grip attached to the rear where the

17 shoulder shock -- stock would be.  Completely legal, but it

18 does make it a smaller weapon, not designed to be fired at that

19 point from the hand rather than the shoulder.  The gun was

20 loaded with a -- a round in the chamber and three -- three, I

21 believe, in the magazine, total of four rounds.

22 Q      "So -- and what was the next weapon that you found that

23 was loaded?

24 A      "There was a Remington Model 740, .30-06 rifle, which was

25 also loaded with five rounds of the ammunition in the magazine