1    and one in the chamber.

2    Q    "Okay.  And you said there was one other?

3    A    "Yes.  There was a Colt Sporter, which is a variation of

4    the M-16, which is a military weapon -- that is, a

5    semiautomatic rifle -- completely legal for personal use in

6    config -- in configuration, very similar to the M-16, but this

7    rifle was a -- a kind of SKS.  It shot an SKS round.  It is a

8    762 by thirty-nine caliber.  It really -- that's really the

9    only difference between it and a semiautomatic, what they call

10   an AR-15, which shoots a .223 caliber, which is just a

11   different caliber.  And there was a magazine loaded for it with

12   five rounds of ammunition laying right beside it; the magazine

13   right beside the rifle.

14   Q    "These firearms that you mentioned, where were they

15   located in the safe in relation to the other firearms?

16   A    "As you opened the door of the safe, there was a -- a pump

17   action 410 rifle laying up kind of vertical across the front.

18   Those loaded guns were in front of the other stack of fourteen

19   guns of the -- not including the pistol on -- up top.  So they

20   were in the front of the -- they were in the front of the safe.

21   Q    "Okay.  And one question I forgot to ask you about the

22   Colt.  You said that the magazine was out of it.

23   A    "Yes.

24   Q    "What does it take to load that weapon and make it ready

25   to fire?

1  A      "It -- it would just -- it would take seconds to insert

2  the magazine and chamber a round.

3  Q      "Okay.  Let's talk a moment about the -- and again, about

4  the machine gun and silencer first.  What did you do with those

5  at the scene?

6  A      "All the weapons were moved from the -- from the safe and

7  seized by myself.

8  Q      "Okay.  And where did you take them when you left the

9  scene?

10  A      "They were taken to my officer here in the federal

11  building.

12  Q      "Okay.  And where are they stored there?

13  A      "They're -- they're stored in -- I have a facility for

14  storage of evidence firearms.

15  Q      "Does anybody else have access to that area?

16  A      "Just myself for the access for the actual guns.

17  Q      "Okay.  And for the machine gun, has it been there the

18  entire time?

19  A      "No, sir.  The machine gun was sent to our firearms

20  technology brans in west -- branch in West Virginia on July the

21  14th.  I received it back on the 25th.  It was sent there for

22  testing.  The machine gun and silencer were analyzed by a

23  firearms examiner for a -- a definite clarification on what

24  they were.

25  Q      "And are those tagged and labeled in some way to track

1  them?

2  A    "Yes, sir.  I tagged them with our ATF case number, I sign

3  it and describe -- and the description of the firearm, the

4  serial number, quantity of ammunition.  Each thing is marked

5  separately and tagged and signed by me.

6  Q    "And when you received the machine gun and silencer back

7  from the ATF lab, were you able to identify it as the one that

8  you'd shipped out?

9  A    "Yes.  Yes, it was.  The lab technician signed for it

10  there and I signed for it back when I -- when it got it -- when

11  I got it -- received it here.

12  Q    "And where did you put the machine gun and silencer when

13  they were returned to you?

14  A    "They were placed back into my evidence vault.

15  Q    "Okay.  Now I'm about to hand you some firearms to

16  identify, but before -- just so everybody understands, have

17  those firearms been rendered safe?

18  A    "I've been -- I've -- I've rendered them safe.  They've

19  been inspected by the Marshal Service, so they are in fact no

20  ammunition with them, but they will be handled in the most safe

21  manner."

22         MR. BARKELEY:  All right.  Pardon me from breaking

23  from the transcript, Your Honor.  That was then.  Is the answer

24  to the question they've been rendered safe true today?

25         THE WITNESS:  Yes.  Yes, it is.

1        MR. BARKELEY:  All right.  With your permission, may

2    I approach the witness, Your Honor --

3        THE COURT:  Yes.

4        MR. BARKELEY:  -- with those exhibits?  Thank you.

5                    (Pause)

6    BY MR. BARKELEY AS MR. SCHRODER:

7    Q    "Now I've handed you what has been marked Government

8    Exhibit 20.  Actually, there are two, 20 and 21."

9        MR. BARKELEY:  Would you take a moment just to make

10   sure I haven't made a mistake, sir, and that I actually gave

11   you 20 and 21?

12       THE WITNESS:  Yes.

13       MR. BARKELEY:  Okay.  And the other -- the other

14   weapon, what is that?  Is that 21, please?

15       THE WITNESS:  This is 20 and 21.

16       MR. BARKELEY:  Oh, I see.  The silencer.  All right.

17       THE WITNESS:  That's 24.

18       MR. BARKELEY:  24.  All right.  Thank you.  Back to

19   the transcript now.

20   BY MR. BARKELEY AS MR. SCHRODER:

21   Q    "Now I've handed you what has been marked as Government

22   Exhibit 20.  Actually, there are two, 20 and 21.  Can you

23   identify that exhibit?

24   A    "Yes, sir.  Exhibit 20 is a Military Armament Corporation,

25   a MAC-10 submachine gun, seized from Mr. Colette's residence.

1   Q    "Okay.  And how are you able to identify those?

2   A    "Identify it by my case number, my signature, and the

3   serial number corresponding to the evidence tag and the weapon

4   itself.

5        (Government's Exhibit 20 previously admitted)

6   Q    "And can you identify 21 as well?

7   A    "Twenty-one is a Bowers silencer also seized from Mr.

8   Colette's residence.  I can recognize it by serial number and

9   my signature affixed to the evidence tag.

10       (Government's Exhibit 21 previously admitted)

11  Q    "And have those evident" -- I'm sorry.  "Have those items

12  been in the care, custody and control of the Bureau of Alcohol,

13  Tobacco and Firearms and Explosives since they were seized by

14  you on November 28th?

15  A    "No, they have not.  They were signed out to the lab for

16  analysis and received there on 7/18.

17  Q    "But the --

18  A    "Yes.

19  Q    "-- the lab is part of ATF?

20  A    "Yes, yes.  And it is currently in, you know, the U.S.

21  Attorney's -- I signed it over to you guys for presentation

22  today.

23  Q    "Now what is the -- just to give the information to the

24  jury, what is the model of that weapon?

