1   A    Yes, I do.

2   Q    Do they have Government Exhibit numbers on them?

3   A    Yes, sir.  Government's Exhibit 30 and 31.

4   Q    All right.  Would you take Exhibit 30 first, please?

5   A    Yes.

6   Q    Do you recognize that photograph?

7   A    Yes, I do.

8   Q    Why is that?

9   A    It's a picture of myself holding the Mossberg 500A shotgun

10  that was seized from Mr. Colette's residence.

11  Q    All right.  And when you say the Mossberg shotgun, are you

12  referring to the shotgun about which you read your previous

13  trial testimony earlier this morning to the jury.

14  A    Yes.  It's -- it's the loaded shotgun that was recovered

15  from the safe.

16  Q    Okay.  Same ques -- same question with regard to the next

17  one, thirty-one.  Do you recognize that photograph?

18  A    Yes, I do.  It's a picture of me holding the Remington

19  .30-06 semiautomatic rifle, unloading it, showing the

20  ammunition within the chamber and the magazine.

21  Q    And same question, is that the aught six that you --

22  A    Yes, it is.

23  Q    -- you read your testimony from the trial about earlier to

24  this jury?

25  A    Yes, it is.

1        MR. BARKELEY:  All right.  Just for purposes of this

2  proceeding, Your Honor, move to admit thirty and thirty-one.

3        MR. COHEN:  Yes.  No objection, Your Honor.

4        THE COURT:  Okay.  Thirty and thirty-one will be

5  received without objection.

6      (Government's Exhibits 30 and 31 admitted)

7  BY MR. BARKELEY:

8  Q    With regard to the aught six or is it the shotgun -- with

9  regard to the shotgun first, is there any -- do you see the

10  evidence tape on that?

11  A    Yes, I do.

12  Q    Okay.  Is that evidence -- is that evidence tape that was

13  placed on there by ATF?

14  A    No, sir.  It was not.

15        MR. BARKELEY:  Nothing further.

16        THE COURT:  Okay.  And I think you're going to

17  reserve examination until after lunch, is that what you said?

18        MR. COHEN:  Yes, that's correct, Your Honor.

19        THE COURT:  All right.  Thank you, sir.  You're free

20  to step down.  Mr. Barkeley, did you --

21        MR. BARKELEY:  Your Honor, the Government rests

22  subject to rebuttal --

23        THE COURT:  Did you have a stipulation you wanted to

24  read into the record?

25        MR. BARKELEY:  I do, Your Honor, if I might.  Thank

1    you.

2              THE COURT:  Okay.

3              MR. BARKELEY:  And Madam Clerk, I apologize.  I've

4    made a housekeeping mistake again, but this will have to be

5    thirty-two -- Exhibit 32.  I've marked it as such.

6        (Government's Exhibit 32 re-marked for identification)

7              THE CLERK:  Thank you.

8              MR. BARKELEY:  Here's the stipulation that's been

9    reached between the parties.  It reads as follows.  It's been

10   marked as Government's Exhibit 32:

11              "The parties stipulate as follows:

12              "Number one.  Plaintiff Exhibit 20 is a Military

13        Armament Corporation, MAC, Ingram Model M10A1, nine-

14        millimeter caliber machine gun, serial number

15        A6041381, and meets the definition of a machine gun

16        in 26 United States Code, Section 5845(b), made

17        applicable in 18 U.S. Code, Section 921(a)(3).

18              "Number two.  Plaintiff Exhibit 21 is a Bowers

19        Model CAC-9 firearms silencer, serial number S927,

20        and meets the definition of a firearms silencer under

21        18 U.S. Code, Section 921(a)(24) and 26 U.S. Code,

22        Section 5845(a).

23              "Number three.  Plaintiff Exhibit 10 is cocaine

24        hydrochloride, net weight six hundred and thirty-four

25        point six [634.6] grams of fifty-eight percent

1    purity.

2        "Plaintiff Exhibit 12 is cocaine hydrochloride,

3    net weight twenty-four point three [24.3] grams of

4    sixty-eight percent purity.

5        "Plaintiff Exhibit 14 is cocaine hydrochloride,

6    net weight two point nine [2.9] grams of thirty-six

7    percent purity."

8    And attached to the stipulation, Your Honor, which was signed

9    by the defendant, his attorney at trial Rex Butler, the

10   Government prosecutor Brian Schroder, is a DEA laboratory

11   report reflecting the fact that these -- these drugs, which are

12   not going to be available to the jury during deliberations were

13   in fact tested and the analytical results are part of this

14   stipulation.

15       THE COURT:  All right.  Very well.  So that -- that

16   will be received as Exhibit 32, and now you said that the

17   Government rests, is that what I heard you say?

18       (Government's Exhibit 32 admitted)

19       MR. BARKELEY:  Yes, Your Honor.  The United States

20   rests subject to rebuttal.

21                   GOVERNMENT RESTS

22       THE COURT:  Okay.

23       MR. BARKELEY:  Thank you.

24       THE COURT:  All right.  So now basically we've moved

25   to the -- that's the Government's evidence.  We're going to

1    take a lunch break and come back and hear from the -- we'll

2    hear from Mr. Cohen as to his plans for the afternoon.

3            I think we didn't plan to have witnesses begin until

4    1:30, so we're going to take a little longer lunch break if you

5    can be back here at 1:20. We'll be back a little earlier doing

6    our work, but no reason to have you sit around if -- if we

7    don't need you. So if you could be back here at 1:20, then

8    we'll -- we'll see what lies ahead for the day. Thank you all

9    very much. We'll stand in recess.

10                        (Pause - side conversation)

11        (Jury out at 11:26 a.m.)

12            THE COURT: All right. Counsel, anything -- let's

13    see, you want to be back here at 1:15? Gives you more -- gives

14    you almost two hours.

15            MR. COHEN: Yeah, that's great, Your Honor. Thank

16    you.

17            THE COURT: Gives you time to do a lot of stuff.

18            MR. COHEN: Good.

19            MR. BARKELEY: Your Honor, do you know -- Madam

20    Clerk, would you like exhibits from the Government's case in

21    chief now or at the end of the case?

