<u>Schultz - Direct</u>

1    now.   Just started a new job.

2    Q    Okay.   Do you recognize Jason Colette?

3    A    Yes.

4    Q    Okay.   And do -- how do you know him?

5    A    I used to have a Matco tool truck and I went there on

6    Fridays, once a week, and sold tools to his shop.

7    Q    When you say I went there once a week, where is -- where

8    are you talking about?

9    A    To his shop on South Cushman, Arctic Alarm.

10   Q    That was -- that would be Arctic Alarm and Audio?

11   A    Yeah.   Yes, sir.

12   Q    1915 South Cushman?

13   A    Yes.

14   Q    I'm going to show you what's been marked as Defendant's

15   Exhibit C for identification.   Do you recognize this

16   photograph?

17        (Defendant's Exhibit C marked for identification)

18   A    Yes, I do.

19   Q    What is that -- what is that a picture of?

20   A    The previous Arctic Alarm and Audio shop.

21   Q    That's the one that we're just talking about --

22   A    Yeah.

23   Q    -- on 1915 South Cushman?

24   A    Yes.

25   Q    And you say you would go there about once a week?

<u>Schultz - Direct</u>

1   A    Yep.

2   Q    And what was the time period that you would go there?

3   A    Usually Friday afternoons.

4   Q    I'm talking about 2001, 2005, 2003 --

5   A    Oh.

6   Q    -- do you remember?

7   A    About December of 2004 to November of 2005, is the time

8   span.

9   Q    And can you explain what your business was with your truck

10  at that time overall?

11  A    It's Matco Tool mobile tool distributor truck.  Sold hand

12  tools.

13  Q    What type of tools?

14  A    Hand tools.

15  Q    Hand tools?

16  A    Mm-hmm (affirmative).

17  Q    Okay.  And did you go to any businesses other than Mr.

18  Colette's?

19  A    Yeah.  I'd go to stops all over town every day of the

20  week.

21  Q    And how much money -- and -- and when you went to Mr.

22  Colette's business, were you -- did you sell tools there?

23  A    Yes, I did.

24  Q    And you went there every Friday.

25  A    Yep.  Yes, sir.

Schultz - Direct

1   Q    And about how many -- do you remember the magnitude or how

2   many tools you would sell each Friday?

3   A    Not each day, but roughly in the time span of that year,

4   about a thousand dollars worth of tools.

5   Q    So you would go there and see if he needed tools --

6   A    Yeah.

7   Q    -- if he didn't, you would leave.

8   A    Yeah, yeah.

9   Q    So he --

10  A    If he needed tools or I would warranty them, anything that

11  got broke.

12  Q    So you made -- you would make calls on various businesses.

13  If they needed tools, you would sell it to them.

14  A    Yes.

15  Q    And when you were at the -- at the business, at Arctic

16  Alarm and Audio, did you notice -- well, what time of the day

17  would you get there?

18  A    Around -- anywheres from two to four o'clock in the

19  afternoon.

20  Q    And who was the person you dealt with that purchased the

21  tools?

22  A    Usually Jason or some of the employees that were there.

23  Q    And when you would arrive there, would Jason be there or

24  not be there?

25  A    Most of the time he was there.  Sometimes he was out.

<u>Schultz - Direct</u>

1  Q    And when you were there, did you notice that there were

2  any employees of the business?

3  A    Yes, there was.

4  Q    Approximately how -- how many employees did you see?

5  A    About two.

6  Q    Did you see them working on cars?

7  A    Yes, I did.

8  Q    Every time you were there, were they open?

9  A    Yes, I did.   They were always open.

10 Q    And did they have business -- did they have cars that they

11 were working on?

12 A    Yes.

13 Q    Did they seem to be busy to you or you couldn't tell?

14 A    There was always cars in there, so to me it seemed always

15 busy.

16 Q    When you were paid for the tools, do you remember how you

17 were paid?

18 A    Most of the time cash or check.  It varies, just as with

19 everybody.  They have a check, then they pay with a check; if

20 they cash, they pay with cash.

21 Q    And in the case of Mr. Colette, do you know whether they

22 paid in cash or in check, or you don't remember?

23 A    He paid in cash and in check.

24 Q    Sometimes you would get cash and sometimes you would get a

25 check.

1  A    Yes.

2  Q    And are you saying that -- that you would go -- you went

3  over a period of about ten months, is that what you're saying?

4  A    Yeah.

5  Q    And in that time, you're saying you -- you sold about a

6  thousand dollars worth of tools or more?

7  A    Roughly right around a thousand.

8         MR. COHEN:  I don't have any further questions for

9  this witness, Your Honor.

10         THE COURT:  Okay.  Thank you.  Cross-examination.

11                    **CROSS-EXAMINATION**

12  BY MR. BARKELEY:

13  Q    Hi, Mr. Schultz.

14  A    Hi.

15  Q    The Pogo Mine.  Is that that mine north of Delta?

16  A    Yes, it is.

17  Q    Okay.  And you're -- you're leaving there right now?

18  A    Yeah.  I started nine days ago.

19  Q    You started there nine days ago --

20  A    Yeah.

21  Q    -- and you're now going somewhere else?

22  A    No.  I just --

23  Q    Or you just -- that's the new job.

24  A    -- just started there, yeah.

25  Q    Oh, good.  Congratulations.  But -- but you used -- before

1    that, is that when you drove this tool truck?

2    A    Yes.

3    Q    Okay.   How long did you drive the tool truck?

4    A    Three years.

5    Q    And how many times would you just sort of guess that you

6    went over to Mr. Colette's shop during that three years?

7    A    Gee, it was just in those times from like December of '04

8    and I just -- just barely started, until about ten months after

9    that, so --

10    Q    Okay.

11    A    -- once a week.

12    Q    All right.   December '04 until sometime late in '05?

13    A    Yeah.

14    Q    Fair enough?   Okay.   Now late in '05, you know that Mr.

15    Colette was arrested in possession of cocaine at his house,

16    correct?

