1          THE COURT:  Well, I don't know the number.

2          MR. COHEN:  I have -- I have --

3          THE COURT:  I would expect that Mr. Johnson would be

4   arriving here in about three minutes.

5          MR. BARKELEY:  I asked him to be early.

6          THE COURT:  Okay.  So he'd be here now.

7          MR. BARKELEY:  I'll go check.

8          THE COURT:  Okay.  Well, don't be gone too long

9   'cause we're going to get Mr. Coe on the phone in about one

10  second.

11          THE CLERK:  (Indiscernible - away from microphone)

12          THE COURT:  And this lady knows the answer to your

13  question anyhow.

14          UNIDENTIFIED SPEAKER:  He's here.

15          THE COURT:  He's here.  Okay.

16                       (Pause)

17          THE CLERK:  She just disconnected me.

18                       (Pause)

19          THE COURT:  So do you have a witness to call at 3:15?

20  Do you have someone available?

21          MR. COHEN:  Your Honor, I should -- I have at least

22  four -- four witnesses --

23          THE COURT:  Okay.

24          MR. COHEN:  -- that are out there.  That's what --

25  I'm looking here, but I'm going to have to see who's actually

1    out there.

2              THE COURT:  Well, you can do that.  We're waiting for

3    Mr. Coe, so you can stick your head out the door there.

4                        (Pause)

5    Don't -- don't disappear though because we've got Mr. Coe here,

6    but you can stick your head out the door.

7              MR. COHEN:  Right.

8              THE COURT:  Okay.

9                        (Pause)

10             THE COURT:  All right.  Mr. Coe, can you hear us?

11   Don't be shy.

12             THE CLERK:  Mr. Coe?

13             MR. COE:  Yes.

14             THE COURT:  Okay.  Mr. Cohen just stepped out the

15   door and disappeared, so we've got to wait for a second.  Just

16   so to bring you up to speed, we've had four witnesses since

17   lunch.  I don't know if we're going to get to Mr. Johnson today

18   or not, and that's what Mr. Cohen is -- he -- he's assessing

19   his witness situation right now, so we'll just wait for him to

20   come back in the room.

21             MR. COE:  So do you know if you're going to need him

22   this afternoon?

23             THE COURT:  No.  That's -- Mr. -- all right.

24             MR. COE:  You're going to have to talk just a little

25   bit louder.

1    THE COURT:  No, I don't know that, but we'll know

2  that as soon as Mr. Cohen steps back in the room.

3    MR. COE:  Oh, okay.

4    THE COURT:  He just stepped out to assess the witness

5  situation.

6    MR. COE:  Oh, okay, as far as witnesses?

7    THE COURT:  What his plans are, and he'll -- he's

8  going to tell us in a minute.

9    MR. COE:  Okay.  My client was coming down, I know

10  that.

11    THE COURT:  Yeah, your client's here somewhere in the

12  building.

13    MR. COE:  Okay.

14    THE COURT:  But he's not in the room.  Okay.  So, Mr.

15  Cohen, we have Mr. Coe on the telephone, and so we'll first

16  hear from Mr. Cohen and see what his plans are, and then we'll

17  try to work from there.  Mr. Cohen.

18    MR. COHEN:  Yes.  Mr. Coe?

19    THE COURT:  Maybe you can remain seated so he can

20  hear you right -- you can speak right into the microphone.

21    MR. COHEN:  Okay.  All right.  Mr. Coe.

22    MR. COE:  Yes.

23    MR. COHEN:  Okay.  Hi.  Are you available at any time

24  tomorrow morning?

25    MR. COE:  No, not in the morning.  Probably be not

1    until later in the afternoon.  Not until the afternoon.

2             THE COURT:  What about first thing in the morning?

3             MR. COE:  I would be available probably at eight

4    o'clock in the morning.

5             THE COURT:  From eight until when?

6             MR. COE:  Eight until approximately 9:30.  I would

7    have to be -- hopefully -- I don't know how long your cross

8    would take, if it's going to take more than an hour.

9             MR. COHEN:  It's -- it's not, that's what I'm saying.

10   I can call him at 8:30 and be done by -- certainly by 9:30.

11            MR. BARKELEY:  That's not your cross you're speaking

12   of though.  It's your direct.

13            MR. COHEN:  I'm speaking about my direct.

14            MR. COE:  Mr. Johnson?

15            THE COURT:  Right.

16            MR. COHEN:  Right.

17            MR. COE:  You think you could be done in an hour

18   or --

19            MR. COHEN:  I think we would be done both direct and

20   cross and -- and redirect in an hour, yes.

21            THE COURT:  Okay.  So Mr. Coe, what is your

22   obligation?  Is it with the -- it's not in the federal court

23   down there, is it?

24            MR. COE:  Oh, my obligation is I'm in a workers' comp

25   hearing that starts about 9:30 tomorrow.

1          THE COURT:  Is it a -- okay.

2          MR. COE:  It's scheduled to last two to three --

3    probably about two to three hours.

4          THE COURT:  Okay.

5          MR. COE:  And I let the Court know this yesterday,

6    so --

7          THE COURT:  No, I know.  I -- no, I understand that.

8    We're just trying to accommodate everything so that Mr. Cohen

9    can present the witnesses in the order he's comfortable doing,

10    and we expect to complete the trial tomorrow morning, frankly.

11    I think -- I -- I believe that tomorrow, there will only be two

12    witnesses.  They'll be Mr. Johnson and then one other witness

13    in the --

14          MR. COHEN:  Oh, there may be several tomorrow, but

15    I'm still --

16          THE COURT:  It just depends on how many we do today.

17          MR. COHEN:  Right.  There may be several, but I'm --

18    I'm shooting for finishing by the end of tomorrow morning --

19          THE COURT:  Right.

20          MR. COHEN:  --  maybe a little -- maybe a little into

21    the afternoon, but we're not talking about, you know, probably

22    all day tomorrow.

