1    the previous questions.

2         THE COURT:  It's a hypothetical, it's not for him to

3    -- you can ask a hypothetical.  I don't think he'd ask --

4    BY MR. BARKELEY:

5    Q    Hypothetically, if somebody had too much to drink,

6    couldn't they get hurt having a round in the chamber even

7    though it was in a safe and they opened their safe?

8    A    Sure, I guess that potential of a hazard is there, sure.

9    Q    You -- you're not seriously contending that keeping a

10   round inside a rifle is safer --

11   A    No, I --

12   Q    -- safer than not having a round in the chamber, are you?

13   A    No, I don't think that it's safe to keep a round in your

14   chamber.

15   Q    In the house.

16   A    But once again, that is a personal preference.

17                        (Pause)

18   Q    So you're -- did you say you're aware of people who have a

19   personal preference for keeping a round in the chamber in their

20   house in -- in a rifle?

21   A    I have talked to people before that who said they leave

22   their guns loaded in their safe.

23   Q    Okay.

24   A    Not anybody -- I mean, as to this -- or relevant people,

25   people I work with.  I work with a lot of different people and

1  talked about it.

2  Q    Was that -- are they the ones who told you they were

3  afraid of getting robbed?

4  A    Well, in a very casual conversation.  I mean, not anything

5  -- I mean, yeah.

6  Q    Okay.  But you mentioned robbery, so is that what the

7  context was, somebody said they keep a round in the chamber

8  because they were afraid of being robbed?

9  A    That's just a working buddy of mine told me one time that

10 he keeps his guns loaded in his safe in case he ever needed to

11 hurry up and get in there and get one for protection of his

12 family or being robbed is an example I used.

13 Q    Okay.  What if I told you that inside that same safe,

14 there's almost thirty-nine thousand dollars in cash and twenty-

15 three ounces of cocaine?

16 A    I -- I -- I didn't know that.  I mean --

17 Q    No, but if I told you that, would -- would the rifle

18 assist you in protecting that, the money and the dope?

19          MR. COHEN:  Your Honor, I think -- I think the

20 question is kind of a misleading question because --

21          MR. BARKELEY:  I'll withdraw it.

22          MR. COHEN:  -- because Mr. -- Mr. Barkeley --

23          THE COURT:  It's withdrawn.

24          MR. BARKELEY:  I agree. I'll withdraw it.  Nothing

25 further.

1        MR. COHEN:  -- has to explain every --

2        MR. BARKELEY:  I've withdrawn the question, counsel.

3        THE COURT:  We're done.

4        MR. COHEN:  Yeah.

5        THE COURT:  Thank you, sir.

6        MR. COHEN:  Sorry -- sorry, Your Honor.  I have a

7   couple of questions --

8        THE COURT:  Okay.  So you're going --

9        MR. COHEN:  -- that arise out of that.  Very quickly.

10        THE COURT:  Okay.

11                **FURTHER REDIRECT EXAMINATION**

12   BY MR. COHEN:

13   Q    Exhibit 5 -- in Exhibit 5 which is in front of you, you

14   see an AR-15 Sporter?  Do you see that in there?

15   A    Yeah, (indiscernible) fifteen.

16   Q    You see that?

17   A    Mm-hmm (affirmative).

18   Q    And the AR-15 Sporter, to your knowledge, is that -- is

19   that a gun that -- that is collected by people who collect

20   guns?

21   A    Absolutely.

22   Q    And is that gun used for hunting?

23   A    Yes, it is.  Actually, I have an AR-15 and I like to use

24   it for wolf hunting.

25   Q    I'm sorry?

Castle - Further Redirect                    2-270

1   A    I like to use by AR-15 for wolf hunting.

2   Q    Wolf hunting?  And I don't know if you can see in the back

3   of Exhibit 5, but there's a 500 Mossberg shotgun.  Do you see

4   that?

5   A    Yeah, I believe I do, if it's the one I'm looking at here.

6   Mm-hmm (affirmative).

7              MR. COHEN:  Excuse me.

8                   (Pause - side conversation)

9   BY MR. COHEN:

10  Q    Can you see the forearm of that 500 Mossberg shotgun?

11  A    Yes, I do.

12  Q    To your knowledge, is a 500 Mossberg shotgun used for bird

13  hunting?

14  A    It can be used for bird hunting.  A lot of people carry it

15  on the front of their four-wheeler for bear protection when

16  they're out in the woods.

17  Q    So a lot of people carry it for bear protection?  Have you

18  -- have people that you've hunted with carry that for bear --

19  carry -- carry a 500 Mossberg shotgun for bear protection?

20  A    I don't carry a Mossberg, but I carry a Remington 1300,

21  about the same length as that, strap it on the front of my

22  load.  I do carry it for bear protection.

23  Q    And do you know people who carry it for bear protection?

24  A    Mm-hmm (affirmative).

25  Q    And on the hunting trip that we talked about starting with

1   your testimony, it turned out that you went hunting for moose

2   and you guys found a bear.  Is that true?

3   A    Yes.

4        MR. COHEN:  I have no further questions, Your Honor.

5        THE COURT:  Mr. Barkeley?

6        MR. BARKELEY:  No, thank you, Your Honor.

7        THE COURT:  Thank you, sir.  You're excused.

8   Counsel, your next witness.

9        MR. COHEN:  Yes, it's Chris Mannino, Your Honor.

10                          (Pause)

11       THE COURT:  All right, sir.  If you can just come up

12  forward.  We've got a chair reserved for you right at the

13  front.  Get as near as you can to the blue chair, then she'll

14  swear you in and we'll go from there.

15       THE CLERK:  Sir, if you could remain standing and

16  raise your right hand.

