1    A    Right.

2    Q    -- at the -- okay.  You said that you said something

3    sarcastic like now I know your name --

4    A    Right.

5    Q    -- right?  Would you explain why -- why was that

6    sarcastic?  Did you know this person Wendy already?

7    A    Last time I came to trial, she was like bickering at me,

8    talking crazy to me, looking at me all crazy, and every time I

9    come into this courtroom or to the courthouse and she's here,

10   she's looking at me crazy.

11   Q    Is she here now?

12   A    I believe so.

13   Q    Well, take a look and see if you can see her and point her

14   out.

15   A    Yeah, I do see her.

16   Q    Why don't you point her out to the jury.  Who is she?

17   A    The middle lady in the back.

18   Q    In the black there in the middle?

19   A    In the middle, yeah.

20   Q    Is she any relation to Mr. Colette?

21   A    She looks like him.  She must be.

22   Q    But you don't know.

23   A    I'm not sure.

24   Q    Okay.  But you say she -- she was intimidating you during

25   the criminal trial?

1   A    Not intimidating, but it was funny, just like she kept

2   saying -- barking some of these and just looking at me crazy.

3   Q    Well, whatever it was, it wasn't friendly you didn't feel?

4   A    No, not at all.

5   Q    Anybody else here in the courtroom have an exchange with

6   you yesterday?

7   A    Not that I know of.  I don't remember that.

8   Q    Well, you and I haven't ever talked this thing with her,

9   right?

10  A    Oh, no, no, not at all.

11  Q    Okay.  You ever been a member of a gang?

12           MR. COHEN:  That was back then.

13  A    No.  I was about thirteen or fourteen when I was in San

14  Bernardino, California.  It was like not necessarily a gang,

15  just your neighborhood, and all the kids in the neighborhood.

16  BY MR. BARKELEY:

17  Q    Okay.  Well, were you a member of the Crips?

18  A    Affiliated.  Not necessarily a member, but I lived in

19  their neighborhood.

20  Q    In California.

21  A    Yes.

22  Q    Okay.  So did you say anything about Crips yesterday to --

23  A    Not at all.

24  Q    -- this Wendy person?

25  A    I never talk about that, ever.  I was thirteen, fourteen

1  years old.  I'm thirty years old.  That was --

2  Q    To your knowledge, are there any Crips in Fairbanks?

3  A    Not that I know of.

4  Q    So as far as you know, there was no basis for being

5  accused this morning of being a member of the Crips other than

6  you had a blue rag in your hand?

7  A    Right.

8  Q    'Kay.  Let's talk about being a dope dealer 'cause I think

9  it's fair to say you've admitted in your life you've been a

10 dope dealer, right?

11 A    I have.

12 Q    Okay.  All right.  So let's -- let's talk about that for a

13 moment.  In your position when you're buying dope from somebody

14 like Mr. Colette, do you want his girlfriend to recognize you

15 or know who you are?

16 A    No.

17 Q    Why not?

18 A    It's irrelevant to me who --

19 Q    Well, she could testify against you some day, couldn't

20 she?  The girl --

21 A    I don't --

22 Q    A bystander watching you do a dope deal with something, do

23 you really want a lot of other people who aren't involved in it

24 knowing you came there and bought dope?

25 A    Don't think so, no.

1  Q    Right.  'Cause if they get in trouble, they might mention

2  that they saw you do a dope deal, right?

3            MR. COHEN:  Objection, Your Honor.  This -- this is

4  -- this is leading questioning.

5            THE COURT:  You can -- you can pursue the line.  I've

6  been -- I've been lenient with both sides in this regard.

7  BY MR. BARKELEY:

8  Q    I'm sorry.  Did you answer that?  Is that correct?

9  A    Can you repeat that for me?

10 Q    Yeah.  If you let people observe you engaging in dope

11 dealing, that could come back to bite you.  They -- they could

12 end up some day testifying against you because they saw you do

13 it, right?

