1  I haven't -- not keeping track.

2  Q      'Kay.  So you think it was three, four, five times,

3  something like that?

4  A      Give or take a little bit.

5  Q      And what would happen is you'd be out there, somebody

6  would drive by on the street and make a gun gesture at you.

7  A      Be at the grocery store or anywhere, in traffic.

8  Q      And that -- and that -- you're concluding that has to do

9  with this trial that took place in this case?

10 A      Yeah.  It never happened before.

11 Q      'Kay.  And doesn't have to do with any of your ten,

12 fifteen arrests for assault?

13 A      No.

14 Q      All those other people that you -- they complained that

15 you assaulted them?  Doesn't have to do with any of them?

16 A      I don't think so.

17 Q      Doesn't have to do with any of the domestic violence or

18 those convictions?

19 A      When I got those DV charges, it wasn't because my old lady

20 pressed charges, because the state picked it up, and they

21 prosecuted me for it.  She never -- it was always just because

22 we had neighbors -- bad situations like living in the College

23 Union and everywhere, I'm arguing, talking loud, troopers come,

24 they arrest me.  I'm nineteen, I'm like -- I have a newborn, I

25 just want to go home, so I pleaded no contest.

1  Q    It doesn't have to do with any of the other sources of

2  supply of cocaine that you had?

3  A    No.  Not that I know of.  I haven't talked to anybody

4  since this crazy -- since November 28th really.

5  Q    Doesn't have anything to do with your plans to potentially

6  rob people?  Doesn't have anything to do with any of those

7  other things?

8  A    I don't know.  It could.  I'm not sure.  But none of the

9  crazy -- like those crazy gestures ever happened until after

10  the trial.

11  Q    You hang -- you hung out for many, many years, by your own

12  testimony, with these people, right?

13  A    With -- who's these people?

14  Q    People who are committing crimes, people who are dealers,

15  that kind of thing.

16  A    I mean, hung out in my neighborhood and, you know -- I'm

17  not sure how to answer that question.

18  Q    But in any case, the people that you saw, you didn't know

19  any of them.  They -- you had never seen any of those people

20  before.

21  A    Right.

22  Q    You have no knowledge that those people have any

23  connection whatsoever to Mr. Colette, is that correct?

24  A    I'm not sure.

25         MR. COHEN:  I have nothing further, Your Honor.

1          THE COURT:  Any redirect or cross?

2          MR. BARKELEY:  No, thank you, Your Honor, neither.

3          THE COURT:  All right.  Thank you, sir.  You're

4    excused.  We'll take a brief recess.  Do you know who your next

5    witness is?

6          MR. COHEN:  (Indiscernible - simultaneous

7    speakers) --

8          MR. COE:  Your Honor, may I be excused?

9          THE COURT:  Yes.  Yes, you may.

10          MR. COE:  Thank you, Your Honor.

11          THE COURT:  So we'll stand in recess -- fifteen-

12    minute recess, then you need to have your next witness back,

13    okay?

14          MR. COHEN:  Yes, Your Honor.

15          THE COURT:  'Kay.

16          THE CLERK:  This matter is in brief recess.

17          UNKNOWN JUROR:  Am I allowed to leave the building to

18    have a cigarette (indiscernible)?

19      (Indiscernible - simultaneous speakers)

20      (Recess at 9:51 a.m., until 10:11 a.m.)

21      (Jury not present)

22          THE CLERK:  All rise.  His Honor the Court, this

23    Court is again in session.

24          THE COURT:  Next witness.

25          MR. COHEN:  Yes, Your Honor.  We don't have a jury.

1          THE COURT:  Well, you don't have a witness.

2          MR. COHEN:  I'll bring the witness.

3          THE COURT:  Okay.  I'll get the jury.

4          MR. COHEN:  There's no point in making a big deal

5    about announcing it if there's no jury.

6          THE COURT:  No, I know.  I just want to know if you

7    had one.

8          MR. COHEN:  I have one.

9          THE COURT:  Okay.  We'll get the jury.

10                    (Pause)

11    Sir, you come forward here and just -- the jury's on the way in

12    and we'll just -- see the blue chair there?  You just stand by

13    that for a second, and we'll swear you in, and get going.  Soon

14    as the jurors get here, we'll swear --

15                    (Pause)

16      (Jury in at 10:12 a.m.)

17          THE COURT:  Okay.  Got the jury.

18          JUROR NO. 12:  Your Honor, I know this witness.

19          THE COURT:  Well, will it affect your ability to be a

20    fair juror in this matter?

21          JUROR NO. 12:  Not at all.  Just thought

22    (indiscernible - away from microphone) worked together --

23          THE COURT:  Okay.  Well, keep that in mind.  All

24    right?

25          JUROR NO. 12:  (Indiscernible - away from microphone)

1     THE COURT:  Okay.  Just -- we've got three other

2  things going.  We just had a juror -- but we didn't -- you

3  didn't announce your name.  You're juror number --

4     JUROR NO. 12:  I'm Juror Number 12.

5     THE COURT:  Okay.  Juror Number 12 knows this

6  particular witness, worked with him six years ago, knows him as

7  Shorty, and you've said that that won't affect your ability to

8  be a fair juror in this case one way or the other, right?

9     JUROR NO. 12:  No, not at all.

10     THE COURT:  Okay.  If it becomes a concern for you,

11  let us know, okay?

12     JUROR NO. 12:  Okay.  I just wanted to make --

13     THE COURT:  Counsel, anything else on that regard?

14     MR. COHEN:  I have nothing, Your Honor.

15     MR. BARKELEY:  No, thank you.

16     THE COURT:  All right.  Thank you.  All right.  Let's

17  swear in the witness.

18     THE CLERK:  If you'd raise your right hand.

19     **WILLIAM WILLIAMS, DEFENDANT'S WITNESS, SWORN**

20     THE CLERK:  Thank you.  You may be seated.  For the

21  record, could you please state your full name, spelling your

22  last?

