<u>Wall - Redirect</u>

1  not.

2  Q    Well, you couldn't have testified that it was a fact

3  because your testimony is you never checked to see whether he

4  was registered as having any automatic weapons.

5  A    No, I think my testimony is I don't recall whether we

6  checked or not.  That's not something that I know how to

7  specifically do unless it comes up in APSIN.  At the time,

8  somebody may have told me that he had an automatic weapon.  My

9  concern at that point was the information that I had from the

10  informant, which was of the most recent information in the

11  field information that we could rely on for officer safety

12  purposes.  It -- I may have been fully aware at the time, and I

13  don't recall right now whether or not I knew he possessed that

14  class three license to possess that weapon or not.

15  Q    Well, you said that -- you've already said that you didn't

16  check yourself.

17  A    I -- no, I didn't -- I didn't sit down in front of the

18  computer and -- and check myself, sir.

19  Q    And you said you don't really know how to check that

20  database.

21  A    Well, if it -- if it pops up in APSIN, yes.  If there's a

22  specific database for automatic weapons, that would be a

23  question for ATF, not for the troopers, sir.

24  Q    Well, you don't recall it popping up in APSIN because you

25  -- you said --

<u>Wall - Redirect/Recross</u>                    3-104

1   A    Well --

2   Q    -- in this case.

3   A    -- as I testified earlier, sir, I don't check APSIN at the

4   time.  That's what I had other people to do.  My job was to be

5   out in the field and -- and try to take care of business.

6   Q    I understand that.  But the APSIN information that you

7   gave to the magistrate had to do with the fact that you

8   verified that Mr. Colette lived there, not anything having to

9   do with the weapon.

10  A    That's correct.

11           MR. COHEN:  All right.  One moment.

12                  (Pause - side conversation)

13           MR. COHEN:  All right, Your Honor.  I have nothing

14  further.

15           THE COURT:  Okay.  Thank you.  Recross?

16                  **RECROSS-EXAMINATION**

17  BY MR. BARKELEY:

18  Q    Lieutenant, this -- this business about not checking the

19  registration.  Again, that's -- that's sort of like a dispatch

20  message that you might receive while on duty saying, you know,

21  man with a gun, shots fired.  I mean, you just assume that

22  that's true for purpose of safety, even though it may not even

23  work out that there is a gun or a man with a gun, right?

24  A    That is correct, sir.

25  Q    Now these checks.  A lot of questions about these checks

<u>Wall - Recross</u>                                    3-105

1   and you've testified you're not certain whether the ones you're

2   looking at there are these checks, but you remember that there

3   were checks in the safe when you opened the safe --

4   A    Yes, sir.

5   Q    -- when the safe was opened.  Okay.  Now I think it's also

6   fair to say, you'll correct me if I'm wrong, that the form you

7   were looking at, DD I guess it's been marked, looks like a

8   State Trooper form and -- and on it there's a notation that's

9   consistent with logging those checks in as evidence, right?

10  A    That's correct, sir.

11  Q    Okay.  Now things are logged in as evidence because --

12  they are at least probable cause to believe that a crime has

13  been committed --

14  A    That's correct.

15  Q    -- they're evidence of a crime, correct?

16  A    That's correct, sir.

17  Q    That's why they're logged into evidence.

18  A    Yes, sir, or safekeeping.

19  Q    All right.  And when you opened the safe and -- and -- did

20  you see the checks or you later learned that there were checks

21  in there?

22  A    You know, for some reason, I think I later learned that

23  they were there when we were searching the -- searching the

24  safe.  I don't -- and I'm looking at the exhibit.  I don't

25  recall the checks being right out in the open.

<u>Wall - Recross</u>                                              3-106

1   Q      Do you remember whether there were ATF firearms documents

2   pertaining to the machine gun that was in there --

3   A      And they were, sir.

4   Q      -- in the safe?  Okay.  And there's -- there's -- there's

5   nothing illegal about those documents in and of themselves,

6   right?

7   A      No, sir.

8   Q      Okay.  And similarly, there's nothing illegal about the

9   checks in and of themselves, right?

10  A      Correct, sir.

11  Q      But you've heard counsel suggest and even (indiscernible)

12  the -- the photocopied document there, DD, that the checks are

13  made out to Arctic Audio and Alarm, correct?

14  A      That's correct, sir.

15  Q      Okay.  Are you -- are you familiar with that -- the name

16  of that business as one being associated directly with Mr.

17  Colette, the defendant here in the courtroom?

18  A      Yes, I believe he was the owner, sir.

19  Q      Okay.  Now without stating anything about what might have

20  been said in such interviews, do you know whether employees of

21  Arctic Audio and Alarm were interviewed by law enforcement in

22  December of 2005?

23  A      They were.

24  Q      And they were interviewed because you and other members of

25  law enforcement were investigating whether Arctic Audio and

1  Alarm, the business, had some connection to drug trafficking,

2  correct?

3  A    That is correct.

4  Q    So, it's -- it's logical, is it not, that checks payable

5  to Arctic Audio and Alarm might be seized as evidence?

6  A    It's likely.

7            MR. COHEN:  Objection, Your Honor.

8            THE COURT:  Overruled.

9                         (Pause)

10            MR. BARKELEY:  Thank you.  Nothing further.

11            THE COURT:  Okay.  Thank you, sir.  You're done.

12  You're excused.

13            MR. COHEN:  I'm sorry.  I'm sorry.

14            THE COURT:  What?  You have more questions?

15            MR. COHEN:  I'm sorry, Your Honor.

16            THE COURT:  Well, we can't keep going back and forth.

17  Is it new ground or what?

18            MR. COHEN:  Well, it's arising out of what was just

19  asked.

20            THE COURT:  Okay.  Go ahead.  Ask the question.

21            MR. COHEN:  That's all -- that's all it is.

22                **FURTHER REDIRECT EXAMINATION**

23  BY MR. COHEN:

24  Q    It's -- not every piece of evidence that is seized in an

25  investigation is part of a probable cause determination, is

1   that true?

