1        MR. COHEN:  I have no further questions, Your Honor.

2        THE COURT:  Okay.  Mr. Barkeley?

3        MR. BARKELEY:  None, Your Honor.

4        THE COURT:  All right.  Thank you, sir.  You're

5   excused.  Have a great day.

6        THE WITNESS:  Thank you.

7        THE COURT:  Mm-hmm (affirmative).

8        MR. COHEN:  Your Honor, we call Jason Pierce.

9        THE COURT:  Very well.

10                        (Pause)

11        **JASON PIERCE, DEFENDANT'S WITNESS, SWORN**

12        THE CLERK:  Thank you.  You may be seated.  Sir, for

13   the record, could you please state your full name, spelling

14   your last?

15        THE WITNESS:  Jason Ronald Pierce, P-I-E-R-C-E.

16        THE CLERK:  Your city and state of residence?

17        THE WITNESS:  Anchorage, Alaska.

18        THE CLERK:  Thank you.

19        THE COURT:  Mr. Cohen.

20        MR. COHEN:  Yes.

21                   **DIRECT EXAMINATION**

22   BY MR. COHEN:

23   Q    Good afternoon, Mr. Pierce.

24   A    Good afternoon.

25   Q    Can you tell the jury how you're employed?

1    A    I'm a tax manager at a large CPA firm in Anchorage,

2    Alaska.

3    Q    And are you -- have you been hired by the defense in this

4    case?

5    A    Yes, sir.

6    Q    What's the nature of your assignment?

7    A    The nature of my assignment is threefold, and if you --

8    I'm just going to refer to my report since we have that

9    capability.  On page three --

10   Q    Well, without referring to your report --

11   A    Oh, okay, okay.

12   Q    You can -- you can use your report to refresh your --

13   A    Oh, fine, fine, fine

14   Q    -- memory, but --

15   A    Okay.

16   Q    -- just go ahead and -- and if you could just explain

17   generally what your --

18   A    Sure.

19   Q    -- the pur -- what your assignment has been.

20   A    Okay.  Well, first thing was to determine whether the --

21   the business was a -- was a going concern.  What I mean by that

22   is -- is it a legitimate business operating in the public, and

23   second-fold was to re -- look at the -- the circumstances

24   surrounding the seizure of the records and the -- specifically

25   the cash in the safe, and determine -- make a determination of

1   whether or not it was reasonable, plausible that the -- that

2   the property seized was part of the business.  And third, we

3   went to try to reconstruct the cash receipts or currency that

4   flowed in and out of the companies.

5   Q    Now when you talk about the -- the business, can you tell

6   the jury which business you're talking about?

7   A    Sure.  It's Arctic Alarm and Audio.

8   Q    Now I'm going to ask you a few questions about your --

9   your background and I'm -- and then I'm going to ask permission

10  to have you qualified as an expert witness.  Are you a

11  Certified Public Accountant?

12  A    Yes, sir.

13  Q    Can you tell the jury very briefly your educational

14  background?

15  A    I have a Bachelor's Degree from the University of

16  Tennessee and a Master's from the University of Alaska.

17  Q    And -- and you're a Certified Public Accountant in Alaska?

18  A    Yes.

19  Q    And what is your professional history?

20  A    Uh --

21  Q    What is your professional history?

22  A    Sure.  Well, I've been in public accounting my -- my whole

23  career.  From predominantly -- I was working for a small firm

24  in Anchorage and worked my way up and became a partner at that

25  firm, and then left a year ago to work for Mikunda Cottrell,

1  so --

2  Q    Okay.  And have you ever taught any classes?

3  A    Yes, sir.  I've taught nine classes in -- including

4  financial accounting, income tax, auditing -- I taught that

5  five times -- and then financial statement analysis.

6  Q    And when you -- when you are at work, what is your -- what

7  do you do primarily at work?  What's your specialty?

8  A    Business evaluations.  We do some litigation work.  This

9  is the first time I've testified for -- on behalf of Mikunda

10  Cottrell, but we've done some mediation work -- you know, for

11  example, if somebody has a business and their marital -- they

12  need to divide the marital estate, they'll come to us and say

13  what's the business worth, can you give us a range, and then --

14  then they oftentimes settle.

15  Q    Do you have any professional affiliations?

16  A    You mean --

17  Q    Do you have any professional affiliations -- member --

18  A    Organizations I belong to or --

19  Q    Exactly.

20  A    Yes.  Sir, I belong to AICPA, the American Institute of

21  Certified Public Accountants, the Alaska Society of CPA's, the

22  Alaska State Planning Council, and the National Association of

23  Certified Valuation Analysts.  Yeah, I think that's --

24       MR. COHEN:  Your Honor, I'd ask that Mr. Pierce be

25  qualified at this time in -- as an expert in accounting and

1   business evaluation.

2          THE COURT:  All right.  Mr. Barkeley, did you have

3   any questions, any voir dire?

4          MR. BARKELEY:  No, thank you, Your Honor.  No

5   objection.

6          THE COURT:  Okay.  Very well.  He will be so

7   qualified.

8   BY MR. COHEN:

9   Q    Now when you provide -- when you were given your

10  assignment, were you provided with any records --

11  A    Yes.

12  Q    -- to review?

13  A    Actually, this -- this box sitting right down there.

14         MR. COHEN:  And, Your Honor, I'd like to --

15                    (Pause)

16  -- Your Honor, I'd like to -- I'd like to mark the box as FF

17  for identification, Your Honor.

18         THE COURT:  Okay.  For identification purposes,

19  that's fine.

20                    (Pause)

21    (Defendant's Exhibit FF marked for identification)

22         MR. COHEN:  Your Honor, at this time, I believe the

23  Government would stipulate that the -- that the records that

24  Mr. Pierce reviewed are the records that were seized during the

25  course of the search warrant from Arctic Alarm and Audio, and

1    later released and produced to the defense.

