1    here, service, it's another ninety-five hundred, so --

2  Q    Another ninety-five hundred?

3  A    Yes.  So roughly fifteen grand.

4  Q    So -- okay.  Approximately fifteen grand for your --

5  A    Yes.

6  Q    -- for your firm's work in -- in this matter.

7  A    Yes.

8  Q    Please forgive me if I ask dumb questions, but I'm -- I'm

9  not an accountant, and you're not a lawyer, so we may not even

10  be able to connect, but in your report you mention -- I'll try

11  to use your attachments for the questions --

12  A    Okay.

13  Q    -- so that hopefully the questions will be better.  But in

14  your report, you -- you noted that -- you kept track of, that

15  is, based on records in the white box there next to you on the

16  witness stand -- you kept track of cash deposits at Denali

17  State Bank, right?

18  A    Yes.

19  Q    Okay.  And was that an account in the name of the

20  business, Arctic Audio and Alarm or whatever?

21  A    Yes.

22  Q    Okay.  Now did I hear you near the end of your testimony

23  say that you did not use the documents in backs -- in the box

24  to add up all of the payments made to the business for -- for

25  its work and then compare that to the amount of cash deposited

1    at the bank?

2    A    I didn't take the -- the sales -- like the customer sales

3    receipts.  I went off the actual deposits.  There was --

4    Q    Right.

5    A    -- copies of deposits, yes.

6    Q    Okay.  All right.  And those -- those -- those deposit

7    slips, they don't specify where the cash came from either, do

8    they?

9    A    Right.

10   Q    Okay.

11   A    That's correct.

12   Q    Would you call this in your business -- this business a

13   sole proprietorship?

14   A    Yes.

15   Q    Okay.  And -- and you determined based on your review of

16   the records and consulting in the case, whatever else you did,

17   that the defendant here in the courtroom, Jason Colette, was

18   the sole proprietor.  He ran the show.

19   A    Yes.

20   Q    Okay.  In your profession, in evaluating the income stream

21   of a sole proprietorship, would it be important to you to

22   understand that the sole proprietor had two income streams?

23   A    I'm not -- I'm not sure what you mean by two income

24   streams.

25   Q    Oh, all right.  Maybe I'm -- maybe I'm assuming that you

1  know something that you don't.  Do you know that the defendant

2  has been convicted of distributing -- of possessing with the

3  intent to distribute cocaine?

4  A    Yes, I do know that.

5  Q    Okay.  All right.  So you do know that he essentially has

6  been convicted of drug trafficking.

7  A    Yes.

8  Q    Okay.  Are you aware of the fact that drug trafficking

9  generates cash?

10  A    My --

11  Q    Selling drugs generates cash.

12  A    I don't know anything about selling drugs, but --

13  Q    Really?  All right.  So you don't know something --

14  anything about selling drugs, but you evaluated a business in

15  which the sole proprietor has been convicted of doing that.

16  A    I'm just here to talk about the business and not --

17  Q    Well --

18  A    -- any other activities that --

19  Q    -- let's talk about --

20  A    Okay.

21  Q    -- the business.

22  A    Okay.

23  Q    If someone who owns a business has another business, why

24  do you not take into account cash generated by his other

25  business?

1  A    I only saw records for one business.

2  Q    Right.  Because the records were seized from the Arctic

3  Alarm place, right?

4  A    Yes.

5  Q    Okay.  Not from the defendant's residence, right?

6  A    Yes.

7         MR. BARKELEY:  Let me show you some pictures of the

8  defendant's residence.

9                         (Pause)

10  May I approach, Your Honor?

11        THE COURT:  Very well.

12        MR. COHEN:  Wait.  Let me see.

13                        (Pause)

14  BY MR. BARKELEY:

15  Q    Sir, I gave you a set of photographs.  They're marked

16  Government's Exhibits 1 through 9.  Take a moment to look

17  through them if you don't mind, and just kind of look at the

18  format of them.  They're color photos of a safe in a bedroom.

19  On the back, they've each got a sticker -- a gold sticker --

20  marked Government's Exhibit and then a number one through nine.

21                        (Pause)

22  Once you agree with me that that's what you've got, I was going

23  to direct your attention to a couple of them.

24  A    Okay.  Yeah, I -- I have them.

25  Q    Okay.  Were you shown those photographs before or at any

1   time during your consultation on this --

2   A    Not these photographs.  I saw photographs of the business.

3   Q    But you're here giving the jury and the Court an opinion

4   about where the cash came from, if I heard your testimony

5   correctly at the beginning.  One of the goals or tasks you were

6   given was to look at the circumstances surrounding the seizure

7   of cash in the safe, true?

8   A    Yes.

9   Q    Did you know --

10  A    Well, not surrounding the -- I was just -- I was tasked to

11  determine whether it was reasonable or plausible that the cash

12  seized from the safe was part of the business.

13  Q    Okay.  But if you didn't know this guy was a drug dealer,

14  how could you -- how could you determine the reasonableness of

15  -- of where that money came from without taking it into

16  account?

17          MR. COHEN:  Objection, Your Honor.  That misstates

18  the evidence.  He testified that he did know that he was a drug

19  dealer.

20          THE COURT:  I can't recall.  (Indiscernible)

21  BY MR. BARKELEY:

22  Q    Do you understand the question?

23  A    Can you repeat it, please?

24  Q    Okay.  Did you take into account the possibility, in

25  reaching your opinion about where that cash came from, that the

1   defendant has been convicted of distributing cocaine?

2   A    These numbers represent logical conclusions based off the

3   business.  I did not --

4   Q    The answer is no.

5   A    -- try to speculate on --

6   Q    The answer is no, you didn't take it into account, right?

7   A    Okay.  Then no.  Yes.

8   Q    Okay.  All right.  You're not going to reasonably dispute,

9   are you, my assertion that drug dealing is a one hundred

10  percent cash business?

