COPY

RECEIVED
OCT 22 2007
CLERK, U.S. DISTRICT COURT
ANCHORAGE, ALASKA

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 4:05-cr-00042-JA-RRB |
| | ) |
| Plaintiff, | ) Fairbanks, Alaska |
| | ) Friday, September 7, 2007 |
| vs. | ) 9:03 o'clock a.m. |
| | ) |
| JASON S. COLETTE, | ) **TRIAL BY JURY – DAY 4** |
| | ) |
| Defendant. | ) |
| ———————————————— | ) |

VOLUME IV
**TRANSCRIPT OF PROCEEDINGS**

BEFORE THE HONORABLE RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:

JAMES BARKELEY, ESQ.
Assistant U.S. Attorney
U.S. Attorney's Office
222 West 7th Avenue, #9
Anchorage, Alaska   99513-7567
(907) 271-5071

For the Defendant:

DAVID J. COHEN, ESQ.
Cohen & Paik, LLP
177 Post Street, Suite 600
San Francisco, California 94108
(415) 398-3900

Court Recorder:

LYNN GROVES-KELLEY
U.S. District Court
101 12th Avenue, Room 229
Fairbanks, Alaska   99701
(907) 451-4792

NoDak Rose Transcripts
721 North 19th Street
Bismarck, North Dakota  58501-4721
(701) 255-1054



1    Transcription Service:         NODAK ROSE TRANSCRIPTS
                                    721 North 19th Street
2                                   Bismarck, North Dakota   58501
                                    (701) 255-1054
3

4    Proceedings recorded by electronic sound recording.
     Transcript produced by transcription service.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                FAIRBANKS, ALASKA - FRIDAY, SEPTEMBER 7, 2007

2          (Call to Order of the Court at 9:03 a.m.)

3          (All parties present; defendant present)

4          (Jury not present)

5               MR. COHEN:  Very well, Your Honor.

6               THE COURT:  Okay.  So we'll just go right for it,

7     right?

8               MR. BARKELEY:  Yes, Your Honor.

9               THE COURT:  Right?

10              MR. COHEN:  Yes, Your Honor.

11              THE COURT:  Okay.

12              MR. BARKELEY:  Oh, Your Honor, by the way,

13    (indiscernible - away from microphone) and it will be provided

14    to counsel this morning.  I've just got to sign a receipt for

15    it (indiscernible - microphone interference).

16              THE COURT:  Okay.  Very well.

17              MR. COHEN:  That's what I've been told.  I haven't

18    seen it yet.

19              MR. BARKELEY:  (Indiscernible - away from microphone)

20              THE COURT:  Yeah, you've got it around your neck.

21              MR. BARKELEY:  (Indiscernible - away from

22    microphone).  Oh, I do, good.

23              THE COURT:  It is picked up.  It's kind of a -- kind

24    of a neat system we have here.  Okay.  All right.

25                          (Pause)

1    (Jury in at 9:05 a.m.)

2        THE COURT:  Good morning, ladies and gentlemen.  How

3    are you doing?

4        THE JURY:  (Indiscernible - away from microphone)

5        THE COURT:  Let me read -- let's see, there's one

6    instruction I usually read before arguments.  Let's see.

7            (Pause)

8    What we have here is -- here's extra copies of the instructions

9    that I've already read.  I'm going to give those to you, and

10   then here's the actual one I read from, it's blue-backed just

11   so you can tell.  And here are the verdict forms -- the actual

12   verdict forms, (indiscernible) blue back, and that's the one

13   the foreperson will date and sign and provide us with.

14        Now let's see here.  There's one instruction that I

15   wanted to read.  It has to do with closing arguments, and I

16   don't have the number handy, but I can find it in a second.

17            (Pause)

18        Counsel, do you happen to remember where that one

19   was?  Let me find that.  Arguments of counsel --

20        MR. BARKELEY:  I believe it's (indiscernible - away

21   from microphone).

22        THE COURT:  Okay.  Well, I'll find it here.

23        MR. BARKELEY:  Around four, five, six

24   (indiscernible).

25        THE COURT:  Oh, it can't be that early.

1          MR. BARKELEY:  No?

2          MR. COHEN:  I think this is the one

3 (indiscernible) --

4          THE COURT:  All right.  Just give me the number.

5          MR. COHEN:  Well, I don't have a number --

6          THE COURT:  Page number.

7          MR. COHEN:  Oh, page -- page seventeen, I believe.

8          THE COURT:  Okay.  Page seventeen.  Okay.  I'll read

9 this to you real briefly:

10          At the close of the trial, counsel have the right to

11 argue the case to the jury.  The arguments of counsel, based

12 upon study and thought may be and usually are distinctly

13 helpful; however, it should be remembered that arguments of

14 counsel are not evidence and cannot rightfully be considered as

15 such.  It is your duty to give careful attention to the

16 arguments of counsel so far as (indiscernible) based upon the

17 evidence which you have heard and the proper deduction

18 therefrom and the law as given to you by the Court in these

19 instructions.  But arguments of counsel, if they depart from

20 the facts or from the law, should be disregarded.

21          Counsel, although acting in the best of good faith,

22 may be mistaken in their recollection of testimony given during

23 the trial.  You are the ones to finally determine what

24 testimony was given in this case as well as what conclusions of

25 fact should be drawn therefrom.  Mr. Barkeley.

1                    **GOVERNMENT'S CLOSING ARGUMENT**

2              MR. BARKELEY:  Thank you.  Good morning, ladies and

3      gentlemen of the jury, Your Honor, counsel, Mr. Colette.

4              Ladies and gentlemen, you were given other jury

5      instructions, and you'll have them back there during your

6      deliberations.  I'd like to begin my opening remarks by

7      addressing some of the instructions and asking that you at

8      least devote some initial attention to number twenty-eight.

9              Number twenty-eight is the jury instruction which

10     said in part that you will conscious -- conscientiously

11     consider and weigh the evidence and apply the law of the case.

12     In other words, it's a reminder of the oath that you've taken

13     about your importance in participating in this process that is

14     part of the legal system.

15              A very important part of that process is your

16     willingness to serve as jurors and your honoring your oath and

17     your duty to objectively and fairly weigh the evidence in the

18     case, and I trust that you've done that, and I'm asking again

19     when you conduct your deliberations.

