1  they're talking about in count one.

2            Cash could be used to buy more cocaine.  It's one way

3  you can use the cash.  And they concede this cash -- they have

4  no idea -- when you have cash, you don't know where it came

5  from or where it goes, 'kay?  We put in evidence on that.  They

6  didn't put anything in other than the fact there was cocaine

7  sitting there.  So you can use the cash to buy more cocaine, or

8  the cash might have been there from a prior cocaine sale.  But

9  they're not proceeding on count two.  They're not proceeding on

10  the conviction of distribution.  They're not saying the cash

11  was there as a result of distribution.  They're not saying

12  that, so you can't look at that.  It's not there as a result of

13  distribution.

14            And there's absolutely no evidence that that money

15  was going to be used to buy additional cocaine.  But even if

16  there were evidence that it would be used to buy additional

17  cocaine, that's not what we're talking about.  We're talking

18  about the cocaine that was there.  The cocaine that was there

19  was already there.  It was already purchased.  It didn't need

20  to be purchased again -- it didn't need to be purchased again.

21            And in fact, the money that was there, even if it

22  came from prior distribution, it didn't come from the

23  distribution of that cocaine that we're talking about.  There

24  has to be a nexus to this cocaine, this twenty-three ounces.

25  The money couldn't have come from selling this cocaine because

1  this cocaine is still there.  The money couldn't come from --

2  come -- the money is not -- is not connected to -- it could be

3  used perhaps to buy additional cocaine, but that's not what

4  we're talking about.  It might -- might facilitate the purchase

5  of additional cocaine, but how does it -- does it facilitate

6  the possession of this cocaine?  Logically, how does it

7  facilitate that?

8           And the judge is saying put your passion to the side.

9  You know, they're saying it was cocaine and there was -- there

10 was -- next to the money, so you've got to forfeit it.  Well --

11 but -- but that's not what your job is as jurors.  Your job is

12 to put your passion and -- to the side, your emotions to the

13 side, your opinions to the side about what you might think

14 about drugs or what you might think about all that stuff.  The

15 issue is, is there a nexus or not?  Dispassionately is there a

16 nexus?

17          Now the only logical argument the Government can have

18 for a nexus is, is that the guns made it easier to -- to

19 possess this particular twenty-three ounces.  That's the only

20 thing that makes some sense, that it made it easier, less

21 difficult because of some -- some of what was put into

22 evidence.  Well, let's take a look at that.

23          Let's take a look at the guns.  I mean, first of all,

24 they're saying two different things.  They're talking about --

25 out of both sides of their mouths on the guns because on the

1    guns, they're saying on the one hand, well, it doesn't make any

2    difference if a gun is loaded or not in terms of facilitation

3    because it could be a fake gun.  It's still going to

4    facilitate.  They're saying that.  And at the same time, they

5    gave back ten of the guns because they're saying, well, we're

6    not seeking those 'cause they weren't loaded.  Well, how does

7    that add up?  They conceded that ten of the guns were not

8    facilitating.

9            Now as to the -- I -- I hesitate to get near these

10   things again, but -- but as to the -- and maybe I should do it

11   by looking at the -- the picture.  Where -- where are the --

12   where are the other -- here they are.  Okay.  Now when you look

13   at the -- okay.

14                      (Pause)

15           So -- so it doesn't make a lot of sense.  They're

16   saying it doesn't matter whether it's loaded or not -- loaded

17   or not, and then they're saying it does matter whether it's

18   loaded.  Well, let's take a look at the shotgun.  You can

19   hardly see the shotgun in this picture.  There were fourteen

20   guns and -- and -- and this is the one that -- that the

21   Government -- that the off -- that the officer said was -- this

22   is the way it appeared, I believe this is -- yeah, this is

23   Exhibit 2 where they said this is the way it appeared when it

24   was opened.  You can hardly see the Mossberg in the back -- you

25   can hardly see it.  Even though it had a couple rounds in it,

1    'kay?  Or one round in it, you can hardly see it.  In fact, I

2    think Agent Cohoon said I don't think I can see it in this

3    picture, too buried there behind all those guns.  So this idea

4    that that particular one was facilitating is -- is pretty

5    attenuated -- I mean, it's pretty -- it's a pretty bad

6    argument, especially when they gave back all these other guns

7    when they decided, you know, just the way that -- they agreed

8    just 'cause they were there doesn't mean that -- that it made

9    it easier.  So that was -- is a bad (indiscernible) -- it was

10   all the way in the back.