25  A    "It's an Ingram Model M-10, referred to as a MAC-10.  It

1    is made by the Military Armament Corporation.  It's called an

2    Ingram.  It's developed, I guess around 1970 by the owner,

3    Gordon Ingram.  That's the -- he's the owner of the MAC

4    Corporation, and this is referred to as a MAC-10, nine-

5    millimeter submachine gun.  A submachine gun meaning it fires a

6    pistol cartridge rather than a rifle carcass -- cartridge, what

7    is still a -- what is still a machine gun.

8    Q    "What makes a machine gun a machine gun?

9    A    "A machine gun is any weapon designed to discharge --

10   first a machine gun has to be a firearm, meaning that it expels

11   a projectile for an explosion, whereas a BB gun or something

12   like that uses compressed air -- uses an explosion to force a

13   projectile out of the chamber.  A machine gun is any firearm

14   that is -- that will discharge more than one bullet with a

15   single depression of a trigger.

16   Q    "And what's the serial number on that particular weapon?

17   A    "Serial number on this weapon is A6041381.

18   Q    "Okay.  Now let's talk about the silencer.  What is the

19   model of that?

20   A    "This is a Bowers CAC-9, serial number S927.  A silencer

21   is a device that either is part of a gun or can be affixed to

22   the gun.  This one can be removed from the weapon like that.

23   This weapon can be fired like this.  This threaded portion of

24   the barrel -- this model comes like that so it can be either --

25   have a suppressor or a barrel shroud or a barrel extension.

1  This Bowers suppressor is a device, and by definition a

2  silencer or a muffler.  Sometimes they're called that.

3  Anything that reduces the report of a firearm when a bullet is

4  discharged from the gun -- like I said, the explosion forces

5  the projectile down the barrel.  That rapidly expanding gas

6  basically creates a ba -- the bang that you hear.  This device

7  here will slow down the expansion of those gases, therefore,

8  reducing the report, making it quieter.

9  Q    "And could you give us the serial number from the --

10 A    "Yes, yes, I did.

11 Q    "-- silencer?

12 A    "I'll give it to you again.  S927.

13        MR. BARKELEY AS MR. SCHRODER:  "Your Honor, if I may

14 approach"

15        THE COURT:  "Yes.  All right.

16                    (Pause)

17 BY MR. BARKELEY AS MR. SCHRODER:

18 Q    "Special Agent Cohoon, so what did you do with the rifle

19 that you seized at the --

20 A    "The rifle was returned back to my office and --

21 Q    "And where did you place the rifle?

22 A    "Placed in the evidence vault for firearms.

23 Q    "And has that been in your evidence vault the entire time?

24 A    "Yes, sir.  It's been there the whole time.

25 Q    "I'm going to ask you to take a look at Government Exhibit

Cohoon - Direct (Reading)                    2-110

1   Number 21 -- oh, I'm sorry.  This will be --

2          THE COURT:  "Twenty-two.

3          MR. COHEN AS MR. BUTLER:  "Twenty-two.

4   BY MR. BARKELEY AS MR. SCHRODER:

5   Q    "This will be twenty-two.  Do you recognize this exhibit?

6   A    "Yes, sir.

7   Q    "And how do you recognize it?

8   A    "This is the Remington rifle that I found inside Mr.

9   Colette's safe.  One of -- one of the -- one of the loaded

10  weapons that was inside.  It's a .30-06 rifle.

11         (Government's Exhibit 22 previously admitted)

12  Q    "Okay.  And has it been in the care, custody -- you care,

13  custody and control since you seized it from the --

14  A    "Yes, it has until --

15  Q    "-- residence?

16  A    "-- trial started.

17  Q    "Special Agent Cohoon, what is the model of that rifle?

18  A    "This is a Remington Model 740, .30-06 rifle.  A typical

19  hunting rifle.

20  Q    "And what is --

21  A    "Magazine fit.

22  Q    "Oh, excuse me.  I didn't mean to interrupt you.

23  A    "It's a magazine fit, gas-operated semiautomatic rifle.

24  Q    "Okay.  And what is the -- what's the serial number?

25  A    "Serial number on this weapon is 82345.

1    MR. BARKELEY AS MR. SCHRODER:  "Okay.  May I

2  approach, Your Honor?

3       THE COURT:  "Yes.

4              (Pause)

5  BY MR. BARKELEY AS MR. SCHRODER:

6  Q    "And the shotgun -- what did you do with the shotgun you

7  seized?

8  A    "The shotgun was returned back to the office here and

9  placed into evidence also.

10 Q   "And has it been there the entire --

11 A   "Yes, it has, until --

12 Q   "Until today?

13 A   "-- the trial started.  Yes, sir.

14 Q   "Okay.  And so -- and has -- so it's been in the care,

15 custody and control of the ATF --

16 A   "Yes, sir.

17      MR. BARKELEY AS MR. SCHRODER:  "-- since it was

18 seized.  I'm going to ask you to take a look at Exhibit Number

19 23.  May I approach, Your Honor?

20      THE COURT:  "Yes."

21              (Pause)

22      MR. BARKELEY:  I'm sorry.  Do you have 23 already up

23 there with you, sir?

24      THE WITNESS:  Yes, sir.

25      MR. BARKELEY:  Thank you.  All right.

1  BY MR. BARKELEY AS MR. SCHRODER:

2  Q    "Are you familiar with that exhibit?

3  A    "Yes, sir.  This is a Mossberg 500A shotgun, pump-action

4  shotgun, which I found loaded inside the safe of Mr. Colette's

5  residence.

6      (Government's Exhibit 23 previously admitted)

7  Q    "And how are you able to identify it?

8  A    "I identify it by the evidence tag with my name and the

9  case number and the serial number.

10 Q    "Okay.  And I believe you already gave the model number of

11 the shotgun.  Could you give us the serial number?

12 A    "Serial number is L986808, a pump-action shotgun with a

13 pistol grip.

14 Q    "And did you say that that particular weapon did have

15 ammunition in it when you found it?

16 A    "Yes, sir.  This was one -- this one was loaded with four

17 rounds of buckshot."

18      MR. BARKELEY:  Okay.  And I believe Exhibit 24 is

19 already there, Your Honor, so I won't ask to approach.  Do you

20 have 24 with you, sir?

21      THE WITNESS:  I'm sorry.  What line are we on?

22      MR. BARKELEY:  I'll go.

23 BY MR. BARKELEY AS MR. SCHRODER:

24 Q    "And what did you do with the Colt Sporter that you

25 described?

1   A    "The Colt Sporter was transported back to the officer here

2   and placed into the evidence facility.