22            THE COURT: The end of the case.

23            MR. BARKELEY: Okay.

24            THE CLERK: End.

25            THE COURT: We've got enough things to keep up --

2-149

1    keep track of.

2              MR. BARKELEY:  Yes.  Okay.

3              THE COURT:  Okay.  So we'll see you here at 1:15.

4    Anything else I can do, Mr. Cohen?

5              MR. COHEN:  Not right now, Your Honor.

6              THE COURT:  Okay.  You'll have a witness ready at

7    1:30.

8              MR. COHEN:  That's right, Your Honor.

9              THE COURT:  Very well.  Thank you.

10             MR. BARKELEY:  Mr. Cohen, does -- is the witness that

11   you want -- do you want me to get Trooper Wall here first?

12             MR. COHEN:  No.

13             MR. BARKELEY:  No.  Okay.

14             THE COURT:  What about Mr. Johnson?

15             MR. COHEN:  Not -- not first.  I have some other

16   (indiscernible) --

17             THE COURT:  So we -- he said -- the last thing I

18   heard him say is -- he walked out is someone has to call me.

19   Who's going to make the call to him?

20             MR. COHEN:  Well, I -- I thought that he was ordered

21   to be here at 1:30.

22             THE COURT:  No, we didn't know what time to tell him,

23   so he's available by telephone, so if you would --

24             MR. COHEN:  I don't have his phone number.

25             THE COURT:  Well, I know, but he'll get a-hold of

1    him.

2            MR. BARKELEY:  I'll give you his phone number.

3            THE COURT:  I mean, Mr. Barkeley, you can -- you tell

4    -- you tell him when you want him, but if you're not going to

5    call him at 1:30, let's not have him come at 1:30.

6            MR. COHEN:  Right.  I'm saying I'm not going to call

7    him at 1:30.  I don't --

8            THE COURT:  Well, you want to have him here at 3:00?

9            MR. COHEN:  I don't -- I don't know if I'm going to

10   call him this afternoon or not.  That depends on how --

11           THE COURT:  Because his attorney is --

12           MR. COHEN:  I know what his attorney wants.

13           THE COURT:  Okay.

14           MR. COHEN:  I'm trying to --

15           THE COURT:  So what do you want us to do?

16           MR. COHEN:  I'm saying that if he wants to come here

17   later in the afternoon, I'll try to get him on.  I can't

18   guarantee it like I told the attorney.  Other -- but otherwise,

19   we're going to need him early tomorrow morning.

20           THE COURT:  Okay.

21           MR. BARKELEY:  I'm going to give you his phone number

22   because the Government excused him from his subpoena and you're

23   calling him back now as your witness, so --

24           THE COURT:  Yeah, but I don't want to lose him

25   because of a technicality.  So you need to work together on

1    this.

2            MR. COHEN:  No, no, he's -- he's subpoenaed to my

3    case.  That's (indiscernible) --

4            THE COURT:  I understand that, but I don't want him

5    because -- I want him back here.  I don't care how he gets

6    here.  I think you have to work together on it.

7            MR. COHEN:  Well, I think we --

8            THE COURT:  I don't want this trial coming to a stay

9    because we can't find a witness.

10           MR. BARKELEY:  Right.  No, I'm willing -- I'm willing

11   to call him any time, but counsel sounds as though like he

12   wants to make the decision of when to make that witness come to

13   court.

14           THE COURT:  Well, we've decided at three o'clock.

15   Three o'clock?

16           MR. COHEN:  That's fine.

17           MR. BARKELEY:  All right.  I will -- I will notify

18   that witness --

19           THE COURT:  Okay.

20           MR. BARKELEY:  -- Mr. Johnson to be here at three

21   o'clock.

22           THE COURT:  He'll be here at three o'clock, and then

23   you, after that, have to tell him when you want him after that.

24           MR. COHEN:  I'll bring him in and/or run him back if

25   we need to.

1    THE COURT:  Okay.  Sounds good.

2    MR. COHEN:  Thank you.

3    THE COURT:  Thank you.

4    MR. COHEN:  Okay.  All right.

5    THE CLERK:  This matter is in recess until 1:15.

6    (Recess at 11:28 a.m., until 1:17 p.m.)

7    (Jury not present)

8    MR. COHEN:  -- as many witnesses as I can this

9  afternoon with the idea of calling my expert tomorrow morning,

10  probably Eugene Johnson tomorrow morning, and a couple of short

11  witnesses tomorrow morning.

12    THE COURT:  Well, the problem with Eugene -- that's

13  going to create a problem because you need -- his counsel's in

14  court tomorrow morning.

15    MR. COHEN:  Well --

16    THE COURT:  Any way you can change that around to put

17  him late this afternoon?

18    MR. COHEN:  I'm hoping -- frankly, I'm trying to put

19  a bunch of stuff together and -- and call him tomorrow morning

20  toward the end of the case.  That's what I'm hoping to --

21    THE COURT:  Well, I'm -- you know, you've got to make

22  the best call.  I'm not telling you what to do.

23    MR. COHEN:  I'm just -- you know, I mean perhaps --

24  I'm certainly happy to work with that --

25    THE COURT:  Mr. Coe.

1          MR. COHEN:  Maybe we can talk to the -- is it Mr.
2    Coe?

3          THE COURT:  Yes.

4          MR. COHEN:  Yeah.  Maybe we can talk to him and
5    figure out whatever time tomorrow morning he's available and --

6          THE COURT:  Sure.  We'll get him on the phone right
7    now.  How about that?

8          MR. COHEN:  Why don't we do that?  And I don't care
9    when it is tomorrow morning.

10          THE COURT:  Okay.  Well, the sooner the better.

11          MR. COHEN:  But the idea -- the idea is I'm hoping to
12    -- the idea is to try to finish up if possible by tomorrow
13    morning or early tomorrow afternoon, and then we can have the
14    instructions and instruct the jury, so I'm trying to --