17    A    Yes.

18    Q    When did you find that out?

19    A    Probably a week after it happened, just word on the

20    street.

21    Q    Okay.   I take it you had not ever had any cocaine dealings

22    with Mr. Colette?

23    A    No, I did not.

24    Q    So there was -- there was that side of Mr. Colette that

25    you did not know anything about?

1  A    No, I didn't.

2  Q    Did you ever go over to Mr. Colette's house?

3  A    No, I did not.

4  Q    Mr. Colette ever show you any weapons while you were at

5  his shop?

6  A    No.

7  Q    Did he ever talk to you about weapons?

8  A    No.

9  Q    Or drugs?

10  A    (No audible reply)

11         THE COURT:  You have to speak out loud.

12  A    No.

13  BY MR. BARKELEY:

14  Q    Do you remember the names of any of the employees who you

15  met at the shop?

16  A    Whitney Cook, Kenji -- I don't know his last name, and

17  Russ Christie.

18  Q    Okay.  I'm sorry.  Whitney Cook, Kenji somebody and --

19  A    Mm-hmm (affirmative).  And Russ -- Russell Christie.

20  Q    -- Russell Christie.  Okay.  Okay.  This Kenji guy, would

21  that be Kenji Badger?

22  A    I believe so, yeah.

23  Q    Well, you don't have to guess.  I mean, I don't mean to

24  put words in your mouth.

25  A    I have no idea what his last name was.

1    Q    Okay.  Just someone named Kenji who worked there at that

2    shop.

3    A    Yeah.  Yes, sir.

4    Q    How well did you get to know these employees, Mr. -- Mr.

5    Cook, Kenji, and Mr. Christie?

6    A    Just on a weekly basis, you know.  Sold them tools, that

7    was it.  I never did anything else with them off of work.

8    Q    Just say you were there like I'm one of the employees on

9    an average Friday and you pull up in your truck.  How long are

10   you going to stay there with us at the shop?

11   A    Fifteen, twenty minutes.  Usually, I was in and out.  You

12   know, I had other stops to go to.

13   Q    So would it be fair to say you didn't really get to know

14   any of those employees very well?

15   A    No.  I didn't.

16   Q    Did you ever do anything with them socially?

17   A    Nope.

18   Q    With Mr. Colette?

19   A    No.

20            MR. BARKELEY:  Nothing further, Your Honor.

21            THE COURT:  Redirect?

22            MR. COHEN:  Your Honor, there's actually a couple of

23   questions on redirect that I forgot to ask him --

24            THE COURT:  Go ahead.

25            MR. COHEN:  -- if I could have permission --

1          THE COURT:  Go ahead.

2          MR. COHEN:  -- real quick.

3                    **REDIRECT EXAMINATION**

4    BY MR. COHEN:

5    Q     Are you aware of whether Arctic Alarm and Audio

6    advertised?

7    A     Just on the road on the signs is all I've ever noticed.

8    Q     Do you remember ever hearing ads on the -- so you saw road

9    sign advertisements?

10   A     Mm-hmm (affirmative).

11   Q     Do you remember hearing ads on the radio?

12   A     I don't know.

13   Q     If I show you a -- part of a -- if I show you a document

14   -- a prior transcript of an earlier statement, would that maybe

15   refresh your recollection?

16   A     Yeah.

17                         (Pause)

18   Q     (Indiscernible - away from microphone)

19   A     Yeah.

20          THE COURT:  You know you have to be at a microphone.

21          MR. COHEN:  I'm sorry.  I'm not a quick learner by --

22          THE COURT:  Okay.

23          MR. COHEN:  -- by any means.

24   BY MR. COHEN:

25   Q     Does that refresh your recollection --

1  A    Yeah.

2  Q    -- that document I showed you?

3  A    Yeah.

4  Q    After reviewing that, do you recall advertisements for

5  Arctic Alarm and Audio -- and Audio on the radio?

6  A    Vaguely on the radio, nothing on TV or anything like that.

7  Q    Okay.  Do you remember seeing business cards when you were

8  there?

9  A    Yes.

10  Q    And did it appear that the business was open during

11  regular weekday business hours?

12  A    Yeah.  Yes, sir.

13  Q    What about on the weekends?

14  A    I -- if I remember, Saturdays they were open for a short

15  period of time.

16         MR. COHEN:  Okay.  I have no further questions.

17         THE COURT:  Recross?

18         MR. BARKELEY:  No, thank you, Your Honor.

19         THE COURT:  Thank you, sir.  You're free to go.  Have

20  a good day.  Next witness, Mr. Cohen?

21         MR. COHEN:  Yes.  The next witness, Your Honor, is

22  Lee Sumpter.

23         THE COURT:  'Kay.

24                         (Pause)

25  All right.  Sir, just head on up this way.  We've got a chair

1  for -- up here at the front.  You just need to get near that

2  chair and remain standing for a second, my Clerk will swear you

3  in, and we'll go from there.

4                          (Pause)

5          **LEE SUMPTER, DEFENDANT'S WITNESS, SWORN**

6          THE CLERK:  Thank you.  You may be seated.  For the

7  record, could you please state your full name, spelling your

8  first and last?

9          THE WITNESS:  Lee Ryan Sumpter.  L-E-E

10  S-U-M-P-T-E-R.

11          THE CLERK:  Thank you.

12                  **DIRECT EXAMINATION**

13  BY MR. COHEN:

14  Q    Good afternoon, Mr. Sumpter.  Can you tell the jury --

15  thank you for coming.  Can you tell the jury how you're

16  currently employed?