23          THE COURT:  So you're telling me, Mr. Cohen, for sure

24    you don't want him today, so should we tell Mr. Johnson that

25    you're not going to -- you -- in other words, we could do him

1   right after the break if you wanted, and that would solve the

2   problem.

3            MR. COHEN:  Well, I would like to do -- I would like

4   to do him tomorrow morning.  I don't -- you know, I have two

5   witnesses -- two other witnesses outside, I have two other

6   witnesses that are expected to be here --

7            THE COURT:  Today?

8            MR. COHEN:  -- today, one at 3:30 and one at four

9   o'clock.  So I'm --

10           THE COURT:  Okay.

11           MR. COHEN:  -- I'm hope -- I'm -- and there's a --

12   there's two other witnesses that are supposed to be here that

13   aren't here.

14           THE COURT:  'Kay.

15           MR. COHEN:  And I also -- if there's any additional

16   time, I'm probably going to question Agent Cohoon.

17           THE COURT:  So why don't we do Mr. Johnson tomorrow

18   at 8:30?

19           MR. COHEN:  That would be fine.

20           MR. COE:  Okay.  Now you're saying tomorrow at 8:30,

21   Your Honor?

22           THE COURT:  That's what we're talking about, yes.

23           MR. COE:  Okay.  And I'm going to check with the comp

24   board to see if I can start my hearing at ten.

25           THE COURT:  If you could do that, it would be great,

1    and if --

2         MR. COE:  Then that would give you -- are you sure

3    that would give you enough lead room?

4         THE COURT:  Oh, I think so.  They -- this is -- it's

5    a limited issue.  It shouldn't take -- you know, the whole

6    thing should be done within an hour from beginning to end.

7         MR. COE:  Okay.

8         THE COURT:  So if you could check with the comp board

9    and if they want to call me, that's fine.

10         MR. COE:  No, no, no.  I'm fine with that.  I mean,

11    you know --

12         THE COURT:  Okay.

13         MR. COE:  -- I -- I -- what I would do is I'll call

14    the comp board and let them know that I cannot start until ten

15    o'clock tomorrow.

16         THE COURT:  Okay.  That's wonderful.  I appreciate

17    your assistance in that regard.  So we will notify Mr. Johnson,

18    He's probably getting tired of coming back and forth, to be

19    here tomorrow morning at 8:25, and we'll start --

20         MR. COE:  Or 8:15.

21         THE COURT:  -- at 8:15, at 8:15, so we can start

22    right sharp at 8:30.

23         MR. COE:  Okay.  You're going to be starting at 8:30

24    tomorrow, is that right?

25         THE COURT:  Oh, yeah.  Well, counsel will meet here

1    at 8:15, but we're going to be -- we'll have the jury starting

2    at 8:30, yes.

3         MR. COE:  Okay.  That's good.  So he would be the

4    first witness tomorrow.

5         THE COURT:  He'll be the first witness tomorrow.

6         MR. COHEN:  Yes, Your Honor.

7         THE COURT:  Yes.

8         MR. COE:  Okay.  And if there's some reason -- I'd

9    ask counsel that if there's some reason that you -- after

10   reflecting tonight you don't want to use him tomorrow, let us

11   know, okay?

12        THE COURT:  Okay.

13        MR. COE:  And I'm in the phone book in Anchorage,

14   it's under Charles Coe, C-O-E.

15        MR. COHEN:  All right.

16        MR. COE:  Okay?

17        MR. COHEN:  Thank you.

18        THE COURT:  Okay.  Well, thank you very much, sir.

19   We'll just call you at this number tomorrow at 8:30.

20        MR. COE:  Okay.  Thank you.

21        THE COURT:  And we'll notify Mr. Johnson that he can

22   go home, but he has to be here tomorrow morning first thing,

23   okay?

24        MR. COE:  Okay.  No problem.  Thank you.

25        THE COURT:  Now let me see if he's available.  Is Mr.

1    Johnson in the hall.

2            MR. COHEN:  Yes, he is.  I can bring him in.

3            THE COURT:  Can you bring him in and I can just tell

4    him that?

5            MR. COE:  Can I -- may I be excused?

6            THE COURT:  Well, I'd like you to hear me talk to

7    your client.

8            MR. COE:  Okay, that's fine.

9            THE COURT:  It's only going to be a second.

10                        (Pause)

11    All right.  Mr. Johnson, we've got good news for you and bad

12    news.  Want to hear the good news or the bad news?

13            THE WITNESS:  Bad.

14            THE COURT:  You have to come back tomorrow at 8:30.

15            THE WITNESS:  Shit.

16            THE COURT:  And you want to hear the good news?  You

17    don't have to testify today, okay?  They're just not -- they

18    just can't get to you.  So 8:30 sharp -- if you be here at

19    8:15, I'm told that within one hour, you'll be done.  That's

20    what counsel just told me, okay?  So --

21            MR. COHEN:  One hour (indiscernible - away from

22    microphone).

23            MR. COE:  And I will be present, Your Honor.

24            THE COURT:  One -- and yes.  And your attorney's on

25    the line.  We've made arrange -- we had to do this with him

1  involved, so your attorney's on the line, this is okay with

2  him, he's clearing his schedule so he can be here between 8:30

3  and 9:30 tomorrow to respond to any questions that you might

4  have, okay?  We're about done.  We're getting toward the end.

5  So you have to be here tomorrow at 8:15, okay?

6         THE WITNESS:  All right.

7         THE COURT:  Have a good evening.  Thank you.  Okay.

8  Let's take fifteen minutes, counsel, okay?

9         MR. COHEN:  All right.  Thank you.

10         THE CLERK:  This matter is in short recess.

11     (Recess at 3:11 p.m., until 3:28 p.m.)

12     (Jury not present)

13         THE CLERK:  His Honor the Court, this U.S. District

14  Court is reconvened.

15         THE COURT:  Everybody ready?

16         MR. COHEN:  Yes, Your Honor.

17         THE COURT:  Got your next witness?

18         MR. COHEN:  He's right here, Your Honor.

19         THE COURT:  Okay.  He can come up and get -- get

20  situated.