17  **GUY CHRISTOPHER MANNINO, DEFENDANT'S WITNESS, SWORN**

18       THE CLERK:  Thank you.  You may be seated.  And sir,

19  for the record, could you please state your full name, spelling

20  your last?

21       THE WITNESS:  Guy Christopher Mannino.

22       THE CLERK:  Spell your last name for the record.

23       THE WITNESS:  M-A-N-N-I-N-O.

24       THE CLERK:  Thank you.

25                     **DIRECT EXAMINATION**

1  BY MR. COHEN:

2  Q    Good afternoon, Mr. Mannino.  Can you tell the jury how

3  you're employed?

4  A    I'm sorry?

5  Q    Can you tell the jury what your job is?

6  A    I'm a doctor.  I'm a chiropractor.

7  Q    You are?

8  A    Yes, I am.

9  Q    Okay.  And do you also sell guns?

10 A    I do.

11 Q    Okay.  Do you have a store that sells guns?

12 A    Yes.

13 Q    And what's it called?

14 A    Arms and Equipment.

15 Q    Arms and Equipment?

16 A    Yes, sir.

17 Q    Where is it located?

18 A    820 Smythe.

19 Q    Is that in Fairbanks?

20 A    It is.

21 Q    How long have you had the -- should I call it a store or

22 dealership?

23 A    Dealership.

24 Q    How long have you had the dealership, guns and equipment

25 -- I'm sorry, Arms and Equipment?

1  A    Approximately ten years, maybe twelve.

2  Q    Are you the owner?

3  A    I am.

4  Q    What type of -- what type of guns do you sell there?

5  A    All sorts of guns.

6  Q    I'm going to show you what's previously been marked and is

7  in evidence in this trial as Exhibits 20 and 21.  I'm going to

8  ask if you recognize them.

9                          (Pause)

10  Do you recognize those?

11  A    Yeah.

12  Q    Did you sell those?

13  A    I did.

14  Q    Who did you sell them to?

15  A    Jason Colette.

16  Q    Do you remember Mr. Colette?

17  A    Vaguely.

18  Q    Do you recognize him sitting here at counsel table?

19  A    He's grown a mustache.

20  Q    Do you remember what year you sold those to Mr. Colette?

21  A    Not really.  I can guess.  Do you want me to guess?

22  Q    If it's a educated guess.

23  A    Better not guess.

24  Q    Better not.  Better not.

25  A    Approximately two years ago.

1   Q    When Mr. Colette came in to buy that -- Exhibit 20 and 21

2   from you, the MAC-10 and silencer, at that point, had you sold

3   other MAC-10's and silencers -- silencers to other people?

4   A    Yes, sir.

5   Q    About how many had you sold before Mr. Colette came in?

6   A    I have no idea.

7   Q    Okay.  Well, was it one other or one hundred other?

8   A    I might have sold a hundred.

9   Q    And since then, you've sold other ones?

10  A    Yeah.

11  Q    Is that right?

12  A    Yes, sir.

13  Q    Approximately how many more have you sold?

14  A    At least fifteen.

15  Q    And that -- when -- when people come in and buy MAC-10's

16  and silencers, do they need to be cleared?  Do they need any

17  type of background check?

18  A    You go through a federal background check, a local

19  background check.

20  Q    And do they fill out a form at your -- at your store?

21  A    Yes, they do.

22  Q    Would you say that that background check is -- is a pretty

23  intense background check?

24  A    I don't know.  It's a federal background check.

25  Q    Is there any other gun that you sell that requires as --

1  as significant a background check?

2  A    Machine guns and silencers, you have to go -- you have to

3  get your fingers printed.

4  Q    So would you say that that's the most significant

5  background check that anyone would require for any weapon you

6  sell?

7  A    Yeah.

8  Q    And you say that that form -- there has to be a federal

9  background check, is that right?

10  A    I'm sorry?

11  Q    A federal background check?

12  A    Yes, sir.

13  Q    And a state background check?

14  A    Yes, sir.

15  Q    And does there have to be a local background check?

16  A    Well, local law enforcement officers have to sign off on

17  the -- on the purchase.  At that time, they do a state

18  background check.

19  Q    So there's federal check, the state check, and then the

20  local law enforcement officer also has to sign off on the

21  purchase.

22  A    The local law enforcement officer does a state background

23  check and signs off on the purchase.

24  Q    How long does the background check generally take?

25  A    Which one?

1   Q   The whole process.

2   A   Ninety, hundred and twenty days.

3   Q   'Kay.  Can it take up to a year?

4   A   The first -- yes.

5   Q   In Mr. Colette's case, do you recall it taking up to a

6   year?

7   A   I remember he had a lot of problems getting the -- the

8   paperwork signed off and there was issues with it.

9   Q   And ultimately everything was signed off --

10  A   That --

11  Q   -- to your recollection?

12  A   That is true.

13  Q   Would you have sold the gun and the silencer to him --

14  A   I'm sorry?

15  Q   Would you have sold the gun -- the MAC-10 -- and the

16  silencer to him if he didn't have proper authorization and

17  clearance to purchase it?

18  A   No.

19  Q   And did he present that to you?

20  A   Yes.

21  Q   Now you say that you sold a MAC-10 and silencer to a

22  number of other customers over the years, is that correct?

23  A   That is correct.

24  Q   More -- more than one hundred, is that right?

25  A   I sold many MAC-10's.  I'm not going to give you a direct

1  number.

2  Q    And what do -- and what do the people who buy these MAC-

3  10's -- what do they use them for?

4  A    Usually on the forms you put personal use.

5  Q    Well --

6  A    Investment.

7  Q    It's an investment?

8  A    Shooting, fun.  Lots of people have them.

9  Q    Do you remember using the phrase "these are toys for big

10 boys"?