14 A    Yeah.

15 Q    Okay.  So you don't -- you don't involve anybody you don't

16 need to when you're buying dope, right?

17 A    No, try not to.

18                           (Pause)

19 Q    Now you had guns in your house when the police searched

20 your house on November 28th, 2005, right?

21 A    Right.

22 Q    Okay.  But you had already cleaned up -- based on a tip

23 that you'd got, you'd already cleaned out dope from the house,

24 true?  Before that time.

25 A    Right.

1   Q    Okay.  Now one reason you had guns in your house was

2   because you occasionally had drugs in your house, true?

3   A    That -- that wasn't the reason why I had guns.

4   Q    Why did you have guns in your house?

5   A    I wasn't a felon.  I thought I had the right to bear arms.

6   Q    Are you a hunter?

7   A    Yeah.

8   Q    Okay.  So you testified, didn't you, that you were

9   thinking of robbing Mr. Colette because he had dope and money

10  at his house?

11  A    Yeah.

12  Q    Okay.  Why weren't you concerned as a drug dealer that

13  somebody might rip you off?

14  A    'Cause I was small time.  I never had big dope -- lots of

15  dope.  And I wasn't like doing it full time like some of these

16  guys were.

17  Q    What did you do with your money -- did you -- you would

18  get money, right?  You would get paid money, cash, for dope?

19  A    Oh, yeah.

20  Q    Okay.  Did you ever get a check from any of your

21  customers?  Business check?

22  A    I -- I most definitely don't remember anything like that.

23  Q    It's kind of ridiculous, isn't it?  People pay in cash for

24  illegal drugs, don't they?

25  A    I believe so.  I don't remember getting no check.

1  Q    Ever.

2  A    Ever.

3  Q    Okay.  So when people would pay you cash for dope, what

4  did you do with the cash?

5  A    Spent it.

6  Q    Before you spent it -- let's -- let's say you sold three

7  zips, okay?  So you got what, thirty-six hundred dollars on you

8  maybe?  Thirty -- three -- three to thirty-five hundred?

9  A    I'm not sure.  It all depends.

10 Q    Okay.  You would -- you would -- if you didn't go spend it

11 all at once though, what would you do with the money?

12        MR. COHEN:  Objection, Your Honor.  All this question

13 about what he would do with the money is well beyond the scope

14 of direct.

15        THE COURT:  You're talking about -- you're not

16 talking about specifically, you're talking about generally.  I

17 don't know what you mean by -- I guess what did you do with the

18 money, he said he spent it.

19        MR. COHEN:  I didn't go to any areas that were

20 remotely connected with the money received or how he spent it.

21        MR. BARKELEY:  Well, Your Honor, he opened the door

22 to this gentleman for two years having supposedly sold drugs,

23 all the way back to high school.  I think it's fair to ask him

24 what -- what he did during that time.

25        THE COURT:  But he -- you can ask him if he can

1    answer it for the -- can you answer that question, sir?

2              THE WITNESS:   Umm --

3    BY MR. BARKELEY:

4    Q    If you had more than you were going to spend on you, what

5    did you do with it?

6    A    I'm not sure.  I don't remember.  I would spend it -- I

7    know I would spend it.

8    Q    So you just always -- when you did a deal, you took it

9    from the customer and then spent it right that moment.

10   A    Oh, not --

11   Q    You went right to a store and bought something with it.

12   A    It would probably be in my pocket until I went and spent

13   it.

14   Q    Did you ever store it with your drugs?

15   A    I don't -- no.

16   Q    And why -- why is that?

17   A    I don't know, just never did.

18   Q    Did you take your money to a bank and deposit it in a

19   bank?

20   A    No.

21   Q    So what's the most money you ever had on you at one time

22   when you were dealing drugs?   Cash.

23   A    I'm not sure.

24   Q    Twenty thousand?

25   A    I'm not sure.

1  Q    That's possible?  It's possible you had as much as twenty

2  grand on you?