23     THE WITNESS:  It's William Shane Williams.

24  W-I-L-L-I-A-M-S.

25     THE CLERK:  Your city and state of residence?

3-67

1          THE WITNESS:  Fairbanks, Alaska.

2          THE CLERK:  Thank you.

3          THE COURT:  Mr. Cohen.

4          MR. COHEN:  Okay.  Thank you, Your Honor.

5                      **DIRECT EXAMINATION**

6   BY MR. COHEN:

7   Q    Good morning, Mr. Williams, and thank you for coming down.

8   Mr. Williams, are you familiar with a business called Arctic

9   Alarm and Audio?

10  A    Yes, I am.

11  Q    And how are you familiar with that business?

12  A    We did frequent business with him through Affordable Used

13  Cars where I've been there for fifteen years.

14  Q    Okay.  And just -- if you could speak a little bit more

15  slowly.  I know that I'm a bad example.

16  A    Yeah.

17  Q    Did you say that you work for Affordable Used Cars?

18  A    Yes, sir.

19  Q    And how long have you worked there?

20  A    Over fifteen years.

21  Q    And what do you do for them?

22  A    At -- right now I'm in sales, but I was service manager

23  for probably fourteen years.

24  Q    So at the time that you interacted with Arctic Alarm and

25  Audio, were you the service manager?

1  A    Yes.

2  Q    And tell me what it was that you did?  What -- what the

3  reason for the business contacts were.

4  A    We -- we did stereo work done, window tinting, something

5  to that effect.  We'd take the vehicle down, he'd install it,

6  when it was finished, he'd call us, we'd come back, drop him

7  off a check, and he basically did all our stereo and some auto-

8  starts also.

9  Q    So he did stereo -- stereo work, window tinting, and auto-

10  starts for your business?

11  A    Yes.  Stereo repairs, things of that nature.

12  Q    'Kay.  Do you remember the calendar years that you were

13  doing business with Arctic -- Arctic Alarm and Audio?

14  A    Since they opened.  I don't recall the -- the years.

15  Q    So from the time they opened to the time they closed down?

16  A    Correct.

17  Q    If I said that was from late 2003 to late 2005, would that

18  -- or from 2003 to late 2005, would that sound right to you?

19  A    Yeah, couple years.  That would be accurate.

20  Q    And how many times were you down to the shop there at

21  Arctic Alarm and Audio?

22  A    It all depends on how much work we needed done.  Sometimes

23  couple times a week, sometimes four times a week.  All depends

24  on what was needed done.

25  Q    So you were there pretty much every week.

<u>Williams - Direct</u>

1   A    Yes.

2   Q    And did you see Jason there?

3   A    Yes.

4   Q    And what was his role at Arctic Alarm and Audio?

5   A    He was owner/manager.

6   Q    Was he there every time you were there?

7   A    Yes, sir.

8   Q    Did you see what he was doing there?

9   A    Yeah, he was working on stereos or doing invoices.  He was

10  -- he was always there.

11  Q    Did you see any employees there?

12  A    Yeah.  There -- he had a couple of employees, but I -- I

13  basically dealt with Jason -- only Jason.

14  Q    'Kay.  Did the store appear to be busy when you were

15  there?

16  A    Yeah.  Actually, it was kind of hard to get work done --

17  get it in there 'cause they were pretty busy.

18  Q    Did it appear the people that were working there were

19  standing around or did they appear to be working on cars?

20  A    Little of both.  I'd go back and bug them.

21  Q    And do you remember what the hours were of the business?

22  A    Our -- our hours are from nine to six, so as long as I got

23  in there before six, then we could pick up our vehicle.

24  Q    And so it appeared to be regular business hours to you?

25  A    Yes.

1  Q    And what type of work -- I mean, was the work any good as

2  far as you were concerned?

3  A    Yeah, and it was fast.  It's -- it was kind of -- we were

4  -- we were -- as a business, it was bad losing them 'cause they

5  were pretty fast.

6  Q    They were fast and --

7  A    And inexpensive compared to other places in town.

8  Q    And the work was --

9  A    Yeah, it was very good.

10  Q    Do -- can you estimate about how much -- how much your

11  business spent at Arctic Alarm and Audio during the time that

12  you were dealing with them?

13  A    I'd have to go with the bookkeeper.  I don't know, I just

14  picked the stuff up and dropped it off.

15  Q    Do you recall how much the average job would be to -- to,

16  for example, install an alarm or a car -- a car starter, that

17  kind of thing?

18  A    Alarm was usually around three hundred dollars and the

19  stereos -- we'd try to do the -- the most inexpensive one,

20  couple hundred bucks maybe.

21  Q    'Kay.  And a start -- a car start?

22  A    Like three hundred, four hundred, usually three hundred.

23  Q    And you were doing two, three, four of those a week?

24  A    Yeah.  It all depends, like I said, on what -- what

25  vehicles came in, what they called for.

1    Q    Is that fair to say, two, three, or four a week?

2    A    Yeah.

3    Q    And I'm going to show you what's been marked as -- I'm

4    sorry -- what's in evidence as Defendant's C.  I'm going to ask

5    you -- oh.

6                          (Pause)

7    I'm going to show you what's in evidence as Defense C.  I'm

8    going to ask you if you recognize that.

9    A    This photo?  This is right where his shop used to be.

10   Q    And again, when it came to Jason, you saw him working on

11   the cars and dealing with customers both?

12   A    Yes.  Most of the time he was dealing with customers

13   though.

14   Q    Are you aware of whether -- I'm sorry.  Did you ever see

15   Mr. Colette's appointment book?

16   A    Negative.

17   Q    Did you see business cards there?

18   A    No.

19   Q    Are you aware of whether the business advertised?

20   A    I heard it on the radio a few times.

21         MR. COHEN:  Okay.  I don't have any further questions

22   for this witness.