2   A    I'd like to think that we're not taking evidence as a

3   frivolous act, that it would in some case relate to criminal

4   activity.

5   Q    But sometimes when you make a seizure, you take all the

6   evidence in the seizure, you take it all into evidence, and

7   they -- so that you or the prosecutor can later -- later

8   determine what value it may or may not have.

9   A    I guess that's possible, but I don't believe that that's

10  the case here.

11  Q    Well, when somebody -- when -- well, you asked the -- you

12  answered the question generally earlier.  The question was

13  generally when you take evidence, it's a part of a probable

14  cause determination --

15  A    That's correct, sir.

16  Q    -- and I'm -- and I'm saying that -- that evidence can be

17  taken for safekeeping?

18  A    It can.  Yes, sir.

19  Q    It can be taken for further evaluation by law enforcement?

20  A    It -- it would, but not pursuant to the search warrant.

21  For the search warrant, it would be taken under a criminal case

22  or to -- to prove the -- some other portion of the criminal

23  case.

24  Q    Well, anything that comes within the description within

25  the search warrant would be taken.

1  A    Could be taken, not would be taken.

2  Q    Well, but it's not for you, the officers executing the

3  search warrant, to make that determination, it's for you to --

4  people in law enforcement or later -- perhaps later on the

5  prosecutors to take a look at that.

6  A    Well, if -- if you -- your question is determined -- or

7  stated that it was for me and law enforcement to determine what

8  was going to be taken pursuant to the search warrant.  The

9  court allows us the authority to search for certain items.  We

10 determine what items will be seized pursuant to that search

11 warrant.  We could take voluminous things which we don't have

12 the ability to store, retain, transport and other other things

13 under the scope of many search warrants.  We try not to do that

14 by -- I supervise the evidence facility and we don't have the

15 room to store all of these items.

16 Q    Right.  But you're not going to -- if there's something

17 that you don't -- you're not sure, it may be relevant, it may

18 not be relevant, you're not going to leave it there, you're

19 going to take that and make it a determine late -- and make a

20 determination later.

21 A    That is correct, sir.

22 Q    So that's what I'm saying.  You can't say that every

23 single piece of evidence that you seize you know necessarily is

24 going to figure into a probable cause determination.

25 A    Of -- of an initial case, correct, sir.

1   Q     That's the --

2   A     It may spider web into something else.

3   Q     Yeah.  We don't -- we don't know.

4   A     Correct.

5   Q     Now in this particular case, do you know whether every

6   item that was found in that safe was actually seized and booked

7   into evidence or not?

8   A     I don't imagine.  It probably was.  I -- I don't know.

9   Q     You don't know.

10  A     Correct.

11  Q     All right.

12  A     I know we didn't take the safe.

13  Q     Okay.  But I'm talking about everything inside the safe.

14  You don't know whether it was taken --

15  A     I don't.

16  Q     -- everything was taken or not.

17  A     I don't, sir.

18  Q     All right.  Thank you.  And so that would include the

19  knives that were found, the safety kit, all those items?

20           MR. BARKELEY:  Objection as to facts in evidence.

21           THE COURT:  Sustained.

22  BY MR. COHEN:

23  Q     Well, were there hunting knives found?

24  A     I believe there were knives in there.

25  Q     'Kay.  And there was a -- there was a clean-up kit that

1  was found?

2  A    I don't recall, sir.

3                  (Pause - side conversation)

4  BY MR. COHEN:

5  Q    Sorry.  A gun-cleaning kit?

6  A    It appears that there's a couple of gun-cleaning kits or

7  cases which were consistent with that -- of what I believed to

8  be cleaning kits.

9  Q    Right.  And to your knowledge, all that was seized?

10  A    I don't think so.  I don't know why it would be seized.

11  Q    So the gun cleaning kits you don't think were seized?

12  A    I -- I don't --

13  Q    Or you don't know.

14  A    I wouldn't have seized them.  If it were up to me, I can't

15  imagine why DEA or ATF would have seized them.  If they did,

16  that would be a question for them, sir.

17  Q    Or the knives, the same thing?

18  A    No.

19  Q    That would be a question for them?

20  A    That would be a question for them, sir.

21          MR. COHEN:  All right.  I have nothing else, Your

22  Honor.

23          THE COURT:  Anything else, Mr. Barkeley?

24          MR. BARKELEY:  No, Your Honor.

25          THE COURT:  All right.  Thank you, sir.  You're

1    excused.

2                   THE WITNESS:  Thank you, Your Honor.

3                   THE COURT:  Next witness?

4                   MR. COHEN:  Your Honor --

5                                (Pause)

6    Okay.  We're going to call Agent Cohoon.

7                   THE COURT:  'Kay.

8                                (Pause)

9            **ERIC COHOON, DEFENDANT'S WITNESS, SWORN**

10                   THE CLERK:  Thank you.  You may be seated.  And for

11   the record, please state your full name.

12                   THE WITNESS:  Eric Cohoon.  C-O-H-O-O-N.

13                   THE CLERK:  Thank you.

14                   THE COURT:  Mr. Cohen?

15                        **DIRECT EXAMINATION**

16   BY MR. COHEN:

17   Q    Just -- we'll just start off with Exhibit DDD [sic], which

18   is in front of you.  Is that -- that still there --

19   A    I don't have any, sir.

20   Q    -- (indiscernible) take it back?

21                   MR. BARKELEY:  I'm sorry.  I cleaned house.  The

22   witness left (indiscernible) and I put it on your chair.

23                                (Pause)

24                   THE WITNESS:  Thank you.

25   BY MR. COHEN:

1    Q    Agent Cohoon, were you present during the execution of the

2    search warrant on November 28th, 2005?