2                THE COURT:  Okay.  Is that right?

3                MR. BARKELEY:  Not quite, Your Honor.  I believe that

4    the providence of the documents is referred to in the witness'

5    report, and for some reason I thought it suggested that they

6    were not all seized from the business.  Maybe the witness

7    knows.  (Indiscernible - simultaneous speakers) --

8                MR. COHEN:  Do you --

9                MR. BARKELEY:  Go ahead.

10               MR. COHEN:  I'm sorry.  If you want to --

11               MR. BARKELEY:  May I ask one --

12               MR. COHEN:  Sure.

13               THE COURT:  Sure.

14               MR. BARKELEY:  Thank you.

15                              VOIR DIRE

16   BY MR. BARKELEY:

17   Q    Sir, everything in the box, are -- are you -- is it your

18   impression that everything in the box was seized from Arctic

19   Alarm and Audio?

20   A    As -- as far as I know.  There's -- there's also my work

21   papers in there, so --

22   Q    Okay.

23   A    -- I've received some documents from Mr. Cohen.

24   Q    Forgetting those for the -- for a moment though --

25   A    Okay.

1    Q    -- didn't -- didn't your report -- you want to look at it

2    for a moment, page eleven?

3    A    Sure.  Okay.

4                              (Pause)

5    Mm-hmm (affirmative).

6    Q    Okay.  So is that banker box number one there sitting next

7    to you?

8    A    Yes, sir.

9    Q    Okay.  And then the -- the other materials, just for

10   clarification, referred to under binder, are those also in

11   there?

12   A    Yeah.  The -- the binder is essentially where I was

13   keeping my work papers.  I received a couple of packages from

14   Cohen & Paik, and I was accumulating those in the binder, so --

15   Q    Okay.  So what you're calling your work papers includes

16   things given to you by counsel which did not come from Mr.

17   Colette's business.

18   A    Yes, sir.

19        MR. BARKELEY:  Okay.  All right.  With that

20   clarification, that's fine.  Thank you.

21        MR. COHEN:  All right.  So -- so -- you're welcome.

22   BY MR. COHEN:

23   Q    So you've reviewed all the records that were seized from

24   Mr. Colette's business, is that correct?

25   A    Yes, sir.

3-192

1    Q     And you've also reviewed additional documents that were

2    provided by me.

3    A     That's correct.

4    Q     And those include court filings, is that correct?

5    A     Yes.

6    Q     And you also received from me the tax returns that were

7    filed with the IRS for 2003, 2004, and 2005 --

8    A     That's correct.

9    Q     -- is that correct?

10   A     Yes.

11   Q     And I sent you a copy of several interviews of potential

12   witnesses in this case, is that correct?

13   A     Yes.

14   Q     Now with respect to the documents that you reviewed from

15   the business, can you describe to the jury what types of

16   documents you found that had been seized from the business that

17   you reviewed?  First, maybe you can start and talk about the

18   number of documents.

19   A     Okay.  Sure.  Well, I wanted to add to -- while we're

20   talking of things that I considered, the bookkeeper prepared a

21   set of financial statements that I also looked at, and she gave

22   me a QuickBooks database as well.  So --

23   Q     Well, I -- I think on that -- on that topic, when you're

24   talking about the bookkeeper, are you talking about the

25   bookkeeper from the business or a bookkeeper that we hired to

1  work with you?

2  A    A bookkeeper that the defense hired, yes.

3  Q    And what's the name of the bookkeeper that we hired to

4  work with you?

5  A    Tabularis (ph) -- Tabularis Bookkeeping.

6  Q    The name of the bookkeeper?

7  A    Oh, Lorraina Moorhouse.

8  Q    Ms. Moorhouse.  So Ms. Moorhouse was given these same

9  documents which are receipts from the business?

10  A    That's correct.

11  Q    And she evaluated those -- she prepared financials for

12  your review?

13  A    Yes.

14  Q    And was that also at your direction?

15  A    No.  She did that -- she did that on her own.  I just got

16  the end product, sir.

17  Q    Okay.  And were the -- was the end product that you got

18  consistent with your review of the documents?

19  A    Yes.

20  Q    And so is it your understanding that there was another

21  bookkeeper that also worked for Arctic Alarm and Audio?

22  A    Yes.  In the testimony -- or in the -- the documents I

23  reviewed, there was reference to Ashley.  I believe that she

24  was also working on a QuickBooks database.

25  Q    Okay.  Incidentally, I didn't ask you earlier.  How many

1    times have you testified before in court?

2    A    Once.

3    Q    So this is your second time?

4    A    Yes.

5    Q    Can I ask you -- and don't use me as an example because I

6    slur my words and I speak very quickly, so maybe you can use me

7    as an example of what you shouldn't do, which is to -- don't be

8    like me.  Speak -- please speak up, call -- bring the

9    microphone toward you and enunciate your words because your

10   words are having a habit of dropping at the end, and at least

11   from our perspective, we'd like the jury to hear --

12   A    Okay.  My apologies.

13   Q    -- everything you're going to say.  Okay.  So now -- now

14   the -- what's -- can you give us an idea of the volume or the

15   -- you know, the magnitude of the documents that you -- that

16   you reviewed that -- that were -- that were from the business?

17   A    Well, there's easily a few thousand pages in there, so in

18   the -- in the box there's bank statements, there's customer

19   sales receipts, there's vendor invoices, there's customer logs,

20   like a day planner, like customer lists, various receipts.

21   Looks like there's some personal mail in there as well, so --

22   Q    Some personal?

23   A    Mail.  I'm sorry.

24   Q    'Kay.  Did you -- so you found a day planner, is that

25   correct?

1   A    Yes.

2   Q    Customer lists?

3   A    Yes.

4   Q    Did you review all the bank statements?

5   A    Yes, that's correct.

6   Q    Did the bank statements -- were they complete enough for

7   you to complete reports for the -- for the years in question?

8   A    That's correct.

9   Q    Now Ms. Moorhouse, did she provide you with an income

10  statement for the business for each year?