11  A    I'll take your word for that.  I -- I mean, I --

12  Q    Are you ever familiar with hearing about instances in

13  which people purchased illegal drugs with checks or cashier's

14  checks or money orders?

15  A    No.

16  Q    So -- 'cause you mentioned a lot of other activities, some

17  of which in certain states are -- are illegal, like gambling.

18  You know that's a high cash business, right?

19  A    Yes.

20  Q    You mentioned that.

21  A    Yes.

22  Q    And you don't have any information to the contrary, do

23  you, that -- that drug dealing is not essentially an all-cash

24  business?

25  A    That's correct.

1  Q    Okay.  Now your report says as part of your analysis, you

2  have considered -- oh, I'm sorry, withdraw the question.

3  Before I move off the topic of the cash deposits at the bank,

4  so you have no idea, do you, where that cash came from that was

5  put into the bank.

6  A    No.

7  Q    Could have come from drug dealing.

8  A    Could have come from his own money.  I don't -- yes.

9  Q    Right.  Didn't necessarily come from Arctic Alarm and

10 Audio at all because you just didn't add up the slips in the

11 box, get a total amount of transaction receipts even, and then

12 figure out how much of that would have been cash based on your

13 ratio.  You just didn't attempt to tie the sour -- you didn't

14 try to figure out where the cash that was deposited came from,

15 did you?

16 A    It's -- I was -- there's -- the -- the records -- the cash

17 customer sales receipts are not pre-numbered, so I would -- I

18 have no way to know if I have the full population or not.

19 Q    All right.  I -- sir, I'm in no way --

20 A    Oh.

21 Q    -- insinuating that you're not competent or that you

22 wouldn't have done it if you were able to --

23 A    Mm-hmm (affirmative).

24 Q    -- but if the documents themselves simply precluded you

25 from being able to, if that's what I hear you saying, that's

1    fine.  Is that --

2    A    Well, I --

3    Q    -- what you're saying, you just couldn't have

4    reconstructed it the way I'm suggesting?

5    A    Are you asking could I have tied those cash invoices to

6    the -- the cash deposited in the bank?

7    Q    Yes.

8    A    Then you're right, I -- I can't.

9    Q    Okay.

10   A    Yeah.

11   Q    All right.  Throughout your testimony, you talked about

12   the years 2003, 2004, and 2005.

13   A    That's correct.

14   Q    They're on your tables and I think a transcript of your

15   testimony would show that you and counsel talked extensively

16   about what was reported to the IRS.  Do you remember this whole

17   line of questioning?

18   A    Yes.

19   Q    Okay.  When you say reported, were you referring to the

20   2003, 2004 and 2005 tax returns that your report says you

21   relied upon in reaching your opinion?

22   A    Yes.

23   Q    All right.  And those tax returns in your report, they are

24   mentioned as an Exhibit D, which was under that binder category

25   that I ask you to look at, is that true?

1   A     Okay.   Yeah, I don't recall exactly which one, but yes.

2   Q     Would -- if you don't mind, would you take a moment and

3   look at your report and just make sure that Exhibit D is what

4   you listed as the -- the item that you looked at that contained

5   the three tax returns, 2003, 2004, and 2005?

6   A     Yes.

7   Q     It was?

8   A     Yes.

9          MR. BARKELEY:   Okay.   May I approach, Your Honor?

10         THE COURT:   Very well.

11                    (Pause)

12  BY MR. BARKELEY:

13  Q     Now, sir, before you, you have exhibits marked

14  Government's Exhibit for identification 33, 34, and 35.   Take a

15  moment and look at them.   I think the first one even says

16  Exhibit D on it.   Do you recognize those?

17                    (Pause)

18  A     Just want to look at the -- the Schedule C.   I mean, I --

19  without checking the numbers, the -- the -- they look -- they

20  look familiar, yes.

21  Q     Would you like a moment to compare them to the actual

22  Exhibit D in your box that you -- that you looked at?

23  A     Sure.   If you don't mind.

24  Q     Okay.   Please do that.

25  A     Okay.

1    (Pause)

2    Yeah, they, they are.

3    Q    Okay.  So those are the tax returns that were given to you

4    by the defense as -- to help you conduct your analysis and

5    reach your opinion.

6    A    Yes, sir.

7         MR. BARKELEY:  Okay.  Take a look -- first, move to

8    admit 33, 34, and 35.

9         MR. COHEN:  (Indiscernible) has he testified those

10   are the ones he reviewed?

11        MR. BARKELEY:  Yes.

12        THE WITNESS:  The net income number is the same.  I

13   haven't checked all the other numbers.

14        MR. COHEN:  All right.  I mean, I'm -- is counsel

15   representing those -- those are the same tax returns?

16        MR. BARKELEY:  Yes.  You -- you -- that you gave me,

17   they've got your handwritten Exhibit D on them.  If the witness

18   needs more time or if you'd like a break, that's fine.

19        MR. COHEN:  I just -- I just -- I just want to check

20   something out.

21        (Pause)

22   Your Honor, I'm objecting to the -- to the tax returns based

23   upon Rule 705.  I think that it's true that the data needs to

24   be disclosed on cross-examination to the opposing counsel,

25   which was done, but there needs to be an independent basis for

<u>Pierce - Cross</u>

3-236

1   its admissibility into evidence, so I object to the -- to the

2   admissibility of these documents.

3            THE COURT:  Mr. Barkeley?

4            MR. BARKELEY:  I'm relying on 703, Your Honor.  I'm

5   not the proponent.  These tax returns were provided to this

6   expert by the defense.

7            THE COURT:  Okay.  Well, let's -- I'm going to take

8   that under advisement and look at your two rules then at the

9   break, 705 and 703.  You can proceed though.