20              And so take a look at twenty-eight, please, before

21     you consider the evidence.  Twenty-eight asks that you do two

22     things conscientiously.  Number one, consider and weigh the

23     evidence and, number two, apply the law of the case.  I'd like

24     to address first the law of the case.  The law of the case is

25     as follows:

1          Instruction fourteen, in relevant part, simply tells

2    you that this is a forfeiture case, and it tells you what that

3    means.  Forfeiture means that the defendant, Mr. Colette, is to

4    be divested or deprived of his ownership or interest in the

5    property, and that's what this is about, and that's all that

6    this is about.  He's already been convicted at the criminal

7    trial of count one and count two, and acquitted on counts three

8    and four, but all that -- all that this is about is whether Mr.

9    Colette's ownership interest in five things -- five pieces of

10   property -- should be taken from him by you.  Those five things

11   are:

12          Thirty-eight thousand eight hundred and forty-eight

13   dollars [$38,848] in currency; this machine gun, Exhibit 20,

14   and 21 is the silencer; this .30-06, Exhibit 22; this pistol-

15   grip shotgun, Exhibit 23; and this Sporter, AR-15 type assault

16   weapon, Number 24.

17          That's what this case is about, five pieces of

18   property and whether Mr. Colette should continue to have

19   ownership of them.  So that's instruction fourteen.

20          Now you were provided in instruction sixteen with the

21   elements of the offenses, and also I believe in instruction --

22   instruction sixteen (indiscernible - paper rustling).

23   Instruction sixteen contains some jury instructions that were

24   given to the original jury in the criminal case.  So while

25   those counts are not before you, they were provided to you so

1   that you can look back to what the original jury did and did

2   not decide.

3         So the Government would point out to you, for

4   example, that the importance of instruction sixteen is as

5   follows:

6         It tells you what the jury in the criminal case had

7   to decide in order to reach its verdict and convict the

8   defendant on counts one and two.

9         Count one.  That's the one the Government is focusing

10  on in this forfeiture trial.  That's really the only one the

11  Government is focusing on.  You see, these items of property

12  had to facilitate or help the commission of some crime of which

13  the defendant was convicted in order to be forfeitable.  So the

14  Government's argument is only that each of these five pieces of

15  property, the four guns and that cash, helped Mr. Colette

16  commit the violation in count one.  That's it.  That's what the

17  Government is arguing, each and every one of them facilitated,

18  made easier, helped him commit the violation in count one,

19  which was, and that's why instruction sixteen tells you what

20  count one was about, which was the knowing possession with the

21  intent to distribute cocaine, twenty-three ounces.  All those

22  zips in that Carr's grocery bag.

23        The question before you, ladies and gentlemen, really

24  is simply with regard to the cash, the machine gun, the

25  shotgun, and the rifles, did they make it easier for somebody

1    like Mr. Colette on November 28th, 2005, to be sitting on

2    twenty-three ounces of cocaine?  And when I say sitting on, I

3    mean being in knowing possession of that cocaine with the

4    intent to distribute it.  Being a drug dealer with regard to

5    those drugs.  Did it make it easier for him.  That's all it's

6    got to be, easier.

7              And the Government's has to prove its case by a mere

8    preponderance of the evidence in comparison to a criminal case.

9    In a criminal case, I would have to be arguing that you must

10   make a finding beyond a reasonable doubt that each of those

11   five pieces of property made it easier to be a drug dealer

12   under count one.  That's not the case here.  It's simply

13   whether each of these five items more likely than not, he

14   probably -- more likely than not helped him be in knowing

15   possession of cocaine with the intent to distribute it on

16   November 28th, 2005.  That's what you have to decide.  Does it

17   make it easier -- based on all the evidence that you've heard,

18   did it make it easier for somebody to be a drug dealer to have

19   a machine gun, have a loaded rifle, have another rifle with

20   access to ammunition immediately adjacent to it, have a loaded

21   shotgun with a pistol grip on it, and have thirty-eight

22   thousand eight hundred and forty-eight dollars [$38,848] in a

23   bucket with drugs also in it, in a safe, in his bedroom, where

24   he had also, Exhibit 8, a money counting machine, right next to

25   it the scale with cocaine residue on it.  The Government

1    submits that the answer to those questions is a yes.

2         Without (indiscernible), the Government could satisfy

3    the burden here of beyond a reasonable doubt.  It doesn't have

4    to, but the evidence would support that.  There's a -- there's

5    no reasonable doubt where these things make it easier to be a

6    drug dealer and you've heard evidence to that effect, and I'm

7    going to remind you of it.

8         So look at instruction sixteen for two purposes,

9    although it is an instruction that came from the previous

10   criminal trial.

11        Number one, it will give you guidance as to what the

12   elements of the offense of possessing cocaine with intent to

13   distribute it are, because that's the offense of which the

14   defendant was convicted and that's the offense that the

15   Government is arguing each of these five pieces of property

16   facilitated.

17        Secondly, please look at sixteen because it shows

18   that the burden there was beyond a reasonable doubt, something

19   that's not the case now.

20        Instruction seventeen tells you what the Government

21   has to prove by a preponderance.  What does the Government have

22   show you more likely than not?  Two things.

23        Number one, that each of the five pieces of property

24   facilitated the possession of cocaine in count one, so

25   facilitation.  Please look at instruction number seventeen very

1    carefully.  Instruction number seventeen is the Court's

2    guidance to you about what it means, what is facilitating

3    property?

4                In part, it says that property need not be

5    indispensable to the commission of the drug violation, and need

6    not be used exclusively for illegal drug trafficking to be

7    facilitating property.  All that is necessary is that the

8    Government prove that the property was used, quote, "in any

9    manner or part," close quote, to commit or facilitate the

10   commission of the drug violation.  Let me give you an example

11   that the Government submits that means.

12               Exhibit 22 is the aught six.  The defendant put in

13   evidence, witness this photograph, Defendant's Exhibit DD, that

14   this rifle was used for hunting.  True.  The Government doesn't

15   dispute, nor does it ever dispute that an aught six nowadays --

16   it's a hunting rifle.  That's its intended purpose.  No doubt

17   about it.  But like the instruction in seventeen says,

18   facilitating property doesn't have to be used exclusively for

19   legal purposes to be forfeitable.  If it's put to an illegal

20   purpose, it can be forfeited.