11          Let's take a look at the Sporter.  They say, well,

12   you know, as far as the Sporter is concerned, which is this gun

13   over here, that one was not loaded.  They say that the reason

14   that they want it forfeited is because the magazine was on the

15   other side of the shelf over here and at the ready.  But

16   really, look at this picture.  Was that at the ready?  Look,

17   there was -- there's another gun here in the front.  This gun

18   here, they gave it back.  They've given that one back.  They

19   didn't even save the very first gun here 'cause it was

20   unloaded, it was facilitating.  They didn't even say it was

21   facilitating even though they also argue that -- that if it's

22   not loaded, it still can facilitate, it could be a fake gun,

23   and they gave it back.  This is the very first one that you can

24   pick up when you open the safe (indiscernible).

25          A hunting rifle -- we know that the hunting rifle --

1  he had just been on a hunting trip.  We have evidence as to

2  that.  He had just been on a hunting trip with his friend.  We

3  have a picture of the hunting trip.  This is this -- this --

4  this family rifle that was given to him by his Dad that doesn't

5  work all that well, that's the one that's sitting there.  They

6  come back from a hunting trip -- we have evidence here from Mr.

7  Mannino and from both -- both friends that testified that --

8  that the -- this is his hunting rifle, that the -- that the

9  Sporter can be used for hunting, that the Mossberg can be used

10  for bear protection, it can be used for shooting birds.  We

11  have evidence to that -- to all that.

12      So -- so when we look -- when we look at these guns

13  and we look at facilitation, really, this is the one maybe is

14  the best argument that it might have made it easier to possess

15  the twenty-three ounces.  That one was given back.  This is a

16  hunting rifle, he came back from a hunting trip.  We've got

17  evidence that some people keep live rounds in the chambers, and

18  it's really not an issue of safety.  I mean, there's no

19  instruction here that says if you conclude that Mr. Colette was

20  not storing his guns in a safe manner, you have to forfeit

21  them.  There's been a lot of evidence here about safety.  It's

22  not about safety, it's about whether it made the possession of

23  these twenty-three ounces easier or not, that's -- or -- or

24  less -- made it easier, less difficult, et cetera.

25      So, it's a very, very poor argument on the -- on the

1  Sporter that it made it easier or less difficult, particularly

2  when all the other guns were given back.  It's a very poor

3  argument on the Mossberg.  Yeah, it had a -- a round in it, but

4  it was all the way in the back, 'kay?  It's a very poor

5  argument on the AR-15 'cause all the un -- other unloaded

6  weapons were given back and they say it was within a very close

7  proximity to the shelf and there's another -- where the

8  magazine was, and it's very, very difficult to argue that

9  you're about to get into a locked gun safe and put that one

10 together -- put the Sporter together with the magazine and use

11 it in connection with the drugs.

12         Now you've got the MAC-10, which is at the -- which

13 is at the top.  Now on the MAC-10 -- the question about the

14 MAC-10 is the Government says, well, it doesn't make any

15 difference whether or not you believe Eugene Johnson.  The

16 Government said that because the Government doesn't believe

17 Eugene Johnson.  But Eugene Johnson lied to Government counsel

18 on the stand yesterday, 'kay?  He -- he lied about that whole

19 fronting thing, remember that?  And I told you guys that when

20 you get a load of Eugene Johnson -- I mean, you're going to be

21 able to conclude that he's a liar.  There's nothing that he

22 said that can be believed.