3   Q    "And has it been there since you seized it?

4   A    "Yes, sir.  It has.

5   Q    "Okay.  I'm going to ask you to look at Government Exhibit

6   24.  Do you recognize that exhibit?

7   A    "Yes, sir.  This is -- this is the Colt Sporter rifle

8   which I found inside Mr. Colt's [sic] safe at his residence.

9        (Government's Exhibit 24 previously admitted)

10  Q    "And how do you recognize it?

11  A    "I recognize it by the serial number and the evidence tag

12  with my name on it.

13  Q    "Is there any model number on that as well as the name?

14  A    "Colt Sporter Lightweight.  That's --

15  Q    "Okay.

16  A    "-- that's all.  It's a -- it's the -- one of the -- I

17  find this weapon inside the safe.  It had a magazine loaded

18  right beside it with five rounds of 762 x .39 ammunition, and

19  it --

20  Q    "And where is the magazine now?

21  A    "The magazine is empty.

22  Q    "Okay.

23  A    "It's right here.  It's a functional part of the firearm,

24  so stored it with it.

25  Q    "And what's the serial number?

1    A      "Serial number on this firearm is LH010714."

2              MR. BARKELEY:  This is off transcript for a moment.

3    It looks like there's reference to Exhibit 25.  Do you have 25

4    there with you, sir?  I believe it's five rounds of aught six

5    ammo.

6              THE WITNESS:  I don't have any ammunition.

7              MR. BARKELEY:  All right.  Again, we're off the

8    transcript.  Your Honor, I think the understanding of the

9    parties was I could elicit from the witness why the ammunition

10   is not here today.

11             THE COURT:  Okay.  Off transcript.

12             MR. COHEN:  Your Honor, that's -- actually, it's my

13   understanding that we're going to read a stipulation about all

14   that to the jury at the conclusion of this witness' testimony.

15             THE COURT:  Okay.  Well, it's no secret.  The

16   ammunition is no longer available.  I mean, it's not a secret,

17   so it's not here, right?

18             MR. BARKELEY:  That's correct, Your Honor.

19             THE COURT:  'Kay.

20             MR. BARKELEY:  In the transcript, there's discussion

21   of Exhibit 26 was -- which was also some ammunition.  Same

22   answer, sir, it's not available anymore?

23             THE WITNESS:  No, sir.

24             MR. BARKELEY:  Same answer as to twenty-seven, four

25   twelve-gauge shotgun shells?

1          THE WITNESS:  No ammunition.

2          MR. COHEN:  Again, Your Honor, it was my

3   understanding that we're going to read a stipulation without

4   having to admit the ammunition and guns if they're no longer

5   available.

6          THE COURT:  I don't -- I -- I -- I'm not sure that --

7   that's fine with me if you want to do so.

8          MR. BARKELEY:  Well, counsel, I don't know that we

9   need to do -- do we need to do that in writing?  I can the jury

10  right now or you can tell them if you like.

11         MR. COHEN:  That's fine.

12         MR. BARKELEY:  Okay.

13         MR. COHEN:  All right.  All the -- the stipulation

14  between the parties is that all the guns and ammunition that is

15  no longer here has been returned to Mr. Colette's family

16  already.

17         MR. BARKELEY:  Okay.  Thank you.  I intend to begin

18  -- to resume then on page 2-126 where the trial testimony

19  concerned Exhibit 27.  You have Exhibit 27 with you at the

20  witness --

21         THE WITNESS:  No, I don't.  They're on the table.

22         MR. BARKELEY:  -- table.  All right.  May the witness

23  step down and retrieve Exhibit 27, Your Honor?

24         THE COURT:  That's fine.  And then when you're ready

25  to resume, tell us what page and line you're on.

1    MR. BARKELEY:  I will, Your Honor.  Please get

2    twenty-eight while you're there, sir, if you can.  And sir,

3    would you mind just briefly showing them to counsel.

4             THE WITNESS:  (Indiscernible - away from microphone)

5             MR. BARKELEY:  Twenty-eight and twenty-nine.  Thank

6    you.

7                           (Pause)

8    Your Honor, I intend to resume at line 19 at page 2-126.

9             THE COURT:  'Kay.

10            MR. BARKELEY:  Counsel?

11            MR. COHEN:  Yeah, that's fine.

12            MR. BARKELEY:  Is that all right?  Okay.

13   BY MR. BARKELEY AS MR. SCHRODER:

14   Q    "Now you'd mentioned that during your search, you found

15   documents related to the weapon.

16   A    "Yes, sir.  I did.

17   Q    "And what were they again?

18   A    "I found two ATF Form 4's for Mr. Colette's machine gun

19   and silencer.

20   Q    "And where were they found?

21   A    "They were found in the top portion of the safe.

22   Q    "And did you seize those forms?

23   A    "Yes, I did.

24   Q    "And where did you place them when they were returned to

25   your office?

1    A    "They were placed in evidence in the evidence vault.

2    Q    "And have -- where have they been since that time?

3    A    "They've been here -- they've been there.

4    Q    "Okay.  I'm going to hand you or you have now before you

5    what has been marked as Government Exhibit Number 28.  Can you

6    identify that exhibit?

7    A    "Yes.  This is the ATF Form 4, the application for tax pay

8    transfer of a registration of a firearm.  This is the paperwork

9    to fill out with ATF to register a machine gun.  This is the

10   actual registration for the MAC-10 machine gun that Mr. Colette

11   applied to ATF and was granted; the two hundred dollar tax

12   stamp affixed to the top of it.

13        (Government's Exhibit 28 previously identified admitted)

14   Q    "And are you familiar with these forms in your work?

15   A    "Yes, sir.  Somewhat.

16   Q    "Is it a record that's regular and maintained by the

17   Bureau of Alcohol, Tobacco, Firearms --

18   A    "Yes -- yes, sir.  Yes, sir.

19   Q    "-- and Explosives?  Is it -- does it reflect an activity

20   of your agency?

21   A    "Yes.  We issue a -- there's a transfer tax on certain

22   types of firearms.  Machine guns, silencers or destructive

23   devices, sawed-off shotguns, can legally be owned by citizens

24   of the United States as long as they aren't prohibited by, you

25   know, prior convictions.  This is indicated by the per -- this

1  is initiated by the purchaser.  His fingerprints, pictures, and

2  a local area check is conducted and signed off.  In this -- in

3  this case, Mr. Colette signed off a -- with the Alaska State

4  Troopers Office.  ATF issued the stamp.  The guns are going

5  into the community and wherever the community, the chief law

6  enforcement officer there is the one that grants that

7  certification here.  This was granted by the Highway Patrol.