15          THE COURT:  Well, if you can finish up tomorrow
16    morning --

17          MR. COHEN:  -- keep on schedule.

18          THE COURT:  -- we can argue right after lunch.

19          MR. COHEN:  Right.  I -- like I said, I'm not -- I
20    can't promise exactly, but that's the goal.

21          THE COURT:  I know you can't.  You just do your best
22    and we -- we deal with what happens.

23          MR. COHEN:  That's the goal.  But I -- it's certainly
24    not -- I mean, I'm not -- I don't see where -- well, depending
25    also -- we have the outstanding issue on Mr. Wamsley.  We're

1  trying to get a-hold of him to see what we can do -- a
2  telephone call.
3       THE COURT:  I know and there's an arrest warrant out
4  for him, too, so he's going to be real shocked.
5       MR. COHEN:  Right.  So we're kind of -- hopefully we
6  can get a phone conference tomorrow with him.
7       (Clerk placing call to Mr. Coe)
8       THE CLERK:  Your Honor, he's not in right now.  They
9  expect him back within a few minutes.
10      THE COURT:  Okay.  You look like you still had more
11 to say.  Are you all --
12      MR. COHEN:  Well, I always have more to say, Your
13 Honor, and I always look that way also.
14      THE COURT:  But it has to be new stuff.
15      MR. COHEN:  It's not frequently, not frequently new
16 stuff.
17      THE COURT:  Oh, okay.
18      MR. COHEN:  I don't -- I don't have anything more.
19 That's --
20      THE COURT:  Okay.
21      MR. COHEN:  -- that's the best I can predict right
22 now.
23      THE COURT:  Okay.  I'm working on the jury
24 instructions.
25      MR. COHEN:  I have a number of comments.  I'm sure

1    both sides do.

2              THE COURT:  Well, I know.  And I -- you're submitting

3    things, I'm working on them, so, you know, none of you have the

4    final packet, but --

5              MR. COHEN:  Right.  I -- I mean, I can -- I can tell

6    the Court the main comments I have on the jury instructions.

7              THE COURT:  Go ahead.  Might as well.

8              MR. COHEN:  Okay.  The main comments are -- I have

9    comments along the way as we go through the instructions, we

10   can do that later, but the main comments are that -- that as to

11   the verdict form, I think the proper question should be should

12   so-and-so weapon be forfeited?  Yes or not.  Should -- as to

13   the three weapons.  And then as to the cash, it should be

14   should the cash or any part thereof be forfeited?  Because I

15   agree with the --

16             THE COURT:  Okay.  I think -- I -- that's not a bad

17   idea.  Mr. Barkeley?  That's just real simple, straightforward,

18   and -- and not try to get all these other elements and -- and

19   things in there because they've been instructed as to the law

20   before that.

21             MR. COHEN:  Exactly.  That's what I think, Your

22   Honor.  I agree.

23             THE COURT:  Because I was trying to read that one

24   that I had yesterday, and putting that little half-sentence at

25   the very end about substantially whatever, all that's going to

1    do is create a jury question.

2            MR. COHEN:  So -- because the Court instructed them,

3    and I think properly, that they need to decide to forfeit some

4    or all of the cash, and it's --

5            THE COURT:  True.

6            MR. COHEN:  -- and so --

7            THE COURT:  And some or all the weapons.

8            MR. COHEN:  And some or all the weapons.

9            THE COURT:  Right.

10           MR. COHEN:  And so that's why I say that they should

11   just be instructed on the law and then say do you want to

12   forfeit this weapon?  Yes or no.  Do you want to forfeit this

13   weapon this weapon?  Yes or no.  Do you want to forfeit some or

14   all of the cash?

15           THE COURT:  I agree with that.  I don't know if Mr.

16   Barkeley does, but that makes sense to me.  Mr. Barkeley?  It's

17   his proposal.

18           MR. BARKELEY:  Oh, well, that's no reason to reject

19   it.  He's got a lot of good ideas.  But my only concern is

20   hearing the opposite of this in some kind of an appeal.  I

21   mean --

22           THE COURT:  How could you hear the -- when he's asked

23   for it, how could he appeal it?

24           MR. BARKELEY:  Oh, oh, oh, it's being done now, Your

25   Honor.  That's how.

1    MR. COHEN:  I'm not -- I didn't do that.

2    MR. BARKELEY:  It's being --

3    MR. COHEN:  Not an appeal in this case.

4    MR. BARKELEY:  It's being -- if I could just finish.

5    If -- if the suggestion is simply should the item be forfeited,

6    I do not understand how one could figure out what the jury

7    unanimously thought the reason for that was.

8    THE COURT:  Why do they have to --

9    MR. BARKELEY:  It has to be facilitation only, I

10   guess.

11   THE COURT:  That's all you're --

12   MR. BARKELEY:  We're not going to mention

13   facilitation.

14   MR. COHEN:  Right.  So there's no reason why we need

15   -- it's clear to the jury that the Government is not arguing

16   count two, it's clear to the jury they're not arguing proceeds.

17   I mean, they said it, I said it in opening (indiscernible -

18   simultaneous speakers) --

19   MR. BARKELEY:  Will I be allowed to even argue

20   substantial connection?  Because I believe it has to be in the

21   record.

22   THE COURT:  Sure.  I'm not -- I haven't said no on --

23   on that, I'm just -- you know, when you start to use the word

24   substantial connection, then you have to start defining

25   substantial connection and it real -- and there are other words

1    much more accurate that -- that convey that thought, and so you

2    wonder why not use those more accurate words instead of using

3    the word substantial connection and then trying to define it,

4    et cetera, et cetera.  But certainly you can make that

5    argument.  I mean that makes your case harder.  Why would

6    anybody object to you increasing your burden on yourself?

7                MR. COHEN:  Your Honor, the other main point, and I

8    -- I have some other ones as we go the instructions -- the

9    other main point is I think if the jury, in order to understand

10   -- they're being asked to decide does this facilitate count

11   one, okay?  Did this facilitate count one?  That's what they're

12   being asked to decide, and count one being possession --

13   possession of cocaine with intent to distribute.