17  A    I own a Mack Tool distributorship.  It's a tool company.

18  Q    'Kay.  And how long have you been in that business?

19  A    Three years.

20  Q    Do you know Mr. Colette, my client?

21  A    Yes.

22  Q    You recognize him?

23  A    Yes.

24  Q    And how do you know him?

25  A    He was one of my customers at his audio shop.

1   Q    Okay.  Do you remember the name of the audio shop?

2   A    Arctic Alarm and Audio.

3   Q    Do you remember where it was located?

4   A    It was off South Cushman.  I don't remember the exact

5   address.

6   Q    Do you remember what time period in terms of years that

7   you interacted with that business?

8   A    I think it was for about a year.

9   Q    Can you tell us when that was?

10  A    Gee, I started off -- probably the end of 2004 into the --

11  right close to the end of 2005 if I remember correctly.

12  Q    End of 2004, end of 2005, approximately?

13  A    Yeah.

14  Q    And did you have a what -- what type of -- did you sell

15  tools?

16  A    Yes.

17  Q    What type of tools did you sell?

18  A    Hand tools, electronics.  Most tools related with

19  automotive repair, maintenance, customizing.

20  Q    And how -- how many customers did you have including Mr.

21  Colette?

22  A    Somewhere between three hundred and three hundred and

23  fifty.

24  Q    And did you make deliveries to that particular business

25  before Mr. Colette owned it?

1  A    No, I did not.

2  Q    How frequently did you make tool deliveries to the

3  business?

4  A    Once a week.

5  Q    And when did you go?

6  A    It was Mondays.

7  Q    And what time?

8  A    Either right before noon or right after noon.

9  Q    And every time that you went, would you sell tools?

10  A    Not every time.  Most of the time, yeah.

11  Q    Most of the time they would buy tools?

12  A    Mm-hmm (affirmative).

13  Q    And who is the person that you -- that purchased the tools

14  at the -- at the business?

15  A    Mr. Colette would -- would purchase tools, and he had some

16  other employees -- Russell Christie would buy tools, Dave Sauer

17  would also buy tools, Damon Wamsley, Kenji -- I can't remember

18  his last name.  Most of the people that were employed in the

19  shop would buy tools from me.

20  Q    And when tools were purchased from you, do you recall if

21  you were paid in cash or by check?

22  A    I'd have to look at my records for that.  I don't recall

23  off the top of my head.

24  Q    All right.  Did some of your customers pay you in cash?

25  A    Yes.

1   Q    What percentage of your business is in cash?

2   A    Let's see, I'd say probably about a third.

3   Q    Do you recall approximately how much in terms of -- how

4   much -- how many tools they bought in terms of cost over the

5   year that you were dealing with them?

6   A    With Mr. Colette?

7   Q    Yeah.

8   A    I'd say probably somewhere around fifteen hundred dollars.

9   Q    When you -- do you see exhibit -- what's been -- actually

10  what's been marked as Exhibit C in front of you?

11  A    That picture of the shop?

12  Q    Yes.  I was going to say, what is that?

13  A    Oh, it's a picture of the shop he was running.

14  Q    And were you -- did you actually go into the shop?

15  A    Yes.

16        MR. COHEN:  I'm going to show you what's been marked

17  as Defendant's Exhibit E.

18        (Defendant's Exhibit E marked for identification)

19        MR. BARKELEY:  Thank you, counsel.  Before you do

20  this one, can you ask the witness what the exhibit is marked

21  that he just testified about?  I don't think he said for the

22  record what that is.

23        THE WITNESS:  It says -- actually, there's -- there's

24  no exhibit number, it's just a case number C.

25        MR. COHEN:  Right.  It's on the wrong line.

1    THE WITNESS:  Okay.

2    MR. COHEN:  (Indiscernible - away from microphone)

3    THE WITNESS:  Yes, this is a picture of the building

4  that Arctic Alarm and Audio was operating out of.

5    MR. BARKELEY:  But it's not -- is it marked yet?  Is

6  it --

7    MR. COHEN:  It's marked C.

8    MR. BARKELEY:  C.  Okay.

9    MR. COHEN:  (Indiscernible - away from microphone)

10    MR. BARKELEY:  You're referring to C.  Thank you.

11    MR. COHEN:  (Indiscernible) referring to C, yes.

12  I'll move C into evidence (indiscernible - away from

13  microphone).

14    MR. BARKELEY:  No objection.

15    MR. COHEN:  (Indiscernible - away from microphone)

16    THE COURT:  Okay.  C will be received without

17  objection.

18    (Defendant's Exhibit C admitted)

19    MR. COHEN:  Okay.  I'm now going to walk up there and

20  I'm not going to say anything.

21    THE COURT:  Okay.  We'll see.

22    (Pause)

23    MR. COHEN:  All right.  I'm showing you -- okay.

24  BY MR. COHEN:

25  Q    I'm showing you what has been marked as Exhibits E, F, and

1    H.   Do you see those?

2         (Defendant's Exhibits E, F, and H marked for

3    identification)

4    A    Yes.

5    Q    Do you recognize them?

6    A    I -- I do not recognize this one possibly, but it's --

7              THE COURT:  Give us a number.

8              THE WITNESS:  Exhibit H.

9              THE COURT:  H.  You don't recognize H?

10             THE WITNESS:  Not --

11   BY MR. COHEN:

12   Q    If you don't recognize them, that's fine.  If any one --

13   if you recognize any of them, then let me know.

14   A    Yeah, I don't -- I don't recognize E, F, and I'm not

15   positive about H.  Looks like a lot of shops.

16   Q    Okay.  I'm going to show you what's been marked as Exhibit

17   Q.

18        (Defendant's Exhibit Q marked for identification)

19   A    Okay.

20                            (Pause)

21   Q    Do you recognize that?

22   A    Not to the best of my recollection, no, I do not.

23   Q    And now -- that's fine.  I'm going to go on to another

24   question.  So when you -- when you appear on Mondays, if you

25   recall, was -- when you would appear, was the business open and

1   running?