21         MR. BARKELEY:  Counsel, are you going to need

22  Lieutenant Wall today?  He's been waiting all day for your

23  cross.

24         MR. COHEN:  (Indiscernible - away from microphone)

25         MR. BARKELEY:  Can I tell him he can go?

1    MR. COHEN:  (Indiscernible - away from microphone)

2              (Pause - side conversation)

3    MR. BARKELEY:  9:30 tomorrow morning?  Thank you.

4    THE COURT:  Sir, you can just be seated now for a

5    minute.  What we're going to do is bring the jury in and you

6    can stand when the jury comes in, most people do, and then

7    we'll swear you in then, and then go for it.

8    THE WITNESS:  I watch TV.  Can't be much different.

9    THE COURT:  No, it's not much different.  A lot

10   easier.

11                      (Pause)

12       (Jury in at 3:29 p.m.)

13   THE COURT:  Okay.  Mr. Cohen, your next witness is?

14   MR. COHEN:  Next witness is Michael Stark.

15   THE COURT:  Okay.  Sir, the Clerk will swear you in.

16   THE CLERK:  Can I ask you to remove your gum, please.

17   THE WITNESS:  Oh, yeah.

18   THE COURT:  And we'll save it as a souvenir.

19   THE WITNESS:  There's no trash.

20   THE CLERK:  Raise your right hand.

21   **MICHAEL STARK, DEFENDANT'S WITNESS, SWORN**

22   THE CLERK:  Thank you.  You may be seated.  Sir, for

23   the record, could you please state your full name, spelling

24   your last?

25   THE WITNESS:  Michael David S -- Stark, S-T-A-R-K.

1      THE CLERK:  And your city and state of residence?

2      THE WITNESS:  Fairbanks, Alaska.

3      THE CLERK:  Thank you.

4      THE COURT:  All right --

5                    **DIRECT EXAMINATION**

6  BY MR. COHEN:

7  Q    Good afternoon, Mr. Stark.  Thank you for coming.  Do you

8  know Mr. Colette?

9  A    Yeah.

10 Q    And how do you know him?

11 A    Oh, he's a friend of mine.  We went to high school

12 together.  We've been friends for a long time.  We go hunting,

13 fishing, you know.

14 Q    And have you -- how frequently -- so how many years have

15 you known Mr. Colette?

16 A    Junior high, high school, and I'm thirty-four, so I don't

17 know exactly, but fifteen years or better.

18 Q    And how many times have you gone hunting with Mr. Colette?

19 A    Two or -- two or three.  Probably -- let's see.  I mean,

20 two -- two or three -- I guess what I'm getting at is actual

21 times we went hunting or years we've been hunting?

22 Q    Well, let's try year --

23 A    Okay.  That's what I was trying --

24 Q    Yes.  Yeah, let's try years first.

25 A    Oh, probably three -- three to four years.

1  Q    Okay.  And how about times?

2  A    Oh, average of at least once a year if not twice.  Just

3  depending on, of course, the year and, you know, how much time

4  we could take time off of work.  I could or him.

5  Q    All right.  And when you went hunting with him -- when you

6  went hunting with him, how long were these trips?

7  A    On average, two to three days, 'cause we both had jobs.

8  He was running a business and I have to work, so on average two

9  or three days.

10  Q    Have you ever seen his business?

11  A    Yeah.

12  Q    Do you know the name of that business?

13  A    Yeah.  Arctic Audio and Alarm.

14  Q    I'm sorry?

15  A    Arctic Audio and Alarm.

16  Q    Have you ever had any work done at that business?

17  A    Yes.  He's --

18  Q    Can you tell the jury what that was?

19  A    He's installed a couple auto-starters for me, one or two

20  for my girlfriends.

21  Q    Do you know whether you paid in cash or by check?

22  A    I honestly don't remember.  I do work on his snowmobiles

23  as well on the side, so we probably traded out.

24  Q    And on these hunting trips, how many people would go on

25  the trips?

1    A    Two to three.  Usually us and one other.

2    Q    I'm going to show you what has been previously marked as

3    Defense Y, Defense Z, and Defense AA, and I'm going to ask you

4    if you recognize them.

5    A    Okay.

6         MR. BARKELEY:  Counsel, could I see them briefly

7    (indiscernible - voice too low)?

8         MR. COHEN:  Yeah.

9         MR. BARKELEY:  Thank you.

10                        (Pause)

11   A    Okay.  That would be --

12   BY MR. COHEN:

13   Q    (Indiscernible - away from microphone) --

14   A    Okay.

15   Q    Why don't you pick up -- why don't you pick up Defense Y

16   first, please.  Do you have that one in hand.

17   A    Yeah.  Okay.  That would be Jay and Matt on a moose kill

18   that was like 76, 77 Mile Steese.

19   Q    Okay.  Is Y a photograph?

20   A    Says Y on the back.

21   Q    Okay.  Is it a picture -- is it a photograph?

22   A    Oh, yes, sir.  It's a photograph.

23   Q    Okay.  And I'm sorry, can you just please explain to the

24   jury where is --

25   A    Okay.  I'm sorry.  I'm not following you --

1  Q    No, no, we're -- believe me, I'm a lawyer and it's hard to

2  follow me, okay?  So -- so -- so that's a given.  Can you -- in

3  that -- in that photograph Y --

4  A    Mm-hmm (affirmative).

5  Q    -- okay, can you explain to -- do you recognize what's in

6  that photograph?

7  A    Yeah.  There's --

8  Q    Okay.

9  A    -- Jason --

10  Q    Okay.

11  A    -- Matt --

12  Q    Right.

13  A    -- a dead moose --

14  Q    Right.

15  A    -- and couple of rifles, and oh, nope, that's just trash

16  on the ground.

17  Q    Okay.  And Matt who?

18  A    To be honest with you, I don't really know.  I don't know

19  him that well.  We went on a couple of trips about five years

20  ago.  Hecker (ph), I think was his name.  I honestly -- I don't

21  know.  I haven't seen him in years.  This is probably a four or

22  five-year-old photo.