11 A    They are toys for big boys.  They cost a lot of money.

12 They're not something that you go out and just -- they're --

13 that's -- that's why I used to sell more of them and less of

14 them now.  They're getting more and more expensive.  You have

15 to go through an expensive -- extensive background check and

16 you have to wait, and a lot of people don't want to do that.

17 Q    Approximately how -- approximately how much did -- did

18 they cost at the time Mr. Colette purchased it?

19 A    Being really honest, I don't recall.

20 Q    I'm going to show you what's in evidence as Exhibits 28

21 and 29, and I'm going to ask you if you recognize them.

22                    (Pause)

23 A    Okay.

24 Q    Do you recognize those?

25 A    Yes.

1    Q    What are they?

2    A    They're the form fours that show tax paid transfer on the

3    weapons.

4    Q    And were those the form fours that -- that were presented

5    to you by Mr. Colette and purchased by Mr. Colette in

6    connection with the purchase of -- of the MAC-10 and the

7    silencer?

8    A    No, that's not the way it works.  They are returned to me.

9    I own the weapon and had it in inventory, the weapons.  I

10   filled out the paperwork, Jason got the sign -- the signatures

11   done, the local law enforcement sign done, put the check in the

12   mail with fingerprint cards off to the BATF.  I know the

13   fingerprint cards go off to the FBI, they do the background

14   check.  When it's cleared, the paperwork comes back to me.

15   When I receive the paperwork in the mail, then I phone the

16   customer and have them come over and pick up their gun.

17   Q    Are you aware of any illegal activity -- or I'm sorry.  At

18   the time that you sold these guns to Mr. Colette, were you

19   aware of any illegal activity by Mr. Colette?

20   A    No.

21   Q    Were you aware of any illegal activity in the past as to

22   Mr. Colette?

23   A    No.

24   Q    Now after Mr. Colette was arrested on November 28th of

25   2005, were you interviewed by agents of the ATF and the DEA?

1   A    I'm sure I was.

2   Q    'Kay.  Well, do you recall being interviewed by Agent

3   Cohoon who's sitting right here, don't you?

4   A    I talk to Eric regularly.

5   Q    Okay.

6   A    In fact Eric help -- has helped me out recently.

7   Q    So you know Eric.

8   A    Yes, sir.

9   Q    And you were also interviewed by Agent Foran of DEA, is

10  that true?

11  A    I know that I talked to DEA agents one time when I was

12  served paperwork once before on this.

13  Q    Okay.  And they attempted to interview you about Mr.

14  Colette --

15          MR. BARKELEY:  Objection, leading.

16          THE COURT:  Sustained.

17  BY MR. COHEN:

18  Q    Did they interview you about this case?

19  A    That was a long time ago.  I don't recall.

20  Q    Do you recall -- do you recall any questions that they

21  asked you about Mr. Colette?

22  A    I recall telling Eric that if there was an ongoing

23  investigation, why did the troopers sign off on it and that my

24  hands were clean 'cause I did all my paperwork correctly.

25  Q    Do you recall either Eric or the DEA agent trying to get

1    you to implicate Mr. Colette?

2         MR. BARKELEY:  Objection, leading.

3         THE COURT:  Sustained.

4         MR. COHEN:  I have no further questions, Your Honor.

5         THE COURT:  Cross-examination?

6                   **CROSS-EXAMINATION**

7    BY MR. BARKELEY:

8    Q    Good afternoon, Mr. Mannino.

9    A    I'm sorry?

10   Q    Good afternoon.

11   A    Good afternoon.

12        MR. BARKELEY:  May I approach, Your Honor?

13        THE COURT:  Yes.

14        THE WITNESS:  Sure.

15                   (Pause)

16   BY MR. BARKELEY:

17   Q    All right.  Sir, I handed you a photograph.  I hope I get

18   the number right this time.  I think it's number two on the

19   back.  Are we together on that?

20   A    Yes, sir.

21   Q    Yes?

22   A    Exhibit 2.

23   Q    All right.  Thank you.  That's already in evidence, so I'm

24   just going to ask you a question about it.  If I told you that

25   that's a bag of marijuana, that green stuff up there sitting

1   next to the very weapon that you've got on the table in front

2   of you, and that that was all located inside a safe inside

3   Jason Colette's house on November 28th of 2005, would that --

4   would you, knowing that, have any impact on Mr. Colette

5   attempting to buy that MAC-10 from you, say, next week, if

6   you're aware of that information?

7   A    I don't understand what you're trying to say.

8   Q    Well, you're a federal firearms licensee, right?

9   A    Yes, sir.

10  Q    Okay.  So you know, don't you, that it's against the law

11  for a person who is an unlawful drug user to possess that kind

12  of a firearm?

13  A    Yeah.

14  Q    Okay.

15  A    It's one of the questions they ask on the form.

16  Q    That's right.  Now, on the form there -- twenty-eight and

17  twenty-nine in front of you, I think they both -- both ask the

18  same question, right?  They asked Mr. Colette are you an

19  unlawful drug user, among other things, is that right?

20  A    Thirteen E says an unlawful user or addicted to marijuana

21  or blah, blah, blah, blah, blah.

22  Q    Okay.

23  A    Okay.

24  Q    All right.  And that one's filled out by Mr. Colette,

25  right?

1   A    Yes, sir.

2   Q    And he checked no --

3   A    Yes, sir.

4   Q    -- he is not an unlawful user of marijuana, right?

5   A    That's what it says.

6   Q    All right.   Now you don't go conduct your own independent

7   investigation of the truthfulness of the answers to the

8   questions on that form, do you?