3  A    Maybe.

4  Q    That's a lot of zips, isn't it?  More than three.

5          MR. COHEN:  Just a second, just a second, just a

6  second.

7  BY MR. BARKELEY:

8  Q    Isn't it?

9  A    Oh, yeah.

10                         (Pause)

11 Q    So suppose I told you somebody in the courtroom saw you

12 wink at Wendy yesterday when you were leaving the courtroom,

13 kind of in a friendly way.  What would you say to that?

14 A    I don't remember winking.  I mean, I blink a lot maybe,

15 but winking?  No.

16 Q    Well, you're admitting you've had as much as twenty

17 thousand dollars on you at one time.

18 A    I'm not sure.  I said maybe.  Could have.  I haven't did

19 anything in a long time, so it's been a long time since I had

20 any money, so --

21 Q    So you don't -- you don't remember whether you ever had

22 more than thirty thousand dollars on you at a time?  Cash?

23 A    I don't remember.

24 Q    Or at your house.

25 A    No.  I don't remember.

<u>Johnson - Cross</u>                                    3-49

1   Q     But you're not denying that it's possible, are you?

2   A     I don't remember ever having that much money.

3   Q     And you know how much Mr. Colette had in his safe on

4   November 28th, don't you?

5   A     After the reports, I think I had a idea, but right now --

6   offhand, I -- I can't recall.

7   Q     How about thirty-nine thousand dollars or thereabouts?

8         MR. COHEN:  Objection, Your Honor.  He said he

9   couldn't recall and he's --

10        MR. BARKELEY:  I'm not suggesting he knows that.

11  BY MR. BARKELEY:

12  Q     I'm saying now, knowing thirty-nine thousand dollars, does

13  that -- does that strike you as crazy or inconsistent in terms

14  of how much cocaine Mr. Colette was dealing?

15  A     If he had that, I wouldn't be surprised.

16  Q     You had other sources of supply at -- that you testified

17  about at trial that you wouldn't identify, do you remember

18  that?

19  A     Correct.

20  Q     Okay.  Now without asking anything about who those people

21  were, do you know anything about what kind of weight they were

22  moving?

23  A     No, they never told me.  They never showed me or told me.

24  Q     You said you went over to Mr. Colette's shop?  You've been

25  over there before where his business was, the audio place?

1  A    Correct.

2  Q    You ever see any drugs over there?

3  A    I'm not sure.  I don't remember seeing any drugs over

4  there at all actually.  I never seen drugs at his shop.

5  Q    You ever talk about your drug dealings with him over there

6  at the shop?

7  A    No.

8  Q    Now in your experience as a drug dealer, you must have

9  fronted people some dope at one point in your career, didn't

10  you?

11  A    I don't recall.

12  Q    You don't recall whether you ever fronted somebody some

13  dope?  Do you even know what the word front means?

14  A    Yeah.

15  Q    Okay.  Why do you know what it means?

16  A    I don't know why I know, but I know.

17  Q    What's it mean -- what's it mean to you, to front somebody

18  dope?

19  A    It's like credit.

20  Q    Right.  It means you give the customer the dope and

21  they'll come back and pay you later, right?

22  A    Right.

23  Q    Okay.  And you're saying you've never done that yourself?

24  A    I didn't say that.  I said I don't recall.

25  Q    Okay.  So you might have done that yourself.

1  A    Maybe.

2  Q    Okay.  And you're certainly familiar that other people who

3  sell drugs front dope, correct?

4  A    It's possible, yeah.

5  Q    Well, it's more than possible, isn't it?  It's common in

6  the drug trade, is it not?  That's how come you know what front

7  means, isn't it?

8  A    I don't know that's why I know what it means, but it's

9  possible that other people do that.

10  Q    All right.  Why do you think that you -- that's how you

11  know what front means?  Did you see it on television or

12  something?

13  A    I could have.  I'm not sure.

14  Q    'Kay.  But you know it's for credit.

15  A    Right.

16  Q    Okay.  And so you -- you're saying you don't remember

17  whether you ever fronted anybody dope, but you might have.