23         THE COURT:  Cross-examination.

24                    **CROSS-EXAMINATION**

25   BY MR. BARKELEY:

1    Q    Morning, sir.

2    A    Morning.

3    Q    How well would you say you came to know Mr. Colette as a

4    result of the business dealings that you had with Arctic Audio

5    and Alarm?

6    A    Strictly business.  I'd see him every now and then maybe

7    at the fights or something also, but that was about it.

8    Q    Okay.  But even at the fights, did you guys go together or

9    did you just happen to see --

10   A    No, no.

11   Q    -- each other there?

12   A    No.  Just acquaintance.

13   Q    Okay.  So no -- no social activities together?

14   A    No.

15   Q    You ever been over to his house?

16   A    No.

17        MR. BARKELEY:  Nothing further, Your Honor.

18        THE COURT:  Anything else?

19        MR. COHEN:  No, Your Honor.

20        THE COURT:  Thank you, sir.  You're excused.  Have a

21   good day.  Next witness?

22        MR. COHEN:  Next witness, Your Honor, is Sergeant

23   Wall.

24        THE COURT:  'Kay.

25                              (Pause)

1          THE COURT:  Okay.  We'll swear the witness in and go

2  from there.

3          **RONALD WALL, DEFENDANT'S WITNESS, SWORN**

4          THE CLERK:  Thank you.  You may be seated.  And for

5  the record, please state your full name, spelling your last.

6          THE WITNESS:  It's Ronald Wall, W-A-L-L.

7          THE CLERK:  Thank you.

8          THE COURT:  Mr. Cohen.

9                    **DIRECT EXAMINATION**

10  BY MR. COHEN:

11  Q    Morning, sir.

12  A    Morning.

13          MR. COHEN:  Do you have the --

14          MR. BARKELEY:  Yes.

15          MR. COHEN:  Yes.  (Indiscernible - away from

16  microphone), thank you.

17  BY MR. COHEN:

18  Q    Now as I understand it, sir, you were involved with the

19  arrest of Eugene Johnson on November 28th of 2005?

20  A    Yes, I was.

21  Q    Were you at his -- were you at the location where the

22  search warrant was executed?

23  A    Off and on, sir.

24  Q    Subsequent to the execution of the search warrant, there

25  was an interview that was conducted with Mr. Johnson, is that

1  true?

2  A    Both at his residence or at the courthouse, sir.

3  Q    Well, there were two interviews, one at his residence and

4  one at the courthouse?

5  A    Well, we -- it depends how you want to term interview.  We

6  talked to him at the courthouse, made application for a search

7  warrant, and we also talked to him at his residence.

8  Q    You talked to him at courthouse before the actual -- he

9  was actually sworn in before the magistrate?

10 A    Well, explaining what was happening and the procedures.

11 Yes, sir.

12 Q    But the interview in terms of the substance of what he was

13 going to say and his cooperation and the details of what he was

14 willing to talk to you about, that took place at his house?

15 A    It did, sir.

16 Q    And at that time, Agent Cohoon and you and Agent Foran

17 were all present?

18 A    I believe so.  Yes, sir.

19 Q    And that was -- and that interview with Mr. Johnson was

20 taped, is that true?

21 A    I don't recall, sir.  We'd have to check the report and

22 see if it's in evidence, sir.

23 Q    Well, if I tell you that the report says there is a --

24 that there is a tape, would you quarrel with me?

25 A    No.

1   Q    Are you aware of where that tape might be today?

2   A    No, sir.

3   Q    Were you the person who would have put that tape into

4   evidence?

5   A    No, sir.

6   Q    Was that a tape that would have been held by federal

7   authorities or state authorities?

8   A    That probably would have been held by Investigator Jess

9   Carson who is a -- was an ABADE member.

10   Q    'Kay.  And at the time that you interviewed -- that --

11   that the three of you conducted the interview of Mr. Johnson,

12   were you and -- were you taking notes?

13   A    No, sir.

14   Q    Was Agent Car -- I'm sorry -- Agent Cohoon taking notes?

15   A    I don't believe anybody was taking notes, sir.

16   Q    Now during the course of that interview, there was a

17   determination made to attempt to use Mr. Johnson as an

18   informant, is that true?

19   A    There was a request if he wanted to provide information.

20   Yes, sir.

21   Q    And he agreed to do that.

22   A    He did.

23   Q    Now you had been investigating Mr. Johnson for some time,

24   is that true?

25   A    Off and on, sir, yes.

<u>Wall - Direct</u>                                3-76

1   Q    You had information from a search warrant -- I'm sorry --

2   from a -- an informant regarding Mr. Johnson, is that correct?

3   A    That is correct.

4   Q    And -- and during the course of the investigation, Mr.

5   Johnson -- it was standard practice, wasn't it, to run his

6   record or his rap sheet?

7   A    We do that, yes.

8   Q    And you did that in this case.

9   A    Investigator Carson did.

10  Q    Okay.  So the -- so Investigator Carson had that available

11  at the time that Mr. Johnson agreed to be an informant, is that

12  true?

13  A    That is correct.

14  Q    And was Investigator Carson there at the time of the

15  interview as well?

16  A    Yes.

17  Q    And so it's true that all the officers present were aware

18  of Mr. Johnson's prior record, is that correct?

19  A    I believe so, yes.

20  Q    Now we've had some testimony in this case about the fact

21  that the MAC-10 that was eventually found -- let me step back

22  and ask were you present during the search of Mr. Colette's

23  trailer when the MAC-10 was found?

24  A    Yes, sir.

25  Q    That was after the grenade -- the concussion grenade was

1    thrown in there?

2    A    Noise distraction device.  Yes, sir.

3    Q    Landing within two or three feet of his children -- or his

4    girlfriend's children?

5    A    I wasn't in the house, so I couldn't tell you how close it

6    landed.

7    Q    In any event, you found the -- or you were present when

8    the MAC-10 was found?