3    A    Yes, sir.  I was.

4    Q    And do you recall checks being found in the safe?

5    A    I do recall that some checks were found in the safe.

6    Q    I'm sorry.  You do or you don't?

7    A    I do.

8    Q    Okay.  And looking at Exhibit DD, can you -- can you -- is

9    it true that Officer Carson was there --

10   A    Yes, he was there.

11   Q    -- at the time of the execution of the search warrant?

12   A    Yes, sir.

13   Q    And are those -- do you recognize his handwriting?

14   A    No, I can't.  I haven't handled that many documents that

15   Jess had signed, but it does appear to be a State Trooper

16   form --

17   Q    And do --

18   A    -- with his name on it.

19   Q    Can you tell us whether those are the checks that were

20   seized that day in looking at that form?

21   A    I didn't personally see the checks that came out of the

22   safe --

23   Q    'Kay.

24   A    -- but I understand some checks were taken.

25   Q    Now I'm showing you -- I'm showing you (indiscernible -

1    away from microphone).

2                        (Pause)

3    I'm showing you what's marked as -- and in evidence as

4    Government's 3.  Do you have that in front of you?

5    A    Yes, sir.

6    Q    Now you testified earlier that it was your job to examine

7    and log the weapons into evidence during the course of this

8    search warrant execution, is that true?

9    A    Yes, sir.  I did examine the weapons and -- that were

10   eventually seized, yes.

11   Q    And was that your job, being the ATF agent at the scene?

12   A    Yes, that was one of my jobs.

13   Q    Do you -- do you see in that exhibit in front of you the

14   receiver for the MAC-10?

15   A    Yes, I see the MAC-10.  Yes, sir.

16   Q    Okay.  Do you see the receiver for the MAC-10?

17   A    There's a receiver on the weapon.  Is that what you're

18   referring to?  This weapon had two receivers.  Okay.  Here's a

19   receiver and there was a receiver.

20   Q    All right.  So -- so there's a -- there's a receiver

21   that's in a little bag at the top of the safe on the left side?

22   A    Yes, I believe that's it.

23   Q    There's that receiver and then there's the receiver that's

24   on the weapon?

25   A    It's only one weapon.  The receiver is the -- is the

1  weapon.

2  Q    'Kay.  Well, you say there's one on the weapon and there's

3  one to the side.

4  A    This -- this certain model of MAC-10, I think, was

5  designed to fire two different calibers, so there are two

6  different --

7  Q    Right.

8  A    -- parts you put on the gun.  Yes, sir.

9  Q    So the one that's on the gun is the forty-five or --

10 A    I believe that's the nine-millimeter, sir.

11 Q    The one that's on the gun is a nine-millimeter.

12 A    Yes, sir.

13 Q    And the gun that you have here in -- in evidence, that's I

14 think Exhibit 20?

15       MR. BARKELEY:  Correct.  And twenty-one is the

16 silencer.

17 BY MR. COHEN:

18 Q    Twenty-one is the silencer.

19 A    Yes, sir.

20 Q    That -- that one is -- is that receiver, the nine-

21 millimeter, attached to that gun as it is in evidence?

22 A    The same configuration it was found in.  Yes, sir.

23 Q    'Kay.  And the -- you list the silencer separately in the

24 -- in the application for forfeiture.  Do you -- why don't you

25 list the receiver that's on the gun separately?

1  A    The receiver is the gun.

2  Q    'Kay.  But there is the receiver -- the forty-five --

3  that's separate that's in the bag on the left side of the safe.

4  A    A unregistered machine gun receiver?  There's only one

5  registered machine gun in this picture.

6  Q    I understand that, but have you -- you've testified

7  already that it -- that it can be fired in two different ways

8  and it comes with --

9  A    That specific model can.  It's supposed to be able to fire

10  two different calibers.  I'm not aware if it can fire a forty-

11  five.  I think it was tested for the nine-millimeter.

12  Q    What I'm saying is the forty-five receiver, which is at

13  the top of the safe on the left side in that bag, do you see

14  that?

15  A    Yes, sir.

16  Q    Okay.  My question is where is it?  Do you know where it

17  is?

18  A    It's in my evidence vault.

19  Q    You have it.

20  A    Yes, sir.  That's part of that gun -- one registered gun.

21  Q    It's not attached to the gun.

22  A    No, sir.  It's not attached in this picture either.

23  Q    And I'm showing you Government's Exhibit 4.  Can you tell

24  us what this is on the -- on the left side?

25  A    I believe that is a magazine.

1   Q    A magazine for?

2   A    A -- probably for this machine gun.

3   Q    'Kay.  And that's also separated from the gun.

4   A    Yes, it is.  There is one in the -- in the gun and there's

5   one sitting here also.

6   Q    And is that listed in the forfeiture application?

7   A    I -- I don't have the forfeiture application in front of

8   me.

9   Q    Okay.

10  A    The -- the gun is listed.  The magazine is a functional

11  part of the gun.  You don't have to list the magazine separate.

12  Q    So it's your -- it's your view that -- that even though

13  that magazine is separate and even though the other receiver is

14  separate, they're all part of the gun.

15  A    Yes, sir.  A gun will not -- it will not function as

16  designed without a magazine.

17  Q    Right.  But there is a magazine on the -- on the actual --

18  on Exhibit 20 right now.

19  A    Yes, there is a magazine.

20  Q    And there is a receiver on Exhibit 20 right now.

21  A    Exhibit -- oh, the gun -- yes, sir.  The gun does have a

22  receiver.

23  Q    And a magazine.

24  A    Yes.

25  Q    So it's functional now.

1   A    Yes, sir.

2   Q    And there's another magazine and there's another receiver

3   that's separate from the gun that you're holding separately, is

4   that true?

5   A    Sir, I don't know if that's actually the receiver to the

6   gun.  We may have a different terminology.  A receiver is the

7   gun.  It's --

8   Q    Okay.  Well, that --

9   A    -- it's a part -- it's probably a part for that MAC-10

10  that allows it to shoot the forty-five caliber.

11  Q    Okay.  Well, the part for the MAC-10 that allows it to

12  shoot the forty-five caliber --

13  A    Yes.

14  Q    -- which is in the bag on the left side --

15  A    Yes.

16  Q    -- of that exhibit -- what is that, Exhibit -- Exhibit 5?

17  A    Yes, in one of these pictures.

18  Q    It's right --

19  A    The magazine is in Exhibit 4 --

20  Q    No, not the mag --

21  A    -- and 3.

22  Q    Okay.  Three is the --

23  A    Yes.

24  Q    -- three is the -- is the -- is the part that allows it to

25  shoot a forty-five.