11  A    Yes.

12  Q    Can you explain to the jury what an income statement is?

13  A    Sure.  An income statement is a summary of the results of

14  operations for a period of time, and usually -- in this case,

15  it's over a year, so from January to December, the -- the

16  results of the business including the sales and all the

17  expenses and then the ending net income number are all

18  summarized on the income statements.

19  Q    When you say a year, how many years did you analyze for

20  this business?

21  A    Yes.  2003, 2004, and 2005.

22  Q    And did Ms. Moorhouse also prepare a balance sheet?

23  A    That's correct.

24  Q    And can you explain to the jury what a balance sheet is?

25  A    Sure.  A balance sheet is a snapshot of what the company

1  has and what they owe at a particular time, and so in this

2  case, since we're referring to January through December, a

3  balance sheet is a snapshot at December 31st, and it tells you

4  how much assets you had, how many liabilities you had, and as

5  well as the difference which is your -- residually your owner's

6  equity, so --

7  Q    All right.  I'm sorry.  Just going back to the documents

8  you reviewed, did you review sales invoices?

9  A    Yes.

10 Q    Vendor invoices?

11 A    Yes.

12 Q    The QuickBooks software and accounting software?

13 A    Yes.

14 Q    Did you review photographs from the place of business?

15 A    Yes.

16 Q    And you -- and you say again that you reviewed the tax

17 returns.

18 A    Yes.

19 Q    Now after making that review, did you -- in making that

20 review, were you able to -- well, before I ask you about

21 summaries, et cetera, were you able to put together some tables

22 or charts to explain your work?

23 A    Yes, and those are attached to my report.

24        MR. COHEN:  All right.  I'm going to show you -- I'm

25 going to show you the first table, and I'm going to try to put

1  it up on the overhead.  I want to see if I can be more

2  successful than Mr. Butler, thus, that remains to be seen.  Is

3  there a way to focus it or --

4                     (Pause - side conversation)

5  BY MR. COHEN:

6  Q    Is this a -- are you able to see that from where you're

7  sitting?

8  A    Yes.

9            MR. COHEN:  Is the jury able to see it from where the

10 jury's sitting?

11           UNIDENTIFIED JUROR:  (Indiscernible - away from

12 microphone)

13           MR. COHEN:  (Indiscernible - away from microphone)

14           THE CLERK:  Is that better?

15           MR. COHEN:  Is the -- as far as you know, there's no

16 way to --

17           THE COURT:  Can you enlarge it?  Can you come down

18 closer?

19           MR. COHEN:  Enlarge it, yeah.

20           MR. BARKELEY:  I don't think so.

21                     (Pause)

22           THE COURT:  Now focus it.

23           MR. BARKELEY:  There you go.

24                     (Pause)

25           THE COURT:  That's better, isn't it?

1          MR. COHEN:  Your Honor, am I doing better at this or

2     worse?

3          THE COURT:  Well, I'm not here to make those kind of

4     judgments.

5          MR. COHEN:  All right.  Is that better for the jury?

6          UNIDENTIFIED JUROR:  (Indiscernible - away from

7     microphone)

8          MR. COHEN:  Little bit better?  Okay.

9     BY MR. COHEN:

10    Q    Can you explain to the jury what Attachment A is?

11    A    Sure.  That's a summary of the three years of balance

12    sheets for the company.

13    Q    'Kay.  So I notice, for example, in 2003, you're looking

14    at cash equivalents -- cash and equivalents, six thousand four

15    dollars [$6,004]?

16    A    Yes.

17    Q    Can you explain what that is?

18    A    That represents the cash that's at Denali State Bank at

19    the time.

20    Q    And was that the bank that the business used?

21    A    Yes.

22    Q    So Arctic Alarm and Audio used Denali State Bank?

23    A    Yes.  That's correct.

24    Q    And these numbers that are here, they didn't -- did they

25    come out of the air or are you confident that these are numbers

1   that came from the business?

2   A    Well, these -- these came -- or excuse me -- the -- the

3   bookkeeper prepared the -- the financial statements from the

4   Denali State Bank statements.  The checks were attached and the

5   deposits were there and the credit card receipts were all

6   there, so yeah, I'm confident that these represent what

7   happened at Denali State Bank.  There -- there are some issues

8   on whether or not it's all of the money that was around, but

9   it's -- that was what definitely cleared the Denali State Bank,

10  yes.

11  Q    'Kay.  So this is based on Denali State Bank.

12  A    That's correct.

13  Q    And when you see the twenty -- looking down further, the

14  fixed assets of twenty-three thousand two forty-six [$23,246],

15  can you explain to the jury what you mean by fixed assets?

16  A    Yes.  That represents -- the description in there is

17  signage and software.  So the -- most of that is software, but

18  what's noticeably absent from that -- the detail is any tools

19  or machinery they used in their operations, so --

20                     (Pause - cell phone ringing)

21            MR. COHEN:  Your Honor, I have to apologize.  That's

22  my phone.  I'm sorry.

23  BY MR. COHEN:

24  Q    All right.  I'm going to -- I'm going to show you now what

25  has been marked as Attachment B, and I think -- well, we'll

1  take the -- yeah, is this Attachment B --

2  A    Yes.

3  Q    -- to your report?

4  A    Yes.

5  Q    Okay.  Can you explain to the jury what this is,

6  Attachment B?

7  A    Sure.  So these are the income statements we were

8  referring to earlier where the revenue is at the top, this is a

9  summary of all the sales, and then the expenses are broken out

10 by category, and the last one there, line twenty-nine, is -- is

11 unknown, which is really just uncategorized, so I believe the

12 bookkeeper didn't know which specific category to stick those

13 in, but if you look at the line above it, it's -- there's a

14 miscellaneous expense there, so --

15 Q    Okay.  But the unknown, is that made up of actual checks

16 that -- that were -- that were written at Denali Bank?