10           MR. BARKELEY:  Okay.  Thank you.

11  BY MR. BARKELEY:

12  Q    You recognize those documents though, right?

13  A    (No audible reply)

14  Q    Okay.  Bottom of 2003 return, please, first -- first page.

15  A    Okay.

16  Q    Is there a date on that for which the return was prepared?

17  A    The first page?

18  Q    Yeah.

19  A    There is nothing on the first page that has a date.

20  Q    There's not a date for the -- that the preparer puts on --

21  is it the second page then?  I'm sorry.

22  A    The second page, yes, yes.

23  Q    Sorry.  You tax guys.

24  A    Yeah, it's April of '07.  I can't read the amount number,

25  but --

1  Q    April '07.  Okay.  So the 2003 tax return was prepared in

2  April of '07?

3  A    Apparently.

4  Q    Okay.  That's a little late, isn't it?  I mean, you're in

5  the tax business.

6  A    Oh, yes.

7  Q    What am I missing?  Okay.  All right.  So did you know Mr.

8  Colette was arrested in November of 2005?

9  A    Yes.

10 Q    Okay.  So that tax return was prepared after Mr. Colette

11 was under arrest, in fact after he had been convicted and knew

12 all about this forfeiture stuff, true?

13 A    Yes.

14 Q    Same question with regard to the 2004 tax return.  What's

15 the date that it was prepared on?

16 A    April of '07.

17 Q    Okay.  And same question in regard to the 2005 tax return?

18 A    It's April of '07.

19 Q    Okay.  All of your testimony when you were talking about

20 what was reported to the IRS, the jury should consider the fact

21 that that was reported to the IRS as of at the earliest April

22 of 2007.

23 A    Yes.

24 Q    Okay.  And by the way, is there any proof on those

25 documents that they were actually filed with the IRS or have

1  you just been assuming that's the case?

2  A    I've been assuming that that's the case.

3  Q    Okay.  You have no evidence to indicate they were actually

4  even filed or reported -- that information was reported to the

5  IRS.

6  A    That's true.

7  Q    So that's another assumption you'd made in your report,

8  that there was actual reporting to the IRS.

9  A    Yes.

10  Q    Let's go back if we can to those exhibits one through

11  nine.

12  A    Okay.

13  Q    Sir, you've given your -- your opinion about cash

14  businesses.  I think you said this, your report also says it,

15  cash transactions in businesses which take in a lot of cash

16  they require a lot of cash on hand.  I mean, it makes sense,

17  right?  You've got to -- you've got a -- for one thing, you

18  have to make change, but for another your vendors may also, in

19  this whole sort of auto-starter, auto repair niche, those

20  people also may have high-cash transaction percentages, right?

21  And you've got to pay your vendors in cash, I think you

22  testified --

23  A    Yes.

24  Q    -- or often you do.

25  A    Yeah, there's vendors that had on their method of payment

1    is C.O.D., so --

2    Q    Okay, right.  So, you know, a Snap-On tool guy drives up

3    to the shop and they sell all these guys a wrench they need

4    right away and these guys go in the cash drawer and pay cash to

5    the vendor, for example, right?

6    A    Is that a ques -- yeah.

7    Q    Is that -- is that an unlikely scenario or --

8    A    No, that's --

9    Q    -- is that kind of what you're getting at in terms of cash

10   on hand --

11   A    Yes.

12   Q    -- being needed?  Okay.  Let me ask you this.  If that's

13   what you're getting at, why on earth would you keep that cash

14   in your bedroom at your house?  You going to tell this Snap-On

15   tool driver, hey, hang on, I've got to go home and get my cash

16   on hand?

17   A    I have no way to know if there was -- if he took it to

18   work every day or if he came home and stuck it in the safe.

19   Maybe he didn't need all of that at once.

20   Q    Okay.  There's -- there's a picture there in front of you,

21   just look for the one with all the cash in it.  Tupperware

22   container with a bunch of currency in it?

23   A    Yes.

24   Q    See that?  Okay.  That came from the defendant's bedroom

25   in a -- in a safe, okay?

1   A    Okay.

2   Q    That wasn't taken from his business.

3   A    Okay.

4   Q    'Kay?  Well, normally when people have cash on hand

5   though, don't they have some kind of system for keeping track

6   of it, like, you know, a ledger or how much there is of it?

7   A    Yes.

8   Q    Do you see anything like that in that photograph, that

9   Tupperware container?  Ignore the cocaine, that's the white

10  powder also in there, but any documents like a -- like a ledger

11  saying how much is in the box right now?

12  A    No, sir.

13  Q    See any deposit slips for Denali State Bank in that box

14  with that cash?

15  A    No, but I don't see the checks either.

16  Q    Correct.  That was my next question.  You don't see any

17  checks in there either, do you?

18  A    Okay.

19  Q    In fact, you don't see anything in that Tupperware

20  container with all that cash that is indicative of an upcoming

21  deposit.

22  A    That's correct.

23                          (Pause)

24  Q    Please look at -- I'm going to guess here -- number --

25  number one.

1    A    This one?

2          MR. BARKELEY:  Ah, thank you.  The teddy bear.  Your

3    Honor, may I approach?

4          THE COURT:  That's fine.

5          MR. BARKELEY:  I'm sorry.  Thank you.

6                        (Pause)

7          THE WITNESS:  Okay, sir.  Okay.  `Okay.

8          MR. BARKELEY:  I wasn't even close.  It's number

9    eight.

10         THE WITNESS:  Okay.

11   BY MR. BARKELEY:

12   Q    You've got number eight in front of you?

13   A    Yes.

14   Q    Okay.  Do you know what that little machine is there?

15   A    Yeah, cash counter.

16   Q    Okay.  Do you see a ledger, deposit slips, anything like

17   that around that money counter?