21               On November 28th, 2005, at the moment somebody from

22   Action Locksmith opened that safe in the drug business office

23   of Mr. Colette, which was his bedroom, what was exposed was a

24   hunting rifle that was facilitating the distribution of

25   cocaine.  Why is that?

1            Well, the evidence you heard in the trial from a

2   number of witnesses is that most of -- most people who have

3   hunting rifles don't keep them loaded, first of all, unless

4   they're hunting.  And we have photographs, Exhibit 31, showing

5   the rifle, the aught six, being unloaded, taking the clip out

6   of it.  It was loaded with a round in the chamber.

7            You heard Eugene Johnson say that he was thinking

8   about maybe robbing the place, but he knew that a machine gun

9   was there and that deterred him.  It's a common sense argument,

10  ladies and gentlemen, it's simply a common sense argument.  At

11  that moment, the defendant wasn't hunting grizzly bear.  At

12  that moment, when the safe was opened, that rifle was loaded,

13  and you are allowed to infer that that helped make the

14  possession of that cocaine easier.

15           When I talk about individual witnesses in a moment, I

16  will remind you of what the Government believes their testimony

17  was about how gun dealers use drugs [sic] and they use them to

18  protect their drugs and their money, and that loaded rifle that

19  was found in the safe within inches -- I'm showing you Exhibit

20  3 now just for example, the photograph -- within inches of all

21  of the other trappings of this guy's drug dealings, which was

22  Exhibit 7, twenty-three ounces of cocaine, Exhibit 8, thirty-

23  eight thousand eight hundred and forty-eight dollars [$38,848]

24  in cash with cocaine inside of the -- in the same Tupperware

25  container as well.

4-13

1    That's the purpose (indiscernible) at that time.  And

2 the rifle could also be serving the (indiscernible) legitimate

3 purpose of being known as a hunting weapon.  It can still be

4 forfeitable under the instructions you've been given, it's just

5 that you have to decide whether it served another purpose that

6 day.  More likely than not.

7    But if you think more likely than not the purpose of

8 this rifle being loaded inside that safe with all the other

9 stuff in the safe was that of a hunting rifle more likely than

10 not, don't forfeit it.  On the other hand, if you think it more

11 likely than not it was loaded because it could facilitate or

12 make easier the possession of that money and those drugs, then

13 forfeit it.  It's up to you.

14    Now the other thing the Government has to prove

15 beside that facilitation is a connection between each of the

16 pieces of property and count one.  It's called a nexus, but

17 you'll see that instruction eighteen defines what that

18 connection (indiscernible - paper rustling).  It has to be a

19 substantial connection.  It can't be just a -- just a

20 coincidence.  It can't be just a tenuous accidental connection.

21    All right.  So the Government's argument is that,

22 again, you must decide this more likely than not.  The

23 Government argues that it was more likely than not that each of

24 the five pieces of property was substantially connected to the

25 cocaine, the violation in count one, by its physical proximity

1    to those items in the safe, and all of the circumstances

2    surrounding what was going on in the bedroom.

3            In other words, put another way, under that

4    instruction -- instruction number eighteen -- what you have to

5    decide is whether it was just a coincidence that the aught six

6    was loaded, that the Sporter had a clip readily available, that

7    the machine gun sitting on the top shelf, obstructed access

8    only by a bag of marijuana, and the pistol-grip shotgun was

9    loaded.  That's what the Government (indiscernible).  Was that

10   just a coincidence that they happened to be in a safe with

11   twenty-three ounces of cocaine and all the cash?

12           The safe was in a room in which a scale with drug

13   residue on it and a money counting machine was also located.

14   Is that just a coincidence?  You see, the Government is only

15   seeking forfeiture on these four firearms because two of them

16   are loaded -- the Government's argument is that the fact that

17   they were loaded indicates more likely than not they were at

18   the ready to protect the drugs and the cash.  They were ready

19   to go.  That's the rifle and the shotgun, Exhibit 22, Exhibit

20   23.  (Indiscernible) having been loaded, Exhibit 30 for the

21   shotgun, 31 for the aught six.  With regard to the Sporter, the

22   clip of ammo was immediately adjacent to, ready to go --

23   essentially ready to go is the Government's argument.

24           Finally, what about that machine gun?  Doesn't the

25   Government have a problem in arguing it's ready to go if,

1  clearly, the testimony established that there wasn't even any
2  ammunition found for it?  No.  Not at all.  In fact, that may
3  be the strongest case the Government has for what -- it's
4  facilitating.  Why?  Look.  You don't have to believe anything
5  Eugene Johnson said.  Look at what happened.
6          Eugene Johnson got caught up in a cocaine
7  investigation, and he went to court and helped the police get a
8  search warrant.  He told them this guy I know, Colette, I just
9  bought dope from him a few days ago -- that's count two by the
10 way (indiscernible - away from microphone) -- just bought dope
11 from him a few days ago and guy's got a machine gun, got a
12 plastic grocery bag with some cocaine in it, it's in a safe in
13 his bedroom.  That's what they found.  Eugene Johnson was
14 corroborated by what was found in the search.  So he could be
15 lying about everything else you heard, but that's what
16 happened.  There's no evidence to the contrary about that, and
17 here's why it's important:
18          It's important because Johnson said -- and it doesn't
19 matter -- please don't get wrapped up in some red herring about
20 who said what to whom first about the machine gun.  It's like
21 one of those things where there's an elephant in the room,
22 who's going to talk about it first, you or me?  There it is.
23 Uh, excuse me, Mr. Barkeley, you know, that machine gun's
24 making me nervous, what's a machine gun doing here?  They
25 started talking about the machine gun was (indiscernible).

1    It was there.  We know that because it was found in

2  the safe.  So you should believe that, it was there at the time

3  that Johnson said it was.  And as you heard testimony from law

4  enforcement officers, nobody can tell when you pick up this

5  machine gun whether it's loaded or not.  There's the clip.

6  Even experienced law enforcement officers had to let an expert

7  clear this weapon.  They didn't just do it themselves.  Now you

8  can see it because the chamber is exposed, and it was not at

9  the time of the search.  Nobody could tell if it was loaded or

10  not.