23         I wrote down -- and I'm running out of time -- I

24 wrote down so many different things that he lied about, I was

25 going to read them all to you and (indiscernible) all, but I'm

1  not -- I'm going to run out of time if I do that, but you guys

2  know all the things that he lied about.  And on top of that, he

3  says I'm going to do what I have to do to protect my kids, I'm

4  going to do what I have to do to protect myself.

5          So I think the Government is wrong when they say that

6  it doesn't matter whether you believe him or not.  It does

7  matter because while it's true that part of what he said was

8  corroborated, that there was a gun in there and there were

9  drugs in there, the important point about what he said that has

10  to do with facilitation, making it easier or less difficult --

11  the important point about that is do you believe that he really

12  went in there to buy drugs a few days before and the MAC-10 was

13  sitting on the table like he says, and that for some reason he

14  was also thinking about robbing Mr. Colette and he aban -- of

15  the cocaine, and he abandoned that as -- as part of the plan?

16          That -- if you don't believe that, then there's

17  absolutely no evidence of facilitation on the MAC-10, and the

18  only evidence we have is that it was a gun that was lawfully

19  purchased, he cleared all the background checks.  It's a toy

20  for big boys and all that stuff.

21          And here's another thing to think about when thinking

22  about the logical argument about facilitation, the idea that --

23  does this cash make it easier to possess the twenty-three

24  ounces of cocaine, or less difficult to possess the twenty-

25  three ounces of cocaine.  What possible argument is -- is there

1  that this cash sitting next to the cocaine makes it easier to

2  possess it or less difficult -- easier or less difficult to

3  possess it?  What possible argument is -- is there?  It's

4  locked in a gun safe.  Is the fact that it's sitting next to

5  cash -- does that make it easier to possess it?

6         If anything, the evidence in this trial shows that

7  the presence of the cash next to the cocaine makes it more

8  difficult to possess -- it makes it more difficult to possess.

9  Why?  Because it -- if there's somebody that knows that there's

10  a lot of cash there, the evidence in this trial is that they're

11  going to come in there and they're going to think about robbing

12  more -- they're going to think about robbing him more.  So

13  having the cash there or having somebody know about the cash

14  there, it makes it more difficult to possess, not less

15  difficult.

16         And in -- and on that same argument -- on that same

17  point, this idea that some -- some people came in here and

18  correctly said if you have a gun that's loaded, it's there for

19  protection, the only -- you know, the cocaine wasn't the only

20  thing at Mr. Colette's house.  His girlfriend was there, the

21  kids were there, other property was there.  Just like the

22  Government ignored when they talked about cash -- what, was

23  there a painting there that he used the cash for?  There was a

24  lot of other things to use cash for.  It's true that they found

25  cocaine.

1          So when we come back to the -- when -- when you guys

2    come back to the overall -- you know, you go back and say what

3    is it that we really have here?  It's like I said, what we

4    really have here is that the Government's case is that we found

5    cocaine next to -- next to money, we found cocaine next to

6    drugs.  Your task is to figure out, okay, well, that's true,

7    but what is the nexus?  Is there any possible nexus?

8          And, Your Honor -- I know that Your Honor knows

9    exactly how much time I have left.

10         THE COURT:  You have roughly ten minutes.  I'm just

11   trying to calculate that now.

12         MR. COHEN:  And -- and I -- and I -- and the

13   Government is going to be -- is going to be --

14         THE COURT:  Right.  They'll get a few minutes.

15         MR. COHEN:  -- has a few -- couple minutes of

16   rebuttal, is that right?

17         THE COURT:  Right.

18         MR. COHEN:  Okay.  Now one thing that's -- one thing

19   that's going to happen here is, is that the Government, under

20   the rules, has the -- because they have the burden of proof,

21   they have the ability to come back and rebut what I said just

22   now, 'kay?  During which time I also can't talk, but not only

23   can't I talk during that time, I'm not allowed to come back up

24   and respond to what the Government said.  I'm not allowed to

25   come back up here and -- and drop the guns or whatever.  But

1   I'm not allowed to come up -- back up here and respond, so I'm

2   going to ask all of you when you go back there to think about

3   what we would have said in response to what the Government's

4   rebuttal is.