8  Mr. Colette answered these pertinent yes and no questions, went

9  to the dealer in this type, ATF licensed dealer for these type

10  of guns, paid his two hundred dollars, the tax stamp was issued

11  to him and it was a lawful transfer of machine gun to Mr.

12  Colette, and that's what's reflected on this form."

13          MR. BARKELEY:  Moving over the admission of twenty-

14  eight to the top of 229, line 1.

15  BY MR. BARKELEY AS MR. SCHRODER:

16  Q    "And do you recognize that form?

17  A    "Yes, sir.  This is another ATF Form 4 that I seized in

18  Mr. Colette's safe on the day of the search warrant.

19      (Government's Exhibit 29 previously admitted)

20  Q    "And how do you recognize it?

21  A    "I recognize it by my signature on the evidence tag" --

22          MR. COHEN:  Your Honor, I'm -- I'm missing as to why

23  we skipped lines 18 through 25 of 2-128.

24          MR. BARKELEY:  2-128?  Oh, counsel, I've been

25  routinely skipping the admission colloquy because the evi --

1    these items are already in evidence.

2              THE COURT:  They're already admitted.

3              MR. COHEN:  All right.  So we're going to have him --

4    we're --

5              THE COURT:  Well, I can tell the jury that all these

6    items that we've talked about, with the exception of the

7    stipulation you just indicated, are admitted and are available

8    for counsel's purposes and for deliberation.

9              MR. COHEN:  Right.  I mean --

10             THE COURT:  The weapon -- the four weapons and these

11   forms are admitted.

12             MR. COHEN:  Right.  And the stipulation we talked

13   about is something that --

14             THE COURT:  You just --

15             MR. COHEN:  -- so the jury knows, it's something that

16   they can properly consider.

17             THE COURT:  Well, you just said yes.

18             MR. COHEN:  Yes.

19             THE COURT:  Right.  They stip -- the stipulation was

20   that the ammunition and the other weapons were returned to the

21   family.  That's just a fact you have to consider as true

22   because everyone says that's what happened, and that's what

23   happened.  Okay?

24             MR. BARKELEY:  Thank you, Your Honor.  Sir, I believe

25   I asked you do you recognize that form.

1    A    "I recognize it by my signature on the evidence tag, the

2    zero number on the -- or the actual number, the identifier on

3    to of it.


4    BY MR. BARKELEY AS MR. SCHRODER:

5    Q    "And again, does this reflect a regular activity of your

6    agency --

7    A    "Yes.

8    Q    "-- using these forms?

9    A    "Yes, sir.

10   Q    "All right.

11   A    "This is the Form 4 with the same certification on the

12   back, Mr. Colette's picture, the answers.  This is for the

13   silencer registered to Mr. Colette.

14   Q    "And --

15   A    "Two --

16   Q    "Oh --

17   A    "-- two hundred dollar tax stamp also.

18   Q    "Excuse me.  And just now, if you could say again, what

19   does that form show?

20   A    "This shows that Mr. Colette has a registered silencer in

21   his name, a Bowers nine-millimeter S926 silencer, to him.

22   Q    "And what is the serial number listed on that form for the

23   suppressor?

24   A    "S926.

1  Q    "Now is that -- does that -- is the same as the one --

2  A    "No, it is not.

3  Q    "And are you aware of why there's -- it's not the same?

4  A    "There was a shipping area -- error.  The manufacturer

5  shipped the wrong one to the dealer and the dealer

6  inadvertently transferred a silencer to Mr. Colette.

7  Q    "But there's no problem with the fact that the two numbers

8  are --

9  A    "No.

10  Q    "-- not the same.

11  A    "He has a silencer registered to him.  It's not a -- it's

12  not the fact that he has any legal silencer, it's just -- it

13  was a typographical error -- error.  Typographical, that's the

14  word.  But yes, just one number -- it's one number off.

15  Q    "Now Special Agent Cohoon, we talked a bit about your

16  qualifications, but I want to ask you a few more questions

17  before we finish here.  You've talked about how much of your

18  career was spent doing drug law enforcement.  Do you have

19  specific training in drug law enforcement?

20  A    "Yes.  Back to my basic police academy, I first took a --

21  just a grand view of narcotics, just techniques to identify

22  people possibly hiding, using narcotic -- narcotics.  As an

23  OSI, Air Force Office -- Office of Special Investigations

24  investigator with the narcotics investigations within their

25  agency, learned techniques to identify users, dealers of

1  illegal drugs.  Also in the ATF, it's -- it's brushed on as a

2  broad -- main -- mainly we concentrate in our AT -- Alcohol,

3  Tobacco, Firearms and Explosives, but there is a -- a great

4  deal of narcotics covered because they -- they are -- they --

5  they cross over so often.  Actually, I'm co-located in the

6  office with DEA because of a common thread in our mission.

7  Q    "And just a reminder, you spent part of your career as a

8  narcotics investigator before --

9  A    "Yes, sir.

10 Q    "-- you got to ATF?

11 A    "Yes.  Four years with the Air Force.

12 Q    "Do you know, based upon a conservative estimation, how

13 many drug arrests do you estimate you've taken part in?

14 A    "Just I assist the task force here.  I assist with their

15 investigations, so probably over a hundred just drug arrests,

16 you know, with no gun involved.  Majority of the time is spent

17 investigating cases that will not have a gun, but, you know, I

18 assist other fellow law enforcement officers.

19 Q    "And how many case -- drug cases and investigations have

20 you participated in?

21 A    "Including my Air Force time and -- and with ATF, probably

22 around a hundred with drugs and gun.

23 Q    "And how many of those involved drug distribution

24 operations?

25 A    "Maybe around fifty with distribution.

1   Q    "And how many -- uh-huh (affirmative).  And how many

2   involved weapons of those?

3   A    "In the cases I'm involved with, probably a --

4              MR. COHEN AS MR. BUTLER:  "Objection, relevance.

5              THE COURT:  "Overruled.

6              MR. COHEN AS MR. BUTLER:  "Objection, 403.

7              THE COURT:  "Overruled.

8   BY MR. BARKELEY AS MR. SCHRODER:

9   Q    "How many times -- or could you just answer the question,

10  I guess -- you --

11  A    "Could you repeat it, Mr. Schroder?

12  Q    "Yeah.  How many of those -- the case -- you said you

13  participated in cases involving drug distribution operations.