14                I think the jury should be aware of what the elements

15   are of count one, what the elements are of count two, count

16   three, and count four.  They know he was convicted of one and

17   two, they know he was acquitted of three and four.  So I think

18   the jury should be told this is what the first jury was told

19   are the elements of counts one, two, three, and four, so they

20   then can decide whether the property facilitated or didn't

21   facilitate count one.

22                So if you just say somebody's in possession of

23   cocaine with intent to distribute, they don't know what -- what

24   the definition is of that.

25                THE COURT:  I may agree with you in part, but only

1  with regard to count one.  Why should I give elements of -- of

2  claims that are not subject to dispute here or that he was

3  acquitted as to here?  They're saying that this -- these

4  materials, these items should be forfeited because they were

5  used to facilitate his operation of selling cocaine.

6       MR. COHEN:  Only -- only because it would put them in

7  the same position as the first jury.  The first jury, if they

8  had been asked to decide this, would have had -- you know, had

9  just gone through the process of counts one through four --

10       THE COURT:  Well, I -- I --

11       MR. COHEN:  -- and they knew -- and they knew at that

12  time the whole case and what the elements were of all those

13  counts.  That's -- that's the -- that's the reason.

14       THE COURT:  Well, we -- well, I don't accept that

15  reason completely.  We've been -- we've been make -- we've been

16  going overboard to try to make this as fair as possible in

17  terms of putting the parties in the -- in the shoes of the

18  first jury, but that's not really totally required.  This is a

19  forfeiture trial.  Been convicted.  The only purpose of our

20  meeting here today is to determine whether a jury concludes by

21  a preponderance of the evidence these items should be

22  forfeited.  That's the purpose of our gathering.  It's not --

23  it's not the same thing that the jury was required to address

24  at the first trial when they had to determine guilt or

25  innocence of all kinds of other issues, and a higher burden.

1      MR. COHEN:  Well, in any event, I don't want to push
2  the Court into ruling finally right now, I just wanted to tell
3  the Court those are my two --
4      THE COURT:  Okay.
5      MR. COHEN:  -- those are the two main areas, and I
6  have some additional comments about the individual instructions
7  as we go through them.
8      The issue on the Jencks Act and the production of
9  Agent Foran's grand jury testimony, I believe is being worked
10  out.  The Government has represented to me that it is going to
11  be given to me either in digital recorded form or a transcript
12  by the end of the day, so I'll have it before the end of the
13  case.
14      MR. BARKELEY:  Certainly not a transcript.  We had to
15  use a certified service that takes weeks to do it.  If it's not
16  been transcribed, then you will get the recording some -- as
17  soon as my office can get it.  They're working on it now.
18      THE COURT:  Okay.
19      MR. BARKELEY:  Transmitting it to Fairbanks.
20      THE COURT:  Okay.  Anything else, Mr. Barkeley?
21  You've been unusually quiet.  What do you have to say?  Your
22  turn.
23      MR. BARKELEY:  Well, guess I'm just tired, Your
24  Honor.  I ran seventeen miles Monday.  I'm still tired.
25      I -- my only comment, Your Honor, is I tend to agree,

1  based upon what the Court will allow in terms of argument, with

2  the idea of giving the jury the elements on the acquitted

3  counts.

4        THE COURT:  The --

5        MR. BARKELEY:  The reason is that I expect -- I

6  expect there to be a lot of argument about the fact that these

7  are not forfeitable because he was acquitted on those two

8  counts, and I would like to at least --

9        THE COURT:  Holey moley, these instructions are

10  getting longer all the time.

11        MR. BARKELEY:  Well, if you -- if the Court then will

12  preclude the defense from arguing that the acquittals on counts

13  three and four mean that they are required to find no

14  forfeiture here --

15        THE COURT:  That's obviously a true state -- they're

16  not required to find forfeiture.  It's a different standard of

17  proof.

18        MR. COHEN:  I think both --

19        MR. BARKELEY:  They're not required to --

20        MR. COHEN:  I think both -- I think both attorneys

21  said that in -- in opening statement, but I -- but I think that

22  I agree with Mr. Barkeley that -- that I think -- we've talked

23  about this, I think we're trying to put the jury in that

24  position, and I think if they had that information about what

25  it was each count meant, I -- I don't -- I think it -- it will

1    precipitate a fair result.

2              THE COURT:  Do you have the jury instructions

3    available that were given in the first trial?

4              MR. COHEN:  Well, I can -- I mean, they're -- they're

5    in the --

6              THE COURT:  We can pull them up probably.

7              MR. COHEN:  Yeah, they can be pulled up from the

8    docket.  And I'm -- oh, I'm not talking about every

9    instructions, I'm just saying count -- in count one the

10   Government has to prove blah and count two blah, and count

11   three and four is one instruction that's one -- it's one

12   standard is the same charge.  And this is what -- and this is

13   what the jury was told and this -- and as you know, the jury

14   convicted on count one and two, they acquitted on counts three

15   and four, you're not called upon to decide that, but in

16   evaluating this case, we want you to know what it was.  Now

17   you're going to decide six and seven, it's a different

18   standard, it's preponderance of the evidence, and their

19   standard was reasonable doubt -- beyond a reasonable doubt.

20             I mean, I -- I -- I was interested to hear the

21   Government argue that beyond a reasonable doubt was a virtual

22   certainty, so I -- I would -- I'm going to use that in my next

23   closing argument.  I'm going to say that the Government, Mr.

24   Barkeley in Alaska, says it's a virtual certainty, ladies and

25   gentlemen.

1        THE COURT:  See how far you get.

2        MR. COHEN:  Yeah.

3        MR. BARKELEY:  Nothing I say is evidence.

4        THE COURT:  Okay.  All right.  Well, I'll just come

5   back when the jury's ready and we'll -- then you get -- you'll

6   have your first witness ready to go?