2   A    Yes.

3   Q    Did it appear to have work to do?

4   A    Yes.

5   Q    Did it appear that there were employees present?

6   A    Yes.

7   Q    Approximately how many employees were there, if you

8   recall?

9   A    I'd say on the average probably three employees at all

10  times.

11  Q    And when the three -- and were the three employees

12  standing around or did they appear to be occupied?

13  A    They were usually pretty busy working.

14  Q    And what is it they were doing that you observed?

15  A    Installing auto-starts, stereos, a little bit of custom

16  fabrication on vehicles.

17  Q    Okay.  So you saw different vehicles there?

18  A    Mm-hmm (affirmative).

19  Q    Every time you went?

20  A    Yeah, usually.  Sometimes the same vehicle getting more

21  work done to it.

22  Q    Did you -- are you aware of whether or not the business

23  advertised?

24  A    Excuse me?

25  Q    Are you aware of whether or not the business had

1  advertisements?

2  A    Yes, I actually heard -- I believe they had advertisements

3  on the radio.

4  Q    Did you ever have any work yourself done at the business?

5  A    Yes.

6  Q    How many times?

7  A    Just one job.  I had a alarm and auto-start installed on

8  my tool truck.

9  Q    Okay.  How was that done?  Was it a good job or a bad job?

10  A    No, it was good.

11  Q    Did you pay him in cash or did you pay by check?

12  A    It was a check.

13  Q    Now with respect to the advertisements -- with respect to

14  the advertisements, do you recall how many times you heard them

15  on the radio?

16  A    I think I'd hear them a couple of times throughout the

17  day.

18  Q    So you would hear them several times throughout the day?

19  A    Yes.

20  Q    Now earlier you said that you believed that they purchased

21  approximately a thousand dollars over the year of tools.

22  A    Are we talking about the whole shop or -- or just Mr.

23  Colette individually?

24  Q    I'm talking about the whole shop.

25  A    Oh, the whole shop?  Without looking at my records, I'd

1    kind of have to guesstimate, three, four thousand dollars

2    within that -- within that year.

3    Q    Okay.  And again, you don't recall whether that was cash

4    or by check?

5    A    I -- I don't recall.  I'd have to look at my records.

6                MR. COHEN:  Okay.  I have no further questions, Your

7    Honor.

8                THE COURT:  Cross-examination?

9                      **CROSS-EXAMINATION**

10   BY MR. BARKELEY:

11   Q    Hi, Mr. Sumpter.  For this approximate year period that

12   your company was doing business with Mr. Colette's business

13   there at Arctic Alarm and Audio, did you ever see a '63 Chevy

14   Impala there?

15   A    Yes.

16   Q    Happen to notice it?  Okay.  Color -- do you remember the

17   color?

18   A    A light blue, silverish blue.

19   Q    Did you ever talk to anybody there about it?

20   A    Just a little bit.  Admiring it.

21   Q    Ever talk to the defendant about it?

22   A    Yes.

23   Q    So what's your understanding of who it belonged to?

24   A    I thought it belonged to Jason.

25   Q    What kind of tools did you sell to Arctic Alarm?

1    A    The one tool that stands out in mind was a scan tool for

2    computer diagnostics on the vehicles.  It was a rather larger

3    item, more expensive item.  That one stands out very clearly.

4    A lot of wiring tools.

5    Q    Okay.  This scan tool, about how much does one of those go

6    for?

7    A    Anywhere from eleven hundred to fifteen hundred dollars.

8    Q    Okay.  So if you did about three to four grand worth of

9    business for that year, scan tool -- just one scan tool would

10   be about half of it, wouldn't it?

11   A    Or a third.  A quarter, I mean.  I'd have to look at my

12   account histories to give a more accurate number.

13   Q    Okay.  And three or four thousand, that's -- let's take

14   the high end, four thousand over, say, only ten months even

15   instead of a year, four hundred bucks a month business --

16   A    Yeah.

17   Q    -- is what you had going with Mr. Colette's shop?

18   A    About average.

19   Q    Is -- would you say that's one of your bigger customers?

20   A    No, I wouldn't say that.

21   Q    It's probably one of your smaller customers, isn't it?  I

22   mean, four hundred bucks a month?

23   A    It's about average.

24   Q    You mentioned some names.  Let me ask you about those guys

25   briefly if I can.  Russell Christie.  How do you know him?

1  A    He was one of my customers at the -- at Hoyt's Audio, and
2  then he was also a customer in there at Arctic Alarm.
3  Q    Okay.  So you -- you knew him from back in the day at
4  another place?
5  A    Yes.
6  Q    And then you saw him working here at Mr. Colette's shop.
7  A    Yes.
8  Q    Okay.  How about Dave Sauer?
9  A    Same.  Dave also worked at Hoyt's and then at Arctic
10  Alarm.
11  Q    Okay.  And how about Damon Wamsley?
12  A    Actually, I know Damon Wamsley back from elementary
13  school.  Known him a long time.
14  Q    Okay.  You guys are both from here, Fairbanks?
15  A    (No audible reply)
16  Q    And Kenji.
17  A    I only knew Kenji from Arctic Alarm to the best that I
18  remember.
19  Q    Okay.  Take -- take Damon.  It sounds like you've known
20  him the longest anyway.  Did you ever see him outside of the
21  business relationship you had with Colette's business?
22  A    Like on social --
23  Q    Socially or -- yeah, hanging out?
24  A    Nah, not really hung out or anything.  May run into him in
25  the store or something, say hello, but --

1  Q    But just kind of a fleeting thing.  You didn't really have

2  a -- a close friendship at all.