23  Q    And were you on that hunting trip?

24  A    Oh, yes, sir.  There's also -- well, your other exhibit

25  here which I'm not supposed to get into has me in the same

1    picture.

2    Q    Okay.  Please get into it.  Which number -- which exhibit

3    is that?

4    A    Okay.  That would be photo number two --

5    Q    No, no --

6    A    -- or Z.  This -- I believe it's a Z.

7    Q    What is that letter on the back?  Is it a --

8    A    Z.

9    Q    Oh, Z.  Right.

10   A    Okay, yeah.  And that is also the same moose and myself

11   and Jason are standing there holding the horns.

12   Q    Okay.  And looking at AA, can you -- is that also a

13   photograph?

14   A    Yes, sir.  That's a photograph and that is Jason with the

15   moose and my dog.

16   Q    Okay.  And was that -- is that photograph as part of that

17   hunting trip or was it from a separate occasion?

18   A    I believe that's the same -- I believe that's the same

19   hunting trip.

20   Q    And you believe that that was about four or five years

21   ago?

22   A    Well, the dog's a pup and she's not five years old, so

23   it'd have to be '02, '03.

24   Q    What's the name of the dog?

25   A    Jenny.

NoDak Rose Transcripts
721 North 19th Street
Bismarck, North Dakota  58501-4721
(701) 255-1054

1    Q    And Jenny's in the picture?

2    A    Yep.

3    Q    And which -- which one?

4    A    AA.

5         MR. COHEN:  Your Honor, I move Exhibits Y, Z, and AA

6    into evidence.

7         THE COURT:  Any objection?

8         MR. BARKELEY:  You don't seriously expecting an

9    objection when he's identified the dog, were you, counsel?

10        THE COURT:  Well, it sounds like pretty clear.  So

11   it'll be received without objection.

12        (Defendant's Exhibits Y, Z, and AA admitted)

13        MR. BARKELEY:  I love Jenny.

14        MR. COHEN:  Your Honor, may I publish the

15   (indiscernible) -- the photographs to the jury?

16        THE COURT:  That's fine.  Yes.

17              (Pause - side conversation)

18        THE COURT:  Just keep it pointed up in the air.

19        MR. COHEN:  (Indiscernible - away from microphone)

20   BY MR. COHEN:

21   Q    I'm showing you what's been marked as --

22        THE COURT:  And stay by a microphone.

23        MR. COHEN:  Yes.

24   BY MR. COHEN:

25   Q    I'm showing you what's been marked and is in evidence as

1  -- as Government's 22.

2  A    Okay.

3  Q    Can you --

4  A    Well, if I'm allowed, yeah.

5  Q    Do you recognize -- do you recognize that gun?

6  A    Yeah.  It's Jason's gun that jams.

7  Q    And what -- what gun is that?  Can you tell us what kind

8  of make you've got?

9  A    Yeah.  It's a semiautomatic .30-06 that his father gave

10 him.

11 Q    That's a .30-06?

12 A    Yes, sir.

13 Q    Now when we -- talking about Exhibits Y and Z and AA --

14 A    Mm-hmm (affirmative).

15 Q    -- did you -- did you see that gun in those pictures?

16 A    Yeah.  'Cause he's always complaining about it jamming on

17 his third shot if he doesn't fix it, so I pretty much recognize

18 the gun.

19 Q    And that gun is in those pictures?

20 A    Yes, sir.

21 Q    I notice there was at least one other gun in the

22 pictures --

23 A    Well, yeah.  That was somebody else's gun.

24 Q    So this one is Jason's gun?

25 A    Yes, sir.

1  Q    And when Jason went hunting, he brought that gun with him

2  that --

3  A    Yeah.

4  Q    Did you -- did you observe that?

5  A    Yeah.

6  Q    You ever observe Jason bring a shotgun along hunting?

7  A    Not that I recall, no.

8  Q    Okay.  You ever observe Jason when he went along hunting

9  shooting at birds or that kind of thing?

10 A    No, we usually went big game hunting.

11 Q    When -- when you guys went.

12 A    Yeah, when we went.  Doesn't mean he didn't, just

13 generally big game hunting.

14 Q    'Kay.  Now, would you hang out with Jason at times other

15 than when you were hunting?

16 A    Yeah.

17 Q    In other words --

18 A    With other friends.  We went snow machining and such.

19 Q    Fishing?

20 A    Mm-hmm (affirmative).

21 Q    So you know -- you know Jason pretty well?

22 A    Yeah.

23 Q    And would you say that he's -- he's a hunting -- I mean,

24 that -- that -- he's a hunting enthusiast --

25 A    Oh, yeah.

1   Q     -- is that fair?

2   A     Yeah, he's an outdoor Alaskan.  We go hunting, fishing,

3   snowmobiling.

4   Q     Have you ever seen any other guns that Jason owns?

5   A     I think I seen a handgun once.  Pistol.

6   Q     'Kay.  In the times that you've known Jason, have you

7   observed him to be interested in collecting guns?

8   A     Yeah, he -- I mean, he told me he had a fair amount, but I

9   didn't, you know, take -- I wasn't -- I'm not big into guns, so

10  it didn't really matter to me one way or the other.

11  Q     When you you're not big into guns, what --

12  A     I use them to go hunting and fishing, but I don't collect

13  them.

14  Q     Well, what about Jason?

15  A     Well, no.  From what I gathered from, you know, what we've

16  spoken about over the years, yes, he did collect them.

17  Q     So, would you say it's fair to say that Jason is big into

18  guns?

19  A     Yeah.

20          MR. COHEN:  I have nothing further, Your Honor.

21          THE WITNESS:  Bigger than me anyway.  Can I set this

22  down?

23          THE COURT:  Yes.  That would be fine.  Cross-

24  examination.

25          MR. BARKELEY:  Thank you, Your Honor.  Thanks for

1    putting that down before I ask you questions.