9   A    Well, if they came in with a -- with a -- smoking a joint,

10  I think I would not sell them a gun, but --

11  Q    All right.

12  A    -- you know --

13  Q    So that's kind of what I'm asking you is if -- if you took

14  as true that the marijuana sitting next to that MAC-10 belonged

15  to Mr. Colette --

16  A    I -- I have to -- I --

17  Q    -- would you sell him that machine gun next week?

18  A    I'm sorry?

19  Q    Would you -- would you sell him a machine gun knowing that

20  he --

21  A    Knowing that he's -- no, I would not.

22  Q    Yeah, okay.   But you didn't know that at the time he

23  applied, did you?

24  A    No, I did not.

25  Q    Now, similarly, you'd have to concede, wouldn't you, that

<u>Mannino - Cross</u>

1  after someone lawfully buys a firearm from you, they can go

2  commit a crime with it, right?

3  A    I can't be responsible for what somebody else does.

4  Q    In fact, that -- that happens routinely, doesn't it, that

5  firearms that are sold to people lawfully are used to commit

6  some type of a crime?

7  A    I would agree with that.

8  Q    How much did you sell that machine gun to Mr. Colette for?

9  A    I truly have no idea.  I mean, I can give you a guess --

10  Q    Five dollars?

11  A    Probably between three and thirty-five hundred dollars.

12  Q    Okay.  And you said they're getting more and more

13  expensive.  What are they going for now?

14  A    That setup, probably four thousand dollars.

15  Q    Okay.  Did you give Mr. Colette a receipt?

16  A    I have no recollection.

17  Q    Well, is it your practice and custom, since you've sold

18  more than a hundred of those machine guns, to give the buyer a

19  receipt showing the purchase price?

20  A    No.

21  Q    All right.  I'm going to ask you why not?

22  A    'Cause more often than not I take people on their word and

23  they take me on mine.

24  Q    Okay.  I want to direct your attention again to twenty-

25  eight and twenty-nine, both of them there.  Take a look at the

1    forms, please.  Did Mr. Colette put down there that he was

2    buying this machine gun as an investment?  That's what it says,

3    isn't it?

4    A     Investment personal use, yes.

5    Q     Uh-huh (affirmative).  Check the other one, too, just to

6    make sure.  I mean, both of them say that, don't they?

7    A     Yep.

8    Q     Okay.  So you're saying that people like Mr. Colette come

9    in, buy a weapon for investment purposes and there's no proof

10   of what was paid for it?

11        MR. COHEN:  Objection, Your Honor.  That misstates

12   the answer.  He said investment personal use.  He didn't say

13   investment, he said investment personal use.

14        THE COURT:  Okay.  With that clarification, he can

15   answer it if he can.

16        THE WITNESS:  I'm sorry.  I'm lost here.

17        THE COURT:  Okay.  Restate the question.

18   BY MR. BARKELEY:

19   Q     Somebody is an investor in art, let's say, a Byron

20   Birdsall painting.  Don't you think they'd want to know what

21   they paid for it so that when they sell it later, they know

22   that they were making a profit on it?  It's an investment.

23   A     I understand.

24   Q     Okay.  So where is your records -- where are your records,

25   where is your evidence of what Mr. Colette invested in that

1  machine gun?

2  A    I don't keep records of what Mr. Colette invested in that

3  machine gun.

4  Q    Well, how about what you took in as a dealer?  You don't

5  keep records of what people pay you for your weapons in your

6  inventory?

7  A    This weapon -- I didn't have it in inventory.  I had to go

8  out and find it.  When I found it, I don't even remember what

9  we paid for it.

10 Q    Okay.

11 A    And when I found the gun, I phoned up Jason and said, I

12 found a MAC-10 for you, it's this much money.  Whatever I paid

13 for it, I added some money on for me, and then that's what he

14 paid me.  I have no -- ask him if I give him a receipt, ask him

15 how much he paid for it.

16 Q    I can't -- I can't do that in these proceedings, sir.  I

17 mean, I -- I can't do that.  I'm asking you.

18         THE COURT:  Okay.  Well, next question.

19         MR. BARKELEY:  Yeah.

20 BY MR. BARKELEY:

21 Q    So with regard to Exhibit 2 --

22 A    The picture.

23 Q    Yes, sir.  Do you see an aught six in there?

24 A    I can't tell which one's an aught six.

25 Q    Do you know anything about the history of the aught six

1    though as a rifle or a round?

2    A    Oh, yeah.  I know a lot about the aught six, the rifle,

3    the round.

4    Q    Okay.

5    A    I can't tell which one in this picture.

6    Q    Okay.  Let's just talk about it in general terms then.

7    A    Okay.

8    Q    It was -- it was a cartridge that was developed in 1906,

9    right?  That's partly where it got it's designation.

10   A    I think it was adopted in 1906, thirty-caliber round.

11   Q    Okay.  For doing what, hunting?

12   A    It's the most -- no, it was adopted as a military

13   cartridge.

14   Q    For killing people.  That was its original designation as

15   a cartridge, correct?  World War I?

16   A    That's correct.

17         MR. BARKELEY:  It's a military weapon for killing

18   people.  Nothing further, Your Honor.

19         THE COURT:  Redirect?

20         MR. COHEN:  Yes.

21                    REDIRECT EXAMINATION

22   BY MR. COHEN:

23   Q    What's -- what's the most common use for an aught six

24   today?

25   A    Deer hunting rifle.

1    Q    It's a hunting rifle, is that right?

2    A    It can be used for hunting.

3    Q    Is that the most common use?

4    A    I think that you could find -- you could go into any small

5    store in the unite -- anywhere in the United States and buy a

6    box of aught six shells to go hunting.