18  A    I'm not sure.

19  Q    Okay.  Let's talk about just not dope.  Let's say you give

20  somebody something else, you sell them a car.  Have you ever

21  sold somebody a car on credit?

22  A    Oh -- no.  Heck no.

23  Q    You haven't, no.  So everything you've done is cash.

24  A    Right.

25  Q    Okay.  You've never given anybody credit.

1  A    Not for no cars.

2  Q    How about for anything?

3  A    I'm not sure.  I don't remember if I did.  It's a

4  possibility, but I don't remember.

5         MR. BARKELEY:  Okay.

6              (Pause - side conversation)

7  BY MR. BARKELEY:

8  Q    You got your trial testimony there?

9  A    Yes, sir.

10 Q    Bear with me for just one second, sir, and I'll see if I

11 can find a page I'm looking for.

12             (Pause)

13 Do you remember at the trial Rex Butler who was the attorney

14 for Mr. Colette?  Mr. Butler, do you remember that?  You don't

15 remember that?

16 A    What?

17 Q    Mr. Butler was the attorney for Mr. Colette at the

18 criminal trial?

19 A    I think so, yeah.

20 Q    Okay.  Check out page 2-26, please, at line ten.

21             (Pause)

22 You see it?

23 A    Yes.

24 Q    Go ahead and read that.

25         THE COURT:  To yourself or --

1          MR. BARKELEY:  No, out loud, please, to the jury.

2     Where it says "Q, Uh-huh (affirmative)."

3     A    "In fact, you fronted him dope in the past, haven't you?"

4     Q    Some dope in the past, doesn't it say that?

5     A    Yeah.

6     Q    "In fact, you fronted him some dope" --

7     A    Right.

8     Q    -- "in the past, haven't you?"

9     A    Right.

10    Q    Keep going.

11    A    "Yes."

12    Q    "Haven't you, sir?"  It was asked twice, right?  I'm

13    asking you to read it.  Why don't you start again, please.

14    Read the question and then the answer.

15         MR. COHEN:  Objection.  That's an improper question.

16    He's not impeaching -- this is not impeachment.  It's not a

17    prior inconsistent statement.  It's proper to ask him to

18    refresh his recollection.  If it does, fine; if it doesn't, no.

19    But he can't ask him to read from the transcript.

20         THE COURT:  That's true.  So read it to yourself, see

21    if it refreshes your recollection.

22                        (Pause)

23    A    Okay.  What's the question now?  Could you repeat the

24    question to me?

25    BY MR. BARKELEY:

1   Q    Yeah.  It says, doesn't it -- it says, "In fact, you

2   fronted him some dope in the past, haven't you -- haven't you,

3   sir?"  And what was your answer to that question?

4   A    Yes.

5   Q    Okay.  So you have fronted dope to people in the past,

6   haven't you?

7   A    I guess so.

8   Q    And you didn't ask Mr. Butler, did you -- you didn't say

9   what does front mean -- what does front mean, help me out, I

10  don't know what that means?  You answered the question

11  immediately, didn't you?  You said yes.

12  A    Right.

13  Q    Okay.  So you know, don't you, that giving people dope on

14  credit means they've got to go sell it or somehow other way

15  come up with the money and come back and pay you, don't they?

16  A    Something like that.

17  Q    Mm-hmm (affirmative).  And in the meantime, if you had

18  some cash available to you, since you're extending cocaine to

19  people on credit, that would be very helpful in your drug

20  business wouldn't you -- wouldn't it?  You can pay bills 'cause

21  you've got cash while you're waiting to get paid for your

22  drugs, right?

23  A    I'm not understanding your question.

24  Q    If you're giving people credit, you need money to live on,

25  don't you?

1    A    Everybody needs money to live on.

2    Q    Mm-hmm (affirmative). 'Cause you're not going to have the

3    money from selling the drugs yet, right?