9    A    I was, sir.

10   Q    When the safe was drilled and opened?

11   A    That's correct.  At my direction.

12   Q    And the safe was in fact -- and the MAC-10 was in fact

13   inside the safe.

14   A    Yes, sir.

15   Q    Every one of the guns was locked in the safe, is that

16   correct?

17   A    To my knowledge.  Yes, sir.

18   Q    Now that particular MAC-10 that we're talking about, Mr.

19   Johnson had indicated that he had seen a machine gun type

20   weapon, an Uzi, that type of weapon at the trailer, is that

21   true?

22   A    Yes.  I don't know if he termed it an Uzi or not.  He

23   mentioned a machine gun.  I don't recall if he specified an

24   Uzi.

25   Q    And in fact you -- you're aware, aren't you, that that

<u>Wall - Direct</u>                                              3-78

1    type of weapon can be lawfully possessed?

2    A    Yes.

3    Q    You know that it's possible to go through a back -- a

4    federal background check and a local -- and a state background

5    check, and have somebody -- a local law enforcement officer

6    sign off and possess the -- that type of weapon and a silencer

7    legally?

8    A    Correct.  The commander or deputy commanders of the local

9    trooper detachment do that.

10   Q    'Kay.  And there's a database that law enforcement has

11   access to, to determine whether a person has in fact registered

12   or has permission to own that type of weapon, is that true?

13   A    I would imagine that ATF has something along those lines.

14   I don't know if it's input into APSIN or not.

15   Q    'Kay.  Well, you know -- you know, as I said, that -- that

16   local law enforcement does sign off on -- on those particular

17   permits, is that true?

18   A    That is correct.

19   Q    Now when Mr. Johnson -- I -- I understand that before the

20   -- you applied for the search warrant, you checked the -- is it

21   called ESPIN (ph) -- the ASPEN (ph) --

22   A    APSIN.  It's Alaska Public Safety Information Network.

23   It's the DMV type records and so forth.

24   Q    And you -- you checked those records to see whether there

25   was any record of Mr. Colette living at that address.

1    A    That is correct.

2    Q    You -- you checked also to see whether there was any

3    record of Mr. Colette having any registered weapons, is that

4    true?

5    A    You know, I don't recall if we did that or not.  I know

6    that -- that we did call my administrative staff and asked them

7    to -- to pull Mr. Colette up, and we did confirm that 1038

8    Lakeview was his address.

9    Q    'Kay.  So you're not -- you have no recollection of

10   whether you checked to see whether he lawfully had permission

11   to own any type of machine gun weapon?

12   A    Well, unless -- that is a database I'm unfamiliar with,

13   I've never been able to search anybody for a -- for automatic

14   weapons.  So unless it pulls up with other information that we

15   normally have access to through the APSIN records, it's not

16   something that -- another database that I would have access to.

17   Q    But Agent Cohoon was present at Mr. Johnson's address,

18   wasn't he, when Mr. Johnson said that his information was that

19   Mr. Colette had a machine gun type weapon?

20   A    Yes.

21   Q    And when that happened -- as I say, at that time, you were

22   aware that it's possible to own that type of weapon lawfully.

23   A    Oh, it's possible.  Yes, sir.

24   Q    Okay.  So your testimony today is, is you don't recall

25   checking personally to see whether he had permission or you

1    didn't check?

2    A    Well, I know I didn't check because we had him ran in

3    APSIN through my administrative staff.  I didn't go to the

4    office and run him.  I was busy doing other things.

5    Q    Okay.  So you -- so you didn't check to see whether he

6    owned any machine gun lawfully?

7    A    That's correct, sir.

8    Q    Prior to the application for the search warrant?

9    A    That's correct.

10   Q    And is it true, sir, that during the course of the

11   application for the search warrant, you testified in front of

12   the magistrate?

13   A    I did, sir.

14   Q    And during the course of the application for the search

15   warrant, you said that -- that it's -- that you believed that

16   Mr. Colette had fully automatic weapons which would be a

17   federal violation?

18   A    That is correct, sir.

19   Q    And you would not tell the magistrate that you hadn't

20   checked to see whether he lawfully owned that weapon.

21   A    Well, it wouldn't -- wouldn't have really mattered at that

22   point, sir, because possession of cocaine and using the fully

23   automatic weapon or any firearm in commission of the sale and

24   delivery of controlled substance would be a federal violation.

25   So --

1  Q    I -- I understand that, but I'm -- but I'm saying -- we're

2  in agreement that when you testified in front of the

3  magistrate, it was before the search warrant was executed and

4  before you found the weapon and the drugs.

5  A    That is correct, but I guess my -- my answer to your

6  question is though it wouldn't have changed the testimony even

7  if I'd had the information after we'd executed the search

8  warrant.  I still believed it to be a federal violation.

9  Q    You're saying if the -- if -- if the gun was there

10 together with the drugs.

11 A    That's correct, sir.

12 Q    But you didn't tell the magistrate, did you, that you

13 failed to check to see whether it was lawfully owned?

14        MR. BARKELEY:  Asked and answered.

15        THE COURT:  Sustained.

16        MR. COHEN:  Your Honor, I don't think I asked this

17 specific question.  I -- I did ask whether he checked to see

18 whether it was lawfully owned, I didn't ask any question to

19 whether he told that to the magistrate or not whether he

20 checked.

21        THE COURT:  Well, okay.  Go -- I think you did.  Go

22 ahead.

23 BY MR. COHEN:

24 Q    You didn't tell the magistrate, did you, that you had not

25 checked to see whether the weapon was lawfully owned.

1    A    I did not.

2    Q    I'm going to show you -- I'm going to show you some

3    photographs from after the execution of the search warrant.

4                    (Pause - side conversation)

5    BY MR. COHEN:

6    Q    Okay.  I'm showing you what's Government's Exhibit 1.

7    A    Yes, sir.

8    Q    Do you see -- do you see that brown box that's on the

9    dresser?