1   A    Yes, sir.  I believe so.

2   Q    And five -- and that's separate from the gun --

3   A    Yes.

4   Q    -- right?

5   A    Yes.

6   Q    And then you've got another magazine in Exhibit 5 that's

7   also separate from the gun.

8   A    Yes.

9   Q    And the gun as assembled now is fully operational.

10  A    Yes, sir.

11  Q    If you wanted to change it to shoot forty-fives, you'd

12  have to put those other two parts on it, is that true?

13  A    Yes, sir.

14  Q    And as you say, you have those other two parts in the

15  evidence locker.

16  A    Yes, I do.

17  Q    Now you testified that you've been present for a number of

18  investigations involving guns and drugs, is that correct?

19  A    Yes, sir.

20  Q    And do you know how many of those investigations that

21  you've been present at involving guns and drugs involved

22  completely lawful weapons?

23  A    Usually the ones that have dope and guns are.  It's not a

24  -- with the dope and guns, it's not a lawful weapon if it's

25  being used with the dope, if that's what you're asking, sir.

1  Q    I'm -- no, I'm asking whether they were lawful in the

2  sense that it was legal to possess them.

3  A    Most people I deal with are convicted felons and drug

4  dealers.   Those people cannot lawfully possess firearms.

5  Q    Let me ask the question -- maybe I can be more clear.

6  A    Sure.

7  Q    It's possible for a gun to be illegally possessed, is that

8  true?

9  A    Yes, sir.

10 Q    Forgetting about whether somebody's previously a felon, et

11 cetera.   It could be unregistered, is that right?

12 A    If you're talking about a -- a registered machine gun

13 specifically, how many I'm come across those?   Is that what

14 you're asking, sir?

15 Q    Yes.

16 A    In the seven years I've been doing this, I think maybe

17 four registered weapons have been recovered during illegal

18 activities.

19 Q    Right.   Other than that, it's been unregistered.

20 A    A unregistered machine gun?

21 Q    Oh, there's different ways.   It could be a stolen gun,

22 right?

23 A    Yes, yes.

24 Q    It could be a gun with an obliterated serial number.

25 A    Yes.

1    Q    It could be a gun that in -- at no time under no statute

2    is lawful.  There are a number of weapons like that, they're

3    just simply unlawful to possess.

4    A    Yes, without a proper tax stamp.

5    Q    And there are some that are unlawful to possess, period,

6    whether you have a tax stamp or not.  Sawed-off shotgun, for

7    example.

8    A    You can have a sawed-off shotgun if it's registered.  Same

9    procedure as the machine gun.

10   Q    All right.  In any event, without belaboring this, most of

11   the time when you -- when you make these seizures involving

12   drug dealers, the guns -- you don't have somebody who has a gun

13   collection which is entirely lawful, is that true?

14   A    I'm sorry, sir.  I don't under -- I'm only come across

15   four registered NFA guns like this in seven years.

16   Q    Talking about the MAC-10.  I'm talking about all the guns.

17   A    I -- I -- I don't understand your question, sir.  When you

18   go in somebody's house, they're -- they're going to have more

19   than a gun than somebody that gets stopped in a car.

20   Q    Right.  But I'm saying that -- that when you're dealing

21   with drug dealers, it's common, isn't it, for them to have

22   stolen weapons, weapons with no serial numbers, weapons that

23   are otherwise unlawful, isn't that common?

24   A    It's common for them to have firearms of any legal, un --

25   illegal, (indiscernible) any type of firearms.  Majority have

1    serial numbers on them, majority of them are not stolen, but

2    they do have some stolens.  Yes, sir.  You are correct.  There

3    are different kinds of guns.  Drug dealers use guns.

4    Q    I'm going to show you what's marked as Exhibit 2.  Now you

5    heard -- you heard (indiscernible - away from microphone)

6    Lieutenant Wall?

7              MR. BARKELEY:  Yes.

8    A    Yes, sir.

9    BY MR. COHEN:

10   Q    You heard -- he's had trooper, then sergeant, now

11   lieutenant.

12   A    Yes, sir.

13   Q    You've heard Lieutenant Wall testify that that's the way

14   that gun safe appeared at the time it was first opened.

15             MR. BARKELEY:  For the record, I think it's -- could

16   you just mention what you're looking at there?

17             MR. COHEN:  It's Exhibit 2.

18   A    It's Government's Exhibit 2.  It's a -- a picture of the

19   gun safe after -- after it had been drilled and the -- and the

20   door was open.  I believe this is the initial configuration of

21   the safe when it was initially opened.

22   BY MR. COHEN:

23   Q    All right.  And it's true, isn't it, that -- it's true,

24   isn't it, that in terms of -- in terms of the -- the hunting

25   weapons, they're in one portion of the safe and the MAC-10 is

1    in a different portion of the safe, is that fair to say?

2    A    Yes.  The MAC-10 is the only weapon located up here and

3    the long guns -- the long guns wouldn't fit up on the shelf so,

4    yes, I assume that's -- yes, sir.

5    Q    But even -- but even looking at the -- even looking at the

6    long guns, there's kind of a distinction between the long guns

7    that are leaning -- the long guns and the shotguns, would you

8    say that, in the way they're leaning?

9    A    There -- there's a one gun laying vertical across the

10   front of the safe, and that's a -- I think a 410 pump shotgun.

11   The rest are standing up on the -- their stocks.

12   Q    'Kay.  The rest are up in the back except for the one

13   that's leaning across the front of the safe, is that right?

14   A    The safe is full.  I mean --

15   Q    Right.  But the one that's leaning -- leaning across the

16   front of the safe, what's -- what weapon is that?

17   A    I believe that's a 410 pump shotgun, Mossberg, I believe.

18        THE COURT:  Counsel, we're going to have to move this

19   along.  This -- I don't know where -- we've been talking about

20   guns for a long, long time.