17 A    Yes --

18        MR. BARKELEY:  Objection --

19 A    -- that's correct.

20        MR. BARKELEY:  -- leading.  Oh, it's been answered.

21        THE WITNESS:  Oh.

22        THE COURT:  Sounds like he withdrew his objection.

23        MR. BARKELEY:  It's been answered.

24        THE COURT:  Okay.

25 BY MR. COHEN:

1  Q    So the lower part -- the net sales from 2003, 2004, and

2  2005, and the cost of goods sold, that represents to you the --

3  if you add -- if you add the net sales -- or I'm sorry -- if

4  you look at the net sales, then you have the cost of goods

5  sold, and the gross profit, can you explain what that is for

6  each year?

7  A    Sure.  Sir, those -- the cost of goods sold is essentially

8  the direct costs of obtaining those sales.  So in this -- this

9  example, a typical case would have been the sale of a remote

10 start.  So he may have -- there may have been products and

11 wages that it took to achieve that sale, but -- so those would

12 be considered direct costs of the sale.  The -- the -- the --

13 the other expenses down below are not considered direct, those

14 are where you look at it like overhead, essentially your

15 lights, rent, things like that then.

16 Q    So if -- so whatever the cost of those -- for example, if

17 some -- if he's installing a stereo, the cost of the stereo

18 that's been installed, would that go under cost of goods sold?

19 A    That's correct.

20 Q    And -- and the net sales, that's the total revenue that

21 went into the bank?

22 A    Yes.

23 Q    Now as to the deposits for each one of those years, 2003,

24 2004, and 2005, were you able to analyze those deposits to

25 determine whether some were made in check and some were made in

1  cash?

2  A    Yes.   There is about a four-inch -- four-inch thick pile

3  of the deposits that broke down the -- between the checks and

4  the cash deposited, so we -- we look to see is there a trend

5  over -- over time.   So we looked at a hundred -- or eighty-five

6  different deposits, and that represented about a hundred and

7  ninety thousand dollars worth of transactions and of those, the

8  -- the portion of cash to checks was fifty-six percent.   So

9  fifty-six percent of the -- the time he deposited cash as well

10 as, you know, the remaining difference being in checks.

11 Q    So fifty-five percent of the deposits that we see in two

12 -- of the net sales, one eighteen, two thirty-nine and three

13 thirty, fifty-five percent of those deposits in your estimation

14 were in cash, forty-five percent in checks.

15 A    Of the actual deposits.   There were some -- there was some

16 credit card receipts as well, so -- but yes, of the actual

17 deposits, fifty-six percent roughly is in -- was in cash.

18 Q    And the deposits again are reflected in net sales?

19 A    Yes.

20                         (Pause)

21 Q    Now I'm going to show you what -- what is Exhibit E, and

22 I'm going to ask you (indiscernible - away from microphone) big

23 as I can.   Okay.   (Indiscernible - away from microphone).   Can

24 you -- can you explain that Exhibit E, please?

25 A    Sure.   This is the 2003 activity that the bookkeeper

1  prepared compared to what the tax returns said.  And so the --

2  the first column is what the -- the Schedule C of the tax

3  return listed broken down into category, and the second column

4  is the QuickBooks, and then the third being the difference

5  between the two.

6  Q    So does that mean that there was a difference between what

7  was reported on Schedule C to the IRS and what was -- what was

8  actually in the QuickBooks or accounting program for Arctic

9  Alarm and Audio?

10 A    Yes, that's correct.  And for the next two exhibits as

11 well, so I did that for 2003, 2004, and 2005.

12 Q    And so that E, F and then -- and then G compares the

13 difference between the QuickBooks accounting program for the

14 business and what was reported to the IRS, is that correct?

15 A    Yes.

16 Q    Now I'm turning -- I'm turning to Exhibit H and I don't

17 know whether -- how well I can do this.  (Indiscernible - away

18 from microphone).

19                         (Pause)

20 Okay.  Let me see if I can --

21                         (Pause)

22 Okay.  Can you explain to the jury what you've done in Exhibit

23 H?

24 A    Sir, I call this a cash summary, so it's a summary of all

25 the -- the bank statements at the -- the -- at Denali State

1  Bank.  So it takes the -- the very beginning deposit of the --

2  the first -- the second column, first number, is fifty-five

3  hundred dollars [$5,500], so that's what started the activity

4  in Denali State Bank, and then I looked and -- just went month

5  by month and added up -- or just summarized the deposits, the

6  re -- the disbursements, and then had a tally.  So it had the

7  beginning and ending balances at the -- of the two ends, so --

8  Q    Okay.  So the -- so on January 21st of 2003, the very

9  first activity for Arctic Alarm and Audio was a deposit of five

10 thousand five hundred dollars [$5,500]?

11 A    Yes.

12 Q    And are you aware whether that five hundred -- five

13 thousand five hundred dollars was deposited in cash or by a

14 check?

15 A    I believe it was by cash.

16 Q    Now I'm going to show you the -- and you did -- you did

17 this -- the beginning balance, the deposits, credits, the

18 charges, the bank service charges, and the ending balance for

19 the -- for the entire Denali State Bank account for each year,

20 is that true?

21 A    That's correct.

22 Q    I'm going to show you on the second page of your exhibit,

23 which is Exhibit H, is there --

24      MR. BARKELEY:  Counsel, I'm sorry, to interrupt.

25 Just for the record though, you're -- I think you're referring

1    to these as exhibits.  That may be confusing because --

2              MR. COHEN:  Oh, I --

3              MR. BARKELEY:  -- they're attachments to his report.

4              MR. COHEN:  -- I totally agree.  I apologize, Your

5    Honor.  I've been referring to attachments to -- to Mr.

6    Pierce's report --

7              MR. BARKELEY:  Throughout this examination.

8              MR. COHEN:  -- throughout -- with that -- throughout

9    the examination.  Nothing -- nothing has been an exhibit, and

10   at some point I'll probably mark -- I'll do this later -- I'll

11   mark the report as an exhibit.  I don't intend to move the

12   report into evidence as I previously told the Court.