18   A    No, sir.

19   Q    Any evidence at all in that box, the white box that you

20   used to prepare your opinion today, is there any evidence at

21   all that there was a cash counter at the business, at the Auto

22   Alarm business?

23   A    At the --

24   Q    Arctic Audio.

25   A    -- they -- they were black and white photographs, but I

1  didn't notice that.

2  Q    Okay.  But no one -- no one for the defense told you they

3  had a cash counter there or anything, did they?

4  A    Right.

5  Q    Okay.  But now you're learning.  Are you learning for the

6  first time that a cash counter was in the defendant's bedroom?

7  A    Yes, sir.

8  Q    And that's the same bedroom where the cocaine and the

9  currency you saw was found.  You didn't know that?

10  A    I didn't know about the cash machine -- cash counter, so

11  -- right, I didn't know that it was in the same bedroom as the

12  safe --

13  Q    All right.

14  A    -- right.

15  Q    That would be significant, would it not though, if you're

16  trying to analyze the income of a business that's only been

17  operated by a sole proprietor, and now you know he actually has

18  a cash counter at his residence, not at the business?  Wouldn't

19  that be significant to understand that when -- when you're

20  saying -- you're arguing that -- that it's logical to think the

21  money in that safe was cash on hand for cash transactions with

22  customers?

23  A    Sorry.  Can you -- can you repeat that, please?

24  Q    Wouldn't you like to have been told that, that there was a

25  cash -- a currency counter in the defendant's bedroom --

1  because you were looking at all this cash flow of stuff for his

2  business and you're giving an opinion about where the money in

3  the same bedroom was likely headed, for deposit in the bank or

4  whatever?

5  A    Well, I would have liked to have had a detailed fixed

6  asset listing, yes.  I mean, this sounds like something that

7  would be on the fixed asset listing.

8  Q    Well, I'm not looking at it from an asset standpoint --

9  A    Okay.

10 Q    -- really, I'm -- I'm suggesting to you that -- that it

11 might say something about whether the defendant has a second

12 stream of income that you didn't account for, and that's where

13 maybe some of those cash deposits at the bank could have come

14 from.

15 A    Okay.

16 Q    That -- that's possible, isn't it?

17 A    You're asking me is the cash -- is it possible that the

18 cash deposited in the bank could have come from somewhere else?

19 Q    From drug dealing.

20 A    Drug dealing, okay.

21 Q    Not just (indiscernible) drug dealing 'cause you have

22 evidence that the defendant was a drug dealer.

23         MR. COHEN:  Objection.  That question's been asked

24 and answered at least twice before -- that particular question.

25         THE COURT:  Overruled.  You can answer it if you

1    recall.

2    A    So, yes, it is possible, yes.

3    BY MR. BARKELEY:

4    Q    Okay.  Is it getting more possible the more evidence you

5    see from the bedroom?

6    A    Is it more possible?  In -- I don't know.  I -- I --

7    Q    Well, it's getting increasingly likely, isn't it, that

8    some of those cash deposits at the bank might have come from

9    somewhere other than Arctic Alarm and Audio?

10   A    It's cash, so I don't -- is it increasingly possible that

11   the cash deposited in Denali State Bank could have come from

12   drug dealing?  Is that what you're asking me based off this

13   cash counter?

14   Q    Now that you're -- now that you're learning what the

15   evidence was in the bedroom.

16   A    I don't know.  I'd have to think on that.

17   Q    You're -- in any event, you weren't made aware of it by

18   the defense, you're learning about it here.

19   A    Okay, yes.

20   Q    Is that true?

21   A    That is true.

22   Q    Okay.  Those -- those cash deposits into the -- into the

23   bank, you remember you gave totals and so on?

24   A    Yes.

25   Q    How many of them were deposits of more than ten thousand

1    dollars in currency?

2    A    I don't think there was very many.

3    Q    You know why I'm asking that, don't you?

4    A    No.

5    Q    Okay.  Are you aware of any reporting requirements for

6    bank that apply when people deposit cash --

7    A    Oh, okay.  Okay.

8    Q    -- in amounts of more than ten thousand dollars?

9    A    Yes, I'm aware of that, yes.

10   Q    What's the requirement?

11   A    You have to report it.

12   Q    The bank --

13   A    The bank has to report it.

14   Q    -- has to report it to the IRS, correct?

15   A    Yes.

16   Q    So you're an expert, you're giving an opinion about a

17   business that's cash heavy, some fifty percent or whatever, and

18   you see this pattern you've mentioned of almost no cash

19   deposits of more than ten thousand dollars with the bank, is

20   that true?

21   A    That's true.

22   Q    Why, as a tax expert and consultant, did that not raise

23   your suspicions?  Or maybe I shouldn't assume that.  Did it

24   raise suspicions for you?

25   A    No.  I mean, it's first time I'm really --

3-246

1   Q      Well, you know that -- you know, do you not, that it is a

2   federal criminal offense to intentionally structure cash

3   transactions with banks in currency of less than ten thousand

4   dollars in an attempt to evade that reporting requirement?

5   A      I did not know that, sir.

6   Q      You do not know that's a crime?

7   A      I just knew that ten thousand dollars that -- threshold.

8                      (Pause)

9   Q      You have no evidence, do you, of what the defendant's

10  intention was with regard to what was going to happen with the

11  money that's in that Tupperware container?  What he was going

12  to do with it.

13             MR. COHEN:  Objection, Your Honor.

14             THE COURT:  Overruled.  He can answer.

15             MR. COHEN:  Let me just -- let me just -- I'm sorry,

16  Your Honor, that I can for the record state the grounds.

17             THE COURT:  Okay.

18             MR. COHEN:  Rel --

19             THE CLERK:  Mr. Cohen, can you pull that microphone

20  just a little bit closer?  Thank you.