11    Now I ask you, ladies and gentlemen, if you met me on

12  the street and I was carrying this, can you tell if this is

13  loaded or not?  And if you want to rob me, is this a deterrent,

14  going to make you think twice about trying to steal my cocaine

15  or my money?  I think it so.  I think this has a big deterrent

16  effect.  It could be a fake, but it's not, as you heard their

17  witness, Mr. Mannino, say this is a very expensive item.  I

18  think the defense called it a toy.  This is not a toy.  This is

19  a tool.  And it's (indiscernible - background noise) for drug

20  dealers to protect big amounts of cash, big amounts of cocaine,

21  which people will kill for.

22    That bedroom was a business office.  The Government

23  doesn't dispute Mr. Colette had one heck of a thriving auto-

24  start business.  If you're good at it, you know, it's

25  (indiscernible - coughing in background).  Kind of like, you

1  know, selling Dipping Dots in Florida or something.  It should

2  be a really good business where it hits forty below zero all

3  the time.  So he was doing well.  Good.  Good for him, had a

4  legal business.

5        Apparently, that wasn't enough 'cause he had another

6  business.  He had another business which, ladies and gentlemen,

7  he hired an expert and him almost seventeen thousand dollars to

8  testify that his legitimate business explains this, Exhibit 6.

9  It doesn't explain this.  You know that.  It's common sense.

10  What explains the cash in Exhibit 6 and the cocaine in Exhibit

11  7 and the money counter and the scale in Exhibit 8 and the guns

12  that were loaded and the one that was ready to go with the clip

13  next to it and a machine gun with (indiscernible) mere presence

14  says don't you dare?  What explains all that is that he had

15  another business which was dealing cocaine (indiscernible)

16  count one.  They are proof of that business.

17        Remember those business checks that were found in the

18  safe.  Where were they?  Where were they in this business

19  office?  (Indiscernible), Exhibit 6, and deposit slips.  That

20  expert, ladies and gentlemen, would have you explain actually

21  that the cash on hand -- this is the cash on hand he said

22  businesses have?  So you come and buy and auto-start for four

23  hundred bucks from Mr. Colette and this is a -- I've got

24  hundred-dollar bill at home, I'll be right back, get you some

25  change.

1    Those nice people they brought in from Snap-On Tools
2  and other vendors, what have they got to say?  One guy said he
3  even had a -- he has a till -- a cash register and what else --
4  he's got a mobile office.  What is he going to do with somebody
5  like that, the guy has appointed rounds all over the place --
6  he testified he had appointed rounds, he'd come on a certain
7  day, come at a certain time.  And is he just going to wait
8  while Colette drives home, gets into his safe, gets some cash,
9  and (indiscernible).  This isn't cash on hand for that
10  business, this is cash on hand for this business.  That's what
11  makes sense.  That is what more likely than not.

12    Even their expert said on cross-examination it's just
13  possible.  That's what he was whittled down to, it's possible
14  that this was money from the business.  Your recollection
15  should be that that expert, who was an expert -- that expert --
16  it has to be a legitimate business (indiscernible) cocaine
17  trafficking.  But that expert said he didn't have any evidence
18  of where the money came from or any evidence of where it was
19  going.

20    You've also got a jury instruction that can help you
21  on the testimony of expert witnesses.  It's number seven.  Take
22  a look at that.  It tells you that opinion testimony should be
23  judged just like any other testimony.  You may accept it or
24  reject it and give it as much weight as you think it deserved
25  considering the witness' education and experience, the reasons

1    given for the opinion, and all the other evidence in the case.

2    When you follow number seven, you should not give any

3    weight to that seventeen-thousand-dollar opinion.  And I am

4    suggesting to you being paid seventeen thousand dollars for

5    that opinion can impair somebody's judgment in terms of what

6    opinion you do give.  That's a lot of money.

7    Instruction nineteen simply reminds you again that

8    the burden of preponderance of the evidence as to each of the

9    five items.

10    Twenty-one defines preponderance for you, more likely

11    than not.

12    So that's all I have to say about the instructions,

13    ladies and gentlemen.  And the way to think of the

14    instructions, I think, is you've got all these pictures, for

15    example.  None of them are framed, but what the instructions do

16    as a legal matter for you is frame them.  They are sort of a

17    window through which you must, by your oath, view the evidence.

18    When you do, if you follow the instructions, each item should

19    be forfeited.

20    The Government's burden has been met by all the

21    evidence because what is that evidence?  Well, first of all,

22    you heard the evidence from the underlying criminal trial, the

23    essentials of it.  That's how all these photographs,

24    Government's Exhibit 1 through 9 and 30 and 31 got introduced,

25    from somebody who was there and recognized the photographs,

1    said, yeah, that's the stuff that came out of the bedroom,

2    that's Trooper Wall for the Government.

3            Now the second witness for the Government to

4    establish the things that came from that place, Special Agent

5    Cohoon.  He explained where the weapons came from.  That's

6    essentially what the Government put on in its case

7    (indiscernible).  Mr. Johnson added the fact that the

8    brandishment of this weapon influenced him -- it would have

9    deterred him from committing a robbery or caused him to think

10   twice about trying to rip Mr. Colette off.  That's essentially

11   what the Government put on in this case in direct.

12           Now, we come to when the defense put on its case.  He

13   put on a number of witnesses who, I think, clearly established

14   that Arctic Audio and Alarm was a legitimate business and it

15   was a going concern, maybe even a (indiscernible), and that

16   they were good at what they did.  No dispute, no dispute.

17           But the Government's view of the evidence is that,

18   unfortunately for some of those employees, that business was

19   being operated by a guy who had another business on the side,

20   and that was that guy, and he was a drug dealer.  And while

21   that business may have generated a lot of cash, you heard their

22   own expert say he couldn't, you know, say with any certainty

23   that the cash deposits into the bank were all cash from that

24   business.  He doesn't know where that cash came from.

25           You've got clear proof, ladies and gentlemen, of two

1    businesses.  That's what you have -- that's what you've heard

2    in this trial.  Their case was they put on the proof of the

3    legitimate business.  No argument from the Government.

4    Absolutely.  The Government put on in the criminal case and

5    here proof that he had another business, and the office and

6    headquarters of that business was right in that bedroom, it's

7    got all the trappings of the drug trade; the scales, money

8    counter, loaded weapons, readily accessible weapons, machine

9    gun, and all that cash.  And that cash was physically co-

10   mingled with cocaine.