5                    (Pause)

6           Well, since I have a little bit of time, I guess I

7   will -- I will go through the various things that Mr. Johnson

8   lied about.  Because it's our argument, like I say, that the

9   entire point -- the entire statement that he made that he went

10  in there and he saw a MAC-10 on the table was a fabrication.

11  It's our argument that all these guns were safely locked in a

12  gun safe, as they were supposed to be, the entire time with

13  everything else, 'kay?

14          What did he lie about?  Okay.  He lie -- he lied

15  about his memory.  His memory went up and it went down, he

16  could remember, he couldn't remember, he lied about that.  He

17  didn't know -- I mean, I got the feeling if I asked him what

18  was yesterday's date, he wouldn't be able to remember it.

19          He lied to the Government.  He -- he just lied to

20  Government counsel in front of you yesterday, 'kay.  He lied

21  about the safe being open because when he testified in

22  connection with the search warrant, he didn't know about that.

23  He lied about the safe being open.  And incidentally, when the

24  Government says that he predicted that there would be a -- a

25  grocery bag full of cocaine, that's not what he said.  What he

1   said when he talked to the magistrate was there would be a big

2   bag -- there would be a big bag in there.  He didn't say

3   anything about a grocery bag, and so after the fact of the

4   trial, after the Government executed the search warrant and

5   found that after this case was in the papers.  So he lied about

6   the bag.

7        He lied about the fact that he had been coming over

8   one or two years.  He couldn't remember that or the issue about

9   the one to two years.  He lied about whether or not he knew the

10  name of Mr. Colette's girlfriend.  He lied about the amount of

11  drugs he was dealing -- the quantity of drugs he was dealing --

12  the quantity.  He lied about his sources of supply.  He lied

13  about the fact that he was dealing drugs out of his parents'

14  house.

15       And when -- and when he -- he -- he -- he lied about

16  the blue bandana when he talked about that yesterday.  So he's

17  -- he's lied about a bunch of stuff and I've got more things

18  here that he lied about.  He was facing ten years in jail --

19  ten years in jail and he was -- he didn't even go to jail.

20  When he had all those guns, he had the drugs, he lied -- oh, he

21  lied -- big thing he lied about was he lied about -- about the

22  -- the -- the tip.  He was tipped off from law enforcement --

23  somebody in law enforcement, and he wouldn't tell them how, and

24  that's how he was able to clean up.  He lied about Monty and

25  about the fact that there's a really good chance here that this

1    -- that this could have been -- these could have been his drugs

2    or Monty's drugs that were in Mr. Colette's safe.  How did he

3    know about it?

4              And so he lied about a huge number of things.  He

5    talked about how he would do anything to protect himself and

6    his family.  He said he would go and he would rob if necessary

7    to protect himself and his family, and -- and on top of all

8    those things, he saved himself from going to jail for even one

9    day.

10             So when you look at -- when you look at Eugene

11   Johnson overall, as I argued in opening, you should not accept

12   the fact that he was in there.  He lied about the amount that

13   he -- that he purchased, if any, from Mr. Colette.  He lied

14   about the money that he had, about the twenty thousand dollars

15   in cash.  He lied about everything.  He's completely no -- you

16   can't believe anything he says.  So there's no reason to

17   believe that he was actually there and he actually saw the MAC-

18   10 on the table, that he was actually planning to rob the --

19   the drugs, and that the MAC-10 dissuaded him from robbing the

20   drugs.

21             And even according to what he said -- even according

22   to what he said, Mr. Colette's not the one who picked up the

23   MAC-10 or used it in any way to intimidate him.  He just had it

24   and it was -- he showed it to him as something that he had

25   recently purchased, and we know that he had purchased lawfully.