14  How many of those involved -- were there weapons involved?

15  A    "Well, drug distributions, it would -- it would be high.

16  Probably ninety percent.  When you get that high in a

17  distribution, they're going to have firearms.

18  Q    "And understanding you're an ATF agent --

19  A    "Yes.

20  Q    "-- that the reason you get involved --

21  A    "That's why -- that's why I'd be there.

22  Q    "-- in many of these investigations is for firearms

23  purposes, right?

24  A    "Yes, sir.

25  Q    "Okay.  And how many times have you been involved in

1   executing search warrants?

2   A    "Probably over a hundred.

3   Q    "Okay.  And how many of those involved drug distribution

4   organizations?

5         MR. COHEN AS MR. BUTLER:  "Same objection.  Relevance

6   and 402 and 403.

7         THE COURT:  "Overruled.

8   BY MR. BARKELEY AS MR. SCHRODER:

9   Q    "Okay.

10  A    "Search warrants involving narcotics are probably eighty

11  percent of the time.

12  Q    "Okay.  I just have a couple more questions."

13        MR. BARKELEY:  To the Court and counsel, because most

14  of this page was resolved at the trial, I don't intend to ask

15  anything until line 21.  Is that acceptable to the Court and

16  parties?

17        MR. COHEN:  I think we should go through it --

18        MR. BARKELEY:  You do?  Okay.

19        MR. COHEN:  -- because we've gone through the

20  colloquys and the objections.

21        THE COURT:  If you want it, that's fine.

22        MR. BARKELEY:  Do you want it?  That's fine, yes.  I

23  wanted to get your permission first.

24  BY MR. BARKELEY AS MR. SCHRODER:

25  Q    "Okay.  I just have a couple more questions.  How do --

1    speaking from your experience and your training in --

2    generally, how do drug distribution organizations use

3    firearms?"

4            THE COURT:  That's line three on page 134.

5            MR. COHEN AS MR. BUTLER:  "Objection, 402, 403.

6            THE COURT:  "If he know -- if he knows just from his

7    general experience.

8    A    "From my experience, drug distribution organizations and

9    through my firearms investigations, they are used as a tool to

10   protect their ill gotten gains, intimidate, to threaten, to --

11   to utilize -- to protect what they have.  They're -- they can

12   be victimized by other drug dealers that operate outside the

13   parameters of law enforcement.  They -- they hesitate to report

14   theft of drugs because they have --

15           MR. COHEN AS MR. BUTLER:  "Objection.  The question

16   goes beyond --

17           THE COURT:  "Sustained.

18           MR. COHEN AS MR. BUTLER:  -- I mean the answer goes

19   beyond the question.

20           THE COURT:  "Sustained.  I think he's answered the

21   question.

22   BY MR. BARKELEY AS MR. SCHRODER:

23   Q    "And one final question.  Isn't it true that guns in a

24   drug distribution operation can serve the purpose as a

25   deterrent?

1  A    "Yes, sir.

2          MR. BARKELEY AS MR. SCHRODER:  "Okay.  No further

3  questions, Your Honor.

4          THE COURT:  "Then Mr. Butler, what's your timing.  Do

5  you want to try to do it before lunch or do you want to come

6  back after lunch.  You can choose.

7          MR. COHEN AS MR. BUTLER:  "Yeah.  I'm -- I'm just

8  going to go down and start the examination, Your Honor.

9          THE COURT:  "Okay.  Okay.

10         **CROSS-EXAMINATION READ FROM PREVIOUS TESTIMONY**

11 BY MR. COHEN AS MR. BUTLER:

12 Q    "Good afternoon, Mr. Cohoon."

13         THE COURT:  Okay.  We're at line 21.

14         THE WITNESS:  Okay.

15         THE COURT:  Page 135.

16         MR. COHEN:  Correct.

17 A    "Good afternoon, Mr. Butler.  Good morning, I'm sorry.

18 BY MR. COHEN AS MR. BUTLER:

19 Q    "I said the name correctly, didn't I?

20 A    "Yes, you did.

21 Q    "Cohoon.  Okay.  Mr. Cohoon, how long have you been in

22 Alaska now?

23 A    "Since last May.

24 Q    "Okay.  So a little over a year?

25 A    "Yes, sir.

1 | Q    "What percentage of households in Alaska have guns?

2 | A    "I do not know.

3 | Q    "Have you worked in other places where you probably didn't

4 | have as many hunters, fishermen, gun enthusiasts, as you have

5 | in Alaska?

6 | A    "My father was a game warden and I grew up in the south,

7 | North Carolina and Mississippi.  There -- there's plenty of

8 | guns there.  I -- I can't make an intelligent decision on how

9 | many guns are in Alaska.  From what I've observed in the last

10 | year, there are -- there are plenty of avid hunters in Alaska.

11 | Q    "And do you ever get into gun safety issues?

12 | A    "Yes, sir.

13 | Q    "Do you ever hold like an seminars where citizens have gun

14 | safety issues?

15 | A    "Yes, I have.  I've put them on -- I've put on

16 | presentations for schools, practicing gun safety, gun locks,

17 | guns -- you know, general gun safety rules.

18 | Q    "And a gun safe is a safe way of keeping guns away from

19 | children and things like that in the household, isn't it?

20 | A    "Yes, sir.  It is.  I'm also a firearms instructor.  I've

21 | been a firearms instructor for six years.

22 | Q    "And when -- while we're waiting on these photographs from

23 | yesterday, sir, the documents -- Government's Exhibits, I think

24 | 28 and 29, you still have them up there?

25 | A    "I have twenty-nine here.

1   Q      "Okay.  So" -- I'm sorry.  "Okay."  And then you said
2   "So."

3   A      "So --

4   Q      "But anyway, you remember what twenty-eight was?  It's --
5   A      "Yes, sir.

6   Q      "-- similar to twenty-nine?

7   A      "Yes, sir.

8   Q      "Just that twenty-eight was in reference to what you refer
9   to as the machine gun, twenty-nine to the silencer, right?

10  A      "Yes, sir.

11  Q      "Now this kind of gun that we're talking about, for
12  example, you got a -- you got a -- you have a -- there's a Fred
13  Meyer's here, isn't it?