7        MR. COHEN:  I'm hoping.  I'm going to look outside.

8   They're supposed to be here.

9        THE COURT:  Okay.

10       MR. COHEN:  Okay.

11       MR. BARKELEY:  I did contact Mr. Johnson, Your Honor.

12  He will be here five until 3:00.

13       THE COURT:  Okay.

14       MR. BARKELEY:  That what's I was asked to do.

15       MR. COHEN:  Okay.  And -- and (indiscernible - away

16  from microphone).

17       THE CLERK:  This matter is in brief recess.

18     (Recess at 1:28 p.m., until 1:39 p.m.)

19     (Jury not present)

20       THE CLERK:  All rise.

21       THE COURT:  Good morning -- afternoon.

22       THE CLERK:  Court is reconvened.

23       THE COURT:  Okay.  We ready to go, Mr. Cohen?

24       MR. COHEN:  Yes, Your Honor.

25       THE COURT:  All right.  We'll bring the jury in.

1    Sir, we're going to bring the jury in, they're going to sit

2    over here.  You can stand when they come in, a lot of people

3    do, then you'll be sworn in and both attorneys will get a

4    chance to ask a few questions, then be done.  Okay?

5                    THE WITNESS:  Good.

6                              (Pause)

7        (Jury in at 1:40 p.m.)

8                    THE COURT:  Welcome back.  Everybody ready to go?

9            MR. COHEN:  Yes, Your Honor.

10           THE COURT:  (Indiscernible)  Okay.  All right.  Your

11   first witness.

12                   MR. COHEN:  Okay.  Your Honor, Mr. Colette calls

13   David Dahl.

14           THE COURT:  'Kay.

15           THE CLERK:  If you could raise your right hand.

16           **DAVID DAHL, DEFENDANT'S WITNESS, SWORN**

17           THE CLERK:  Thank you.  You may be seated.  And for

18   the record, could you please state your full name, spelling

19   your last?

20                   THE WITNESS:  David E. Dahl, D-A-H-L.

21           THE CLERK:  Your city and state of residence?

22                   THE WITNESS:  I actually reside at Chena Hot Springs

23   Resort, Fairbanks, Alaska.

24           THE CLERK:  Thank you.

25           THE COURT:  Mr. Cohen.

### DIRECT EXAMINATION

BY MR. COHEN:

1  Q    Good afternoon, Mr. Dahl.  Can you tell the jury whether
-- first of all, how are you employed?

A    I'm the Assistant General Manager at Chena Hot Springs
Resort.

Q    And how long have you been residing in the Fairbanks area?

A    Been here since 1972.  That would be thirty-five years.

Q    Do you know Mr. Colette, my client, seated at counsel's
table?

A    Yes, I do.

Q    Do you recognize him?

A    Yes.

Q    And how do you know him?

A    I met him when I had a business on South Cushman.  He was
employed by me in early -- probably in 2001, 2002, in that
area.

Q    And what was the address of that business?

A    That was 1915 South Cushman.

Q    And what was the name of the business?

A    Auto Expressions.

Q    Mr. -- did Mr. Colette -- you say Mr. Colette worked for
you?

A    Yes.  He worked for me, then he quit, started his own, and
came back about six months later and bought me out.

1  Q    So he purchased the business?

2  A    Yes, he did.

3  Q    And at the time that he purchased the business -- I'm

4  sorry, do you recall what he -- what -- how much it was that he

5  purchased the business for?

6  A    The price I don't remember because a lot of it included

7  equipment and stock that I had, but the exact number I don't

8  recall.  It was basically inventory.

9  Q    Do you have any type of estimate, whether it was a hundred

10 dollars or a thousand dollars or ten thousand?

11 A    Oh, it was somewhere between twelve and fifteen thousand.

12 Q    And when he purchased the business from you, did he

13 purchase that with a check or did he use cash?

14 A    I don't remember.

15 Q    Do you recall when it was that he -- that he purchased the

16 business?

17 A    Would have been in January, and I believe it was 2004.  If

18 it wasn't four, it was 2003.  I have a little problem with my

19 last ten years.

20 Q    Did he -- as part of the sale, did he purchase the

21 business name or trademark?

22 A    Yes, he did.

23 Q    And -- do you know whether he eventually changed the name

24 of Auto Expressions after that?

25 A    He did change the name and it was Arctic something, but I

1   can't really remember.

2   Q    Are you familiar with his management style when he

3   purchased the business from you and went out on his own?

4   A    Yes, very much so.

5   Q    Okay.  And what was that?

6   A    He was very aggressive sales, hard worker, he worked

7   harder after he bought it from me than he did when he worked

8   for me, I'll tell you that.  When it had it himself, it was ten

9   and twelve hours a day.

10  Q    And was he a hands-on kind of person with the business, if

11  you know?

12  A    Very much so.

13  Q    Would he actually work with his employees?

14  A    He did everything from the top to the bottom.

15  Q    Are you aware of whether he had employees in the business?

16  A    Oh, yes, he did have employees.

17  Q    And do you know the number?

18  A    I was only in there a couple of times, but he put some

19  driving lights on for me and I think he fixed my auto-start,

20  and I would say he had three to five people there.

21  Q    How many employees did you have when you owned the

22  business?

23  A    Depended on the season, but sometimes about the same

24  number, three or four.

25  Q    And the business essentially did what?

1  A    Yes, my business did well until Jason left and then it

2  went downhill and he definitely -- when he bought me out, he

3  was going strong.

4  Q    And what -- what did the business do exactly?  What did

5  you do for customers?

6  A    It was -- it was selling stereo equipment, auto-starts,

7  anything -- any after-market equipment for the newer cars.

8  Q    So stereo equipment, after-market speakers?

9  A    Certainly, certainly.

10 Q    And that was essentially what you were doing?

11 A    I was doing the same thing, yeah.

12 Q    Do you recall approximately how many customers you had

13 when you sold the business?

14 A    Oh, that would be hard to determine.  I don't know.  We

15 probably sold -- taking a guess, but somewhere between fifteen

16 hundred and two thousand auto-starts a year.

17 Q    Say that again, sir.  What was that?

18 A    Fifteen hundred to two thousand auto-starts per year plus

19 the stereo business.