3  A    No.

4  Q    Okay.  Is the same thing true of Russell Christie?

5  A    Correct, but I have known Russell since elementary school.

6  Q    Okay.  You've known him for a long time, but you didn't

7  hang around with him or consider him a close friend of yours?

8  A    No.

9  Q    Okay.  Dave Sauer?

10  A    Same.

11  Q    Okay.  I'm sorry.  Forgive me if I asked you about Kenji.

12  Kenji?

13  A    Same.

14  Q    Same.  Okay.  So with respect to -- are those the only

15  employees you remember working at Arctic when you went there?

16  Except for Mr. Colette, of course.

17  A    Yeah.  Every once in awhile I'd see somebody in there

18  helping out with maybe one of the larger projects.  Maybe

19  someone that might be involved for a little bit more or

20  specialty on customizing a box or --

21  Q    Some kind of particularly difficult job where they bring

22  in somebody who's done that or something?

23  A    Yeah.

24  Q    Okay.  Well, with regard to those four guys -- Russell

25  Christie, Dave Sauer, Damon Wamsley, and Kenji -- then you

1    really didn't know much about them other than what you saw at

2    this business relationship and shop where you'd call and talk

3    about tool sales possibly, right?

4    A    Correct.

5    Q    Okay.  How about Mr. Colette?  Were you a close friend of

6    his, or are you?

7    A    No.

8    Q    Ever do anything with him socially?

9    A    No.

10   Q    Did you ever go to his house?

11   A    No.

12   Q    Ever talk to him about how he handled his gross receipts

13   for his business?

14   A    I think I remember having a conversation -- I was actually

15   referring him to my tax accountant, told him that he did a good

16   job for me and seemed like he knew his stuff as far as small

17   business goes.

18   Q    Okay.  Now in your business, did you estimate you get paid

19   about a third of the time in cash?

20   A    Approximately.

21   Q    Okay.  And then what do you do with your cash?

22   A    Deposit it in the bank.

23   Q    When you were at the shop on the Arctic premises, did you

24   ever observe anybody smoking marijuana?

25   A    No.

1   Q    Ever see anybody purchase cocaine?

2   A    No.

3   Q    Anybody ever display any guns to you?

4   A    No, I don't think so.

5   Q    Now you hesitated there a little bit.  Is there a reason

6   for that hesitation?

7   A    I -- just having some conversations about firearms and

8   stuff and hunter and sportsman, just one of those topics, and a

9   lot of times at places you -- you know, you do talk, and I just

10  wanted to make sure I was going to give you an accurate answer.

11  Q    Okay.  Thank you.  And -- and again, I think my question

12  was did anybody display them, but that was the next question,

13  did you ever talk about guns there while you were at Arctic

14  Alarm?

15  A    Yeah.

16  Q    Do you remember what kind of guns you talked about?

17  A    Oh, you name it, pistols, rifles, handguns, clinkers (ph),

18  whatever.

19  Q    Machine guns?

20  A    Yeah.  I believe there was a conversation.

21  Q    Who -- who talked about machine guns?

22  A    Me and Mr. Colette.

23  Q    Mr. Colette say anything to you about a machine gun?

24  A    He said he was trying to get the paperwork done to own

25  one.

1  Q    And what was your part of the conversation?

2  A    That it's expensive.

3  Q    Did he tell you how much?

4  A    I don't recall.

5  Q    How did you know it'd be expensive?

6  A    'Cause there's a lot of licensings basically that you have

7  to pay for.  I've had other customers and friends that have

8  bought them in the past, and I know it's expensive.

9  Q    Do you have one yourself?

10  A    No.

11                         (Pause)

12           MR. BARKELEY:  Could I have just one moment, Your

13  Honor?

14           THE COURT:  Mm-hmm (affirmative).

15                         (Pause)

16           MR. BARKELEY:  Thank you, sir.  I've got nothing

17  further, Your Honor.

18           THE COURT:  Recross -- redirect?

19           MR. COHEN:  No, Your Honor.

20           THE COURT:  All right.  Thank you, sir.  You're

21  excused.  Next witness?  There you go.  Thank you.

22                         (Pause)

23           MR. COHEN:  Your Honor, I came back to the microphone

24  to say that our next witness is Steven Alt.

25           THE COURT:  Okay.

<u>Alt - Direct</u>

2-210

1          (Pause)

2          THE COURT:  How's the jury holding up?  Can you go

3  one more witness before we break?  Okay.

4          (Pause)

5  All right, sir.  Just head on -- head on this direction.  If

6  you can just get up near the -- the blue chair here, we'll --

7  remain standing for a second.  My Clerk will swear you in.

8          THE WITNESS:  'Kay.

9          THE CLERK:  Raise your right hand.

10          **STEVEN ALT, DEFENDANT'S WITNESS, SWORN**

11          THE CLERK:  Thank you.  You may be seated.  For the

12  record, could you please state your full name, spelling your

13  last?

14          THE WITNESS:  Steven Matthews Alt, A-L-T.

15          **DIRECT EXAMINATION**

16  BY MR. COHEN:

17  Q    Good afternoon, Mr. Alt.  Thank you for coming.  Can you

18  tell the jury how you know Mr. Colette?

19  A    He was a customer of mine for -- since I started being a

20  tool dealer as far as I can remember, which is 2003 up until

21  the time that the shop was shut down.

22  Q    And do you remember when that was?

23  A    Roughly around ten of '05.

24  Q    And what's -- what's the name of your business?

25  A    I work for Snap-On Tools.

<u>Alt - Direct</u>

1    Q    Are you an employee?

2    A    I am an employee of Gary Lane, Inc.

3    Q    And do you drive a truck?

4    A    I do.

5    Q    How many businesses do you drive around to see?

6    A    Probably on average twelve businesses a day, five days a

7    week, say roughly.

8    Q    And what type -- what type of tools do you sell?

9    A    I sell hand tools, power tools, air tools, welders, whole

10   bunch of shop equipment to service businesses to where they

11   don't have to go out and get it.