2           THE WITNESS:  Well, I'm getting tired of holding it.

3    I figured everybody's seen a rifle.  We're in Alaska.

4           MR. BARKELEY:  Yeah.

5                        **CROSS-EXAMINATION**

6    BY MR. BARKELEY:

7    Q    Okay.  So all three of those pictures that you talked

8    about were from the same hunt?

9    A    Yes, sir.

10   Q    Okay.  Did you guys call him or did you just, you know,

11   sit up high and glass for moose?

12   A    Up on ridge tops.

13   Q    Okay.  And who shot it?

14   A    I believe Jason did.

15   Q    You were on the hunt, right?

16   A    Oh, yes, sir, but that doesn't necessarily mean I was

17   right there when it got shot.

18   Q    Okay.

19   A    I was -- at one point, I was up sheep hunting -- I went up

20   to look for sheep at the same time, then we came back and he

21   had shot the moose.

22   Q    Okay.  And you say you've done other things with Mr.

23   Colette besides this particular hunting trip.

24   A    Oh, yeah.

25   Q    You've gone on other hunting trips?

1  A    Oh, yes, sir.  Fishing trips.

2  Q    And snow machining, fishing?

3  A    Yeah.

4  Q    Okay.  Now you said -- I think you've testified that you

5  feel that you know Mr. Colette pretty well.

6  A    Yeah, I'd say so.

7  Q    On November 28th of 2005 --

8  A    Okay.

9  Q    -- did -- did you know he had twenty-three ounces of

10  cocaine in his bedroom?

11  A    No.

12  Q    So you didn't know him that well, did you?

13  A    Well, you know, that's not something you'd go around

14  telling people, if it -- if that wasn't something they wanted

15  to know.

16  Q    All right.  With regard to the aught six --

17  A    Mm-hmm (affirmative).

18  Q    -- would you agree with me that that can be used for

19  something other than hunting?

20  A    Well, yeah, you could hit -- I mean, you could play

21  baseball with it if you wanted to.  You can use it for

22  anything.

23  Q    You could commit a crime with it, couldn't you?

24  A    Yeah.

25  Q    You could rob a bank?

1    A    Yeah.

2    Q    Okay.  You could use it to protect yourself in drug

3    dealing?

4    A    I suppose.  It's kind of large, but if that's what you

5    wanted to do.  I mean it's a ri -- it's a gun.

6    Q    All right.  And you're not a collector but you're a

7    hunter.

8    A    No.  Yeah, I go hunting and fishing.

9    Q    Okay.  What do you shoot (indiscernible) let's say.

10   A    Three hundred winch -- three hundred win mag.

11   Q    Okay.  Would you use an aught six even when it didn't jam

12   and -- if you were in bear country?

13   A    Yeah, I used one before I purchased my three hundred win

14   mag.

15   Q    Okay.  What do you load it with, one-eighties, two-

16   twenties, two hundred?

17   A    One eighty-fives.

18   Q    Okay.  Boat tail?

19   A    Just one eighty-five Federal.  Just cheap --

20   Q    Factory ammo?

21   A    Yep.

22   Q    Okay.  Do you keep -- and your -- you've got a three

23   hundred mag?

24   A    Mm-hmm (affirmative).

25   Q    Winchester?

1  A    Yep.

2  Q    Okay.  You keep it loaded in your house with a round in

3  the chamber?

4  A    Not in the chamber.

5                        (Pause)

6  Q    I really didn't get to see the picture very well.  What

7  kind of dog is Jenny?

8  A    Blue Heeler.

9           MR. BARKELEY:  Ah, okay.  Nothing further, Your

10  Honor.

11          THE COURT:  All right.  Redirect?

12          MR. COHEN:  Your Honor, just -- there's a gun

13  question that I would like to ask him, but it's going to take

14  me about ten seconds to get it all out.

15          THE COURT:  Go ahead.

16          MR. COHEN:  Because I'm not --

17          THE COURT:  So it's going to take you ten seconds to

18  get the question out?

19          MR. COHEN:  To get the information necessary --

20          THE COURT:  Okay.  Go for it.

21          MR. COHEN:  -- to ask the question --

22          THE COURT:  Okay.  Go --

23          MR. COHEN:  -- 'cause I don't know anything about

24  guns.

25          THE COURT:  Okay.  Go.

1                          (Pause)

2              MR. COHEN:  Your Honor, I ask permission to ask one

3     leading question?  And you know, I --

4              THE COURT:  All right.  Try it and see what --

5              MR. COHEN:  When the Court hears it, maybe the

6     Court's not going to allow it, but let me --

7              THE COURT:  I may not, I don't --

8              MR. COHEN:  -- let me try it.  I might ask --

9              THE COURT:  -- I have no idea.

10             MR. COHEN:  Okay.

11                      **REDIRECT EXAMINATION**

12    BY MR. COHEN:

13    Q    Your three hundred win mag is a bolt action, not a semi --

14             MR. BARKELEY:  Objection.  It is leading, Your Honor.

15    Let him just ask him about his gun.

16             MR. COHEN:  Well --

17             MR. BARKELEY:  Let him tell you what the gun --

18    BY MR. COHEN:

19    Q    Well, is -- is your three hundred win a bolt action or a

20    semiautomatic mag feed?

21             THE COURT:  Okay.  Answer if you can.

22    A    Bolt action.  Bolt action.

23    Q    Okay.  In that case, when you have a bolt action as

24    opposed to a semiautomatic mag feed, could that -- is -- could

25    that be an explanation for why you wouldn't --

1          MR. BARKELEY:  Objection.

2          THE COURT:  So you want to know why he wouldn't have

3    a --

4          MR. COHEN:  Round in the chamber.  Why he -- why he

5    would have --

6          THE COURT:  Ask him why -- just -- you can just ask

7    him why he wouldn't have a round in the chamber.

8          MR. COHEN:  -- why he --

9    BY MR. COHEN:

10   Q    Is that -- is that the reason why you wouldn't have a

11   round in the chamber, because of that kind of gun?

12   A    Not necessarily.  I just try to -- at the house in my

13   closet, I try to not keep a round in the chamber.  There's a

14   round -- there's three rounds in the clip.  I mean, all you've

15   got to do is slide the bolt back.  I just don't keep one in the

16   chamber.