7    Q    Okay.  And what about the aught six itself?

8    A    Well, it's probably the most popular rifle cartridge in

9    the United States.

10   Q    And what about the -- the AR-15 Sporter.  Is that popular?

11   A    They're very popular.

12   Q    For hunting?

13   A    They're more for target shooting.

14   Q    And are they used for hunting as well?

15   A    I suppose you could use it for hunting.

16   Q    What about a 500 Mossberg shotgun?  What's that used for?

17   A    Probably for keeping people out of the house.

18   Q    Is it used for hunting?

19   A    Yes, sir.

20   Q    How is it used in hunting?

21   A    Go duck hunting with it, I guess.

22   Q    Say again?

23   A    Depends on -- it depends on how long the barrel is.  You

24   might use it for duck hunting --

25   Q    Might use --

1    A    -- might use it for quail hunting or grouse or -- shotguns

2    are good bird for -- good for birds.

3    Q    Okay.

4    A    Certain states you can use them for deer.

5    Q    What about bear protection?

6    A    You could use it for bear protection.

7    Q    Now the -- part of the application we're talking about

8    says investment and personal use, is that right?

9    A    Yes, sir.

10   Q    And did you testify earlier that that's generally when you

11   sell these MAC-10's, generally what -- from what you sell them

12   for, investment and personal use.

13   A    Yeah.

14   Q    So in the times that you sold MAC-10's before, when those

15   forms are filled out, the ATF forms, is it common in those

16   transactions for people write down investment personal use?

17   A    Yes.

18   Q    Would you say that that happens in almost every one of

19   those transactions?

20   A    No.

21   Q    Okay.  When you say it's -- but you say it's common.

22   A    Common.

23            MR. COHEN:  I have nothing further.

24            THE COURT:  All right.  Thank you.  Re --

25            MR. BARKELEY:  Just a couple, Your Honor.

1    THE COURT:  Okay.  Recross.

2    MR. BARKELEY:  Be very brief.

3    **RECROSS-EXAMINATION**

4  BY MR. BARKELEY:

5  Q    Sir, you mentioned your inventory.  Do -- do you have all

6  of your guns that you sell located in one store location?

7  A    Not now.

8  Q    Okay.  Wherever you store them, you know, as inventory, do

9  you keep your weapons loaded with a round in the chamber?

10  A    Personal guns or inventory?

11  Q    You can answer both.

12  A    My personal guns are always loaded.

13  Q    You always have a round in the chamber?

14  A    Always.

15  Q    Rifles, too?

16  A    Yes.

17  Q    These are where, at your home?

18  A    I have an M-16 that's loaded right next to my bed.

19  Q    And do you have any children in the house?

20  A    Yes, sir.

21  Q    'Kay.  And why is it you keep it loaded ready to go at the

22  side of your bed?

23  A    Well, it's -- unless it's loaded, it's just a big club,

24  and because I do have machine guns and silencers on the

25  premise, even though they are locked in a safe and I do have an

1    alarm.  I also have been robbed and it's not unnatural that

2    people are robbed up here when they have machine guns.

3            MR. BARKELEY:  Nothing further.

4            THE COURT:  Thank you, sir.  You're all done.

5            MR. COHEN:  Sorry -- sorry, Your Honor.

6            THE COURT:  Oh, you've got more?

7            MR. COHEN:  Just ver -- very, very quickly.

8                    **FURTHER REDIRECT EXAMINATION**

9    BY MR. COHEN:

10   Q    So if somebody's got a gun safe and they keep -- and

11   they've got a rifle in there with a -- with -- that's loaded

12   with a round in the chamber, would that be unusual to you?

13   A    I don't keep my guns in my safe loaded.

14   Q    I'm saying if somebody did that, would that be unusual to

15   you?

16   A    Yeah.

17   Q    Okay.  So someone that -- got a round in the chamber and

18   it's inside a safe, is there -- is that additional safety for

19   the -- for the weapon?

20   A    I suppose it would be.

21   Q    And you said that you went out and you got this MAC-10 for

22   Mr. Colette.  Is that common with the other MAC-10's that

23   you've sold, that they were not in inventory and you went out

24   and you got them --

25            MR. BARKELEY:  Objection, beyond the scope, Your

1    Honor.

2              THE COURT:  It is beyond the scope, but I'll allow

3    it.  If you can -- if you can --

4    A    You have to understand that many machine guns are very

5    expensive, and if someone wants something that I don't have --

6    and because machine guns are very expensive, I might not have

7    what everybody's cup of tea is.  So if you wanted a 1919 belt-

8    fed machine gun that was used during World War II, because you

9    are a World War II collector, I'm sorry, I just don't have that

10   gun in stock, I'd have to go out and look for it.  And the

11   second reason is that gun would probably cost eighteen thousand

12   dollars.  So if you came to me and said, gee, Chris, I want

13   that, I'd say I'll be glad to find it for you, it's going to

14   run about eighteen thousand dollars, are you committed for

15   that.  And if they say yes, then I will go start looking and I

16   will tell them make sure you get the money ready because when I

17   find it, I want to be able to say it's sold.  And once I find

18   the gun and I talk to the person and we go -- go back and forth

19   with pictures, the gun is sold, I will send a cashier's check

20   out.

21   BY MR. COHEN:

22   Q    So in summary, as to the people that you've sold MAC-10's

23   to before, the many times that you've sold them, it's more

24   often than not that you don't have it in inventory, you go out

25   and you get it somewhere else.

1  A     It depends -- right now I have two in inventory.  It

2  depends on whether or not -- if -- if I sold them both this

3  week, next week I'll have to go out and look for one.