4            MR. COHEN:  Your Honor, again, I object to this line

5    of questioning.  I think it's outside the scope.  On top of

6    that, there isn't any foundation or evidence that there was any

7    credit being extended in any way in this case.

8            THE COURT:  Sustained.

9                        (Pause)

10   BY MR. BARKELEY:

11   Q    Have you discussed your testimony here today or the fact

12   you were going to testify with anybody over here at this table

13   before you came in?

14   A    No, sir.

15   Q    And did you discuss your testimony today with Wendy, who

16   you identified in the courtroom today?

17   A    Oh, no, sir.

18   Q    How about anybody I haven't mentioned.  Have you talked

19   about what you're going to testify about today?

20   A    No, sir.

21                        (Pause)

22   Q    Has anybody ever threatened you in any way for testifying

23   either at the criminal trial or here during this proceeding?

24   A    Maybe not indirect -- maybe indirectly in a sense, but

25   nothing just all out.

<u>Johnson - Cross</u>                                     3-56

1    Q    What did they -- what did they say or do?

2    A    Just --

3    Q    What was the threat?

4              MR. COHEN:  Objection, Your Honor.

5    A    -- manner -- mannerisms --

6              MR. COHEN:  Objection, Your Honor.  Lack of

7    foundation.  The foundation would be who it was, what -- what

8    -- what the surrounding circumstances were.  He can't --

9              THE COURT:  It's a foundational objection.  Simply a

10   foundation --

11   BY MR. BARKELEY:

12   Q    Who -- who threatened you indirectly?

13   A    Just people I don't even know that know the situation.

14   They might drive by, do some crazy shit like that, but ain't

15   nobody ever said nothing like -- I have my language,

16   mannerisms, stuff like that.  I get that all the time.

17   Q    Okay.  The gesture that you made -- the gesture that you

18   made for the record was the cap come down on a pistol?

19   A    That's what it looks like to me.

20   Q    Mm-hmm (affirmative).  Did -- were you able to identify

21   any of these people who made a gesture like that to you?

22   A    Probably not.  Lot like -- like I said it'd be people I

23   don't even know doing shit like that.  Ever since that first

24   trial, I've had issues like that around Fairbanks, yeah.

25   Q    How about -- how about this week though.  Did anything

1    like that happen this week?

2    A    Not that I remember.

3         MR. BARKELEY:  Nothing further, Your Honor.  Thank

4    you, sir.

5         THE COURT:  Redirect?

6         MR. COHEN:  Yes, Your Honor.

7                    (Pause)

8                **REDIRECT EXAMINATION**

9    BY MR. COHEN:

10   Q    First of all, you told Mr. Barkeley that you never talked

11   about dope at Jason's shop, is that true?

12   A    I don't remember talking to Jason about dope at his shop.

13   Q    Isn't it true that you told Agent Cohoon before the search

14   warrant was sworn out that you met Jason at his shop and

15   arranged to meet him that evening to buy dope at his trailer?

16   A    I don't remember.

17   Q    You don't remember ever saying that to him?

18   A    I could have, but I don't remember.  It was awhile back.

19   Q    You said that the guns that you had on November 28th of

20   2005, you had them lawfully?

21   A    I'm not sure about lawfully, but I -- I had some.  I

22   thought I had the right to bear arms.  I would go -- go to gun

23   shows and look in the classifieds and stuff like that, but I

24   wasn't going to Fred Meyer's and buying me a gun.

25   Q    You don't have the right to bear arms when you've been

1    convicted of domestic violence, do you?

2    A    I'm not sure.

3    Q    You were never told that by your attorneys?

4    A    I don't remember.

5    Q    You don't remember being convicted of domestic violence on

6    at least two occasions?

7    A    I'm not sure.  I don't know how many times it was.

8    Q    I'm sorry.  You're don't -- you're not sure if you were

9    convicted of domestic violence?

10           MR. BARKELEY:  Objection.  Again, Your Honor, none of

11   this is cumulative.  It directly goes against what the Court

12   said before about trying to impeach the witness for bias with

13   his criminal history.  It has nothing to do with this case.