10    A    I do, sir.

11    Q    And it's open?

12    A    It is.

13    Q    I'm going to show you what's marked --

14                        (Pause)

15    -- I'm going to show you Government's Exhibit 9.

16    A    Okay.

17    Q    Is that a close-up of the brown box on the dresser?

18    A    It is, with the -- the scale and a NIC wipe.

19    Q    Okay.  The NIC wipe is something that you used to check

20    for residue on the scale, is that true?

21    A    Well, law enforcement.  Yes, sir.

22    Q    Somebody who was there as part of the search?

23    A    Correct.

24    Q    Now my question is when you first came into the bedroom,

25    that particular -- that scale that's on that box in those

1  photographs, that scale was inside the box and the box was

2  closed, is that true?

3  A    My understanding.  Yes, sir.

4  Q    Well, that's what you saw.  You were the first person in,

5  weren't you?

6  A    Well, I wasn't the first person in, but I was one of the

7  people in there.

8  Q    And that's your understanding, is that true?

9  A    Yes, that's my understanding.

10  Q    The box was open and the -- and the scale was taken out

11  for the purpose of that photograph.

12  A    That's correct, sir.

13                          (Pause)

14  Q    I'm showing you what's been marked as Government's

15  Exhibit 8.

16  A    Yes, sir.

17  Q    Do you see the scale in that photograph?

18  A    I do, sir.

19  Q    Was there any cocaine on that scale?  I'm sorry, I didn't

20  mean -- strike that.

21  A    Well, if you want --

22  Q    Do you see the money counter in that photograph?

23  A    I don't know.  I didn't NIC wipe it.

24  Q    So you don't know whether or not there was any cocaine on

25  that, on the money counter?

1  A    Cocaine on the money counter.

2  Q    That's correct.

3  A    I -- I wouldn't have checked the money counter for

4  cocaine.  I don't know why there would be cocaine on the money

5  counter.

6  Q    No, I understand that.  I'm -- my question is you don't

7  know whether or not there was any cocaine residue on the money

8  counter.

9  A    No, I didn't send it in to the crime lab to be analyzed

10 for particulates of cocaine.  I guess sitting in the proximity

11 to that it's entirely possible, but -- I mean, I don't know.

12 It's not something I would normally do unless it was visible

13 powder on the -- on the money counter.

14 Q    All right.  I know, I understand all that.  I'm just

15 saying that you're not aware of whether there was or not as you

16 sit here.

17 A    No, not at all, sir.

18 Q    And -- and it's your testimony that there was no NIC wipe

19 done of the -- of the money counter, is that correct?

20 A    Correct.  To my knowledge.

21 Q    And that money counter was sitting out -- in other words,

22 it wasn't hidden, it was sitting out on that dresser when you

23 -- when you guys came in, is that true?

24 A    Correct, sir.

25                         (Pause)

1  Q    I'm showing you what's been marked as Government's 2 and

2  5.  Do you see those --

3  A    I do.

4  Q    -- photographs?  Do you see the .30-06 in -- in number

5  two?

6  A    I see some rifles in there.  Whether that's a .30-06 or

7  not, I -- I don't know.  As -- you'd have to examine the weapon

8  or something.  I see some high-powered rifles or shotguns and

9  an assault weapon.

10 Q    Do you notice that the -- that the rifle in the middle of

11 the safe is standing straight up in Exhibit 2?

12 A    I do.

13 Q    Do you notice how in Exhibit 5 that same rifle is leaning

14 to the side?

15 A    Yes, I do.

16 Q    Okay.  Now we've already had testimony that these

17 photographs were taken after you may have moved at least the

18 scale for the purposes of the photograph, is that correct?

19 A    No, sir.  You're -- you're saying me, and I didn't touch

20 the scale.  I believe I know who did if you'd like me to answer

21 that, but I didn't touch the scale, and I can explain probably

22 why the rifle is moved if you'd like me to do that.

23 Q    Yeah, I'm going to get to that.  I just wanted -- and I

24 asked the question the wrong way.  I should have said we've

25 already had testimony that the scale was moved in anticipation

1  of the photograph.

2  A    Correct, sir.

3  Q    And we now know that the rifle was in two different

4  positions, so --

5  A    That's correct.

6  Q    -- first question is to your knowledge, which position was

7  it rifle in when the safe was first opened, the one in Exhibit

8  2 or Exhibit 5?

9  A    Obviously, it was in -- in Exhibit 2 because the rifle was

10 moved to display the bags of cocaine that were behind the

11 barrel so that you could see that.

12                          (Pause)

13 Q    So Exhibit 2 which was in front of you -- actually -- I

14 can bring it back if you want, but is Exhibit 2 to your

15 knowledge a fair and accurate depiction of what the safe looked

16 like just after it was opened when the locksmith finished

17 drilling?

18 A    That's correct, sir.

19 Q    And this photograph shows exactly where the money was,

20 exactly where the cocaine was, and exactly where the guns were

21 situated, is that correct?

22 A    To my knowledge.  Yes, sir.

23 Q    Now the items that are in this gun safe, were they all

24 confiscated and booked into evidence and everything?

25 A    You would have to ask DEA.  A lot of it was.  What may

1  have been left, I don't know.  The case originated as a state

2  case.  Following the middle of the investigation, the case was

3  then deferred to Special Agent Foran and Special Agent Cohoon

4  because of the -- the type of case.  So at that point, the case

5  in chief was turned over to the federal government to proceed.

6  We helped them take evidence.  I don't have a list of that

7  evidence there.  I didn't document where it was taken.

8  Q    All right.

9  A    So we could ask them and I'm sure they would be able to

10  answer that.

11  Q    Have you (indiscernible - away from microphone) -- here it

12  is.  Do you recall -- I'm going to show you the document that

13  has been marked as -- before I show you this -- so is it fair

14  to say that -- that all the evidence in Exhibit 2, whatever was

15  taken, was turned over to the federal authorities?