21   BY MR. COHEN:

22   Q    It's a 410 pump shotgun?

23   A    I believe it is, sir.  I can't -- yes, it's a pump -- it's

24   one that's been returned to the family already.

25   Q    And that's the one that's all the way in the front, is

1   that correct?

2   A    Yes -- yes, sir.  Yes, sir.

3   Q    Now the Colt Sporter, that was not loaded, was it?

4   A    No.  There was a magazine in the -- with -- within a foot

5   of it -- a loaded magazine.

6   Q    'Kay.

7   A    You can't see it in this picture, I don't think.

8            MR. COHEN:  Well, (indiscernible - away from

9   microphone).

10                        (Pause)

11           THE COURT:  How's the jury doing?  You don't okay?

12  Okay.  You need a break, let me know.

13                        (Pause)

14           MR. COHEN:  Your Honor, (indiscernible - away from

15  microphone).

16           THE COURT:  Anything you can do to expedite it.

17           MR. COHEN:  Okay.

18  BY MR. COHEN:

19  Q    All right.  Now looking at -- looking at Government's

20  Exhibit 2, can you -- can you point out where in Government's

21  Exhibit 2 is the -- is the Sporter -- the Colt Sporter?

22  A    The Colt Sporter is right beside the .30-06.

23  Q    'Kay.  Colt Sporter is -- so -- so there's the gun --

24  there's the weapon in the front --

25  A    Yes.

1    Q    -- which has been given back.

2    A    Yes.

3    Q    There's a .30-06 which is right behind it, the -- all the

4    way to the right behind it.

5    A    It's kind of in the center of the safe.

6    Q    The center, right.  And then the Colt Sporter is just to

7    the left of that, of the .30-06, is that correct?

8    A    Yes, sir.

9    Q    'Kay.  And the Colt Sporter now is unloaded.  Now looking

10   at -- at this exhibit, which is Exhibit 5, can you show -- can

11   you explain where the -- where the magazine and ammunition was

12   for the Colt Sporter?

13   A    Appears to be on a shelf located maybe six inches from the

14   front sight of the Colt Sporter.

15   Q    So --

16   A    This is the magazine right here -- the loaded magazine.

17   Q    Okay.  That's the loaded magazine and what -- and what

18   about these items here on the right?

19   A    That appears to be -- that's a AR type magazines.  They

20   were empty.

21   Q    Okay.  Those aren't part of the Colt Sporter.  The AR

22   magazines --

23   A    They go to a Colt Sporter.  They were not loaded with any

24   ammunition for this -- this rifle.

25   Q    Okay.  So you gave those back.

1  A    I did not take those -- those magazines.

2  Q    So the only one that you have -- the only one is the

3  magazine that's loaded on the left side.

4  A    Correct.

5  Q    And that's the one that's separated -- it's on the shelf

6  and there's a wall separating that from the Colt Sporter that

7  is on the left side, is that true?

8  A    Yes.  There's a partition here --

9  Q    Right.

10  A    -- but, yes, it's in the immediate vicinity on the other

11  side of the divider there.

12  Q    'Kay.  The -- and the last -- the last question is that

13  the -- or on what's -- what's here is the Mossberg Model 500A

14  twelve-gauge shotgun, is there some type of forearm or some

15  part of that gun that you can see in this picture, which is

16  Exhibit 5?

17  A    I can't make it out here.  Do you have some better

18  pictures?  It may be -- it's -- it's in here somewhere --

19  Q    Take a look at Exhibit 2.

20  A    I can't -- I can't make it out from these pictures, sir.

21                      (Pause)

22  Q    You sure you can't see the forearm of it all the way

23  (indiscernible)?

24  A    This might be it, but I can't tell.  It's a similar stock

25  to it.  Maybe right here, but --

1   Q    But in any case, are we in agreement that the model --

2   Mossberg Model 500A twelve-gauge shotgun was all the way in the

3   back of the gun safe?

4   A    I can't see all the way in the back, Mr. Cohen.  It was in

5   the safe.  I don't know if it was all the way in the back.

6   Q    Well, looking at Exhibit 2 --

7   A    It's not in the front in these pictures.

8   Q    You can't see it (indiscernible - away from microphone).

9   A    Right.  It's not in the front.  It's not one of these

10  front three weapons, these -- the 410 shotgun, the loaded

11  .30-06 or the AR.  It's not in this picture, but it is

12  somewhere behind them.

13  Q    It's somewhere in the safe behind them on the left side,

14  is that true?

15  A    Yes, yes.  It wouldn't -- it wouldn't have fitted -- fit

16  -- I'm sorry -- on these shelves.

17  Q    And you -- and you've said that there were a total -- you

18  take the MAC-10 which is on top, there were a total of thirteen

19  other weapons, the ones that we see in this picture and the

20  ones that were behind them, is that true?

21  A    Yes.  The total, I'd have to look.  Thirteen, four -- you

22  know, there was another handgun in here also that you can't

23  see, but it's been returned also, but I -- I don't know --

24  Q    Now wait a second.  There were fourteen -- there were

25  fourteen guns to begin with --

1   A    Okay.

2   Q    -- (indiscernible - simultaneous speakers).

3   A    I'd have to see my notes.  I can't -- I don't know exactly

4   how many.  We still have four guns.

5   Q    I understand that, but you're the case agent, you reviewed

6   the Indictment, is that right?

7   A    I'm sorry?

8   Q    You've -- you're the case agent, you have reviewed the

9   Indictment, is that right?

10  A    Yes.  Yes, I have.

11  Q    Okay.  And you're aware that originally there were

12  fourteen guns that were found that were charged in the

13  Indictment, is that right?

14  A    If that's what the Indictment says, sir.  I haven't

15  reviewed the Indictment today.  We have many indictments.

16  Q    'Kay.

17  A    If -- if the Indictment says they were indicted, they were

18  indicted.

19  Q    And how -- and how many of those fourteen guns can you see

20  in the picture when you first opened the safe?