13             THE COURT:  Okay.

14   BY MR. COHEN:

15   Q    All right.  So now taking a look at Exhibit H, the bottom

16   of the second page, do you see the number six hundred and

17   ninety-nine thousand oh eight three eighty-nine [$699,083.89]?

18   A    Yes.

19   Q    Can you explain to the jury what that is?

20   A    That's the total number of deposits that cleared the

21   Denali State Bank account during 2003 through 2005.

22   Q    And six hundred and ninety-eight thousand eight forty-five

23   [$698,845], what does that represent?

24   A    That's the total number of checks during the same period

25   that went out.

1  Q    And the next column?

2  A    Is the -- the two hundred and thirty-eight dollars [$238]

3  of bank service charges.

4  Q    So if you add the two hundred and thirty-eight and the six

5  ninety-eight, it equals the six ninety-nine?

6  A    Yes, that's correct.

7  Q    And is it -- and are you testifying that -- that under

8  your analysis, approximately fifty-five percent of the six

9  ninety-none oh eight three eighty-nine [$699,083.89] was

10 deposited in cash?

11 A    Well, there -- there was -- about fifty percent of the

12 total deposits were credit card receipts, but of the remaining

13 deposits, the -- then it breaks down into the percentage I

14 described earlier with the cash and checks, so yes.

15 Q    Okay.  So what percentage of the six ninety-nine oh eight

16 three eighty-nine [$699,083.89] in your estimation was

17 deposited in cash?

18 A    About twenty-five percent.

19 Q    'Kay.  So that -- so about twenty-five percent of

20 approximately seven hundred thousand dollars.

21 A    Yes, yes.

22 Q    Now is there any part of your report now where you --

23 where you show the total amount that was -- that was reported

24 to the IRS -- the total revenue that was reported to the IRS?

25 A    I did in the conclusions, but I didn't do a separate table

1  for that.  Basically, I just added up the -- the -- the

2  differences column for the three years and -- and got a total.

3  Q    All right.  What -- what was the total amount of revenue

4  that was reported to the IRS?

5  A    That was -- I'd have to add that up real quick.

6                      (Pause)

7  To the IRS, it was -- it was roughly the seven hundred

8  thousand.  There -- there was actually -- I actually -- it was

9  -- yeah, that's right, it was seven hundred thirty-six

10 thousand, excuse me, seven hundred thirty-six.

11 Q    Okay.  There was a total -- the revenue that was reported

12 to the IRS based upon the tax returns was seven hundred and

13 thirty-six thousand?

14 A    Yes.

15 Q    And is there a table attached to your report that shows

16 that?

17 A    I -- I know I've discussed it -- I referenced that number

18 in here, but I didn't do a separate table on how I came up with

19 that number, but --

20 Q    Okay.  So approximately seven hundred and thirty-six

21 thousand was reported to the IRS.

22 A    Yes.

23 Q    And what was the total -- we went through the total

24 revenue that was reported to the IRS, is that correct?

25 A    Right.

1   Q    I'm sorry, the total revenue that the -- strike that.  We

2   went through the total expenses from Denali State Bank, is that

3   correct?

4   A    The expenses?

5   Q    The total expenses being six hundred and ninety-eight

6   thousand.

7   A    Yes.

8   Q    Is there anywhere where you calculated the total expenses

9   that were reported to the IRS?

10  A    Yeah, it's -- it's -- it's that six hundred ninety-eight

11  thousand plus another hundred and twenty-six thousand, so

12  whatever that ends up being, about eight fifty, was reported to

13  the IRS --

14  Q    'Kay.

15  A    -- as expenses.

16  Q    Now the amount of money -- let's talk about the revenue

17  that was reported to the IRS.  You say seven hundred and

18  thirty-four thousand was reported to the IRS, is that correct?

19  A    Roughly, yes.

20  Q    And approximately six hundred and ninety-nine thousand was

21  deposited in the bank, is that correct?

22  A    That's correct, yes.

23  Q    And the difference between the seven hundred thirty-four

24  thousand reported to the IRS and the six hundred and ninety-

25  nine thousand that was deposited in the bank, can you explain

1  any conclusions you might have drawn about that?

2  A    Yes.  When we made an attempt to reconcile the total

3  currency received through the business, we included the

4  difference as undeposited cash receipts, so I just added that

5  to the pool of cash that was received in -- for -- from the

6  business.

7           MR. COHEN:  'Kay.  Your Honor, I think we can turn on

8  the light.

9           THE COURT:  Okay.

10                       (Pause)

11  BY MR. COHEN:

12  Q    So that -- so that over and above the -- correct me if I'm

13  wrong, but over and above the six hundred and ninety-nine

14  thousand, there were another approximately thirty-four thousand

15  dollars of cash receipts --

16  A    Yes.

17  Q    -- that were not deposited in the bank.

18  A    Yes.

19  Q    Now you mentioned that there were expenses -- there was a

20  difference in the expenses --

21  A    Actually, I have the number right here.  It's --

22  Q    'Kay.

23  A    -- forty -- it's forty-seven thousand eight eighty-six

24  [$47,886] is the -- the difference.  We were -- we were off a

25  little bit.

1  Q    Okay.  So the difference between the amount reported to

2  the IRS and the amount that was deposited in the bank is forty-

3  seven thousand?

4  A    Yes.  Well, not -- to clarify your question, not -- the

5  deposits -- there was -- there's a few purchase returns, so

6  there's -- there's some differences in material, but -- so the

7  deposits don't line up exactly with the revenues, but yes, the

8  -- the difference between the revenue that the bookkeeper

9  prepared and what was reported to the IRS was this forty-seven

10 thousand eight eighty-six.

11 Q    'Kay.  And as I understand it, you're saying that -- just

12 to -- just -- just to be clear, and your explanation for the

13 difference is what?

14 A    There was -- she did a journal entry based off the old

15 QuickBooks database that she'd received, and then there was

16 some items that were returned that was deposit, and you didn't

17 call those sales, so --

18 Q    Okay.  But I'm saying the difference is -- and I

19 understand --

20 A    Okay.

21 Q    -- there were a couple of slight differences, but

22 approximately forty -- there was approximately a forty-seven

23 thousand dollar difference, and how is that explained?