21             MR. COHEN:  Objection on grounds revel -- on grounds

22  of relevance and for the reasons that I earlier stated on the

23  record about that argument.

24             THE COURT:  Okay.  Very well.

25             MR. COHEN:  Thank you.

1          THE COURT:  Overruled.

2    BY MR. BARKELEY:

3    Q     You can answer the question.

4    A     I'm sorry.  Can you say that again?

5    Q     I'll even ask it in a -- in a -- do you have any evidence

6    as to what the defendant intended to do with the money that's

7    in that Tupperware container?

8    A     No.

9    Q     Because you testified that cash on hand is used to pay

10   expenses, correct?

11   A     Yes.

12   Q     Okay.  So you don't have any evidence that the defendant

13   intended to use the money in that Tupperware container to pay

14   expenses for his business, do you?

15   A     No.  I mean, could shut down tomorrow, or it could have

16   shut down the next day or --

17   Q     He could have spent it on something else.

18   A     Yeah.

19   Q     Right?

20   A     Right.

21   Q     Like cocaine.

22   A     Is that a question you want me to answer?

23   Q     That is a question.

24   A     Okay.  I -- could he have spent it on cocaine?  I suppose,

25   yes.

1  Q    Well, I also could have said he -- he could have spent it

2  on art, but there was no artwork found in his bedroom, there

3  was cocaine found in his bedroom.  You don't disagree with

4  that, do you?

5  A    I don't -- I do not disagree with that.

6                          (Pause)

7          MR. BARKELEY:  I have nothing further, Your Honor.

8  Thank you, sir.

9          THE COURT:  All right, thank you.  Redirect?

10          MR. COHEN:  Yes.

11                   **REDIRECT EXAMINATION**

12  BY MR. COHEN:

13  Q    You were asked, Mr. Pierce, a number of questions about

14  whether you could specifically determine where every dollar

15  that went into Arctic Alarm and Audio's account came from.  Do

16  you recall that?

17  A    Yes.

18  Q    But you opinion -- you issued an opinion about cash that

19  came into the business, is that correct?

20  A    Yes.

21  Q    And based upon your review of the business records and the

22  -- including the bank accounts, did you believe that it was

23  reasonable to conclude that the amount of cash that we're

24  talking about over three years, the two hundred and fifty

25  thousand dollars, was business related?

1   A    Is it reasonable to assume that's business related?  Yes.

2   Q    Yes.

3   A    Yeah.  In my opinion, it is.

4   Q    Okay.  And has anything that -- that Mr. Barkeley asked

5   you changed your opinion about that?

6   A    No.

7   Q    When you looked at the type of business that you were

8   evaluating, (indiscernible - too close to microphone) -- I

9   mean, what do you look at in determining whether what's

10  reasonable?  You looked at all the records, right?

11  A    Yes.  What led me to believe that was the amount of -- the

12  volume that went through Denali State Bank, the -- the

13  testimony and the records that are in the box.

14  Q    And the type of business that we're talking about.

15  A    Yes.

16  Q    You knew what type of business it was.

17  A    Yes.

18  Q    And you said that you didn't add up every single written

19  cash receipt in the business.  Even if you had added up every

20  single written cash receipt in the business, you couldn't

21  guarantee that that cash receipt was actually part of the cash

22  deposit that matched it.

23  A    That's correct.

24  Q    And that's why you didn't do it.

25  A    Right.  That's when I went for the deposits -- copies of

1   the deposits from the bank.

2   Q    So if you -- so your analysis was, look, there's always

3   cash coming in.   Is it reasonable to believe that this case was

4   related to the business given all the information I have, or is

5   it unreasonable, correct?

6   A    That's -- right, that's correct.

7   Q    And your belief as looking at the business records and --

8                MR. BARKELEY:   Objection.   Leading, Your Honor.

9   This --

10               THE COURT:   Overruled, so we can move it along.

11  BY MR. COHEN:

12  Q    Your belief is looking at the type of business and given

13  these business records, it's reasonable.

14  A    Yes.

15               MR. COHEN:   And you knew that when you took out --

16               THE COURT:   Let's not do too much leading.

17               MR. COHEN:   -- did you know that -- well, I -- I was

18  really going to move it along, Your Honor.

19               THE COURT:   Okay, good.

20  BY MR. COHEN:

21  Q    You knew that -- that -- when you took on this assignment,

22  that it was an assignment where my client had already been

23  convicted of possession of cocaine with intent to distribute.

24  A    Yes.

25  Q    And I told you, didn't I, that the whole issue is does

1  this cash come from cocaine -- is it related to the cocaine or

2  is it related to the business.

3  A    My task was to determine whether it was reasonable or

4  plausible that the cash seized was part of -- could have been

5  related to the business.

6  Q    Right.  But Mr. Barkeley tried to make it sound like you

7  didn't know that --

8           MR. BARKELEY:  Objection.

9           MR. COHEN:  I didn't finish the question, Your Honor.

10          THE COURT:  I know.  I don't think that the first

11  part of it --

12          MR. COHEN:  You didn't like it already?

13          THE COURT:  Can you rephrase it?

14          MR. COHEN:  Is it that you're getting to know me or

15  that I'm transparent.  I --

16  BY MR. COHEN:

17  Q    Did you know when you took on your assignment that the

18  issue at this trial is -- was going to be whether the cash is

19  related to cocaine or whether the cash is related to the

20  business?

21  A    I knew that I was going to look at the business to

22  determine whether it was viable, a going concern, and also to

23  look at whether or not the -- the cash seized could have come

24  from the business and try to --

25  Q    Right.

1   A    -- reconstruct in a --

2   Q    And -- I'm sorry.  And did you know what the Government's

3   position was -- what they were going to say or what their view

4   is about this case when you talked to them?