11          Now with regard to the witnesses.  Mr. Dahl, remember

12   him, the guy from Chena Hot Springs?  Mr. Colette bought the

13   business from him.  Consider the fact in weighing his testimony

14   that he couldn't remember ten to fifteen thousand dollars

15   purchase price he gave it to him in cash or by check.  I

16   suggest to you, based on your common experience, you would

17   remember that.

18          Ryan Schultz.  Said he just became a mill mechanic at

19   the Pogo Mine.  Matco Tool truck.  You know, there was a series

20   of witnesses who -- vendors who -- who made calls and sold

21   Arctic Audio and Alarm tools.  No dispute.  No dispute.  Makes

22   sense.  Got nothing to do with what was going on at the

23   headquarters of the business in his bedroom though.  They all

24   said that essentially.  All of those witnesses -- I didn't -- I

25   didn't know that, I didn't know -- no, I had no reason to know

1    that.  Never went to his house, never socialized with him, did

2    not know the man really, not that side of him, not the count

3    one side of him.

4           Mr. Sumpter -- Lee Sumpter -- he mentioned some of

5    the other employees -- Russell Christie, Dave Sauer, Damon

6    Wamsley, some guy named Kenji, didn't know his last name.

7           Same thing was true of another guy, Steve Alt.  He's

8    the Snap-On guy.  He mentioned Kenji, Russ, Whitney, Damon.

9    But the same thing, you know, vendors, sold them tools,

10   legitimate business, was apparently a nice guy and -- and a

11   good -- good salesman and good customer relations.  That's --

12   that's a side of who his is, an admirable side actually.  The

13   bedroom was the side none of them knew about.

14          You may recall Mr. Alt saying, too, that Mr. Colette

15   would say to him once in awhile I've got to go run and make a

16   bank deposit.  Well, if Mr. Colette knew how to make a run and

17   take cash proceeds of the business to the bank, what's all that

18   money doing in his -- in his bedroom if that's business money?

19   I mean, Arctic -- Arctic Alarm business money.  What's it doing

20   in his bedroom?  He didn't -- he didn't say to Alt I've got to

21   run home and put this in my safe, he said I've got to make a

22   run to the bank.  That's because this is a separate business.

23   Cash in his bedroom is a different business, a business he

24   didn't want those people at Arctic Audio and Alarm apparently

25   to know about.

1          Well, some of those vendors (indiscernible - paper
2     rustling), so then the defense called Kenji Badger.  You should
3     not attribute much weight to anything Mr. Badger said.  The
4     Government's view is that he clearly struggled in terms of
5     credibility when asked about having been interviewed by police,
6     an interview he conceded took place, and whether he, that is
7     Kenji, said anything or was able to observe anything about
8     business going on at Arctic Audio and Alarm other than parts
9     and services for automobiles.

10          So the one employee they called as a witness, really
11     in the Government's view, adds -- adds nothing to their case,
12     saying don't -- saying to you don't forfeit the machine gun,
13     the two rifles, the shotgun, and all that money.

14          Then the defense called some friends -- hunting
15     friends.  Michael Stark, Joseph Castle, and again
16     (indiscernible) Government.  As was argued earlier, the aught
17     six, a hunting rifle, it was used for hunting.  You've got a
18     jury instruction that tells you things can be forfeited even
19     though they're, you know, otherwise legal to own, legal to use,
20     it just wasn't being used for hunting that day, and if it was
21     intended to be used for hunting, it had another purpose that
22     day, (indiscernible) another purpose, it was serving to protect
23     the drugs and the money.  And the evidence of that is that it
24     was loaded.  You don't need to keep -- common sense tells you,
25     you don't need to keep a hunting rifle loaded to have a hunting

1  rifle (indiscernible).  In fact, all those other weapons that
2  were returned to the family, they weren't loaded.

3      Joe Castle, even he mentioned in passing he talked to
4  friends who do keep guns loaded in their house.  (Indiscernible
5  - paper rustling).

6      How about Mannino?  Even he said he keeps his guns
7  loaded at his bedside.  Why?  Fear of being robbed.  He's
8  sitting on a bunch of guns.  Well, Mr. Colette was sitting on
9  twenty-three ounces of cocaine and thirty-eight thousand
10 dollars in cash.  That's why his guns were loaded.  Having
11 loaded guns around facilitates drug possession.

12     The friends came in and gave you anecdotes about
13 hunting experiences with Mr. Colette dealing with the aught
14 six.  Nobody came in here and told you this was a hunting
15 rifle.  This is the Sporter for the record.  Nobody came in and
16 told you this menacing thing was a hunting rifle.  Nobody came
17 in and told you this machine gun was for hunting.

18     And only one person came in and told you what they
19 thought this might be, and that person, although qualified as
20 an expert, only gave you an opinion based upon knowledge of the
21 legitimate business that Mr. Colette was running.  That expert
22 gave you absolutely no evidence from which you should find that
23 that money isn't forfeitable.  In fact, he assisted the
24 Government with his testimony in giving you evidence that that
25 money wasn't facilitating a legitimate business Mr. Colette ran

1   and, therefore, the only reasonable thing you can find is it

2   was more likely that that money was facilitating his possession

3   of all that cocaine.

4          THE COURT:  Ten minutes.

5          MR. BARKELEY:  Thank you, Your Honor.  You heard

6   testimony from Trooper Wall, when he was called back by the

7   defense, to this effect:

8          Trooper Wall said when I go get a search warrant, the

9   warrant authorizes us to take essentially the tools of the drug

10  business.  He can take guns, he can take money, he can take the

11  drugs.  What did Trooper Wall find?  Guns, money, and drugs.

12         The defense then recalled another government witness,

13  Special Agent Cohoon.  His exact words were, "Drug dealers use

14  guns."  He's a drug dealer, he was using guns.  More likely

15  than not?  Yes.  More likely than not.  Thank you, ladies and

16  gentlemen.

17         THE COURT:  Mr. Cohen.

18                 (Pause)

19             **DEFENDANT'S CLOSING ARGUMENT**

20         MR. COHEN:  Probably didn't -- probably didn't do

21  that right.  It's -- as you guys probably have been able to

22  figure out, it's painful for me to listen to the other side

23  talk for forty-five minutes and have to sit there and be quite,

24  and people who know me I think would enjoy that because I was

25  -- I had to do that and they'd say you had to sit there and

1    listen to all their arguments and not say a word.  We obviously
2    -- in regard to the defense, we obviously have a very different
3    view about this case.