1                              (Pause)

2          So we thank you -- I thank you for all your attention

3    this week to this to this case.  I know it's probably -- you

4    probably were thinking it's kind of -- we're kind of coming in

5    here after the first counts were decided and we're being asked

6    to kind of look at this again, and that may be a little bit

7    frustrating for you guys, but on the other hand, I've noticed

8    that you've paid attention all week, your duty as jurors

9    extremely seriously.  This is a very, very important case to

10   the Government and to Mr. Colette, and we all thank you for

11   your attention, and we ask that -- that you go back and think

12   very carefully about what all of us said.

13          But really there's no way, in our view that you can

14   find by a preponderance of the evidence under the law, under

15   the logic, and under the facts as presented, that they've shown

16   that it is more likely than not that their view is correct,

17   that their track is correct rather than our track.  The gun

18   collection, the lawful guns, the hunting, the cash from the

19   business, the cash coming out of the business, as opposed to

20   the fact that they say the cash could have been used for

21   something else.

22          Why?  Because if there's two competing explanations,

23   then the person that has the burden loses because they've got

24   to show that one is more likely than not.  Why else?  Because

25   there's no logical reason -- there's no logical explanation for

1  how this cash possibly could have made it easier or less

2  difficult to possess the twenty-three ounces of cocaine in the

3  safe as opposed to cocaine that was going to be purchased later

4  or cocaine that was sold some time before.

5       And there's no argument here, nobody's saying you can

6  forfeit it -- and remember, this is very important, you can't

7  forfeit it if you think it's the proceeds of some previous sale

8  because that's not what we're talking about.  The question is

9  did it make it easier to possess this twenty-three ounces.

10      So thank you very much for your attention.  Thank

11  you, Your Honor.

12      THE COURT:  All right, thank you.  Mr. Barkeley?

13  Nine minutes.

14            (Pause)

15       **GOVERNMENT'S REBUTTAL ARGUMENT**

16      MR. BARKELEY:  Ladies and gentlemen, in rebuttal,

17  very briefly, first of all, I hope that each of you heard the

18  judge sustain the objection about improper argument.  There was

19  nothing improper about my questioning the expert witness about

20  the date on the tax returns.  In fact, what happened is I guess

21  you don't get much for sixteen thousand five hundred dollars

22  because obviously their expert hadn't even noticed the dates on

23  the tax returns.  He didn't know why they were dated '07.

24  Turns out he was mistaken and you were informed of the truth

25  about them, and the Government stipulated to the truth.

1    Secondly, you should understand the Government has no
2  obligation to charge all of the guns, to charge any of the
3  money that might have been found, didn't forfeit the money
4  counter -- think of the safe.  The safe is a great example for
5  you to think of in terms of common sense.  Did that safe make
6  it easier for this guy to be sitting on the dope?  Of course it
7  did, of course it did.  It hid the cocaine from -- from anybody
8  else.  It was only accessible to people who had the
9  combination.  The safe is forfeitable.  There is no law
10  requiring the Government to forfeit the safe.

11    The Government has the right to choose what it wants
12  to forfeit, and it chose four weapons, which probably shouldn't
13  be out in the community, you know, in terms of the safe or
14  something like that.  Machine gun, things like that, those --
15  those -- those weapons were ready to go, that's the
16  Government's view, and the Government can choose which weapons
17  it chooses to forfeit.

18    Now also, counsel argued to you, and this is where
19  the jury instructions are important in terms of sorting out any
20  confusing questions that might arise.  Counsel suggested to
21  you, improperly, that the previous jury, because it acquitted
22  this guy on two counts of using and carrying the firearms, that
23  you're still not bound by that.  Uh-huh (affirmative).
24  Instruction twenty-one.  Please -- please --

25    MR. COHEN:  Objection, Your Honor.  I --

1          MR. BARKELEY:  -- please read it carefully.

2          MR. COHEN:  Well, objection.  I didn't suggest that

3  -- that they're bound by that and I didn't do anything

4  improper.  I just read from what the Court is going to say to

5  the jury.