14  A      "Yes, sir.  I believe there's two in Fairbanks.

15  Q      "Okay.  Do they sell guns over the counter there?

16  A      "Yes, sir.  They do.

17  Q      "Okay.  Shotguns, right?

18  A      "Yes.

19  Q      "Guns with a scope on them like one of the guns that was
20  admitted here?

21  A      "Yes, sir.

22  Q      "Handguns?

23  A      "Yes.

24  Q      "Some of them big handguns look like, right?

25  A      "All calibers.

1  Q    "Okay.  This particular gun, Government's Exhibit 20, can

2  you walk into Fred Meyer's and buy that?

3  A    "No, sir.  You have to go to a specific Title 2 dealer

4  that deals in that type of firearms.

5  Q    "Can you go to a -- okay.  Can you go into Fred Meyer and

6  buy that Bowers silencer?

7  A    "No, sir.

8  Q    "So it sounds like the government really regulates this

9  type of weapon -- the sale of the -- possession of anyway.

10  A    "It -- it's the only national registry for any firearms.

11  Q    "It's what, sir?

12  A    "It's the only national register -- registry we have for

13  any firearms in the country.

14  Q    "Okay.  And I probably didn't quite understand your answer

15  which made me -- but I mean, I'm missing something, forgive me.

16  A    "Yes, it is.  It's -- they're -- they're -- they're

17  regulated.  They're -- you have to have --

18  Q    "Oh.

19  A    "-- a special stamp and a background check.

20  Q    "Okay, okay, okay.  And it takes awhile to get it, doesn't

21  it?  It's not an overnight type?

22  A    "No, it's not an instant background check like you can get

23  at Fred Meyer's.  It takes time for it to go to D.C. and come

24  back.

25  Q    "Can you look at the document in front of you?

1          MR. COHEN AS MR. BUTLER:  "Your Honor, may I

2    approach, please?

3          THE COURT:  "Yes, that would be fine.  Yes, yes, yes.

4    BY MR. COHEN AS MR. BUTLER:

5    Q    "Sir, I'm going to hand you that --

6    A    "Sure.

7    Q    "-- and can you tell us how long this process takes for

8    this particular firearm, sir?

9    A    "It looked like Jason -- Mr. Colette did his part on

10   10/29/04.

11   Q    "Now do you see a January date on any of that -- of

12   January '05?

13   A    "Yes.  1/20/05 when it -- the certification by the State

14   Troopers.

15   Q    "Okay.  And -- but not received until when?

16   A    "October 17th, '05.

17   Q    "Okay.  So it takes awhile to --

18   A    "Yes, sir.

19   Q    "Now if I go buy one of these other firearms at Fred

20   Meyer's, we're talking about the shotguns, the Mossberg -- you

21   can buy a Mossberg at Fred Meyer's, can't you?

22   A    "Yes, if they carry Mossbergs.  You can buy a similar type

23   gun.

24   Q    "Okay.  And the gun with a scope, that -- was that the

25   .30-06?

1    A    "Yes, sir.

2    Q    "Okay.  These kinds of guns, if I want to buy them at Fred

3    Meyer's today, how long does it take before I can walk -- go

4    home with it?

5    A    "If there's no prohibiting factors there, you can within

6    three business days walk out with the gun.

7    Q    "Now the -- what I'd like to do is show you what's been

8    previously marked and admitted as Plaintiff's Exhibit Number

9    3."

10              MR. COHEN:  And I guess that's -- that's one of the

11   photos.

12                         (Pause)

13              MR. COHEN AS MR. BUTLER:  "May I, Judge, and may I --

14              THE COURT:  "Yes.

15              MR. COHEN AS MR. BUTLER:  "-- show the jury this?

16              THE CLERK:  "Yes.  Same as before.

17              MR. COHEN AS MR. BUTLER:  "Okay.

18                         (Pause)

19   BY MR. COHEN AS MR. BUTLER:

20   Q    "Sir, and this paperwork would have been kept with that

21   gun then, it sounds like.  It was on top of the top shelf you

22   said.

23   A    "Yes, it was inside the -- the, I believe, the top shelf

24   underneath the ammunition over here.

25   Q    "Okay.  And there was no ammunition for that weapon in

1    that house at all, was there?

2    A    "There was no ammunition in that safe for that gun.

3    Q    "Okay.  I mean, you didn't find any, right?

4    A    "No.  No, sir.

5    Q    "And -- but there was ammunition in that safe for other

6    weapons or guns or rifles or whatever you want to call it.

7    A    "Yes, yes.

8    Q    "Okay.  Give me just a moment, sir, because I think -- and

9    just for -- to make sure I've got things covered here, sir, any

10   inconsistency in the silencer paperwork and the silencer owned

11   by my client was not my client's doing, right?

12   A    "Correct.

13            MR. COHEN AS MR. BUTLER:  "Okay.  Thank you.  Pass

14   the witness, Your Honor."

15            THE COURT:  Okay.  Looks like we're done.  So you can

16   step down, sir, for now.  Why don't we take a -- let's see.

17   What do you want to do, Mr. Barkeley?

18            MR. BARKELEY:  Well, Your Honor, I think at -- at

19   this point --

20            THE COURT:  Why don't we make sure we -- that

21   everyone understands what exhibits are admitted so that that's

22   clear.

23            MR. BARKELEY:  Yes.

24            THE COURT:  So that you're comfortable with what's

25   been admitted and so is --

1    MR. BARKELEY:  Yes.

2    THE COURT:  -- Mr. Cohen.  My understanding is that

3 the four weapons have been admitted, that the nine photographs

4 have been admitted, that the two documents regarding the paper

5 -- the silencer and the machine gun, if that's what you call

6 it, have been admitted.  What else is there?