20 Q    And when you say auto-starts per year, what does that

21 mean?

22 A    That means that's how many we installed.

23 Q    Oh, stereos.

24 A    No, auto-starts -- remote-controlled auto-starts.

25 Q    Oh, auto-starts.

1  A    Auto-starts, yes.

2  Q    And how many stereos would you install?

3  A    I have no idea.  Can't remember.

4  Q    Something less than that or more?

5  A    Well, when you're talking about stereo setups, you're

6  talking about, you know, installing two speakers or installing

7  a three-thousand-dollar system, so it'd be hard to -- to pin

8  that down.

9  Q    'Kay.  So you --

10 A    We were heavier into the auto-starts than we were the

11 stereos, I know that.

12 Q    At that -- at that time.

13 A    Yep.

14 Q    'Kay.  And it was your impression in coming by the

15 business after you sold it that the business was more active

16 than before?

17 A    Definitely.

18 Q    And what did you base that opinion on?

19 A    Just on the amount of business that he had the days that I

20 was there.  I mean, he had the place full of cars and there was

21 some of the competition that was very concerned about how he

22 was doing.

23      MR. COHEN:  'Kay.  I'm going to ask the Clerk whether

24 we can mark -- we have -- we have a series of -- we have a

25 series of photographs.

1              (Pause - side conversation)

2              THE CLERK:  Sir, you have exhibit stickers on your

3   counsel table right there.  (Indiscernible -- voice too low)

4              MR. COHEN:  Oh, okay.

5                              (Pause)

6   Do we (indiscernible - away from microphone) should I start

7   with A?

8              THE CLERK:  Yes.

9              MR. COHEN:  Okay.

10             MR. COHEN:  I'm going to show you -- I'm going to

11  show you just a couple of these photographs and I'll try to

12  pre-mark some of the rest of them later before we bring in the

13  other witnesses.

14  BY MR. COHEN:

15  Q    I'm going to show you what I'm marking as Defense A and

16  Defense B for identification, and I'm going to ask you if you

17  recognize what's in those photographs?

18            (Defendant's Exhibits A and B marked for identification)

19  A    Yeah.  Exhibit A is -- that would be the showroom going

20  into the shop, and Exhibit B would be the shop itself behind

21  the showroom and the office.

22  Q    And is that the way it looked when you sold it?

23  A    Pretty much so.

24  Q    'Kay.  And are you aware of whether or not -- of how it

25  looked when -- later on when you came by to visit?

1    A    As I remember, yeah, this is pretty much the same.

2            MR. COHEN:  'Kay.  I'd move A and B into evidence,

3    Your Honor.

4            MR. BARKELEY:  May I -- may I see them, counsel?

5            MR. COHEN:  Yes.

6                            (Pause)

7            MR. BARKELEY:  Thank you.  No objection.

8            THE COURT:  Very well.  They will be received without

9    objection.

10        (Defendant's Exhibits A and B admitted)

11           MR. COHEN:  Okay.  Your Honor, I have no further

12   questions for this witness.

13           THE COURT:  All right.  Cross-examination?

14           MR. BARKELEY:  Yes, Your Honor.  Thank you.

15                      **CROSS-EXAMINATION**

16   BY MR. BARKELEY:

17   Q    Afternoon, Mr. Dahl.

18   A    Good afternoon.

19   Q    So you live out at Chena Hot Springs?

20   A    Yes, I do.

21   Q    Okay.  So you drove in here today for your testimony?

22   A    I came in yesterday.  Yeah.

23   Q    Yesterday?  Okay.  Is that Bernie Karl's place?

24   A    Yes, it is.  He's the general manager.

25   Q    Okay.  Yeah.  Okay.  How long have you worked out there

1  with Bernie?

2  A    Been with Bernie about three and a half years.

3  Q    Did you go to work for Bernie right after you sold or

4  shortly after you sold your previous business to the defendant,

5  Mr. Colette?

6  A    I think I sold out in January and I went to work for

7  Bernie in June --

8  Q    'Kay.

9  A    -- so whatever year that was.  That would have been three

10  years ago this June.  Wait.  Yes, I believe so.

11  Q    All right.  It sounds like you might have had a few months

12  off before you started working for Bernie --

13  A    I did, yes.

14  Q    -- after you sold the business --

15  A    Mm-hmm (affirmative).

16  Q    -- to Mr. Colette.

17  A    Yes.

18  Q    May I ask you, sir, how did you meet Mr. Colette?  How did

19  it come about that he was working for you?

20  A    I opened Auto Expressions when I was up at Airport and

21  Cushman, and had a number of people that were techs.  In fact,

22  I'm not even certain that Jason didn't work for me at that

23  location before I moved to South Cushman.  I went through a lot

24  of techs during those years.  They're hard to find -- good ones

25  are very hard to find, and I just met him through the stereo

<u>Dahl - Cross</u>                                    2-173

1  and auto-start business.  Everybody kind of knows each other.

2  The auto trim people and -- and all those new ones that are in

3  town now.

4  Q    Okay.  How much were you paying him?

5  A    He was being paid a commission.  He'd be paid a certain

6  amount for each auto-start and a certain amount for each stereo

7  system.

8  Q    Ball park, how much a year you figure you were paying him?

9  A    I'd have to go back in the records.  I don't know.

10  Q    Pay him in cash or pay him with a company paycheck?

11  A    Paid him in cash.

12  Q    You recall the question about what you sold the business

13  to Mr. Colette for, about twelve to fifteen thousand dollars,

14  was that --

15  A    Right.

16  Q    -- your testimony?

17  A    Somewhere in that vicinity.

18  Q    Okay.  And then I wrote down that you didn't remember

19  whether you got cash or a check for that.

20  A    Yes, and I don't.

21  Q    You don't?

22  A    I don't remember.

23  Q    Is it often that you receive twelve to fifteen thousand

24  dollars in cash and that's why you can't remember that if that

25  happened?

1  A    No, it's not very often that you get twelve to fifteen

2  thousand in cash, no.

3  Q    What did you mean, sir, when you said you have a little

4  problem with your last ten years?