12   Q    Is there a particular day that you went to Arctic --

13   Arctic Alarm and Audio?

14   A    I went there, I believe, Monday mornings, I want to say

15   roughly around ten, best I can remember.  It's been awhile.

16   Q    And looking at the exhibits in front of you, do you

17   recognize any of them?

18   A    I recognize the building which is now changed as far as

19   its name.  This one here.

20   Q    What's the -- what's the exhibit number on the back?

21   A    C -- case number C.  Exhibit there no number.

22   Q    Okay.  See any -- any other photographs.  Do you recognize

23   any of the other ones?

24                          (Pause)

25   A    Can't say that I do.  This photo here could be the inside

1   of that same shop.

2          THE COURT:  What exhibit is it?

3          THE WITNESS:  This is H.

4          MR. COHEN:  Okay.

5                  (Pause - side conversation)

6   BY MR. COHEN:

7   Q    I'm going to show you what has been -- I'm showing you

8   what's been marked as Defendant's S through X for

9   identification.  Do you recognize any of those photographs?

10         (Defendant's Exhibits S-X marked for identification)

11  A    Exhibit S is the same shop on the inside.  I remember it

12  'cause the block structure looks slightly different than that,

13  but I don't recognize any of the boxes or stuff hanging on the

14  wall.

15  Q    But that's the inside of Arctic Alarm and Audio as you

16  recall?

17  A    Yep.

18  Q    Okay.  And would the other photographs similarly depict

19  anything you recognize?

20  A    Part three here is the upstairs.

21  Q    Okay.  What is the number on the exhibit tag on the back?

22  A    U.

23  Q    Okay.

24  A    And V.  I remember that 'cause at one point in time, there

25  was a leak on the roof, so he had the plastic hanging down.

1    Q    So that's V?

2    A    Correct.

3    Q    Well, that -- that's sufficient.  So you recognize all

4    those three as photographs of the interior of Arctic Alarm and

5    Audio?

6    A    Correct.

7              MR. COHEN:  I move them into evidence, Your Honor.  S,

8    U, and V.

9              MR. BARKELEY:  If I may ask a question.  I may have

10   an objection, Your Honor, to the -- to the witness.

11             THE COURT:  (No audible reply)

12                         VOIR DIRE

13   BY MR. BARKELEY:

14   Q    Sir, good afternoon.  A question about all those photos.

15   Are you -- are you -- the ones -- the three that you said you

16   recognize parts of were S, U, and V, is that correct?  Like

17   SUV?

18   A    Correct.

19   Q    Okay.  And what -- what time frame are we talking about

20   here?  What year or years?  Can you tell from the photographs?

21   I take it you didn't take the photographs.

22   A    Correct, I did not.  A lot of this there was different

23   electronic devices in there 'cause he did auto-starts and and

24   car stereos.  There's a lot of car stereo installation kits

25   that used to hang on the wall.  Like I noted in one other

1   picture -- let's see which one it is here -- Exhibit S, I don't

2   recall seeing that toolbox and as being a tool salesman, the

3   first thing we do is look and see what kind of box they have,

4   see if they need upgraded or something different, you know.

5   Q     Especially Snap-On, right?

6   A     Well, sure, anybody.

7   Q     Mm-hmm (affirmative).  Yeah.  Okay.  So, would it be fair

8   to say then you're -- you're saying you recognize the photos,

9   but some -- some things on the interior have changed.  You're

10  saying you recognize the structure though basically?

11  A     Yes.

12  Q     The shop?

13  A     Yes.

14         MR. BARKELEY:  Okay.  Nothing further, Your Honor.

15  No objection.

16         THE COURT:  Okay.  They will be received without

17  objections, S, U, V.

18      (Defendant's Exhibits S, U, and V admitted)

19         MR. COHEN:  Thank you.

20  BY MR. COHEN:

21  Q     And when -- what was the time period in years that you --

22  when I say years, I mean was it 2000, 1998, 2004, that kind of

23  thing -- that you recall going to Arctic Alarm and Audio?

24  A     Definitely '05, and I would say some part in '03.  My

25  route has restructured a couple of times since then with

1    additional stops, and I don't remember when officially that had

2    become my stop.  I would have to look at my records and see.

3    Q    So your best recollection now is parts of '03 and -- and

4    definitely in the year '05.

5    A    Well, I started in 10/10 of '03, so it would have been

6    from that date later through '05 when his shop closed down.

7    '05 for sure, parts of '04 for sure, whether it was all of '04

8    or all of '03, I couldn't tell you without looking at my

9    records to be a hundred percent certain.

10   Q    Do you recall when it was that you would visit the store?

11   A    On a weekly basis, every Monday, if I remember right, in

12   the morning, I want to say roughly around ten.

13   Q    And when you got to the store on Mondays, would you always

14   sell tools?

15   A    You always try to.  You always hope, but you don't always

16   sell tools.  Sometimes you just collect money, sometimes you

17   collect money and sell tools.  Sometimes you've got to hear

18   about the big whopper fish that they caught this weekend in

19   Valdez.

20   Q    So sometimes you sold tools.

21   A    Yep.

22   Q    Do you recall approximately how -- how -- what the value

23   was of the tools you sold over time?

24   A    I would have to say to the shop, which everything I run

25   through the shop was Jason, I probably did five to ten thousand

1  dollars, in the neighborhood. I know of a couple big ticket

2  items that add up to five thousand dollars probably by

3  themselves towards the tail end of it.

4  Q    Do you recall whether you were paid in cash or by check?

5  A    It varies. I recall getting paid sometimes in cash, most

6  of the time with a business check, sometimes with a debit card.