17         MR. COHEN:  All right.  I don't have any further

18   questions, Your Honor.

19         THE COURT:  Okay.  Any re --

20         THE WITNESS:  I don't quite --

21         THE COURT:  I think we're -- are you done?

22         MR. BARKELEY:  Just one question.

23         THE COURT:  Recross?

24                    **RECROSS-EXAMINATION**

25   BY MR. BARKELEY:

1   Q    How about when you -- you know you're going to use your

2   rifle, or you're hoping you can --

3   A    Yeah, it's --

4   Q    -- very soon, like you see a bull --

5   A    Yeah, it's loaded safe --

6   Q    -- you've got one racked in the chamber, correct?

7   A    Yeah, loaded and safety on.

8           MR. BARKELEY:  Nothing further.

9           THE COURT:  All right, sir.  Thank you very much.

10  You're all done.  Have a great day.  Next witness.

11          MR. COHEN:  Okay.  Thank you.  Your Honor, the -- Mr.

12  Colette's next witness needs my help to get through security

13  downstairs.

14          THE COURT:  So what's your question?  Do we need --

15  want a recess?

16          MR. COHEN:  Can I go downstairs to security and get

17  him in?

18          THE COURT:  Sure.  Do you need five minutes?

19          MR. COHEN:  Yeah.  I don't even know if it'll take

20  five minutes --

21          THE COURT:  Okay.

22          MR. COHEN:  -- as long as he's over there.

23          THE COURT:  That's fine.  That's fine.  Coun -- we'll

24  go off the record.  The jury can stay or they can go, whatever

25  you want.  We've got five minutes to -- to secure the next --

1    bring the next witness in.

2           MR. COHEN:  (Indiscernible - away from microphone)

3           THE COURT:  Yeah, we'll get the rifle.  So are you

4    going to help him -- help him get the witness -- oh, you're

5    going to get the rifle.

6           MR. COHEN:  I'm going to get the witness.  He's going

7    to get the machine gun.

8           THE COURT:  Burning daylight here.

9           THE CLERK:  Off record.

10       (Off record, at 3:47 p.m.)

11       (On record, at 3:50 p.m.)

12       (Jury present)

13          MR. COHEN:  -- (indiscernible - away from

14   microphone) --

15          THE CLERK:  Back on record.

16          MR. COHEN:  -- (indiscernible - away from microphone)

17          THE COURT:  That's good.  Very well.  Now, sir, if

18   you can just forward to this blue chair here, remain standing

19   just for a second, we'll swear you in and get going here.

20          THE CLERK:  Raise your right hand.

21          **JOSEPH CASTLE, DEFENDANT'S WITNESS, SWORN**

22          THE CLERK:  Thank you.  You may be seated.  And for

23   the record, could you please state your full name, spelling

24   your last?

25          THE WITNESS:  Joseph Castle, C-A-S-T-L-E.

1       THE CLERK:  Thank you.

2       THE COURT:  All right.  Counsel?

3       MR. COHEN:  Yes.

4                   **DIRECT EXAMINATION**

5   BY MR. COHEN:

6   Q    Good afternoon, Mr. Castle.  Do you know Mr. Colette?

7   A    Went to high school together, and we get together about --

8   seems like just hunting season really we get together and do

9   some hunting.  Other than that hardly -- didn't really ever see

10  him much.

11  Q    So you've gone hunting with Mr. Colette?

12  A    Mm-hmm (affirmative).

13  Q    And how many times have you been hunting with Mr. Colette?

14  A    We went -- I can't even remember the year.  I live --

15  first time we ever went was about ten years ago, when he got

16  his first moose, and there -- elapsed time when I went down to

17  Southeast for awhile, and when I got back, last couple of years

18  before he got in trouble, we'd go moose hunting.

19  Q    So you'd say four or five times?

20  A    Yeah, four times.

21  Q    Okay.  And when you -- did you ever go hunting -- I'm

22  going to show you two exhibits that have been marked as

23  Defendant's BB and CC, and I'm going to ask you if you

24  recognize them.

25  A    Sure.

1                              (Pause)

2    Q    Do you recognize those pictures?

3    A    Oh, yeah.  After the --

4    Q    Did you take those pictures?

5    A    You know, there were three of us down there, there was a

6    gentleman named Joe, I don't even remember his last name was,

7    he just went on that trip with us, and Jason -- I think Joe

8    actually took the pictures, but I remember it very much, it was

9    the three of us that went down there and helped him get it out

10   -- or two of us that went down and met up (indiscernible) and

11   the three of us got it out.

12   Q    So that was a hunting trip?

13   A    Mm-hmm (affirmative).

14   Q    And do you remember what year that was?

15   A    It was -- I want to say three years ago.  (Indiscernible)

16   I think it was a few months before he got in trouble.

17   Q    And so you think it was in the hunting season in 2005?

18   A    I believe it was, yep.

19   Q    And in looking at those pictures, do you recognize the

20   gun?

21   A    I do.  It's a .30-06 -- clip (indiscernible) .30-06.  It's

22   the one he always hunted with.  When we went hunting ten years

23   ago and he shot his first moose, that was the same gun he was

24   carrying.  Pretty much a totally unreliable firearm.  He had

25   trouble with it all the time.

1  Q    So that was the first time -- I'm sorry.  The first time

2  you saw it was approximately ten years ago?

3  A    Yeah, I believe so.  It was his father's gun, if I

4  remember correctly, and his father gave it to him when he

5  started hunting with us and stuff all the time, and I remember

6  -- I remember the joke was the first time he ever shot it, he

7  killed a moose with it.  And then -- and then he just -- it's

8  what he always had whenever we went out.

9  Q    Is there an animal in that photo?

10  A    Excuse me?

11  Q    Is there an animal in those photographs?

12  A    Oh, yeah.  The bear?  Mm-hmm (affirmative).

13  Q    Is that bear dead or alive?

14  A    Oh, it's dead.

15        MR. COHEN:  Your Honor -- Your Honor, I'd like to

16  move Exhibits -- Defendant's CC and BB into evidence.