4  Q     All right.  So it's not unusual to --

5  A     No, it's not unusual.

6            MR. COHEN:  All right.  That's it, Your Honor.

7            THE COURT:  All right.  Thank you, sir.  All done.

8  You're free to go.  How's the witness situation?

9            MR. COHEN:  I've got more.  You want me to keep

10 going?

11            THE COURT:  Do you have a short one that would be

12 really -- real short in five or ten minutes or --

13            MR. COHEN:  I don't know about -- let me see if I

14 can --

15            THE COURT:  Take the shortest one you have.  Can we

16 -- we're trying to get this done.  Do you mind if we stay a few

17 minutes to take one more witness that's standing out here?

18                         (Pause)

19 There's a chair up here.  If you can stand for a moment,

20 please.

21            THE CLERK:  Raise your right hand.

22            **KENJI BADGER, DEFENDANT'S WITNESS, SWORN**

23            THE CLERK:  Thank you.  You may be seated.  For the

24 record, would you please state your full name, spelling your

25 last?

1       THE WITNESS:  Kenji Dane Badger, B-A-D-G-E-R.

2       THE CLERK:  And for the record, could you also spell

3  your first name?

4       THE WITNESS:  Oh.  Kenji, K-E-N-J-I.

5       THE COURT:  Could you get a little closer to the

6  microphone?

7       THE CLERK:  Thank you.

8       THE COURT:  Counsel?

9       MR. COHEN:  Yes.

10                    **DIRECT EXAMINATION**

11  BY MR. COHEN:

12  Q    Were you an employee at Arctic Alarm and Audio?

13  A    Yes, sir.

14  Q    And you worked for Mr. Colette?

15  A    Yes, sir.

16  Q    How long did you work there?

17  A    Approximately two years, I think.

18  Q    And what were those years that you worked there?

19  A    2003 to 2005, I believe.

20  Q    What did you do there?

21  A    I installed stereos, auto-starts, lights, anything.

22  Q    I'm sorry?

23  A    I installed stereos and stuff --

24  Q    You sold --

25  A    -- auto-starts --

1  Q    You sold stereos?

2  A    Installed them.

3  Q    Oh, installed stereos.

4  A    Yes, sir.

5  Q    How many employees were there?

6  A    There was five including Jason.

7  Q    Was the -- was the shop busy?

8  A    It was busy all the time.

9  Q    A lot of customers?

10  A    Every day.  Shop days were full --

11  Q    And what -- when did you -- what did the shop install

12  other than stereos and -- other than stereos?

13  A    CD players, speakers, auto-starts, running lights, running

14  boards, anything and everything you wanted on your car.

15  Q    What about alarms?

16  A    Yes, sir.

17  Q    What were the hours of the store?

18  A    From eight to five.

19  Q    Work on weekends?

20  A    On Saturday, closed on Sunday.

21  Q    Was -- were the employees there full-time?

22  A    Yes, sir.

23  Q    Did the customers pay in cash?

24  A    Some did.  I didn't -- I worked in the back, so I didn't

25  see every customer.  We had a credit card machine, but there

1  was people who paid in cash and credit card, but I didn't see

2  every customer.

3  Q    So some customers paid in cash?

4  A    Mm-hmm (affirmative).

5  Q    Some people paid by credit card?

6  A    Yes, sir.

7  Q    Some people paid by check?

8  A    I'm sure they did.

9  Q    What about you?  Were you paid by check or in cash?

10  A    I was paid in cash.

11  Q    And how much were you paid?

12  A    I think it was twelve dollars an hour.

13  Q    And you were paid in cash?

14  A    Mm-hmm (affirmative).

15  Q    Do you know if the business had advertising?

16  A    We had a radio ad and I think one TV commercial.

17                    (Pause)

18  Q    And I'm showing you -- showing you what's been marked as

19  Defense A, B, C, E, F, H, and Q.  Do you see those photographs?

20  A    Yes, sir.

21  Q    And what are those pictures of?

22  A    Pictures of the shop.

23  Q    Is that the Arctic Alarm and Audio where you worked?

24  A    Yes, sir.

25  Q    Are they true and accurate representations -- depictions

1    of that shop?

2    A    Not what it looked like when we worked there, but that's

3    the building that we worked in.

4         MR. COHEN:  Okay.  Your Honor, I move E, F, H, and Q

5    into evidence.

6         THE COURT:  Mr. Barkeley?

7         MR. BARKELEY:  No objection.

8         THE COURT:  They'll be received without objection.

9         (Defendant's Exhibits E, F, H, and Q admitted)

10   BY MR. COHEN:

11   Q    When you saw Mr. Colette working at Arctic Alarm and

12   Audio, was he there every day?

13   A    Yes, sir.

14   Q    Did you see him working hard?

15   A    Yeah, we all were.  Everybody was under the hood of a car

16   or putting an auto-start in every day.

17   Q    He was there all the time?

18   A    Occasionally he left to go get stuff for the -- for the

19   business, go get supplies or go to the bank or whatever.

20   Q    When you say occasionally, how often was he gone?

21   A    I don't know.  I never really kept track.

22   Q    Okay.

23   A    I just kept working.

24   Q    In your forty-hour week, would you say he was there most

25   of the time?

1  A    Yeah.

2  Q    And he was working?

3  A    Yeah.

4  Q    Was he up front or in back?

5  A    A little bit of both.

6  Q    What's your opinion about whether -- was he -- was he good

7  with the workers?

8  A    He was very good.  He took me in when I didn't know

9  nothing and taught me everything I know, so --

10  Q    Was he good with the customers?

11  A    Yeah, very good.

12  Q    You have any idea whether the costs for the equipment of

13  the business were paid in cash?