14           MR. COHEN:  It has to do with -- the prosecutor

15   opened the door to this by asking a question about whether he

16   thought the weapons were lawful.  I'm simply saying if you felt

17   that the weapons were lawful, what about the fact that you were

18   convicted and you're weren't allowed to have them?

19           MR. BARKELEY:  I never asked whether they were

20   lawful.

21           MR. COHEN:  He said he answered that -- that was in

22   response to his question.

23           THE COURT:  Apparently what you're saying -- domestic

24   violence is when there's been a dispute with a wife or

25   significant other.  Apparently he's had two episodes of that,

1   and you're saying that that's -- that impacts his ability to

2   have weapons.  Then you can ask him if that's true or not true

3   and then we need to move on.

4           MR. COHEN:  'Kay.

5   A    For my knowledge, I thought you had -- you couldn't have

6   weapons if you were a felon, and that was misdemeanors.

7   BY MR. COHEN:

8   Q    The twenty thousand dollars that you had on one time, you

9   said you had at least twenty thousand dollars at one time?

10  A    I don't remember.

11  Q    You didn't tell that to Mr. Barkeley just now?

12  A    No, I didn't.  I said it was possible, but I don't

13  remember having that much money at one time.

14  Q    'Kay.  So -- but you -- it was possible you had twenty

15  thousand dollars from drug dealing, that's what you said.

16  A    I don't remember.

17  Q    You don't remember telling him that or you don't remember

18  if you had it?

19  A    I don't remember if I had twenty thousand at one time.

20  Q    Did you tell him it was possible?

21  A    It was possible.

22  Q    Okay.  Somebody who had twenty thousand dollars at one

23  time, is that consistent with your testimony that the most you

24  remember dealing was one ounce -- or I'm sorry -- dealing in

25  was one ounce?

1  A    I don't remember saying that, just dealing one ounce.

2  Q    I'm going to ask you one more time.  Do you remember the

3  quantities of cocaine you were dealing in?

4  A    It fluctuated like I said before.  It all depends.

5  Q    Okay.  Give me a number though.  It fluctuated to what?

6  A    I'm not sure.

7  Q    You have no recollection.

8  A    From -- all depends.

9  Q    Twenty thousand dollars is twenty ounces, isn't it, sir?

10 A    I wasn't doing like that.  I wasn't doing that many at one

11 time.  Maybe one or two here and there, you know.  If I even

12 had any money, it's because I was saving it and putting it up

13 and -- not because of one major deal or something crazy like

14 that, no.

15 Q    So it was possible that you had as much as twenty

16 thousand?

17 A    Maybe.

18 Q    You say that you -- that you winked at my client's sister

19 yesterday.

20 A    No, I didn't say that.

21 Q    'Kay.  Mr. Barkeley asked you whether if somebody said

22 that you winked at -- at that, was that -- does that sound

23 correct to you?

24 A    No.  Maybe I blinked when I walked out of the courtroom,

25 but I don't know about winking.

1  Q    You didn't do any winking?

2  A    I don't remember.

3  Q    You didn't wink -- just kind of -- in good humor, you

4  didn't say that on -- on cross-examination just now?

5  A    I didn't say I winked.  I said I blinked.

6  Q    You blinked.  Like it had nothing to -- you -- we -- we

7  blink all day --

8  A    My --

9  Q    -- so there was absolutely no actual wink directly at

10 my --

11 A    Right.

12 Q    -- client's sister.

13 A    Right.

14 Q    You didn't do that.

15 A    No.

16 Q    The people that were driving by and making those gun --

17 those gun gestures at you, this all happened since the last

18 trial?

19 A    Right.

20 Q    And how many times did that happen to you?

21 A    I get crazy gestures off and on since then.

22 Q    Right.  How many times did that happen to you?

23 A    I'm not sure.

24 Q    Was it one, was it a hundred?

25 A    I'm not sure.  It was more than two or three times.  I --