16  A    That is correct, sir.

17        MR. BARKELEY:  'Kay.

18        MR. COHEN:  (Indiscernible - away from microphone)

19        MR. BARKELEY:  Before the witness answers, I would

20  like to see the document, counsel.

21              (Pause - side conversation)

22  BY MR. COHEN:

23  Q    I'm showing you what's been marked as Defense DD for

24  identification, and I'm going to ask you if you recognize that

25  document?

1  A    I don't, sir.  It's Investigator Carson's.

2  Q    Do you recall -- do you recall the time that the search

3  warrant was executed at Mr. Colette's residence, that there

4  were checks that were found in the safe together with the

5  money?

6  A    That's correct, sir.

7  Q    And in looking at the checks that are attached and looking

8  at the form that was signed by Investigator Carson, are you

9  able to say that those are copies of the checks that were found

10 in the safe that day?

11 A    You're asking me if I can guarantee that these were the --

12 the checks?  I can't guarantee these are exact checks.  I know

13 that several checks were found.  If I recall, the -- the search

14 warrant was served -- executed in November as a --

15 Q    November 28th.

16 A    Okay.  This form shows that Investigator Carson signed

17 these checks into evidence December 6, so that would indicate

18 that he received these checks after or at a different time than

19 probably the search warrant.  Now is it possible that he had

20 those from Special Agent Foran or seized them from the scene?

21 It is entirely possible.  But looking at it from here, it shows

22 that it was signed into evidence probably two weeks following

23 the execution of the search warrant.

24 Q    Your recollection, however, is, is that the -- there were

25 checks that were made payable to Arctic Alarm and Audio, Mr.

1  Colette's business, that were found in the safe, is that

2  correct?

3  A    Yes, sir.  That is correct.

4  Q    And every check that was found in the safe was a check

5  that was made payable to Arctic Alarm and Audio, is that true?

6  A    I couldn't tell you that.  I know that some of them were.

7  Whether they were made payable to him or to the business I -- I

8  couldn't tell you for sure.  These checks, the copies that you

9  have here, are all Arctic Alarm and Audio.

10 Q    'Kay.  And you don't have any recollection of checks made

11 payable to anything other than Arctic Alarm and Audio that were

12 found there.

13 A    I do not, sir.

14 Q    And if I told you there were seven checks, you wouldn't

15 quarrel with me, would you?

16 A    Well, I don't recall.

17 Q    You don't recall the number is what I'm saying.

18 A    Correct, sir.

19 Q    It could have been seven.  You don't know.

20 A    Could have been seven, could have been nine, could have

21 been five.

22 Q    Right.  That's what I'm asking.  'Kay.

23                        (Pause)

24 Would you agree with me that -- that on the evidence page

25 signed by Officer Carson, that he indicates in his handwriting

1  that those are seven checks from Arctic Alarm and Audio found

2  in safe?

3  A    That's correct.  He wouldn't put found from Special Agent

4  Foran.  He'd want to know where they came from for the purposes

5  of where the original seizure would be.

6  Q    Right.  And would you agree with me that that -- that that

7  report does say the seven -- do you recognize Inspector

8  Carson's -- or Officer Carson's handwriting?

9  A    Yes, I do.

10 Q    Is that his handwriting?

11 A    It is, sir.

12 Q    So you don't have any question that he wrote seven checks

13 from -- seven Arctic Alarm and Audio checks from safe, do you?

14 A    No, I don't.

15 Q    Given that and your -- and what you know about what

16 happened that day, do you have any -- do you think it's

17 accurate or fair to say that those are the checks?

18 A    I have no -- nothing to dispute that.  If those are the

19 checks that were in the safe, that would be something to ask

20 Agent Foran or Investigator Carson.  I can't tell you.  I'm not

21 going to dispute that they most likely are, I just can't say

22 for -- for a certainty because I didn't take the checks, I

23 didn't photocopy the checks, sir.

24         MR. COHEN:  All right.  All right.  Thank you.  I'll

25 need just to speak to counsel for one second.

1          (Pause - side conversation)

2          MR. COHEN:  All right.  Okay.  I'm going to move to

3  admit Defense DD into evidence, Your Honor.

4          MR. BARKELEY:  Objection, Your Honor.  Lack of

5  authentication, lack of foundation.  All the witness has said

6  at this point is he recognizes the signature.  Obviously, there

7  is no testimony that he knows that the checks which are

8  apparently attached to this unidentified exhibit came from

9  where the searches that they came from.

10         THE COURT:  Okay.  We'll take that under advisement.

11         MR. COHEN:  All right.  I don't have any further

12  questions at this time.

13         THE COURT:  Recross -- or cross.

14                   **CROSS-EXAMINATION**

15  BY MR. BARKELEY:

16  Q    Welcome back, Lieutenant Wall.

17  A    Thank you, sir.

18  Q    You didn't really think that a federal prosecutor was

19  going to miss the chance one time in his career to cross-

20  examine a State Trooper, did you?

21  A    No, sir.

22  Q    Okay.  Just a few questions.  You recall the line of

23  questions that went to the issue of the registration -- the

24  lawful registration and lawful possession of a machine gun and

25  whether you searched for -- did a search for that before you

1    went to the state magistrate to get a search warrant?

2    A    I remember that, sir.

3    Q    Okay.  From an officer safety standpoint when you're

4    applying for a search warrant, did you care whether a machine

5    gun is registered?

6    A    No, sir.  Any gun will kill you.

7    Q    So is that at least one reason why -- why you don't -- you

8    don't check to see whether someone lawfully owns a gun?

9    A    It's -- it's one of the reasons that -- the other place is

10   I'm not sure exactly where I would check other than with Agent

11   Cohoon, unless it pops up as a flier.  They're not something

12   that's real common to come across.

13   Q    I mean, the reason for your concern was that an informant

14   was telling you that this guy had a machine gun in his bedroom

15   with dope, right?

16   A    That's correct, sir.

17   Q    And that was Eugene Johnson.

18   A    It is, sir.

19   Q    And when you executed the warrant, Mr. Colette did have a

20   machine gun and dope in his bedroom, didn't he?