21          MR. BARKELEY:  Objection as to relevance, Your Honor.

22          THE COURT:  Sustained.

23  BY MR. COHEN:

24  Q    Now you interviewed -- you interviewed Eugene Johnson, did

25  you not, after the search warrant was executed on his house?

1  A    Yes, sir.

2  Q    And you took notes during that interview, is that correct?

3  A    I did record my interview of Mr. Johnson.  I think I

4  interviewed him -- I talked with him the day the search warrant

5  was conducted, and I think a couple days later I interviewed

6  him with Special Agent Foran at Mr. Johnson's home.

7  Q    And you took notes on those occasions?

8  A    The interviews I did write up a report on those.  Yes,

9  sir.

10 Q    Did you take notes?

11 A    Sometime I do, sometime I don't.  I don't recall if I took

12 notes on that one.

13 Q    Well, if you had -- if you took notes, would you still

14 have them?

15 A    I think I just wrote a report of the -- of the interview

16 with him.

17 Q    Well, you -- you testified in front of the grand jury in

18 this case, did you not?

19 A    Yes, sir.

20 Q    And during the course of your testimony in front of the

21 grand jury, you told the grand jury that you were checking your

22 notes.

23 A    Yes.  I -- if I said I took notes, I took notes.

24 Q    Okay.  And if you took notes, do you have them?

25 A    Yes.  They would be in the case file.  Yes, sir.

1  Q    And those would be the notes from the initial interview on

2  the day that Mr. Johnson was arrested together with the --

3  A    I did not take any notes when -- when we did the search

4  warrant on his house.  I'm pretty sure of that.

5  Q    And you're saying you took notes two days later?

6  A    I took -- if I said I took notes, I took notes.

7  Q    'Kay.  Now Mr. Johnson told you, didn't he, that Mr.

8  Colette wasn't the person who brought up the MAC-10, it was --

9  it was Mr. Johnson, he said what is that?

10 A    When they were in the bedroom, I think the machine gun was

11 in plain view and it was mentioned by one of the -- one of the

12 parties.  It may have been Mr. Johnson that noticed it sitting

13 on the bed or the desk there.

14 Q    You told the grand jury that it was Mr. Johnson who was

15 the one who brought it up 'cause he was seeing it for the first

16 time.

17 A    If that's what I told the grand jury, I -- I wrote a

18 report.  If I could see my report, I could tell you exactly who

19 noticed it, but the gun was in the bedroom when they walked in

20 there.  It was not in the safe.

21 Q    I'm asking you if that's what you told the grand jury?

22 A    I told the grand jury that the machine gun was in the room

23 and it was noticed when they walked in.  I don't know who

24 noticed it first.  I'm sure Mr. Colette knew the gun was

25 there --

1   Q    I'm not talking about --

2   A    -- and Eugene noticed it.

3   Q    I know.  I'm not arguing with you, I'm just asking the

4   question.  Did you tell the grand jury that it was Mr. Johnson

5   who brought up the subject of the gun and said what is this, I

6   haven't seen it before?

7            MR. BARKELEY:  Objection, Your Honor.  This is just

8   an attempt to try to I guess impeach the witness by his failure

9   to memorize what he said two years ago in front of the grand

10  jury.  Counsel has the grand jury testimony --

11           THE COURT:  He's already said he doesn't remember.

12           MR. BARKELEY:  Counsel can give him what he said.

13           MR. COHEN:  I have -- wait, hold on.

14  BY MR. COHEN:

15  Q    The question is did -- the question is, is did you tell

16  that to the grand jury?  Is the answer that you don't remember?

17  A    I do not remember exactly who noticed the gun.  I do not

18  remember exactly what I said to the grand jury.

19  Q    'Kay.  Do you remember telling -- telling the grand jury

20  that Mr. Johnson told you guys that Mr. Colette said this is my

21  new toy, I've taken it out, I've fired it on a range, I'm

22  really pleased with it, then he handled it and he showed it to

23  him, and that was how the whole subject of the MAC-10 came up.

24  A    I do remember writing a report where the gun was referred

25  to as a new toy.  Yes, sir.

<u>Cohoon - Direct</u>

3-132

1  Q    'Kay.  Do you remember saying that to the grand jury, what

2  I just said?

3  A    I do not remember if I said that to the grand jury.  I do

4  remember writing a report where the gun was referred to as a

5  new toy by Mr. Colette.

6  Q    But just to be clear, I just said this -- did you say all

7  these things at -- Mr. Johnson said all these things to you and

8  you said it to the grand jury?  Your testimony is I don't know

9  what I said to the grand jury, I don't remember.

10            MR. BARKELEY:  Objection, relevance.

11            THE COURT:  Well, he said he didn't remember.  How

12  many times can he say it?

13                      (Pause)

14  BY MR. COHEN:

15  Q    Are you aware or do you recall seizing from Mr. Colette a

16  concealed handgun permit?

17  A    No, sir.  I did -- I did not seize a concealed handgun

18  permit from his residence.

19  Q    Okay.  If somebody has a concealed handgun permit, how

20  long does it take them to get a -- a weapon if they apply?

21            MR. BARKELEY:  Objection, relevance.

22            THE COURT:  You can ask the question.  I don't know

23  how -- how -- I don't even know if it's relevant at all, but do

24  you know the answer?

25            THE WITNESS:  I'm not aware of any procedures in the

1  State of Alaska for concealed weapons permits.  The federal

2  government does not have such a permit, so I cannot

3  intelligently answer anything about Alaska concealed weapons

4  permit.

5  BY MR. COHEN:

6  Q    Now with respect to the .30-06 that you examined, would

7  you -- is it fair to say that the .30-06 shows a good deal of

8  weathering and use?

9  A    Yes, sir.

10         MR. COHEN:  I don't have any further questions, Your

11  Honor.

12         THE COURT:  Cross.

13                      **CROSS-EXAMINATION**

14  BY MR. BARKELEY:

15  Q    Special Agent Cohoon, you recall the questions in the area

16  of whether in your invest -- in the course of drug

17  investigations you've participated in, you've found guns and

18  drugs together?  Do you recall that line of questioning by

19  counsel?