24 A    Well, the difference between what -- the revenue that the

25 bookkeeper prepared on her financial statements versus the

1  revenue that was declared on the tax return is this forty-seven

2  thousand that we're talking about.

3  Q    Okay.  And I'm asking you --

4  A    Oh.

5  Q    -- is that explained by -- by checks or by cash?

6  A    Oh, I assumed that that was cash.

7  Q    And why is that?

8  A    Well, 'cause it didn't clear the bank statement and it

9  declared to the IRS as income, so it had to come from

10  somewhere.

11  Q    Now is -- are there other -- you mentioned earlier that

12  there were -- that -- that the claimed expenses on the IRS

13  returns were greater than the expenses that were reflected in

14  the QuickBooks accounting program from the business.

15  A    That's correct.

16  Q    And what was the difference between those two?

17  A    Roughly a hundred and twenty-seven thousand.

18  Q    And how do you explain that difference?

19  A    The -- the same methodology.  The -- the expenses that

20  were claimed on the tax return was a hundred and twenty-seven

21  thousand dollars more than what cleared the bank, so once

22  again, the difference is -- had to come from somewhere, so we

23  assumed that it was cash when we were trying to reconcile the

24  -- the cash received and disbursed.

25  Q    So would it be correct to add the one hundred and twenty-

1    seven thousand dollars to the forty-nine thousand dollars as

2    additional cash, or would it be correct to subtract the forty-

3    nine thousand from the one twenty-seven?

4    A    You net those out.  So the -- the difference is eighty

5    thousand dollars net.  So in other words, the -- the net income

6    reported -- or the net income prepared by the bookkeeper is

7    eighty thousand dollars more than the net income reported to

8    the IRS.

9    Q    And your explanation for that is cash receipts?

10   A    Yeah, the -- the difference is that the -- the cash

11   receipts and then these -- the cash disbursements, those two --

12   yes, they -- they netted out -- can -- can you ask that

13   question again?

14   Q    Is it fair to say that what you're saying is that there's

15   eighty thousand dollars that you found, based upon the tax

16   returns, that didn't make it into the bank?

17   A    That's correct, yes.

18   Q    So when I go back -- is it your view that -- I'm going to

19   ask about potential cash that came into the business.

20   A    Okay.

21   Q    One area of potential cash that came into the business is

22   approximately twenty-five thousand -- I'm sorry --

23   approximately twenty-five percent of the seven hundred thousand

24   that went into Denali Bank.

25   A    That's correct.

1  Q     So that's number one.  A second area, a net difference of

2  approximately eighty thousand dollars, which is cash that never

3  made it to the bank.

4  A     Yes.

5  Q     So would it be correct to add then, if we're talking about

6  cash that came in, the twenty-five percent of seven hundred

7  thousand, which is approximately how much?

8  A     I estimated that the total currency deposited was a

9  hundred and ninety -- about -- almost a hundred and ninety-six

10  thousand.

11  Q     Of the seven hundred thousand.

12  A     Yes, yes.

13  Q     So it's a hundred and ninety-six thousand of currency

14  deposited --

15  A     Yes.

16  Q     -- plus -- plus another -- another eighty thousand dollars

17  that didn't make it to the bank.

18  A     That's correct.

19  Q     And so the total of those two is how much?

20  A     One -- two seventy-five.

21  Q     Is that correct?  It's -- it's eighty -- isn't it eighty

22  plus one twenty?  Oh, I'm sorry, it's like two seventy --

23  you're right, you're right.  The total of those two is two

24  hundred and seventy-five.  So that's two hundred and seventy-

25  five thousand dollars in cash that was coming into the

1    business.

2    A    Yes.

3    Q    Now are there other areas of potential unexplained cash

4    coming into the business that you found?

5    A    Well, one was just the -- the cash on hand that was in the

6    safe.  If the -- the historical trend was fifty-six percent of

7    the deposits that made it to the bank were in cash, then it's

8    logical that fifty-six percent of the -- the cash on hand --

9    fifty-six percent -- sorry.  Of -- if -- okay.  Let me just

10   back up.  Excuse me.  See, the total checks found -- there was

11   eight checks found -- seven or eight checks found in the safe,

12   totaled about twenty-five hundred bucks, okay?  So that twenty-

13   five hundred bucks should be roughly forty-five percent of the

14   next deposit.  So I extrapolated that and arrived at a figure

15   of twenty-four hundred dollars for the -- the -- the expected

16   cash that should have gone into the bank.

17   Q    In other words, at any moment in time, there was

18   approximately twenty-four hundred dollars that -- that would be

19   explained for what's about to go into the bank.

20   A    Yes.

21   Q    But are there other areas of unexplained cash?  For

22   example --

23   A    Oh.

24   Q    -- in the areas of -- of fixed assets?

25   A    Yes.  There was -- in the evidence, I saw there was --

<u>Pierce - Direct</u>                                3-215

1    there was records that said that there was inventory and

2    property at the business that were not in the fixed assets, and

3    there was also testimony that said that there was employees

4    paid that -- that didn't show up on any of the financial

5    statements.  There's no wages expense anywhere, so -- but did I

6    quantify -- I didn't -- wasn't able to quantify that, so I

7    didn't include it in my numbers.

8    Q    So an additional area of cash coming in would be fixed

9    assets that were paid for but aren't reflected on the books, is

10   that correct?

11   A    Yeah, fixed assets, inventory, and the employees.

12   Q    That are -- and -- and monies being paid to the employees.

13   A    Yes.

14   Q    That would be coming in that you don't see on the books.

15   A    Right.

16   Q    Now were you able to come up -- if we -- if we take the

17   cash that -- for the fixed assets and the cash that was paid to

18   employees to the side, were you able to come up with a -- an

19   estimate for the total amount of currency that was disbursed to

20   -- not over and above the business expenses, the total amount

21   of cash currency that was disbursed out of the business in the

22   three years?