5   A    With respect to the -- the drugs?

6   Q    Yes.

7   A    Yes.

8   Q    And with respect to the cash.

9   A    Yes.  Yes.

10  Q    Now you testified earlier that the -- that you were

11  involved in a small business and other small businesses.  They

12  take the cash home or they keep the cash at home for security

13  reasons.

14  A    Yes.

15  Q    You said that you personally were involved in a business

16  where they took the cash home.

17  A    Yes, I was taking cash home.

18  Q    And so if you take the cash home and you keep the cash at

19  home, you take it back to the business if you need it during

20  the day.

21  A    That's correct.

22  Q    Do you take all the cash back or do you leave some of it

23  at home?

24  A    I take it all back.

25  Q    Okay.  Do you -- is that -- would that be necessary as to

1    your analysis?  I mean --

2    A    Well, we're -- would it be necessary if we -- I'm sorry.

3    Q    If you're storing your cash safe at home, do you have to

4    take it -- you know, store it in a safe at home for

5    safekeeping, do you have to take all the cash back to the

6    business every morning, or can you leave some of it at home?

7    A    Well, given my background that I'm an accountant, I have

8    to keep track of the dollars and cents --

9    Q    Right.

10   A    -- so I take it all back.  I'd -- it was not my custom to

11   keep --

12   Q    All right.

13   A    -- cash prolonged at my house.

14   Q    Okay.  Now I'm talking about in general.

15   A    Okay.

16   Q    You said businesses in general take the cash -- if it's a

17   cash business, they may take it somewhere for safekeeping.

18   Would it be necessary for that business to keep the cash -- you

19   know, to take call the cash and bring it to the business every

20   morning, or could you leave some of the case at home?

21   A    That would be reasonable.

22   Q    Which?

23   A    To -- to assume that they wouldn't bring the entire cash

24   to -- to work every day.

25   Q    And businesses that have cash receipts or take cash in, is

1    it unusual for a business like that to have a money counter --

2    cash counter?

3    A    I've -- I've seen those before on fixed asset records, so

4    it's -- it's not common, but yeah.  I mean, it's -- it does

5    happen, so, yes.

6    Q    And so if you have a business that -- a cash business and

7    you're keeping cash at home -- I mean, could you -- well, let

8    me ask you this.  I mean, you have a small business and you're

9    keeping assets at home or is it common that a small business

10   might keep some of its assets at the home of the sole

11   proprietor?

12   A    Yes.  It's common.  I have records in my house today for

13   my business.

14   Q    And would it be -- and -- and if you're going to keep cash

15   in a safe, would you keep the cash counter near the safe, or

16   would you keep it somewhere else?

17   A    If it was me?  I would keep it near where I'm going to

18   store the cash.

19   Q    So in looking at your opinion, if you're looking at this

20   cash counter, you're looking at the safe, you're looking at the

21   fact that the money was kept there, you were asked by Mr.

22   Barkeley, well, has this changed your opinion or is it now --

23   is this now -- now that you had a chance to sit down and

24   breathe after that assault, when you sit down and you said I

25   have to think about that, is this -- is this changing your

1    opinion overall -- as you sit down and think about it, does

2    this change your opinion that -- that the thirty-eight thousand

3    -- do you believe that there's a plausible explanation, a

4    reasonable explanation?

5    A    Yes, I do.  It hasn't -- it has not changed my opinion,

6    no.

7    Q    And -- and once again, what is your opinion about -- about

8    the thirty-eight thousand given your whole analysis of the

9    business?

10   A    I believe that it's reasonable and plausible to conclude

11   that the cash seized was -- could have been related to the

12   business.

13   Q    And you were asked some questions about the date of the

14   tax returns.  You don't have any information that those tax

15   returns were not filed, right?

16   A    That's correct.

17   Q    I mean, the Government hasn't given you any information to

18   that effect, have they?

19   A    That's correct.

20   Q    You were given those returns and told that they were the

21   copies of the filed returns.

22   A    That's right.

23   Q    And in your practice, have you seen returns that are filed

24   after April 15th of the following year?

25   A    Oh, yes.

1  Q    That happen all the time?

2  A    Oh, yeah.  I've got somebody that I need to do ten years

3  worth.

4  Q    And if you have somebody, you know, who's -- who's in a

5  situation like Mr. Colette and the family -- the business is

6  winding down or what have you and they want to make sure all

7  the books are closed, is that -- does it make sense that you'd

8  file all the tax returns to make sure everything's taken care

9  of?

10  A    Yes.

11  Q    And you were asked questions about deposits of more than

12  ten thousand dollars.  If you have a business that -- that is

13  making -- that is taking in cash on a regular basis, it --

14  would it be the norm to make deposits that large of over ten

15  thousand dollars or would it be the norm to make smaller

16  deposits?

17  A    Well, if -- if you just look at their -- their history,

18  one of those exhibits where we -- it goes to the monthly

19  activity at Denali State Bank, I mean, three years, it's still

20  considered a start-up company.  So if you look at the first

21  year's receipts, they're less than the second year's receipts,

22  which are less than the third year's receipts.  So those -- the

23  cash deposited at the bank -- and once again, I didn't look at

24  all of them, but, you know, it would make sense that it would

25  increase -- or would reflect the level of activity of -- of the

1   company, so --

2   Q    So I think you said less, less, and less.  I think what

3   you -- do you mean that each year there was more activity

4   rather than less?