4         If it were enough for -- as the Government says, that
5    they find this safe, it's got guns, it's got drugs, it's got
6    money, there's a money counter and there's a scale and,
7    therefore, the cash and the four guns they're talking about,
8    they all should be forfeited.  If that were enough, we wouldn't
9    be here.  And the fact is if that -- that really is the
10    Government's case, we wouldn't need to be here.

11         Government's going to tell you the reason we're here
12    is because the fact that Mr. Colette was convicted of count
13    one, of possession with intent to distribute, is the starting
14    point because you want to find out if there's a nexus between
15    the two, but that's not -- that doesn't mean just 'cause he was
16    convicted of that, that this property should be forfeited.
17    That's why we've been all sitting here all week, because that's
18    not enough.

19         And it's also not enough that guns are found next to
20    drugs because if that were enough, then why would the
21    Government have given back ten of fourteen guns?  If that were
22    the case, then how come the first jury voted not guilty, and
23    you're going to see that in the instructions, on counts three
24    and four, which was the charge that Mr. Colette possessed the
25    guns in connection with the drugs?

1          You're going to see what the instructions were to the
2    first jury.  Government -- the Government had to prove beyond a
3    reasonable doubt that the guns were held in furtherance of the
4    drugs, that the guns were held to facilitate the drugs, and the
5    first jury said, no, you haven't sustained your burden, Mr.
6    Colette is not guilty, and that is of all the fourteen guns.
7    First jury said not -- so when Mr. Barkeley says we sustained
8    our burden of the connection of these guns to the drugs beyond
9    a reasonable doubt -- well, we don't need to do that, we just
10   have to do it by a preponderance of the evidence -- by a
11   preponderance of the evidence, Mr. Barkeley is wrong because
12   they were unable to sustain their burden beyond a reasonable
13   doubt.  They weren't able to do it.  They lost.  So that is not
14   correct.
15          Now they're back here and they're saying we've got a
16   lesser standard here.  They -- they lost.  They gave back ten
17   of the guns, 'kay?  Now we're here with the four remaining
18   guns, they say we've got a lesser standard today, they say it's
19   simply the more -- is it more likely?
20          Well, they -- I think Mr. Barkeley is glossing over
21   the fact, number one, that it's the Government's burden,
22   they've got to prove it, it's their burden, and more likely
23   means fifty-one percent.  They've got to prove that fifty-one
24   percent, their theory is correct.  If they don't, then they
25   don't win, which means they lose.

1          Now when you guys go back and you think about this

2  evidence, as I said in opening, the question is, 'kay, now you

3  have a concession by the Government.  There's a concession by

4  the Government of two very important points.  One, they concede

5  that these guns -- that these guns were lawfully owned, 'kay?

6  That three of the guns are hunting guns, that the fourth gun,

7  the MAC-10, was lawfully owned, they concede that.  They

8  concede that at least as to the aught six, which is Exhibit 22

9  -- one of the best things about this trial is being able to

10 hold these guns for counsel.  I'm sorry, this --

11         But the -- the aught six -- the -- whoa

12 (indiscernible - background noise) -- the aught six -- the

13 aught six, they concede -- I guess I -- I spoke too soon about

14 that.  I shouldn't touch these guns.  I won't touch them

15 anymore.

16         THE COURT:  Or you can just lay them down if you

17 want.

18         MR. COHEN:  Yeah.  The aught six --

19         MR. BARKELEY:  Lay down your weapons, counsel.

20         MR. COHEN:  Yeah, now I've got to -- now I've got to

21 get this whole thing redone.  Oh, God.  How embarrassing.

22 Okay.

23                    (Pause)

24         Okay.  All right.  They've conceded that the aught

25 six -- let me try it again -- they conceded the aught six is a

1    hunting gun.  They've conceded -- now just to go back so I

2    don't lose that thread with my idiocy here of -- of dropping

3    the guns.

4          They conceded two points.  Point one is they've

5    conceded that the aught six is a hunting gun and it was used

6    for hunting.  They've conceded that.  They've conceded that the

7    other two guns are hunting guns, and they've conceded that the

8    other two guns, the Sporter and the -- the Sporter and the --

9    and the shotgun are both hunting -- hunting guns as well.

10          Now in the -- in the Indictment that -- in the

11    Indictment that was originally returned, there were also

12    (indiscernible - background noise) -- ah, boy.  In the

13    Indictment that was originally returned, there were two other

14    Mossberg guns -- there were two other Mossberg guns that were

15    also there that they returned.  Like I say, they -- they've

16    conceded that.  They've conceded that there are ten guns that

17    were legitimate, that all the guns were lawfully owned, that

18    the MAC-10 was lawfully owned, and that the -- and that the

19    aught six was used for hunting.  They've conceded that.  So

20    that's the first main point that they've conceded.

21          The second main point that they've conceded is that

22    Arctic Alarm and Audio was a legitimate business.  They said

23    there's no question that Arctic Alarm and Audio was a

24    legitimate business.  They don't dispute that.  In fact,

25    they're saying it was probably a thriving business, Arctic

1   Alarm and Audio, 'kay?

2        So we've got a concession by the Government that

3   basically there's two tracks here.  There's the fact that

4   there's no question that Mr. Colette is a hunter, that he's a

5   gun collector, that he's got legitimate guns, that he's got

6   lawful guns, that he hunts with his friends, all those things.

7        They conceded that he's a good business person, that

8   he's got a legitimate business.  In fact, a thriving business.

9   A business where there's a lot of money that's coming in, and

10  they conceded that not only is there a lot of money coming into

11  the business, they've conceded that there's a lot of cash

12  coming into the business, which was legitimate cash.  They've

13  conceded all of that.

14       They say that there's two tracks.  And when you look

15  at the evidence here, the thing is, is that we -- there are two

16  explanations -- there are two explanations here.  Explanation

17  one -- number one is, is that they're legitimate, 'kay?  As to

18  ten of the guns, they've even agreed with us, but that's --

19  that -- that -- that explanation is the better explanation.  As

20  to four of the guns they have not agreed, but they've said

21  there are two possible explanations.  As to the money, they

22  haven't agreed with us, but they've said there are two possible

23  explanations.