6          THE COURT:  Okay.  Go ahead.

7          MR. BARKELEY:  Here's what instruction twenty-one

8  tells you:

9          "You must not discuss or consider anew whether the

10          defendant is guilty or not guilty on those charges.

11          However, you must determine whether criminal

12          forfeiture is appropriate in this matter according to

13          these instructions and without regard to the prior

14          jury's findings on the other charges."

15          That -- defense counsel's right.  The Government does

16  have a lower burden in this case, but read those elements from

17  what we have to prove -- the Government has to prove to convict

18  somebody of a crime.  There's no crime on the table here,

19  ladies and gentlemen, it's forfeiture.  To convict somebody of

20  a crime beyond a reasonable doubt, the Government would have

21  had to prove very different facts in terms of how actively

22  these guns were employed.  This is the Government's argument in

23  a nutshell:

24          These things, including the cash are inherently

25  facilitating drug possession.

4-57

1          MR. COHEN:  Objection, Your Honor.  That's -- that's

2   improper -- that's -- that's not what the law said.

3          MR. BARKELEY:  That's the Government's argument is

4   that they inherently facilitate it.  It's a matter of common

5   sense, and you can use your common sense.  Does having a loaded

6   gun right next to your dope make it easier or more difficult

7   for you to possess that dope?  You're allowed to decide the

8   answer to that question.

9          Same with the machine gun -- and by the way, what

10  makes that machine gun different is that was brandished in the

11  middle of a drug deal, a drug deal for which he was convicted

12  in count two, a drug deal where Mr. Johnson -- none of this

13  stuff matters.  What matters is he said if you go to that guy's

14  house today, November 28th, 2005, you're going to find a

15  machine gun, you're going to find a bunch of dope.  And even

16  Mr. Johnson never said he saw any cash -- never saw any cash.

17  Isn't that funny?  That's probably 'cause that guy didn't show

18  him the cash.  Would you?  Course not.  Common sense.

19          This was cash on hand, just like their expert said,

20  and this inherently facilitates drug dealing.  You know why?

21  Count one says possession -- not just possession, possession

22  with intent to distribute.  Possess -- this is -- this --

23  ladies and gentlemen, just think, these -- these could be auto-

24  starts, but this is the illegal business.  This is the

25  inventory, right?  Ready to go.  It's going to be sold.  I've

1  got cash on hand.  Why?  Somebody comes to your house, they've

2  got four grand, price is thirty-five hundred, you've got five

3  hundred bucks to give him.  What do you think is going to

4  happen when somebody comes again to the bedroom and buys dope

5  for cash?  You're going to go running to the bank and get some

6  money?  Of course not.  That is cash on hand -- I agree with

7  the expert, it's cash on hand for distributing cocaine.  Count

8  one.  That's the nexus.

9       The nexus is proven to you by the physical proximity

10 of these items.  You can infer the nexus, the connection.

11 That's what you're deciding.  Is that just a coincidence all

12 this stuff was together?  No.  And it's not just the safe.  Go

13 to the whole bedroom.  Look at the whole thing.

14      Counsel also suggested the Government had some

15 obligation to put on more than what it put on with reading the

16 prior testimony.  It's not true.  The evidence in this case,

17 and that's in the jury instructions, is all the testimony of

18 all the witnesses.  It includes the Government's cross-

19 examination of their witnesses and their answers.  That's all

20 evidence.  You can weigh it all.  It doesn't have to be just

21 put on by the Government.