7    MR. BARKELEY:  That's correct, Your Honor.  So I

8 think those exhibit numbers 1 through 9, 22, 23 -- 21 -- 20,

9 21, 22, 23, and 24, so five of those --

10    THE COURT:  'Kay.

11    MR. BARKELEY:  -- 20 through 24, 28 and 29 are the --

12    THE COURT:  Okay.

13    MR. BARKELEY:  -- paperwork.  There's a stipulation

14 which really has no number, but the jury can take it into

15 account about the return of the --

16    THE COURT:  That we -- that we previous -- okay.

17    MR. BARKELEY:  There is a stipulation that the

18 Government would offer at this time --

19    THE COURT:  'Kay.

20    MR. BARKELEY:  -- which was at trial, a stipulation

21 read to the jury --

22    THE COURT:  What --

23    MR. BARKELEY:  -- is Government's Exhibit 30 --

24    THE COURT:  'Kay.

25    MR. BARKELEY:  -- concerning the fact that the

1  machine gun -- well, I won't get into the merits of it --

2          THE COURT:  Okay.

3          MR. BARKELEY:  -- until counsel says it's all right.

4          THE COURT:  Right.  So let -- let Mr. Cohen look at

5  number thirty.  The Government proposes that be admitted at

6  this time.

7          MR. COHEN:  Your Honor, we -- we would object to the

8  admission of this particular exhibit for the reasons that I

9  discussed --

10         THE COURT:  Okay.  Why don't we just --

11         MR. COHEN:  -- outside the presence of the jury.

12         THE COURT:  Yeah, we'll take care of it in a minute.

13  I'll have to look at it and see and we can take it up in a

14  minute.  Anything else?

15         MR. COHEN:  Yes, Your Honor.  There are three

16  additional photographs, and if I could have a very brief moment

17  to consult with my client.

18         THE COURT:  Okay.

19                      (Pause)

20         MR. COHEN:  All right.  Yes, Your Honor.  We're fine.

21         THE COURT:  Okay.  All right.  So having it -- having

22  addressed the exhibits and the testimony, what's the

23  Government's next --

24         MR. BARKELEY:  The Government -- outside of the

25  presence of the jury meant to address the Court about the

1    remainder of exhibits, but --

2              THE COURT:  Okay.  So why don't we just take a ten-

3    minute recess and then we'll come back.  Stand in recess for

4    ten minutes.

5                              (Pause)

6        (Jury out at 11:10 a.m.)

7              THE COURT:  Okay.  Mr. Barkeley.

8              MR. BARKELEY:  There were two exhibits, Your Honor,

9    that the Government would want to refer to in this trial simply

10   because they were admitted at --

11             THE COURT:  Okay.  What are they?

12             MR. BARKELEY:  -- the underlying criminal trial.

13   They're Exhibits 30 and 31.  If I may approach, Your Honor, you

14   can see the --

15             THE COURT:  Okay.

16             MR. BARKELEY:  -- what they -- what they are.

17             MR. COHEN:  They were admitted though, I think,

18   through Agent Foran.

19             THE COURT:  Well, I will just take a look.

20                              (Pause)

21   Okay.

22             MR. BARKELEY:  I don't know really whether they were

23   admitted through Agent Foran or not, that's likely true since

24   no one else is going to get them in, but I don't think it's

25   relevant.  I just thought it might be helpful to the jury, Your

1    Honor, because the ammunition is missing, but this shows that

2    what the agent is saying about the fact that the weapons were

3    loaded is correct.

4    MR. COHEN:  Well, again, I -- again, Your Honor,

5    that's certainly something --

6    THE CLERK:  Sir, microphone.

7    MR. COHEN:  That's certainly something that the

8    Government -- the Government is putting on its case whichever

9    way it chooses.  If the Government wants to call Agent Cohoon

10   and ask that question, I suppose the Government can do that.

11   But without any -- any foundation for these exhibits or

12   explanation as to what they are or what they're showing, just

13   to put them into evidence I think is inappropriate.

14   THE COURT:  'Kay.  So you've got the witness, you can

15   call the witness.

16   MR. BARKELEY:  Okay.  Yes, Your Honor.  I will do

17   that briefly.

18   MR. COHEN:  And -- and I -- and again, that -- and

19   that was my earlier point, that that's the way the Government

20   should have proceeded as I stated earlier for the entire trial.

21   They should have called the witness live and allowed new cross-

22   examination.

23   MR. BARKELEY:  The Government stands admonished, Mr.

24   Cohen.

25   MR. COHEN:  Well, I was just -- it's -- it's not so

1  much that, it's --

2        THE COURT:  You're retreading -- we don't have -- why

3  would you want to keep raising the same argument I've already

4  ruled on.  I've ruled on it five times.

5        MR. COHEN:  I'm -- all -- I'm just pointing out for

6  the record, Your Honor, that this -- this -- this further

7  supports that argument, that's all, and I'll -- I'll stop.

8        THE COURT:  'Kay.

9        MR. BARKELEY:  The other -- the other one, Your

10  Honor, is that I do not understand -- I thought that this

11  morning counsel had a discussion before the Court.  Counsel

12  insisted that wherever there -- there was something in the

13  record that wasn't here, we should explain to the jury the

14  cocaine can't go back -- I wasn't trying any sort of

15  subterfuge, just simply introduce the stipulation that's

16  already part of the trial record --

17        THE COURT:  What are you talking about?  Just tell me

18  what you're talking about.  What stipu --

19        MR. BARKELEY:  Exhibit 30, Your Honor.  I thought

20  this morning, counsel said he didn't have a problem with it,

21  and now he doesn't want it -- submit ex -- I'm sorry, the

22  stipulation -- it's a stipulation, Your Honor, that is Exhibit

23  30.

24        THE COURT:  Okay.  Well now -- see, I've got to read

25  it and see what you're talking about.

1                          (Pause)

2          MR. BARKELEY:  And that's a stipulation that Your

3  Honor inquired about previously.

4          THE COURT:  I already said it could be admitted over

5  your objection.  This is a stipulation that was admitted at the

6  prior trial by the parties after some discussion.  It was

7  written up, signed by the defendant, by defendant's attorney,

8  and by the Assistant United States Attorney.  And it's really

9  an -- an undisputed fact in the case.

10         MR. COHEN:  Well, there are parts of that stipulation

11 that are disputed in terms of the weight, et cetera, but -- as

12 I pointed out at sentencing.  Any my client was not -- did not

13 have that -- that stipulation explained to him or its

14 importance before he signed it.  We objected to it at

15 sentencing and we object to it now.

16         THE COURT:  'Kay.

17         MR. COHEN:  But -- that's all, and it's what I

18 pointed out earlier.  I think what the Court said this morning

19 was if it comes up and the Government seeks to admit it, I'll

20 rule on it then.