5  A    Just the fact that my -- I got a divorce, my wife died, I

6  had some problems with the estate, and all of that.  It's just

7  been a tough ten years.

8  Q    I'm sorry to hear that.

9  A    No problem.

10  Q    So are you saying it somehow affects your ability to

11  remember?  That remark came upon the -- was following the idea

12  of what happened, whether it was a cash or check transaction

13  with Mr. Colette.

14  A    Well, I said in the last ten years, I jumped around, done

15  different things, and it's only been the last three and a half

16  years that I've really knuckled down and worked for Bernie

17  full-time.

18  Q    All right.  So I guess the best that can be said is that

19  Mr. Colette might have paid you in cash for the business, but

20  you don't recall?

21  A    It's very possible.

22  Q    Before you came to court today, did you look to see if you

23  had a check around indicating that Mr. Colette paid you with a

24  check?

25  A    No, I do not have my records anymore for Auto Expressions.

1  Q    How many times did you visit the business after you sold

2  it to Mr. Colette?

3  A    I'm thinking about three different times.

4  Q    How -- how long were you there each time?

5  A    He fixed my auto-start once, that probably took half hour,

6  forty-five minutes, and I probably stayed there an hour.  And

7  he put on some driving lights for me, that probably took two,

8  two and a half hours, and the other thing -- the other time I

9  think I just stopped in to talk to Jay.

10  Q    When you say Jay, are you're referring to the defendant?

11  A    Jason.

12  Q    Okay.  A nickname?  Okay.  How long did you talk with Jay

13  at that time?

14  A    Probably not a lot.  He was pretty busy.  You know, ten,

15  fifteen minutes.

16  Q    Okay.  So would it -- would it be fair to say maybe the

17  total amount of time you spent at that business after you sold

18  it to Mr. Colette was five hours?

19  A    Very likely.

20  Q    Now during all that time, the whole five hours, did you

21  see anybody on the property smoking marijuana?

22  A    No, I did not.

23  Q    Did you see anybody come there and buy drugs?

24  A    No, I did not.

25  Q    Did anybody display a machine gun to you?

1    A    Never.

2    Q    Do you know any -- the names of any of the employees that

3    Mr. Colette had working for him when you visited his place?

4    A    I may have known them at the time by first-name basis, but

5    as far as their first and last name, no, I did not.

6    Q    So Kenji Badger?

7    A    Kenji sounds familiar, but I'm not sure.

8    Q    David Sauer?

9    A    I don't recognize that.

10   Q    Damon Wamsley?

11   A    Don't recognize that.

12   Q    So you're not -- you're not sure whether those people were

13   even employees of Mr. Colette at the time you visited his

14   business?

15   A    No, I'm not.

16   Q    Did you know the names of any of his employees when you

17   visited him?

18   A    No.

19   Q    I believe you said you were heavier into auto-starts than

20   stereos when you were running your business?

21   A    That's true.

22   Q    How heavy are we talking?  I know you said up to maybe --

23   A    Excuse me?

24   Q    How heavy are we talking?  You said I think maybe up to

25   two thousand auto-starts a year?

1    A    Right.  And I'd say we probably did sixty, seventy percent

2    of our business was auto-starts.

3    Q    Okay.  Was the rest stereos then?

4    A    Yes.

5    Q    What percentage of your receipts -- your gross receipts

6    would you say were cash?

7    A    I have no idea.

8    Q    Did you pay all your employees in cash though?

9    A    Yes, I did.

10   Q    Did you keep records of what you were paying them?

11   A    Yes, I did.

12   Q    Were all your employees paid on a commission basis like

13   Mr. Colette?

14   A    Yes, they were.

15   Q    So I take it that's why his ability as a salesman was

16   important to you.  You said he was an aggressive salesman

17   because he gets a commission for every auto-start he sells or

18   brings into the shop?

19   A    He was paid a certain percentage on each auto-start he

20   installed.

21   Q    After you sold the business to Mr. Colette, aside from the

22   visits to his business maybe three times, about five hours,

23   when, if any other time other than that, did you see Mr.

24   Colette?

25   A    I don't remember seeing him.  If I saw him, it was in

1  passing in town, and I don't remember that.

2  Q    So other than just in passing, you didn't have any contact

3  with Mr. Colette after you sold him the business except for the

4  visits you mentioned?

5  A    That's correct.

6  Q    How about in November of 2005, were you in contact with

7  Mr. Colette at that time?

8  A    Not that I'm aware of.

9  Q    Specifically, on November -- on or about November of 2005,

10  maybe late November, Thanksgiving time, were you in contact

11  with Mr. Colette?

12  A    Not that I remember.  Is there something that I -- did I

13  meet him at the shop or what -- I don't understand.

14  Q    Well, do you know as you sit here today that Mr. Colette's

15  house was searched in November of 2005 by the police?

16  A    I read that in the paper.

17  Q    But you didn't know of -- anything about that --

18  A    Nothing.

19  Q    -- other than what you read in the paper.

20  A    Nothing.

21  Q    Okay.  So what did you read in the paper that you recall?

22         MR. COHEN:  Objection, Your Honor.

23         THE COURT:  Well, can you recall?

24         THE WITNESS:  All I can recall is that Jason was

25  arrested and charged with selling drugs and that the police had

1  cordoned the building off.  I did drive by the building several

2  times when I was in town, but that was the extent of it.

3  BY MR. BARKELEY:

4  Q    Okay.  So you -- you read that he was arrested for

5  something to do with drugs.

6          MR. COHEN:  Objection.  Again, the previous objection

7  calls for hearsay --

8          THE COURT:  Well, it's asked and answered.

9          MR. COHEN:  -- (indiscernible) --

10          THE COURT:  Sustained.

11  BY MR. BARKELEY:

12  Q    Is that the first time you became aware of Mr. Colette --

13  A    The very first.

14  Q    -- and drugs --

15  A    Very first time that I was aware that Jason Colette was

16  involved in drugs.