7  Q    Are we talking at Arctic Alarm and Audio or in general?

8  A    Both.

9  Q    Okay. Well, I'm saying specifically at Arctic Alarm and

10  Audio, do you recall being paid in cash?

11  A    On occasion. Most of the time it was a business check, on

12  occasion it would be a debit card.

13  Q    Okay. What type of work did you observe Jason performing

14  at the business?

15  A    Doing car stereo installs, doing auto-starts, which is a

16  big ticket item up here during the winter. Trying to think --

17  towards the tail end, they got into after market accessories,

18  like Goldwing doors, different mounts, instead of the doors

19  just opening up regularly, they would open up at the top.

20  Trying to get into any after market accessory that they could

21  sell, whether it be window tint, bug deflectors, winter front,

22  anything that they could do to make money.

23  Q    When you saw Mr. Colette, was he mostly in the shop

24  working or was he mostly up front?

25  A    It was more in the shop towards -- I want to say towards

1    the end, he was back and forth trying to manage his employees

2    that he did have, trying to play supervisor role, keep them all

3    in check lined out with the projects that were there for the

4    day so that they could get the customer rigs taken care of

5    before the customers got off at five o'clock to come pick up

6    their rig.

7    Q    How many -- how many customers did -- I'm sorry, how many

8    employees did you observe at the business?

9    A    There was a couple over the time.  I remember Kenji, Russ,

10   Whitney, Damon -- trying to think.  That's all I can remember

11   off the top of my head.

12   Q    Are you aware of what the hours were for the business?

13   A    Regular business hours are from eight to five.  I can't

14   recall what his sign said, but I know that's the only time I

15   was really there was within that window.

16   Q    When you saw -- when you were there, did the -- did they

17   appear to be busy?

18   A    Seemed to be very busy.  I mean, the stalls were full most

19   of the time.  As long as everybody showed up to work, the

20   vehicles were moving in and out.  Attendance -- 'cause some of

21   them got in a little later, the vehicles sat in there for a

22   little bit longer, but then by the time they got there, they'd

23   be working on them, getting them finished, and moving them out

24   the door.

25   Q    Now did it appear that -- did Jason appear to be the

1  person in charge of the business?

2  A    Most definitely.

3  Q    Was he there when you were there or was he -- I mean, when

4  you -- the times that you were there, did you see him there

5  working?

6  A    I would probably say ninety-five percent of the time, he

7  was there at the business.  Couple times maybe run to do a bank

8  deposit, go down to -- what is it?  Auto Trim Design, which is

9  who holds the command start, I believe it is, license or

10 whatever -- he had to buy his auto-starts from there.  So he'd

11 run down and buy five, ten auto-starts, come back, put them in.

12 Q    Did you have an occasion to note -- notice whether Jason

13 appeared knowledgeable with respect to the business that he was

14 running?

15 A    Most definitely.  I mean, I asked him some questions.  Car

16 stereos, any auto-starts are of interest to me 'cause all

17 knowledge is power.  Any questions I can ask can prevent me

18 from having to pay somebody else to do the work if I can do it

19 myself.  But when I went in there a couple times earlier in the

20 morning, if I caught him early enough, he'd be on a whole bunch

21 of car stereo forums trying to get information and build his

22 knowledge base as well, and compare problems, particular

23 vehicle -- this is an example, let's say a Volkswagen, you've

24 got to pull this one fuse or this circuit have problems once

25 you put an auto-start in, trying to alleviate any problems he

1    would have in his business so he wouldn't run into that.

2    Q    And when you say the forums, are you talking about on the

3    Internet?

4    A    Correct.

5    Q    So you saw him actually on these Internet forums?

6    A    Yes.

7    Q    And did you -- are you aware of any advertising by the

8    business?

9    A    I can remember one program in particular, I was there when

10   the radio salesman, I believe, for 95.9, come in and they were

11   going to get this pick-up truck -- you put in so much towards

12   the advertising of putting your name on there, they'd bring the

13   pick-up truck and the radio DJ to your shop, do the

14   advertising, and that was your incentive to get more people to

15   come to your business 'cause they would hand out T-shirts and

16   bumper stickers or whatever as a promotion.

17            MR. COHEN:  Thank you.  I have no further questions,

18   Your Honor.

19            THE COURT:  Cross-examination?

20                      **CROSS-EXAMINATION**

21   BY MR. BARKELEY:

22   Q    Hi, Mr. Alt.

23   A    Hello.

24   Q    Snap-On Tools.  Do they still give away calendars, Snap-On

25   Tools?

1    A    Yes and no.

2    Q    Yes and no?  They changed the type of calendar?

3    A    They've changed the type of calendar --

4    Q    Okay.

5    A    -- and most dealers will give them away, but they're not

6    supposed to be free --

7    Q    Okay.

8    A    -- but I still give them away when I have them.

9    Q    And you usually called on Monday mornings it sounds like

10    pretty regular over at Arctic Alarm.  You figure maybe five to

11    ten grand in -- in business over the time that you did business

12    with Mr. Colette's business?

13    A    Roughly, off the top of my head.

14    Q    You mentioned a big ticket item or two, they could maybe

15    go for like five grand, okay?

16    A    Correct.

17    Q    I'd like to focus on your -- your answers to the questions

18    dealing with how payment was made and that sort of thing.  For

19    a big ticket item, would -- did you get five thousand dollars

20    in cash, let's say, from Mr. Colette?

21    A    Most definitely not.  Anything over three hundred dollars

22    in value, Snap-On has a contract program where they hold the

23    note, the customer pays a percentage of interest, just like any

24    other loan, pays on a regular payment schedule, let's say,

25    twenty-two dollars a week, until the loan is paid off.

<u>Alt - Cross</u>                                        2-221

1    Q     Okay.  So do you know whether that procedure was used in

2    some of the purchases that Mr. Colette's business made from

3    Snap-On?

4    A     Definitely.  He used one big -- the big ticket item was a

5    welder and I believe a plasma cutter that I can remember, and

6    those were written on a contract so that somebody wouldn't have

7    to come up with five thousand dollars 'cause that's hard to do,

8    takes it out of your business budget, you know, and businesses

9    have enough waves.