17        MR. BARKELEY:  I haven't seen them yet, Your Honor.

18  If I might have a moment.  Thank you.

19        THE COURT:  All right.

20                     (Pause)

21        MR. BARKELEY:  Thank you.  No objection.

22        THE COURT:  They will be received without objection.

23    (Defendant's Exhibits BB and CC admitted)

24        MR. COHEN:  Your Honor, may I publish them to the

25  jury?

1      THE COURT:  That'll be fine.

2              (Pause)

3      MR. COHEN:  Your Honor, does the Clerk have the last

4  group that I published to the jury?

5      THE COURT:  Does the Clerk have them?  No.

6      MR. COHEN:  Oh, they're up -- they're up here.  Okay.

7              (Pause)

8  BY MR. COHEN:

9  Q    Did you have -- did you have an opportunity, in spending

10  time with Mr. Colette, to speak to him about the topic of

11  hunting?

12  A    No.  I haven't talked to Jason in a couple of years.

13  Q    No, I'm saying when you guys were on the trips together,

14  did you guys talk about hunting?

15  A    Yeah, absolutely.

16  Q    Did it appear -- did it appear to you that he's a -- that

17  he's a hunter?

18  A    Oh, absolutely.

19  Q    Were you able to see whether he's interested in -- in

20  guns?

21  A    His interest in guns was -- I mean, all of us is having --

22  like to collect guns, you know.  Every chance we got, which was

23  pretty much just during moose season 'cause everybody's pretty

24  busy, you know, you get out and get to use your firearms and

25  moose hunt, bear hunt, caribou hunt, depends, you know?  Not

1    very long, but --

2    Q    Do you know whether Mr. Colette -- I'm sorry -- do you

3    know whether Mr. Colette was a collector of guns?

4    A    I believe he had a few that he was collecting.  You know,

5    I mean, we get started on collecting, you know, it takes many

6    years to really be called a collector, but you've got to start

7    somewhere.

8                MR. COHEN:  All right.  I don't have any further

9    questions, Your Honor.

10               THE COURT:  Thank you.  Cross-examination.

11                         **CROSS-EXAMINATION**

12   BY MR. BARKELEY:

13   Q    Morning, sir.

14   A    Okay.

15   Q    Were you alone on the bear hunt in the two photographs

16   that you're talking about there?

17   A    Mm-hmm (affirmative).  Yes, I was.

18   Q    Okay.  Well, were you guys are out moose hunting and

19   happened to run across a bear or was that a bear hunt?  You

20   guys decided to hunt brown bear?

21   A    We were out moose hunting, but -- but we went prepared if

22   we saw a caribou or a bear, then -- you know, I mean we were in

23   an area where we could hunt all -- bear, wolf, caribou, moose,

24   all that stuff.

25   Q    You just needed a harvest tag, twenty-five bucks or

1    whatever for a resident for the bear?

2    A    Correct.  Well, we got to get a --

3    Q    Sealing --

4    A    Yeah, sealing clip, yeah.

5    Q    -- tag?  Mm-hmm (affirmative).  Okay.

6    A    Twenty-five bucks, I think.

7    Q    What were you carrying?

8    A    For a firearm or --

9    Q    Yeah, yeah.

10   A    A three hundred Weatherby.  Back in the military, I had my

11   three-hundred Winchester magnum.  That's what I carried.

12   Q    Who shot the bear?

13   A    Jason did.

14   Q    With the aught six?

15   A    Mm-hmm (affirmative).

16   Q    Did you fire also?

17   A    No.

18   Q    You trusted that --

19   A    No, he --

20   Q    You trusted that weapon to kill a brown bear?

21   A    He -- Jason wanted to go after the bear and we actually

22   sat about a half a mile away with binoculars and watched it.

23   It was quite a show.

24   Q    And you lived, obviously, to tell the tale.  You know you

25   can commit a crime with an aught six, right?  I mean, you can

1   hunt with it for sure, you've established that.  You can shot a

2   brown bear with it, right?  You can also rob a bank with it,

3   can't you?

4   A    Well, sure, I guess you could, but I never, ever heard of

5   anybody robbing a bank with a .30-06.  I mean, I --

6   Q    So you're saying you can't use an aught six for anything

7   except hunting?

8   A    It's a hunting rifle.  That's -- that's its purpose and --

9   Q    You can kill somebody with it, can't you?

10  A    Sure, you can kill someone with a twenty-two, too.

11  Q    That's not what I'm asking you, sir.  I'm asking you the

12  weapon that you're testifying about could be used for any

13  number of illegal purposes.  All you're doing is saying it was

14  used for a legal one, one time, correct?

15  A    It could be, sure.

16       MR. COHEN:  Well, actually, I think that misstates

17  the evidence.  He's said he's seen it used hunting on a number

18  of occasions.

19       THE COURT:  Okay.  Very well.

20  BY MR. BARKELEY:

21  Q    Do you know how that very same aught six ended up in the

22  courtroom just a few minutes before you walked in here?

23  A    I -- I don't know.  Last time I saw that aught six was on

24  that hunt that the pictures were taken.

25  Q    Did you know that on November 28th of 2005, that aught six

1  was in a safe within inches of twenty-three ounces of cocaine

2  in --

3  A    No, I did not know that.

4  Q    -- Mr. Colette's bedroom.

5  A    Nope, I did not know.

6  Q    And thirty-nine thousand dollars in cash or thereabouts?

7  A    I did not know that.

8  Q    When you were hunting with Mr. Colette, did you ever

9  discuss with him anything dealing with drug trafficking?

10 A    No.

11 Q    Cocaine?

12 A    No.

13 Q    Marijuana?

14 A    No.

15 Q    How about machine guns?  Did you ever talk about machine

16 guns with him?

17 A    No.  Not nothing having -- people talk about getting their

18 class three license and stuff as a topic of conversation, but

19 nothing not of any magnitude whatsoever.  Just basic

20 conversation.