14  A    What's that?

15  Q    When the business bought equipment, the alarms that were

16  installed or the equipment was installed, was that -- was that

17  purchased in cash?

18  A    I think that was with the business credit card.

19  Q    Did you ever see that purchased with cash?

20  A    The equipment?  No.

21  Q    Any of the equipment.

22  A    No, sir.

23  Q    Okay.  So the only cash that you saw was going out of the

24  business, other than coming in, was to pay wages?

25  A    And it went to the bank.

1  Q    Okay.  And was there -- were there other employees that
2  were paid in cash to your knowledge?

3  A    Everybody was.

4  Q    Were you involved in the accounting or bookkeeping for the
5  business?

6  A    No, sir.

7  Q    Was there a person who was involved in the accounting and
8  bookkeeping for the business that you know?

9  A    Russ handled more of the money than anybody, I think,
10  because he worked -- he was our salesman.

11  Q    But that wasn't your part of the business --

12  A    I wasn't --

13  Q    -- the accounting and bookkeeping, is that right?

14  A    No, sir.  I was an installer.

15  Q    Or the tax returns?

16  A    Nope.

17        MR. COHEN:  Okay.  I don't have any further
18  questions, Your Honor.

19        THE COURT:  Thank you.  Mr. Barkeley?

20                    **CROSS-EXAMINATION**

21  BY MR. BARKELEY:

22  Q    How are you, sir?  Your last name is Badger?

23  A    Yes, sir.

24  Q    You've taken an oath here today to tell the truth, right?

25  A    Yes, sir.

1    Q    You were interviewed by the police in December of 2005,

2    weren't you?

3    A    Yes, sir.

4    Q    And you told the police at that time that you knew people

5    who worked at Arctic Audio and Alarm smoked marijuana, but that

6    you didn't use drugs, didn't you?

7    A    Yes, sir.

8    Q    You stated to a police officer in that interview that you

9    remembered one occasion where you were going to move a 1963

10    Chevy convertible and you were told by another employee not to

11    move it because there was a black duffle bag in the vehicle

12    which contained twenty to thirty zips.  You said that, didn't

13    you?

14    A    I wasn't told that, I just was told there was a duffle bag

15    in it, but I don't really remember the occasion.

16    Q    You told the officer that the duffle bag had twenty to

17    thirty zips in it according to what you were told by another

18    employee there, didn't you?

19    A    No, I didn't tell --

20    Q    You're denying you told the police officer that?

21    A    Well, I believe I was shown that statement and I did not

22    agree with that statement, and that's what happened when we

23    talked to Denise Petty (ph), the private investigator.

24    Q    Okay.  You believed, you told the officer, that the zips

25    was a reference to cocaine.

1   A     No, sir.  I did not.

2   Q     You deny that.  All right.  You also told the officer that

3   you had observed Mr. Colette, the defendant here in the

4   courtroom, with a large baseball to softball size bag of

5   methamphetamine in the shop, didn't you?

6   A     That's what I was told, but I don't know if it was or not.

7   I've never seen the stuff, no.

8   Q     You told the police officer you observed him with that.

9   A     But I don't know if it was.  How am I -- I -- I'm never

10  around that stuff, so I'm not sure that it was.

11  Q     All right.  So you did at least -- now you're saying you

12  do recall telling the police officer you observed Mr. Colette

13  with a large baseball to softball sized bag of something in the

14  shop.

15  A     Of something.  I don't know what it was.

16  Q     All right.  But if the police officer testifies that you

17  told him it was methamphetamine -- that you knew it was

18  methamphetamine, you'd say the police officer got it wrong.

19  A     How am I to know if it -- if it's meth though?  I don't --

20  I don't do any of that stuff, so I don't know what it looks

21  like.

22  Q     Maybe somebody else told you it was meth.  No one's

23  suggesting you ran a test on it.

24  A     But they could have been lying, too.

25  Q     Did -- someone told you it was meth, didn't they?

1   A    But what if they're not telling me the truth?

2   Q    So they did.  You also told the police officer that Mr.

3   Colette showed you the meth after you asked Mr. Colette what

4   meth looked like.

5   A    No, I never asked him what meth looked like.  No, sir.

6   Q    So if the police officer comes into this courtroom later

7   and says you told the officer that, that you showed it -- that

8   you were talking with Colette and Colette -- you asked Colette

9   what does meth look like --

10  A    I didn't --

11  Q    -- the police officer got that wrong.

12  A    Yes, sir.  I -- he was showing somebody else and I asked

13  what it was, and then he showed me.  I never asked him what

14  meth looked like.

15  Q    All right.  Let's go over that a little bit more slowly

16  then.  So you're saying Mr. Colette did have this bag --

17  softball to baseball sized bag of something.

18  A    Yes, sir.

19  Q    Kind of a powderish substance?

20  A    No, sir.

21  Q    Well, what did it look like?

22  A    I can't really recall.  I think it was like rocky -- I

23  don't know.

24  Q    Okay.

25  A    It's been two years, so --

1  Q    And Mr. Colette was showing it to somebody else.

2  A    Yes.

3  Q    Who?

4  A    Damon.

5  Q    Damon who?

6  A    Wamsley.

7  Q    Okay.  And so again, I'm -- I'm -- I'm saying that a

8  police officer is going to say that you told the officer that

9  during this interview in 2005, that you asked Colette what does

10 meth look like.  Are you denying that now today?

11 A    Yes, sir.

12 Q    You're saying you never asked Mr. Colette what

13 methamphetamine looks like?

14 A    No, sir.  I never did.

15        MR. BARKELEY:  Okay, okay.  Nothing further, Your

16 Honor.

17        THE COURT:  Redirect?

18        MR. COHEN:  Yes, Your Honor.  I'm just waiting for

19 one second, Your Honor.