21   A    That is correct, sir.

22   Q    Now when you applied for the search warrant in this case,

23   did you apply for the legal authority to seize evidence of drug

24   possession and distribution?

25   A    Yes, sir.

<u>Wall - Cross</u>                                    3-93

1   Q    So among the things that you applied for the authority to

2   seize were scales, correct?

3   A    Correct, sir.

4   Q    Did you find any scales?

5   A    We did, sir.

6   Q    You applied for the authority to search for and seize

7   scales because scales are commonly used in drug trafficking,

8   correct?

9   A    That's correct.

10  Q    And when you executed that warrant, you did find a scale,

11  right?

12  A    Yes, sir.

13  Q    And it had cocaine residue on it?

14  A    It did, sir.

15  Q    And it was in this defendant's bedroom.

16  A    Yes, sir.

17  Q    Right next to a money counter.

18  A    Correct, sir.

19  Q    When you apply for the warrant, you apply for the

20  authority to search for and seize cash, don't you?

21  A    Yes, sir.

22  Q    Now that's because cash is commonly around cocaine in

23  terms of cocaine distribution and trafficking, isn't it?

24  A    Yes, sir.

25  Q    When you executed the search warrant, you found cash,

1  didn't you?

2  A    We did, sir.

3  Q    Almost thirty-nine thousand dollars in cash, correct?

4  A    Close to it, sir.

5  Q    When you applied for the search warrant, you asked for the

6  legal authority to search for and seize guns, didn't you?

7  A    Yes, sir.

8  Q    And the reason that you apply for that authority is

9  because guns are commonly used in conjunction with cocaine

10 trafficking, true?

11 A    They are, sir.

12 Q    When you executed the warrant, you found guns, didn't you?

13 A    Yes, sir.

14 Q    In close physical proximity, a matter of inches, to

15 twenty-three ounces of cocaine.

16          MR. COHEN:  Objection, Your Honor.  I mean, if the

17 witness is going to say inches, that's fine, but inches assumes

18 facts not in evidence.

19          THE COURT:  It -- overruled.  Go ahead.

20 BY MR. BARKELEY:

21 Q    Well, sir, were you there when the safe was opened?

22 A    I was, sir.

23 Q    And how far away would you estimate any of the firearms

24 were in relationship to the twenty-three ounces of dope?

25 A    The farthest away they could possibly be -- the safe is

1  probably eighteen inches wide, so the -- the drugs were on a

2  shelf off to the center right-hand portion of the -- the safe,

3  so it had to be less than a foot --

4  Q    And any --

5  A    -- from any of the firearms.

6  Q    I'm sorry.  And you've got the pictures there in front of

7  you if they help you refresh your recollection on the

8  distances.  How distant was that fully automatic machine gun

9  from the cocaine?

10  A    It was less than a foot.  I believe defense counsel still

11  has that photo, sir.

12        MR. BARKELEY:  Oh, I'm sorry.  May I?  May I

13  approach, Your Honor?

14        THE COURT:  Yes.

15                          (Pause)

16        THE WITNESS:  Thank you, sir.

17  BY MR. BARKELEY:

18  Q    All right.  You've got Exhibit 2 now in front of you --

19  Government's Exhibit 2.  Is your testimony the same now that

20  you're looking at the picture?

21  A    Slightly different, sir.  The -- as far as where the drugs

22  -- the cocaine -- there was also cocaine and the money, and I

23  believe it was thirty-eight thousand eight hundred and some

24  dollars, in the Tupperware tub that is probably a foot below

25  the -- the MAC-10.  The remainder of twenty-two ounces or so is

<u>Wall - Cross</u>                                      3-96

1  probably two and a half feet, but there's also a bag of

2  marijuana that's laying right on the -- the machine gun and

3  silencer.

4  Q    And is there -- how -- is there cocaine -- did you see

5  cocaine also in the same Tupperware container as the cash?

6  A    I did, sir.

7                        (Pause)

8  The cocaine in the Tupperware container can be seen right at

9  the -- the beginning of the photograph if you look right behind

10  the barrel of the .30-06.  You can see that it's open and --

11  and sitting right at the front of the clear Tupperware

12  container.

13  Q    Now are you experienced in terms of your -- your work as a

14  State Trooper in firearm safety?

15  A    Somewhat.  Yes, sir.

16  Q    Do you know whether any of the weapons in that safe, when

17  you opened the safe, were loaded?

18  A    I didn't personally clear the weapons.  The -- I'm not

19  familiar with the Ingram MAC-10 or MAC-11 model, so rest

20  assured that for the safety of the entire team, I wouldn't

21  handle that weapon.  I would handle it -- hand it off to

22  somebody like the ATF agent or one of the other members of the

23  team that might be more familiar with that.

24  Q    Are you a hunter?

25  A    I am, sir.

<u>Wall - Cross</u>                                   3-97

1  Q    Long rifle?

2  A    Absolutely.

3  Q    Okay.  What's your practice at home?  Do you keep your

4  hunting rifles loaded with a round in the chamber?

5  A    No, sir.

6  Q    You have an opinion based on your experience as a law

7  enforcement officer and carrying a firearm every day about the

8  safety of that practice?

9  A    Well, to store a weapon -- my personal policy as well as

10  our department practice is we don't store a weapon either in my

11  personal safe or our arms locker that is loaded or has

12  ammunition in the magazine.  I mean, it's not a -- a safe

13  practice.  Whether or not I carry my duty weapons and off-duty

14  weapons are always prepared to be used, but not while in

15  storage.  You don't want to depress the magazine, the springs.

16  There are inherent issues for the preservation of the rifle as

17  well as the safety of those people handling them.

18  Q    These weapons, as you testified, were locked inside the

19  safe, correct?

20  A    That is correct, sir.

21  Q    One you had to have drilled in fact to get open?

22  A    Yes, sir.

23  Q    Okay.  Do you have any opinion about whether it's still

24  unsafe to have loaded weapons even though they're inside a

25  safe?

1  A    Well, it's not a practice that I recommend.  There's

2  really no reason to have it loaded inside the safe if it's

3  going to be put in there for storage.

4                      (Pause)

5            MR. BARKELEY:  Nothing further, Your Honor.  Thank

6  you, sir.

7            THE COURT:  Redirect?

8                   **REDIRECT EXAMINATION**

9  BY MR. COHEN:

10 Q    Do you still have Exhibit DD in front of you?

11 A    I do, sir.

12 Q    Do you see on page two of that exhibit at the bottom of

13 the page, it says from safe?

14 A    Okay.

15 Q    Do you see that?

16 A    I see that -- part of it.  I've got half of it on the

17 Xerox.

18 Q    Exactly.  That's what I have.  Do you have -- does that

19 appear to be Officer Carson's handwriting to you?

20 A    I can't tell what that -- if that's Carson's or somebody

21 else.  It could be Carson's or Foran's or anyone.  I'm sorry, I

22 can't --

23 Q    You can't tell whose initials those are?

24 A    Well, I mean, I want to say it appears to be, but without

25 having the rest of it --

1    Q     Looking at the next --

2    A     -- I can't say for certainty.

3    Q     I'm sorry to interrupt you.  And looking at the next page,

4    do you see there's handwriting there that says from safe?

5    A     Correct.  That's why -- with Investigator Carson's

6    permanent identifier, but -- and that's why I say it appears to

7    be -- I'm just -- I'm not an -- not an expert, but it does

8    appear to be his -- his writing.

9    Q     The -- on the -- on the last page, the from safe appears

10   to be his writing?

11   A     It does.  It appears to be the same writing on both pages,

12   sir.

13   Q     And what appears below the writing on the last page

14   appears to be his initials, is that correct?

15   A     That's his permanent identifier.  Yes, sir.

16   Q     Now these -- does this entire exhibit -- have you reviewed

17   the file before?  Have you reviewed this exhibit before?

18   A     This one?

19   Q     Yes.

20   A     It may have been in one of the reports that I signed off

21   in review.

22   Q     It appears to be on the face of it a -- a true and

23   accurate report in connection with this case?

24   A     Well, it seems to be a -- what we would call a form -- a

25   12-210, an evidence document issued by the Department of Public

1  Safety and I -- I would assume by the case number at the top it

2  was -- it was a document in one of his police reports.

3  Q    In this case?

4  A    Mm-hmm (affirmative).  And it shows item number one

5  hundred which tells me that most likely it was seized sometime

6  after the incident because when we review these documents and

7  you -- you list items out and you take them, you're going to

8  take items one, two, three, four, and you're going to list

9  those out at the scene.  Usually, when you take documents after

10  -- after the scene or you take them from somewhere else, you

11  would start with one hundred, two hundred, one thousand, things

12  like that, so you don't duplicate those those numbers in the

13  system.

14  Q    All right.  But you recall that there were checks in the

15  safe when you first -- when the safe was first opened and you

16  looked in there, is that right?

17  A    I do.  I'm just referring to this being item number one

18  hundred.  So that's --

19       MR. COHEN:  Right.  All right.  Your Honor, based

20  upon that testimony, I renew my offer for -- my offer to -- my

21  request to move this into evidence.

22       MR. BARKELEY:  Same objection, Your Honor.

23       THE COURT:  Okay.  We'll take --

24       MR. BARKELEY:  Although the only concern is whether

25  these are the checks.  I think it's clear that there were

1    checks.  The witness has said there were checks there.  The

2    witness is not, though, I don't think, able to say that these

3    are the checks.

4                 THE COURT:  I'll take it under advisement.  Any

5    recross?

6                 MR. COHEN:  I have some additional -- I have -- I

7    have some additional questions, Your Honor.

8                 THE COURT:  Okay.

9                         (Pause)

10   BY MR. COHEN:

11   Q    And when you say not -- when you say not logged in until

12   later, that -- that particular scene, was -- was it roped off

13   or something where -- where there was a continuing

14   investigation at the scene for several days?

15   A    No.  What I -- what I mean by that is frequently when

16   you're dealing with federal agencies and state agencies and

17   whether it's patrol, in our investigations, major crimes unit,

18   and we transfer evidence -- let's say you'll seize a bunch of

19   evidence and you'll have to stage it because, obviously, that

20   has to be packaged, it has to be labeled, it has to be secured,

21   and it may be transferred from one agency's responsibility to

22   another.  Well, if I -- if I can explain --

23   Q    Yeah.

24   A    -- that's why I say logged in.  It takes awhile to do

25   that.  In this case, we were also involved with other issues

1  with the City of Fairbanks, and that's why these things could

2  have been transferred around.

3  Q    So what you're saying is it was seized on November 28th,

4  but it may have taken a few days, given the interagency

5  cooperation, for it to actually be logged in.

6  A    Or transferred to a different evidence custodian for a

7  different purpose.

8  Q    Exactly.  So you're not saying it was seized at a later

9  time, it's just that it was logged in at a later time.

10  A    Well, it would have been seized on the 28th.

11  Q    That's what I'm saying.

12  A    Whether it was by Agent Foran or by Investigation Carson,

13  it would have been seized on the 28th.

14  Q    Thank you.  Okay.  Now just following up on some

15  questions, Mr. Barkeley asked you about this issue that you

16  believed that -- that the possession of even a legal automatic

17  weapon would have been a violation of law if it was in the

18  proximity to drugs.  Do you recall that?

19  A    I do, sir.

20  Q    Now is it true, though, that when you testified that --

21  about that in your -- in the application for the search warrant

22  about that subject to the magistrate, that you told the

23  magistrate under oath that it was a fact that Mr. Colette

24  possessed fully automatic weapons?

25  A    I don't recall whether I testified that it was a fact or