20  A    Yes, yes.

21  Q    Okay.  And you responded at the end of it, drug dealers

22  use guns, correct?

23  A    Yes, sir.

24  Q    Okay.  And you testified that it's common for drug dealers

25  to have firearms whether the firearms are legally obtained,

1 that is registered or -- or not stolen, for example. Guns of

2 all types of origins was the nature of your answer, right?

3 A    Yes, sir.

4 Q    But you did say, did you not, that it is not uncommon in

5 your experience for you to find drug dealers with -- with guns

6 that are lawful otherwise -- outside of the drug trafficking,

7 lawful to own.

8 A    Correct.

9 Q    Now in the course of those drug investigations, you were

10 asked about it's also common to find stashes of cash in close

11 physical proximity to guns and drugs, is it not?

12 A    Yes, sir.  It is -- is common to keep the guns close to

13 their valuables, including the dope and cash.

14 Q    And that's because drug dealing is a cash business, isn't

15 it?

16 A    Yes, sir.  From my experience, it's mostly been cash

17 (indiscernible) --

18 Q    And when you said drug dealers use guns, they use them to

19 protect themselves against other people, don't they?

20 A    Yes, sir.

21 Q    They're not for hunting even if it is a hunting-caliber

22 rifle.  A drug dealer uses guns to protect his drugs and his

23 money, correct?

24 A    Yes, they do.

25 Q    And their lives.

1  A    Yes.

2  Q    Now in the course of your drug investigations, have you

3  ever purchased drugs undercover yourself?

4  A    I've sold them and I've arranged purchases.  I've never

5  had a hand-to-hand with myself, but I've set up deals.

6  Q    All right.  You've been part of investigations where that

7  was a technique that was employed?

8  A    Yes, sir.

9  Q    Did they ever involve people getting checks instead of

10 cash for the drugs?

11 A    No, sir.

12 Q    In fact, in your experience, drug dealers need cash to buy

13 more drugs, don't they?

14 A    That's the -- that's the method of operation is cash and

15 carry; the more cash you have, the more product you can have.

16 It's a business.

17 Q    In your experience, the way drug trafficking works is you

18 sold -- you --

19        MR. COHEN:  Objection.

20 BY MR. BARKELEY:

21 Q    -- you sell drugs to people?

22        THE COURT:  What's the objection?

23        MR. COHEN:  I'm sorry.  The objection to this line of

24 questioning is it's beyond the scope.  Not only that, this

25 is --

1    THE CLERK:  Sir, if you could get in front of the

2  microphone, please.

3    MR. COHEN:  It's beyond the scope, and not only that,

4  this witness is not a DEA agent.  His area of expertise is in

5  guns.  But in any event, it's beyond the scope of what we were

6  talking about.

7    THE COURT:  You finish up this question, then move

8  on.  I think you've already asked the question.

9    MR. BARKELEY:  I believe I have, Your Honor.  For

10  that reason, I'll withdraw it.  It's fair enough.

11    THE COURT:  I think he even answered it.

12    MR. BARKELEY:  It's a reasonable objection.  I think

13  it's been answered.

14  BY MR. BARKELEY:

15  Q    Finally, sir, do you remember the question about who said

16  what to whom first about the machine gun and what you might

17  have said to the grand jury about that versus what you might

18  have written in a report or notes or whatever?  Do you recall

19  that general line questioning?

20  A    Yes, sir.  Yes, I do.

21  Q    Okay.  No matter who said what first or what you said

22  about that, do you have any information today that calls into

23  doubt that Eugene Johnson says he went into the defendant's

24  bedroom and there was a machine gun there during a drug

25  transaction in which Johnson bought cocaine from the defendant?

1    Do you have any reason to doubt that?

2    A    No, sir.  I do not.

3    Q    I mean, what's your opinion?  Do you think who mentions

4    the gun first has -- has any bearing on whether that machine

5    gun was there and present during a drug transaction?

6              MR. COHEN:  Objection, Your Honor.  He -- all he --

7    the question is -- the question is vague.  He doesn't know

8    whether it was there or it wasn't.  The question had to do with

9    what was he told by Mr. Johnson.

10             THE COURT:  Okay.  Overruled.

11   A    I'm sorry.  I -- could you rephrase the question again?

12   BY MR. BARKELEY:

13   Q    Essentially, you've testified and drug dealers use guns.

14   Does it -- does it mean a drug dealer isn't using a gun based

15   on who mentions the gun first?

16   A    The mere presence of a gun can intimidate many people.

17   Q    Speaking of which, the mere presence of a gun can

18   intimidate people even if the gun isn't loaded, correct?

19   A    Correct.

20   Q    I mean, I think you've -- you (indiscernible) the trial as

21   the case agent.  You heard law enforcement testify more than

22   once that you can't look at a MAC-10 and tell whether there's a

23   round in the chamber, whether it's loaded, correct?

24   A    Correct.

25   Q    So a machine gun like that can have a deterrent effect on

1  that -- that's what you should do, is that true?

2  A    What, store guns in a gun safe?  Yes, sir.

3  Q    That's correct.

4  A    Yes, sir.

5  Q    So the fact that somebody has a gun collection such as

6  this, fourteen guns, and they're all stored in a gun safe, that

7  would be consistent with ATF recommendations, wouldn't it?

8  A    For the proper storage of guns, a gun safe.  Yes, sir.  I

9  can't speak for the whole agency.  I don't know what ATF's

10  stance is on gun safety --

11  Q    You're speaking for yourself and your expertise.

12  A    Yes, sir.  That would be my opinion.

13  Q    And you've been -- you've been in the field for many

14  years, is that right?

15  A    Yes, sir.

16         MR. COHEN:  I don't have any further questions, Your

17  Honor.

18         THE COURT:  Recross?

19         MR. BARKELEY:  Very briefly, Your Honor.

20                    **RECROSS-EXAMINATION**

21  BY MR. BARKELEY:

22  Q    Just following up on that though, based on your experience

23  and training as an ATF agent, you wouldn't recommend storing

24  them inside a gun safe loaded, would you?

25  A    No, sir.  That's -- that's not a safe practice.

1    people even if it's not loaded and even if there's no

2    ammunition for it in that safe, correct?

3    A    That's correct.

4    Q    It could be a fake MAC-10, correct?

5    A    Yes, sir.

6    Q    Could have a deterrent effect.  And that picture -- last

7    question -- Exhibit 2, you've been testifying about?

8    A    Yes, sir.

9    Q    Is there anything obstructing access to the MAC-10?

10   A    No, sir.  There's a bag of marijuana, but you could draw

11   that gun out and -- if you needed it.

12   Q    Okay.  But unlike the aught six and other rifles you were

13   questioned about which might have been -- access to them might

14   have been complicated a little bit by all the guns in the safe,

15   there's nothing except a bag of marijuana keeping someone from

16   grabbing that machine gun, correct?

17   A    That's correct, sir.

18            MR. BARKELEY:  Nothing further.

19            THE COURT:  Redirect?

20                      (Pause)

21                **REDIRECT EXAMINATION**

22   BY MR. COHEN:

23   Q    I'm showing you a copy of the Indictment in this case.  Do

24   you see that?

25   A    Yes, sir.

1    Q     And you see that in counts three and four, there's

2    fourteen different guns that are listed?

3    A     Yes, sir.

4    Q     Do you have any dispute that those are the guns that were

5    found, say, in the safe that day?

6    A     No, sir.

7    Q     I think you were asked on cross-examination about whether

8    guns and drugs can be used together, is that correct?

9    A     Yes, sir.

10   Q     Ten of the guns that are listed there on the Indictment

11   have been given back to the Colette family, is that true, sir?

12   A     Yes, sir.

13   Q     And all ten of those guns are guns that could be used in a

14   drug transaction, is that true?

15   A     Yes, they could have.

16   Q     No reason that those guns have any less utility in a drug

17   transaction than certainly three or four guns that you're

18   seeking to forfeit.

19   A     The guns that we maintain, that we still have, the machine

20   gun and the other three guns were loaded.  That's why we still

21   have those.

22   Q     Well, they weren't all loaded.  The Sporter was not

23   loaded.

24   A     Well, there was readily accessible ammunition.

25   Q     Well, that's your position, that the ammunition that was

1   on the other side of the shelf was readily accessible, is that

2   correct?

3   A     Yes, sir.

4   Q     There was in fact ammunition in that gun safe for all the

5   other guns that were found other than the -- other than the

6   MAC-10, is that right?

7   A     There was some other ammunition that was not taken.  No

8   other ammunition -- no other magazines were loaded.

9   Q     And you testified that -- that guns and drugs and money,

10  they all go together, is that correct?

11  A     In a -- in drug dealers in that combination.  Yes, sir.

12  Q     But what we're talking about here is a gun safe, is that

13  right?

14  A     Yes, there was a gun safe in the bedroom of Mr. Colette.

15  Q     And it's recommended that -- that people who collect guns,

16  that they keep their guns in a gun safe for safety reasons, is

17  that true?

18  A     Yes.  You can store valuables of any kind in a gun safe.

19  Yes, sir.

20  Q     You can, but it's also recommended with respect to guns

21  that you store guns in a gun safe for safety reasons, isn't

22  that true?

23  A     Yes, sir.  It is -- I think it was a Winchester safe

24  actually.

25  Q     Yes, but that would be your recommendation as an expert,

1    Q    And I take it you wouldn't recommend storing them with

2    cocaine?

3    A    No, sir.

4              MR. BARKELEY:  Nothing further.

5              MR. COHEN:  Your Honor, I'd like to -- I would like

6    to mark --

7              THE COURT:  Well, wait.  We're through with this

8    witness, right?

9              MR. COHEN:  Well, just before we're through with this

10   witness, I want to mark in evidence as Defense EE which is a --

11   which is the grand jury -- which is the grand jury transcript.

12             THE COURT:  Mr. Barkeley?

13             MR. BARKELEY:  There are some definite complications

14   with this exhibit, Your Honor.  We'll need a side bar.

15             THE COURT:  Okay.  We'll take it under advisement.

16   Okay.

17             MR. COHEN:  I'm just marking it.

18             THE COURT:  Okay.  Just mark it --

19             MR. COHEN:  (Indiscernible - away from microphone)

20       (Defendant's Exhibit EE marked for identification)

21             THE COURT:  Well, do you need this witness for that?

22             MR. COHEN:  Only to the extent (indiscernible - away

23   from microphone) Defense EE is in fact the -- the transcript

24   for the record of Mr. Cohoon's testimony in grand jury -- Agent

25   Cohoon's testimony in the grand jury, then that's fine.

1    THE COURT:  Well, we can take that -- we can take
2    that up later.  I don't think we need the witness to sit here.
3    MR. COHEN:  All right.
4    THE COURT:  So, thank you, sir.  You're excused.  And
5    we'll just take these various evidentiary issues in a break.
6    So what's the plan in terms of your next witness?
7    MR. COHEN:  Your Honor, I have one witness who was
8    supposed to be here yesterday and they weren't here.  A second
9    wit -- and I've asked him to be here this morning and was still
10   out looking for him to bring him in.  He's going to a
11   relatively short witness.  I hope to get them here.
12   THE COURT:  Okay.
13   MR. COHEN:  And then I have one other witness who is
14   a little bit longer who is our accountant and expert.
15   THE COURT:  So --
16   MR. COHEN:  If that short witness is here --
17   THE COURT:  Could you look and see?
18   MR. COHEN:  -- then we could do that right now.
19   THE COURT:  Yeah, let's look and see.
20   MR. COHEN:  Right.
21   THE COURT:  Any of you need to use the restroom, take
22   five minutes to go to the restroom, how about that?  Let's
23   take -- well, you go --
24   MR. COHEN:  Well, why don't I check because Your
25   Honor -- if the person's not here, I would recommend that we