23   A    Yes.  It was -- (indiscernible) -- yeah, twenty-two

24   thousand -- almost twenty-three thousand dollars of cash --

25   there was either -- well, that was either straight cash

1  withdrawals or money orders.  There was owner distributions in

2  the neighborhood of sixty-six thousand dollars, but not all of

3  those were in cash, so if you're just asking me about cash,

4  then --

5  Q    Well, what I was asking is -- I'm -- I'm directing you to

6  page six of your report.

7  A    Yes.

8  Q    There's a table two there --

9  A    Mm-hmm (affirmative).

10 Q    -- and there's a figure there for total currency

11 disbursed.  Can you tell the jury what that is?

12 A    Yes.  A hundred and forty-nine thousand six hundred and

13 three [$149,603].

14 Q    'Kay.  And the total currency disbursed, the one forty-

15 nine six oh three [$149,603], what is that -- what do you mean

16 by total currency disbursed?

17 A    Well, that is -- that's the money orders and the -- the

18 cash withdrawals that were -- that came straight out of the

19 bank, and then the difference is from the expenses that were

20 reported to the IRS that didn't clear the bank.  So those two

21 together total that hundred and fifty.

22 Q    So is it fair to say that you concluded that based upon

23 your review, that there was at least a hundred and fifty

24 thousand dollars of cash that came out of the business in the

25 three years?

1  A    That's correct.

2  Q    And in addition to that, there may have been more cash

3  based upon -- based upon the fact that fixed assets were not

4  reflected in the books, inventory was not reflected in the

5  books, and payments to employees in cash were not reflected in

6  the books?

7  A    That's correct.

8  Q    Now do you have any opinion about whether people who have

9  small businesses that take in cash -- at -- or in your

10 experience, do you have any opinion about whether that cash is

11 kept or accumulated over time?

12 A    Yes.  Actually, in my old office, we sometimes received

13 cash and -- we had a break-in, so what we did, we each took the

14 cash box home until we deposited in the bank, and so -- is

15 that --

16 Q    Well, I'm saying do you have any opinion about whether in

17 this particular business, Arctic Alarm and Audio, that there --

18 that there was cash accumulated, because we have the thirty-

19 eight thousand dollars in the safe, over time?

20 A    Yes.  I -- I thought that for a number of reasons.  One is

21 'cause these -- these issues that we're talking about, and also

22 just the predominance of testimony says that there was numerous

23 cash -- cash transactions as well as the -- there allege --

24 allegedly wasn't a safe on site, so to safeguard the assets,

25 they -- that it would make sense to have it in a secure

1   location, so --

2   Q    And did you notice anything in reviewing the record about

3   whether there were certain times of the year they were more or

4   less busy for Arctic Alarm and Audio?

5   A    Yes.  Consistently, October, November of each year was the

6   busiest times.  In fact, November of 2005 was the busiest month

7   on record.

8   Q    So that in that period of time, October, November, would

9   you expect to see more cash receipts and deposits?

10  A    Yes.  Yes.

11  Q    Now in a business that deals in cash, is cash held for --

12  is cash held by the owners for themselves in addition to being

13  held for deposits in addition to being held for payments for

14  expenses?

15  A    I'm sorry.  Can you ask that again?

16  Q    Yes.  Why is cash held in a small business?

17  A    Well, one is to -- like we were discussing safeguarding of

18  assets.  Another is if -- if the business is growing, you know,

19  maybe that -- that gives you working capital.  Also, if there's

20  a planned acquisition coming up, say, that -- going to go buy

21  some -- bulldozer, whatever, piece of equipment that you'd want

22  to have that on ready.

23  Q    So one reason to keep cash is to make -- to buy items for

24  the business?

25  A    Yes.

1    Q     And one reason a person might keep cash is you're about to

2    make a deposit?

3    A     Yes.

4    Q     Another reason is to pay an employee?

5    A     Yes.

6    Q     Pay an expense?

7    A     Yes.

8    Q     Or use it for yourself.

9    A     Right.  Yes.

10   Q     Now were you able to reach any conclusions about Arctic

11   Alarm and Audio, just general -- general -- general conclusions

12   after the work that you did?

13   A     Yes.  Well, there was -- you know, based on all the -- the

14   evidence I looked at and the -- well, just based off the

15   evidence, it looked like the business was a valid going

16   concern, like it was -- there wasn't any pending bankruptcy at

17   the time, business -- I mean, if you look at the financial

18   statements, it looked like the business was trending up, so --

19   so that was one of my tasks.  The other one was that the --

20   whether or not it was reasonable to conclude that the cash

21   received -- the cash seized in the safe was part of -- or was

22   related to the business, and in -- in my report I say that I

23   believed that it was.

24   Q     And why do you believe that it's reasonable to believe

25   that the thirty-eight thousand dollars that was seized in the

1  safe was -- was business related?

2  A    Well, the -- the biggest reason is just that -- the nature

3  of operations.  It was common practice to have cash on hand for

4  -- you know, whether you were -- you received cash from

5  customers, you paid cash to your vendors, you paid cash to your

6  employees, you know, that requires a lot of cash on hand, and

7  so we -- we were able to reconcile that, yeah, there's -- there

8  was plenty of cash receipts and plenty of cash actually

9  disbursed as a -- it's over and above the amount that they --

10  they found at -- that was seized at the time (indiscernible).

11  Q    In other words, the amount of disbursements you're talking

12  about, the hundred and fifty-two thousand, is -- is more than

13  the thirty-eight thousand.

14  A    That's correct.

15  Q    In addition to that, were you able to determine the

16  percentage of the total amount of cash receipts which you

17  estimated at approximately two seventy-five over the three

18  years -- approximately what percentage of the two seventy-five

19  is the thirty-eight thousand?

20  A    Oh, so, yeah, there's two hundred and fifty -- I don't --

21  Q    Is it two fifty or two seventy-five?

22  A    I've got -- I'm looking at it, it's two fifty-one.

23  Q    Total two fifty-one cash receipts.

24  A    I don't have a calculator.  I don't know what that works

25  out to be.

1    Q    Okay.  But you're saying that the thirty-eight thousand is

2    -- is -- is a percent -- is a percentage of --

3    A    One-sixth?  Yeah.

4    Q    -- the two hundred -- the thirty-eight thousand is a

5    percentage of the two hundred and fifty thousand, such that

6    what?

7    A    Approximately one-sixth of the -- the total cash receipts.

8    Q    And the -- I just wanted to clarify something.  I thought

9    earlier you were telling me it's -- it's two seventy-five.

10   What's -- what's the total?  You said the total cash receipts

11   that came from the deposits to Denali Bank plus the eighty

12   thousand.

13   A    Well, the -- the eighty thousand is split between the

14   revenue and the expenses, so this -- this first table includes

15   the revenue and that totals to two fifty-one.  The second table

16   includes the -- the expenses which is one forty-nine, so --

17   Q    Okay.  So the -- the total amount of cash receipts when

18   you look at the whole thing, the amount -- the differences

19   between the IRS and the bank and the deposit analysis that you

20   did, the total is two fifty --

21   A    Yes.

22   Q    -- is that correct?

23   A    Yes.

24   Q    Okay.  And would it be fair, when you look at the thirty-

25   eight thousand in the safe, to compare that to the two fifty in

1  terms of percentages?

2  A    When -- when you -- the -- the two fifty represents, you

3  know, three years.

4  Q    Right.

5  A    So, you know, the -- the thirty-eight thousand was at a

6  point in time, so -- I mean, I -- it might -- might be a useful

7  comparison to do that percentage calculation, yes.

8  Q    'Kay.  And again, this is all over and above what -- you

9  what you found in the bank, which was seven hundred thousand

10  dollars approximately.

11  A    That's correct.

12  Q    Now were you able to determine whether the business was a

13  profitable business during the years that you analyzed?

14  A    Yes.  Both the -- both what was reported to the IRS and

15  what the Tabularis Bookkeeping prepared said the business was

16  over and above its peer group.  Also, I did -- I did a

17  comparison of industries ratios, and the -- that income on both

18  accounts was higher, so --

19  Q    Now had you previously had the opportunity to evaluate a

20  number of small businesses in your practice?

21  A    Yes.

22  Q    And how can you compare this -- this small business in

23  terms of its viability, reasonability to other small businesses

24  that you've evaluated?

25  A    Well, it's -- it's not uncommon to -- to have companies

1  with poor records, so this is no exception.  What I -- I think

2  in this example, the -- the amount of cash transactions is

3  higher than -- than normal, but in terms of the -- the growth

4  rate, it's not unreasonable, the income produced is not

5  unreasonable, so --

6  Q    Are there some businesses that have higher cash receipts

7  than other businesses?

8  A    Yes.  Yeah.  Mm-hmm (affirmative).  Yes.

9  Q    And -- and cash receipts in the area of twenty-five

10 percent, thirty percent, a third, is that something that you've

11 seen in other businesses as well?

12 A    Well, yeah.  Just look at like bingo halls or gambling

13 places.  Yeah, it's -- there you have to weigh the cash, so

14 yeah.

15 Q    But I'm saying are there other small businesses that

16 you've looked at with those types of --

17 A    Oh, yes.

18 Q    -- deposits?

19 A    Oh, yes, yes.

20 Q    Okay.  How many that you've seen -- or is it -- is it

21 uncommon to see twenty-five, thirty percent, thirty-three

22 percent in cash?

23 A    No, I'd -- I'd say it's not uncommon.

24 Q    And again, you -- you spend your time looking at and

25 evaluate -- and -- and valuing businesses, is that -- that

1  true?

2  A    That's correct, yes.

3  Q    Okay.  Were you able to reach any conclusion in looking at

4  Arctic Alarm and Audio and all the information -- well, let me

5  ask you this.  You said that some of the records were

6  incomplete, but do you find that there were enough records in

7  all those thousands of pages of documents to complete an

8  analysis that you're comfortable with?

9  A    Yes.  Yes.  And actually, to emphasize on the -- the cash

10 receipts, there was a bank -- a paper box full of receipts that

11 said cash sales.  So, yeah, that's -- I didn't try to go back

12 and match those actual receipts with the bank deposit.  I think

13 that would -- beyond what we want to do here, but -- but there

14 was ample support for that, there was ample support for the

15 checks.  The -- the bank statements themselves had copies of

16 the checks that were written and, yeah, there was -- to answer

17 your question, yes, there was enough support to reach -- I feel

18 to reach my conclusions.

19 Q    Were you able to determine who it was that appeared to be

20 running this business, Arctic Alarm and Audio?

21 A    Oh, Jason Colette.

22 Q    And just in the interest of full disclosure, who was it

23 that, you know, retained you to work on this case?

24 A    Cohen & Paik.

25 Q    Which is my law firm.

1  A    Yes.

2  Q    And how much do you charge for your services?

3  A    A hundred and sixty-five an hour.  Court time is two oh

4  five an hour.

5  Q    Court time is more?

6  A    Yes.

7           MR. COHEN:  I have no further questions.

8           THE COURT:  All right.  Thank you.  Cross-

9  examination?

10          MR. BARKELEY:  Yes.  I'm going to run up the bill on

11 Mr. Cohen.

12          THE COURT:  Okay.

13                    **CROSS-EXAMINATION**

14 BY MR. BARKELEY:

15 Q    Good afternoon, sir.

16 A    Hello.

17 Q    Speaking of the -- of the money just to get that out of

18 the way.  Everybody knows professionals have to be paid and

19 you're an expert in this area.  What's the ball park estimate

20 of the total amount your firm has been paid for your work in

21 this case, maybe including another twenty minutes of being on

22 the stand with me.

23 A    Sure.  That -- we took a sixty-five hundred dollar

24 retainer and I just sent out an invoice on Friday for seven --

25 I'm sorry, including this -- I did an estimate for my time up