5   A    Yes.  Yeah.  I'm sorry.

6   Q    So can you just say that again so that we have it correct

7   for the record?  You're saying that --

8   A    Yeah.  It --

9   Q    -- it makes sense in a start-up that each year --

10  A    Yeah, 2003 deposits on aver -- the monthly activity was

11  less than the 2004 --

12  Q    You're saying -- now you're doing it again.  I think what

13  you --

14  A    No, the 2000 -- well, 2003 is less than 2004, so 2004 --

15  Q    Oh, I see, I see what --

16  A    -- deposits are more than 2003 --

17  Q    -- I see -- I see -- the total number.

18  A    -- 2005 deposits are more than the previous years.

19  Q    Yeah.  It makes sense that each year, 2003, 2004, 2005,

20  the deposits are going up.

21  A    Yes.

22  Q    But I'm saying, looking at this type of business, and you

23  looked at all these documents, you know, what -- what was the

24  total -- what was the type of money that was coming in for a

25  car starter, an alarm, or a, you know, speakers or that kind of

Pierce - Redirect                                    3-258

1    thing?  Was it in the range of ten thousand dollars?

2    A    No, it -- actually, Attachment J shows just a typical

3    alarm is four hundred ninety-five dollars.

4    Q    And so when you looked at the total -- the type of

5    business that they had, type of work that they were doing, did

6    it appear unusual to you in any way that when they made cash

7    deposits, those deposits were less than ten thousand dollars?

8    A    Didn't seem unusual -- no, it does not seem unusual.

9    Q    Well, let me ask you even more than that.  Does it appear

10   to you that in a business like this, deposits would be ten --

11   around ten thousand dollars, that type of magnitude, or -- or a

12   different magnitude?  What type of deposits would you expect to

13   see?

14   A    Well, for example, the -- the 2005 November activity, they

15   cleared Denali State Bank was fifty-five thousand dollars, give

16   or take.  So if you divide that out -- I don't know if they

17   were open six days a week, seven days a week, but if you divide

18   that out by day and then you figure you're not going to hold a

19   typical deposit for, you know, a month, you know, you would

20   want to periodically make those deposits in the bank, that if

21   -- that it would -- it would be consistent with the -- the

22   actual operations of the company, so --

23   Q    But I'm -- but I'm -- well, I'm going some math quickly in

24   my head, I'm multiplying out thirty-six months approximately

25   and --

1    A    Yeah.

2    Q    -- you know, and I'm -- and I'm looking at the total

3    deposits of seven hundred thousand dollars and then the total

4    cash above that -- that -- that you included was approximately

5    another eighty thousand dollars or more.  So if you're talking

6    bout eight hundred thousand dollars in thirty-six months,

7    you're talking about -- in my head, I'm coming up with twenty

8    to twenty-five thousand dollars a month over that period.  Does

9    that -- is that reasonable?

10   A    That -- that sounds reasonable, yeah.

11   Q    So if you're looking at that per month, is that consistent

12   -- and also knowing about how they're being paid, whether

13   they're being paid for three hundred dollars, five hundred

14   dollars, seven hundred dollars for each job, is that consistent

15   with ten thousand dollar bank deposits?

16   A    Is --

17   Q    Is that consistent with making single deposits of greater

18   than ten thousand dollars in this business?

19   A    I don't think so.  I mean, I -- I think it's -- I'm sorry,

20   I want to make sure I understand your question.  Is -- is the

21   nature of operations with the low transaction dollar amount --

22   Q    And given the total amounts of deposits averaged over the

23   three-year period.

24   A    Yeah, is -- is that consistent with having deposits less

25   than ten thousand dollars?  Yes.

Pierce - Redirect

1  Q    Okay.  Is that why when you saw that there were a few

2  deposits of greater than ten thousand dollars, it didn't raise

3  any -- it didn't raise -- cause you any concern or surprise?

4  A    Yeah, I -- I did a spreadsheet on it and I -- I didn't --

5  nothing -- I don't recall seeing any ten thousand dollar

6  deposits on there, actually.  Unfortunately, I don't think I

7  printed it today.

8  Q    Okay.  But I'm saying did that surprise you given all

9  these facts?

10  A    No.

11  Q    Would it have --

12  A    I think it would have surprised me if --

13  Q    -- would it have surprised you if you saw a lot of

14  deposits greater than ten thousand dollars?

15  A    Yes.

16  Q    Why is that?

17  A    Well, then I would want to look at see, well, is it -- has

18  it been a month since they did a deposit, you know, why -- why

19  is -- a big spike in activity if -- if the -- if the trend line

20  is starting small and gradually -- gradually increasing over

21  time, you know, why would there be a big spike in a deposit.

22  Q    And you were asked some questions about whether the money

23  that was in the safe --

24        THE COURT:  Let me -- let me interrupt here.  We're

25  past break time.  Are you about done or should we take our

1  break?

2          MR. COHEN:  Oh, Your Honor, that's -- that's the

3  first time you --

4          THE COURT:  No, I'm not -- I'm just --

5          MR. COHEN:  -- you always want me to keep going.

6          THE COURT:  No, no, no, no.  I -- I'm just saying

7  we're about break time.

8          MR. COHEN:  No, I mean -- oh, we -- oh, we can

9  definitely take a break.  I just -- I just had one area of

10 questioning for him and then I was going to -- I was going to

11 sit down.  So it's up to Your Honor.

12         THE COURT:  Okay.  Well, I don't know, can you make

13 it a few more minutes?  'Cause it's been a long push.  Do you

14 want a break, or keep going?

15         THE JURY:  (Indiscernible.)

16         THE COURT:  For a few more minutes?  I don't want

17 anybody to have an accident, including me.  So let's keep

18 going, and I won't -- we -- we do -- we will take a break here

19 pretty quick.

20         MR. COHEN:  Right.

21 BY MR. COHEN:

22 Q    You -- you were asked -- you were asked some questions

23 about, well, he -- he could have used the thirty-eight thousand

24 dollars to buy art, but there was no art in the room, there was

25 just cocaine.  Do you remember that line of questioning?

1  A    Yes.

2  Q    Well, I mean, he could have used -- I mean, there were

3  other things in the room besides cocaine.  Did you see -- even

4  in the pictures that you saw, right?

5  A    Yes.

6  Q    I mean --

7  A    There's a CD player right here, so --

8  Q    -- when you're talking about thirty-eight thousand

9  dollars, as you sit there -- sit here, you don't know whether

10  -- I mean, there -- there was a bed in the room, right?

11  A    Right.

12  Q    There was a gun safe in the room --

13        MR. BARKELEY:  Objection, Your Honor.  Just

14  cumulative.  It's argument.

15        THE COURT:  Sustained.

16        MR. COHEN:  I don't have any further questions.

17        THE COURT:  Mr. Barkeley, any recross?

18        MR. BARKELEY:  Yes.  I'm mindful of the bathroom

19  break, Your Honor.

20        THE COURT:  Okay.

21                    **RECROSS-EXAMINATION**

22  BY MR. BARKELEY:

23  Q    Sir, I hate to subject you to another assault.  I hope you

24  don't think I'm assaulting you just because I'm challenging

25  your logic.  I certainly didn't mean to do that.  But I want to

1   explore that a little bit again.  You just said -- tell me if

2   you didn't say this.  You just said it is plausible that the

3   money -- talking about the money in the bedroom -- could have

4   been related to the business.

5   A    Yes.

6   Q    Those are your words --

7   A    Yes.

8   Q    -- correct?  Okay.  Didn't what you're saying is simply

9   possible -- that's what that says, right?  It's possible that

10  the money was related to the business.

11  A    Reasonable and plausible, I think, is what I've been

12  saying.

13  Q    Mm-hmm (affirmative).  But you said it could have been

14  related to the business.  Isn't "could" a word of possibility?

15  A    Yes.

16  Q    Okay.  So you're saying it's possible the money was

17  related -- you can say plausal -- plausible and logical all you

18  like -- now this is where the lawyer's coming out in me meeting

19  the accountant -- but, you know, it's plausible and logical

20  that -- that what?  That the money was related to the business.

21  You said it could be related to the business --

22  A    Yes.

23  Q    -- correct?

24  A    Yes.

25  Q    It's just possible.  You didn't say it was related to the

1   business, and you didn't because you have no evidence that it

2   was related to the business, do you?

3   A    Well, I've looked at a lot of evidence in this -- this

4   case --

5   Q    Well, you have a lot of info --

6   A    -- but specifically with cash --

7   Q    I'm sorry.

8   A    -- I mean, it's bare -- bare -- not bondsman, you know,

9   bare currency, so who knows where bare currency flows from.

10  Q    My point exactly.

11  A    Mm-hmm (affirmative).

12  Q    Currency by its inherent nature -- you don't know where it

13  came from.  I'm talking about the magic money, the thirty-eight

14  eight forty-eight sitting in that tupperware container in the

15  photograph in front of you.  You don't know where it came from

16  and you don't know where it was going, do you?

17  A    Based on my analysis, I -- I think it came from the

18  business -- or could have come from the business.

19  Q    What -- what evidence do you point to, except for the fact

20  that you analyzed the records of a business that had a lot of

21  cash transactions, what other evidence do you have that that

22  money in that Tupperware container came from Arctic Audio and

23  Alarm?  What evidence do you have?

24  A    No other evidence.

25       MR. BARKELEY:  Nothing further, Your Honor.

3-265

1          THE COURT:  All right.  Thank you.  We'll take a

2    fifteen-minute recess, and come back and see what's next.

3    Thank you, sir.  You're excused.

4          JUROR NO. 12:  Your Honor, (indiscernible - away from

5    microphone) to have a cigarette?

6          THE COURT:  They certainly can.  Can you do that,

7    sir?  All right.

8                          (Pause)

9    Just put it right there.  All right.  Thank you.

10                         (Pause)

11         MR. COHEN:  (Indiscernible - away from microphone)

12         THE COURT:  What is it, the checks?

13         MR. COHEN:  The checks, yeah.

14         THE COURT:  Did you reach your stipulation on those?

15         MR. COHEN:  (Indiscernible - away from microphone)

16         THE COURT:  Okay.  Very well.

17     (Jury out at 3:19 p.m.)

18         MR. BARKELEY:  Are we making a record of this?

19         THE COURT:  We'll find it.

20         MR. BARKELEY:  Can I be --

21         THE COURT:  No, we've got it -- yes.  I need to know

22    what's going to happen next.

23         MR. COHEN:  What's going to happen next is we're

24    going to find Exhibit DDD [sic].

25         THE COURT:  Okay.

1          MR. COHEN:  I'm going to say we have a stipulation

2    that it's admissible.

3          THE COURT:  Okay.

4          MR. COHEN:  And then move it into evidence.

5          THE COURT:  Okay.

6          MR. COHEN:  The next thing that's going to happen is

7    I'm going to rest.

8          THE COURT:  Okay.

9          MR. COHEN:  Next thing that's going to happen is the

10   Government is going to want to put on a rebuttal case to play

11   some tapes of -- of --

12         MR. BARKELEY:  Well, why don't I talk about it.

13         THE COURT:  Well, what do you --

14         MR. COHEN:  Yeah, go ahead.  And I -- I have some

15   comments about that.

16         THE COURT:  Okay.

17         MR. BARKELEY:  Okay.  The Court will recall yesterday

18   the witness Kenji --

19         THE COURT:  Mm-hmm (affirmative).

20         MR. BARKELEY:  -- Badger.

21         THE COURT:  Right.

22         MR. BARKELEY:  And the cross that I conducted -- the

23   cross I conducted was based on a -- a summary of an interview

24   where I challenged him and said --

25         THE COURT:  Okay.