24       And the reason why Mr. Barkeley has glossed over this

25  burden that he's got by a preponderance of the evidence and

1    they couldn't sustain it beyond a reasonable doubt to the first
2    jury as to the guns -- and they didn't put the -- the money to
3    the first jury, 'kay?  The reason he's glossed over that is
4    because if there are two possible explanations and it's their
5    burden to show that one is more likely, fifty-one percent,
6    question is who wins if you guys go back and you think, you
7    know what?  There's two possible explanations here.  The answer
8    to that question is, is that we win.
9         Now, what have you seen at this trial as to their
10   possible explanation that would convince you that it's more
11   likely?  What evidence have they put in to show that it's more
12   likely?  The evidence they put in to show that it's more likely
13   is the old trial testimony.  That's it.  The old trial
14   testimony, which is this is what was found in the safe, this
15   was what was found -- this is what we found, it was in close
16   proximity, et cetera.  That's what they've put in.
17        What evidence have we put in?  We showed that the
18   business was legitimate, we've shown that there was cash that
19   was coming out of the business, 'kay?  We showed that these
20   guns were being used for hunting, 'kay?  We showed all those
21   things in our case.  We put in all of that evidence.  They
22   haven't put in anything other than the fact that all this stuff
23   was found together.  So you're going to go back there and
24   you're going to think, well, what's more -- you've got to
25   decide what is more likely than not?

1    Now I want to talk a little bit about the -- the

2 accountant's testimony.  And Mr. Barkeley -- Mr. Barkeley says

3 that -- that -- Mr. Barkeley says that --

4                          (Pause)

5 -- that he said was possible.  Well, what he said was I think

6 that it is plausible -- he was paid fifteen five, not

7 seventeen, not that that's a big deal, but just -- that's what

8 he said.  He's a very -- he's only testified one time before.

9 I think if you looked at his demeanor, he -- he's a -- he's a

10 -- he's a honest guy, he looked at thousands of pages of

11 records, and put together an opinion, 'kay?  He's a -- he's a

12 -- he's -- he's an expert, they don't dispute that he's an

13 expert, and what he said was I went through all this -- all

14 these materials, and what I have concluded is, is that it is

15 plausible and reasonable to believe that the money in that safe

16 was business related.  That's what he said.  He said it and he

17 said it again.  The money is that safe is business related.

18    And the Government is not contesting -- they are not

19 contesting any of the numbers at all.  They're not contesting

20 it.  In fact they were contesting for awhile the issue having

21 to do with the tax returns, whether they were filed or -- or --

22 or ginned up or that kind of thing, and there was a stipulation

23 read to you, we looked into that --

24    MR. BARKELEY:  Objection.  Your Honor, this isn't

25 proper argument.  Counsel knows the Government -- there's

1    nothing improper about the Government's questioning about the

2    date of the tax returns.

3              MR. COHEN:  There's a stipulation --

4              THE COURT:  That's true.

5              MR. COHEN:  There's a stipulation that was read to

6    you that -- and when a stipulation is read to you, it means

7    there are -- those are -- those are facts that are proven that

8    you have to accept as true.  There was a stipulation read to

9    you at the end of the day yesterday by the Court, by the judge,

10   that every one of these tax return -- that the 2003 and 2004

11   were filed with the IRS and they were filed on time; 2005 was

12   filed with the IRS, it was filed in 2007 when Mr. Colette was

13   in jail and his family was gathering the records.

14             That the reason -- when you look at the Government's

15   exhibits, the tax returns, the reason that the printout on the

16   bottom of those tax returns is from April of 2007 is because

17   that's the day when the tax preparer printed it out off his

18   computer -- that was the day he printed it out and that's why

19   that date appears.

20             So what I'm getting at is, is that the Government is

21   not disputing any of the accountant's numbers.  They're just

22   not.  That's not what they're saying.  They're not disputing

23   the numbers.  They're just not.  That's not what they're

24   saying.  They're not disputing the numbers.  And -- and -- and

25   what are the numbers?

1          The numbers are that -- and this is what -- this is
2   what he said.  Over 2003, 2004, and 2005, approximately two
3   hundred and fifty thousand dollars came into Arctic Alarm and
4   Audio in cash.  That's what he said.  He also said that the
5   there was other cash that -- and -- and the reason why he came
6   to that -- the reason he came to that conclusion is because he
7   analyzed the deposits into the bank -- into the -- the Denali
8   Savings Bank, he analyzed those deposits, and he talked about
9   what percentage of the seven hundred thousand dollars that was
10  deposited into the bank over that period was cash, that's how
11  he -- and he added to that -- he added to that the amounts that
12  were reported to the IRS, both in expenses and in revenue, that
13  were not found in the Denali -- that were not deposited or
14  recorded in the Denali Bank, either deposited or accounted for
15  by checks.  He went through a thorough analysis of that, and he
16  found that there was two hundred and fifty thousand dollars of
17  cash that went in, okay, over and above what -- that was --
18  that -- that includes the deposits into Denali Bank and the
19  cash over and above what was actually in Denali Bank based upon
20  the returns to the IRS.  Two hundred and fifty thousand dollars
21  in cash.

22          He also said there was potentially additional cash
23  because he said that there were fixed assets and inventory in
24  the business that were not accounted for by the checks that
25  came out of the Denali Bank or -- or by any -- anything else

1    that was in the business records, but there were other assets.

2    What he -- what he talked about -- what he means by fixed

3    assets were other goods costs, other inventory that was there,

4    and other assets other than the one asset of twenty-three

5    thousand dollars that he found that was actually on the books.

6    So there were additional assets -- there were additional

7    assets, okay?

8         Then he said that the employees were paid in cash,

9    and that was not reflected on the books, and that was

10    additional cash that was coming in, and the -- we had testimony

11    here that that in fact was the case, the employees were paid in

12    cash.  So the employees and the additional inventory.  And all

13    of that was over and above -- according to Mr. Pierce, all of

14    that was over and above the two hundred and fifty thousand

15    dollars that went in.

16         He also said that the amount that was disbursed in

17    cash over that period -- 2003, 2004, and 2005 -- was one

18    hundred and fifty thousand dollars.  That was -- that was

19    disbursed in cash.  This is cash that came out of the business,

20    and in addition to that, again, were the additional assets, the

21    employees, and the inventory.  What he said was, was that cash

22    related to additional assets and (indiscernible) into inventory

23    was over and above the one hundred and fifty thousand dollars

24    that he found by looking at the books and looking at the tax

25    returns came out.

1          The reason I'm emphasizing all of this is because, as

2    I said earlier, the Government is not disputing it because it's

3    correct.   That there was a hundred and fifty thousand dollars

4    or more of cash that came out of that business -- that came out

5    of that business that was available to Mr. Colette in those --

6    in those periods, 'kay?   And the Government isn't saying that

7    wasn't the case, they're just saying there's another track

8    here, that he had another business.   Okay.

9          So the other thing that Mr. Pierce said is that when

10   you have a small business, a business that has a lot of cash --

11   and remember, we heard -- we heard that even the business

12   before -- before Mr. Colette purchased it was bringing in

13   twenty-five to thirty -- thirty-three percent of cash.   When

14   you have a cash business in a small business, it's not unusual

15   to keep that money in a safe, and it's not unusual to keep that

16   money off site.

17         He also said that the busy time of the year for this

18   -- for this business is October and November, and that just

19   based upon the regular cash that was being paid out on a

20   regular basis, you'd have twenty-four hundred dollars on hand

21   in a safe, and that you might accumulate cash over a period of

22   time.

23         So -- so there's the whole question about would you

24   keep a safe off site or a money counter off site in connection

25   with this type of business?   The reason why this is important

1   is, is because they're not disputing the fact that that's the

2   case.   Okay.

3          So we look at the cash that is in the safe.  How does

4   the Government show more probably than not that it was related

5   to the possession of cocaine with intent to distribute?  How do

6   they show that?  How do they show that?  They say correctly,

7   and they asked the accountant, and they say in their opening --

8   in their -- in the opening part of their closing statement --

9   they say there's no way that we can -- we can determine where

10  cash comes from, and there was a question about a painting or

11  whatever.  Is the cash used to purchase the bed in the bedroom?

12  Is the cash used for -- what purpose is cash used -- you don't

13  -- there's no way to know what cash is used for, where it came

14  from, et cetera.

15         The same that applies to the accountant -- to the

16  question to the accountant also applies to the Government.

17  They could have asked the same question of themselves, which is

18  how do we know where that cash came from?  How do we know what

19  that cash is going to be used for?  Their only argument is we

20  think it was all related to cocaine because it was next to the

21  cocaine.  But we know that this was a locked gun safe.  We know

22  that what was kept in that gun safe were valuables of Mr.

23  Colette.  We know what was kept -- what was kept in that gun

24  safe in addition to -- in addition to the cocaine was -- was --

25  were -- were ten rifles -- guns that the Government has already

1  conceded are legitimate, knives, documents, cleaning kits, and,

2  importantly, there were in that same safe seven checks that

3  were made payable to a business that the Government concedes is

4  legitimate, Arctic Alarm and Audio.

5          This is Exhibit DD, and I ask the jury to consider

6  and look at it because this safe has in it business documents,

7  it has in it legitimate guns, he has his hunting collection in

8  it -- in other words, it's locked and he's got everything in

9  that safe that is important to him.

10          So -- so when they say, well, how do we know where

11  the cash came from or where it's going to, we have put in

12  evidence showing where cash came from.  We have put in evidence

13  showing where cash is going to.  The Government hasn't put in

14  any evidence showing where cash came from, the Government

15  hasn't put in any evidence showing where cash is going to.

16  They haven't shown, okay, this cash was part of a controlled

17  buy.  Did we hear an agent get up on the stand and said this

18  cash that we found there, that was part of a controlled buy?

19  Did we have somebody come in here and say I paid Mr. Colette

20  money, et cetera, that was part of this cash?  No.  We have no

21  evidence about where it came from.  We didn't have anybody come

22  in and say this cash was going to be used in a drug

23  transaction.

24          But more than that, there has to be -- as the

25  Government said, there has to be a nexus -- there has to be a

1 nexus -- there has to be a nexus between the cash and count

2 one.  Now let's think about that logically, 'kay?

3         Count one is, is that on November 28th, 2005, Mr.

4 Colette possessed twenty-three ounces of cocaine in a locked

5 safe with intent to distribute.  Let's think about that

6 logically.  And the -- the instruction is going to be -- 'kay,

7 anything can be facilitating property.  You're going to hear

8 this instruction, anything can be facilitating property.  You

9 know, anything that can -- that -- facilitating property in a

10 drug trafficking case, any property used or intended to be used

11 in any -- in any way to promote drug trafficking, and it goes

12 on and on and on.  It could be anything.  Anything could be

13 facilitating property.  No question that these guns that we're

14 talking about and this money could be facilitating property.

15         But then we go on and we talk about the nexus.  The

16 real question, which is -- well, what's the nexus?  How do they

17 show a nexus, the connection between what could be facilitating

18 property and count one, possession with intent to distribute?

19 This -- the connection is showing facilitation.

20         As I said in opening, they're not even arguing that

21 -- that distribution is related to these -- this property

22 anymore, they've abandoned that.  They're not -- and this is

23 very important -- they're not saying --

24         MR. BARKELEY:  Objection to abandonment, Your Honor.

25 The Government never argued that.

1    MR. COHEN:   The Government is not arguing at all --

2    THE COURT:  Sustained.

3    MR. COHEN:   -- that this money is the proceeds.   It

4  was charged originally in the Indictment that this money was

5  the proceeds -- or these funds were the proceeds of --

6    MR. BARKELEY:  Same objection, Your Honor.

7    THE COURT:  Sustained.

8    MR. COHEN:   The Government is not arguing that it is

9  the proceeds.

10    MR. BARKELEY:  Same objection, Your Honor.

11    MR. COHEN:   Well, the Indictment was read to the jury

12  and the Indictment says proceeds.  That's not what we're

13  talking about here.  The Government is not arguing -- that's

14  not what they're saying.  They're not saying that -- that --

15  that the thirty-eight thousand dollars was the proceeds of a

16  drug transaction.  They're saying that the thirty-eight

17  thousand dollars made the possession with intent to distribute

18  the twenty-three ounces -- they're saying it made it easier or

19  less difficult.  That's what they're saying.

20    So logically, let's think about that.  What can that

21  cash be used for in the what the Government says is Mr.

22  Colette's parallel business?  What can that cash be used for?

23  The cash -- or how did that cash get there in Mr. Colette's

24  parallel business?  The cash can be used for only two things in

25  Mr. Colette's alleged parallel business -- business that