22      The Government is not appealing to your passion.

23 That was suggested to you.  The Government is appealing to your

24 common sense.  Notice also the Government isn't seeking

25 forfeiture of the checks.  That's cash.  That belongs to that

1  man.  The Government isn't seeking forfeiture of that, just

2  like it's not seeking forfeiture of the guns.  Why not?  That

3  is a legitimate -- that's a legitimate payment for auto-

4  starters and other stuff from his business made out to him.  He

5  can have it.  The Government isn't seeking to forfeit it.  No

6  argument would be reasonable, I don't think, that -- that those

7  checks facilitate the possession of cocaine.

8         Ladies and gentlemen, when you get right down to it,

9  you're going to conduct your deliberations, you're going to

10  make your decisions, and you're going to have to make -- make

11  the ultimate decision on five verdict forms.  Each one of them

12  says with regard to this item -- the cash, the machine gun and

13  silencer, shotgun, the Sporter, the aught six -- should it be

14  forfeited?  Yes or no.  Your answer should be yes on all five.

15  Thank you.

16         THE COURT:  All right.  Thank you.  All right.

17  Ladies and gentlemen, I've already read the instructions to

18  you, so you're ready to go and begin your deliberations.

19  Again, I told you you've got the blue-backed copies for the

20  original and for the verdict forms.  Basically, you'll be able

21  to deliberate as long as necessary -- as you feel necessary.

22         You'll have the option -- if you can reach a verdict

23  today, that's fine.  If you feel that more time is necessary,

24  you'll have the option of going into tomorrow.  If you feel

25  that you want to not go into tomorrow, you can come back Monday

4-60

1  morning.  You just have to advise us in advance as to what your

2  thinking is in that regard so we can make appropriate

3  accommodations.

4          So anything else that -- any questions you would have

5  before we excuse the alternate and let everybody go?  Is

6  everybody healthy?  Can I excuse the alternate, or is someone

7  -- think they can't make it?  You all look healthy.  All right.

8  So any questions at all?  You ready to go back and -- and start

9  deliberating?  Okay.

10          So you can just -- the alternate -- do you have any

11  -- do you have your -- anything back in that room?

12          ALTERNATE JUROR:  No, I don't.

13          THE COURT:  Okay.  You can just stay here for a

14  second, we'll excuse the rest.  We'll give you the jury

15  instructions and those -- all these exhibits will be back and

16  we will be available if there's any questions, otherwise it's

17  up to you, okay?  Thank you.  Now you can take your notes with

18  you.

19                    (Pause)

20      (Jury excused for deliberations at 10:34 a.m.)

21          THE COURT:  And you, sir, I just wanted to thank you

22  for sitting through this.  I know it's -- you're going to be

23  just as curious as everybody else, but thank you very much and

24  you're free to go and we just appreciate your service, okay?

25  And Lynn, I think that he's -- he can just walk out the door,

1  can't he?

2         THE CLERK:  Let me call Carolyn.

3         THE COURT:  (Indiscernible - simultaneous speakers)

4  if you have any questions for Carolyn, you can ask her and make

5  sure she has your address and everything so she can take care

6  of you.  I think you're free to go.  Why don't you just go back

7  and -- at the main room and see if Carolyn has any questions

8  for you.  But again, thank you very much.  Counsel, any reason

9  I can't excuse the alternate?

10        MR. BARKELEY:  No, Your Honor.  Thank you.

11        MR. COHEN:  No, Your Honor.

12        THE COURT:  All right.  Good.  Thank you, sir.

13      (Alternate juror excused)

14        THE COURT:  Okay.  Well, we just need to get these

15 exhibits off -- counsel, you want to go make sure you've got

16 the exhibits before we roll them back?  And Mr. Barkeley, if

17 you can take care of the weapons?

18        MR. BARKELEY:  Yes, Your Honor.

19        MR. COHEN:  I was just saying that.  (Indiscernible -

20 away from microphone).

21        THE COURT:  And counsel, we need to make sure you

22 have your phone numbers, that you're accessible, that -- if

23 there's questions -- sometimes a question comes back and says

24 do we need -- we would like some more pencils.  I just deal

25 with that.  But if it's anything substantive, I notify counsel.