21         MR. BARKELEY:  I'm moving to admit it now.

22         THE COURT:  Okay.  It can be admitted.  It's -- this

23 is not a surprise.  It's consistent with some of the testimony

24 that's already been presented, it was a stipulation that the

25 parties discussed at the trial, that they entered into in good

1    faith, that they signed, the defendant himself signed it --

2         MR. COHEN:  No, I don't think it was discussed at

3    trial.  I think it was just -- just admitted.  My review of

4    the --

5         THE COURT:  It just popped -- you just think it

6    popped out of nowhere?

7         MR. COHEN:  Well, I think what happened was -- I

8    reviewed the record.  I think what happened was that the --

9    that the Government said we're now going to submit this -- or

10   read and/or submit this stipulation that was previously agreed

11   to, and it went in.  I don't think there was a discussion, I

12   don't think that the stipulation was explained to Mr. Colette

13   on the record or anything along those lines.

14        THE COURT:  'Kay.  All right.  So this will be --

15   what exhibit number is it in this case?  In the --

16        MR. BARKELEY:  Well, I would suggest perhaps for

17   clarity's sake, Your Honor, that I just give it a number all of

18   its own for purposes --

19        THE COURT:  Okay.  It should have its own number.

20   This is a stipulation previously entered into in the prior

21   trial that -- I think it's appropriate and can be admitted and

22   be read into evidence.

23        MR. BARKELEY:  So I will assign it a number -- I know

24   we didn't go as high as fifty in the original case, so five

25   zero?  Madam Clerk, is that all right?

1    THE CLERK:  Yes, sir.  Actually, you went as high as

2  thirty.  So do you to want to keep in it numerical order?

3    MR. BARKELEY:  Yes, if you like.

4    THE COURT:  Thirty-one?

5    MR. BARKELEY:  Thirty-one?

6    THE CLERK:  Thirty-one.

7    MR. BARKELEY:  All right.

8    (Government's Exhibit 31 marked for identification)

9    MR. COHEN:  And, Your Honor, just so the Court knows,

10  after the Government asks Agent Cohoon the questions regarding

11  those exhibits, I am going to save any questions for Agent

12  Cohoon for those exhibits and any other questions for my case

13  so I question him one time.

14    THE COURT:  That's fine.

15    MR. COHEN:  Okay.

16    MR. BARKELEY:  Madam Clerk, could I trouble you to

17  read me the case number?  I don't have anything on hand with

18  the case number on it.

19    THE CLERK:  Yes.  It's 4:05-cr-00042.

20    MR. BARKELEY:  Thank you.

21    THE COURT:  Okay.  So it sounds to me that the

22  Government's about ready to rest.  You want to read a

23  stipulation in, you want want to ask a few -- couple more

24  questions about Exhibits 30 and 31, then you're going to rest.

25  Then we'll break for lunch, we'll take an hour and fifteen

1    minutes, and we'll come back and we'll begin defendant's case.

2            MR. COHEN:  Your Honor, I told the witnesses to be

3    here at 1:30.

4            THE COURT:  Well, okay.

5            MR. COHEN:  All right?

6            THE COURT:  Well, we can come back -- we can come

7    back and -- don't worry, I'm not going to -- we're not going to

8    start before your first witness is here.

9            MR. BARKELEY:  May I approach -- may I approach, Your

10   Honor --

11           THE COURT:  Yes.  Well, we can always meet together

12   just to talk about jury instructions or whatever.  I'll tell

13   the jurors to be back about 1:20, and then they can assemble

14   and we should be ready to start about 1:30 with your first

15   witness.

16           MR. BARKELEY:  So, yes, Your Honor, that con -- that

17   -- that will -- the Government will rest after Special Agent

18   Cohoon testifies.

19           MR. COHEN:  If -- if --

20           THE COURT:  Okay.  Are you going -- go ahead.

21           MR. COHEN:  No, I was going to say if -- that's fine,

22   it's just in gathering the witnesses, if we could break as soon

23   as he's finished, it would help me put everything together --

24           THE COURT:  We are.

25           MR. COHEN:  -- and be more efficient for the

1  afternoon.

2          THE COURT:  Okay.  I want to help -- I'm going to --
3  we're going to give you time to do what you need to do.

4          MR. COHEN:  All right.  This should be about four
5  questions.

6          MR. BARKELEY:  Not -- probably not even that, yes.

7          THE COURT:  Okay.  So we're going to have to swear
8  him in --

9          MR. BARKELEY:  Yes, yes.

10         THE COURT:  -- and -- all right.  So we'll bring the
11  jury back.

12         THE CLERK:  Okay.

13                        (Pause)

14     (Jury in at 11:19 a.m.)

15         THE COURT:  So somebody's going to come out of the
16  restroom and think they've been abandoned.  Let the witness
17  (indiscernible) --

18         THE WITNESS:  Okay.

19         THE COURT:  Okay.  Okay.  Now -- now we're going
20  to -- we're beginning kind of a new phase of the trial.  We've
21  now -- as I've -- I believe we're through reading -- re-reading
22  the transcript of the earlier trial, so this is -- this witness
23  is going to testify briefly independently, so we're going to
24  have him sworn in.  So Madam Clerk, if you'll do that, please.

25         THE CLERK:  Sir, do you solemnly swear --

1      THE COURT:  Okay.

2      MR. BARKELEY:  I'm sorry --

3      MR. COHEN:  Your Honor --

4      MR. BARKELEY:  We're still short one.

5      THE COURT:  Oh.  How many bathrooms there are in

6   there?

7      THE CLERK:  Two.

8      THE COURT:  Oh, there are two.  Okay.  That's right.

9   I was wondering what all this arm signaling was for.  Okay.

10  Now we've got the whole team.  Just so everyone's benefit,

11  we're kind of moving to a new phase here of the trial.  We're

12  through with reading the transcripts of the earlier trial.  Now

13  we're going to have some new independent testimony.  We'll --

14  so the witness will be sworn in.  Madam Clerk?

15          **ERIC COHOON, GOVERNMENT'S WITNESS, SWORN**

16      THE CLERK:  Thank you.  You may be seated.  And for

17  the record, could you please state your full name.

18      THE WITNESS:  My name is Eric Cohoon, C-O-H-O-O-N.

19      THE CLERK:  Thank you.

20      THE COURT:  Mr. Barkeley?

21      MR. BARKELEY:  Thank you, Your Honor.

22                  **DIRECT EXAMINATION**

23  BY MR. BARKELEY:

24  Q    Special Agent Cohoon, you have before you two photographs,

25  is that correct?