17  Q    How long did he work for you?

18  A    Off and on, somewhere around two years.

19  Q    Did you ever go over to his house?

20  A    Never have been.

21                    (Pause)

22  Q    Now you said you -- you -- after the business -- you sold

23  him the business, you -- you liked his management style, is

24  that right?

25  A    He was good at it.  Very good at it.

1  Q    Could you describe that a little more for the jury?  What

2  did you mean by that?  What was his management style?

3  A    What I mean by that is he was very aggressive, he sold

4  hard, he sold high, he made money.  He wasn't a lazy person.

5  Never.  Oh, he did very well.  He had some people in town very

6  concerned -- the competition was very concerned that Jason was

7  going to get big.  He was doing very well.

8                        (Pause)

9  Q    So the three times you visited the business when Mr.

10  Colette had it, one was just a social visit, is that right?

11  A    That's correct.

12  Q    Okay.  But two times you had a little work for his shop to

13  do?

14  A    Yes.

15  Q    How did you pay Mr. Colette at that time?

16  A    I don't remember, but I believe I paid him in cash.  The

17  one was warranty, my auto-start, he fixed that free of

18  charge --

19  Q    That was --

20  A    -- which is normal.

21  Q    Was that a warranty issue by you?

22  A    Actually, he installed it in my vehicle when I owned the

23  truck, yes.

24  Q    (Indiscernible - microphone interference) so you went in

25  and -- claimed on your own warranty, is that right?

1  A    He was very good about that warranty work.

2  Q    Did you know any of Mr. Colette's friends outside the

3  shop?

4  A    Yes, I did.  I knew a fellow installer, and I can't even

5  remember his name right now.  He worked alongside Jason when I

6  owned the -- the -- the business.  That and there was some

7  people from Hoyt's that -- that Jason knew that were friends of

8  his.  Derek somebody and, of course, Hoyt himself, Greg.  Other

9  than that, no, I didn't know any of his -- his close friends or

10 who he went snow machining with or that.  There's a mechanic

11 over at -- oh, I can't think of the shop now, but it's -- it's

12 a snow machine shop, he was a good friend of Jason's.  I don't

13 remember his name.  I knew them casually, at work, never did

14 participate after hours with him.  I was quite a bit older than

15 they and they didn't have much in common with me.

16 Q    Did -- after Mr. Colette bought the business from you, do

17 you know whether he was doing any work other than installs and

18 electronics on cars?  That is, just, you know, basically --

19 A    No, I don't know any --

20 Q    -- fix-it-up cars?

21 A    Far as I know, he was doing exactly what we were doing

22 before he purchased it.

23 Q    When you visited, did you ever see any -- any junkers or

24 fix-up projects in the lot?

25 A    We always had a project here and there.

Dahl - Cross/Redirect                                        2-182

1   Q    Did you know any of his customers who were having rigs

2   worked on there?

3   A    No, I don't.

4   Q    Do you know Eugene Johnson?

5   A    Who?

6   Q    Eugene Johnson.

7   A    I don't recognize the name.

8                          (Pause)

9   Q    You ever remember seeing a '63 Chevy Impala at the shop?

10  A    A '63?

11  Q    Chevy Impala?

12  A    Jason had a blue one.  I don't know if that was a '63 or

13  not.  I don't know.

14  Q    But you recall seeing an (indiscernible - microphone

15  interference)?

16  A    Excuse me?

17  Q    A blue Impala -- you saw a blue Impala there?

18  A    Right.

19          MR. BARKELEY:  Nothing further, Your Honor.

20          THE COURT:  Redirect?

21          MR. COHEN:  Yes, Your Honor.

22                  **REDIRECT EXAMINATION**

23  BY MR. COHEN:

24  Q    So when you sold the business, you were not installing

25  alarms?

1  A    Yes, we were installing alarms and auto-starts, stereo

2  equipment --

3  Q    Alarms, auto-starts, stereos.

4  A    Mm-hmm (affirmative).

5  Q    And when you say that when you were operating the

6  business, the majority of the -- well, what percentage of the

7  receipts from customers came in cash?  If you can give us an

8  estimate?

9  A    That's hard to say because we did honor credit cards.  A

10 ball park figure, you're probably talking about twenty-five

11 percent.

12 Q    And -- and you say that when you -- when you had your --

13 when you came in for work later on after Jason bought the

14 business, you paid in cash?

15 A    Yes, I did.

16 Q    Now you talked about how Mr. Colette was a sales -- a good

17 salesman.  Was he also -- was he also -- would he also actually

18 install the alarms and the auto-starts and the stereos?

19 A    Yes.  He was probably the best -- best installer in

20 Fairbanks for auto-starts, alarms, and stereos.

21         MR. COHEN:  Nothing further, Your Honor.

22         THE COURT:  Recross?

23         MR. BARKELEY:  No, thank you, Your Honor.

24         THE COURT:  Thank you, sir.  You're free to go.

25         THE WITNESS:  Thank you.

1     THE COURT:  Have a good day.  Next witness?

2     MR. COHEN:  Next witness is Ryan Schultz, Your Honor.

3     THE COURT:  All right.

4                        (Pause)

5  All right, sir.  If you'll just come up -- get -- get back by

6  that blue chair here, and remain standing just for a second, my

7  Clerk will swear you in.

8     THE CLERK:  Could you raise your right hand?

9  **RYAN SCHULTZ, DEFENDANT'S WITNESS, SWORN**

10    THE CLERK:  Thank you.  You may be seated.  Sir, for

11 the record, could you please state your full name, spelling

12 your last?

13    THE WITNESS:  Ryan Michael Wayne Schultz,

14 S-C-H-U-L-T-Z.

15    THE CLERK:  Thank you.

16    THE COURT:  Mr. Cohen.

17    MR. COHEN:  Yes.

18                   **DIRECT EXAMINATION**

19 BY MR. COHEN:

20 Q   Mr. Schultz, how are you employed?

21 A   I work down at Pogo Goldmine.

22 Q   And what do you do there?

23 A   I'm a mill mechanic.

24 Q   Do you do any business with your truck?

25 A   Now now.  I'm -- I'm just getting out of business right