10   Q     Okay.  So these big ticket items you're -- you're sure

11   that Snap-On, through you, sold them to Colette's business, a

12   welder and a plasma cutter?

13   A     Correct.

14   Q     Okay.  And they would have been several thousand dollars,

15   but you know for sure because of this contract business that

16   Mr. Colette didn't pay you in cash for those, right?

17   A     To pay on the contract, you still could pay cash, but he

18   didn't pay cash outright.  It would have been probably twenty

19   to fifty dollars in that neighborhood once a week, which most

20   of the time was written in a business check 'cause he had his

21   had his business checkbook.

22   Q     Okay.  So does Snap-On have any policy in terms of your

23   safety -- in terms of you carrying around a lot of cash when

24   you're making your calls in your rig on businesses?

25   A     Any policy --

1   Q    Well, policy about how much cash you can carry.  In other

2   words, if somebody did pay you for a big ticket item like a

3   plasma cutter and they gave you five grand in cash, what would

4   you do?

5   A    Stick it in the till and continue on my day.  I'm not as

6   concerned in Fairbanks as I would be in, say, L.A. or a big

7   city.  It's a very small town.

8   Q    When you say the till, is there a till in your vehicle?

9   A    Most definitely.

10  Q    In the truck.  I see.  Okay.

11  A    And a computer and a printer so I can print off receipts.

12  Q    Oh, I see.  So your -- your -- your -- those Snap-On Tool

13  trucks we see are actually sort of a rolling office in addition

14  to kind of a tool warehouse in there?

15  A    It's a mobile store.

16  Q    Okay.

17  A    I mean, we've got the checkout area, we've got the display

18  shelves, everything.

19  Q    All right.

20  A    It's actually out in the parking lot.

21          THE COURT:  We'll all stop in afterwards.

22          MR. BARKELEY:  It is now.  It sounds like a jury

23  view, Your Honor.

24  BY MR. BARKELEY:

25  Q    Now you mentioned the -- the -- I think the first names of

1    some employees who you must have become familiar with a little

2    bit at this business -- Kenji, Russ, Whitney, Damon.

3    A    Correct.

4    Q    Can I ask you, do you know any of them personally very

5    well?

6    A    Outside of the business environment, I really haven't

7    dealt with any of them.  Inside the business environment, you

8    try and become empathetic, sympathetic towards any of the

9    customers, and you build a rapport because I'm there once a

10   week, and you get to know them by first name basis.  It's one

11   of the only door-to-door type salesmen, touchy, feely.  It's

12   not come in, take your money, (indiscernible), and go on your

13   way.  You actually deal with the customers.

14   Q    All right.  So you have to establish somewhat of a

15   personal relationship with your customers that you call on --

16   A    Correct.

17   Q    -- right?  Okay.  But you don't know everything about your

18   customers and their lives away from the business, do you?

19   A    Most definitely not.

20   Q    For -- for example, you did not know that in November of

21   2005, Mr. Colette had twenty-three ounces of cocaine in his

22   bedroom at his house here in town?

23   A    I did not.  I've never been to his house.

24   Q    Did you ever talk about drug dealing with Mr. Colette when

25   you called at his business?

<u>Alt - Cross</u>

1  A    No.

2  Q    You mentioned that while you were at the business, Mr.

3  Colette would sometimes go and run errands.

4  A    Correct.

5  Q    Do you remember that?  One of the ones I wrote down, you

6  said was he -- some things -- he'd run and do a bank deposit?

7  So is that something that Mr. Colette told you, hey, I'm going

8  to go put some money in the bank?

9  A    Most definitely.  Worked on Saturdays.  I believe -- but I

10 know some of the work that they had done throughout the week,

11 he would count all the check, whatever, his bank deposit was

12 ready, go to the bank whenever the bank opened up.  Common

13 occurrence in quite a few shops.

14 Q    As -- in distinction from quite a few shops, did you ever

15 observe at Mr. Colette's shop, Mr. Colette putting together

16 checks or cash, things to take to the bank, and then he said

17 I'm going to go take these to the bank?  Did you ever see what

18 he took to the bank when he told you that, is what I'm saying.

19 A    I would say, yes, on occasion.  There would be a stack of

20 checks here, you know, small amount of cash.  Most of the

21 business, I could say, would be checks versus cash.

22 Q    Did you ever see a light blue or silver Chevy Impala,

23 maybe a '63, at the business here?

24 A    Yes.

25 Q    Any idea who that -- whose that was?

Alt - Cross

1  A    I believed to be Jason's.

2  Q    The defendant.

3  A    Correct.

4                    (Pause)

5            MR. BARKELEY:  One moment, Your Honor.

6                    (Pause)

7  Thank you, sir.  No further questions, Your Honor.

8            THE COURT:  Redirect?

9            MR. COHEN:  No, Your Honor.  Nothing further.

10           THE COURT:  Thank you -- thank you, sir.  You're

11 excused and, ladies and gentlemen, we'll take a fifteen-minute

12 recess.

13                    (Pause)

14 Lynn, could you make a quick call to Mr. Coe before we all run

15 out of here.

16     (Jury out at 3:02 p.m.)

17           THE COURT:  Okay.  The jury has left the room,

18 counsel.  We're making a quick phone call to Mr. Coe right now

19 to get that issue cleared up.  Mr. Cohen, how is your schedule

20 going?

21           MR. COHEN:  Well, I'm going to have to look to see

22 who's out in the hall.

23           THE COURT:  Okay.  We've -- we've got four down and

24 you had six.  So you've got --

25           MR. COHEN:  Well, no, I don't know if I had six.