21 Q    You know what a MAC-10 is?

22 A    Yes, I do.

23 Q    What is it?

24 A    A nine-millimeter machine gun, I believe.

25 Q    Would you go hunting with a nine-millimeter machine gun?

1  A    Excuse me?

2  Q    Would you go hunting with one?

3  A    No, that's more of something you'd take out to the range,

4  practice with.

5  Q    Now people have robbed banks with machine guns, haven't

6  they?  You're aware of that.

7  A    Sure, yeah.

8  Q    Did you know Mr. Colette had a machine gun, a MAC-10?

9  A    I've heard that he was trying to get his class three

10  license to buy one, but I never -- I mean, that's as much as I

11  ever knew about it.

12  Q    He never showed it to you or told you that he had one?

13  A    No, I never saw it.

14  Q    Did he tell you that he had one?

15  A    No.

16  Q    You said you were a hunter, so you like to collect

17  weapons.  How many would you estimate you've got at your house?

18  A    Firearms?

19  Q    Yeah.  Just take hunting rifles.

20  A    Five or six.

21  Q    Okay.  Do you keep them at your house with a round in the

22  chamber?

23  A    I have a handgun at my house with a round in the chamber.

24  Q    I'm asking about your hunting rifles, the long arms.  Do

25  you keep your long arms loaded with a round in the chamber at

1    your house?

2    A    No, I don't.

3    Q    Your hunting rifles.

4    A    No.

5                MR. BARKELEY:  Thank you, sir.  Nothing further.

6                THE COURT:  Redirect?

7                MR. COHEN:  Yes.

8                        **REDIRECT EXAMINATION**

9    BY MR. COHEN:

10    Q    Do you have a gun safe at home?

11    A    Yes, I do.

12    Q    And do you keep your guns in the gun safe?

13    A    Mm-hmm (affirmative).  I do.

14    Q    If you've got a gun in the gun safe, does that make it

15    more safe, so to speak, if you happen to have a round in the

16    chamber?

17    A    If -- if I have -- I mean, just my personal preference.  I

18    don't store a round in the chamber when I put it in the safe,

19    but some people do.  I know people that do if they need to get

20    into it to -- you know, their house is being robbed or

21    something and, sure, you know, maybe they don't want to have to

22    dig for a round.

23    Q    What about if somebody came -- just came back from a

24    hunting trip and they put it in the gun safe and didn't take

25    the round out of the chamber?

1   A    That's a personal preference.

2   Q    Sure.

3   A    I mean, that's --

4   Q    Does that sound --

5   A    Everybody has their own habits and how they like to store

6   their firearms.

7   Q    So does that sound plausible to you that somebody would

8   come back from a hunting trip, put the hunting rifle in the gun

9   safe, and forget to take the round out of the chamber?

10  A    Sure.  I mean, that -- that -- I could see where that

11  would -- that would happen.  I don't do that myself, and so

12  once again, I mean that's a personal preference.  I do know

13  people that do do that.  You know, I also don't have any

14  children and so that's -- you know, I don't worry about that.

15          MR. COHEN:  Okay.  One second.

16                  (Pause)

17  All right.  Thank you very much for coming --

18          THE COURT:  Recross?

19          MR. COHEN:  One second.

20              (Pause - side conversation)

21          MR. BARKELEY:  May I approach, Your Honor?

22          THE COURT:  All right.

23                  (Pause)

24              **RECROSS-EXAMINATION**

25  BY MR. BARKELEY:

1  Q     Sir, I've given you a photograph that's been marked --

2  it's already in evidence as Government's Exhibit 6.  You see

3  that sticker on that back of photograph?

4  A     Mm-hmm (affirmative).

5  Q     Says six there?

6  A     Looks like a five to me --

7            MR. COHEN:  I think it's five.  I think it's five.

8            MR. BARKELEY:  Is it five?

9            MR. COHEN:  (Indiscernible) yeah.

10 BY MR. BARKELEY:

11 Q     So Exhibit 5 is the one you've got in front of you?

12 A     Yeah.

13 Q     All right.  That's a -- look like a gun safe?

14 A     Mm-hmm (affirmative).

15 Q     Bunch of long arms in it, right?

16 A     Yeah, (indiscernible) looks like a couple of shotguns,

17 AR --

18 Q     Do you recognize that -- that aught six you're so familiar

19 with from the bear hunt?

20 A     I'm looking for it in here.  I believe that's it right

21 there on the right-hand side.

22 Q     Okay.  Now let me ask you, if this was your -- if this was

23 your gun safe at home, you had a bunch of questions about

24 whether you keep -- your personal preference is keep a round in

25 the chamber.  That's pretty dangerous to have that aught six in

1    that safe like that with a round in the chamber, isn't it?  In

2    that condition.  Look at those weapons.  They're all standing

3    there.  If you open that safe and one of those things fell over

4    toward you, you could blow your head off, true?

5    A    Sure, I guess that's true.

6                            (Pause)

7    Not just anybody is going to get in your safe though.  I mean,

8    you're the only one who's going to get in your safe, and so if

9    you know that that handgun is loaded, then -- or that rifle or

10   long gun, shotgun, whatever is loaded, then you know to take

11   precautions for that.  You're the only one who's in it.

12   Q    Suppose the police got a search warrant for your house

13   'cause somebody told them they bought drugs from you in your

14   bedroom just a couple of days before, and an innocent person

15   from Action Locksmith had to drill the safe open, and when they

16   did that, they didn't know there was a round in the chamber and

17   a gun fell over and hurt them.  That's possible, too, isn't it?

18   A    I don't think a lot of people figure that their safe is

19   going to be cracked when they lock their guns in there.

20   Q    You ever had too much to drink?

21           MR. COHEN:  Objection, Your Honor.  This is --

22   A    Have I ever had too much to drink?

23           MR. BARKELEY:  Yeah.

24           MR. COHEN:  Well, hold on, hold on, hold on.

25   Objection, Your Honor.  This is way, way beyond the scope of