20                    (Pause)

21              **REDIRECT EXAMINATION**

22 BY MR. COHEN:

23 Q    All right.  First of all, you told the defense

24 investigator that you never saw any drugs at the business,

25 isn't that right?

1          MR. BARKELEY:  Objection, foundation, defense

2    investigator.

3          THE COURT:  You need to lay a foundation.

4    BY MR. COHEN:

5    Q    Did you talk to the defense investigator in this case?

6    A    Denise Petty.

7    Q    Yes.

8    A    Yeah.

9    Q    And you told her that you never -- that you never saw any

10   drugs at the business other than the fact that some people

11   smoked marijuana.

12   A    Knowingly.  I didn't -- I wasn't positive that it was

13   methamphetamine, so how am I -- I didn't know.

14   Q    Okay.  You didn't see any cocaine.

15   A    No, sir.

16   Q    You saw some people smoke marijuana on occasion.

17   A    Yes, sir.

18   Q    And one time, Mr. Colette was showing Damon Wamsley a bag

19   that had something in it, right?

20   A    Mm-hmm (affirmative).  Yes, sir.

21   Q    David Sauer walked by, who was another employee, right?

22   A    Yes, sir.

23          MR. BARKELEY:  Objection, leading.  David Sauer

24   wasn't in any of the direct.  This is just --

25          THE COURT:  Okay.  It is leading.

1    MR. COHEN:  Well, I'm -- this is -- this is -- arises

2  from Mr. Barkeley's question.

3    THE COURT:  Well, you can ask the question and it may

4  be appropriate to do it without -- I mean, maybe not require

5  leading questions.  We'll see what he knows.

6  BY MR. COHEN:

7  Q    Did you see David -- did you -- did you see David Sauer at

8  that time?

9  A    I think so.  I'm not positive.

10  Q    Did he say anything to you -- or did he say anything to

11  you guys when he walked by?

12  A    David?

13  Q    Yes.

14  A    I can't remember.

15  Q    'Kay.  Mr. Colette had a -- was showing a bag, but it was

16  a bag of salt, right?

17    MR. BARKELEY:  Objection, leading.

18  A    It could have been.

19    THE COURT:  It is leading.

20  A    It very well could have been.  I don't know 'cause I've

21  never -- I've never been around drugs all my life.  My dad was

22  raised -- I was raised a military kid, so I've never been

23  around any of that stuff.

24    MR. BARKELEY:  Motion to strike.  I believe the Court

25  ruled that it was leading.

1      MR. COHEN:  Motion to strike what?

2      MR. BARKELEY:  The answer.  It could have been salt.

3  You suggested salt.

4      MR. COHEN:  Well --

5      THE COURT:  He doesn't know what it -- he test -- he

6  didn't know what it was.

7      (Indiscernible - simultaneous speakers)

8      MR. COHEN:  Well, why isn't that part of his answer

9  that he said that -- he said that --

10      THE COURT:  Well, let's just move on.

11      MR. COHEN:  -- on cross.

12      THE COURT:  You can ask the next question.

13      MR. COHEN:  Well, let me ask -- let me ask that

14  question.

15      THE COURT:  But don't ask leading questions, just ask

16  him for him --

17      MR. COHEN:  I'm trying --

18      THE COURT:  -- for his own --

19  BY MR. COHEN:

20  Q    I mean, it could have been salt.

21  A    It very well could have been.

22  Q    You didn't know what it was.

23  A    No, sir.

24  Q    You didn't ask Mr. Colette what it was.

25  A    No, sir.

1  Q    Mr. Colette didn't tell you what it was.

2  A    No, sir.

3  Q    One of the people that was there commented about what it

4  looked like, or no?

5  A    I can't remember.

6  Q    So then when you talked to the invest -- the defense

7  investigator, Ms. Petty.

8  A    Mm-hmm (affirmative).

9  Q    You told her I had no idea what it was.

10 A    Yes, sir.

11 Q    Is that still true today?

12 A    Yes, sir.  I've never, ever seen meth before.

13 Q    Okay.  And that particular occasion that you were talking

14 to the police about, did you know it was meth?

15 A    No, sir.

16 Q    Did somebody tell you it was meth?

17 A    That's what they were leading to, yeah.

18 Q    Okay.

19 A    When they were questioning me.

20 Q    The person who told you it was meth was not Mr. Colette.

21 A    No, sir.

22 Q    And who was the person who told you it was meth?

23 A    I don't remember.

24 Q    Do you know whether when that person said that, he was

25 serious or he knew what he was talking about?

1          MR. BARKELEY:  Objection, calls for speculation.  We

2    don't know who the person was.

3          THE COURT:  He indicated he didn't recall who the

4    person was, so I think that would be appropriate foundation.

5    BY MR. COHEN:

6    Q    So you don't remember who the person was.

7    A    No, sir.

8    Q    And you don't know -- and not knowing who the person was,

9    do you know whether that person knew what he was talking about

10   or not?

11   A    No.

12         MR. COHEN:  Okay.  I don't have any further

13   questions.

14         THE COURT:  Okay.  Is that -- are you done, Mr.

15   Barkeley?

16         MR. BARKELEY:  Yes, Your Honor.

17         THE COURT:  Okay.  Thank you, sir.  You're excused.

18   I think that pretty --

19         MR. COHEN:  Hold on, hold on.  I'm sorry, Your Honor.

20   One second.

21         THE COURT:  All right.  Just a minute.

22               (Pause - side conversation)

23         MR. COHEN:  All right.  I'm sorry, Your Honor.  I

24   have one more question.

25   BY MR. COHEN: